UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:07-HC-2042-FL

| | |
|---|---|
| UNITED STATES OF AMERICA | RESPONDENT'S PROPOSED |
| v. | FINDINGS OF FACT AND |
| | CONCLUSIONS OF LAW |
| BYRON ANTONE | |

Comes now the respondent, Byron Antone, by and through undersigned counsel, and

respectfully requests that the Court enter the following findings of fact and conclusions of law in

this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

I.     **INTRODUCTION**

Petitioner, the United States of America ("the Government") instituted this civil action on

February 23, 2007, seeking to commit Byron Antone ("Mr. Antone" or "Respondent") as a

sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006

("the Act").  18 U.S.C. § 4248. Docket Entry ("DE") 1.   The Government's petition states that

mental health personnel for the Federal Bureau of Prisons ("BOP") examined Respondent and

issued a preliminary determination that he is sexually dangerous within the meaning of the Act.

The petition stayed Respondent's release from federal custody pending a hearing to determine

whether Respondent qualifies for commitment as a sexually dangerous person.  The

1

Government's petition was filed four days prior to Respondent's scheduled date of release from BOP custody on February 27, 2007. *See id.*

An evidentiary hearing and bench trial is scheduled in this case before Magistrate Judge James E. Gates on October 20, 2011. On September 8, 2011, Magistrate Judge Gates directed the parties to file proposed findings of fact and conclusions of law by no later than October 7, 2011. After considering the testimony at the evidentiary hearing, the evidentiary record, and the parties' submissions, this Court concludes that the government has failed to establish by clear and convincing evidence that Respondent is sexually dangerous to others as required by the Act and the Constitution.

## II.    FACTS

1. Byron Antone is a 39-year old Native American male whose tribal heritage is Tohono O'odham. He was born in 1972 on the Tohono O'odham reservation, which is located in south central Arizona. Ex. 5 at 450.

2. At the time of his hearing, Mr. Antone will have been incarcerated for 1696 days, almost five years, past his scheduled release date of February 27, 2007. DE 1.

### A.    **Personal History**

3. Mr. Antone was raised by his mother, Betty Antone, other relatives and friends. Mr. Antone reports that he did not meet his father until he was 15 or 16 years old even though he was married to someone else on the reservation. Resp. Ex. 1 at 2. Mr. Antone has one sister, Jennifer, and one brother, Eric, but the paternity of these siblings is unknown. Ex. 5 at 450.

4. Mr. Antone had a very difficult childhood, and suffered verbal and physical abuse from his mother, who was an alcoholic. "Everybody was a drunk in my house." From the age of

9 or 10 years old, Respondent resided with his grandmother. *Id.* Respondent reports that his grandmother was also an alcoholic, and that he started drinking alcohol when he was about 11 or 12 years old. Resp. Ex. 1 at 2. "Everybody was always drunk." Respondent reports that not long after he started drinking alcohol, he began to have episodes where he could not remember what he had done the night before, characterizing these episodes "blackouts." *Id.* Antone explained that he started with the drug alcohol and then moved onto marijuana, huffing gas, cocaine, LSD, and PCP. *Id.* Antone described himself as a drug addict and an alcoholic.

5. In his late teens, Mr. Antone tried to kill himself at least three times. At the age of 16, Mr. Antone overdosed on an unidentified substance. *See* Ex. 5 at 452. At the age of 18, Mr. Antone hung himself, and at the age of 20 Mr. Antone stabbed himself in the chest. *See id.* Mr. Antone reports that these attempts were caused by abuse of alcohol and by feeling down on himself. Resp. Ex. 1 at 3.

6. After those attempts on his own life, Antone was never admitted into a psychiatric hospital for treatment. Resp. Ex. 1 at 3. However, over the eleven years of federal incarceration he has sought out counselors in the prisons and received treatment while incarcerated. Ex. 5 at 452.

7. Respondent was repeatedly molested by his aunt over the course of one year, when he was 7 years old. Mr. Antone was sexually abused at the age of 12 by a 26-year-old woman who was described as his sister's cousin. Ex. 5 at 450.

8. Mr. Antone completed the eighth grade and began the ninth grade before he was expelled his freshman year for drinking. Ex. 5 at 450. Mr. Antone received his GED while incarcerated, in addition to certification in a number of art, music, craft and vocational courses.

3

*See* Ex. 5 at 450-51; Resp. Ex. 1 at 3.  Mr. Antone not only learned to play guitar while in BOP custody, but also teaches basic guitar classes.  *See id.*

9.      Respondent has never been married.  However, Mr. Antone has been in two long-term adult relationships.  When he was 18 years-old, Mr. Antone dated a woman named Shawna for approximately a year.  Ex. 5 at 451.

10.      Prior to his incarceration in 1999, Mr. Antone had been in a relationship with Tanya McCloud for approximately six years.  Ex. 5 at 451.  At the time the relationship began, Mr. Antone was 23 years old and Ms. McCloud was 18.  *See* Ex, 2 at 2015.  The two lived together as a couple for over five years.  Mr. Antone and Ms. McCloud have one child, a son who is 14- years-old at this time.  *See id.*  Antone and Ms. McCloud's relationship deteriorated because of their abuse of alcohol and drugs. Although Antone does not have the same relationship with Ms. McCloud, he tries to keep in contact with his son by writing letters.  "He (my son) can't forget what I said in a letter like he could from a phone call." Resp. Ex. 1 at 2.

11.      As a person who had an extensive substance abuse history prior to incarceration, Respondent declares that he is a drug addict and alcoholic.  Antone has been tested for alcohol while at the prison hundreds of times. While other inmates have been positive for alcohol or illegal substances, Antone is proud that he has been negative.  Ex. 5 at 451; Resp. Ex. 1 at 2-3.

12.      Respondent attends Alcoholics Anonymous and Narcotics Anonymous meetings while incarcerated, as well as successfully completing a Drug Education Program and a non-residential substance abuse program while incarcerated at the United States Penitentiary in Florence, Colorado.  *See* Ex. 5 at 451.  Mr. Antone has been sober for the last twelve plus years. He intends to stay sober, clean and chemical free for the rest of his life. Resp. Ex. 1 at 3.

4

13.     Prior to incarceration, Mr. Antone was employed by the U.S. Forestry Service as a firefighter. He attended specialized training classes in firefighting and was in the process of being promoted prior to being arrested. Phenix Report at 2014.

**B.      Criminal and Sexual Offense History**

14.     According to the Presentence Investigation Report (PSIR) compiled by the United States Probation Office for the District of Arizona, at the time of the federal sentencing which led to the Respondent's incarceration in BOP custody, the Respondent had zero criminal history points. Ex. 8 at 86.

15.     Prior to the offenses leading to his incarceration in BOP custody, Respondent was convicted of the following charges: Disorderly Conduct on February 12, 1997 (at age 24); Unlawful Possession of Liquor by Consumption on February 12, 1994 (at age 21); Criminal Damage to Private Property on July 7, 1990 (at age 18); and Unlawful Possession of Liquor by Consumption on July 4, 1990 (at age 18). Ex. 8 at 86-88. During the time of committing all charges Antone was intoxicated.

16.     Respondent was also arrested on charges of Domestic Violence/Assault on April 16, 1992 (at age 19), but no criminal complaint was ever filed. *Id.* at 88.

17.     According to the PSIR, on March 16, 1999, the following charges (which were filed during a period of time from May 1990 to November 1997) were dismissed: 5 counts of disorderly conduct; 2 counts of threatening; 2 counts of child molestation; 1 count of sexual abuse; and 1 count of sexual assault. *Id.* at 86.

18.     On May 18, 1998, a charge of threatening (filed on February 17, 1997) was dismissed. *Id.*

19.     On April 10, 1991, the following charges (all filed on September 25, 1990) were dismissed: 1 count of statutory rape, 2 counts of contributing to the delinquency of a minor, 1 count of sexual assault and 1 count of disorderly conduct.  *See id.* at 87.

20.     On September 25, 1990, at the age of 18, Respondent pled guilty to one count of Sexual Abuse against a 16-year-old female victim.  *Id.*  The victim was the Respondent's girlfriend, who he manipulated into entering his house and then engaged in forcible sexual intercourse with her.  On prior occasions, the two had engaged in consensual sexual activity.  *See* Ex. 5 at 455.

21.     On February 28, 1998, Respondent was placed in custody by the Tohono O'odham Police on charges of a number of sexual and sex-related offenses.  Over the course of the resulting investigation, there were reportedly six female victims, ranging in age from 11 or 12-years-old to 21-years-old.  Ex. 5 at 455-56.

22.     Victim One (CR) - on November 8, 1997, Respondent's 21-year-old female cousin accompanied him to his room in order to watch a movie.  Respondent had reportedly been drinking alcohol and using cocaine.  Respondent reportedly tried to force himself on his cousin, and put his hand up her shirt and felt her breast.  Respondent's cousin fought him off and escaped out the bedroom window.    Respondent was 25-years-old at the time of this incident. Ex. 8 at 82; Ex. 5 at 455.

23.     Victim Two (V) - this incident is the conduct related above regarding Respondent's September 25, 1990 conviction for sexual abuse.  As noted above, the victim was 16 and Respondent was 18-years-old at the time of this incident.

24.     Victim Three (VR) - this victim was interviewed by the FBI on April 8, 1997, and indicated that approximately 5 years prior to the interview, Antone raped her.  The victim was 14 or 15-years-old at the time of this incident.

25.     Victim Four (TF) - this victim was interviewed on March 25, 1997, and stated that Respondent on one occasion when she was 13-years-old tried to fondle her genitals through her clothes and reached up under her shirt and touched her breast.  TF also reported that on February 17, 1997, while she was sleeping at her aunt's house, Respondent came in and began rubbing her butt over the blanket covering her.  TF was approximately 21-years-old according to the PSIR at the time of this incident.  Ex. 8 at 83.

26.     Victim Five (RA) - this victim reported that Respondent repeatedly molested her by fondling her genital area over and under her clothes.  This took place during the summer of 1996, when the victim was 11 or 12 years old and the Respondent was approximately 24-years-old.  Ex. 5 at 456.

27.     Victim Six - this victim reported that Respondent forced her to have sexual intercourse with her on one occasion in 1997.  The victim was 20-years-old and the Respondent was approximately 25-years-old at the time of this incident.  *See id.*; *see* Ex. 8 at 83-84.

28.     On March 16, 1999, Respondent pled guilty in Tohono O'odham tribal court to charges of Kidnaping and Sexual Assault as to Victim One; Kidnaping, Threatening, Sexual Abuse and Sexual Assault as to Victim Six; and Kidnaping, Threatening, Sexual Abuse and Sexual Assault as to Victim Three.  Respondent therefore pled guilty to a total of 10 charges, and was sentenced to 360 days incarceration on each charge, to be served consecutively, for a total

sentence of 3,600 days. The sentence was ordered to be served concurrently with related federal charges. *See* Ex. 8 at 86; *see also* Ex. 7.

29.     On June 2, 1999, a one-count criminal information was filed in the United States District Court for the District of Arizona, charging Respondent with Aggravated Sexual Abuse in violation of 18 U.S.C. §§ 1153 and 2241(a) and charging that Respondent "knowingly cause[d] another person to engage in a sexual act by using force against that other person . . . [by] directly touching the victim's breast and touching her genitalia through the clothing. . . ." *See* Ex. 12 at 1215.

30.     On June 28, 1999, Respondent pled guilty to the criminal information pursuant to a plea agreement which included a binding agreement to a sentence within the 108-114 month range. *See* Ex. 12 at 1218 ¶7.

31.     The United States District Court for the District of Arizona accepted the plea agreement and imposed a sentence of 114 months incarceration and five years supervised release on November 30, 1999. *See* Ex. 7. On February 18, 2000, the District Court Ordered that the federal sentence imposed run concurrently with the sentence imposed by the Tohono O'odham Tribal Court. *See* Ex. 11.

**C.     Bureau of Prisons Disciplinary History**

32.     According to the BOP Forensic Evaluation report dated May 29, 2007, Respondent has been sanctioned for the following code violations: Assaulting any Person (2004); Failing to Stand Count (2001); Using Phone or Mail without Authorization (2000); and Fighting with Another Person (2000). *See* Ex. 5 at 456.

33. On September 12 2008, a search of Mr. Antone's cell discovered eight pictures of adult women dressed in swimsuits and undergarments cut out of magazines; three copies of magazines that contained semi-nude images of adult women; and a novel titled "The Contestants" that contained written depictions of adults engaging in sexual activity. *See* Ex. 23. No disciplinary actions were taken.

34. On August 11, 2006 and October 4, 2006, the Warden of USP Atwater, CA rejected copies of Maxim magazine intended for Respondent on the grounds that the publication could pose a threat to the security, good order or discipline of the institution. *See* Ex. 21-22. No disciplinary actions were taken.

### D. Sex Offender Treatment

35. Respondent has not participated in the BOP's Sex Offender Treatment Program (SOTP). Antone requested treatment through his attorney, Allen Duprey. Mr. Antone was never afforded treatment before he was supposed to be released from the BOP. Respondent has never participated in sex offender treatment outside of the BOP.

### E. Current Status

36. On February 23, 2007, the United States filed the instant proceedings seeking to commit Mr. Antone as a sexually dangerous person under the Adam Walsh Act, 18 U.S.C. § 4248. DE 1. This was four days before he was supposed to be released after completing his federal sentence.

37. Respondent's commitment proceeding was stayed for almost two years while the appellate courts analyzed the constitutionality of section 4248 of the Adam Walsh Act. DE 13 (Order to Stay filed Sep. 26, 2007); DE 22 (Order Lifting Stay filed June 11, 2010). At the time

of this filing, Mr. Antone will have been held in the custody of the BOP for almost five years after his scheduled release date.

## III. EXPERT'S QUALIFICATIONS

38.     The government filed the curriculum vitae (C.V.) of Dr. Manuel E. Gutierrez, Psy.D., as a government expert on January 6, 2011.  DE 48.  Dr. Gutierrez is an employee of the Psychology Services department of Federal Correctional Complex - Butner (FCC-Butner), where Respondent (and all those currently undergoing 4248 proceedings) is currently housed.  Dr. Gutierrez  reviewed Respondent's records but did not conduct an interview of Mr. Antone.

39.     The government also filed the C.V. of Dr. Amy Phenix, Ph.D., on January 6, 2011 as a retained government expert.  Dr. Phenix originally reviewed Respondent's records and filed an evaluation of Mr. Antone dated October3, 2010.  Dr. Phenix subsequently interviewed Respondent on April 12, 2011.  Dr. Phenix submitted a 51 page evaluation of Respondent on September 8, 2011.

40.     Respondent filed notice of his Mental Health Examiner, Dr. Roy Daum, Psy.D., on March 7, 2011.  *See* DE 56.  Respondent filed Dr. Daum's C.V. and moved for his appointment as a mental health examiner on June 1, 2011.  Dr. Daum reviewed Respondent's records and conducted an interview of Respondent.

41.     The Parties did not challenge the qualifications of any of the above experts.  The Court, having reviewed the curriculum vitae of the experts and their reports, and having heard their testimony, finds that each individual is qualified by education, skill and experience to offer expert testimony in this matter.

## IV.    LEGAL PRINCIPLES

### A.    Section 4248 Violates Equal Protection

42.    As a preliminary matter, this Court finds that § 4248 deprives Respondent of equal protection of the law under the Fourteenth and Fifth Amendments because there is no rational basis for § 4248's differentiation between individuals in BOP custody and individuals in the general public. *Incorporated by reference, United States v. Timms,* 5:08-HC-01256-BO (Eastern District of North Carolina, filed July 1, 2011).

### B.    Delay in the Proceeding Violated Respondent's Due Process Rights

43.    This Court also finds that Respondent was deprived of his due process rights under the Fifth Amendment of the United States Constitution because the government failed to bring Respondent before the court for a civil commitment hearing within a reasonable time after they filed the petition seeking commitment pursuant to § 4248. *Id.*

### C.    Standard of Proof and Elements Required to be Established

44.    The government has the burden of proving each element by clear and convincing evidence. 18 U.S.C. § 4248(d). "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity" that this standard is required not only by the Act, but by the Due Process clause of the Constitution." *Addington v. Texas*, 441 U.S. 418, 427 (1979). The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." *Id.* at 425. "'Clear and convincing' has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001)(internal

11

quotations and citations omitted).  It has alternatively been described "as meaning 'highly probable.'"  *Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 810 n.7 (4th Cir. 1992) (quoting 9 J. Wigmore, Evidence § 2498 (3d ed. 1940)).

45.	To commit Respondent, the government must prove by clear and convincing evidence that Respondent is a "sexually dangerous person," which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."  18 U.S.C. § 4247(a)(5).  An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(6).

46.	This phrase has not been defined by the statute.  The legislative history indicates that it is a direct legislative enactment of the principle of volitional impairment enunciated in *Kansas v. Hendricks*, 521 U.S. 346 (1997) and *Kansas v. Crane*, 534 U.S. 407 (2002).  *See,* H.R. Rep. No. 109-218(I) Section-by-Section Analysis and Discussion § 511.  In *Crane*, the Supreme Court stated that the "serious difficulty" requirement is intended to distinguish the "dangerous sexual offender whose mental illness, mental abnormality or mental disorder subjects him to civil commitment, from the dangerous, but typical, recidivist convicted in an ordinary criminal case who, having been convicted and punished for one crime, proceeds through his own free choice to commit another." *Crane*, 413.

47.	A finding of dangerousness is also constitutionally required.  *Kansas v. Crane*, 534 U.S. 407-409, 410 (stating "we have consistently upheld involuntary commitment statutes . . . [when] (1) the confinement takes place pursuant to proper procedures and evidentiary standards;

(2) there is a finding of 'dangerousness either to one's self or others,' and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality'" (*citing Kansas v. Hendricks*, 521 U.S. 346, 357-358; quotations omitted)). *See also Foucha v. Louisana*, 504 U.S. 71, 82-83 (1992).

48.     The Court finds that in this regard, the statute and due process considerations require that, in addition to a volitional impairment, the government must prove by clear and convincing evidence that Respondent poses a risk of reoffense that is significant enough to justify a finding that Respondent is sexually dangerous and therefore can be preventively detained.

49.     In this case the government has proven neither.  The evidence in this case does not demonstrate that Respondent currently suffers from a volitional impairment.  The evidence also demonstrates that the recidivism rates proposed by the government's experts are likely overestimates.  Further, even if this Court were to credit the government's experts regarding Respondent's likelihood of recidivism, the statistical evidence presented does not rise to the level of clear and convincing evidence of dangerousness sufficient to justify commitment.

V.     **FINDINGS**

   A.     <u>**Prior Bad Acts**</u>

50.     Mr. Antone does not dispute his sexual history nor the charges placed by the victims.  This Court finds that the government has established this element by clear and convincing evidence.

**B.** **Suffers from a Serious Mental Illness, Abnormality or Disorder**

51.     All of the experts who have evaluated Mr. Antone agree that he suffers from a certain mental illness, abnormality or disorder.  However, they disagree as to the types of conditions from which Respondent suffers as well as the severity.

52.     Dr. Daum diagnosed Respondent as suffering from Polysubstance Dependence, Frotteurism, and Borderline Personality Disorder with Antisocial Features.

53.     Dr. Gutierrez diagnosed Respondent as suffering from Polysubstance Dependence in a Controlled Environment, Paraphilia Not Otherwise Specified ("NOS") (Non-consent and Hebephilia), and Antisocial Personality Disorder.

54.     Dr. Phenix diagnosed Respondent as suffering from Paraphilia NOS (Non-Consent), Alcohol Dependence in a Controlled Environment, Depressive Disorder NOS, and Antisocial Personality Disorder.

55.     This Court finds that the government has not established by clear and convincing evidence that the Respondent suffers from a serious mental illness, abnormality or disorder that impairs his volitional control such that he would have serious difficulty refraining from sexually violent conduct or child molestation if released.

**C.** **Serious Difficulty Refraining from Sexually Violent Conduct or Child Molestation**

56.     In order to commit Mr. Antone, the government must prove that the disorder results in "serious difficulty refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(6).  As discussed previously, this term implies a volitional impairment.

14

57.     The DSM-IV-TR is clear that the fact that someone has been diagnosed with a

mental illness or disorder does not answer the question of whether that person's volition is

impaired.  The manual states:

> It is precisely because impairments, abilities and disabilities vary widely within
> each diagnostic category that assignment of a particular diagnosis does not imply a
> specific level of impairment or disability.  The fact that an individual's
> presentation meets the criteria for DSM diagnoses does not carry any necessary
> implications regarding the individual's degree of control over the behaviors that
> may be associated with the disorder.  Even when diminished control over one's
> behavior is a feature of the disorder, having the diagnosis in itself does not
> demonstrate that a particular individual is or was unable to control his or her
> behavior at a particular time.

DSM-IV-TR at page xxxiii.

58.     This Court finds that the government has not shown by clear and convincing

evidence that Respondent currently presents a serious mental illness, abnormality or disorder that

impairs his volitional control such that he would have serious difficulty refraining from sexually

violent conduct or child molestation if released.

## VI.     DANGEROUSNESS/RISK ASSESSMENT

### A.     <u>Introduction</u>

59.     All of the experts in this case conducted a risk analysis based on empirical tools

and actuarial instruments to evaluate, quantify, and support their dangerousness determination.

60.     All of the experts agree that no psychological tests or actuarial instruments have

been developed that predict with certainty an individual's risk of future sexual offending

15

behavior. The actuarial instruments provide only group prediction rates on risk of reoffending. These instruments do not provide individual rates of reoffending. *Id.*[1]

61.     In their evaluation of Respondent, all three experts utilized a clinical analysis in combination with actuarial instruments to determine if Mr. Antone poses a serious risk of reoffending.

62.     Three expert opinions were offered by the Parties on the issue of whether Mr. Antone meets the criteria for commitment pursuant to 18 U.S.C. 4248.  Dr. Gutierrez and Dr. Phenix wrote for the government and both opined that Mr. Antone is a sexually dangerous person within the meaning of the statute.  Dr. Daum wrote for the Court and opined that Mr. Antone is not a sexually dangerous person and does not pose a serious risk of reoffending if released.

63.     For the reasons set forth below, the Court finds that the government has not established by clear and convincing evidence that Respondent suffers from a serious mental illness, abnormality or disorder that impairs his volitional control and would result in him having difficulty refraining from sexually violent conduct or child molestation.

---

[1] The risk instruments are based on group data and provide risk estimates of defined sample groups to which an individual is compared.  "The recidivism rates contained in the actuarial tables are the product of the amalgamated risk characteristics of the group and, therefore cannot be ascribed to a particular individual since the risk factors for the individual may vary substantially from that of the group."  Theodore Donaldson and Brian Abbott, *Prediction in the Individual Case: An Explanation and Application of its Use with the Static-99R in Sexually Violent Predator Risk Assessments,* American Journal of Forensic Psychology, Volume 29, Issue 1, at 7 (2011).

**B. Expert Opinions**

    **1. Dr. Manuel E. Gutierrez**

64.    Dr. Gutierrez evaluated Respondent on behalf of the Government and authored two reports, dated May 29, 2007 and September 13, 2010. He opined that based on his review of Respondent's records, Mr. Antone meets the criteria of a sexually dangerous person based on 18 U.S.C. 4248. Dr. Gutierrez did not conduct a clinical interview of Respondent. Ex. 5 at 448.

65.    Dr. Gutierrez opined that Respondent suffers from Paraphilia - NOS (Nonconsent and Hebephilia). He defined Hebephilia as "sexual attraction to adoloescents, or minors that are pubescent/postpubescent but not of consenting age)." Ex. 5 at 457-58.

66.    According to Dr. Gutierrez, the essential features of a paraphilia under the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision ("DSM IV-TR") are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving (1) nonhuman objects, (2) the suffering or humiliation of oneself or one's partner, or (3) children or other nonconsenting persons that occur over a period of at least six months. Ex. 5 at 457.

67.    Dr. Gutierrez further opined that the DSM-IV-TR allows for a diagnosis of Paraphilia-NOS to account for paraphilias that do not meet the criteria for a specific category. *Id.*

68.    Based on Mr. Antone's history, Dr. Gutierrez noted that Respondent has engaged in nonconsensual sexual intercourse with a number of females. Ex. 5 at 458. Dr. Gutierrez also noted that Respondent appeared to be sexually attracted to underage females. Based on these

criteria, Dr. Gutierrez diagnosed Respondent with Paraphilia NOS, with Nonconsent[2] and

Hebephilia[3] specified for the purpose of diagnostic clarity.  *Id.*

69.     Dr. Gutierrez also cited in his report to a psychophysiological examination

conducted in July and August 1999 of Respondent by Dr. Steven Gray and Mr. Stephen Sadler.

*See id.* at 452.

70.     As part of their evaluation, Dr. Gray and Mr. Sadler administered a number of

psychological tests to measure Respondent's sexual attraction to children, adolescents and adults.

Dr. Gray and Mr. Sadler concluded that Respondent showed significant sexual interest in

[2]  There is disagreement among experts in the field of forensic psychology as to the validity of a diagnosis for Paraphilia NOS on the basis of non-consenting victims.  *See* Thomas K. Zander,  "Commentary: Inventing Diagnosis for Civil Commitment of Rapists," Journal of the American Academy of Psychiatry and the Law, Vol. 36 No. 4 (2008).  As noted by Dr. Zander in his article, "No edition of the DSM has ever included a specific diagnosis for which the criteria included nonsadistic rape." *Id.* at 461.  Dr. Zander further discusses the proposal beginning in 1983 to introduce a specific diagnosis for "paraphilic coercive disorder" into the DSM-III-R. The proposal would have created a specific diagnosis for a paraphilia whose diagnostic criteria would have encompassed coercive sexual urges and fantasies involving a nonconsenting victim, and that the individual diagnosed acted upon the urges and fantasies or was markedly distressed by them. *Id.*  The proposed diagnosis faced strong opposition from within the field of forensic psychology and psychiatry. *See id.* at 462.  The diagnosis was eventually rejected by the APA Board of Trustees. *See id.*  Dr. Zander further notes that "The history and text of DSM following the APA's rejection of PCD does not suggest any intent that the diagnostic concept it embodied be used even within the [Paraphilia - Not Otherwise Specified] miscellaneous category. . . ." *Id.*

[3]  There is similarly disagreement among experts as to the validity of a diagnosis of Paraphilia-NOS Hebephilia.  *See, e.g.*, Allen Frances, MD and Michael B. First, MD, "Hebephilia Is Not a Mental Disorder in DSM-IV-TR and Should Not Become One in DSM-5" Journal of the American Academy of Psychiatry and the Law, Vol. 39 No. 1 (2011).  The authors note that "The numerous conceptual problems with the diagnosis of hebephilia and the extreme limitations of its research base have already been well described by authorities in the sexual disorders field." *Id.* at 79.  After extensive discussion of the limitations and problems with the diagnosis, the authors conclude "Hebephilia is not a paraphilia, because the sexual arousal patter that would define it is not inherently deviant.  Normal men have fantasies and urges in response to pubescent targets; acting on such attractions is a serious crime, not a mental disorder.  Beyond this seemingly conclusive conceptual obstacle, the research support for hebephilia is remarkably undeveloped, weak, and unconvincing." *Id.* at 84.

adolescent and adult females, but showed no interest in preschool females, pre-adolescent females, or males of any age.  Respondent also showed no interest in sexually sadistic behavior.  Ex. 5 at 452-53.

71.     Dr. Gray and Mr. Sadler noted that Respondent's greatest sexual interest was in females between the ages of 14 and 17.  However, they also cautioned that normal heterosexual adult males showed objective sexual interest in adolescent and adult females.  *Id.*

72.     Dr. Gutierrez also noted that Respondent had a long history of abuse of multiple substances.  Dr. Gutierrez opined  that it was probable Respondent would still be abusing substances were it not for his incarceration, and so applied a diagnosis of Polysubstance Abuse in a Controlled Environment.  *Id.* at 458.

73.     Dr. Gutierrez also noted that a diagnosis of Antisocial Personality Disorder ("ASPD") is assigned when there is a pervasive pattern of disregard for and violation of the rights of others.  The individual must be at least 18 years old at the time of diagnosis, and there must be evidence of Conduct Disorder before the age of 15.  Although Dr. Gutierrez notes that there is no official diagnosis of Conduct Disorder in the record, he opines that Respondent met the criteria for such a diagnosis before the age of 15, based on Respondent's school and juvenile court record.  He therefore applies a diagnosis of ASPD to Respondent.  *Id.*

74.     In his original report, dated May 29, 2007, Dr. Gutierrez assessed Respondent's record using two actuarial measures - the Rapid Risk Assessment for Sex Offender Recidivism (RRASOR) and the Static-99.  Ex. 5 at 459.  Both instruments measure an individual's responses on a number of identified risk factors and compare the individual's score to the scores of others in a group whose recidivism rate is known.  *Id.*

75.     On the RRASOR, which measures only four risk factors[4], Dr. Gutierrez scored Respondent as a 4 out of a maximum score of 6.  According to Dr. Gutierrez, a score of 4 on the RRASOR is associated statistically with about a 33% likelihood of reconviction for a sexual offense within 5 years of release from incarceration, and a 49% likelihood for reconviction within 10 years.  Ex. 5 at 459.

76.     Dr. Gutierrez also scored Respondent on the Static-99 actuarial instrument, which includes the same four factors utilized by the RRASOR and adds six other items.[5]  On the Static-99, Dr. Gutierrez scored Respondent as a 6, on a scale from 0-12.  According to Dr. Gutierrez, a score of 6 statistically corresponds with about a 39% likelihood of reconviction within five years, approximately a 45% likelihood of reconviction within 10 years, and a 52% likelihood within 15 years.  Ex. 5 at 459-60.

77.     Dr. Gutierrez opined that Respondent's diagnoses of Paraphilia NOS and APSD each qualified as a serious mental illness, abnormality, or disorder that would cause him to experience serious difficulty in refraining from sexually violent conduct or child molestation, and that Respondent therefore should be considered a sexually dangerous person under the Adam Walsh Act[6].  Ex. 5 at 460.

---

[4]  The risk factors on the RRASOR are whether the individual's age is less than 25 years old at time of assessment, prior sexual offenses, whether the individual had unrelated victims, and whether the individual had male victims.

[5]  The additional items considered on the Static-99 are: whether the individual has lived with a lover for more than two years; a conviction for a non-sexual crime of violence at the time of the index offense; any prior convictions for non-sexual violence; the number of prior sentencing dates; prior convictions for non-contact sexual offenses; and the presence of stranger victims.

[6]  As the government's own expert has opined, however, a diagnosis of ASPD is insufficient in itself to support civil commitment for sexual dangerousness.  *See* Jack Vognsen,

78.     On September 13, 2010, Dr. Gutierrez filed an update to his original report.  In the update, he noted that the designers of the Static-99 instrument now recommend that an updated version, the Static-99-Revised, or Static-99R, be utilized instead of the Static-99.  The Static-99R was revised in part to make more allowance for the individual's age at the time of assessment, based on studies that older sexual offenders are at lower risk of recidivism than younger offenders.  Ex. 6 at 1919.

79.     Dr. Gutierrez also noted that the Static-99R was also revised to compare the individual tested to preselected samples of offenders determined to be most similar to the individual being evaluated.  In this case, Mr. Antone was compared to the High Risk/High Needs Group sample - the sample with the highest rates of recidivism.  Ex. 2 at 2035.

80.     Utilizing the Static-99R, Dr. Gutierrez again scored the Respondent as a 6 on a scale from 0-12.  Offenders from the High-Risk/High Needs Group with a score of 6 have been found to be associated with a recidivism rate of 31.2% within five years and 41.9% within ten years.  Ex. 6 at 1919.

81.     Dr. Gutierrez again opined that Respondent should be considered a sexually dangerous person within the meaning of the Adam Walsh Act.  Ex. 6 at 1919.

---

Ph.D and Amy Phenix, Ph.D, "Antisocial Personality Disorder is Not Enough: A Reply to Sreenivasan, Weinberger, and Garrick," Journal of the American Academy of Psychiatry and the Law, Vol. 32 No. 4 (2004).  As noted in that article, "An antisocial personality disorder diagnosis indicates the presence of general criminality. . . However, the definition of an antisocial personality disorder does not demand the presence of sexual abnormalities, although it is possible for any criminally or noncriminally oriented person to commit sexual misbehavior and violate the law." *Id.* at 441.  The authors conclude that "individuals who have serious difficulty controlling their emotions and volition in such a manner that they repeatedly commit criminal sexual acts must undoubtedly have a paraphilia." *Id.*  In the absence of such a paraphilia, ASPD in itself is insufficient to support a conclusion of sexual dangerousness and involuntary civil commitment under § 4248.

21

## 2. Dr. Amy Phenix

82. Dr. Amy Phenix performed a record evaluation of Respondent on behalf of the Government and authored a report dated October 3, 2010. Ex. 2. Dr. Phenix opined that Respondent met the criteria for involuntary commitment as a sexually dangerous person under 18 U.S.C. § 4248.

83. Dr. Phenix subsequently conducted a clinical interview of Respondent on April 12, 2011 and filed a second report and evaluation on September 8, 2011. Ex. 3. Dr. Phenix again opined that Respondent met the criteria of a sexually dangerous person under 4248.

84. In her original evaluation, Dr. Phenix diagnosed Respondent as having four separate mental disorders: Paraphilia NOS (Non-consenting Females), Alcohol Dependence in a Controlled Environment, Depressive Disorder NOS, and Antisocial Personality Disorder (ASPD). See Ex. 2 at 2030.

85. With respect to Paraphilia NOS, Dr. Phenix noted that Respondent committed six acts of forced sexual activity with non-consenting females ranging in age from 12 to 20 years old. Because two of these acts occurred while Respondent was living with his girlfriend (the mother of his child), Dr. Phenix opined that Respondent committed these two acts of non-consensual sexual activity when a consenting sexual partner was available. Dr. Phenix also opined that although Respondent was acquitted of two charges of sexual assault brought against him that these acts very likely occurred as described. *See id.* at 2030-31.

86. With respect to Alcohol Dependence, Dr. Phenix noted that substance abuse is defined in the DSM-IV as a "maladaptive pattern of substance abuse leading to clinically significant impairment or distress," marked by three or more occurrences of certain factors within

a 12-month period.  The factors include increased tolerance for a substance leading to increased use or diminished effect with continued use of the same amount; withdrawal; use of larger amounts of the substance than intended or over a longer period than intended; persistent desire or unsuccessful attempts to reduce or control use; great deal of time spent in activities necessary to obtain the substance; reduction or loss of important social, occupational or recreational activities because of substance use; and/or continued use despite recognition of physical or psychological problems cause by substance use.  *See id.* at 2031.

87.     Dr. Phenix noted that Respondent admitted to beginning heavy alcohol use at the age of 12, and substantial use on a daily basis.  Respondent admitted to symptoms of blackouts and increased tolerance to alcohol, and that he believed he needed treatment for alcohol abuse. Dr. Phenix also opined that Respondent's alcohol abuse contributed to his sexual offending by disinhibiting his deviant sexual arousal.  *Id.*

88.     Dr. Phenix also opined that it was likely that Respondent suffered from drug abuse or dependence in addition to alcohol, but that there was insufficient information to support a diagnosis of Polysubstance Abuse.  *Id.*

89.     With respect to her diagnosis of Depressive Disorder Not Otherwise Specified, Dr. Phenix noted that this disorder is diagnosed when depressive features are present that do not meet the criteria for other depressive disorders, such as major depressive disorder.  Dr. Phenix further noted that Respondent had a history of three suicide attempts beginning at age 16, and that he has experienced other symptoms of depression in the past.  Respondent currently receives an antidepressant medication in the BOP.  *See id.* at 2032.

90.     With respect to Antisocial Personality Disorder, Dr. Phenix opined that

Respondent does have the requisite evidence of conduct disorder occurring prior to age 15.  Dr.

Phenix cites to Respondent's school and juvenile court history, and the fact that he started

drinking at the age of 12.  Dr. Phenix also cites to Respondent's history of violence and sexual

violence, including one fight with an inmate in October of 2004.  *See id.* at 2033.

91.     Dr. Phenix also performed a risk assessment of Respondent using multiple

actuarial instruments - in her case, the Static-99R, the Static-2002R[7], and the Minnesota Sex

Offender Screening Tool - Revised, or Mn-SOST-R.  *Id.* at 2034.

92.     Dr. Phenix noted that the developers of the Static-99 recommend that the Static-

99R replace the older test in all contexts where the Static-99 was used.  She also noted that the

---

[7] In 1999, Dr. Karl Hanson, a statistical researcher with the Canadian Office of Public
Safety, developed the Static-99, an actuarial instrument consisting of ten factors.  The ten factors
are: whether the offender is younger than 25 years old, whether the offender ever lived with a
lover for at least two years, index non-sexual violence, prior non-sexual violence, number of
prior sentencing dates, any unrelated victims, any stranger victims, and any male victims.  The
Static-99 scores the offender on a scale from 0 to 12.  Each score is associated with a risk level
(i.e. high, medium, low).  Each score was also associated with a percentage of recidivism over 5
years, 10 years, and 15 years.  Dr. Hanson derived the original recidivism percentages associated
with each score on the Static-99 by retrospectively scoring the instrument on a group of 1,086
offenders released from incarceration in Canada and the United Kingdom between 1958 and
1993 with known 5, 10, and 15 year recidivism rates after release.  The average age of these
1,086 individuals was 33.5 years old.  The Static-99 has been revised and replaced by the 99-R
and revised again in 2002.
   In the fall of 2008, the developers of the Static-99 issued new recidivism percentages
associated with the different scores on the instrument.  The prior recidivism percentages
associated with the original Static-99 were derived from sex offenders released from 1958 to
1993, these newer recidivism percentages are based on contemporary samples of sex offenders
who were released from incarceration in the 90s and after.  The new recidivism percentages
associate with the different scores on the Static-99 are substantially lower than the old recidivism
percentages.  (Hanson, R.K., Helmus, L. & Thornton, D. (2009) *"Predicting Recidivism
Amongst Sexual Offenders: A Multi-site study of Static-2002."*

Static-99R has been shown to have moderate accuracy in ranking sexual offenders according to their relative risk for sexual recidivism. *Id.*

93.     Dr. Phenix also noted that the norms used in scoring the Static-99R instrument are presented as percentile ranges which provide a relative ranking. Absolute degrees of individual recidivism risk cannot be directly inferred from these relative rankings. *Id.* at 2034-35.

94.     Dr. Phenix scored Respondent as a 6 out of a range of 0-12 on the Static-99R. She opined that this score placed Respondent in the 89.7 to 94.9 percentile of sex offenders ranked in the Static-99R samples. *Id.*

95.     Dr. Phenix also noted that the Static-99R samples were grouped in four categories: the routine sample group, the pre-selected for treatment group, the high-risk/high needs group, and the non-routine group. *Id.* at 2035. She noted that each group is based on various characteristics and has a different range of recidivism risk associated with it. For example, the high-risk/high needs group includes offenders identified through a quasi-judicial or administrative process, such as sentence extensions for dangerousness or denial of statutory release. It has the highest range of recidivism risk associated with it. *See id.* at 2037.

96.     Dr. Phenix noted that the routine sample (which has the lowest range of recidivism risk associated with it) will usually reflect the most appropriate recidivism rates as this sample is representative of typical sex offenders in correctional systems. Use of any of the other sample groups (non-routine, pre-selected for treatment, or high-risk/high needs) requires justification on the part of the evaluator. *Id.*

97.     Dr. Phenix opined that Respondent was most similar to the non-routine sample due to the presence of dynamic risk factors for sexual reoffending. *Id.* Based on comparison of

Respondent's score of 6 with other offenders in the non-routine sample, she concluded that offenders with this score from this group have been found to sexually re-offend at a rate of 24.7% in five years and 33.4% in ten years. *Id.*

98.     With respect to the Static-2002R, Dr. Phenix again noted that the developers of the revised instrument noted that it should be used in place of the prior Static-2002, in part because the revised instrument takes account of the relationship of age at release and sexual recidivism. *Id.* at 2038.

99.     In comparison to the RRASOR, which incorporates only four factors, and the Static-99 and 99R, which incorporate 10 factors, the Static-2002R incorporates 14 factors, divided into five categories of age, persistence of sex offending, deviant sexual interests, relationship to victims, and general criminality. *Id.*

100.     Dr. Phenix found that Respondent scored as a 6 on the Static-2002R, out of a range from -2 to 13. This score places Respondent in the Moderate risk category. *Id.*

101.     As with the Static-99R, individuals evaluated using the Static-2002R are compared to different sample groups in order to determine recidivism risk. As with the Static-99R, the high-risk/high needs group is associated with the highest recidivism rates, the preselected for treatment sample has intermediate recidivism rates, and the routine correctional sample had substantially lower recidivism rates. *See id.* at 2039-40. Again, use of the routine sample is usually most appropriate, and use of the other norms requires justification by the evaluator. *See id.* at 2040.

102.     Dr. Phenix compared Respondent's score of 6 on the Static-2002R to the non-routine sample group. Dr. Phenix did not offer any justification for use of this sample in her

report. *See id.* at 2040-41. Offenders in the non-routine sample with a score of 6 have been found to sexually re-offend at a rate of 20.5% over five years and 30.2% over ten years. *Id.* at 2041.

103. Dr. Phenix also used the Mn-SOST-R to evaluate Respondent's record. Dr. Phenix opined that the Mn-SOST-R has been shown to have moderate accuracy in predicting sexual recidivism, defined as likelihood of re-arrest for a contact sexual offense within the first six years of release from incarceration. The Mn-SOST-R places individuals into one of four risk categories - Low, Moderate, High, and Refer (for civil commitment review). *Id.* at 2041.

104. On the Mn-SOST-R, Dr. Phenix scored Respondent as a 15 in the High Risk category. According to the original norms utilized with the Mn-SOST-R, a score of 15 would be associated with a 72% likelihood of re-arrest for a sexual offense within six years. However, more recently updated norms suggest that the more accurate expected recidivism rate would be 40% within six years. *Id.* at 2041-42.

105. Dr. Phenix also evaluated dynamic risk factors using an instrument known as the STABLE-2007, in addition to the static risk actuarial instruments listed above. Dr. Phenix opined that Respondent showed evidence of dynamic risk factors due to the lack of positive social influences, the lack of significant intimate relationships, poorly controlled sexual impulses, lack of cooperation with supervision, and lack of general self-regulation. Dr. Phenix opined that Respondent did not show evidence of positive protective factors for time in the community without sexual offending, having less that 15 years left in his time at risk due to illness or physical conditions that significantly decrease the motivation or ability to sexually reoffend, or very advanced age. *Id.* at 2042-44.

106.    Dr. Phenix opined, in sum, that Respondent meets the criteria as a sexually

dangerous person under 18 U.S.C. § 4248.  *See id.* at 2045.

### 3.    Dr. Roy Daum

107.    Dr. Daum performed an evaluation on Respondent's behalf.  Dr. Daum both

reviewed Respondent's record and conducted a clinical interview of Mr. Antone on February 19,

2011.  Resp. Ex. 1 at 4.  Dr. Daum submitted a report dated March 1, 2011, concluding that Mr.

Antone does not meet the criteria for commitment as a sexually dangerous person under 18

U.S.C. § 4248.

108.    Dr. Daum diagnosed Respondent as suffering from three mental conditions:

Frotteurism, Polysubstance Dependence, and a principal diagnosis of Borderline Personality

Disorder with Antisocial Features.  *Id.* at 10.

109.    The diagnostic criteria for frotteurism set forth in the DSM-IV-TR require that the

individual so diagnosed have had, over a period of at least six months, recurrent, intense, or

arousing sexual urges or fantasies that involve touching and rubbing against a nonconsenting

person, and that the individual have acted upon these urges or fantasies, or that they cause the

person significant distress to the point that they are disruptive to everyday functioning.

110.    Dr. Daum noted that Respondent's sexual history shows evidence of charges and

convictions involving rape and frotteurism, but that the records show no evidence of sexual acts

with prepubescent girls, and Mr. Antone denies any fantasies of children or young teens.  Dr.

Daum opined that Mr. Antone's history and records supported a diagnosis of frotteurism.  *Id.* at 9.

111.    Dr. Daum further opined that Mr. Antone's history of alcohol and substance abuse

from an early age showed that use of these substances had a significant impact on his social,

occupational and recreational activities. Dr. Daum further opined that Mr. Antone had developed a tolerance requiring markedly increased amounts of these substances to achieve intoxication. Dr. Daum therefore concluded that Respondent met the criteria for a diagnosis of Polysubstance Abuse. *Id.* at 9-10.

112.    Dr. Daum also noted that Mr. Antone had a history of failing to conform to social norms and behaviors, citing Respondent's history of run-ins with the authorities at both the Federal and Tribal levels. Specifically, Dr. Daum noted that Mr. Antone has a long history of impulsivity linking substance abuse and sexual relations. Dr. Daum concluded that these behaviors best fit a diagnosis of Borderline Personality Disorder with Antisocial Features. *Id.* at 10.

113.    Dr. Daum, like Dr. Phenix, also utilized the Mn-SOST-R and the Static-99R actuarial instruments in order to assess Respondent's risk of recidivism for sexual offending. *See id.* at 7.

114.    On the Mn-SOST-R, Dr. Daum scored Respondent as a 4, placing Respondent in the moderate risk range. *See id.* at 7. Dr. Daum indicated that this score is associated with groups of similar individuals who reoffended at a rate between 19% and 46% over a period of six years. Dr. Daum also noted that this is only a comparison, and should not be interpreted as meaning this is Respondent's risk of sexual recidivism. *Id.*

115.    On the Static-99R, Dr. Daum scored Respondent as a 4, placing him in the Moderate-High-Risk category. Dr. Daum compared Respondent's score to the Preselected for Treatment group, rather than the Routine sample group. Dr. Daum opined that compared to the

Preselected for Treatment sample, individuals with a score of 4 were associated with a risk of recidivism of 12.3% over 5 five years, and 18.2% over ten years. *Id.*

116.   Dr. Daum was able to conduct a forensic interview of Mr. Antone, and reported that Respondent was cooperative with the process and provided details as requested. *Id.* at 8.

117.   When asked if he would have continued with sex offenses had he not been arrested, Mr. Antone reported that "I think as long as I was drinking and drugging, I would have done those things. I understand it was not about sex, it was about me being an alcoholic and not being in control of me." *Id.* at 8.

118.   When asked to explain why he had not completed a sex offender treatment program (SOTP) during his incarceration, Mr. Antone responded "I don't know why. Some places I went didn't have the program. I really don't know why. I was talking with some other brothers who are here and they said they were told they didn't qualify. I don't know what that means." *Id.* at 8.

119.   Dr. Daum opined that Mr. Antone would benefit from continued treatment to help him further understand his cycle of offending behavior, but further opined that such treatment could be achieved in an outpatient, community setting rather than incarceration. Dr. Daum also opined that based on his history of substance abuse and links between that and his sexual offending, Mr. Antone could benefit from continued substance abuse treatment centered around relapse prevention. *Id.* at 11.

120.   Dr. Daum concluded that Mr. Antone does not meet the criteria for commitment as a sexually dangerous person under 18 U.S.C. § 4248.

## VII.    CONCLUSIONS OF LAW

121.    The Court finds that § 4248 deprives Respondent of equal protection of the law under the Fourteenth and Fifth Amendments to the United States Constitution because there is no rational basis for § 4248's differentiation between individuals in BOP custody and individuals in the general public.

122.    The Court finds that Respondent was deprived of his due process rights under the Fifth Amendment of the United States Constitution because the government failed to bring Respondent before the Court for a civil commitment hearing within a reasonable time after they filed the petition seeking commitment pursuant to § 4248.

123.    The Court finds that Respondent has committed acts of sexual violence in the past.

124.    The Court finds that Respondent meets the diagnostic criteria for Alcohol Abuse, Frotteurism, and Antisocial Personality Disorder.

125.    The Court has considered the evidence for and against the validity of the diagnosis of Paraphilia-NOS-Nonconsent.  Given the lack of agreement among experts in the field as to the validity of this diagnosis, the Court finds that the government has failed to show, by clear and convincing evidence, that the Respondent suffers from this mental illness, condition or disorder.

126.    The Court has also considered the evidence for and against the validty of the diagnosis of Paraphilia-NOS-Hebephilia.  Given the lack of agreement among experts in the field as to the validity of this diagnosis, the Court finds that the government has failed to show, by clear and convincing evidence, that the Respondent suffers from this mental illness, condition or disorder.

127.     The Court finds that none of these mental illnesses, conditions or disorders carry the necessary implications regarding lack of volitional control.  The Court finds that the government has not proven by clear and convincing evidence that Respondent suffers from a volitional impairment such that he would have "serious difficulty refraining from sexually violent conduct or child molestation if released."

128.     The United States Supreme Court precedent makes clear that the "serious difficulty" language does not require total or complete lack of control, but does require that it must be difficult, if not impossible, for the individual to control his dangerous behavior.  *See* Kansas v. Crane, 534 U.S. 407, 411 (2002) (*citing Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)).  The conflicting evidence presented concerning the probability of Mr. Antone's reoffending cannot support a finding that he would have "serious difficulty" in refraining from acts of sexual violence.

129.     The Court has been presented with three opinions about Respondent's risk of reoffense in the event that he is released.  The Court has considered the information and finds this information relevant to its determination of Respondent's sexual dangerousness.  Having considered the reports, forensic evaluations, and testimony of the three experts in this case, the Court finds that the government has not proven dangerousness by clear and convincing evidence sufficient to justify commitment.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in this matter that Byron N. Antone is not a "sexually dangerous person" and order his release from the custody of the federal Bureau of Prisons.

Respectfully submitted this 7th day of October, 2011.

THOMAS P. McNAMARA
Federal Public Defender

/s/ Joseph L. Ross II
JOSEPH L. ROSS II
Assistant Federal Public Defender
Attorney for Respondent
Office of the Federal Public Defender
150 Fayetteville Street
Suite 450, Wachovia Capital Center
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Joseph_Ross@fd.org
Pennsylvania Bar No. 61722
LR 57.1 Counsel
Appointed

/s/ Robert E. Waters
Robert E. Waters
Assistant Federal Public Defender
Attorney for Respondent
Office of the Federal Public Defender
150 Fayetteville Street
Suite 450, Wachovia Capital Center
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Robert.waters@fd.org
North Carolina Bar No. 32985
LR 57.1 Counsel
Appointed