```
1              UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NORTH CAROLINA
2                  WESTERN DIVISION

3

4   UNITED STATES OF AMERICA,    )
                                 )
5                                )
                  PETITIONER,    )
6                                )
            VS                   ) CASE NO. 5:07-HC-2042-FL
7                                )
                                 )
8   BYRON NEIL ANTONE,           )
                                 )
9                 RESPONDENT.    )

10

11

12                     BENCH TRIAL

13                  OCTOBER 20, 2011

14          HONORABLE JAMES E. GATES, PRESIDING

15

16   APPEARANCES:

17        MR. JOSHUA ROYSTER
          ASSISTANT UNITED STATES ATTORNEY
18        310 NEW BERN AVENUE
          RALEIGH, NC   27601
19        (FOR THE GOVERNMENT)

20        MR. MICHAEL BREDENBERG
          ASSISTANT UNITED STATES ATTORNEY
21        310 NEW BERN AVENUE
          RALEIGH, NC   27601
22        (FOR THE GOVERNMENT)

23        MR. JOSEPH ROSS
          ASSISTANT FEDERAL PUBLIC DEFENDER
24        150 FAYETTEVILLE STREET
          SUITE 450
25        RALEIGH, NC   27601
          (FOR THE DEFENDANT)
```

```
 1   APPEARANCES:

 2        MR. ROBERT WATERS
          ASSISTANT FEDERAL PUBLIC DEFENDER
 3        150 FAYETTEVILLE STREET
          SUITE 450
 4        RALEIGH, NC   27601
          (FOR THE DEFENDANT)
 5
          MS. SONYA ALLEN
 6        ASSISTANT FEDERAL PUBLIC DEFENDER
          150 FAYETTEVILLE STREET
 7        SUITE 450
          RALEIGH, NC   27601
 8        (FOR THE DEFENDANT)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   SHARON K. KROEGER, COURT REPORTER
     MACHINE SHORTHAND REPORTER, COMPUTER AIDED TRANSCRIPTION
```

1                         I N D E X

2                         WITNESSES

3    NAME                 DIRECT  CROSS  REDIRECT  RECROSS

4    (FOR THE GOVT.)

| NAME | DIRECT | CROSS | REDIRECT | RECROSS |
|------|--------|-------|----------|---------|
| BYRON ANTONE | 20 | 49 | 93 | |
| CLEMENT GALLOP | 96 | | | |
| DR. AMY PHENIX | 102 | 196 | 235 | 240 |
| DR. MANUEL GUTIERREZ | 251 | 300 | 336 | 342 |
| ANDRE TAYLOR | 364 | | | |
| ALLAN DUPREY | 377 | 388 | 391 | |
| ANNE SCHAUDER | 394 | 405 | 407 | |
| DR. ROY DAUM | 409 | 477 | | |

5    BYRON ANTONE          20     49      93

6    CLEMENT GALLOP        96

7    DR. AMY PHENIX        102    196     235      240

8    DR. MANUEL GUTIERREZ  251    300     336      342

9    ANDRE TAYLOR          364

10   ALLAN DUPREY          377    388     391

11   ANNE SCHAUDER         394    405     407

12   DR. ROY DAUM          409    477

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  GOOD MORNING, FOLKS.

2          MR. ROYSTER:  GOOD MORNING.

3          MR. ROSS:  GOOD MORNING.

4          THE COURT:  WE ARE HERE FOR THE COMMITMENT

5   HEARING IN THE CASE OF UNITED STATES OF AMERICA VERSUS

6   BYRON NEIL ANTONE.

7          LET ME JUST BEGIN WITH AT LEAST ONE

8   HOUSEKEEPING MATTER, AND THAT IS THAT I DO INTEND TO

9   CONVENE COURT AT 9:00 TOMORROW, AND IF -- I HOPE THERE

10  AREN'T SUBSEQUENT DAYS OF HEARING, BUT IF THERE ARE,

11  WE'LL BEGIN AT 9:00.  AND MY INTENTION IS TO WORK UNTIL

12  AS CLOSE TO 5:00 AS POSSIBLE, PROBABLY NOT PAST 5:00

13  BECAUSE OF THE INCONVENIENCE FOR COURT STAFF.

14         WE'LL TAKE A MORNING BREAK AND WE'LL TAKE AN

15  AFTERNOON BREAK OF 10 TO 15 MINUTES EACH TIME.

16         ARE THERE ANY OTHER HOUSEKEEPING MATTERS THAT

17  COUNSEL WISH TO ADDRESS?

18         MR. ROYSTER:  THERE ARE, JUDGE.  THANK YOU.

19  FIRST, YOU HAVE A NOTEBOOK AT YOUR DESK WHICH INCLUDES

20  ALL OF THE GOVERNMENT'S EXHIBITS, AND INCLUDED IN THAT

21  NOTEBOOK ARE THE RESPONDENT'S EXHIBITS, SO WE HAVE ONE

22  NOTEBOOK THAT CONTAINS ALL THE EXHIBITS.

23         THE COURT:  VERY GOOD.

24         MR. ROYSTER:  ADDITIONAL FOLKS WITHIN THE

25  COURTROOM HAVE COPIES OF THAT AS WELL.

1          THE COURT:  NOW, IS THERE A SET OF THIS, MR.

2   ROYSTER, THAT HAS BEEN GIVEN TO THE CLERK, OR IS THIS THE

3   OFFICIAL SET?

4          MR. ROYSTER:  THAT IS A COPY FOR YOU.  THE

5   OFFICIAL SET HAS BEEN GIVEN TO THE COURT CLERK WHICH

6   INCLUDES THE ORIGINALS.

7          THE COURT:  OKAY.

8          MR. ROYSTER:  JUDGE, ON ANOTHER NOTE, THERE

9   ARE SOME WITNESSES THAT WERE SUBPOENAED YESTERDAY FROM

10  B.O.P. AND AT LEAST ONE OF THEM, I UNDERSTAND, IS HERE

11  THIS MORNING, AND HE HAS A FAMILY OBLIGATION TOMORROW,

12  AND I WANTED TO MAKE THE COURT AWARE OF THAT.

13          WE DO OBJECT TO ANY OPINION TESTIMONY FROM

14  HIM, BUT IF IT'S -- IF WE CAN, WE WOULD ASK THAT AND WE

15  WOULD BE WILLING TO TAKE HIM OUT OF ORDER, PERHAPS THIS

16  AFTERNOON, SO THAT HE CAN TAKE CARE OF HIS FAMILY

17  OBLIGATION TOMORROW THAT MAY REQUIRE HIM BEING INCLUDED

18  IN THE GOVERNMENT'S CASE.

19          HE IS A WITNESS THAT WAS SUBPOENAED BY THE

20  RESPONDENT.

21          THE COURT:  I ASSUME FROM YOUR COMMENTS THAT

22  IS TRUE.  I HAVE NO PROBLEM WITH TAKING WITNESSES OUT OF

23  ORDER.

24          MR. ROYSTER:  OKAY.  WE'LL THINK ABOUT THAT AS

25  WE GO THROUGH THE DAY, AND I WILL TALK WITH OPPOSING

1    COUNSEL ABOUT IT.

2           THE COURT:  MR. WATERS, IS THAT SATISFACTORY,

3    OR MR. ROSS?

4           MR. ROSS:  YES, WE DO KNOW THAT MR. GALLOP HAS

5    FAMILY OBLIGATIONS, AND THAT WOULD BE PLEASING.

6           THE COURT:  VERY GOOD.

7           MR. ROYSTER:  JUDGE, ONE OTHER MATTER THAT MAY

8    ASSIST WITH RESPECT TO THE PRESENTATION OF THE EVIDENCE

9    THIS MORNING IS YOUR RULING ON EXCLUDING INFORMATION FROM

10   DR. PHENIX'S REPORT.

11          THE COURT:  YES.

12          MR. ROYSTER:  I DID SEE IN YOUR ORDER THAT WE

13   NEEDED TO SUBMIT A JOINT STATEMENT.  I SAW A PROPOSED

14   JOINT STATEMENT YESTERDAY AFTERNOON AROUND 4:00 O'CLOCK.

15   I WAS ABLE TO LET THEM KNOW THAT WE DIDN'T AGREE TO THAT,

16   BUT I DIDN'T HAVE TIME TO RESPOND SO THAT WE COULD FILE A

17   JOINT STATEMENT.

18          WE BELIEVE THAT YOUR ORDER EXCLUDES CERTAIN

19   INFORMATION RELATING TO HER OPINIONS, BUT THAT IT DOES

20   NOT EXCLUDE FACTUAL INFORMATION THAT SHE GLEANED DURING

21   HER CLINICAL INTERVIEW.  IF YOU HAVE READ HER

22   SUPPLEMENTAL REPORT, YOU SAW THAT THERE WERE SEVERAL

23   SECTIONS THAT SAID THAT IN HIS CLINICAL INTERVIEW, HE

24   STATED X, Y AND Z.  WE DON'T BELIEVE THAT IS THE KIND OF

25   INFORMATION THAT SHOULD BE EXCLUDED FROM HER REPORT, BUT

1    IF YOU ARE GOING TO EXCLUDE THE FACTUAL INFORMATION FROM

2    THE CLINICAL INTERVIEW, THEN I MAY NEED TO CALL HIM FIRST

3    AS A WITNESS TO OBTAIN THAT INFORMATION.

4         SO PERHAPS SOME CLARITY ON THAT ISSUE WOULD BE

5    HELPFUL AT THIS POINT, UNLESS YOU WANT TO RESERVE RULING

6    FOR LATER.

7         THE COURT:  WELL, THE INTENTION OF THE ORDER

8    WAS TO EXCLUDE ANY MATERIAL, AND IT WAS WORDED IN TERMS

9    OF OPINIONS, BUT THAT TERM WAS MEANT TO SUBSUME ANY

10   FACTUAL INFORMATION THAT WAS NOT PREVIOUSLY ADDRESSED IN

11   DR. PHENIX'S INITIAL REPORT OR IN THE DEPOSITION.  I KNOW

12   WHAT IS IN HER INITIAL REPORT.  I DON'T KNOW WHAT WAS

13   COVERED AT HER DEPOSITION OBVIOUSLY BECAUSE I WASN'T

14   THERE AND DON'T HAVE A COPY OF IT.

15        MR. ROYSTER:  WELL, THEN I AM PREPARED TO FILE

16   IN OPEN COURT THIS MORNING A PROPOSED STATEMENT OF

17   OPINIONS TO BE EXCLUDED.  IT DOES NOT INCLUDE THAT

18   FACTUAL INFORMATION, BUT I WOULD LIKE TO HAND IT UP AT

19   THIS TIME, AND THEN I UNDERSTAND FROM YOUR RULING THAT

20   THE FACTUAL INFORMATION IS EXCLUDED AND I WILL TAKE THE

21   APPROPRIATE COURSE AS A RESULT OF THAT.

22        THE COURT:  OKAY.  THAT IS FINE.  OBVIOUSLY,

23   IF THE RESPONDENT BELIEVES THAT INFORMATION -- THAT A

24   QUESTION IS BEING ASKED THAT WOULD ELICIT INFORMATION

25   THAT IS SUBJECT TO EXCLUSION, IT WILL BE UP TO THE

1  RESPONDENT TO OBJECT TO THAT.

2          MR. ROYSTER:  SURE.  MAY I APPROACH?

3          THE COURT:  YOU MAY.  MR. WATERS.

4          MR. WATERS:  IF WE MAY BE HEARD, YOUR HONOR.

5  WE DID -- RESPONDENT DID ATTEMPT TO CONFER WITH THE

6  GOVERNMENT TO IDENTIFY A JOINT STATEMENT.  WE TRANSMITTED

7  TO THEM OUR STATEMENT IDENTIFYING THE PORTIONS OF THE

8  SUPPLEMENTAL REPORT THAT WERE NOT PREVIOUSLY DISCUSSED IN

9  DR. PHENIX'S ORIGINAL REPORT OR IN HER DEPOSITION,

10  INCLUDING THE FACTUAL INFORMATION AND BASES THAT WE

11  THOUGHT SHOULD BE EXCLUDED.

12          WE RECEIVED THE GOVERNMENT'S RESPONSE THAT

13  THEY COULDN'T AGREE TO IT AND WE FILED OUR STATEMENT, THE

14  RESPONDENT'S STATEMENT YESTERDAY AFTERNOON.  SO THAT

15  SHOULD BE BEFORE THE COURT --

16          THE COURT:  OKAY.

17          MR. ROSS:  -- IDENTIFYING EVERYTHING THAT WE

18  THINK SHOULD BE EXCLUDED.

19          THE COURT:  VERY GOOD.  THANK YOU, SIR.

20  MR. ROSS.

21          MR. ROSS:  WE HAVE ONE LAST MATTER BRIEFLY,

22  FOR THE RECORD, AS THE COURT KNOWS, WE HAVE FILED AN

23  APPEAL WITH THE FOURTH CIRCUIT AND IT IS BASED ON THAT WE

24  BELIEVE THAT THE FOURTH CIRCUIT HAS JURISDICTION.  WE

25  UNDERSTAND WHAT THE COURT'S ORDER IS AND WE ARE PREPARED

1    TO GO, BUT I THINK IT'S BEST THAT WE PLACE THAT ON THE

2    RECORD.

3                THE COURT:  THAT IS FINE, SIR.

4                MR. ROSS:  THANK YOU.

5                THE COURT:  ANYTHING ELSE, MR. ROYSTER?

6                MR. ROYSTER:  NOTHING FURTHER, YOUR HONOR, WE

7    ARE READY TO PROCEED.

8                MR. ROSS:  OKAY.

9                THE COURT:  WELL, LET'S BEGIN THEN.  MR.

10   ANTONE, SIR, I WANT TO BEGIN THE HEARING TODAY BY JUST

11   MAKING SURE YOU UNDERSTAND THE -- MAKING SURE THAT YOU

12   UNDERSTAND THE RIGHTS THAT YOU HAVE IN CONNECTION WITH

13   THIS HEARING THAT THE LAW EXPRESSLY PROVIDES YOU, AND I

14   AM SURE YOU HAVE COVERED THIS WITH YOUR COUNSEL, BUT I

15   WANT TO TAKE THIS OPPORTUNITY FOR COURT TO ADVISE YOU

16   EXPRESSLY.

17                YOU, OF COURSE, HAVE THE RIGHT TO BE

18   REPRESENTED BY COUNSEL, BY A LAWYER AT THIS PROCEEDING,

19   AND IF YOU ARE FINANCIALLY UNABLE TO OBTAIN ADEQUATE

20   REPRESENTATION, TO HAVE COUNSEL APPOINTED FOR YOU.  AND,

21   OF COURSE, YOU ARE REPRESENTED, IN FACT, BY APPOINTED

22   COUNSEL.

23                YOU ALSO HAVE THE RIGHT TO TESTIFY YOURSELF AT

24   THIS PROCEEDING IF YOU CARE TO DO SO.  YOU HAVE THE RIGHT

25   TO PRESENT EVIDENCE, THE RIGHT TO SUBPOENA WITNESSES,

1    THAT IS, THE RIGHT TO HAVE THE COURT ISSUE ORDERS CALLED

2    SUBPOENAS DIRECTING WITNESSES TO COME TO TRIAL, TO THE

3    HEARING THAT IS, SO THAT THEY MAY TESTIFY ON YOUR BEHALF.

4         YOU ALSO HAVE THE RIGHT TO CONFRONT WITNESSES,

5    AS WELL AS TO CROSS-EXAMINE THEM, CROSS-EXAMINATION

6    MEANING THE RIGHT TO ASK QUESTIONS OF WITNESSES WHO

7    APPEAR AT THE HEARING.

8         MR. ROYSTER, SIR, I WOULD BE HAPPY TO HEAR ANY

9    EVIDENCE THE GOVERNMENT CARES TO OFFER.

10        MR. ROYSTER:  YOUR HONOR, WILL YOU ALLOW A

11   BRIEF OPENING STATEMENT.

12        THE COURT:  YES.  I DIDN'T MEAN TO PASS OVER

13   THAT.  IF COUNSEL WOULD LIKE TO MAKE AN OPENING

14   STATEMENT, I WOULD BE HAPPY TO ENTERTAIN THAT.

15        MR. ROYSTER:  THANK YOU, SIR.

16        THE COURT:  MR. ROYSTER.

17        MR. ROYSTER:  JUDGE, FIRST OF ALL, I AM JOSH

18   ROYSTER, ASSISTANT UNITED STATES ATTORNEY.  I WANT TO

19   MAKE SURE YOU KNOW THAT MIKE BREDENBERG IS HERE.  HE IS

20   ASSISTING IN THIS CASE AS WELL.  HE IS A SPECIAL

21   ASSISTANT UNITED STATES ATTORNEY FROM BUTNER.

22        THE COURT:  VERY GOOD.

23        MR. ROYSTER:  JUDGE, THIS IS A CASE UNDER THE

24   ADAM WALSH ACT IN WHICH THE UNITED STATES SEEKS TO

25   CIVILLY COMMIT BYRON ANTONE AS A SEXUALLY DANGEROUS

1   PERSON.

2            TO PREVAIL, THE GOVERNMENT MUST SHOW BY CLEAR

3   AND CONVINCING EVIDENCE THAT MR. ANTONE HAS ENGAGED IN OR

4   ATTEMPTED TO ENGAGE IN SEXUALLY VIOLENT CONDUCT OR CHILD

5   MOLESTATION AND THAT HE IS SEXUALLY DANGEROUS TO OTHERS.

6   THAT MEANS UNDER THE STATUTE THAT HE SUFFERS FROM A

7   SERIOUS MENTAL ILLNESS, ABNORMALITY OR DISORDER AS A

8   RESULT OF WHICH HE WOULD HAVE SERIOUS DIFFICULTY

9   REFRAINING FROM SEXUALLY VIOLENT CONDUCT OR CHILD

10  MOLESTATION IF RELEASED.

11           BYRON ANTONE IS 39 YEARS OLD.  HE IS FROM THE

12  TOHONO O'ODHAM RESERVATION IN ARIZONA.  HE HAS COMMITTED

13  MULTIPLE ACTS OF SEXUALLY VIOLENT CONDUCT AND CHILD

14  MOLESTATION.  IT'S BELIEVED HIS FIRST SEX OFFENSE

15  OCCURRED IN 1989 WHEN HE WAS JUST 18 YEARS OLD.  THE

16  VICTIM WAS 13 AND SHE WAS IN THE EIGHTH GRADE.  HE

17  MOLESTED HER BY TOUCHING HER BREASTS AND GENITALIA OVER

18  HER CLOTHING.  HE ALSO TOUCHED HER BREASTS SKIN TO SKIN

19  WITH HIS HAND.

20           IN SEPTEMBER 1990 HE RAPED HIS 16 YEAR OLD

21  COUSIN AT HIS HOME.  THE ASSAULT IS REPORTED TO HAVE

22  LASTED FOR A HALF HOUR.

23           A COUPLE OF YEARS LATER, IN THE SUMMER OF '92

24  OR '93, HE RAPED ANOTHER COUSIN.  SHE WAS 14 OR 15 YEARS

25  OLD AT THE TIME OF THE ATTACK.  IT HAPPENED OUTSIDE

1    DURING THE NIGHT.

2              IN 1993, MR. ANTONE BEGAN DATING TANYA

3    MCCLOUD.  HE DATED HER FOR APPROXIMATELY SIX YEARS.  HE

4    HAS ADMITTED TO FORCING HER TO HAVE SEX WITH HIM ON

5    NUMEROUS OCCASIONS WHEN HE WAS INTOXICATED.

6              IN JULY OF '96 WHEN HE WAS 24 YEARS OLD, HE

7    MOLESTED A 12 YEAR OLD GIRL.  HE TOUCHED HER GENITALIA

8    OVER HER CLOTHING, AND THE VICTIM REPORTED THIS WAS THE

9    LAST TIME THAT HE TOUCHED HER, BUT HE HAD TOUCHED HER

10   LOTS OF TIMES BEFORE.

11             IN THE SUMMER OF 1997, MR. ANTONE, THEN 25

12   YEARS OLD, ATTEMPTED TO RAPE A 21 YEAR OLD FEMALE.  ON

13   THIS OCCASION THE VICTIM WAS HANGING OUT WITH HIM AT HIS

14   HOUSE WHILE HE DRANK AND USED COCAINE.  HE TRIED TO GET

15   HER TO HAVE SEX WITH HIM.  AND WHEN SHE REFUSED, HE HELD

16   HER HANDS DOWN WHILE HE TOUCHED HER BREASTS AND THEN

17   TOUCHED HER GENITALIA THROUGH HER CLOTHING.

18             HE UNBUTTONED HER PANTS, AND WHEN SHE YELLED

19   FOR HELP, HE TOLD HER TO SHUT UP AND HE PLACED HIS HANDS

20   OVER HER MOUTH AND SQUEEZED HER CHEEKS.  HE TOLD HER TO

21   LET HIM DO IT AND SHE WOULD LIKE IT.  SHE WAS ABLE TO GET

22   HIM OFF OF HER AND SHE JUMPED OUT OF THE BEDROOM WINDOW.

23             A FEW MONTHS LATER, IN NOVEMBER OF 1997, HE

24   RAPED YET ANOTHER WOMAN.  THIS TIME, A 21 YEAR OLD

25   FEMALE.  AS HE RAPED HER, HE HIT HER AND TOLD HER TO SHUT

1    UP.

2         AT LEAST SEVEN VICTIMS OF SEXUAL ASSAULT --

3    FOUR THAT HE RAPED, ONE HE ATTEMPTED TO RAPE, AND TWO

4    CHILDREN THAT HE MOLESTED THAT WE KNOW OF.

5         IN THE SUMMER OF 1997, HE WAS CONVICTED IN

6    FEDERAL COURT OF AGGRAVATED SEXUAL ABUSE RELATING TO A

7    SEXUAL ASSAULT OF THE WOMAN FROM THE SUMMER OF 1997

8    ATTEMPTED RAPE.  HE WAS SENTENCED TO 114 MONTHS IN PRISON

9    AND FIVE YEARS SUPERVISED RELEASE.

10        PRIOR TO HIS FEDERAL INCARCERATION HE HAD AN

11   EXTENSIVE ALCOHOL AND SUBSTANCE ABUSE PROBLEM.  YOU WILL

12   HEAR A FAIR AMOUNT ABOUT THAT DURING THE COURSE OF THE

13   TRIAL.  HE WAS DRINKING AT AGE 9, DRINKING HEAVILY BY AGE

14   12, USING MARIJUANA BY THE TIME HE WAS 13, AND USING

15   COCAINE WHEN HE WAS 16.

16        YOU WILL HEAR TESTIMONY FROM MULTIPLE EXPERTS

17   IN THIS CASE, JUDGE.  DR. PHENIX IS THE GOVERNMENT'S NON

18   B.O.P. EXPERT.  SHE HAS TESTIFIED IN CIVIL COMMITMENT

19   CASES ALL OVER THE COUNTRY AND IN SOME OF THE ADAM WALSH

20   TRIALS IN MASSACHUSETTS.

21        SHE HAS BEEN DOING THIS WORK FOR MORE THAN 15

22   YEARS.  SHE HAS DIAGNOSED MR. ANTON WITH PARAPHILIA NOT

23   OTHERWISE SPECIFIED, ANTI-SOCIAL PERSONALITY DISORDER,

24   AND ALCOHOL DEPENDENCE IN A CONTROLLED ENVIRONMENT.

25        DR. GUTIERREZ WILL ALSO TESTIFY.  HE IS A

1    B.O.P. PSYCHOLOGIST.  HE HAS CONDUCTED MANY OF THE

2    PRE-CERTIFICATION EVALUATIONS THAT HAVE LED TO THE FILING

3    OF A PETITION UNDER THE ADAM WALSH ACT IN THIS DISTRICT.

4         HE HAS ALSO DIAGNOSED PARAPHILIA NOT OTHERWISE

5    SPECIFIED AND ALSO POLYSUBSTANCE DEPENDENCE IN A

6    CONTROLLED ENVIRONMENT AND ANTI-SOCIAL PERSONALITY

7    DISORDER.

8         DR. PHENIX AND DR. GUTIERREZ WILL BOTH TESTIFY

9    THAT MR. ANTONE IS A SEXUALLY DANGEROUS PERSON UNDER THE

10   ADAM WALSH ACT.

11        DR. ROY DAUM IS THIS RESPONDENT'S CHOSEN

12   EXAMINER.  THIS IS THE FIRST EVALUATION FOR CIVIL

13   COMMITMENT THAT HE HAS EVER CONDUCTED OF A SEXUALLY

14   DANGEROUS PERSON.  HE DETERMINED MR. ANTONE SUFFERS FROM

15   FROTTEURISM, POLYSUBSTANCE DEPENDENCE, AND BORDERLINE

16   PERSONALITY DISORDER WITH ANTI-SOCIAL FEATURES, BUT THAT

17   HE IS NOT SEXUALLY DANGEROUS.

18        ALL OF THE EXPERTS AGREE THAT MR. ANTONE MEETS

19   THE FIRST ELEMENT OF THE CRITERIA.  HE HAS ENGAGED IN

20   SEXUALLY VIOLENT CONDUCT.  THE MULTIPLE RAPES ARE WITHOUT

21   QUESTION SEXUALLY VIOLENT.  ADDITIONALLY, THERE IS

22   EVIDENCE, AND YOU WILL HEAR IT, THAT MR. ANTONE HAS

23   MOLESTED CHILDREN.

24        THE EXPERTS ALSO AGREE THAT MR. ANTONE SUFFERS

25   FROM A SERIOUS MENTAL ILLNESS, ABNORMALITY OR DISORDER.

1    THE EXPERTS DO NOT AGREE, HOWEVER, WITH RESPECT TO

2    THEIR -- WHETHER MR. ANTONE WILL HAVE SERIOUS DIFFICULTY

3    REFRAINING FROM THIS CONDUCT IF RELEASED.

4            JUDGE, AT THE END OF THIS TRIAL, WE WILL ASK

5    THAT YOU COMMIT BYRON ANTONE UNDER 18 U.S.C. SECTION

6    4248, AS A SEXUALLY DANGEROUS PERSON SO THAT HE CAN

7    REMAIN AT BUTNER AND GET THE TREATMENT HE NEEDS, AND THAT

8    WE BELIEVE HE SHOULD HAVE BEFORE BEING RELEASED INTO THE

9    COMMUNITY ON CONDITIONAL RELEASE.

10           THANK YOU, JUDGE.

11           THE COURT:  THANK YOU, SIR.  MR. ROSS.

12           MR. ROSS:  EIGHT YEARS AGO TODAY, THERE WAS A

13   CONVERSATION FROM THE PRISON THAT MR. ANTONE HAD.  IT WAS

14   WITH HIS MOTHER.  THERE HE SPOKE ABOUT ALL THE DRINKING,

15   ALL THE DRUGGING, THE FACT THAT HE DIDN'T FINISH SCHOOL,

16   THE FACT THAT THERE WAS SO MANY ISSUES GOING ON IN HIS

17   LIFE, ISSUE OF NOT KNOWING WHO HIS FATHER IS, NEVER

18   MEETING HIS FATHER, TALKED ABOUT ALL THE OBSTACLES THAT

19   HE PLACED IN HIS WAY.  AND WHY HE WAS IN PRISON.

20           AND WITH THAT CONVERSATION WITH HIS MOTHER, HE

21   TALKED ABOUT WHAT HE WAS GOING TO DO FOR THE FUTURE.  HE

22   SPOKE ABOUT IT IN WORDS THAT WERE ON A PERSONAL LEVEL.

23   IT WAS ON A LEVEL IN WHICH HE HAD NEVER SPOKEN TO HIS MOM

24   ABOUT.  BECAUSE THIS WAS THE SAME HOUSEHOLD WHERE HE

25   LEARNED HOW TO DRINK, HE LEARNED THAT ON THE RESERVATION

1    THAT IS SO POOR, ABOUT 30 MILES FROM MEXICO, HE LEARNED

2    IT FROM UNCLES AND AUNTS WHO WERE DRINKING ALL THE TIME.

3    HE WOULD WATCH RELATIVES AS THEY DIED BEFORE THEY REACHED

4    THE AGE AT WHICH HE WAS.

5         AND HE SPOKE HONESTLY AND SINCERELY WITH HIS

6    MOTHER, AND SAID, I AM GOING TO MAKE THAT CHANGE.  THAT

7    CHANGE DID NOT START ON EIGHT YEARS AGO.  IT STARTED A

8    LITTLE BIT BEFORE THEN.  BUT THAT IS THE POINT WHERE MR.

9    ANTONE REMEMBERS.  HE REMEMBERS IT SO VIVIDLY BECAUSE

10   THAT WAS THE LAST TIME HE SPOKE TO HIS MOTHER.  SHE WAS

11   ON HER WAY TO A FUNERAL FOR SOMEONE WHO HAD BEEN

12   DRINKING, WHO HAD BEEN IN A CAR ACCIDENT.  SHE NEVER

13   RETURNED FROM THAT FUNERAL BECAUSE ON THE WAY BACK FROM

14   THAT FUNERAL, SHE WAS KILLED IN A CAR ACCIDENT.

15        MR. ANTONE TOOK IT UPON HIMSELF TO DEAL WITH

16   WHATEVER GRIEF THAT HE HAD, WHATEVER STRESS, WHATEVER

17   DEPRESSION THAT HE HAD WHILE HE WAS IN THE BUREAU OF

18   PRISONS.  HE LEARNED AND UNDERSTOOD HIS ALCOHOLISM AND

19   HIS DRUG ADDICTION AND WHAT TO DO WITH IT.  HE HAD

20   WATCHED IN THE DIFFERENT PRISONS AS PEOPLE, NATIVE

21   AMERICANS, OTHER FOLKS WHO HAD ACCESS TO ALCOHOL ON A

22   DAILY LEVEL.  HE WOULD WATCH AS OFFICERS OR COUNSELORS

23   WOULD CHECK TO SEE IF THAT PERSON WAS DRINKING ALCOHOL IN

24   THE PRISON.

25        AND HE MADE A CHOICE THAT HE WAS NOT GOING TO

1    FOLLOW WHAT HE HAD DONE.  HE MADE A CHOICE TO STOP

2    DRINKING.  HE REALIZED THAT PART OF HIS LIFE WERE ASHES

3    THAT HAD FALLEN ON THE GROUND AND HE WAS GOING TO RISE

4    FROM WHAT HE HAD BEEN BEFORE.  HE TOOK CLASSES.  HE GOT

5    HIS GED.  HE NEVER THOUGHT HE WAS GOING TO BE ABLE TO GET

6    IT.  HE HAD BEEN TOLD SO MANY TIMES THAT HE WOULD NEVER

7    AMOUNT TO ANYTHING.

8              HE LEARNED HOW TO DEAL WITH CAR MAINTENANCE.

9    HE TAUGHT HIMSELF SKILLS THAT HE NEVER THOUGHT HE WOULD

10   HAVE.  HE LEARNED HOW TO PLAY THE GUITAR.  HE LEARNED HOW

11   TO SING.  HE LEARNED HOW TO DRAW, PAINT, AND USE HIS

12   ARTISTIC SIDE, TO PUT IT IN AREAS WHERE HE FOUND OUT THAT

13   HE WAS HAVING STRESS.

14             HE KNEW THERE WAS ANOTHER OPTION ALONG THE

15   WAY, THAT HE NEEDED TO DEAL WITH THOSE DADDY ISSUES THAT

16   HE HAD NEVER MET HIS DAD.  HE HAD NEVER SPOKEN TO HIM.

17   BUT HE REACHED OUT AND WROTE A LETTER.  FROM THIS NEW

18   FOUND EDUCATION OF BEING ABLE TO WRITE AND READ AND

19   UNDERSTAND, HE UTILIZED IT.  HE PUT IT TO USE.  HE WROTE

20   LETTERS UPON LETTERS.  HE SENT LETTERS TO HIS SON.  THAT

21   SON THAT HE LIKES TO WRITE LETTERS TO BECAUSE TALKING ON

22   TELEPHONES ARE ONLY MEMORIES THAT LAST FOR A VERY SHORT

23   TIME.  IT'S THE LETTERS THAT LAST A LIFE TIME.

24             MR. ANTONE UNDERSTOOD THAT HE NEEDED SOME FORM

25   OF TREATMENT, AND THAT IS THE REASON WHY HE ENDED UP IN

THE FEDERAL SYSTEM.  HE WAS ORIGINALLY CHARGED IN THE

TOHONO NATION JUDICIAL SYSTEM.  BUT AS A RESULT OF THESE

CASES, AND WHERE HE WOULD HAVE BEEN PLACED IN A JAIL CELL

FOR THE AMOUNT OF TIME IN WHICH HE RECEIVED IN THE TOHONO

NATION, HIS ATTORNEY, ALONG WITH MR. ANTONE, DECIDED TO

MOVE HIS CASE INTO FEDERAL COURT.

SO HE IS ONLY HERE BECAUSE THE OPTION, HIS

ATTORNEY, MR. DUPREY WANTED HIM TO GET TREATMENT.

MR. DUPREY TRIED TO GET MR. ANTONE TREATMENT.  HE WROTE

SEVERAL LETTERS ALONG THE WAY TO LET FOLKS KNOW THAT HE

WANTED TREATMENT.

MR. ANTONE, FOR HIS RESPECT, WAS TOLD THAT HE

WOULD NOT BE ABLE TO GET IT.  SO WHAT DID HE DO?  HE

STOPPED DRINKING.  HE STOPPED DRUGGING.  HE STARTED

UNDERSTANDING WHAT HIS ISSUES WERE.  HE START ASKING FOR

HELP.  THOSE ARE THE THINGS IN WHICH MR. ANTONE DID.

AND THEN ON FEBRUARY 14, 2007, 14 DAYS OR 13

DAYS BEFORE HE IS SUPPOSED TO BE RELEASED BACK INTO THE

COMMUNITY, BACK INTO ARIZONA, BACK TO THE TOHONO NATION

OR TO TUCSON, ARIZONA, HE IS BROUGHT ACROSS THE COUNTRY,

PLACED IN THE SHU, AND TOLD THAT HE IS ABOUT TO BE

PRE-CERTIFIED.

HE COULD HAVE GIVEN UP AT THAT POINT, BUT HE

DID NOT.  HE CONTINUED TO KEEP HIS RECORD CLEAN.  NO

DRINKING.  NO DRUGGING.  AND STILL LEARNING.  AND ALSO

1   DEALING WITH HIS ISSUES AND SEEKING OUT FOR HELP.

2          DR. DAUM, WHO IS OUR DOCTOR WHO EVALUATED MR.

3   ANTONE WILL TELL THIS COURT THAT HE DOES NOT MEET THE

4   CRITERIA OF 4248.  WE HAVE A PROBATION OFFICER WHO WILL

5   TESTIFY AS TO HER EXPERIENCE WITH DEALING WITH NATIVE

6   AMERICANS IN ARIZONA, AND WHAT PROGRAMS ARE AVAILABLE FOR

7   HIM ONCE HE IS OUT.

8          WE HAVE MR. DUPREY WHO IS PRESENT HERE TODAY

9   TO TALK TO THIS COURT ABOUT WHAT KIND OF THINGS HE TRIED

10  TO DO TO SEEK OUT TREATMENT AND WHY MR. ANTONE IS PRESENT

11  IN FEDERAL COURT.

12         WE HAVE MR. GALLOP WHO IS PRESENT HERE FROM

13  THE BUREAU OF PRISONS.  IT'S ONE OF THE PERSONS THAT MR.

14  ANTONE SOUGHT OUT, SEEKING HELP, DEALING WITH STRESSFUL

15  ISSUES, LEARNING PARENTAL SKILLS, LEARNING THINGS ABOUT

16  HIMSELF.

17         AND WE ALSO HAVE MR. ANDRE TAYLOR WHO IS A

18  COUNSELOR AT THE PRISON WHO CAN TALK ABOUT THE INS AND

19  OUTS OF WHAT IT'S LIKE TO BE A COUNSELOR AT THE PRISON,

20  ESPECIALLY IN THE MARYLAND UNIT WHERE MR. ANTONE IS.

21         WE CAN'T TAKE AWAY WHAT HAS HAPPENED IN THE

22  PAST, BUT WE DO BELIEVE AT THE END OF ALL THE EVIDENCE,

23  THAT THIS COURT WILL FIND THAT MR. ANTONE DOES NOT MEET

24  THE CRITERIA UNDER 4248.  THANK YOU.

25         THE COURT:  THANK YOU, SIR.

1            IS THERE ANY REQUEST TO SEQUESTER WITNESSES

2   UNTIL THEY HAVE TESTIFIED, MR. ROYSTER?

3            MR. ROYSTER:  NO, YOUR HONOR.

4            THE COURT:  MR. ROSS?

5            MR. ROSS:  NO, YOUR HONOR.

6            THE COURT:  VERY GOOD.  WITH THAT, MR.

7   ROYSTER, YOU CAN CALL YOUR FIRST WITNESS.

8            MR. ROYSTER:  THE GOVERNMENT CALLS BYRON

9   ANTONE.

10           BYRON ANTONE, THE RESPONDENT, HAVING BEEN
             FIRST DULY SWORN, ON HIS OATH, TESTIFIED AS
11           FOLLOWS:

12           THE COURT:  MR. ROSS, MAY I INQUIRE OF YOU,

13  HOW DOES YOUR CLIENT PREFER TO HAVE HIS NAME PRONOUNCED?

14  I KNOW I THOUGHT IT WAS ANTONE.  I THINK YOU USED ANTON.

15           THE RESPONDENT:  ANTONE.

16           THE COURT:  VERY GOOD.

17           THE CLERK:  PLEASE STATE YOUR NAME FOR THE

18  RECORD.

19           THE RESPONDENT:  BYRON NEIL ANTONE.

20           THE COURT:  MR. ROYSTER.

21           MR. ROYSTER:  THANK YOU, JUDGE.

22  DIRECT EXAMINATION BY MR. ROYSTER:

23  Q    MR. ANTONE, HOW OLD ARE YOU?

24  A    39.

25  Q    WHERE ARE YOU FROM?

1    A    ARIZONA, FROM TOHONO O'ODHAM INDIAN RESERVATION.

2    Q    HOW MANY PEOPLE LIVE ON THE RESERVATION?

3    A    I DON'T KNOW.

4    Q    I AM SORRY?

5    A    I DON'T KNOW.

6    Q    CAN YOU PULL THAT MIKE TO YOU JUST A LITTLE BIT SO

7    MAYBE WE CAN HEAR YOU A LITTLE BETTER.  LET'S TRY THAT.

8    A    I DON'T KNOW.

9    Q    ALL RIGHT.  THANK YOU.  DID YOU LIVE ON THE

10   RESERVATION ALL YOUR LIFE UP UNTIL YOU WENT TO FEDERAL

11   PRISON?

12   A    YES.

13   Q    DO YOU KNOW WHY YOU ARE HERE TODAY?

14   A    YES.

15   Q    WHY?

16   A    BECAUSE THE GOVERNMENT PASSED A LAW, 4248.

17   Q    WHEN DID YOU GO TO FEDERAL PRISON?

18   A    1999, I THINK.

19   Q    WHAT DID YOU GO TO FEDERAL PRISON FOR; DO YOU

20   REMEMBER?

21   A    FOR AGGRAVATED SEXUAL ABUSE.

22   Q    DO YOU KNOW WHAT YOU WERE SENTENCED TO?

23   A    114 MONTHS.

24   Q    DID YOU HAVE ANY SUPERVISED RELEASE TERM?

25   A    YES.

1   Q    DID YOU HAVE TO PAY ANY VICTIM RESTITUTION TO THE

2   VICTIMS OF YOUR CRIMES?

3   A    I THINK I HAD TO PAY COURT COSTS.

4   Q    DID YOU AGREE TO PAY RESTITUTION TO THE VICTIMS?

5   A    YES.

6   Q    DID YOU PLEAD GUILTY OR WAS THERE A TRIAL?

7   A    I PLED GUILTY.

8   Q    WHAT DID YOU DO THAT LED TO THAT CHARGE, AGGRAVATED

9   SEXUAL ABUSE?

10  A    I REALLY DON'T REMEMBER.

11  Q    YOU PLED GUILTY TO IT?

12  A    YES.

13  Q    BUT YOU DON'T REMEMBER?

14  A    NO.

15  Q    WHY DID YOU PLEAD GUILTY?

16  A    BECAUSE I WAS DRUNK AND DOING DRUGS.

17  Q    NOT AT THE TIME YOU PLED GUILTY?

18  A    NO.

19  Q    WHY DID YOU PLEAD GUILTY THOUGH IF YOU DIDN'T

20  REMEMBER DOING IT?

21  A    BECAUSE I DON'T SEE NO REASON FOR ANYBODY TO LIE.

22  Q    BY THAT, I GUESS YOU MEAN THE VICTIM?

23  A    YES.

24  Q    WHAT WAS HER NAME?

25  A    RICHANDA.

1  Q   SO IT'S YOUR BELIEF THAT THE CHARGE OF AGGRAVATED

2  SEXUAL ABUSE RELATED TO YOUR CONDUCT WITH RICHANDA;

3  IS THAT RIGHT?

4  A   YES.  IT MIGHT BE RICHANDA OR CHERYL OR ONE OF THEM.

5  I CAN'T REMEMBER.

6  Q   WELL, LET'S TALK ABOUT CHERYL FIRST.  DO YOU REMEMBER

7  TRYING TO RAPE HER?

8  A   NO, SIR.

9  Q   YOU DID TRY TO APOLOGIZE TO HER A COUPLE WEEKS AFTER

10 YOU TRIED TO RAPE HER THOUGH; DIDN'T YOU?

11 A   I DON'T REMEMBER.

12 Q   DO YOU REMEMBER THAT IS WHAT SHE TOLD INVESTIGATORS?

13 A   I DON'T REMEMBER.

14 Q   DO YOU NOT REMEMBER TRYING TO APOLOGIZE TO HER?

15 A   NO.

16 Q   CHERYL WAS A COUSIN OF YOURS; WASN'T SHE?

17 A   YES.

18 Q   AND THIS HAPPENED IN JUNE OR JULY OF 1997?

19 A   I DON'T REMEMBER.

20 Q   DO YOU REMEMBER ANYTHING THAT LED UP TO THE POINT

21 WHERE YOU TRIED TO RAPE HER?

22 A   NO, SIR.

23 Q   DO YOU REMEMBER IF YOU WERE DRINKING THAT DAY?

24 A   I DON'T KNOW.

25 Q   DO YOU REMEMBER IF YOU USED DRUGS THAT DAY?

1    A    I DON'T REMEMBER.

2    Q    DO YOU REMEMBER WHERE YOU WERE?

3    A    NO.

4    Q    WELL, YOU WERE IN ARIZONA; RIGHT?

5    A    YES.

6    Q    YOU WERE ON THE RESERVATION?

7    A    YES.

8    Q    YOU WERE AT YOUR HOUSE; RIGHT?

9    A    I DON'T KNOW.

10   Q    YOU DON'T REMEMBER TELLING HER TO LET YOU DO IT?

11   A    NO.

12   Q    YOU DON'T REMEMBER TELLING HER SHE WOULD LIKE IT?

13   A    NO.

14   Q    NOW, PRIOR TO TRYING TO RAPE HER, YOU DID HAVE SEXUAL

15   THOUGHTS OF HER; RIGHT?

16   A    NO.

17   Q    DO YOU REMEMBER TELLING SOME PSYCHOLOGIST BACK IN

18   1999 THAT YOU HAD SEXUAL THOUGHTS ABOUT HER BEFORE YOU

19   TRIED TO RAPE HER?

20   A    NO.

21   Q    DO YOU REMEMBER TELLING THE PSYCHOLOGIST BACK IN 1999

22   THAT YOU DID INTEND TO DO SOMETHING SEXUAL TO HER?

23   A    NO.

24   Q    NOW, BEFORE CHERYL, YOU RAPED A 16 YEAR OLD GIRL IN

25   1990; IS THAT RIGHT?

1   A   YES.

2   Q   WHAT WAS HER NAME?

3   A   I DON'T KNOW.

4   Q   WAS SHE YOUR COUSIN?

5   A   I DON'T KNOW.

6   Q   SO YOU DON'T KNOW IF SHE WAS YOUR COUSIN AND YOU

7   DON'T KNOW HER NAME, BUT YOU RAPED HER; IS THAT RIGHT?

8   A   I REALLY DON'T REMEMBER A LOT OF STUFF THAT YOU ARE

9   ASKING ME.  I DON'T REMEMBER ALL THE NAMES.  I USED A LOT

10  OF DRUGS AND DRANK A LOT, AND I REALLY DON'T REMEMBER.  I

11  REALLY DON'T REMEMBER A LOT OF THINGS YOU ARE ASKING ME.

12  Q   WELL, LET'S -- YOU DON'T DENY THAT THESE THINGS

13  HAPPENED; IS THAT RIGHT?

14  A   I PLED GUILTY TO THE CHARGES.  I DON'T REMEMBER NONE

15  OF THE STUFF HAPPENING, BUT I DON'T SEE NO REASON FOR

16  THEM TO LIE ABOUT WHAT THEY SAID.

17  Q   SO IF THE GIRL -- IF THE GIRL FROM THE 1990 OFFENSE

18  TOLD LAW ENFORCEMENT THAT YOU RAPED HER IN THE MIDDLE OF

19  THE NIGHT AT YOUR HOUSE, YOU DON'T HAVE ANY REASON TO

20  DISPUTE THAT?

21  A   1990?

22  Q   SHE WASN'T LYING; WAS SHE?

23  A   WHICH ONE?  WHAT WAS HER NAME?

24  Q   HER NAME WAS VERONICA.

25  A   I DON'T REMEMBER.

1    Q   WELL, MY QUESTION TO YOU IS IF SHE TOLD LAW

2    ENFORCEMENT THAT YOU RAPED HER AT YOUR HOUSE, YOU DON'T

3    HAVE ANY REASON TO DISPUTE THAT; IS THAT RIGHT?

4    A   NO.

5    Q   DO YOU REMEMBER BEING INTERVIEWED BY DR. PHENIX?

6    A   YES.

7    Q   DO YOU REMEMBER TELLING HER THAT YOU DIDN'T RAPE

8    VERONICA?

9    A   YES.

10   Q   SO YOU DID DENY TO DR. PHENIX THAT YOU RAPED HER;

11   DIDN'T YOU?

12   A   NO.

13   Q   DID YOU ADMIT THAT YOU RAPED HER TO DR. PHENIX?

14   A   I TOLD DR. PHENIX THAT I DON'T REMEMBER A LOT OF THE

15   STUFF THAT SHE WAS ASKING ME THE QUESTIONS, AND I TOLD

16   HER I PLED GUILTY BECAUSE I DON'T SEE NO REASON FOR THEM

17   TO LIE.

18   Q   AND JUST SO WE ARE CLEAR, YOU DID NOT TELL DR. PHENIX

19   THAT YOU DIDN'T RAPE VERONICA; IS THAT YOUR TESTIMONY?

20   A   (NO RESPONSE.)

21   Q   MR. ANTONE, IS THAT YOUR TESTIMONY, THAT YOU DID NOT

22   TELL -- LET ME BACK UP AND ASK IT AGAIN.  IS IT YOUR

23   TESTIMONY THAT YOU DID NOT DENY TO DR. PHENIX THAT YOU

24   RAPED VERONICA?

25              MR. ROSS:  OBJECTION.  CONFUSING.

1          THE COURT:  OVERRULED.  DO YOU UNDERSTAND THE

2     QUESTION, MR. ANTONE?

3          THE WITNESS:  NOT REALLY.

4          THE COURT:  COULD YOU REPHRASE IT, MR.

5     ROYSTER?

6          MR. ROYSTER:

7     Q    YOU DO REMEMBER TALKING TO DR. PHENIX; RIGHT?

8     A    YES.

9     Q    SHE TALKED TO YOU ABOUT SOME OF YOUR CRIMES; RIGHT?

10    A    YES.

11    Q    AND SHE ASKED YOU ABOUT THE VICTIMS OF YOUR RAPES;

12    DIDN'T SHE?

13    A    YES.

14    Q    AND ONE OF THOSE PEOPLE THAT SHE TALKED TO YOU ABOUT

15    WAS A GIRL NAMED VERONICA; WASN'T IT?

16    A    SHE TALKED TO ME ABOUT ALL OF THEM.

17    Q    WELL, SHE TALKED TO YOU ABOUT VERONICA SPECIFICALLY,

18    DIDN'T SHE, FROM THE 1990 OFFENSE?

19    A    NO.

20    Q    YOU DON'T THINK SHE DID?

21    A    NO.  I KNOW WE TALKED ABOUT ONE AND HER NAME WAS

22    VALITA AND SHE USED TO BE MY GIRLFRIEND.  THAT IS THE ONE

23    WE WERE TAKING ABOUT.

24    Q    DID YOU RAPE VALITA?

25    A    NO, SHE WAS MY GIRLFRIEND.

1              MR. ROYSTER:  JUST A SECOND JUDGE, PLEASE.

2              THE COURT:  YES, SIR.

3              MR. ROYSTER:

4    Q   LET'S BACK UP, MR. ANTONE.  VALITA, YOUR GIRLFRIEND,

5    WAS SHE YOUR GIRLFRIEND IN 1990?

6    A   YES.

7    Q   DID YOU RAPE HER?

8    A   NO.

9    Q   SHE TOLD LAW ENFORCEMENT THAT YOU RAPED HER; DIDN'T

10   SHE?

11   A   YES.

12   Q   AND YOU PLED GUILTY TO RAPING HER, TOO; DIDN'T YOU?

13   A   YES.

14   Q   BUT NOW YOU ARE SAYING YOU DIDN'T RAPE HER?

15   A   NO, WE HAD CONSENSUAL SEX.  HER PARENTS DIDN'T LIKE

16   ME AND HER PARENTS -- SHE THOUGHT SHE WAS PREGNANT AND

17   SHE TOLD HER PARENTS AND HER PARENTS ENDED UP CALLING THE

18   POLICE BECAUSE THEY DIDN'T WANT ME TO RUIN HER BECAUSE I

19   WAS A DRUG ADDICT AND AN ALCOHOLIC.

20   Q   SO YOU PLED GUILTY TO RAPING HER, BUT YOU DIDN'T RAPE

21   HER; IS THAT RIGHT?

22   A   YES.

23   Q   ALL RIGHT.  SO LET'S GO BACK TO VERONICA.  VERONICA

24   IS VALITA'S SISTER; RIGHT?

25   A   YES.

1    Q   DID YOU RAPE HER?

2    A   I PLED GUILTY TO THAT, BUT I DON'T REMEMBER NONE OF

3    THAT.

4    Q   DO YOU DENY THAT YOU RAPED HER?

5    A   NO.

6    Q   SO YOU DON'T REMEMBER RAPING HER IN THE MIDDLE OF THE

7    NIGHT OUTSIDE; IS THAT YOUR TESTIMONY?

8    A   YES.

9    Q   MR. ANTONE, WHEN DID YOU START USING ALCOHOL?

10   A   PROBABLY WHEN I WAS -- I HAD THE FIRST ONE WHEN I WAS

11   LIKE 9.

12   Q   WHEN DID YOU START DRINKING HEAVILY?

13   A   WHEN I WAS LIKE 12.

14   Q   AND NOW -- AND WHEN I ASKED HEAVILY, THAT IS A TERM

15   THAT YOU HAVE USED.  WHAT DO YOU DESCRIBE AS DRINKING

16   HEAVILY AT AGE 12?  HOW MUCH ARE YOU DRINKING?

17   A   ABOUT TWO OR THREE QUARTS.

18   Q   OF WHAT?

19   A   BUD, BUDWEISER.

20   Q   TWO OR THREE QUARTS OF BEER?

21   A   YES.

22   Q   IS THAT A DAY?

23   A   PROBABLY EVERY OTHER DAY.

24   Q   HOW WERE YOU GETTING IT?

25   A   LIKE MY UNCLES AN MY AUNTS, WHEN THEY WAS DRINKING,

1    AND THEY WOULD BE DRUNK AND WE WOULD TAKE THE QUARTS FROM

2    THEM.

3    Q   AND WHEN YOU WERE 12 YEARS OLD, WERE YOU DRINKING TO

4    BLACK OUT?

5    A   I DRANK, BUT I DON'T REMEMBER BLACKING OUT.

6    Q   WAS THERE A POINT IN TIME WHEN YOU WERE DRINKING SO

7    MUCH THAT YOU WERE BLACKING OUT?

8    A   YES.

9    Q   WHAT DID THAT START HAPPENING?

10   A   WHEN I WAS 14.

11   Q   HOW OFTEN WAS IT HAPPENING?

12   A   PROBABLY EVERY TIME I DRANK.

13   Q   WHICH WAS HOW OFTEN; AT 14?

14   A   IT WAS MORE LIKE ON THE WEEKENDS.

15   Q   SO YOU WEREN'T DRINKING DURING THE WEEK?

16   A   NO.

17   Q   WHAT WERE YOU DOING?  DID YOU HAVE A JOB?

18   A   NO.

19   Q   BUT YOU WEREN'T DRINKING DURING THE WEEK WHEN YOU

20   WERE 14?

21   A   NO.

22   Q   SO THE BLACK OUTS STARTED HAPPENING WHEN YOU WERE 14

23   AND THEY WERE HAPPENING EVERY OTHER WEEKEND.  WAS THERE A

24   POINT IN TIME WHERE THE BLACK OUTS STARTED HAPPENING MORE

25   OFTEN?

1    A    YES.

2    Q    WHEN DID THAT START?

3    A    WHEN I WAS PROBABLY 17.

4    Q    HOW OFTEN WAS IT HAPPENING WHEN YOU WERE 17?

5    A    EVERY TIME I DRANK.

6    Q    AND HOW MUCH WOULD YOU HAVE TO DRINK BEFORE YOU WOULD

7    BLACK OUT?

8    A    I REALLY DON'T REMEMBER.

9    Q    HOW MUCH WERE YOU REGULARLY DRINKING AT AGE 17?

10   A    WHENEVER IT CAME AROUND OR WHENEVER I GOT IT.

11   Q    AND BY THAT, I MEAN QUANTITY.  HOW MANY BEERS WOULD

12   YOU DRINK IN A DAY TO BLACK OUT AT 17?

13   A    I DON'T KNOW.  I DIDN'T COUNT THEM.  I JUST KEPT

14   DRINKING.

15   Q    AND HOW OFTEN WAS THAT HAPPENING AT AGE 17; EVERY

16   DAY, EVERY OTHER DAY?

17   A    PROBABLY LIKE EVERY OTHER DAY.

18   Q    HAVE YOU HAD ANY ALCOHOL TREATMENT WHILE YOU HAVE

19   BEEN IN FEDERAL PRISON?

20   A    I GO TO AA MEETINGS.

21   Q    HOW OFTEN ARE YOUR AA MEETINGS?

22   A    EVERY TUESDAY.

23   Q    AND HOW LONG HAVE YOU BEEN GOING TO THE AA MEETINGS?

24   A    I WENT TO AA WHEN I FIRST GOT IN PRISON, AND THEN I

25   STOPPED GOING TO AA, AND WHEN I GOT TO BUTNER, THEY PUT

1    US IN ONE UNIT TO WHERE WE COULDN'T GO TO THE AA MEETINGS

2    OR EDUCATION, BUT THEY RECENTLY STARTED DOING AA

3    MEETINGS.  IT'S UP INSIDE THE UNIT.  SO RIGHT NOW,

4    PROBABLY ABOUT A YEAR THAT THEY HAD IT UP THERE.

5    Q   NOW, THE AA MEETINGS, DO YOU CONSIDER THAT TO BE

6    TREATMENT FOR YOUR ALCOHOL PROBLEM?

7    A   IT'S MORE TO HELP YOU -- IT'S A GROUP OF GUYS THAT

8    DRINK AND THEY ENCOURAGE EACH OTHER BY TALKING ABOUT

9    THEIR DRINKING, HOW OFTEN THEY DRINK, AND THEY ENCOURAGE

10   YOU BY TELLING YOU TO TAKE IT ONE DAY AT A TIME.

11   Q   OTHER THAN YOUR AA MEETINGS, IS THERE ANY OTHER

12   TREATMENT THAT YOU HAVE HAD WHILE YOU HAVE BEEN IN

13   FEDERAL PRISON TO ADDRESS YOUR ALCOHOL PROBLEM?

14   A   I HAD A 40-HOUR DRUG TREATMENT, AND IT WAS ALMOST

15   KIND OF BASICALLY FOR THE SAME THING, DRUG AND ALCOHOL.

16   Q   AND OTHER THAN THE AA AND THE 40-HOUR DRUG PROGRAM,

17   HAVE YOU HAD ANY TREATMENT TO ADDRESS YOUR ALCOHOL

18   PROBLEMS?

19   A   NO.

20   Q   AND IN THE DRUG PROGRAM, DID THEY SPECIFICALLY

21   ADDRESS THE ALCOHOL ISSUES?

22   A   NO.

23   Q   WHAT KINDS OF THINGS DID YOU LEARN IN YOUR DRUG

24   PROGRAM?

25   A   ABOUT THE DRUGS AND WHAT KIND OF EFFECTS IT HAS ON

1   YOU, WHAT IT DOES TO YOUR THINKING.

2   Q   DO YOU THINK THAT HAS HELPED YOU?

3   A   YES.

4   Q   HOW?

5   A   WHEN I WAS USING DRUGS AND DRINKING, MY MIND WAS SO

6   CLOUDY THAT I COULDN'T MAKE A RATIONAL DECISION, AND

7   AFTER I STOPPED USING THE DRUGS AND DRINKING, I COULD

8   MAKE CLEAR DECISIONS.

9   Q   WHEN YOU WERE DRINKING, DID YOU LOSE CONTROL OF

10  YOURSELF?

11  A   YES.

12  Q   WAS IT OFTEN?

13  A   I DON'T KNOW.

14  Q   WHEN YOU WERE BLACKING OUT, DID YOU LOSE CONTROL?

15  A   YES.  PROBABLY.

16  Q   OTHER THAN THE 40-HOURS SUBSTANCE ABUSE OR DRUG ABUSE

17  PROGRAM, HAVE YOU HAD ANY OTHER TREATMENT TO ADDRESS YOUR

18  SUBSTANCE ABUSE PROBLEM, DRUG PROBLEM?

19  A   NO.

20  Q   WHEN DID YOU START USING DRUGS?

21  A   PROBABLY ABOUT 13 OR 14.

22  Q   WHAT KINDS OF DRUGS WERE YOU USING AT 13 OR 14?

23  A   MARIJUANA.

24  Q   HOW OFTEN WERE YOU USING IT?

25  A   PROBABLY EVERY OTHER DAY.

1   Q    WERE YOU USING THAT IN CONJUNCTION WITH DRINKING AT

2   THE SAME TIME?

3   A    YES.

4   Q    WHEN DID YOU STOP USING MARIJUANA?

5   A    WHEN I ENDED UP IN THE TRIBAL JAIL.

6   Q    RIGHT BEFORE YOUR FEDERAL INCARCERATION?

7   A    YES.

8   Q    HOW ABOUT COCAINE?  WHEN DID YOU START USING THAT?

9   A    PROBABLY ABOUT 16.

10  Q    HOW OFTEN WERE YOU USING IT?

11  A    THAT WAS KIND OF EXPENSIVE, SO IT WASN'T THAT OFTEN.

12  Q    ONCE A MONTH, ONCE A WEEK?

13  A    PROBABLY ONCE A MONTH.

14  Q    HOW LONG DID YOU USE COCAINE?  OR LET ME ASK IT

15  DIFFERENTLY.  WHEN DID YOU STOP USING COCAINE?

16  A    WHEN I ENDED UP IN PRISON.

17  Q    DID YOU USE ANY OTHER DRUGS BEFORE YOU WENT TO

18  PRISON?

19  A    NO.  THOSE WERE THE THREE MAIN ONES.  I HAVE TRIED

20  OTHER DRUGS, BUT I DIDN'T LIKE THEM.

21  Q    WHAT WERE THE THREE?  MARIJUANA, I GOT, COCAINE?

22  A    ALCOHOL.

23  Q    ALCOHOL.  NOW, LET'S TALK ABOUT TANYA MCCLOUD FOR A

24  MINUTE.  WHO IS TANYA MCCLOUD?

25  A    MY SON'S MOTHER.

1    Q    DID YOU DATE HER FOR A WHILE?

2    A    YES.

3    Q    WHEN DID YOU START DATING HER, MCCLOUD?

4    A    PROBABLY STARTED '92 OR SOMETHING LIKE THAT.

5    Q    WAS IT ABOUT SIX YEARS BEFORE YOU WENT TO PRISON?

6    A    YES.

7    Q    NOW, DO YOU REMEMBER -- WELL, LET ME ASK YOU THIS.

8    DID YOU EVER FORCE YOUR GIRLFRIEND, TANYA MCCLOUD, TO

9    HAVE SEX WITH YOU?

10   A    NO.

11   Q    DO YOU REMEMBER TELLING THE PSYCHOLOGIST BACK IN 1999

12   WHEN YOU WERE EVALUATED THAT THERE WERE TIMES THAT YOU

13   GOT DRUNK AND WANTED TO HAVE SEX WITH HER AND SHE

14   WOULDN'T HAVE SEX WITH YOU, SO YOU FORCED HER TO HAVE SEX

15   WITH YOU?

16   A    I NEVER SAID THAT.

17   Q    YOU NEVER SAID THAT?  SO THE PSYCHOLOGIST THAT

18   INCLUDED THAT IN THEIR REPORT, THEY ARE LYING?

19   A    I WOULDN'T SAY THEY ARE LYING.  I JUST NEVER SAID

20   THAT.

21   Q    DID YOU EVER RAPE TANYA?

22   A    NO.

23   Q    IS IT POSSIBLE THAT YOU RAPED HER, BUT YOU JUST DON'T

24   REMEMBER?

25   A    YES.

1    Q    NOW, IN NOVEMBER OF 1997 OR 1998, YOU RAPED RICHANDA;

2    IS THAT RIGHT?

3    A    I PLED GUILTY TO THAT, YES.

4    Q    DO YOU DENY THAT YOU RAPED HER?

5    A    I DON'T REMEMBER.  I DON'T SEE ANY REASON FOR HER TO

6    LIE.

7    Q    DO YOU REMEMBER ANYTHING ABOUT RAPING HER?

8    A    NO.

9    Q    I AM SORRY?

10   A    NO.

11   Q    DO YOU REMEMBER TELLING THE PSYCHOLOGIST BACK IN 1999

12   THAT YOUR SEXUAL ENCOUNTER WITH RICHANDA WAS CONSENSUAL?

13   A    I DON'T REMEMBER, NO.

14   Q    IS IT POSSIBLE THAT YOU TOLD HIM THAT IT WAS

15   CONSENSUAL?

16   A    YES, IT'S POSSIBLE.

17   Q    NOW, WHEN YOU WERE 18, YOU MOLESTED A 13 YEAR OLD

18   GIRL.  HER INITIALS ARE ARE T.F.; IS THAT RIGHT?

19   A    YES.  I DON'T REMEMBER, BUT I PLED GUILTY TO THAT,

20   TOO.

21   Q    MR. ANTONE, I AM SORRY.  I AM HAVING A HARD TIME

22   HEARING YOU.  IF YOU CAN PULL THAT A LITTLE.  PART OF IT

23   IS THAT COMPUTER SCREEN -- AND YOU CAN'T DO ANYTHING

24   ABOUT THIS -- IS RIGHT IN FRONT OF YOUR MOUTH.

25   A    I PLED GUILTY TO THAT, TOO.

1    Q    DO YOU DENY THAT YOU MOLESTED HER WHEN SHE WAS 13

2    YEARS OLD AND IN THE EIGHTH GRADE?

3    A    I DON'T SEE ANY OF THE VICTIMS THAT SAID WHAT I DID

4    TO BE LYING.  I DON'T REMEMBER NONE OF THE THINGS.

5    Q    WELL, WHAT ABOUT VALITA?  YOU THINK SHE WAS LYING?

6    A    NO.

7    Q    YOU DON'T?

8    A    SHE WENT AND TOLD HER PARENTS AND HER PARENTS CALLED

9    THE POLICE.

10   Q    BUT SHE TOLD THE POLICE THAT YOU RAPED HER?

11   A    YES.

12   Q    BUT YOU SAY YOU DIDN'T?

13   A    I THINK SHE WAS SCARED OF HER PARENTS.

14   Q    SO YOU THINK SHE WAS LYING WHEN SHE SAID YOU RAPED

15   HER?

16   A    NO.

17   Q    YOU DON'T THINK THAT?

18   A    WE HAD CONSENSUAL SEX.

19   Q    SO YOU THINK SHE WAS LYING WHEN SHE SAID YOU RAPED

20   HER; IS THAT RIGHT?

21   A    (INAUDIBLE)

22            THE COURT:  PLEASE ANSWER THE QUESTION, SIR,

23   IF YOU UNDERSTAND IT.

24            MR. ROYSTER:

25   Q    DO YOU WANT ME TO ASK IT AGAIN?

1    A    YES.  I KIND OF GOT CONFUSED BECAUSE YOU KEEP ASKING

2    ME THE SAME QUESTION IN DIFFERENT WAYS.

3    Q    WELL, I AM JUST TRYING TO MAKE SURE I UNDERSTAND YOUR

4    TESTIMONY.

5    A    I PLED GUILTY TO WHAT VALITA SAID.

6    Q    BUT A MINUTE AGO YOU SAID THAT NONE OF THE VICTIMS

7    WERE LYING, BUT VALITA TOLD THE POLICE THAT YOU RAPED

8    HER; RIGHT?

9    A    I DIDN'T SAY A MINUTE AGO.  I SAID I DON'T REMEMBER A

10   LOT OF THE OTHERS ONES, BUT VALITA, WE HAD CONSENSUAL

11   SEX.  SHE WAS MY GIRLFRIEND AT THE TIME.

12   Q    SO IF SHE TOLD THE POLICE YOU RAPED HER, THEN SHE IS

13   LYING?

14          MR. ROSS:  OBJECTION.

15          THE COURT:  OVERRULED.

16          MR. ROYSTER:

17   Q    RIGHT?

18   A    NO.

19   Q    NOW, IN THE SUMMER OF 1996, YOU WERE ABOUT 24 YEARS

20   OLD; IS THAT RIGHT?

21   A    YES.

22   Q    AND YOU MOLESTED A 12 YEAR OLD GIRL DURING THE SUMMER

23   OF 1996; DIDN'T YOU?

24   A    I DON'T REMEMBER.

25   Q    DO YOU DENY IT?

1    A    I PLED GUILTY TO IT.

2    Q    SO YOU DON'T DENY IT?

3              MR. ROSS:  OBJECTION.  ASKED AND ANSWERED.

4              THE COURT:  OVERRULED.

5              MR. ROYSTER:

6    Q    YOU DON'T DENY THAT YOU MOLESTED THE 12 YEAR OLD

7    GIRL; DO YOU?

8    A    THERE WAS SO MANY CASES AND SO MANY CHARGES, AND YOU

9    ARE GETTING ME CONFUSED.  I DON'T KNOW WHICH IS WHICH,

10   AND WHAT IS WHAT, BUT I PLED GUILTY TO A LOT OF CHARGES

11   BECAUSE MY LAWYER WAS TRYING TO HELP ME TO GET TREATMENT,

12   AND I REALLY -- I AM KIND OF CONFUSED ON A LOT OF THINGS.

13   I DON'T REMEMBER THE NAMES AND STUFF LIKE THAT.

14   Q    WELL, LET ME ASK YOU THIS THEN.  AT ANY POINT AFTER

15   YOU WERE 18 YEARS OLD, DO YOU REMEMBER MOLESTING ANY

16   CHILDREN?

17   A    NO.

18   Q    MR. ANTONE, HAVE YOU HAD ANY SEX OFFENDER TREATMENT

19   WHILE YOU HAVE BEEN IN PRISON?

20   A    NO.

21   Q    WHY NOT?

22   A    I ASKED FOR HELP WHEN I FIRST GOT IN PRISON WHEN I

23   WAS IN COLORADO, AND THEY TOLD ME THAT I DIDN'T QUALIFY

24   AT THE TIME.  SO I CALLED MY LAWYER AND I ASKED MY LAWYER

25   WHAT HAPPENED.  HE SAID I WILL LOOK INTO IT.  SO HE SENT

1   A LETTER TO THE PRISON AND ASKED THEM IF THEY COULD SEND

2   ME SOMEWHERE TO GET SOME ALCOHOL AND DRUG TREATMENT AND

3   SEX OFFENDER TREATMENT, AND THEY NEVER DID.

4   Q   DO YOU THINK YOU NEED SEX OFFENDER TREATMENT?

5   A   I PROBABLY THINK THAT IT WILL PROBABLY DO ME SOME

6   GOOD.

7   Q   WHY?

8   A   BECAUSE OF ALL THE CHARGES.  BUT I ALSO KNOW I ALSO

9   PROBABLY NEED ALCOHOL AND DRUG TREATMENT, TOO.

10  Q   DO YOU THINK THE ALCOHOL AND DRUG USE LED TO YOUR

11  SEXUAL OFFENDING?

12  A   EXCUSE ME?

13  Q   DO YOU THINK THAT THE ALCOHOL AND DRUG ABUSE, THE

14  ALCOHOL AND DRUG USE LED YOU TO SEXUALLY OFFEND?

15  A   YES.

16  Q   DO YOU REMEMBER TELLING A B.O.P. PSYCHOLOGIST BACK IN

17  2008 THAT YOU DIDN'T THINK YOU NEEDED SEX OFFENDER

18  TREATMENT?

19  A   NO.

20  Q   WAS THERE A TIME IN THE LAST COUPLE OF YEARS WHERE

21  YOU DIDN'T THINK YOU NEEDED IT?

22  A   NO.

23  Q   DID YOU SEEK OUT DRUG TREATMENT AT BUTNER?

24  A   NO, SIR.

25  Q   DID YOU HAVE THE OPPORTUNITY TO DO THAT?

1    A    NO, SIR.  THEY SENT ME TO BUTNER TWO WEEKS PRIOR TO

2    MY RELEASE AND THE DRUG TREATMENT PROGRAM, I THINK YOU

3    HAD TO BE THERE ABOUT 18 MONTHS OR SOMETHING LIKE THAT.

4    Q    SINCE YOU HAVE BEEN IN THE MARYLAND UNIT THOUGH, HAVE

5    YOU HAD THE OPPORTUNITY TO GET DRUG TREATMENT?

6    A    WE CAN'T GO TO THE DRUG TREATMENT PROGRAM.  WE ARE

7    CONFINED IN ONE UNIT.

8    Q    WHAT ABOUT SEX OFFENDER TREATMENT?  CAN YOU GET THAT?

9    A    THEY HAVE A PROGRAM THERE.

10   Q    AND YOU ARE AVAILABLE TO BE IN IT; AREN'T YOU?

11   A    YES, IT'S VOLUNTARY.

12   Q    BUT YOU HAVEN'T DONE THAT?

13   A    NO.

14   Q    MR. ANTONE, IS THERE A NOTEBOOK UP THERE WITH YOU?

15   A    NO, SIR.

16            MR. ROYSTER:  CAN I JUST HAVE A MOMENT, JUDGE?

17            THE COURT:  YOU MAY.

18            MR. ROYSTER:  JUDGE, THIS IS THE BINDER OF ALL

19   THE EXHIBITS.  I MEANT TO PUT IT UP THERE ON THE STAND.

20   IF I MAY APPROACH?

21            THE COURT:  YOU MAY.

22            MR. ROYSTER:

23   Q    MR. ANTONE, IF YOU TAKE A LOOK AT EXHIBIT 12, AND IF

24   YOU WILL JUST OPEN UP THE NOTEBOOK THERE, YOU WILL SEE

25   THAT THERE ARE TABS ON THE SIDE.

1       DO YOU SEE THAT?

2   A   YES.

3   Q   DO YOU RECOGNIZE WHAT THAT DOCUMENT IS, EXHIBIT 12?

4   A   PLEA AGREEMENT.

5   Q   DO YOU REMEMBER ENTERING THIS OR AGREEING TO THIS

6   BACK IN 1999?

7   A   YES.

8   Q   AND THIS WAS PART OF YOUR FEDERAL CONVICTION; IS THAT

9   RIGHT?

10  A   YES.

11  Q   AND DO YOU SEE THOSE NUMBERS ON THE BOTTOM THAT SAYS

12  BOP_ANTO.  DO YOU SEE THAT AT THE VERY BOTTOM OF THE

13  PAGE?

14  A   YES.

15  Q   THERE IS A NUMBER OUT AT THE SIDE, 1216, DO YOU SEE

16  THAT?

17  A   YES.

18  Q   IF YOU WILL FLIP OVER A COUPLE OF PAGES, YOU WILL SEE

19  THAT THERE IS A NUMBER 1224.  WOULD YOU FLIP OVER TO THAT

20  PAGE FOR ME.  DO YOU SEE THAT?

21  A   YES.

22  Q   DO YOU RECOGNIZE THAT SIGNATURE ON THE DOCUMENT?

23  ARE YOU ON BOP_ANTO_1224?

24  A   YES, SIR.  I RECOGNIZE THAT.

25  Q   WHOSE SIGNATURE IS THAT?

1    A    THAT IS MINE.

2    Q    DID YOU SIGN THIS DOCUMENT?

3    A    YES.

4    Q    WAS THAT BACK ON JUNE 28, 1999?

5    A    YES.

6    Q    DO YOU REMEMBER SIGNING IT?

7    A    YES.

8    Q    NOW, AS PART OF YOUR -- DID YOU READ IT BEFORE YOU

9    SIGNED IT?

10   A    NO.

11   Q    YOU DID NOT READ THE PLEA AGREEMENT BEFORE YOU SIGNED

12   IT?

13   A    NO.

14   Q    WHEN YOU PLED GUILTY IN FEDERAL COURT, DID THE JUDGE

15   ASK YOU IF YOU READ IT?

16   A    NO.

17   Q    NOW, WHEN YOU PLED GUILTY IN FEDERAL COURT, YOU WENT

18   TO COURT ONE DAY, RIGHT, AND PLED GUILTY?

19   A    YES.

20   Q    AND DID THE JUDGE ASK YOU SOME QUESTIONS ABOUT WHY

21   YOU WERE PLEADING GUILTY?

22   A    YES.

23   Q    AND YOU WERE REPRESENTED BY AN ATTORNEY?

24   A    YES.

25   Q    AND PART OF THIS PLEA AGREEMENT INCLUDES A FACTUAL

1   BASIS FOR THE PLEA.  DO YOU REMEMBER TALKING TO YOUR

2   LAWYER ABOUT THAT?

3   A    YES.  HE KIND OF MENTIONED THAT TO ME.

4   Q    AND THERE WERE CERTAIN THINGS IN YOUR PLEA AGREEMENT

5   THAT YOU AGREED WERE TRUE.  DO YOU REMEMBER THAT?

6   A    YES.

7   Q    IF YOU WILL FLIP ONE PAGE BACK TO 1223, AND THEN DO

8   YOU SEE THAT SECTION THERE, FACTUAL BASIS?

9   A    YES.

10  Q    AND IT SAYS, I FURTHER AGREE THAT THE FOLLOWING FACTS

11  ACCURATELY DESCRIBE MY CONDUCT IN CONNECTION WITH THE

12  OFFENSE TO WHICH I AM PLEADING GUILTY, AND THAT IF THIS

13  MATTER WERE TO PROCEED TO TRIAL, THE GOVERNMENT COULD

14  PROVE THOSE FACTS BEYOND A REASONABLE DOUBT.

15      DO YOU SEE THAT?

16  A    YES.

17  Q    AND THAT FIRST PARAGRAPH THERE, YOU ADMIT THAT YOU

18  ATTEMPTED AGGRAVATED SEXUAL ABUSE OF YOUR COUSIN, C.L.R.

19  DO YOU SEE THAT?

20  A    YES.

21  Q    AND IT SAYS THAT YOU AGREE THAT THE GOVERNMENT WILL

22  BE ABLE TO PROVE THESE FACTS, THAT SHE REFUSED AND YOU

23  HELD HER HANDS DOWN WHILE YOU TOUCHED HER BREASTS, SKIN

24  TO SKIN, AND TOUCHED HER GENITALIA THROUGH HER CLOTHING.

25  DO YOU SEE THAT?

1   A    YES.

2   Q    AND YOU UNBUTTONED HER PANTS AS WE STRUGGLED.  DO YOU

3   SEE THAT?

4   A    YES.

5   Q    AND SHE YELLED FOR HELP AND YOU TOLD HER TO SHUT UP

6   AND YOU PUT YOUR HAND OVER HER MOUTH AND SQUEEZED HER

7   CHEEKS.  DO YOU SEE THAT?

8   A    YES.

9   Q    SO YOU AGREE THAT THESE FACTS WERE TRUE; RIGHT?

10  A    YES, I AGREE BECAUSE I DON'T SEE NO REASON FOR THEM

11  TO LIE.

12  Q    NOW, THERE IS ANOTHER SECTION DOWN THERE, OTHER

13  RELEVANT CONDUCT, AND WE HAVE ALREADY BEEN OVER SEVERAL

14  OF THESE, SO I WON'T GO THROUGH -- WE HAVE BEEN OVER ALL

15  OF THEM, I BELIEVE, AND I WON'T GO THROUGH EACH ONE, BUT

16  THESE ARE THE FACTS THAT YOU AGREED WERE TRUE; IS THAT

17  CORRECT?

18  A    YES.

19          MR. ROYSTER:  CAN I HAVE JUST A MOMENT, JUDGE?

20          THE COURT:  YOU MAY, SIR.

21          MR. ROYSTER:  THANK YOU.

22          THE COURT:  MR. ROYSTER, LET ME JUST

23  MENTION -- AND THIS APPLIES TO COUNSEL FOR THE RESPONDENT

24  AS WELL -- TO ENSURE THAT ANY CONFERENCES THAT YOU HAD

25  AMONGST YOURSELVES ARE NOT BROADCAST OVER THE SPEAKER

1    SYSTEM, YOU MAY WANT TO TURN THE MICROPHONES OFF.

2              I HAVE NOT BEEN ABLE TO UNDERSTAND ANYTHING

3    YOU HAVE SAID.  I HAVE HEARD WHISPERING THOUGH.

4              MR. ROYSTER:  I HAVEN'T SAID ANYTHING BAD YET,

5    JUDGE.

6              THE COURT:  I HAVEN'T UNDERSTOOD IT.  I ASSUME

7    IT'S NOT UNDERSTANDABLE, BUT I WANT TO PUT YOU ON NOTICE.

8              MR. ROYSTER:  I THINK YOU HAVE TO HOLD IT

9    DOWN.

10             THE CLERK:  IF THE LIGHT IS OFF, THAT MEANS

11   IT'S NOT, BUT JUST REMEMBER, BOTH OF YOU HAVE TWO MIKES

12   AT YOUR TABLE, SO YOU HAVE TO TURN THEM BOTH OFF.

13             MR. ROYSTER:  THANK YOU, JUDGE.

14             THE COURT:  YOU ARE WELCOME.

15             MR. ROYSTER:

16   Q   MR. ANTONE, IF YOU ARE RELEASED, WHERE ARE YOU GOING

17   TO GO?

18   A   PROBABLY TO TUCSON.

19   Q   WHY DO YOU SAY YOU ARE PROBABLY GOING THERE?

20   A   BECAUSE THEY HAVE PROGRAMS THERE THAT HAVE SEX

21   OFFENDER TREATMENT PROGRAM AND ALCOHOL TREATMENT PROGRAM.

22   Q   DO YOU HAVE A RELAPSE PREVENTION PLAN?

23   A   YES.

24   Q   WHAT IS A RELAPSE PREVENTION PLAN?

25   A   SOMEBODY TO HELP ME IF I FEEL THE NEED TO REOFFEND OR

1    FEEL THE NEED TO DRINK OR USE DRUGS, AND I KNOW I AM

2    STILL ON PROBATION IF I AM RELEASED, AND I KNOW I HAVE TO

3    ASK MY PROBATION OFFICER FOR SOME PSYCHOLOGIST THAT I CAN

4    GO TO AND TALK TO IF I NEED TO, BECAUSE I FOUND THAT

5    RELEASING MY FEELINGS WHILE I WAS INCARCERATED, I LEARNED

6    HOW TO RELEASE MY FEELINGS IN A POSITIVE WAY.  AND I

7    FOUND IT USEFUL TO TALK TO SOMEBODY AND LET THEM GIVE ME

8    IDEAS OF HOW TO COPE WITH MY FEELINGS.

9    Q    WHAT ELSE IS PART OF YOUR RELAPSE PREVENTION PLAN?

10   A    TO STAY AWAY FROM HIGH RISK PLACES.

11   Q    WHAT WOULD BE HIGH RISK PLACES FOR YOU?

12   A    BARS WHERE PEOPLE ARE USING DRUGS.

13   Q    ANYTHING ELSE?

14   A    (NO RESPONSE.)

15   Q    MR. ANTONE, DO YOU THINK -- IS THAT A NO?  WAS THAT A

16   NO?

17   A    I DON'T KNOW.  I JUST WENT BLANK.

18   Q    YOU WHAT?

19   A    I JUST -- I DON'T KNOW.

20   Q    DO YOU THINK SEX OFFENDER TREATMENT WOULD HELP YOU

21   IDENTIFY A RELAPSE PREVENTION PLAN?

22   A    YES.

23   Q    DO YOU HAVE ANY FAMILY IN TUCSON?

24   A    YES.

25   Q    WHO IS THERE?

1    A    MY SISTER.

2    Q    DID SHE EVER LIVE WITH YOU ON THE RESERVATION?

3    A    YES.

4    Q    DID SHE HAVE AN ALCOHOL PROBLEM, TOO?

5    A    NOT REALLY.  I DIDN'T REALLY KNOW.  SHE WAS ALWAYS

6    AWAY AT BOARDING SCHOOL.

7    Q    WHO ARE YOU GOING TO LIVE WITH IN TUCSON?

8    A    MY SISTER AND MY SON.

9    Q    HOW OLD IS YOUR SON NOW?

10   A    13.

11             MR. ROYSTER:  THANK YOU, MR. ANTONE.  NO

12   FURTHER QUESTIONS AT THIS TIME, YOUR HONOR.

13             THE COURT:  VERY GOOD, SIR.  WHY DON'T WE TAKE

14   OUR MORNING BREAK.  AND WE'LL RECONVENE AT 10:50.

15             (WHEREUPON, A SHORT RECESS WAS TAKEN.)

16             THE COURT:  MR. ANTONE, SIR, COULD YOU PLEASE

17   RESUME THE STAND?

18             MR. ANTONE, I ASSUME ONE OF YOUR LAWYERS IS

19   GOING TO HAVE SOME QUESTIONS FOR YOU AND THEN THE

20   GOVERNMENT COUNSEL MAY HAVE ADDITIONAL ONES AFTER THAT.

21             I WOULD REMIND YOU, SIR, THAT YOU DO REMAIN

22   UNDER OATH.

23             MR. ROSS.

24             MR. ROSS:  YES.  THANK YOU, YOUR HONOR.

25

 1   CROSS-EXAMINATION BY MR. ROSS:

 2   Q   I NEED YOU TO TAKE A DEEP BREATH AGAIN.  YOU ARE A

 3   LITTLE NERVOUS; AREN'T YOU?

 4   A   YES, SIR.

 5   Q   MORE THAN NERVOUS, SCARED?

 6   A   YES.

 7   Q   ALL RIGHT.  I WANT TO DIRECT YOUR ATTENTION TO

 8   OCTOBER 20, 2002, WHICH IS EIGHT YEARS AGO TODAY.  YOU

 9   WERE IN FCI-COLORADO?

10   A   AT THE PENITENTIARY.

11   Q   WHERE?

12   A   COLORADO.

13   Q   TAKING YOU INTO THE PLACE WHERE YOU MAKE A PHONE

14   CALL.  ALL RIGHT.  YOU MAKE THAT PHONE CALL TO SOMEONE

15   BACK IN ARIZONA; IS THAT CORRECT?

16   A   YES.

17   Q   THAT WAS YOUR MOTHER?

18   A   YES.

19   Q   AND YOU HAD A CONVERSATION WITH HER?

20   A   YES.

21   Q   NOW, PART OF THIS CONVERSATION DEALT WITH --

22           MR. ROYSTER:  OBJECTION.  LEADING.

23           THE COURT:  I AM SORRY?

24           MR. ROYSTER:  OBJECTION.  LEADING.

25           THE COURT:  THIS IS CROSS-EXAMINATION.  THE

1    OBJECTION IS OVERRULED.

2              MR. ROSS:

3    Q    PART OF THIS CONVERSATION DEALT WITH YOU GROWING UP

4    ON A TOHONO O'ODHAM RESERVATION; IS THAT RIGHT?

5    A    YES.

6    Q    NOW, LET'S TALK ABOUT TOHONO O'ODHAM FOR A MOMENT,

7    AND THEN WE WILL GET BACK TO THIS CONVERSATION.  TOHONO

8    O'ODHAM GOES ALL THE WAY TO THE MEXICO BORDER; IS THAT

9    CORRECT?

10   A    YES.

11   Q    AND IT ALSO BORDERS ON TUCSON, ARIZONA?

12   A    YES.

13   Q    AND PART OF IT BORDERS NEAR PHOENIX, ARIZONA AS WELL?

14   A    YES.

15   Q    IT'S A VAST AMOUNT OF LAND?

16   A    YES.

17   Q    IT'S DESERT?

18   A    YES.

19   Q    AND WHAT ALSO THE TOHONO O'ODHAM IS, IT IS A DRY

20   RESERVATION?

21   A    YES.

22   Q    AND FOR THOSE WHO DON'T KNOW WHAT A DRY RESERVATION

23   IS, IT'S A PLACE WHERE YOU NATIVE AMERICANS OR ANYONE IS

24   NOT SUPPOSED TO HAVE ALCOHOL ON THE RESERVATION; IS THAT

25   RIGHT?

1    A    YES.

2    Q    BUT ALCOHOL GETS ON THE RESERVATION?

3    A    YES.

4    Q    THE TOHONO O'ODHAM RESERVATION ALSO IS A PLACE THAT

5    DOESN'T HAVE MANY JOBS?

6    A    YES.

7    Q    MANY SCHOOLS?

8    A    YES.

9    Q    MANY OPPORTUNITIES?

10   A    YES.

11   Q    IT'S A POOR RESERVATION?

12   A    YES.

13   Q    WHAT TOHONO O'ODHAM ACTUALLY DOES HAVE ON THE

14   OUTSKIRTS OF TUCSON IS A CASINO?

15   A    YES.

16   Q    AND THE TOHONO O'ODHAM NATION IS GIVEN A STIPEND EACH

17   YEAR AS A RESULT OF WHAT IS MADE AT THE RESERVATION AT

18   THE CASINO?

19   A    YES.

20   Q    NOW, LET'S TALK ABOUT WHERE YOUR MOM STAYED.  WHAT

21   CITY WAS THAT?

22   A    SELLS.

23   Q    SELLS.  AND SELLS IS A COMMUNITY ABOUT 30 MILES AWAY

24   FROM MEXICO?

25   A    YES.

1   Q   NOW, SELLS, IF YOU ARE GOING TO LOOK AT THE

2   RESERVATION, THAT WOULD BE CONSIDERED A BIG CITY?

3   A   YES.

4   Q   BUT ANYWHERE ELSE, IT WOULD BE CONSIDERED A SMALL

5   PLACE; IS THAT RIGHT?

6   A   YES.

7   Q   NOW, YOU WERE GROWING UP.  YOU HAD A SISTER,

8   JENNIFER?

9   A   YES.

10   Q   SHE WAS OLDER?

11   A   A YEAR OLDER.

12   Q   A YEAR OLDER.  HER DAD WAS NOT YOUR DAD?

13   A   NO.

14   Q   YOU WERE THE SECOND CHILD TO YOUR MOTHER?

15   A   YES.

16   Q   YOUR DAD DID NOT LIVE AT THE SAME HOME WITH YOU OR

17   YOUR MOM OR YOUR SISTER?

18   A   YES.

19   Q   YOUR DAD WAS MARRIED TO SOMEONE ELSE?

20   A   YES.

21   Q   YOU DID NOT FIND OUT WHO YOUR DAD WAS UNTIL YOUR LATE

22   TEENS?

23   A   YES.

24   Q   WHEN AN AUNT KIND OF SLIPPED IT OUT WHILE SHE WAS

25   INTOXICATED FROM ALCOHOL?

1    A    YES.

2    Q    THERE WAS A YOUNGER BROTHER, OR THERE IS A YOUNGER

3    BROTHER, ERIC; IS THAT RIGHT?

4    A    YES.

5    Q    AND ERIC HAS SEVERAL HALF-SIBLINGS; IS THAT RIGHT?

6    A    YES.

7    Q    AND I MIGHT PRONOUNCE HER NAME WRONG, BUT HIS

8    HALF-SIBLING IS RICHANDA?

9    A    YES.

10   Q    WE WILL GET BACK TO THAT.  YOU DON'T REMEMBER WHAT

11   HAPPENED WITH RICHANDA?

12   A    NO.

13   Q    ALCOHOL WAS IN YOUR HOUSE WHILE YOU WERE GROWING UP;

14   IS THAT RIGHT?

15   A    YES.

16   Q    YOUR AUNTS AND UNCLES AND GRANDPARENTS, THEY ALL

17   DRANK?

18   A    YES.

19   Q    AND WHEN YOU OBSERVED THEM DRINKING, THEY WERE DRUNK,

20   WHAT YOU KNOW TO BE DRUNK?

21   A    YES.

22   Q    NOW, AGE 9 YOU STARTED DRINKING BUDWEISER; IS THAT

23   RIGHT?

24   A    YES.

25   Q    AND YOU WOULD SNEAK IT FROM FAMILY MEMBERS?

1   A   YES.

2   Q   IT WOULD BE GIVEN TO YOU BY UNCLES?

3   A   YES.

4   Q   INCLUDING THE UNCLE WHICH YOU REALLY LOVED.  I THINK

5   HIS NAME IS ALEX?

6   A   YES.

7   Q   THIS UNCLE THAT YOU LOVED OVER THE YEARS GAVE YOU

8   CONSIDERABLE AMOUNTS OF ALCOHOL?

9   A   YES.

10  Q   THIS UNCLE THAT YOU LOVED, ALEX, DIED OF CIRRHOSIS

11  WHILE YOU WERE IN PRISON?

12  A   YES.

13  Q   YOUR MOM, SHE DRANK A LOT?

14  A   YES.

15  Q   SHE WOULD NOT TELL YOU WHO YOUR DAD WAS?

16  A   NO.

17  Q   DID SHE EVER TELL YOU WHO YOUR DAD WAS?

18  A   NO.

19  Q   THAT HURT?

20  A   YES.

21  Q   IT HURT WHEN YOU SAW KIDS PLAYING WITH THEIR FATHERS?

22          MR. ROYSTER:  OBJECTION.  THIS IS OUTSIDE THE

23  SCOPE OF THE DIRECT EXAMINATION.

24          THE COURT:  PLEASE RISE, MR. ROYSTER, WHEN YOU

25  ARE ADDRESSING THE COURT, SIR.

1              I WILL ALLOW IT.  THE OBJECTION IS OVERRULED.

2              MR. ROSS:

3    Q   THIS HURT WHEN OTHER KIDS WERE PLAYING WITH THEIR

4    DADS?

5    A   YES.

6    Q   YOU KNOW WHAT DEPRESSION IS; RIGHT?

7    A   YES.

8    Q   YOU HAVE BEEN ON MEDICATION FOR DEPRESSION; RIGHT?

9    A   YES.

10   Q   YOU WERE DEPRESSED AS A KID?

11   A   YES.

12   Q   YOU WERE ANGRY AS A KID?

13   A   YES.

14   Q   YOU WERE CONFUSED AS A CHILD?

15   A   YES.

16   Q   THIS IS WHAT YOU TALKED ABOUT TO YOUR MOM ABOUT;

17   RIGHT?

18   A   YES.

19   Q   TALKED ABOUT THE ANGER?

20   A   YES.

21   Q   YOU TALKED ABOUT THE USE OF ALCOHOL?

22   A   YES.

23   Q   AND YOU TALKED ABOUT THE OTHER DRUGS WHICH YOU USED?

24   A   YES.

25   Q   THAT WAS COCAINE; RIGHT?

1    A    YES.

2    Q    MARIJUANA?

3    A    YES.

4    Q    HUFFING?

5    A    YES.

6    Q    HUFFING IS A POOR MAN'S WAY OF GETTING HIGH; RIGHT?

7    A    YES.

8    Q    AND HUFFING IS TAKING PAINT CANS WITH PAINT IN IT,

9    STICKING YOUR NOSE DOWN AND SMELLING THE FUMES THAT ARE

10   INSIDE THE PAINT CAN?

11   A    YES.

12   Q    YOU DID THAT A LOT?

13   A    YES.

14   Q    YOU DRANK A LOT?

15   A    YES.

16   Q    YOU USED MARIJUANA AND COCAINE WHEN YOU COULD GET IT?

17   A    YES.

18   Q    YOU TALKED TO YOUR MOM ABOUT THE CAR ACCIDENT THAT

19   YOU HAD OR THAT CAR ACCIDENT THAT YOU WERE IN WHERE THERE

20   IS THAT SCAR RIGHT UNDERNEATH YOUR CHIN.  CAN YOU POINT

21   TO IT, PLEASE?

22   A    RIGHT HERE.

23   Q    YOU TALKED ABOUT THE CAR ACCIDENT WHERE THE PERSON

24   STOPPED AND HIT SOMETHING AND YOU FELL OUT THE BACK

25   WINDOW; IS THAT RIGHT?

1   A   THE FRONT WINDSHIELD.

2   Q   I AM SORRY.  THE FRONT WINDSHIELD.  YOU NOT ONLY CUT

3   UNDERNEATH YOUR CHIN, YOU GOT A CUT ABOVE YOUR EYEBROW

4   AND YOUR EYE?

5   A   YES.

6   Q   YOU TALKED ABOUT BLACK OUTS?

7   A   YES.

8   Q   WHERE YOU DIDN'T REMEMBER THINGS?

9   A   YES.

10  Q   THIS HAPPENED WHEN YOU WERE DRINKING?

11  A   YES.

12  Q   THIS HAPPENED WHEN YOU WERE HUFFING?

13  A   YES.

14  Q   PEOPLE WOULD COME BACK AND TALK TO YOU ABOUT WHAT YOU

15  HAD DONE?

16  A   YES.

17  Q   AND YOU HAD NO RECOLLECTION?

18  A   NO.

19  Q   YOU GOT INTO TROUBLE IN SCHOOL; RIGHT?

20  A   YES.

21  Q   YOU WERE TOLD BY PEOPLE THAT YOU WOULD NEVER AMOUNT

22  TO ANYTHING; IS THAT RIGHT?

23  A   YES.

24  Q   YOU EVEN BELIEVED THAT?

25  A   YES.

1    Q    YOU TRIED TO TAKE PILLS TO TAKE YOUR LIFE?

2    A    YES.

3    Q    YOU TRIED TO HANG YOURSELF WHILE YOU WERE AT A

4    FRIEND'S HOUSE IN HIS CLOSET?

5    A    YES.

6    Q    BUT YOU WERE SPARED?

7    A    YES.

8    Q    YOU TALKED TO YOUR MOM ABOUT WHAT YOU HAVE DONE WHILE

9    YOU HAVE BEEN IN PRISON; IS THAT RIGHT?

10   A    YES.

11   Q    YOU TALKED TO HER ABOUT HOW SINCE 1997 -- 1998,

12   EXCUSE ME, 1998, YOU HAVE BEEN SOBER?

13   A    YES.

14   Q    YOU TALKED TO HER EVEN BEFORE THAT HOW IN THE CELL

15   THAT YOU WERE IN IN TOHONO O'ODHAM JAIL WHERE YOUR CELL

16   MATE COMMITTED SUICIDE BY HANGING WHILE YOU WERE IN

17   THERE?

18   A    YES.

19   Q    YOU TALKED TO YOUR MOM ABOUT THE FACT THAT THE

20   DIFFICULTY THAT YOU HAD OF DEALING WITH THE DEATH OF A

21   CELL MATE WHO HUNG HIMSELF AND KILLED HIMSELF WHILE HE

22   WAS IN THAT JAIL?

23   A    YES.

24   Q    YOU TALKED TO YOUR MOM ABOUT THE FACT THAT YOU NEEDED

25   TO TALK TO SOMEBODY ABOUT WHAT YOU WERE FEELING?

1    A    YES.

2    Q    BECAUSE YOU KNOW THAT YOU WERE ANGRY GROWING UP?

3    A    YES.

4    Q    YOU WERE ANGRY BECAUSE NO DAD IN THE HOME?

5    A    YES.

6    Q    AND YOU TOLD THIS TO YOUR MOM AND YOU WEREN'T

7    ACCUSING HER; WERE YOU?

8    A    NO.

9    Q    YOU WERE JUST LETTING OUT YOUR FEELINGS?

10   A    YES.

11   Q    THIS IS SOMETHING THAT YOU DID NOT LEARN WHILE YOU

12   WERE IN GROWING UP IS HOW TO DEAL WITH YOUR FEELINGS?

13   A    YES.

14   Q    GOING BACK EIGHT YEARS AGO TODAY, YOU WERE 31 YEARS

15   OLD?

16   A    YES.

17   Q    BY THE TIME YOU WERE TALKING TO YOUR MOM, YOU HAD

18   MADE A WAY WHILE YOU WERE IN THE PENITENTIARY TO GET YOUR

19   GED?

20   A    YES.

21   Q    THAT WAS ONE OF THE FIRST THINGS YOU DECIDED TO DO

22   WHEN YOU WERE IN THE PENITENTIARY?

23   A    YES.

24   Q    I AM DIRECTING YOUR ATTENTION TO DEFENSE EXHIBIT

25   NUMBER 12.  THAT IS THE SECOND SET OF 12, NUMBER 12 IN

1    THAT BOOK, ANTONE.

2         DO YOU SEE RESPONDENT'S EXHIBIT NUMBER 12?

3    A    NO.

4    Q    IT'S THE SECOND SET OF NUMBERS, TOWARDS THE BACK OF

5    THE BOOK.  I SEE YOU LOOKING DOWN AND YOU HAVE STOPPED

6    TURNING PAGES.  DOES THAT MEAN YOU FOUND RESPONDENT'S

7    EXHIBIT NUMBER 12?

8    A    YES.

9    Q    THAT IS YOUR HIGH SCHOOL EQUIVALENCY DIPLOMA; IS THAT

10   RIGHT?

11   A    YES.

12   Q    YOU GOT IT FROM THE STATE OF COLORADO?

13   A    YES.

14   Q    THIS WAS THE PAPER THAT PEOPLE TOLD YOU YOU WOULD

15   NEVER BE ABLE TO GET?

16   A    YES.

17   Q    AND YOU RECEIVED IT ON OCTOBER 17, 2001?

18   A    YES.

19   Q    SOME THREE YEARS AFTER YOU HAD BEEN COMMITTED TO THE

20   FEDERAL PENITENTIARY OR AFTER YOU HAD BEEN ARRESTED; IS

21   THAT RIGHT?

22   A    YES.

23   Q    IT WAS A PROUD MOMENT?

24   A    YES.

25   Q    THIS WAS THE FIRST TIME YOU HAD TAKEN THE TEST TO GET

1    YOUR GED?

2    A    YES.

3    Q    THIS WAS A DUTY IN WHICH YOU TOOK UPON YOURSELF TO

4    STUDY HARD FOR?

5    A    YES.

6    Q    YOU WOULD AGREE WITH ME WHILE YOU WERE AT U.S.P.-

7    FLORENCE, THE PENITENTIARY IS NOT AN EASY PLACE TO BE?

8    A    YES.

9    Q    IT'S NOT EASY BECAUSE PEOPLE WHO HAVE BEEN CONVICTED

10   OF WHAT YOU HAVE BEEN CONVICTED OF, ARE SOUGHT OUT AND

11   ATTACKED BY PEOPLE WHILE THEY WERE IN THE PRISON; IS THAT

12   RIGHT?

13   A    YES.

14   Q    MANY OF THE PEOPLE CONVICTED OF WHAT YOU WERE

15   CONVICTED OF STAY IN SEGREGATED POPULATION?

16   A    YES.

17   Q    STAY AWAY FROM THE COMMUNITY; IS THAT RIGHT?

18   A    YES.

19   Q    TO MAKE SURE THEY ARE NOT ATTACKED?

20   A    YES.

21   Q    THEY ARE NOT HURT?

22   A    YES.

23   Q    THEY ARE NOT KILLED?

24   A    YES.

25   Q    TURN BACK TO RESPONDENT'S EXHIBIT NUMBER 8.  YOU

1    TALKED TO YOUR MOM ABOUT GOING TO THESE CLASSES THAT YOU

2    HAD BEEN TO, THE BASIC LITERACY AND THE GED CLASS?

3    A    YES.

4    Q    YOU TOLD YOUR MOM THAT YOU HAD BEEN SOBER FOR THIS

5    AMOUNT OF TIME WHILE YOU HAD BEEN IN THE SYSTEM?

6    A    YES.

7    Q    PRETTY AMAZING?

8    A    YES.

9    Q    IT WAS PRETTY AMAZING BECAUSE EVEN AT THAT TIME YOU

10   HAD BEEN SOBER FOR OVER TWO YEARS?

11   A    YES.

12   Q    NOW, AT THIS POINT, YOU HAVE BEEN IN CUSTODY FOR

13   ALMOST 14 YEARS; IS THAT RIGHT?

14   A    YES.

15   Q    OVER 1,400 DAYS LONGER THAN WHAT YOU WERE SUPPOSED TO

16   BE RELEASED ON FEBRUARY 27, 2007; IS THAT RIGHT?

17   A    YES.

18   Q    SOBER IN THE PRISON.  NOT EVERY INMATE IS SOBER IN

19   THE PRISON?

20   A    YES.

21   Q    YOU CAN GET ALCOHOL WHEN YOU ARE IN THE PRISON?

22   A    YES.

23   Q    PEOPLE MAKE IT?

24   A    YES.

25   Q    PEOPLE HIDE IT?

1    A    YES.

2    Q    PEOPLE DRINK IT?

3    A    YES.

4    Q    AND YOU TALKED TO YOUR MOM ABOUT DOING THE

5    BREATHALYZER AT THE PRISON?

6    A    YES.

7    Q    THAT OFFICERS AND LIEUTENANTS RANDOMLY CHECK TO SEE

8    IF YOU HAVE BEEN DRINKING ALCOHOL?

9    A    YES.

10   Q    YOU ALSO TALKED TO YOUR MOM ABOUT GETTING TESTED FOR

11   DRUGS?

12   A    YES.

13   Q    AND YOU WERE NEGATIVE FOR NOT ONLY THE DRUG OF

14   ALCOHOL, BUT THE DRUG OF ANY SUBSTANCE?

15   A    YES.

16   Q    THAT WAS YOUR CHOICE?

17   A    YES.

18   Q    YOU HAD OPPORTUNITIES TO TAKE AND PARTAKE IN ALCOHOL?

19   A    YES.

20   Q    YOU HAD OPPORTUNITIES TO PARTAKE IN ANY -- ANOTHER

21   KIND OF DRUG AS WELL?

22   A    YES.

23   Q    BUT YOU CHOSE NOT TO?

24   A    YES.

25   Q    YOU DECIDED THAT WAS GOING TO BE DIFFERENT ABOUT YOUR

1    LIFE, THAT YOU WERE NOT GOING TO PARTAKE IN THESE THINGS?

2    A    YES.

3    Q    AND YOU TOLD THIS TO MOM?

4    A    YES.

5    Q    YOU TALKED TO YOUR MOM ABOUT NOT WORKING WHILE YOU

6    WERE ON THE RESERVATION; IS THAT RIGHT?

7    A    YES.

8    Q    YOU TALKED ABOUT THE SKILLS THAT YOU HAD OF

9    FIREFIGHTING; IS THAT RIGHT?

10   A    YES.

11   Q    THAT IS SEASONAL WORK?

12   A    YES.

13   Q    YOU TALKED TO YOUR MOM ABOUT TRYING TO PICK YOURSELF

14   UP AND GAIN NEW SKILLS SO YOU CAN BE EMPLOYED WHEN YOU

15   ARE FINALLY RELEASED FROM PRISON?

16   A    YES.

17   Q    FINALLY RELEASED FROM A PLACE AFTER SERVING THE TIME

18   IN WHICH THE DISTRICT COURT IN TUCSON, ARIZONA GAVE YOU

19   AS A RESULT OF YOUR GUILTY PLEA?

20   A    YES.

21   Q    IN A SHORT AMOUNT OF TIME WHILE YOU WERE IN PRISON,

22   YOU LEARNED HOW TO READ?

23   A    YES.

24   Q    YOU LEARNED HOW TO COMPREHEND?

25   A    YES.

1    Q    YOU LEARNED HOW TO WRITE?

2    A    YES.

3    Q    YOU LEARNED HOW TO DO MATH?

4    A    YES.

5    Q    YOU LEARNED THE ABILITY TO WANT TO LEARN?

6    A    YES.

7    Q    YOU DIDN'T HAVE ALL THOSE SKILLS WHEN YOU WERE OUT ON

8    THE STREET?

9    A    NO.

10   Q    YOU DIDN'T HAVE THOSE SKILLS OF REALIZING THAT YOU

11   WERE AN ALCOHOLIC?

12   A    NO.

13   Q    YOU TOLD YOUR MOM THAT YOU WANTED TO FIGURE OUT A

14   BUSINESS AND YOU WERE TAKING BUSINESS CLASSES WHILE YOU

15   WERE AT THE PRISON?

16   A    YES.

17   Q    AND YOU TOOK THOSE BUSINESS CLASSES?

18   A    YES.

19   Q    AND YOU TALKED ABOUT YOUR SON?

20   A    YES.

21   Q    ERIC IS HIS NAME?

22   A    PERNEL.

23   Q    I AM SORRY.  YOU ARE RIGHT.  PERNEL IS YOUR SON'S

24   NAME.  AND AT THIS TIME THAT YOU TALKED TO YOUR MOTHER

25   EIGHT YEARS AGO DAY, HE WAS A LITTLE OVER FOUR YEARS OLD?

1    A    YES.

2    Q    AND AT THIS POINT IN YOUR LIFE, HE WAS STAYING WITH

3    YOUR SISTER, JENNIFER?

4    A    YES.

5    Q    HIS MOTHER TANYA JUST DROPPED HIM OFF ONE DAY AND

6    MOVED ON?

7    A    DROPPED HIM OFF WITH MY MOTHER.

8    Q    REALLY NEVER TO RETURN BACK INTO HIS LIFE?

9    A    YES.

10   Q    THIS TANYA, HIS MOTHER, USED DRUGS; RIGHT?

11   A    YES.

12   Q    USED ALCOHOL?

13   A    YES.

14   Q    YOU ALL KIND OF DID THE SAME THING?

15   A    YES.

16   Q    THAT IS WHY YOU WERE COMPATIBLE?

17   A    YES.

18   Q    YOU TALKED TO YOUR MOM ABOUT WHERE DO YOU GO FROM

19   HERE?

20   A    YES.

21   Q    YOU TALKED TO HER ABOUT MAKING HER PROUD?

22   A    YES.

23   Q    YOU TALKED TO HER ABOUT DEALING AND MAKING SURE YOU

24   ARE SOBER?

25   A    YES.

1    Q   YOU TALKED TO HER ABOUT BEING THE FATHER FOR YOUR

2    SON, THE FATHER YOU NEVER HAD?

3    A   YES.

4    Q   THAT WAS A DIFFICULT CONVERSATION?

5    A   YES.

6    Q   THAT WAS AN EMOTIONAL CONVERSATION?

7    A   YES.

8    Q   DO YOU REMEMBER HOW YOU GOT INTO TROUBLE AS YOU WERE

9    GROWING UP?

10   A   YES.

11   Q   CUTTING SCHOOL?

12   A   YES.

13   Q   DRINKING?

14   A   YES.

15   Q   DISOBEYING YOUR PARENT?

16   A   YES.

17   Q   TRYING TO GET HIGH OR STONED OR INTOXICATED AT ANY

18   CHANCE YOU POSSIBLY COULD?

19   A   YES.

20   Q   YOU WANTED THIS TREATMENT PROGRAM WHILE YOU WERE IN

21   THERE, IN THE PRISON?

22   A   YES.

23   Q   YOU WANTED THIS BECAUSE YOU WANTED TO UNDERSTAND WHY

24   IT WAS THAT YOU WERE BEING ACCUSED OF SO MANY OF THESE

25   THINGS; RIGHT?

1    A    YES.

2    Q    YOU WANTED THIS TREATMENT BECAUSE THIS IS THE REASON

3    WHY YOU WERE IN FEDERAL COURT?

4    A    YES.

5    Q    THIS WAS THE REASON WHY YOU DID NOT STAY AT THE

6    TOHONO O'ODHAM NATION JAIL?

7    A    YES.

8    Q    WHICH WAS ON THE RESERVATION?

9    A    YES.

10   Q    WHICH IS IN SELLS?

11   A    YES.

12   Q    IT WAS FRUSTRATING AT FIRST WHEN YOU FOUND OUT THAT

13   YOU COULD NOT GET THIS TREATMENT?

14   A    YES.

15   Q    YOU DIDN'T STOP THERE.  YOU DECIDED TO DO WHAT YOU

16   COULD WITH THE THINGS THAT YOU KNEW YOU HAD PROBLEMS

17   WITH, WHICH WAS ALCOHOL?

18   A    YES.

19   Q    YOU TALKED ABOUT BEING IN THE HIGH RISK AREA.  YOU

20   TALKED ABOUT NOT GOING AROUND BARS?

21   A    YES.

22   Q    THAT IS A HIGH RISK AREA BECAUSE WHAT HAPPENS IF YOU

23   ARE AROUND A PLACE THAT SERVES ALCOHOL?

24   A    THERE IS ALWAYS A CHANCE I MIGHT DRINK.

25   Q    PULL THE MIKE UP.

1    A    I KNOW THERE IS ALWAYS A CHANCE I MIGHT DRINK.

2    Q    SO, IF YOU KNOW THAT YOU CAN'T BE AROUND PLACES THAT

3    SERVE ALCOHOL, YOU ALSO KNOW WHILE YOU ARE IN THE PRISON

4    THAT FOLKS ARE DRINKING ALCOHOL; IS THAT RIGHT?

5    A    YES.

6    Q    AND WE ARE NOT JUST TALKING ABOUT AT THE PENITENTIARY

7    OUT IN COLORADO; ARE WE?

8    A    NO.

9    Q    WE ARE TALKING ABOUT IN THE MARYLAND UNIT?

10   A    YES.

11   Q    WE ARE TALKING ABOUT IN THE PLACE WHERE THEY HAVE YOU

12   ALL SECLUDED BEHIND A GATE AT BUTNER?

13   A    YES.

14   Q    THERE IS ALCOHOL THERE AND YOU CAN SMELL IT WHEN

15   PEOPLE HAVE BEEN DRINKING?

16   A    YES.

17   Q    AND YOU DO EVERYTHING IN YOUR POWER TO STAY AWAY FROM

18   THAT?

19   A    YES.

20   Q    AND WHEN I SAY STAY AWAY, YOU SMELL IT, YOU GO THE

21   OPPOSITE WAY?

22   A    YES.

23   Q    THAT IS YOUR OLD LIFE, THE ALCOHOL?

24   A    YES.

25   Q    THE FACT THAT YOU CAN'T REMEMBER A LOT OF THINGS IS

1    NOT SOMETHING THAT YOU WANT TO REPEAT AS A 39 YEAR OLD

2    PLUS MAN; IS IT?

3    A    YES.

4    Q    YOU DON'T WANT TO BLACK OUT?

5    A    NO.

6    Q    YOU DON'T WANT TO NOT REMEMBER WHAT IS GOING ON

7    AROUND YOU?

8    A    (NO RESPONSE.)

9    Q    AND IF IT'S CONFUSING, I CAN REPEAT IT?

10   A    YES.  IT'S CONFUSING.

11   Q    NOT A PROBLEM.  YOU WANT TO REMEMBER WHAT IS GOING ON

12   AROUND YOU?

13   A    YES.

14   Q    YOUR SON, PERNEL, DO YOU HAVE A RELATIONSHIP WITH

15   HIM?

16   A    YES.

17   Q    HAS HE BEEN TO SEE YOU WHILE YOU HAVE BEEN AT BUTNER

18   A    NO.

19   Q    HAS HE BEEN TO SEE YOU WHILE YOU HAVE BEEN IN

20   COLORADO?

21   A    NO.

22   Q    HAVE YOU HUGGED HIM?

23   A    NO.

24   Q    IT'S JUST LIKE YOU AND YOUR DAD.  HAVE YOU EVER

25   HUGGED HIM?

1    A    NO.

2    Q    DO YOU TALK TO YOUR SON?

3    A    YES.

4    Q    YOUR SON KNOWS WHAT YOU ARE IN CUSTODY FOR?

5    A    YES.

6    Q    YOU HAVE TOLD HIM NOT TO FALL DOWN AND GO DOWN THE

7    SAME PATH THAT YOU HAVE BEEN?

8    A    YES.

9    Q    YOU HAVE EXPLAINED TO HIM THE PERILS OF DRINKING?

10   A    YES.

11   Q    HE ASKED QUESTIONS OF YOU?

12   A    YES.

13   Q    YOU WRITE LETTERS?

14   A    YES.

15   Q    HE WRITES BACK?

16   A    YES.

17   Q    YOU WRITE TO HIM BECAUSE YOU DON'T LIKE TO TALK ON

18   THE PHONE WITH HIM; RIGHT?

19   A    YES.

20   Q    YOU WRITE TO HIM SO HE CAN REMEMBER YOUR WORDS

21   LONGER?

22   A    YES.

23   Q    SO THAT HE CAN KEEP YOUR WORDS?

24   A    YES.

25   Q    THAT IS SOMETHING THAT YOU DID NOT HAVE AS A CHILD

1    GROWING UP FROM YOUR DAD?

2    A    YES.

3    Q    YOU HAVE LEARNED SKILLS WHILE YOU HAVE BEEN IN PRISON

4    LONG AFTER THAT PHONE CALL EIGHT YEARS AGO.  YOU LEARNED

5    HOW TO PLAY THE GUITAR?

6    A    YES.

7    Q    DEFENSE EXHIBIT NUMBER -- EXCUSE ME -- RESPONDENT'S

8    EXHIBIT NUMBER 10.  THIS WAS THE DRUG TREATMENT TIME THAT

9    YOU HAD WHILE YOU WERE IN PRISON; IS THAT RIGHT?

10   A    YES.

11   Q    DOES IT SAY 40 HOURS?

12   A    YES.

13   Q    AUGUST 21, 2000, TO SEPTEMBER 27, 2000?

14   A    YES.

15   Q    SO HOW MANY TIMES HAVE YOU TURNED UP POSITIVE SINCE

16   SEPTEMBER 27, 2000?

17   A    NONE.

18   Q    HOW MANY TIMES HAVE YOU SEEN OTHER PEOPLE HIGH OR

19   INTOXICATED SINCE 2000?

20   A    MANY TIMES.

21   Q    RESPONDENT'S EXHIBIT NUMBER 9, THE ONE RIGHT BEFORE

22   IT, THIS WAS YOUR -- TURNING TO THE SECOND PAGE, WHICH IS

23   BOP_ANTO_371, THAT IS YOUR SIGNATURE?

24   A    YES.

25   Q    THAT IS WHERE YOU AGREED TO ABIDE BY THE CONDITIONS

1    OF DOING THE ALCOHOL TREATMENT PROGRAM?

2    A   YES.

3    Q   RESPONDENT'S EXHIBIT NUMBER 13.  THE FIRST ONE UP

4    SHOULD BE THE MEINEKE MAINTENANCE SERVICE PROGRAM?

5    A   YES.

6    Q   DEALING WITH CARS?

7    A   YES.

8    Q   THIS 2007 IS FOR, IT LOOKS LIKE, SOME KIND OF SPORT.

9    QUARTERBACK?

10   A   YES.

11   Q   ARE YOU A QUARTERBACK?

12   A   YES.  QUARTERBACK CHALLENGE.

13   Q   WHICH IS BOP_ANTO_ NUMBER 375, WHICH IS THE NEXT

14   PAGE.  IT'S A CERTIFICATE FOR BEGINNING LESSONS OF

15   GUITAR; IS THAT RIGHT?

16   A   YES.

17   Q   IS THAT THE FIRST TIME YOU HAVE PICKED UP A GUITAR IN

18   2007?

19   A   YES.

20   Q   CAN YOU PLAY THE GUITAR?

21   A   YES.

22   Q   CAN YOU PLAY ANY SONGS ON THE GUITAR?

23   A   YES.

24   Q   CAN YOU TELL US SOME OF THE SONGS WHICH YOU CAN PLAY?

25              MR. ROYSTER:  OBJECTION.  RELEVANCE.

1          THE COURT:  OVERRULED.  YOU MAY ANSWER THE

2    QUESTION, SIR.

3          THE WITNESS:

4    A    LANDING IN LONDON.

5    Q    WHAT IS IT?

6    A    LANDING IN LONDON.

7    Q    WHO DID THAT SONG ORIGINALLY?

8    A    THREE DOORS DOWN.  AND ONE FROM NICKELBACK, AND IT'S

9    CALLED HEAVEN.

10   Q    I HAVE ONE MORE THAT I AM GOING TO ASK YOU ABOUT, AN

11   ERIC CLAPTON SONG, STAIRWAY TO HEAVEN.  CAN YOU PLAY THAT

12   ON THE GUITAR?

13   A    YES.

14   Q    NOT ONLY CAN YOU PLAY THE GUITAR, YOU HAVE BEEN

15   TEACHING OTHERS HOW TO PLAY THE GUITAR?

16   A    YES.

17   Q    WAS THAT A SKILL IN WHICH YOU HAD BEFORE YOU WENT TO

18   PRISON?

19   A    NO.

20   Q    NOW, THE GUITAR IS NOT THE ONLY THING THAT YOU HAVE

21   LEARNED HOW TO PLAY; IS IT?

22   A    NO.

23   Q    YOU CAN PLAY THE NATIVE AMERICAN FLUTE?

24   A    YES.

25   Q    CAN YOU DESCRIBE WHAT THAT FLUTE LOOKS LIKE?

1    A    WELL, IT'S A KIND OF LONG PIECE OF WOOD THAT HAS FIVE

2    OR SIX HOLES IN IT AND IT HAS A SOOTHING SOUND TO IT.

3    Q    AND YOU PLAY THAT?

4    A    YES.

5    Q    DOES IT SOOTHE YOU?

6    A    YES.

7    Q    DO YOU FIND YOURSELF EVEN IN PRISON NOW BEING

8    FRUSTRATED?

9    A    YES.

10   Q    THAT YOU NEED TO SOOTHE YOURSELF?

11   A    YES.

12   Q    IS THIS ONE OF THE WAYS IN WHICH YOU HAVE LEARNED TO

13   SOOTHE YOURSELF?

14   A    YES.

15   Q    IS THIS ONE OF THE WAYS YOU HAVE LEARNED, INSTEAD OF

16   GOING TO FIND SOME ALCOHOL TO DRINK?

17   A    YES.

18   Q    LET'S TALK ABOUT THE NEXT ONE, WHICH IS BOP_ANTO_376.

19   THIS IS TO CERTIFY THAT YOU FINISHED THE DRUG EDUCATION

20   PROGRAM IN 2000.  THAT IS A CERTIFICATE; RIGHT?

21   A    YES.

22   Q    THEN THERE IS THE NEXT PAGE WHICH IS BOP_ANTO_377,

23   AND THIS IS A PROGRAM, AND THIS IS A CERTIFICATE THAT HAS

24   A CRUTCH AND IT HAS A CIRCLE WITH A LINE THROUGH THE

25   MIDDLE.  IN OTHER WORDS, NO CRUTCHES?

1   A   YES.  LIFE WITHOUT A CRUTCH.

2   Q   NO EXCUSES?

3   A   YES.

4   Q   YOU ARE WHO YOU ARE?

5   A   YES.

6   Q   YOU HAVE TO PICK YOURSELF UP?

7   A   YES.

8   Q   DUST YOURSELF OFF?

9   A   YES.

10  Q   MAKE YOUR OWN WAY?

11  A   YES.

12  Q   I DON'T KNOW IF THE NEXT ONE HAS A NUMBER ON IT, BUT

13  IT IS CALLED VOCATIONAL TRAINING COMPUTER PROGRAMS

14  CERTIFICATE.  YOU HAD 120 HOURS OF THAT PROGRAM?

15  A   YES.

16  Q   THE NEXT ONE, WHICH I THINK IS BOP_ANTO_379, FIRST

17  AND SECOND DEGREE -- IS IT REIKI?

18  A   REIKI.

19  Q   WHAT IS THAT?

20  A   IT'S A FORM OF MEDITATION THAT HAS A HEALING

21  TECHNIQUE.

22  Q   IS THAT NATIVE AMERICAN OR IS THAT SOME OTHER --

23  A   I THINK IT ORIGINATED FROM JAPAN.

24  Q   THE NEXT PAGE, WHICH I DON'T SEE THE NUMBER, IS

25  CERTIFICATE OF COMPLETION FOR MONEY MANAGEMENT AND

1    PERSONAL FINANCE; IS THAT RIGHT?

2    A    YES.

3    Q    THAT YOU RECEIVED NOVEMBER 14, 2002?

4    A    YES.

5    Q    BUT YOUR EDUCATION AND YOUR CLASSES HAVE NOT STOPPED

6    THERE; HAVE THEY?

7    A    NO.

8    Q    YOU HAVE TAKEN CLASSES ON HOW TO BEAD?

9    A    YES.

10   Q    LET'S TALK ABOUT BEADING FOR A MOMENT.  HOW DID YOU

11   LEARN HOW TO BEAD?

12   A    WE HAD AN ELDER NATIVE AMERICAN THAT TAUGHT A CLASS

13   AT BUTNER.

14   Q    AND WHEN DID YOU START LEARNING?  THIS IS SOMETHING

15   RECENTLY THAT YOU HAVE PICKED UP, THIS BEADING?

16   A    YES.

17   Q    AND THE BEADS ARE SMALL?

18   A    YES.

19   Q    AND YOU, AS THE PERSON WHO IS BEADING, HAS TO DECIDE

20   WHAT BEAD GOES WHERE TO MAKE A PATTERN?

21   A    YES.

22   Q    IT TAKES PATIENCE?

23   A    YES.

24   Q    IT TAKES A CREATIVE MIND?

25   A    YES.

1    Q   IT TAKES A PLAN?

2    A   YES.

3    Q   AND IF IT TURNS INTO SOMETHING, IT'S A RESULT OF HARD

4    WORK?

5    A   YES.

6    Q   AND I KNOW YOU JUST STARTED IT, AND JUST FOR

7    ILLUSTRATIVE --

8              MR. ROSS:  YOUR HONOR?

9              THE COURT:  YES, SIR.

10             MR. ROSS:  I JUST WANTED THE COURT TO KNOW WE

11   DIDN'T HAVE THIS BEFORE BECAUSE HE JUST RECENTLY FINISHED

12   IT, AND WE ARE NOT ASKING TO ENTER IT, BUT JUST FOR

13   ILLUSTRATIVE PURPOSE WANT TO SHOW THE COURT WHAT BEADING

14   DOES, BECAUSE I HAVE A COUPLE OF HIS PIECES HERE BEFORE

15   THE COURT.  AND I JUST WANTED TO SHOW IT TO THE COURT SO

16   THE COURT IS AWARE OF WHAT IT IS.

17             ANY OBJECTION, MR. ROYSTER?

18             MR. ROYSTER:  NO, YOUR HONOR.

19             THE COURT:  ALL RIGHT.

20             MR. ROSS:  YOUR HONOR, MAY I APPROACH?

21             THE COURT:  YOU MAY, SIR.

22             MR. ROSS:

23   Q   JUST GIVING THE COURT TWO PIECES, AND I WANT TO TALK

24   ABOUT THE ONE THAT IS BLACK WITH BLUE, AND IT HAS SOME

25   PINK IN IT; OKAY.  AND IT APPEARS TO BE AN EARRING?

1    A    YES.

2    Q    THAT PIECE RIGHT THERE, IF YOU TURN IT A CERTAIN WAY,

3    AND LOOK AT THE SMALL PART DIRECTLY IN FRONT OF YOU, IT

4    LOOKS LIKE AN ANGEL?

5    A    YES.

6    Q    AND ON THE END OF IT, IT HAS SEVERAL BEADS THAT ARE

7    LIKE 16 DIFFERENT BEADS UNDERNEATH THE ANGEL?

8    A    YES.

9    Q    BUT WHEN YOU TAKE THOSE 16 BEADS THAT ARE UNDERNEATH

10   THE ANGEL AND YOU GRAB THAT AND FLIP IT OVER, IT LOOKS

11   LIKE A MASK?

12   A    YES.

13   Q    THAT TOOK SOME TIME?

14   A    YES.

15   Q    AND IT TOOK SOME EFFORT.  IF YOU DO BEADING WRONG,

16   YOU WILL MESS UP THE WHOLE PATTERN?

17   A    YES.

18   Q    YOU HAVE TO START OVER?

19   A    YES.

20   Q    OR YOU HAVE TO GIVE UP?

21   A    YES.

22   Q    YOU WERE AN ALCOHOLIC?

23   A    YES.

24   Q    YOU WILL ALWAYS BE AN ALCOHOLIC?

25   A    YES.

1    Q    YOU KNOW YOU NEED TO STAY AWAY FROM ALCOHOL?

2    A    YES.

3    Q    YOU HAVE BEEN IN AA MEETINGS?

4    A    YES.

5    Q    AND THAT IS HELPFUL?

6    A    YES.

7    Q    YOU KNOW THAT YOU HAVE THESE EMOTIONS OF DEALING WITH

8    THINGS INSIDE OF YOU, AND YOU NEED TO TALK TO PEOPLE

9    ABOUT IT?

10   A    YES.

11   Q    AND YOU HAVE MADE YOUR WAY TO DIFFERENT PSYCHOLOGISTS

12   OR COUNSELORS WHILE YOU HAVE BEEN AT BUTNER?

13   A    YES.

14   Q    LET'S DEAL WITH THE FIRST PART WHICH IS TREATMENT.

15   NOW, YOU ARE NOT IN A SEXUAL SOTP PROGRAM; IS THAT RIGHT?

16   A    YES.

17   Q    YOU WERE NOT SENT TO THE SOTP PROGRAM UNTIL TWO WEEKS

18   BEFORE YOU WERE SUPPOSED TO BE RELEASED?

19   A    YES.

20   Q    AND WHEN YOU GOT TO BUTNER, THEY TOLD YOU THAT THEY

21   WERE CERTIFYING YOU UNDER THIS ADAM WALSH ACT?

22   A    YES.

23   Q    AND YOU UNDERSTOOD THAT THAT MEANT THERE IS THE

24   POSSIBILITY OF BEING BEHIND BARS FOR THE REST OF YOUR

25   LIFE?

1    A    YES.

2    Q    AND YOU WERE PUT IN THE SETTING WITH OTHER PEOPLE WHO

3    WERE CERTIFIED OR PRE-CERTIFIED AND AS PEOPLE UNDER THE

4    4248 ACT?

5    A    YES.

6    Q    THE ADAM WALSH ACT?

7    A    YES.

8    Q    AND THERE WAS TALK; IS THAT RIGHT?

9    A    YES.

10   Q    THERE WAS TALK AMONG THE INMATES?

11   A    YES.

12   Q    AND YOU KNEW AS A RESULT OF THAT, THAT THINGS COULD

13   BE USED AGAINST YOU?

14   A    YES.

15   Q    YOU KNEW THAT IF YOU WERE TO TALK TO ANYBODY THERE IS

16   THE POSSIBILITY OF THAT BEING USED AGAINST YOU?

17   A    YES.

18   Q    YOU ARE READY TO GO HOME; IS THAT RIGHT?

19   A    YES.

20   Q    1,400 DAYS AGO PLUS, YOU WERE READY TO GO HOME?

21   A    YES.

22   Q    BUT YOU DON'T WANT TO GO OUT WITHOUT THE HELP AND THE

23   SECURITY OF YOU HAVING SOME HELP WHEN YOU GET OUT; IS

24   THAT RIGHT?

25   A    YES.

1   Q    YOU KNOW THAT YOU HAVE SUPERVISED RELEASE?

2   A    YES.

3   Q    YOU KNOW THAT YOUR JUDGE PLACED YOU ON CONDITIONS FOR

4   YOUR SUPERVISED RELEASE?

5   A    YES.

6   Q    YOU KNOW THAT THIS JUDGE HAS TOLD YOU THAT YOU HAVE

7   TO DO CERTAIN THINGS, INCLUDING POSSIBLY SEEING A

8   PSYCHOLOGIST; RIGHT?

9   A    YES.

10   Q    TAKING TREATMENT, IF NECESSARY?

11   A    YES.

12   Q    AND YOU WOULD COMPLY?

13   A    YES.

14   Q    AND YOU KNOW THAT IF YOU GO TO THE HALFWAY HOUSE IN

15   TUCSON, YOU KNOW THAT THERE IS A POSSIBILITY OF YOU

16   GETTING A JOB?

17   A    YES.

18   Q    FROM THE SKILLS IN WHICH YOU LEARNED WHILE YOU WERE

19   IN PRISON?

20   A    YES.

21   Q    YOU KNOW THAT THERE IS AA MEETINGS ALL AROUND?

22   A    YES.

23   Q    YOU KNOW THAT EVEN TOHONO O'ODHAM NATION HAS AN

24   ABILITY TO PAY FOR IN-PATIENT ALCOHOL TREATMENT IN

25   TUCSON, IF IT IS DEEMED NECESSARY; IS THAT RIGHT?

1    A    YES.

2    Q    AND YOU WERE WILLING TO DO THAT?

3    A    YES.

4    Q    EVEN WITH THE SEXUAL OFFENDER TREATMENT, YOU WILL BE

5    WILLING TO DO THAT WHEN YOU ARE ON THE OUTSIDE; IS THAT

6    RIGHT?

7    A    YES.

8    Q    SO HOW MANY WRITE-UPS DO YOU HAVE OF A SEXUAL NATURE

9    WHILE YOU HAVE BEEN IN PRISON?

10   A    NONE.

11   Q    HOW MANY WRITE-UPS DO YOU HAVE AS AN ALCOHOL PROBLEM

12   WHILE YOU HAVE BEEN INCARCERATED?

13   A    NONE.

14   Q    TO STAY AWAY FROM THE ALCOHOL, TO STAY AWAY FROM

15   DRUGS, TO BEAD, TO LEARN THE SKILLS OF GUITAR, AND THE

16   ISSUES THAT CONFRONT YOU WITH DRUGS AND ALCOHOL TAKES

17   DISCIPLINE; RIGHT?

18   A    YES.

19   Q    WE TALKED ABOUT YOU LEARNING THESE SKILLS, AND I AM

20   DIRECTING YOUR ATTENTION TO 17, RESPONDENT'S EXHIBIT

21   NUMBER 17.

22        THAT IS A LIGHTHOUSE THAT YOU DID?

23   A    YES.

24   Q    IT'S NOT A DRAWING; IS IT?

25   A    NO.

1   Q   IT'S A PAINTING?

2   A   YES.

3   Q   PAINTING WITH INKS?

4   A   PAINT.

5   Q   NOT WITH WATERCOLORS?

6   A   OIL PAINT.

7   Q   OIL PAINTING.  RESPONDENT'S EXHIBIT NUMBER 18, THAT

8   IS A PICTURE; IS THAT RIGHT?

9   A   YES.

10          MR. ROSS:  YOUR HONOR, I ACTUALLY HAVE THE

11  COLOR ONE SO YOU CAN GET A BETTER IDEA OF WHAT IT LOOKS

12  LIKE.

13          THE COURT:  THANK YOU, SIR.

14          MR. ROSS:

15  Q   THAT IS ALSO INK AS WELL?

16  A   OIL PAINT.

17  Q   OIL.  I AM SORRY.  YOU CAN TELL I DON'T PAINT.

18  RESPONDENT'S EXHIBIT NUMBER 19.  TELL ME THE ART FORM ON

19  THAT?

20  A   IT'S A WOLF.

21  Q   YOU ARE ON RESPONDENT'S NUMBER 20, BUT THAT'S OKAY.

22  THAT IS A WOLF.  AND HOW DID YOU DO THAT?

23  A   PASTELS.

24  Q   PASTELS.  GO BACK TO NUMBER 19.  TELL ME ABOUT THIS

25  BECAUSE THIS HAS SEVERAL PICTURES IN THIS.  YOU DON'T

1    HAVE IT?

2            THE COURT:  WELL, MY NUMBER 19, MR. ROSS, IS

3    THIS ONE.

4            MR. ROSS:  MY NUMBER 19 IS THIS.

5            THE WITNESS:  IT'S 21.

6            MR. ROSS:

7    Q   WHAT NUMBER IS THAT?

8    A   21.

9    Q   NUMBER 21.  TELL ME ABOUT THAT PICTURE?

10   A   IT'S A GIRL WITH A BASKETBALL, AND IN THE BACKGROUND

11   IT HAS A MAN IN A MAZE WITH A SPIRIT BEHIND HIM.

12   Q   NOW, THAT IS SOMETHING THAT IS --

13           THE COURT:  MR. ROSS, JUST SO THE RECORD IS

14   CLEAR, THE EXHIBIT THAT THE WITNESS IS DESCRIBING APPEARS

15   TO BE OUR -- THE COURT'S EXHIBIT COPY OF EXHIBIT

16   RESPONDENT'S 20, NOT 21.

17           MR. ROSS:  IT'S 20.

18   Q   IS THAT THE NUMBER THAT YOU HAVE ON YOURS?

19   A   YES.

20   Q   OKAY.  SO YOU SAID IT HAS A MAZE.  THAT MAZE IS

21   PREVALENT IN THE TOHONO O'ODHAM NATION; IS THAT RIGHT?

22   A   YES.

23   Q   TELL ME ABOUT THAT MAZE?

24   A   IT'S FROM MY TRIBE.  THEY SAY THAT IS THE MAZE OF

25   LIFE, AND PEOPLE TAKE A PATH IN THEIR LIVES AND SOMETIMES

1    THEY COME TO A DEAD END, AND WHEN THEY COME TO A DEAD

2    END, THEY CAN ALWAYS TURN AROUND AND TRY A DIFFERENT PATH

3    TO CORRECT THE WRONG THAT THEY DID.

4         AND WHEN THEY COME TO THE CENTER OF THE MAZE, THEY

5    HAVE COMPLETED THEIR JOURNEY THROUGH THEIR LIFE AND THAT

6    IS WHEN THEY MOVE ON TO GO TO HEAVEN.

7    Q   HOW DO YOU RELATE THAT MAZE TO YOUR LIFE?

8    A   IT HAS LIKE A LOT OF MEANING TO TO ME, AND I DON'T

9    REALLY UNDERSTAND IT WHEN I WAS YOUNG, BUT WHEN I WAS IN

10   PRISON, I KIND OF LOOKED INTO IT AND MY AUNT KIND OF

11   EXPLAINED IT TO ME AND SHE SAID I WILL SEND YOU A COPY OF

12   THE MEANING OF IT, AND IT'S KIND OF LIKE THAT IS MY PATH

13   NOW WHERE I AM GOING, HOW MUCH I HAVE TRIED TO CHANGE IT.

14   Q   TRIED TO CHANGE YOUR LIFE?

15   A   YES.

16   Q   TRIED TO CHANGE YOUR PATHWAY?

17   A   YES.

18   Q   YOU ACTUALLY HAVE CHANGED YOUR LIFE?

19   A   YES.

20   Q   AND YOU ALSO HAVE RESPONDENT'S EXHIBIT NUMBER 21 THAT

21   APPEARS TO BE TEPEES, AND YOU CAN CORRECT ME IF I AM

22   WRONG.

23   A   YES.

24   Q   WHAT KIND OF ART IS THAT?

25   A   PASTELS.

1    Q    ARE THESE SKILLS IN WHICH YOU LEARNED WHILE YOU WERE

2    IN PRISON?

3    A    YES.

4    Q    DID YOU REALIZE WHEN YOU WERE ON THE OUTSIDE THAT YOU

5    HAD ALL THESE SKILLS?

6    A    NO.

7    Q    DID YOU REALIZE WHEN YOU WERE DRINKING AND DRUGGING

8    AND DOING THE THINGS THAT YOU WERE DOING THAT YOU COULD

9    GET YOUR EDUCATION?

10   A    NO.

11   Q    THE GOVERNMENT, THROUGH MR. ROYSTER, ASKED YOU ABOUT

12   MANY OF THE THINGS IN WHICH YOU PLED GUILTY TO.  YOU DO

13   NOT DENY THAT YOU PLED GUILTY; IS THAT CORRECT?

14   A    YES.

15   Q    WHAT YOU ARE SAYING TO EVERYONE HERE IN THE

16   COURTROOM, YOU DO NOT REMEMBER WHAT HAPPENED ON THOSE

17   CASES THAT BROUGHT YOU TO FEDERAL COURT; IS THAT RIGHT?

18   A    YES.

19   Q    THAT RICHANDA THAT WE TALKED ABOUT, THAT IS YOUR

20   BROTHER'S HALF SISTER; IS THAT RIGHT?

21   A    YES.

22   Q    DO YOU REMEMBER WHAT HAPPENED WITH RICHANDA?

23   A    NO.

24   Q    BUT IN YOUR MIND, SHE TOLD -- WHAT SHE TOLD ON YOU,

25   SHE HAD NO REASON TO LIE?

1   A   YES.

2   Q   YOU JUST DON'T REMEMBER IT?

3   A   NO.

4   Q   GOING BACK TO WHAT HAPPENED IN 1990 WITH YOUR

5   GIRLFRIEND; IS THAT RIGHT?

6   A   YES.

7   Q   SHE WAS 16?

8   A   YES.

9   Q   YOU WERE 18?

10  A   YES.

11  Q   THIS HAPPENED IN SEPTEMBER OF 1990?

12  A   YES.

13  Q   THAT IS FOUR MONTHS AFTER YOU TURNED 18?

14  A   YES.

15  Q   YOU WERE DATING HER WHEN YOU WERE 17?

16  A   YES.

17  Q   AND YOU HAVE TO ADMIT TO THIS COURT THAT YOU WERE

18  USING A LOT OF DRUGS?

19  A   YES.

20  Q   YOU WERE USING ALCOHOL?

21  A   YES.

22  Q   YOU WERE PROBABLY NOT THE PERSON THAT YOUNG LADY

23  SHOULD HAVE BEEN AROUND AT THAT TIME?

24  A   YES.

25  Q   YOU KNEW SHE WAS SCARED WHEN SHE THOUGHT SHE WAS

1    PREGNANT?

2    A    YES.

3    Q    YOU KNOW THAT SHE TOLD HER PARENTS?

4    A    YES.

5    Q    YOU KNEW HOW HER PARENTS FELT ABOUT YOU?

6    A    YES.

7    Q    AND YOU KNEW THAT SHE WAS LIVING WITH HER PARENTS?

8    A    YES.

9    Q    IN THEIR HOUSE?

10   A    YES.

11   Q    WE STARTED WITH TALKING ABOUT WHAT HAPPENED EIGHT

12   YEARS AGO.  YOU ARE A DIFFERENT PERSON FROM EIGHT YEARS

13   AGO WHEN YOU HAD THAT CONVERSATION WITH YOUR MOM?

14   A    YES.

15   Q    THE LAST CONVERSATION YOU HAD WITH HER?

16   A    YES.

17   Q    BECAUSE OF A CAR ACCIDENT?

18   A    YES.

19   Q    BECAUSE OF ALCOHOL IN THAT CAR ACCIDENT?

20   A    YES.

21   Q    WHILE SHE WAS COMING FROM ANOTHER FUNERAL?

22   A    YES.

23   Q    FROM ANOTHER COUSIN?

24   A    YES.

25   Q    WHO HAD BEEN DRINKING?

1    A    YES.

2    Q    THAT PROMISE THAT YOU MADE TO YOUR MOM THAT YOU WOULD

3    CHANGE AND BECOME A BETTER MAN, YOU KEPT THAT PROMISE?

4    A    YES.

5    Q    EVEN IN YOUR RESTRICTIONS THAT YOU HAVE IN THE

6    MARYLAND UNIT, YOU HAVE FOUND A WAY TO KEEP A JOB?

7    A    YES.

8    Q    TO STAY SOBER?

9    A    YES.

10   Q    TO UNDERSTAND THAT YOU HAVE RISKY PLACES TO BE AROUND

11   AND THAT YOU WANT TO STAY AWAY FROM THEM?

12   A    YES.

13   Q    THAT YOU ARE WILLING TO TAKE THAT KIND OF TREATMENT

14   WHEN YOU ARE ON THE OUTSIDE?

15   A    YES.

16   Q    YOU ARE WILLING TO HAVE A SPONSOR?

17   A    YES.

18   Q    EVEN IF IT IS RECOMMENDED FOR THE SEXUAL TRAINING?

19   A    YES.

20   Q    YOU WOULD TAKE THAT WHILE YOU WERE ON THE OUTSIDE?

21   A    YES.

22   Q    ARE YOU GOING TO DRINK ANYMORE?

23   A    NO.

24   Q    ARE YOU GOING TO USE DRUGS ANYMORE?

25   A    NO.

1  Q   AND IF YOU ARE AROUND THOSE AREAS, WHAT ARE YOU GOING

2  TO DO?

3  A   I AM GOING TO LEAVE, GO THE OTHER WAY.

4  Q   TANYA, THE MOTHER OF PERNEL, YOU ARE NOT WITH HER

5  NOW; ARE YOU?

6  A   NO.

7  Q   THE REASON WHY YOU ARE NOT WITH HER IS BECAUSE SHE

8  STILL USES DRUGS?

9  A   YES.

10  Q   SHE STILL USES ALCOHOL?

11  A   YES.

12  Q   EVEN THOUGH SHE WOULD WANT TO BE AROUND YOU TO THIS

13  DAY?

14  A   YES.

15  Q   THE GOVERNMENT ASKED YOU WHETHER YOU TOLD THE DOCTORS

16  ALMOST 13 YEARS AGO THAT YOU FORCED TANYA TO HAVE SEX

17  WITH YOU.  YOU DIDN'T FORCE HER; DID YOU?

18  A   NO.

19  Q   YOU ALSO KNOW THAT TANYA DID AN AFFIDAVIT SAYING THAT

20  YOU DIDN'T FORCE HER TO HAVE SEX?

21              MR. ROYSTER:  OBJECTION.

22              THE COURT:  PLEASE DON'T ANSWER THAT QUESTION,

23  SIR.

24              MR. ROYSTER:  WE HAVE NOTED OUR OBJECTION,

25  THAT IT IS HEARSAY, FILED IN THE PRETRIAL ORDER.

1              THE COURT:  CORRECT.  DO YOU WISH TO BE HEARD

2    ON THAT, MR. ROSS?

3              MR. ROSS:  NO, I DO NOT.

4              THE COURT:  I SUSTAIN THE OBJECTION.  AN

5    AFFIDAVIT IS HEARSAY.

6              MR. ROSS:

7    Q   YOU KNOW YOU DID NOT FORCE HER TO HAVE SEX WITH YOU;

8    RIGHT?

9    A   YES.

10   Q   HE ASKED YOU ABOUT IF THAT DOCTOR WAS LYING SOME 13

11   YEARS AGO WHEN THEY PUT THAT IN THE REPORT.  DO YOU

12   REMEMBER THAT QUESTION?

13   A   YES.

14   Q   YOU KNOW THAT PEOPLE MAKE MISTAKES?

15   A   YES.

16   Q   YOU KNOW EVEN IN YOUR REPORT, DR. PHENIX WROTE THAT

17   YOU TOLD HER THAT YOUR MOM DIED OF A HEART ATTACK?

18   A   YES.

19   Q   YOUR MOM DIDN'T DIE OF A HEART ATTACK; DID SHE?

20   A   NO.

21   Q   ARE YOU, IF YOU ARE RELEASED, IF FOUND NOT TO MEET

22   THE CRITERIA UNDER 4248, GOING TO BE -- GOING TO GO OUT

23   AND A COMMIT SEXUALLY DANGEROUS OFFENSE?

24   A   NO.

25   Q   ARE YOU READY TO GO HOME?

1    A    YES.

2    Q    ARE YOU READY TO BE THE FATHER THAT YOU NEVER HAD?

3    A    YES.

4    Q    ARE YOU READY TO CONTINUE TO BE SOBER?

5    A    YES.

6    Q    ARE YOU READY TO USE YOUR SKILLS THAT YOU HAVE

7    LEARNED WHILE YOU HAVE BEEN IN PRISON?

8    A    YES.

9             MR. ROSS:  NOTHING FURTHER, YOUR HONOR.

10            THE COURT:  THANK YOU, SIR.  MR. ROYSTER.

11   REDIRECT EXAMINATION BY MR. ROYSTER:

12   Q    MR. ANTONE, BEFORE YOU WENT TO FEDERAL PRISON, DID

13   YOU WORK?

14   A    U.S. FORESTRY AND FIREFIGHTERS.

15   Q    WAS THAT A SEASONAL JOB?

16   A    YES.

17   Q    WERE THERE MONTHS OF TIME THAT YOU WERE NOT IN WORK?

18   A    YES.

19            MR. ROYSTER:  I DON'T HAVE ANY OTHER

20   QUESTIONS.  THANK YOU, JUDGE.

21            THE COURT:  OKAY.  DO YOU HAVE ANY FOLLOW-UP,

22   MR. ROSS?

23            MR. ROSS:  NO.

24            THE COURT:  VERY GOOD.  YOU MAY STEP DOWN, MR.

25   ANTONE.

1           MR. ROYSTER, WHO IS YOUR NEXT WITNESS?

2           MR. ROYSTER:  WELL, MY NEXT WITNESS IS GOING

3    TO BE DR. PHENIX BUT, I AM A LITTLE CONCERNED THAT WE MAY

4    NOT GET THROUGH HER ENTIRE TESTIMONY TODAY AND MAYBE WE

5    SHOULD TAKE MR. GALLOP OUT OF ORDER AND ALLOW THEM TO

6    CALL HIM, BUT CERTAINLY AT THE COURT'S DISCRETION WITH

7    RESPECT TO THAT.  I AM JUST TRYING TO RESPECT HIS

8    SCHEDULE AND HIS FAMILY OBLIGATION.

9           THE COURT:  WELL, THAT IS FINE.  I THINK IT

10   WOULD BE BETTER IF WE ARE GOING TO START WITH A WITNESS

11   TO FINISH IF POSSIBLE ON THE SAME DAY.  AND MR. GALLOP

12   NEEDS TO.  IN OTHER WORDS, IT IS PREFERABLE NOT TO START

13   WITH DR. PHENIX, STOP, AND THEN SWITCH TO MR. GALLOP.

14          DOES COUNSEL HAVE A PROJECTION HOW LONG IT

15   WILL TAKE WITH MR. GALLOP?

16          MR. ROSS:  I DON'T THINK IT WILL TAKE VERY

17   LONG.

18          THE COURT:  I AM WONDERING WHETHER WE OUGHT TO

19   TAKE CARE OF THAT BEFORE LUNCH OR DEFER IT UNTIL AFTER

20   LUNCH.

21          MR. ROSS:  WE CAN PROBABLY DO IT BEFORE.  IT

22   WILL NOT TAKE LONG.

23          THE COURT:  OKAY.  ANY OBJECTION BY THE

24   GOVERNMENT?

25          MR. ROYSTER:  NO, YOUR HONOR.

1          THE COURT:  WHY DON'T WE HAVE MR. GALLOP

2    TESTIFY AT THIS TIME.

3          MR. ROYSTER:  JUDGE, AS I MENTIONED, IF I

4    MIGHT, --

5          THE COURT:  YES, SIR.

6          MR. ROYSTER:  I MENTIONED BEFORE WE BEGAN THAT

7    WE DO OBJECT TO ANY OPINION TESTIMONY FROM THIS WITNESS,

8    AND I JUST WANTED TO LET THE COURT KNOW THAT.

9          THE COURT:  OKAY.  THAT IS NOTED.  OBVIOUSLY,

10   THAT DOESN'T OBVIATE OBJECTIONS TO SPECIFIC QUESTIONS.

11         MR. ROYSTER:  SURE.

12         THE COURT:  VERY GOOD.  MR. GALLOP, WOULD YOU

13   PLEASE APPROACH.

14         CLEMENT GALLOP, CALLED AS A WITNESS,
            HAVING BEEN FIRST DULY SWORN, ON HIS OATH,
15         TESTIFIED AS FOLLOWS:

16         THE CLERK:  PLEASE STATE YOUR NAME FOR THE

17   RECORD.

18         THE WITNESS:  MY NAME IS CLEMENT GALLOP.

19         THE COURT:  MS. ALLEN, ARE YOU HANDLING THIS

20   WITNESS?

21         MS. ALLEN:  NO, YOUR HONOR.  MR. WATERS IS

22   HANDLING IT.

23         THE COURT:  OKAY.  VERY GOOD.  MR. WATERS IS

24   HANDLING IT.

25

1    DIRECT EXAMINATION BY MR. WATERS:

2    Q    MR. GALLOP, COULD YOU PLEASE TELL US YOUR EMPLOYMENT?

3    A    MY POSITION WITH THE FEDERAL BUREAU OF PRISONS IS AS

4    A TREATMENT SPECIALIST IN THE COMMITMENT AND TREATMENT

5    PROGRAM.

6    Q    WHERE DO YOU WORK?

7    A    AT FCI-BUTNER.

8    Q    AND HOW LONG HAVE YOU BEEN AT FCI-BUTNER IN THIS

9    CAPACITY, SIR?

10   A    19 YEARS AND 11 MONTHS.

11   Q    NOT QUITE 20.  WHAT SORT OF SPECIALIZED EDUCATION AND

12   TRAINING HAVE YOU HAD FOR THIS POSITION?

13   A    I HAVE A MASTER'S DEGREE IN COUNSELING AND MY

14   UNDERGRADUATE DEGREE IS IN SECONDARY EDUCATION.

15   Q    ARE YOU ACQUAINTED WITH MR. ANTONE?

16   A    YES, I AM.

17   Q    HOW LONG HAVE YOU KNOWN MR. ANTONE?

18   A    A LITTLE OVER FOUR YEARS.

19   Q    SO SINCE 2007?

20   A    YES.

21   Q    AND CAN YOU DESCRIBE YOUR INTERACTIONS WITH MR.

22   ANTONE?

23   A    IT STARTED AT THE REQUEST OF A FORMER COUNSELOR WHO

24   ASKED IF I WOULD SPEAK WITH HIM REGARDING ISSUES THAT HE

25   WAS DEALING WITH HIS SON.

1    Q    AND DID YOU SPEAK WITH MR. ANTONE ABOUT HIS SON?

2    A    YES, I DID.

3    Q    WHAT SORTS OF THINGS DID YOU DISCUSS WITH MR. ANTONE?

4    A    HE WAS CONCERNED ABOUT THE BEHAVIOR OF HIS SON AND

5    HOW TO COMMUNICATE WITH HIM.

6    Q    AND WERE YOU ABLE TO GIVE HIM ANY ADVICE ON THAT

7    SUBJECT?

8    A    YES, I DID.

9    Q    AND JUST TO CLARIFY, WHEN WAS THIS?

10   A    THIS WAS AROUND THE LATTER PART OF 2007.

11   Q    AND HAVE YOU SPOKEN WITH MR. ANTONE SINCE THEN?

12   A    YES.

13   Q    CAN YOU DESCRIBE ABOUT HOW OFTEN?

14   A    I WOULD ESTIMATE ANYWHERE FROM -- I SEE HIM DAILY.

15   IN TERMS OF CONTACTS, PROBABLY ANYWHERE FROM TWO TO THREE

16   TIMES A WEEK.

17   Q    ARE THESE CONTACTS THAT YOU INITIATE OR THAT HE

18   INITIATES OR ON A REGULAR SCHEDULE?

19   A    NO.  NOT ON ANY REGULAR SCHEDULE.  USUALLY HE

20   INITIATES THE CONTACT.

21   Q    AND DOES HE HAVE PARTICULAR ISSUES THAT HE ASKS TO

22   SPEAK TO YOU ABOUT?

23   A    MOST OF THE TIME, YES.

24   Q    DID MR. ANTONE ASK YOU FOR ADVICE OR PARTICULAR TYPES

25   OF COPING MECHANISMS?

1            MR. ROYSTER:  OBJECTION.

2            THE COURT:  WHAT IS THE NATURE OF THE

3    OBJECTION?

4            MR. ROYSTER:  I AM SORRY?

5            THE COURT:  WHAT IS THE NATURE OF THAT

6    OBJECTION?

7            MR. ROYSTER:  JUDGE, IT'S OUR UNDERSTANDING

8    THAT ACCORDING TO THE PRETRIAL DISCLOSURE THAT HE IS

9    GOING TO TALK ABOUT THE INSTITUTIONAL CONDUCT, AND HE IS

10   ASKING HIM ABOUT COUNSELING, IT SOUNDS LIKE, AND

11   TREATMENT.  SO OUR OBJECTION WOULD BE IT'S OUTSIDE THE

12   SCOPE OF WHAT THEY HAVE IDENTIFIED THIS WITNESS WOULD

13   TESTIFY ABOUT.

14           THE COURT:  WELL, I AM OVERRULING THIS

15   PARTICULAR OBJECTION.  MR. WATERS.

16           MR. WATERS:

17   Q   MR. GALLOP, I BELIEVE THE QUESTION WAS DID MR. ANTONE

18   ASK YOU FOR ADVICE ABOUT SAY PARTICULAR COPING

19   MECHANISMS?

20   A   MOST OF THE ADVICE CONCERNED ISSUES WITH HIS SON

21   BEING IN SCHOOL AND BEING DELINQUENT AND GETTING INTO

22   TROUBLE AND HOW TO COMMUNICATE WITH HIM EFFECTIVELY.

23   Q   DID MR. ANTONE EVER ASK YOU ABOUT ADVICE CONCERNING

24   ANGER MANAGEMENT ISSUES?

25   A   YES, ON OCCASION.

1    Q    ABOUT HOW OFTEN?  I KNOW YOU SAID YOU SAW MR. ANTONE

2    DAILY.  ABOUT HOW OFTEN WOULD HE COME TO YOU WITH THESE

3    SORTS OF QUESTIONS?

4    A    I CAN'T SPECIFY ANY PARTICULAR NUMBER OF TIMES, BUT

5    WHENEVER ANY ISSUES WOULD ARISE IN THE UNIT, TENSIONS AND

6    SO FORTH, AS TO HOW TO DEAL WITH THOSE SITUATIONS.

7    Q    I AM SORRY.  WERE THESE SITUATIONS WHERE YOU WOULD

8    INITIATE CONTACT AFTER A SITUATION AT THE UNIT?

9    A    NO.  HE WOULD INITIATE THE CONVERSATION.

10   Q    OKAY.  AFTER YOUR MEETINGS WITH MR. ANTONE, WAS THERE

11   EVERY ANY FOLLOW-UP SESSIONS THAT YOU SCHEDULED WITH HIM?

12   A    THE FOLLOW-UP SESSIONS WOULD BE BRIEF IN PASSING IN

13   THE HALLWAY TO INQUIRE IF EVERYTHING WAS OKAY, IF THE

14   ISSUE HAD BEEN RESOLVED.  AND IF HE WAS OKAY.

15   Q    AND IN GENERAL HOW DID HE RESPOND?

16   A    GENERALLY IT WAS POSITIVE.

17   Q    AND IN GENERAL, HOW DID MR. ANTONE REACT AFTER YOUR

18   INTERACTIONS WITH HIM?

19   A    HE WOULD ALWAYS THANK ME FOR TAKING TIME OUT TO SPEAK

20   WITH HIM.

21   Q    DO ALL OF THE INMATES THAT YOU DEAL WITH AT

22   FCI-BUTNER COME TO SEE YOU IN THIS MANNER?

23   A    NO.

24   Q    SO ARE MR. ANTONE'S INTERACTIONS WITH YOU MORE OFTEN

25   THAN THE AVERAGE?

1    A    YES, MORE OFTEN THAN THE AVERAGE.

2              MR. WATERS:  NOTHING FURTHER, YOUR HONOR.

3              THE COURT:  THANK YOU, SIR.  MR. ROYSTER.

4              MR. ROYSTER:  WE DON'T HAVE ANY QUESTIONS FOR

5    THIS WITNESS.  THANK YOU, JUDGE.

6              THE COURT:  MR. GALLOP, SIR, YOU MAY STEP

7    DOWN.  WHY DON'T WE TAKE OUR LUNCH BREAK.  WE'LL

8    RECONVENE AT 1:05.

9              MR. ROSS:  YOUR HONOR, MAY MR. GALLOP BE

10   RELEASED.

11             THE COURT:  ANY OBJECTION TO THAT, MR.

12   ROYSTER?

13             MR. ROYSTER:  NO, YOUR HONOR.

14             THE COURT:  MR. GALLOP IS RELEASED.

15             (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

16             THE COURT:  GOOD AFTERNOON, FOLKS.  MR.

17   ROYSTER, YOU MAY CALL YOUR NEXT WITNESS.

18             MR. ROYSTER:  THE GOVERNMENT CALLS DR. AMY

19   PHENIX.

20             JUDGE, AS SHE IS MAKING HER WAY TO THE STAND,

21   IF I MIGHT FOR THE RECORD MOVE INTO EVIDENCE OUR

22   EXHIBITS, 1 THROUGH 27.  I DO RECOGNIZE THAT THE COURT

23   HAS EXCLUDED THE SUPPLEMENTAL REPORT OF DR. PHENIX AS

24   STATED IN YOUR ORDER, BUT I WOULD SUBMIT THAT, YOUR

25   HONOR, AS A PROFFER OF THE ENTIRE REPORT AS IF IT HAD

1    BEEN ACCEPTED SO THAT WE MAY PRESERVE THAT ISSUE FOR

2    APPEAL.

3              THE COURT:  DO YOU WISH TO BE HEARD ON THAT,

4    MR. ROSS?

5              MR. ROSS:  YOUR HONOR, AS TO PROFFER, I HAVE

6    NO OBJECTION AS TO THAT.

7              THE COURT:  THE MOTION TO ADMIT THOSE EXHIBITS

8    IS ALLOWED SUBJECT TO THE QUALIFICATION WITH RESPECT TO

9    DR. PHENIX'S SUPPLEMENTAL REPORT.

10             WHAT EXHIBIT NUMBER IS THAT, MR. ROYSTER?

11             MR. ROYSTER:  THAT IS EXHIBIT 3, JUDGE.

12             THE COURT:  EXHIBIT 3?

13             MR. ROYSTER:  YES, SIR.

14             THE COURT:  THAT EXHIBIT IS SUBJECT TO THE

15   ORDER ENTERED BY THE COURT EXCLUDING -- FOR PURPOSES OF

16   EVIDENCE THAT WILL BE CONSIDERED BY THE COURT ON THE

17   MERITS OF THE CASE.  THAT EXHIBIT IS SUBJECT TO THE

18   COURT'S ORDER, EXCLUDING FROM THE EVIDENCE, OPINIONS SET

19   OUT IN GOVERNMENT'S EXHIBIT 3 THAT WERE NOT COVERED IN

20   DR. PHENIX'S INITIAL REPORT OR AT HER DEPOSITION.

21        AND BY USE OF THE TERM OPINIONS IN THE COURT'S PRIOR

22   ORDER, THE INTENTION WAS THAT THAT WOULD INCLUDE ANY

23   FACTUAL INFORMATION AS WELL THAT WASN'T DISCLOSED IN THE

24   PRIOR REPORT OR AT THE DEPOSITION.

25

1                    DR. AMY PHENIX, CALLED AS A WITNESS, HAVING
                 BEEN FIRST DULY SWORN, ON HER OATH, TESTIFIED
2                 AS FOLLOWS:

3                    THE CLERK:  PLEASE STATE YOUR NAME FOR THE

4       RECORD.

5                    THE WITNESS:  AMY PHENIX.

6                    THE COURT:  MR. ROYSTER.

7                    MR. ROYSTER:  THANK YOU, JUDGE.

8                    THE COURT:  YES, SIR.

9       DIRECT EXAMINATION BY MR. ROYSTER:

10      Q    GOOD AFTERNOON, DR. PHENIX.

11      A    GOOD AFTERNOON.

12      Q    WHAT IS YOUR OCCUPATION?

13      A    I AM A CLINICAL PSYCHOLOGIST IN PRIVATE PRACTICE.

14      Q    HOW LONG HAVE YOU BEEN A CLINICAL PSYCHOLOGIST?

15      A    SINCE 1990.

16      Q    WHERE ARE YOU LICENSED TO PRACTICE?

17      A    THREE STATES.  THAT WOULD BE WASHINGTON, CALIFORNIA

18      AND FLORIDA.

19      Q    AND DO YOU HAVE ANY PARTICULAR AREA OF EXPERTISE?

20      A    YES.  THAT WOULD BE THE ASSESSMENTS OF SEXUAL

21      OFFENDERS.

22      Q    AND HOW LONG HAVE YOU BEEN INVOLVED IN THIS AREA OF

23      PSYCHOLOGY?

24      A    I HAVE BEEN WORKING WITH SEX OFFENDERS SINCE 1989 IN

25      MY CLINICAL INTERNSHIP, AND I INITIALLY PROVIDED

1    TREATMENT TO SEX OFFENDERS, AND IN 1995 I BEGAN

2    CONDUCTING SEXUALLY VIOLENT PREDATOR EVALUATIONS IN THE

3    STATE OF CALIFORNIA, AND HAVE CONDUCTED MANY OF THOSE

4    EVALUATIONS SINCE THAT TIME.

5    Q    TELL THE COURT ABOUT YOUR EDUCATIONAL BACKGROUND

6    BEGINNING WITH YOUR UNDERGRADUATE DEGREE.

7    A    I HAVE A BACHELOR'S DEGREE IN EDUCATION FROM THE

8    UNIVERSITY OF CINCINNATI.  I HAVE A MASTER'S DEGREE IN

9    PSYCHOLOGY FROM THE UNIVERSITY OF SOUTH ALABAMA.  AND I

10   HAVE A DOCTORATE OF PHILOSOPHY OF CLINICAL PSYCHOLOGY

11   FROM THE CALIFORNIA SCHOOL OF PROFESSIONAL PSYCHOLOGY IN

12   FRESNO, CALIFORNIA.

13   Q    DR. PHENIX, ARE YOU A MEMBER OF ANY PROFESSIONAL

14   ORGANIZATIONS?

15   A    YES.

16   Q    WHICH ONES?

17   A    THE AMERICAN PSYCHOLOGICAL ASSOCIATION, CALIFORNIA

18   PSYCHOLOGICAL ASSOCIATION, ASSOCIATION FOR TREATMENT OF

19   SEXUAL ABUSERS, CALIFORNIA COALITION FOR SEX OFFENDING,

20   AND FORENSIC MENTAL HEALTH ASSOCIATION OF CALIFORNIA.

21   Q    AND HAVE YOU GIVEN ANY PRESENTATIONS TO PROFESSIONAL

22   GROUPS ON ISSUES RELATING TO SEX DEVIANCY?

23   A    YES.

24   Q    CAN YOU TELL THE COURT ABOUT THOSE PRESENTATIONS?

25   A    I HAVE GIVEN MANY PRESENTATIONS SINCE 1997 ON

1    ASSESSING SEX OFFENDERS, CONDUCTING RISK ASSESSMENTS FOR

2    SEXUAL OFFENDERS, SCORING, SOME WELL KNOWN ACTUARIAL

3    INSTRUMENTS THAT MEASURE SEX OFFENDER RECIDIVISMS,

4    STATIC-99R, AND STATIC-2002R.

5         AND I HAVE GIVEN THOSE PRESENTATIONS TO MANY

6    DISCIPLINES.  THAT WOULD INCLUDE VARIOUS KINDS OF MENTAL

7    HEALTH WORKERS, LAW ENFORCEMENT AND ATTORNEYS AND SEXUAL

8    ASSAULT INVESTIGATORS.

9    Q    AND HAVE YOU GIVEN ANY PRESENTATIONS AT ANY OF THE

10   PROFESSIONAL ORGANIZATIONS THAT YOU LISTED BEFORE?

11   A    YES.  I HAVE GIVEN SEVERAL PRESENTATIONS AT THE

12   ASSOCIATION FOR TREATMENT OF SEXUAL ABUSERS, WHICH IS OUR

13   LARGEST CONFERENCE IN MY FIELD, EVERY YEAR, THE LARGEST

14   PROFESSIONAL ORGANIZATION THAT PROVIDES ETHICS AND

15   TRAINING IN EVALUATING SEX OFFENDERS.

16   Q    HAVE YOU AUTHORED OR CO-AUTHORED ANY PEER REVIEW

17   ARTICLES ON SEXUAL DEVIANCY?

18   A    YES.

19   Q    ARE THOSE LISTED IN YOUR RESUME?

20   A    THEY ARE.

21   Q    IF YOU WILL TAKE A LOOK AT EXHIBIT 1, AND JUST

22   IDENTIFY THAT DOCUMENT FOR THE RECORD?

23   A    THAT WOULD BE MY CURRICULUM VITAE.

24   Q    YOU MENTIONED THE ACTUARIALS A FEW MOMENTS AGO.  WERE

25   YOU INVOLVED IN ANY OF THE DEVELOPMENT OF THE ACTUARIALS?

1    A    I AM ON WHAT WE CALL THE STATIC-99 TEAM.  THE

2    STATIC-99 IS PROBABLY THE MOST WIDELY USED ACTUARIAL FOR

3    SEX OFFENDER RISK.

4         I DEVELOPED THE CODING OR HOW TO SCORE THE

5    STATIC-99.  I AM ONE OF THE AUTHORS ON THE CODING FOR

6    STATIC-99, AND THEN I AM THE LEAD AUTHOR FOR HOW TO SCORE

7    OR CODE THE STATIC-2002.

8    Q    HAVE YOU YOURSELF CONDUCTED SEX OFFENDER EVALUATIONS?

9    A    YES.

10   Q    DO YOU KNOW APPROXIMATELY HOW MANY?

11   A    OVER 350.

12   Q    HAVE YOU DONE THIS WORK FOR THE -- INVOLVING CIVIL

13   COMMITMENT OF SEX OFFENDERS?

14   A    YES.

15   Q    HAVE YOU DIAGNOSED AND TREATED SEX OFFENDERS?

16   A    YES.  I HAVE BEEN DOING THAT SINCE 1989.

17   Q    YOU MENTIONED YOUR INTERNSHIP IN 1989.  TELL THE

18   COURT ABOUT YOUR EXPERIENCE THERE?

19   A    I PARTICIPATED IN A ONE YEAR CLINICAL INTERNSHIP AT

20   CALIFORNIA MEN'S COLONY WHICH IS A MEDIUM SECURITY PRISON

21   ON THE CENTRAL COAST OF CALIFORNIA.

22        IT'S ALSO A LARGE PSYCHIATRIC HOSPITAL FOR THE

23   DEPARTMENT OF CORRECTIONS IN CALIFORNIA, SO INMATES WHO

24   ARE IDENTIFIED AS HAVING MENTAL DISORDERS ARE SENT TO

25   CALIFORNIA MEN'S COLONY FOR THE PURPOSE OF EVALUATION,

1    TREATMENT PLANNING, AND RECEIVING TREATMENT, AND I WAS

2    ONE OF THE PSYCHOLOGISTS THAT PROVIDED THOSE EVALUATIONS

3    AND THE TREATMENT FOR THOSE INDIVIDUALS.

4    Q    WHAT DID YOU DO AFTER YOUR INTERNSHIP?

5    A    I REMAINED AT THE CALIFORNIA MEN'S COLONY AS A STAFF

6    PSYCHOLOGIST ON THIS WHAT WE CALL INTAKE TEAM THAT WOULD

7    BE EVALUATING INCOMING INMATES WHO HAVE SOME TYPE OF

8    MENTAL DISORDER OR MENTAL ILLNESS, AND I CONDUCTED THOSE

9    EVALUATIONS ON THE INTAKE TEAM FOR ABOUT FOUR YEARS.

10   Q    AND YOU MENTIONED MENTAL DISORDERS.  ARE THOSE

11   INDIVIDUALS THAT WERE SEX OFFENDERS?

12   A    MANY OF THEM WERE SEX OFFENDERS.  CALIFORNIA MEN'S

13   COLONY ALSO IS A PROTECTIVE CUSTODY INSTITUTION IN THE

14   DEPARTMENT OF CORRECTIONS AND OFTENTIMES SEX OFFENDERS

15   WERE SENT THERE FOR THAT PURPOSE.

16   Q    WHERE DID YOU GO AFTER YOUR WORK WITH THE CALIFORNIA

17   MEN'S COLONY?

18   A    I TRANSFERRED TO -- STILL WITHIN THE DEPARTMENT OF

19   CORRECTIONS -- TO THE PAROLE DEPARTMENT WHERE I WAS A

20   STAFF PSYCHOLOGIST.

21   Q    AND WHAT WERE YOUR RESPONSIBILITIES THERE?

22   A    IN THE PAROLE DEPARTMENT, STAFF PSYCHOLOGISTS ARE

23   MANDATED TO PROVIDE TREATMENT TO INDIVIDUALS WITH MENTAL

24   ILLNESS, TO INDIVIDUALS WITH VIOLENT OFFENSES, AND TO ALL

25   SEX OFFENDERS.

1    Q    HOW LONG WERE YOU THERE?

2    A    I WAS THERE ALMOST A YEAR.

3    Q    AND WHAT DID YOU DO AFTER THAT?

4    A    AFTER THAT, I TRANSFERRED AGAIN AS A CIVIL SERVANT TO

5    THE ATASCADERO STATE HOSPITAL WHICH IS CALIFORNIA'S

6    LARGEST LOCKED FORENSIC HOSPITAL, AND I WORKED ON A WARD

7    OF MENTALLY DISORDERED OFFENDERS.  THAT WAS A CERTAIN

8    TYPE OF COMMITMENT BY LAW.

9    Q    WHAT WAS THE NAME OF THE UNIT?

10   A    MENTAL DISORDER DEFENDER UNIT.

11   Q    AND TELL THE COURT GENERALLY WHAT YOUR

12   RESPONSIBILITIES WERE AT THE STATE HOSPITAL?

13   A    THESE MENTALLY DISORDERED OFFENDERS WERE COMMITTED

14   AFTER THEY SERVED THEIR CORRECTIONAL TERM BECAUSE THEY

15   HAD COMMITTED A VIOLENT OFFENSE AND THEY HAD SYMPTOMS OF

16   THEIR MENTAL ILLNESS THAT CAUSED THEM TO CONTINUE TO BE

17   DANGEROUS.

18        SO THEY WERE COMMITTED TO THE HOSPITAL UNTIL SUCH

19   TIME THAT THEY WERE NO LONGER DEEMED DANGEROUS BY REASON

20   OF THEIR MENTAL ILLNESS, SO I PROVIDED PSYCHOLOGICAL

21   TESTING, PROVIDED PSYCHOLOGICAL EVALUATIONS TO THESE

22   INDIVIDUALS, AND THEN I PROVIDED COURT TESTIMONY TO THE

23   SUPERIOR COURT IN SAN LUIS OBISPO COUNTY ON ISSUES OF

24   DANGEROUSNESS AND RELEASE OF THE MENTALLY DISORDERED

25   OFFENDERS.

1    Q    HOW LONG WERE YOU THERE?

2    A    ALMOST A YEAR.

3    Q    WHERE DID YOU GO AFTER THAT?

4    A    I WAS REDIRECTED BY THE DEPARTMENT OF MENTAL HEALTH

5    TO THE HEADQUARTERS IN SACRAMENTO, CALIFORNIA, WHERE I

6    WAS APPOINTED THE CLINICAL CONSULTANT TO THE SEX OFFENDER

7    COMMITMENT PROGRAM.  THIS WAS ONLY A FEW MONTHS BEFORE

8    THE STATE SEXUALLY VIOLENT PREDATOR LAW WAS SIGNED INTO

9    EFFECT IN CALIFORNIA.

10   Q    AND TELL THE COURT ABOUT YOUR RESPONSIBILITIES THERE?

11   A    THERE I WAS RESPONSIBLE FOR, AS CLINICAL CONSULTANT,

12   RESPONSIBLE FOR DEVELOPING THE PROTOCOL, HOW TO WRITE AN

13   EVALUATION PURSUANT TO THE SEXUALLY VIOLENT PREDATOR LAW

14   IN CALIFORNIA.

15       I WAS RESPONSIBLE FOR HIRING THE 45 DOCTORS THAT

16   CONDUCT THOSE EVALUATIONS, AND FOR TRAINING THEM IN HOW

17   TO CONDUCT THE EVALUATION.

18       ALSO, MYSELF, I CONDUCTED THOSE EVALUATIONS AND

19   PROVIDED COURT TESTIMONY IN VARIOUS COUNTIES IN

20   CALIFORNIA SUBSEQUENT TO THE SEXUALLY VIOLENT PREDATOR

21   LAW.

22       AND LASTLY, I WAS RESPONSIBLE FOR QUALITY ASSURANCE

23   TO MAKE SURE THAT THE EVALUATIONS THAT THE DOCTORS WROTE

24   MET THE QUALITY STANDARDS OF THE DEPARTMENT OF MENTAL

25   HEALTH.

1    Q    IN THE COURSE OF YOUR COURT TESTIMONY THERE, DID YOU

2    HAVE OCCASIONS WHERE YOU TESTIFIED AGAINST COMMITMENT?

3    A    YES.

4    Q    WHY DID YOU LEAVE -- WELL, DID YOU EVENTUALLY LEAVE

5    THE SEX OFFENDER COMMITMENT PROGRAM?

6    A    I LEFT MY JOB AS A CIVIL SERVANT IN THAT PROGRAM.

7    Q    WHERE DID YOU GO?

8    A    I WENT INTO PRIVATE PRACTICE, AND THEN I CONTRACTED

9    WITH THE DEPARTMENT OF MENTAL HEALTH TO MAINTAIN THE SAME

10   JOB RESPONSIBILITIES THAT I HAD WHEN I CAME AS A STATE

11   EMPLOYEE.

12   Q    DID YOUR WORK CHANGE IN ANY WAY WHEN YOU WENT INTO

13   PRIVATE PRACTICE?

14   A    NO.

15   Q    ARE YOU STILL CONDUCTING SEX OFFENDER EVALUATIONS FOR

16   CIVIL COMMITMENT?

17   A    YES.  HOWEVER, IN 2008, I GAVE UP THE TRAINING

18   CONTRACT, SO I NO LONGER TRAIN THE DOCTORS WHO CONDUCT

19   THOSE EVALUATIONS.

20   Q    DR. PHENIX, HOW MANY STATES HAVE SEXUALLY VIOLENT

21   PREDATOR LAWS?

22   A    18.

23   Q    HOW MANY OF THOSE -- IN HOW MANY OF THOSE

24   JURISDICTIONS HAVE YOU RECEIVED --

25   A    NINE.

1    Q    DURING THE COURSE OF YOUR PRIVATE PRACTICE, HAVE YOU

2    BEEN ASKED TO CONDUCT EVALUATIONS FOR THE RESPONDENTS?

3    A    YES.

4    Q    AND HAVE YOU TESTIFIED IN CASES IN SOME OF THOSE

5    JURISDICTIONS FOR THE RESPONDENTS?

6    A    YES.

7    Q    DR. PHENIX, ARE YOU FAMILIAR WITH THE ADAM WALSH ACT?

8    A    YES.

9    Q    HAVE YOU EVALUATED SEX OFFENDERS UNDER THE ADAM WALSH

10   ACT TO SEE IF THEY MEET THE CRITERIA FOR COMMITMENT?

11   A    YES.

12   Q    DO YOU KNOW HOW MANY EVALUATIONS YOU HAVE DONE?

13   A    20.

14   Q    ARE THEY ALL FOR THE EASTERN DISTRICT OF NORTH

15   CAROLINA?

16   A    NO.  SOME OF THEM WERE FOR THE DISTRICT OF

17   MASSACHUSETTS.

18   Q    SO YOU TESTIFIED -- OR DID YOU TESTIFY IN FEDERAL

19   COURT IN MASSACHUSETTS UNDER THE ADAM WALSH ACT?

20   A    I DID.

21   Q    OF THOSE EVALUATIONS, HAVE THERE BEEN OCCASIONS WHERE

22   YOU FOUND THE PERSON DID NOT MEET THE CRITERIA?

23   A    YES.

24   Q    DO YOU KNOW APPROXIMATELY HOW MANY TIMES?

25   A    THREE.

1    Q    WERE THOSE OCCASIONS WHERE THE B.O.P. PSYCHOLOGIST

2    ACTUALLY OPINED THAT THEY DID MEET THE CRITERIA?

3    A    YES.

4              MR. ROYSTER:  YOUR HONOR, AT THIS TIME WE

5    TENDER DR. PHENIX AS AN EXPERT IN FORENSIC PSYCHOLOGY

6    SPECIALIZING IN THE EVALUATION, DIAGNOSIS AND TREATMENT

7    OF SEX OFFENDERS.

8              MR. ROSS:  CAN I HAVE A COUPLE OF QUESTIONS?

9    MAY I ASK A COUPLE OF QUESTIONS OF THE WITNESS?

10             THE COURT:  RELATING TO HER QUALIFICATIONS?

11             MR. ROSS:  YES.

12             THE COURT:  YES, YOU MAY.

13   EXAMINATION BY MR. ROSS:

14   Q    DR. PHENIX, YOU SAID YOU HAD EVALUATED 20 FEDERAL

15   INMATES FOR THE ADAM WALSH ACT; IS THAT RIGHT?

16   A    YES.

17   Q    AND THREE YOU FOUND NOT TO MEET THE CRITERIA?

18   A    YES.

19   Q    CORRECT?

20   A    YES.

21   Q    WHICH THREE WERE THEY?

22             MR. ROYSTER:  OBJECTION.  WHAT IS THE

23   RELEVANCE OF WHO THESE INDIVIDUALS WERE?

24             MR. ROSS:  THEY MADE A BIG DEAL BY ASKING HER

25   ABOUT THE THREE THAT SHE DID NOT SAY MEET ADAM WALSH ACT.

1    I WANT TO SEE IF THIS IS SOMETHING THAT WE CAN VERIFY.

2                THE COURT:  THAT IS FINE.  OBJECTION IS

3    OVERRULED.  DR. PHENIX, YOU MAY ANSWER, IF YOU KNOW THE

4    ANSWER.

5                THE WITNESS:

6    A    I RECOLLECT ONLY ONE INDIVIDUAL OF THE THREE, IN

7    TERMS OF JUST REMEMBERING AT THE MOMENT.  MR. HICKS.  AND

8    OTHER THAN THAT, I JUST DON'T RECALL.

9    Q    WERE THE OTHER TWO FROM THE EASTERN DISTRICT OF NORTH

10   CAROLINA OR FROM MASSACHUSETTS?

11   A    NORTH CAROLINA.

12   Q    AND AS FAR AS YOUR TESTIFYING, HOW MANY TIMES HAVE

13   YOU TESTIFIED?

14   A    I AM NOT SURE IN WHAT JURISDICTION YOU ARE ASKING ME.

15   Q    IN FEDERAL COURT, HOW MANY TIMES HAVE YOU TESTIFIED?

16   A    I BELIEVE ABOUT FIVE TIMES.

17   Q    AND OUT OF THE 350 TIMES THAT YOU HAVE EVALUATED

18   SEXUAL OFFENDERS, IN HOW MANY OF THOSE CASES HAVE YOU

19   TESTIFIED IN ANY CAPACITY?

20   A    I WOULD SAY ABOUT 170 TIMES.

21   Q    AND OUT OF THOSE 350 PEOPLE THAT YOU EVALUATED, HOW

22   MANY OF THEM WERE FOR THE RESPONDENT?

23   A    IN TERMS OF TESTIMONY?

24   Q    YES.

25                MR. ROYSTER:  JUDGE, IF I MIGHT AT THIS POINT

1    OBJECT.  I AM NOT -- OUR OBJECTION IS IT'S OUTSIDE THE

2    SCOPE OF QUALIFICATIONS AT THIS POINT.

3            MR. ROSS:  THE GOVERNMENT ASKED HER THESE

4    QUESTIONS.  I AM JUST FOLLOWING UP ON WHAT THE GOVERNMENT

5    ASKED.

6            THE COURT:  WELL, THE PURPOSE OF THE INQUIRY

7    HERE IS TO DETERMINE WHETHER SHE MEETS THE QUALIFICATIONS

8    AS AN EXPERT IN FORENSIC PSYCHOLOGY, AND IT'S NOT TO

9    IMPEACH HER CREDIBILITY AS A WITNESS THAT FAVORS THE

10   GOVERNMENT.

11           THE QUESTIONS THAT YOU ARE ASKING NOW, MR.

12   ROSS, SEEM TO BE HEADED IN THAT DIRECTION.  YOU WILL

13   CERTAINLY HAVE THE OPPORTUNITY TO PURSUE THAT, BUT I AM

14   NOT CLEAR ON HOW IT RELATES TO WHETHER SHE IS QUALIFIED

15   TO BE RECOGNIZED AS AN EXPERT.

16           MR. ROSS:  I UNDERSTAND THAT, YOUR HONOR.  AND

17   WHAT THE GOVERNMENT HAS ESTABLISHED IS THAT THEY HAD

18   TENDERED HER 350 EVALUATIONS AS SOMETHING THAT THIS COURT

19   SHOULD CONSIDER AS A REASON WHY SHE WOULD BE CONSIDERED

20   AS AN EXPERT.

21           THEY HAVE ALSO CONSIDERED OR TENDERED TO THIS

22   COURT THAT DR. PHENIX HAS ALSO FOUND FOR THE RESPONDENT

23   ON MANY DIFFERENT AREAS.  BUT SPECIFICALLY AS TO WHY THAT

24   WOULD GO TO HER EXPERTISE, I BELIEVE THAT INFORMATION

25   WOULD MAKE HER 350 A LITTLE BIT MORE RELEVANT TO THIS

1    COURT TO FIND OUT WHERE SHE STANDS.

2              IF ALL OR MOST OR OVER 300 ARE TO THE

3    GOVERNMENT, I THINK THE COURT WOULD UNDERSTAND EXACTLY

4    WHERE SHE IS, AND IT WOULD ALSO GO TO HER CREDIBILITY,

5    ALSO GO TO WHETHER SHE IS AN EXPERT AS TO FORENSIC

6    PSYCHOLOGY.

7              THE COURT:  I WILL PERMIT YOU TO PURSUE THIS

8    BRIEFLY.  I THINK IT'S TANGENTIALLY RELATED, BUT I WILL

9    OVERRULE THE OBJECTION.

10             MR. ROSS:

11   Q   OUT OF THE 350 PEOPLE THAT YOU HAVE EVALUATED FOR

12   SEXUALLY VIOLENT PREDATOR, HOW MANY OF THOSE DID YOU FIND

13   FOR THE RESPONDENT, ON BEHALF OF THE RESPONDENT?

14   A   OVER HALF OF THOSE I FOUND FOR THE RESPONDENT.

15   PROBABLY, IF I WOULD AVERAGE THEM ALL, IT WOULD BE ABOUT

16   40 TO 45 PERCENT OF THEM I FOUND TO MEET THE CRITERIA OF

17   THE LAW, AND THE REST I DID NOT.

18   Q   HOW MANY OF THOSE DID YOU TESTIFY ON BEHALF OF THE

19   RESPONDENT?

20   A   PROBABLY ABOUT 20 TIMES.

21   Q   AND THE REST OF THE TIME YOU TESTIFIED ON BEHALF OF

22   THE GOVERNMENT; IS THAT RIGHT?

23   A   YES.

24             MR. ROSS:  THANK YOU.  NO FURTHER QUESTIONS AT

25   THIS TIME.

1           THE COURT:  DO YOU WISH TO BE HEARD, MR. ROSS,

2   ON THE ISSUE OF QUALIFICATIONS.

3           MR. ROSS:  NO, YOUR HONOR.

4           THE COURT:  VERY GOOD.  MR. ROYSTER, YOU SEEK

5   HER RECOGNITION AS AN EXPERT IN FORENSIC PSYCHOLOGY, AND

6   CAN YOU REMIND ME, PLEASE, OF THE PARTICULAR --

7           MR. ROYSTER:  SPECIALIZING IN THE EVALUATION,

8   DIAGNOSIS AND TREATMENT OF SEX OFFENDERS.

9           THE COURT:  VERY GOOD.  DR. PHENIX IS

10  RECOGNIZED AS AN EXPERT IN THE FIELD AS DESCRIBED BY

11  COUNSEL FOR THE GOVERNMENT.

12          YOU MAY PROCEED, MR. ROYSTER.

13          MR. ROYSTER:  THANK YOU, JUDGE.

14  CONTINUED DIRECT EXAMINATION BY MR. ROYSTER:

15  Q   DR. PHENIX, YOU WERE ASKED TO CONDUCT AN EVALUATION

16  OF BYRON ANTONE?

17  A   YES, I WAS.

18  Q   WELL, SPECIFICALLY WHAT WERE YOU ASKED TO DO?

19  A   I WAS ASKED TO REVIEW THE DISCOVERY OR ALL THE

20  RECORDS IN THE CASE, AND THEN I WAS ULTIMATELY ASKED TO

21  CONDUCT AN INTERVIEW WITH HIM.

22  Q   AND DO YOU RECALL APPROXIMATELY WHEN YOU WERE ASKED

23  TO DO THESE THINGS?

24  A   YES.  I WAS ASKED TO DO THOSE THINGS IN SEPTEMBER OF

25  2010.

1    Q    HOW DID YOU GO ABOUT CONDUCTING YOUR EVALUATION?

2    A    I DID REVIEW ALL THE RECORDS THAT WERE SENT TO ME.

3    AND THEN I PREPARED WHAT WAS CALLED A RECORD REVIEW

4    EVALUATION.  SO I EXAMINED HIS HISTORY IN THE RECORDS

5    THAT I HAD THAT WAS PERTINENT TO ME FINDING WHAT WAS

6    REQUIRED BY THIS LAW, AND THEN I COMPLETED A WRITTEN

7    EVALUATION.

8    Q    CAN YOU GIVE THE COURT A FLAVOR OF THE KINDS OF

9    DOCUMENTS THAT YOU WERE REVIEWING?

10   A    YES.  I REVIEWED CRIMINAL LEGAL DOCUMENTS.  I

11   REVIEWED CHARGING DOCUMENTS, CONVICTION DOCUMENTS FROM

12   HIS SEXUAL CASES.

13        I ALSO REVIEWED ANY AVAILABLE POLICE REPORTS,

14   PRESENTENCE INVESTIGATION REPORTS THAT WERE AVAILABLE.

15        I REVIEWED ANY PSYCHOLOGICAL EVALUATIONS THAT WERE

16   CONDUCTED DURING ANY OF THOSE COURT PROCEEDINGS AND

17   SUBSEQUENT TO THAT.

18        I ALSO REVIEWED ALL OF HIS RECORDS FROM THE B.O.P.,

19   INCLUDING INSTITUTIONAL PROGRESS, EDUCATIONAL PROGRAMS,

20   RULES VIOLATIONS REPORTS, AND THAT TYPE OF THING.

21   Q    AND YOU MENTIONED AN INTERVIEW.  WITHOUT STATING ANY

22   OF THE INFORMATION THAT YOU OBTAINED FROM THAT INTERVIEW,

23   WHEN DID THE INTERVIEW TAKE PLACE?

24   A    THE INTERVIEW TOOK PLACE ON APRIL 12, 2011.

25   Q    WHERE DID IT HAPPEN?

1    A    IT OCCURRED AT BUTNER FEDERAL CORRECTIONAL INSTITUTE.

2    Q    HOW LONG DID IT LAST?

3    A    ABOUT THREE HOURS.

4    Q    WAS ANYONE ELSE IN THE ROOM WITH YOU WHEN YOU

5    INTERVIEWED MR. ANTONE?

6    A    NO, THEY WEREN'T.

7    Q    DR. PHENIX, WHAT IS YOUR CONCLUSION AS TO WHETHER

8    BYRON ANTONE IS SEXUALLY DANGEROUS?

9    A    I BELIEVE HE IS SEXUALLY DANGEROUS.

10   Q    CAN YOU SUMMARIZE THE BASIS OF YOUR OPINION THAT HE

11   MEETS THE CRITERIA UNDER THE ADAM WALSH ACT?

12   A    YES.  I BELIEVE THAT HE HAS ENGAGED IN OR ATTEMPTED

13   TO ENGAGE IN SEXUALLY VIOLENT CONDUCT OR CHILD

14   MOLESTATION.

15        I BELIEVE THAT HE SUFFERS FROM MENTAL ILLNESS,

16   MENTAL ABNORMALITY OR DISORDER.

17        AND I ALSO BELIEVE THAT AS A RESULT OF THAT MENTAL

18   ILLNESS, MENTAL ABNORMALITY OR DISORDER THAT HE WILL HAVE

19   SERIOUS -- THAT HE WILL HAVE SERIOUS DIFFICULTY IN

20   REFRAINING FROM SEXUALLY VIOLENT CONDUCT OR CHILD

21   MOLESTATION IN THE FUTURE WHEN HE IS RELEASED.

22   Q    LET'S TALK FIRST ABOUT YOUR UNDERSTANDING OF SEXUALLY

23   VIOLENT CONDUCT.  WHAT DO YOU UNDERSTAND THAT TO BE?

24   A    SEXUALLY VIOLENT CONDUCT I FIND TO BE BEHAVIOR THAT

25   USES FORCE OR THREATENS AN INDIVIDUAL IN COMMITTING ANY

1    SEXUAL ACT, IN COMMITTING A SEXUAL OFFENSE WITH FORCE

2    AGAINST AN UNCONSCIOUS PERSON, AGAINST A PERSON WHO HAS

3    BEEN SUBJECT TO INTOXICATION OR BEEN GIVEN A DRUG OR TYPE

4    OF SUBSTANCE THAT WOULD CAUSE THEM NOT TO BE COMPETENT TO

5    CONSENT TO THAT BEHAVIOR, AND ALSO IT WOULD BE CONDUCT

6    WITH AN INDIVIDUAL WHO IS PHYSICALLY OR MENTAL INCAPABLE

7    OF GIVING CONSENT TO PARTICIPATING IN THAT CONDUCT.

8    Q    WHAT IS THE BASIS OF YOUR UNDERSTANDING THAT THAT IS

9    WHAT SEXUALLY VIOLENT CONDUCT IS?

10   A    THAT WOULD BE IN THE FEDERAL CODE OF REGULATIONS.

11   Q    DR. PHENIX, WHY HAVE YOU DETERMINED THAT HE HAS

12   COMMITTED OR ATTEMPTED TO COMMIT SEXUALLY VIOLENT ACTS OR

13   CHILD MOLESTATION?

14   A    BECAUSE MR. ANTONE HAS USED FORCE AGAINST HIS VICTIMS

15   IN COMMITTING SEXUALLY VIOLENT OFFENSES.

16   Q    HOW DID YOU GO ABOUT DETERMINING THAT HE SUFFERED

17   FROM SERIOUS MENTAL ILLNESS, ABNORMALITY OR DISORDER?

18   A    I REVIEWED THE RECORDS AND I LOOKED AT HIS PAST

19   CONDUCT.  I LOOKED AT PAST PSYCHIATRIC EVALUATIONS.  AND

20   FROM THAT AND OTHER INFORMATION CONTAINED IN A

21   PSYCHOSOCIAL HISTORY, I WAS ABLE TO ASCERTAIN THAT HE HAD

22   DIAGNOSED MENTAL DISORDERS OR MENTAL ABNORMALITIES.

23   Q    WHAT WERE YOUR DIAGNOSTIC CONCLUSIONS?

24   A    I GAVE MR. ANTONE A DIAGNOSIS OF PARAPHILIA NOT

25   OTHERWISE SPECIFIED, NONCONSENTING FEMALES, ALCOHOL

1    DEPENDENCE IN A CONTROLLED ENVIRONMENT, DEPRESSIVE

2    DISORDER, NOT OTHERWISE SPECIFIED, AND ANTISOCIAL

3    PERSONALITY DISORDER.

4    Q   DR. PHENIX, WHICH OF THESE DISORDERS AFFECT HIS

5    SEXUAL DANGEROUSNESS?

6    A   I BELIEVE THAT THREE OF THESE AFFECT HIS SEXUAL

7    DANGEROUSNESS; PARAPHILIA NOT OTHERWISE SPECIFIED,

8    NONCONSENTING FEMALES, ALCOHOL DEPENDENCE, AND ANTISOCIAL

9    PERSONALITY DISORDER.

10   Q   IS THERE ONE OF THESE THAT AFFECTS HIS SEXUAL

11   DANGEROUSNESS MORE THAN OTHERS?

12   A   I WOULD SAY THAT THEY EQUALLY CONTRIBUTE TO HIS

13   SEXUAL DANGEROUSNESS.

14             THE COURT:  DR. PHENIX, I WANT TO BE CLEAR.

15   NOW IS IT YOUR OPINION THAT EACH OF THESE IS A SERIOUS

16   MENTAL ILLNESS?

17             THE WITNESS:  THE THREE THAT I LISTED, YES.

18             THE COURT:  THANK YOU.

19             MR. ROYSTER:

20   Q   WHICH ONE OF THE FOUR WOULD YOU SAY DOES NOT -- IS

21   NOT A SERIOUS MENTAL ILLNESS FOR PURPOSES OF THE ADAM

22   WALSH ACT?

23   A   THAT WOULD BE DEPRESSIVE DISORDER NOT OTHERWISE

24   SPECIFIED.

25   Q   DR. PHENIX, LET'S TALK FIRST ABOUT YOUR DIAGNOSIS OF

1    PARAPHILIA NOT OTHERWISE SPECIFIED NONCONSENT.  JUST IN

2    GENERAL TERMS, WHAT IS A PARAPHILIA?

3    A    A PARAPHILIA IS SEXUAL ABNORMALITY.  IT'S GENERALLY

4    ASSOCIATED WITH A PERSON WHO EXPERIENCES INTENSE

5    RECURRENT SEXUALLY AROUSING FANTASIES, URGES AND

6    BEHAVIORS TOWARDS ABNORMALLY SEXUAL THINGS SUCH AS

7    NONLIVING OBJECTS, SUCH AS CAUSING PAIN OR HUMILIATION TO

8    ONE'S PARTNER OR HAVING THEM DO THAT TO YOU, COMMONLY

9    KNOWN AS SEXUAL SADISM AND SEXUAL MASOCHISM, AND ALSO A

10   PERSON WHO EXPERIENCES THESE FANTASIES, URGES AND

11   BEHAVIORS TOWARDS PREPUBESCENT CHILDREN AS WELL AS

12   NONCONSENTING PERSONS.

13   Q    DID YOU INCLUDE A DEFINITION OF PARAPHILIA IN YOUR

14   REPORT?

15   A    YES, I DID.

16   Q    AND IF WE COULD PULL UP -- WELL, FIRST OF ALL, DR.

17   PHENIX, LET ME HAVE YOU IDENTIFY FROM THE NOTEBOOK

18   EXHIBIT 2 AND EXHIBIT 3, JUST STATING WHAT THOSE EXHIBITS

19   ARE?

20   A    EXHIBIT 2 WOULD BE THE INITIAL EVALUATION THAT I

21   CONDUCTED DATED OCTOBER 3, 2010.  EXHIBIT 3 WOULD BE MY

22   SECOND EVALUATION THAT I COMPLETED AFTER THE CLINICAL

23   INTERVIEW DATED SEPTEMBER 8, 2000 --

24            MR. ROSS:  OBJECTION.

25            THE COURT:  I AM SORRY.  WHAT IS THE NATURE?

1            MR. ROSS:  OBJECTION AS TO EXHIBIT NUMBER 3.

2   I BELIEVE THAT IS THE ONE IN WHICH THE COURT RULED

3   AGAINST.

4            THE COURT:  WELL, SHE IS SIMPLY IDENTIFYING

5   IT.  OBJECTION OVERRULED.

6            DR. PHENIX, YOU WERE GIVING THE DATE OF THAT

7   REPORT?

8            THE WITNESS:  YES, YOUR HONOR.  SEPTEMBER 8,

9   2011.

10           MR. ROYSTER:

11  Q   AND DOES YOUR REPORT INCLUDE A DEFINITION OF

12  PARAPHILIA?

13  A   YES, IT DOES.

14  Q   IF WE CAN PULL UP ON THE SCREEN, JUST FOR ASSISTANCE,

15  2030.  THIS IS BATES STAMP 2030.  AND MAYBE YOU CAN ZOOM

16  IN ON JUST THAT.

17           DR. PHENIX, FOR RECORD, COULD YOU STATE WHAT -- HOW

18  THE DSM DEFINES PARAPHILIA?

19  A   YES.  THE DEFINITION OF A PARAPHILIA IN THE DSM WOULD

20  BE DEFINED AS A PERSON EXPERIENCING RECURRENT, INTENSE

21  SEXUALLY AROUSING FANTASIES, SEXUAL URGES OR BEHAVIORS

22  GENERALLY INVOLVING NONHUMAN OBJECTS, THE SUFFERING OR

23  HUMILIATION OF ONESELF OR ONE'S PARTNER, CHILDREN OR

24  OTHER NONCONSENTING PERSONS THAT OCCUR OVER A PERIOD OF

25  AT LEAST SIX MONTHS.

1           THE COURT:  LET ME JUST NOTE FOR THE RECORD,

2    THE PAGE THAT WE ARE LOOKING AT, IT'S BATES STAMP 2030,

3    AND AS COUNSEL INDICATED, IT'S IN EXHIBIT NUMBER 2,

4    GOVERNMENT'S EXHIBIT NUMBER 2.  MR. ROYSTER.

5           MR. ROYSTER:  THANK YOU, JUDGE.

6    Q    DR. PHENIX, WHAT IS MEANT BY NONHUMAN OBJECTS IN THAT

7    DEFINITION?

8    A    THESE WOULD BE INDIVIDUALS WHO SUFFER FROM FETISH

9    DISORDERS.  IN OTHER WORDS, THEY ARE SEXUALLY AROUSED TO

10   SOMETHING LIKE WOMEN'S UNDERWEAR OR SHOES, SO THAT WOULD

11   BE A NONLIVING OBJECT.  AND THEY GENERALLY ARE SEXUALLY

12   AROUSED SO THAT THEY WOULD USE THOSE OBJECTS FOR THE

13   PURPOSES OF MASTURBATION AND SEXUAL AROUSAL.

14   Q    IS THERE ANY EVIDENCE OF THAT IN THIS CASE?

15   A    NO.

16   Q    AND WHAT ABOUT THE SECOND PART, THE SUFFERING OR

17   HUMILIATION OF ONESELF OR ONE'S PARTNERS.  WHAT DOES THAT

18   MEAN?

19   A    THAT WOULD BE SEXUAL AROUSAL TO CAUSING PAIN, TORTURE

20   OR HUMILIATION TO YOUR PARTNER AS COMMONLY KNOWN AS

21   SEXUAL SADISM OR BEING AROUSED AT HAVING SOMEONE CAUSE

22   YOU PAIN OR HUMILIATION OR SUFFERING DURING SEXUAL

23   ACTIVITY, COMMONLY KNOWN AS SEXUAL MASOCHISM.

24   Q    IS THERE ANY EVIDENCE OF THAT IN THIS CASE?

25   A    NO.

1    Q    AND THE THIRD COMPONENT THERE, CHILDREN OR OTHER

2    NONCONSENTING PERSONS.  WHAT DO YOU UNDERSTAND THAT TO

3    MEAN?

4    A    GENERALLY THIS IS ACCEPTED AS CHILDREN BEING

5    PREPUBESCENT, SO THAT WOULD BE AGE 13 YEARS OR UNDER, AND

6    OTHER NONCONSENTING PERSONS.  SO, OF COURSE, CHILDREN ARE

7    NONCONSENTING PERSONS, AS WOULD BE ADULTS WHO HAVE SEX

8    OFFENSES PERPETRATED AGAINST THEM AGAINST THEIR WILL.

9    Q    AND IS THERE EVIDENCE OF ANY OF THE THIRD COMPONENT

10   IN THIS CASE?

11   A    YES.

12   Q    WHAT IS MEANT BY THE DEFINITION PARAPHILIA NOT

13   OTHERWISE SPECIFIED NONCONSENT.  WHAT DO YOU MEAN BY

14   THAT?

15   A    WELL, THERE ARE A NUMBER OF PARAPHILIC DISORDERS

16   UNDER THE UMBRELLA OF PARAPHILIAS IN THE DSM THAT ARE

17   SPECIFICALLY DEFINED, SUCH AS PEDOPHILIA, SEXUAL AROUSAL

18   TO PREPUBESCENT CHILDREN, BUT THERE ARE MANY PARAPHILIAS

19   OR SEXUAL ABNORMALITIES THAT ARE NOT INDIVIDUALLY DEFINED

20   UNDER THE PARAPHILIAS BUT WE KNOW EXIST.

21        AND WHEN THERE IS NO SPECIFIC DEFINITION IN THE DSM

22   FOR ONE OF THOSE SEXUAL ABNORMALITIES, THEN WE WOULD USE

23   THE NOT OTHERWISE SPECIFIED CATEGORY.

24        PEOPLE ARE NOT ALL ALIKE.  THERE WILL ALWAYS BE

25   DIFFERENT TYPES OF MENTAL CONDITIONS WHICH IS WHY EVERY

1    CATEGORY OF MENTAL DISORDERS IN THE DSM HAS A NOT

2    OTHERWISE SPECIFIED CATEGORY, SO THAT YOU CAN PROVIDE

3    THAT DIAGNOSIS AND THEN USE A DESCRIPTOR TO SAY WHAT THE

4    ABNORMALITY IS ABOUT.

5    Q    AND WHEN YOU SAY NONCONSENT, IS THAT THE DESCRIPTOR?

6    A    YES.

7    Q    DR. PHENIX, YOU ARE AWARE THAT THERE IS SOME ARGUMENT

8    OUT THERE THAT THIS IS NOT A VALID DIAGNOSIS?  ARE YOU

9    AWARE OF THAT?

10   A    YES, I AM.

11   Q    WHAT IS YOUR OPINION AS TO WHETHER PARAPHILIA NOT

12   OTHERWISE SPECIFIED WITH A DESCRIPTOR OF NONCONSENT IS A

13   VALID DIAGNOSIS?

14   A    IT'S VALID.  IT HAS BEEN USED FOR YEARS TO DESCRIBE

15   PARAPHILIAS INVOLVING NONCONSENTING PERSONS.  WE

16   CERTAINLY KNOW THAT A PERSON WHO, FOR EXAMPLE, COMMITS A

17   RAPE HAS COMMITTED A CRIMINAL ACT.

18    PARAPHILIAS FOR NONCONSENTING PERSONS ARE RARE.  IT'S A

19   PERSON WHO HAS, WITH THEIR SEXUAL ORIENTATION, THEY

20   ACTUALLY HAVE THROUGHOUT THEIR LIFE A SEXUAL AROUSAL TO

21   NONCONSENTING SEX.

22       WHEN THEY HAVE SEXUAL FANTASIES, THEY FANTASIZE

23   ABOUT NONCONSENTING SEX.  THEY MAY ALSO BE AROUSED TO

24   CONSENTING SEX, BUT THIS IS A DIAGNOSIS THAT WE BEGAN

25   USING IN A DIFFERENT WAY AT THE TIME OF THE DSM-III-R.

1      YOU WOULD SEE THE DIAGNOSIS OF SEXUAL DEVIATION AND

2  THAT WOULD BE APPLIED TO INDIVIDUALS RATHER THAN

3  PARAPHILIA NOT OTHERWISE SPECIFIED.

4      OVER THE MANY YEARS THAT THIS DIAGNOSIS HAS BEEN

5  USED, IT HAS EVOLVED TO A CATEGORY CALLED PARAPHILIA NOT

6  OTHERWISE SPECIFIED, AND THEN WE QUALIFY WITH NONCONSENT.

7      THERE IS A GOOD DEAL OF RESEARCH IN THE FIELD AND

8  PARTICULARLY, MOST RECENTLY AS THIS DIAGNOSIS WAS BEING

9  CONSIDERED FOR INCLUSION IN THE DSM-V, THAT INDICATES

10 PHYSIOLOGICAL MEASURES THAT ARE PRESENT IN INDIVIDUALS

11 WITH THIS DIAGNOSIS THAT ARE VERY CONVINCING.

12     IN OTHER WORDS, WE CAN FIND PATTERNS OF SEXUAL

13 AROUSAL TO RAPE SCENARIOS IN A CERTAIN SUBGROUP OF

14 INDIVIDUALS WITH THIS PARAPHILIA.

15     SO WE HAVE IDENTIFIED A GROUP OF INDIVIDUALS

16 PHYSIOLOGICALLY THAT HAVE THIS DISORDER, AND IN OUR

17 TEACHINGS, FOR EXAMPLE, THE DSM CASE BOOK THAT TEACHES US

18 HOW TO PROVIDE DIAGNOSES, THERE IS A DESCRIPTOR OF THIS

19 DISORDER AND HOW TO DIAGNOSIS THIS DISORDER WRITTEN BY

20 ONE OF OUR MOST WELL KNOWN RESEARCHERS IN THE FIELD, DR.

21 FRED BERLIN, WHERE HE ADVISES THAT WE SHOULD PROVIDE A

22 DIAGNOSIS OF PARAPHILIA NOS NONCONSENT WHEN IT IS A

23 PARAPHILIA THAT SHOWS AROUSAL TO COERCION DURING SEXUAL

24 ACTIVITY.

25 Q   DR. PHENIX, ARE YOU AWARE OF ANY JURISDICTION THAT

1    HAS HELD THAT PARAPHILIA NOT OTHERWISE SPECIFIED IS AN

2    INVALID DIAGNOSIS?

3    A    NO.

4    Q    NOW, YOU TESTIFIED IN THE CARTER CASE; DIDN'T YOU?

5    A    YES.

6    Q    IN THAT CASE, DID YOU DIAGNOSIS PARAPHILIA NOT

7    OTHERWISE SPECIFIED?

8    A    YES.

9    Q    DID THE COURT UPHOLD THAT THAT WAS A VALID DIAGNOSIS?

10            MR. ROSS:  OBJECTION.  WHAT IS THE RELEVANCE

11   TO SOME OTHER CASE?

12            THE COURT:  I THINK CASE LAW IN THIS AREA IS

13   RELEVANT TO THIS CASE, EVEN THOUGH IT MAY NOT BE BINDING.

14   THE OBJECTION IS OVERRULED.

15            MR. ROYSTER:

16   Q    DR. PHENIX, DID THE COURT ULTIMATELY UPHOLD THE

17   DIAGNOSIS OF PARAPHILIA NOT OTHERWISE SPECIFIED AS A

18   VALID DIAGNOSIS?

19   A    YES.

20   Q    DR. PHENIX, LET'S TALK ABOUT YOUR DIAGNOSIS OF

21   PARAPHILIA NOT OTHERWISE SPECIFIED NONCONSENT IN THIS

22   CASE.  AND FIRST OF ALL, WOULD IT ASSIST YOU IN YOUR

23   TESTIMONY TO SEE A TIME LINE OF HIS CONDUCT?

24   A    YES.

25            MR. ROYSTER:  IF WE COULD, YOUR HONOR, USE THE

1    BOARDS THAT WE HAVE PREPARED, AND ALSO THERE IS A PAPER

2    COPY OR SHOULD BE A PAPER COPY IN YOUR NOTEBOOK AT THE

3    VERY FRONT.

4              THE COURT:  I ASSUME THAT COPIES HAVE BEEN

5    PROVIDED TO COUNSEL FOR THE RESPONDENT.

6              MR. ROYSTER:  THEY HAVE.

7              MR. ROSS:  WE JUST RECEIVED IT YESTERDAY.

8              THE COURT:  GO AHEAD.  YOU MAY PROCEED.

9              MR. ROYSTER:

10   Q    ALL RIGHT, DR. PHENIX, USING THE CHRONOLOGY THAT HAS

11   BEEN PUT TOGETHER, HOW DID YOU COME TO THE CONCLUSION

12   THAT HE SUFFERS FROM PARAPHILIA NOT OTHERWISE SPECIFIED

13   NONCONSENT?

14   A    THE FIRST THING I DID WAS LOOK AT THE PATTERN AND

15   DURATION OF HIS DEVIANT SEXUAL BEHAVIORS OR ABNORMAL

16   SEXUAL BEHAVIORS.

17        THE SECOND THING THAT I DID WAS EXAMINE THE RECORDS

18   FOR ANY ADMISSIONS THAT HE WOULD HAVE MADE OR CLINICAL

19   INFORMATION THAT WOULD INDICATE THAT HE IS AROUSED TO

20   NONCONSENTING SEX.

21   Q    WHAT DID YOU FIND?

22   A    WELL, IN TERMS OF LOOKING AT HIS CRIMINAL SEXUAL

23   BEHAVIORS, THOSE THAT ACTUALLY RESULTED IN CHARGES AND

24   CONVICTIONS AND THOSE THAT DID NOT, BECAUSE ALL OF THAT

25   IS VERY CLINICALLY RELEVANT TO ME, I SAW A PATTERN OF

1    BEHAVIOR THAT INDICATED OVER APPROXIMATELY EIGHT YEARS,

2    THAT MR. ANTONE HAD COMMITTED MULTIPLE ACTS INVOLVING

3    NONCONSENTING PERSONS.

4         HE ALSO HAS A VICTIM RANGE OF VICTIMS THAT WERE BOTH

5    PREPUBESCENT, WOULD BE CONSIDERED PREPUBESCENT ACCORDING

6    TO THE DSM-IV-TR, AND ALSO THOSE THAT WERE MORE PEER AGED

7    TO HIM, HIS AGE, AT APPROXIMATELY 20 YEARS OF AGE.

8         SO THAT BEGINS, THAT HISTORY BEGINS, WHEN HE IS 18

9    YEARS OF AGE IN 1989 WHEN HE FIRST OFFENDED AGAINST ONE

10   OF HIS YOUNGER VICTIMS, ONE OF THE TWO CHILDREN THAT HE

11   OFFENDED AGAINST.  THAT WOULD BE T.F.

12        WITH THIS VICTIM, HE TOUCHED HER BREASTS AND HER

13   GENITALS OVER HER CLOTHING, BUT HE ALSO TOUCHED HER

14   BREASTS INSIDE OF HER BLOUSE, SKIN TO SKIN, WITH HIS

15   HAND.

16        THIS IS AN INDIVIDUAL WHO HE TOUCHED IN A

17   NONCONSENTING WAY.  IT'S THE FIRST KNOWN INCIDENT OF THIS

18   TYPE IN 1989.

19        EIGHT YEARS LATER, HE WENT ON TO OFFEND AGAINST HER

20   AGAIN WHEN SHE WAS STAYING AT HIS MOTHER'S HOME.  HE CAME

21   IN IN THE EVENING.  SHE WAS SLEEPING ON THE COUCH, AND HE

22   RUBBED HER BUTTOCKS OVER A BLANKET AGAINST HER WILL AGAIN

23   AT THAT TIME.

24        SO AGAIN, THIS HAPPENED OVER AN EIGHT YEAR PERIOD.

25   SO HE OFFENDED IN 1989 AGAINST THIS 13 YEAR OLD VICTIM

1   AND THEN HE WAS CONVICTED IN 1990 OF COMMITTING A RAPE

2   AGAINST V.R. 1.  THIS IS A YOUNG WOMAN WITH WHOM HE HAD A

3   RELATIONSHIP.  AND HE HAD ENGAGED IN CONSENTING SEX WITH

4   HER ON ONE INCIDENT.  HE CAME OVER TO HER HOUSE LATE ONE

5   NIGHT AND SAID THAT HE WAS GOING TO BREAK OUT A WINDOW IF

6   SHE DIDN'T COME OVER TO HIS HOUSE.  SHE THOUGHT HE WAS

7   GOING TO KILL HIMSELF, SO SHE WENT WITH HIM OVER TO HIS

8   HOUSE AND THERE HE FORCED HER INTO AN ACT OF SEXUAL

9   INTERCOURSE AGAINST HER WILL.

10      WHEN THERE ARE INDIVIDUALS WITH WHOM A PERSON HAS

11  HAD SOME KIND OF PREEXISTING RELATIONSHIP, IT'S A

12  CONSIDERATION IN TERMS OF PARAPHILIC BEHAVIOR.  IN HIS

13  MIND'S EYE, HE COULD SEE THIS AS, WELL, YOU KNOW, THIS IS

14  REALLY CONSENTING, I JUST WANT TO GO A LITTLE FARTHER

15  THAN SHE IS GOING, AND THIS IS A VERY TYPICAL DYNAMIC IN

16  TERMS OF DATE RAPE, THAT YOU ARE NOW A DATE, YOU HAVE

17  SOME TYPE OF FOREPLAY, AND THEN YOU DON'T TAKE NO FOR AN

18  ANSWER AND GO ON AND COMMIT A FORCED SEX ACT.

19      AND WE GENERALLY VIEW THAT AS NOT PARAPHILIC, BUT

20  ONE HAS TO EXAMINE THE ENTIRE RECORD TO SEE IF ALL OF THE

21  BEHAVIORS ARE SIMILAR TO THAT, OR IF THEY INVOLVE INTO

22  MORE OF AN ACTIVITY OF NONCONSENT, YOU KNOW, OF RAPE.

23      SO, HE HAD THIS CONVICTION IN 1990.  THIS IS A

24  PERSON WHO HAS NOW BEEN SANCTIONED FOR SERIOUS SEXUAL

25  BEHAVIOR.  AND IT WAS LESS THAN TWO YEARS UNTIL IN

1   1992 --

2   Q   DR. PHENIX, LET ME STOP YOU RIGHT THERE BEFORE WE GO

3   ANY FURTHER.  WERE YOU IN COURT WHEN HE TESTIFIED?

4   A   YES.

5   Q   DID YOU HEAR HIM DENY THAT HE RAPED HER?

6   A   YES.

7   Q   DOES THAT HAVE ANY SIGNIFICANCE OR BEARING ON YOUR

8   EVALUATION WITH RESPECT TO HIS RISK ASSESSMENT?

9   A   YES.  I MEAN, I BELIEVE HE IS BEING DECEPTIVE.

10  I THINK THE REPORT THAT SHE PROVIDED TO POLICE, IT WAS

11  VERY CLEAR THAT SHE SAID HE WAS SIMPLY TOO HEAVY TO GET

12  OFF OF HER, THAT SHE WAS UNABLE TO GET AWAY FROM HIM, AND

13  THAT HE IS DENYING THAT SEXUAL BEHAVIOR.

14  Q   ALL RIGHT.  GO AHEAD.  YOU WERE REFERRING TO THE NEXT

15  OFFENSE.

16  A   RIGHT.  AND THE NEXT OFFENSE, TO ME, THESE OFFENSES

17  BECOME MUCH MORE OF A PLANNED TYPE OF EVENT, SO THAT IN

18  MY OPINION IT'S STARTING TO EVOLVE INTO A SITUATION THAT

19  HE DESIGNS SO THAT HE CAN ENGAGE IN NONCONSENTING SEX

20  WITH THESE VICTIMS.

21      HE IS NOW 20 OR 21 YEARS OF AGE.  HE HAS ALREADY

22  BEEN ADJUDICATED FOR THE RAPE OF V.R. 1.  AND HE GOES TO

23  THE HOME OF V.R. 2.  SHE IS ONLY 14 OR 15 YEARS OF AGE.

24  HE IS NOW 20 OR 21.  AND HE GETS HER TO WALK WITH HIM

25  UNDER THE RUSE THAT THEY ARE GOING OVER TO ANOTHER

1    COUSIN'S HOUSE, AND SHE REALLY WANTED TO SEE THIS PERSON

2    SO SHE WAS GLAD TO GO DO THAT.

3         SO HE GETS HER OUTSIDE, ISOLATED FROM EVERYONE ELSE,

4    AND THEN OFFERS HER ALCOHOL.  SHE REFUSES.  SHE IS NOT

5    INTERESTED IN DRINKING.  AND THEN HE RAPES HER THERE, OUT

6    IN THE OPEN.

7         SO, IN MY OPINION, THIS IS A PLANNED ACT OF

8    NONCONSENT WITH THIS VICTIM.

9    Q   DR. PHENIX, WHAT IS YOUR UNDERSTANDING OF WHETHER HE

10   IS OF ANY RELATION TO THE TWO VICTIMS YOU HAVE SPOKEN OF,

11   V.R. 1 AND V.R. 2?

12   A   YES.  IT'S MY UNDERSTANDING THAT THESE ARE HIS

13   COUSINS AND THAT THEY ARE SISTERS.

14   Q   AND DOES THAT HAVE ANY SIGNIFICANCE TO YOUR

15   EVALUATION?

16   A   YES.  I THINK THAT IT JUST SPEAKS TO HIS VICTIM POOL.

17   HE HAS A WIDE VICTIM POOL.  HE WAS IN A RELATIONSHIP WITH

18   V.R. 1 AT THE SAME TIME HE PLANNED THE RAPE AND SEXUAL

19   ASSAULT AND EXECUTED THAT WITH V.R. 2.

20        SO THAT EXPANDS HIS VICTIM POOL IN TERMS OF

21   RELATIVES AND IN TERMS OF ACTUALLY HAVING HAD A

22   RELATIONSHIP WITH ONE OF THEM IGNORES THAT.  YOU WOULD

23   GENERALLY HAVE SOME CONNECTION TO THAT PERSON.  AND GOES

24   ON TO RAPE HER SISTER.

25             THE COURT:  DR. PHENIX, JUST SO THAT THE

1    NOMENCLATURE THAT WAS USED IN MR. ANTONE'S TESTIMONY

2    MATCHES UP WITH YOURS, IF IT DOES, IS V.R. NUMBER 1 THE

3    PERSON TO WHOM MR. ANTONE REFERRED TO AS VALITA?

4              THE WITNESS:  YES.

5              THE COURT:  AND V.R. NUMBER 2, IS THAT THE

6    PERSON WHO WAS REFERRED TO IN THAT TESTIMONY AS

7    VERONICA?

8              THE WITNESS:  YES, YOUR HONOR.

9              THE COURT:  OKAY.  THANK YOU.  MR. ROYSTER.

10             MR. ROYSTER:  ALL RIGHT.  THANK YOU, JUDGE.

11   Q   CONTINUING ON, DR. PHENIX, WITH YOUR REVIEW OF THE

12   CONDUCT THAT LED TO YOUR DIAGNOSIS OF THE PARAPHILIA NOT

13   OTHERWISE SPECIFIED NONCONSENT.

14   A   IN 1993, IT'S NOTABLE THAT MR. ANTONE BECAME INVOLVED

15   IN ESSENTIALLY HIS ONLY LONGER TERM RELATIONSHIP, AND

16   THAT WOULD BE WITH TANYA MCCLOUD, AND AT THE TIME OF HIS

17   SUBSEQUENT OFFENDING, WHICH WE CAN SEE HERE ON THE TIME

18   LINE, HE WAS INVOLVED IN A RELATIONSHIP WHERE HE WAS ABLE

19   TO ENGAGE IN CONSENTING SEXUAL ACTIVITY.

20       AND NOT UNLIKE INDIVIDUALS WITH SEXUAL AROUSAL TO

21   NONCONSENT, EVEN THOUGH THEY DO HAVE AVAILABLE CONSENTING

22   SEXUAL PARTNERS, THEY WILL SEEK SEXUAL PARTNERS FOR

23   NONCONSENT OUTSIDE OF THAT RELATIONSHIP BECAUSE IT'S

24   AROUSING TO THEM, THAT EXCITEMENT OF NONCONSENT, THE

25   POWER OF NONCONSENT, AND SEXUAL AROUSAL THAT THEY HAVE TO

1    IT.

2         AND SO HE IS INVOLVED IN A RELATIONSHIP IN 1993.  HE

3    MOVES IN WITH HIS GIRLFRIEND WHO BECOMES ESSENTIALLY A

4    COMMON LAW WIFE.  AND WE CAN SEE THAT IN 19 -- IN JULY OF

5    1996, THAT HE MOLESTS R.A. FOR THE LAST TIME.

6         NOW, AT THE TIME THAT R.A. REPORTED THIS, SHE SAID

7    THAT -- THE RECORDS WOULD INDICATE SHE WAS 12 YEARS OF

8    AGE.

9         THIS WOULD BE THE SECOND CHILD VICTIM, BECAUSE I

10   BELIEVE THAT MR. ANTONE HAS DEVIANT AROUSAL TO BOTH

11   CHILDREN AND ADULTS.

12        SHE REPORTED THAT HE HAD TOUCHED HER GENITALS OVER

13   HER CLOTHING.  AND THAT THE LAST TIME WAS WHEN SHE WAS 12

14   YEARS OF AGE, BUT THAT HE HAD DONE THAT A LOT OF TIMES

15   PRIOR.

16        AND IN FACT, IN THE POLICE REPORT, IT WOULD INDICATE

17   THAT SHE SAID IT HAPPENED WAY BEFORE SHE WAS 11.

18        SO THAT INDICATES TO ME THAT IT DID NOT JUST OCCUR

19   FROM AGE 11 TO 12, THAT IT OCCURRED ACTUALLY BEFORE AGE

20   11, AND FURTHERMORE, THE VICTIM RELUCTANTLY ADMITTED IN

21   THE POLICE REPORT THAT MR. ANTONE HAD UNBUTTONED HER

22   PANTS AND PUT HIS HAND INTO HER PANTS AND FONDLED HER,

23   SKIN TO SKIN, ON HER GENITALS.

24        THEN AGAIN, IN 1997, IS THE INCIDENT THAT I TALKED

25   ABOUT WITH T.F. WHO HE HAD TOUCHED WHEN SHE WAS 13 YEARS

1    OF AGE, AND THEN HE WENT TO TOUCH HER EIGHT YEARS LATER

2    IN 1997 BY RUBBING HER BUTTOCKS WHEN SHE WAS SLEEPING AT

3    HIS MOTHER'S HOME.

4         AND THEN I BELIEVE THE EPISODES OF NONCONSENT, THE

5    SEXUAL ACTIVITY OF NONCONSENT ESSENTIALLY ESCALATED FROM

6    1996 TO 1997.

7         SO HERE HE HAS COMMITTED CHILD MOLEST IN 1996,

8    MULTIPLE TIMES, WITH R.A. FROM PRIOR TO AGE 11, AND THEN

9    HE COMMITS TWO WHAT WOULD BE RAPES.  ONE WAS AN ATTEMPTED

10   RAPE SIMPLY BECAUSE THE VICTIM COULD ESCAPE.

11        AND SO IN JUNE OF 1997, JUST A FEW MONTHS AFTER HE

12   HAD FONDLED T.F., HE ATTEMPTED TO RAPE HIS COUSIN C.R.,

13   OR CHERYL, WHO WAS 21 YEARS OF AGE.

14        AND AGAIN, I BELIEVE THAT THIS WAS A PLANNED

15   ACTIVITY.  HE WAS INTOXICATED.  HE WENT OVER TO GET HER,

16   TO TELL -- ASK HER TO COME OVER AND WATCH A MOVIE WITH

17   HIM AT THE HOUSE.  SHE THOUGHT THAT WOULD BE ENJOYABLE.

18   SHE WENT WITH HIM.  AND AS SOON AS SHE GETS INTO THE

19   ROOM, THEN HE ATTEMPTS -- THEN HE SEXUALLY ASSAULTS HER

20   AND ATTEMPTS TO HAVE SEXUAL INTERCOURSE WITH HER.  HE

21   HELD HER HANDS DOWN.  HE TOUCHED HER BREASTS, SKIN TO

22   SKIN, AND HER GENITALS.  HE UNBUTTONED HER PANTS.

23        AND THE POLICE REPORT WOULD REFLECT THAT THE ONLY

24   REASON SHE WAS ABLE TO GET OUT OF THE ROOM AND JUMP OUT

25   OF THE WINDOW WAS BECAUSE HIS MOTHER HEARD NOISE AND

1    BUMPING IN THE ROOM AND CAME TO THE DOOR AND WAS YELLING

2    THINGS AT HIM, AND SO IT DISTRACTED HIM AND SHE WAS ABLE

3    TO ESCAPE OUT THE WINDOW.

4         AND IT WAS ONLY A FEW MONTHS LATER WHEN HE COMMITTED

5    THE RAPE OF RICHANDA, R.J., WHO WAS 20 YEARS OF AGE AND

6    RICHANDA HAD COME OVER TO THE HOUSE ESSENTIALLY TO VISIT

7    WITH THE FAMILY, WITH HER CHILD, AND TO VISIT HIS

8    BROTHER.  THEY WERE HAVING A FAMILY GATHERING AT THAT

9    TIME.

10        AND IN TERMS OF MR. ANTONE'S BEHAVIOR, HE COMMITTED

11   THIS BEHAVIOR.  HE RAPED HER IN THE HOUSE WHILE ALL THE

12   FAMILY MEMBERS WERE OUTSIDE THE HOUSE AND VERY CLOSE IN

13   PROXIMITY AND WHILE HIS COMMON LAW WIFE, TANYA, WAS

14   ACTUALLY IN THE RESIDENCE WITH THEM.

15        SO HE GOES INTO THE ROOM, SHUTS THE DOOR, LOCKS THE

16   DOOR, AND IT'S MY OPINION YOU WOULD LOCK A DOOR FOR THE

17   PURPOSE OF GETTING SOMEONE ISOLATED FOR THE PURPOSE OF

18   RAPING THEM, AND ACTUALLY WAS INTERRUPTED BY TANYA COMING

19   TO THE DOOR, WANTING TO KNOW WHY IT WAS LOCKED, AND

20   WANTING TO KNOW WHAT HE WAS DOING.  BUT IT WASN'T

21   INTERRUPTED UNTIL HE HAD RAPED R.J.

22        SO, AS I LOOK AT THIS BEHAVIOR, IT'S NOT UNUSUAL TO

23   SEE SEXUAL AROUSAL TO NONCONSENTING SEX EVOLVE OVER TIME.

24        SO HE BEGAN WITH FONDLING, CHILD MOLEST IN 1989 OR

25   PERHAPS BEFORE, AND THAT EVOLVED INTO RAPING HIS

1   GIRLFRIEND, AND THEN ULTIMATELY INTO CONTINUED OFFENDING

2   RESULTING IN 1997 IN TWO RAPES, VERY CLOSE TOGETHER.

3   Q    DR. PHENIX, IN REVIEWING THE RECORDS, DID YOU FIND

4   ANY INFORMATION REGARDING HIM FORCING TANYA TO HAVE SEX

5   WITH HIM?

6   A    YES.

7   Q    COULD YOU TELL THE COURT ABOUT THAT?

8   A    YES.  FURTHERMORE, INFORMATION FROM A 1999

9   PSYCHOLOGICAL EVALUATION WOULD INDICATE WHAT I SAID I

10  RELIED ON WHICH WAS ADMISSIONS, AND THAT WAS AN ADMISSION

11  ON THE PART OF MR. ANTONE THAT THERE WERE SEVERAL TIMES

12  WHEN HE WOULD FORCE OR RAPE TANYA BECAUSE SHE WOULD NOT

13  BE WILLING TO ENGAGE IN SEXUAL ACTIVITY WITH HIM.

14  Q    WAS THERE ANY OTHER INFORMATION THAT YOU CAN RECALL

15  WITHOUT REVIEWING THE PSYCHOLOGICAL EVALUATION THAT WAS

16  SIGNIFICANT TO YOUR ANALYSIS WITH RESPECT TO THIS

17  DIAGNOSIS?

18  A    YES.

19  Q    WHAT?

20  A    AGAIN, THE PSYCHOLOGICAL EVALUATION IN 1999 BY DR.

21  SADLER AND GRAY CONTAINED A POLYGRAPH WHICH ASKED A

22  NUMBER OF QUESTIONS, AND OF THOSE QUESTIONS, ONE OF THEM

23  WAS HAVE YOU EVER MASTURBATED TO A RAPE TYPE OF FANTASY,

24  AND ON THAT POLYGRAPH, MR. ANTONE SHOWED DECEPTION IN

25  RESPONSE TO THAT QUESTION.

1      SO THAT WOULD INDICATE A FAIRLY CLASSIC EXPRESSION OF

2   PARAPHILIA NOT OTHERWISE SPECIFIED, INTENSE RECURRENT

3   SEXUAL FANTASIES, OBVIOUS SEXUAL URGES THAT RESULTED IN

4   THESE OFFENSES TOWARDS NONCONSENTING SEX.

5      THERE WAS CLEAR SEXUAL AROUSAL WHICH IS VERY UNUSUAL

6   FOR MEN TO SHOW SEXUAL AROUSAL IN NONCONSENTING

7   SITUATIONS BECAUSE HE WAS ABLE TO MAINTAIN ERECTIONS WHEN

8   HE COMMITTED THESE CLEARLY NONCONSENSUAL SEXUAL ASSAULTS.

9   Q   DR. PHENIX, IF YOU COULD, FLIP OVER IN THE NOTEBOOK

10  TO EXHIBIT 10 AND IDENTIFY THAT DOCUMENT FOR THE COURT,

11  PLEASE?

12          THE COURT:  DR. PHENIX, ONCE YOU GET THERE, I

13  AM GOING TO ASK YOU JUST ANOTHER ONE OF THESE NAME

14  QUESTIONS.

15          IN THE TIME LINE THE REFERENCE TO C.R., IS

16  C.R. THE PERSON IDENTIFIED IN MR. ANTONE'S TESTIMONY AS

17  CHERYL?

18          THE WITNESS:  YES, YOUR HONOR.

19          THE COURT:  OKAY.  THANK YOU.

20          MR. ROYSTER:  JUDGE, CAN I JUST ASK A QUICK

21  QUESTION, JUST THINKING BROADLY ABOUT THESE ADAM WALSH

22  CASES DEALING WITH THE VICTIM'S NAMES, IS IT HELPFUL IF

23  WE GO AHEAD AND INCLUDE THE NAME ON THE CHRONOLOGY

24  INSTEAD OF DOING THE ABBREVIATIONS AND THINGS LIKE THAT?

25          THE COURT: I AM FINE WITH THE ABBREVIATIONS.

1    I HAVE NO PROBLEM WITH THE ABBREVIATIONS.  IT'S OBVIOUSLY

2    THE NOMENCLATURE, IT'S PREFERABLE IF IT'S CONSISTENT.  IF

3    IT'S NOT GOING TO BE CONSISTENT, WE NEED TO MATCH IT UP.

4              MR. ROYSTER:  OKAY.  THANK YOU, JUDGE.

5    Q    DR. PHENIX, EXHIBIT 10, WHAT IS THAT?

6    A    THAT WOULD BE THE PSYCHOPHYSIOLOGICAL EVALUATION AND

7    TREATMENT PLAN CONDUCTED ON AUGUST 30, 1999 BY DR. GRAY

8    AND MR. SADLER.

9    Q    DID YOU RELY ON THIS DOCUMENT IN PREPARING YOUR

10   EVALUATION?

11   A    YES.

12   Q    DR. PHENIX, SO MUCH TIME HAS PASSED SINCE HE

13   COMMITTED HIS LAST OFFENSE.  HOW CAN YOU SAY THAT HE

14   STILL HAS PARAPHILIA NOT OTHERWISE SPECIFIED, NONCONSENT,

15   WHEN HE HASN'T COMMITTED AN OFFENSE, APPARENTLY, SINCE

16   1997?

17   A    RIGHT.  IT'S VERY UNUSUAL TO SEE THESE OFFENSES

18   INVOLVING NONCONSENT INSTITUTIONALLY.  IT'S DIFFICULT TO

19   COMMIT THOSE OFFENSES IN VERY SECURE SETTINGS.

20        SO IT'S NOT UNUSUAL TO SEE A LENGTHY PERIOD OF TIME

21   WHERE THE PERSON DOES NOT COMMIT THOSE TYPES OF BEHAVIORS

22   BECAUSE THEY ARE IN PRISON OR THEY ARE IN JAIL WHERE IT'S

23   TOO DIFFICULT TO DO THAT.

24        THE ISSUE IS THAT THESE DISORDERS ARE CHARACTERIZED

25   BY EXPERIENCING SEXUAL FANTASIES WHERE THEY PLAY THESE

1     SCENARIOS OUT, THESE DEVIANT SEXUAL FANTASIES WHICH MR.

2     ANTONE HAS ADMITTED TO, SO YOU CAN'T SEE WHEN SOMEONE IS

3     SITTING IN PRISON FOR 15 YEARS WHAT THEIR SEXUAL

4     FANTASIES ARE.  THEY ARE A PRIVATE, PERSONAL THING, AND

5     SO THEY CAN CONTINUE TO RE-ENFORCE THEIR DEVIANT SEXUAL

6     AROUSAL INSTITUTIONALLY AND THEN YOU SEE THEM ACTED OUT

7     WHEN THEY HAVE AN OPPORTUNITY TO ACT THEM OUT ONCE

8     RELEASED BACK TO THE COMMUNITY.

9     Q   YOU ALSO DIAGNOSED HIM WITH ALCOHOL DEPENDENCE IN A

10    CONTROLLED ENVIRONMENT.  FIRST, WHAT IS THAT?  AND THEN

11    WHAT IS THE BASIS OF YOUR DIAGNOSIS?

12    A   ALCOHOL DEPENDENCE, AS WITH DRUG DEPENDENCE, WOULD BE

13    A PERSON WHO EXPERIENCES TOLERANCE TO THE SUBSTANCE SO

14    THEY CONTINUE TO USE MORE AND MORE FOR THE SAME EFFECT.

15        SOMEONE WHO GENERALLY EXPERIENCES SOME TYPE OF

16    WITHDRAWAL SYMPTOMS AND THAT WOULD BE PHYSICAL OR

17    PSYCHOLOGICAL WITHDRAWAL SYMPTOMS, A PERSON WHO HAS TRIED

18    TO STOP, BUT CAN'T, AND FINDS THEMSELVES UNSUCCESSFUL IN

19    STOPPING.

20        INDIVIDUALS WHO HAVE SUBSTANCE DEPENDENCE SPEND A

21    GOOD DEAL OF TIME TRYING TO GET THE SUBSTANCE AND A GOOD

22    DEAL OF TIME USING THE SUBSTANCE SUCH AS THEY ARE LIKELY

23    TO GIVE UP MANY PERSONAL ACTIVITIES, HOBBIES, FAMILY

24    ACTIVITIES, WORK, SCHOOL ACTIVITIES IN ORDER TO BE ABLE

25    TO USE THE SUBSTANCE.

1        AND IT'S ALSO SOMEONE WHO USES THE SUBSTANCE EVEN

2    THOUGH THEY REALIZE THAT THEY HAVE PSYCHOLOGICAL OR

3    PHYSICAL PROBLEMS AS A RESULT OF USING IT.

4    Q    WHAT IS THE BASIS OF YOUR DIAGNOSIS THAT HE SUFFERS

5    FROM ALCOHOL DEPENDENCE?

6    A    WELL, I THINK CERTAINLY TODAY WE HEARD MR. ANTONE SAY

7    THAT HE IS AN ALCOHOLIC, AND WE HEARD HIM TALK ABOUT THE

8    STRUGGLE WITH ALCOHOL WHEN HE WAS IN THE COMMUNITY.

9        HE HAD A VERY EARLY ONSET OF DRINKING ALCOHOL AND

10   BECOMING DEPENDENT, SO AT AGE 12, HE BEGAN TO DRINK.  AT

11   AGE 15 TO 16, HE SAID HE WAS DRINKING MORE HEAVILY.  AND

12   BY AGE 18, HE SAID THAT HE WAS DRINKING A CASE OF 32

13   OUNCE BEERS BETWEEN THURSDAY AND SUNDAY, THAT HE SUFFERED

14   MANY SYMPTOMS OF ALCOHOL DEPENDENCE, INCLUDING HAVING

15   BLACK OUTS EVERY DAY THAT HE DRANK.  HE TALKED ABOUT --

16   HE ALSO TOLD ME THAT HE WOULD BE SHAKY AND FEEL WOOZY AS

17   A RESULT.

18            MR. WATERS:  OBJECTION.  FALLS WITHIN THE

19   SCOPE OF THE MOTION TO EXCLUDE IN THE ORDER ON THAT.

20            THE COURT:  WELL, I WILL NOTE THE OBJECTION.

21   DO YOU WISH TO BE HEARD ON THAT, MR. ROYSTER?

22            MR. ROYSTER:  I DON'T.  I CAN'T RECALL OFFHAND

23   IF THIS IS IN THE DEPOSITION, BUT WE CAN MOVE FORWARD

24   WITHOUT HER TALKING ABOUT WHAT SHE GLEANED FROM HIM IN

25   THE INTERVIEW.

1         THE COURT:  THAT IS FINE.  I WILL ALLOW YOU TO

2    PRESERVE THE RECORD ON THOSE POINTS, BUT YOU DO NEED TO

3    NOTE IF IT'S MATERIALLY OBJECTED TO.

4         MR. ROYSTER:  OKAY.  ON THAT PARTICULAR POINT

5    THEN I WOULD ASK THAT WE BE ALLOWED TO MAKE A PROFFER AS

6    TO WHAT SHE WOULD HAVE SAID WITH RESPECT TO WHAT HE TOLD

7    HER IN THE INTERVIEW, BUT SOLELY FOR THE PURPOSE OF THE

8    PROFFER.

9         THE COURT:  THAT IS FINE.

10        MR. ROYSTER:

11   Q   DR. PHENIX, JUST SO WE ARE CLEAR, YOU WERE GETTING

12   READY TO SAY SOMETHING ABOUT WHAT HE TOLD YOU IN THE

13   INTERVIEW, AND I WANT YOU TO ANSWER THE -- I WANT YOU TO

14   CONTINUE SAYING WHAT YOU WERE GOING TO SAY, BUT

15   UNDERSTAND THAT WHEN YOU ARE DONE TALKING ABOUT WHAT HE

16   SAID IN YOUR INTERVIEW AND HOW IT AFFECTED YOUR ANALYSIS,

17   I WANT YOU TO STOP; OKAY?

18   A   YES.

19   Q   ALL RIGHT.  GO AHEAD.

20   A   HE HAS TALKED IN HIS TESTIMONY TODAY ABOUT

21   EXPERIENCING BLACK OUTS WHICH WOULD BE A SYMPTOM OF HIS

22   DRUG INTAKE, HIS ALCOHOL INTAKE.

23        HE ALSO WAS PLACED INTO ALCOHOL TREATMENT AT AGE 16.

24   THAT WAS AT THE TUCSON PSYCHIATRIC INSTITUTE.  HE

25   RECEIVED SUBSTANCE ABUSE TREATMENT AND HE RELAPSED AFTER

1   ABOUT A MONTH GOING BACK TO DRINKING.

2       SO HE HAS HAD A NUMBER OF UNSUCCESSFUL ATTEMPTS IN

3   HIS LIFE TO TRY TO STOP USING SUBSTANCES, BUT CONTINUED

4   TO DO SO.

5       THE RECORDS WOULD ALSO INDICATE THAT HIS DRINKING

6   WAS DETRIMENTAL TO HIS SCHOOL WORK, THAT IT CONTRIBUTED

7   TO HIM DOING POORLY IN SCHOOL, AND ALSO HAVING TO DROP

8   OUT OF SCHOOL.

9       HE HAS, IN TESTIMONY THIS MORNING, TALKED ABOUT HOW

10  HE BELIEVED THAT HIS ALCOHOL INTAKE AND DRUG USE HAS

11  CONTRIBUTED TO HIS SEX OFFENDING.  IT CAUSED HIM NOT TO

12  BE ABLE TO THINK CLEARLY AND WAS A CONTRIBUTOR TO

13  OFFENDING SEXUALLY.

14  Q   DR. PHENIX, YOU WERE JUST -- JUST A MOMENT AGO, YOU

15  WERE TALKING ABOUT ALL THE THINGS EXCEPT WHAT HE TOLD YOU

16  IN THE INTERVIEW?

17  A   CORRECT.

18  Q   NOW, WHAT THE COURT IS ALLOWING ME TO DO IS FOR YOU

19  TO SAY WHAT HE TOLD YOU IN THE INTERVIEW AND HOW IT

20  AFFECTS YOUR EVALUATION WITH RESPECT TO THE ALCOHOL ONLY

21  AT THIS POINT.

22      BUT WHEN YOU ARE DONE WITH THAT ANSWER, I WANT YOU TO

23  STOP SO IT'S CLEAR ON THE RECORD; OKAY?

24  A   ALL RIGHT.

25  Q   DO YOU UNDERSTAND?

1    A    YES.

2    Q    ALL RIGHT.

3    A    WHAT HE TOLD ME IN THE INTERVIEW ABOUT HIS DRINKING

4    WAS THAT HE DID HAVE SOME SYMPTOMS, BESIDES JUST THE

5    BLACK OUTS, AND THAT WAS THAT HE FELT SHAKY AND WOOZY

6    FROM HIS DRINKING, AND THAT IT FREQUENTLY MADE HIM SICK.

7    Q    DR. PHENIX, HOW DOES THE -- WELL, FIRST, YOU HEARD

8    HIM TESTIFY ABOUT NOT HAVING ANY ALCOHOL ISSUES FOR

9    SEVERAL YEARS?

10   A    YES.

11   Q    RIGHT.  HOW DO YOU EXPLAIN THAT AND HOW DO YOU

12   RECONCILE THAT WITH YOUR DIAGNOSIS OF ALCOHOL DEPENDENCE?

13   A    WELL, I DIAGNOSED ALCOHOL DEPENDENCE IN A CONTROLLED

14   ENVIRONMENT, AND THE REASON THAT I DID THAT WAS BECAUSE

15   HE IS ABSTAINING WITH THE CONTAINED SETTING.

16        SO, I NEED TO THINK CLINICALLY, NOT JUST ABOUT HOW

17   HE CAN CONTAIN HIMSELF FROM USING SUBSTANCES WHICH ARE

18   AVAILABLE INSTITUTIONALLY, BUT IT IS HARDER TO GET, AND

19   WHEN YOU DO GET CAUGHT, THERE ARE IMMEDIATE SANCTIONS FOR

20   THAT.

21        SO IT'S DIFFERENT THAN BEING OUT IN THE COMMUNITY

22   WHEN YOU ARE NOT GOING TO HAVE NECESSARILY THOSE KIND OF

23   SANCTIONS WHEN YOU HAVE MORE FREEDOM TO ACT ON ANY

24   COMPULSIONS OR URGES THAT YOU HAVE TO USE SUBSTANCES.

25        SO IT'S NOT PARTICULARLY UNUSUAL FOR PEOPLE WHO HAVE

1  BEEN DRUG AND ALCOHOL DEPENDENT TO STOP USING SUBSTANCES

2  INSTITUTIONALLY.  IT'S VERY POSITIVE THAT THEY STOP USING

3  SUBSTANCES AND CAN DO THAT INSTITUTIONALLY, SO THAT IS A

4  POSITIVE SIGN, BUT IT DOESN'T MEAN THAT THE PROBLEM IS

5  OVER WITH, THAT THEY ARE NOT GOING TO HAVE A PROBLEM

6  AGAIN ONCE LEFT TO THEIR OWN DEVICES IN THE COMMUNITY.

7  Q   HOW DOES THIS DIAGNOSIS OF ALCOHOL DEPENDENCE IN A

8  CONTROLLED ENVIRONMENT AFFECT HIS RISK, IF AT ALL?

9  A   WELL, SUBSTANCES -- USING ALCOHOL OR OTHER SUBSTANCES

10  IS, WHAT I WOULD CALL, A CONTRIBUTOR TO SEX OFFENDING,

11  AND IT INCREASES RISK FOR THE VERY REASONS THAT MR.

12  ANTONE DISCUSSED, AND THAT IS THAT IT DOESN'T ALLOW HIM

13  TO THINK THROUGH THE CONSEQUENCES OF HIS BEHAVIOR.  IN

14  THE FIELD, WE DO NOT BELIEVE THAT SUBSTANCES ARE FULLY

15  RESPONSIBLE, GENERALLY, FOR THIS TYPE OF SEX OFFENDING

16  HISTORY.  I BELIEVE THAT HIS PARAPHILIC DISORDER IS

17  PRIMARILY RESPONSIBLE FOR SO MANY INCIDENTS OF

18  NONCONSENTING SEXUAL ACTIVITY AND CHILD MOLEST.

19      ON THE OTHER HAND, FOR SOMEONE WHO DOES HARBOR

20  SEXUAL DEVIANCE AS A PARAPHILIA DISORDER, THE SUBSTANCES

21  WILL DISINHIBIT IT, SO IT'S MORE LIKELY THAT THE PERSON

22  WILL ACT OUT ON THAT SEXUAL DEVIANCE WHEN THEY ARE USING

23  SUBSTANCES.

24  Q   DR. PHENIX, MR. ANTONE TESTIFIED DURING HIS

25  EXAMINATION THAT HE HAD BEEN TO AA MEETINGS AND HE HAD

1    RECEIVED 40 HOURS OF SUBSTANCE ABUSE TREATMENT.

2        WHAT IS YOUR OPINION AS TO WHETHER THAT IS

3    SUFFICIENT TO HAVE ADDRESSED HIS TREATMENT OR HIS ALCOHOL

4    DEPENDENCE?

5    A    I DON'T THINK IT'S SUFFICIENT.  I THINK A 40-HOUR

6    TREATMENT PROGRAM IS A GREAT START FOR SOMEONE WHO HAS

7    HAD AS MUCH OF A PROBLEM AS MR. ANTONE HAS HAD.  SO

8    I THINK THAT THAT IS A BEGINNING FOR HIM, AND IT'S

9    POSITIVE THAT HE ENGAGED IN THAT TREATMENT.

10        HOWEVER, WHEN I EXAMINED THE RECORDS, HE WAS

11   PARTICIPATING BETWEEN OCTOBER IN 2000 AND MAY OF 2002 IN

12   NARCOTICS ANONYMOUS, ALCOHOLICS ANONYMOUS, PROGRAMS THAT

13   WERE ALSO OFFERED INSTITUTIONALLY.  HIS ATTENDANCE WAS

14   THAT HE ATTENDED ABOUT HALF OF THOSE SESSIONS DURING THAT

15   WHAT, YEAR AND A HALF OR SO.

16        AND THEN HE DID NOT ATTEND ANY MORE SESSIONS AFTER

17   THAT APPARENTLY UNTIL RECENTLY WHICH I JUST FOUND OUT

18   ABOUT, SO THERE WERE MANY YEARS AFTER 2002 TO 2010 OR '11

19   WHEN HE WAS NOT PARTICIPATING IN AA AND NA.

20        AND I HAVE SERIOUS CONCERNS ABOUT THAT.  THIS IS A

21   PERSON WHO HAS SUCH A SEVERE ALCOHOL DEPENDENCE AND HAS

22   STRUGGLED A LOT WITH DRUG DEPENDENCE THAT IT'S MY OPINION

23   THAT HE SHOULD BE CONSISTENTLY -- IF HE IS SERIOUS ABOUT

24   IT, HE SHOULD BE CONSISTENTLY ATTENDING THOSE MEETINGS

25   THROUGHOUT HIS INCARCERATION.

1        HE HAS HAD MANY YEARS TO WORK ON THIS ISSUE WHERE HE

2    HAS NOT UNTIL RECENTLY.

3        SO I STILL SEE HIM AT THE BEGINNING OF THE TYPE OF

4    TREATMENT THAT IS NECESSARY FOR HIM TO BE SUCCESSFUL IN

5    THE COMMUNITY.

6             THE COURT:  DR. PHENIX, IS IT YOUR

7    UNDERSTANDING THAT THE 40-HOUR PROGRAM THAT HE COMPLETED

8    INCLUDED HIS ATTENDANCE AT THESE NA AND AA MEETINGS BACK

9    IN -- STARTING IN OCTOBER OF 2000, ALL THE WAY UP TO THE

10   PRESENT.

11            THE WITNESS:  YES.  WELL, HE, AFTER THE

12   40-HOUR PROGRAM IN 2000, THEN UNTIL MAY OF 2002, HE DID

13   CONTINUE TO ATTEND NA AND AA HALF THE TIME.

14            THE COURT:  SO THE NA AND AA IS ON TOP?

15            THE WITNESS:  IT'S ON TOP OF IT, YES.

16            THE COURT:  OKAY.

17            THE WITNESS:  RIGHT.

18            MR. ROYSTER:

19   Q    DR. PHENIX, WHAT IS DEPRESSIVE DISORDER NOT OTHERWISE

20   SPECIFIED?

21   A    THAT IS A GENERAL CATEGORY AGAIN, THE NOS CATEGORY,

22   NOT OTHERWISE SPECIFIED, IS A GENERAL CATEGORY THAT I USE

23   TO DIAGNOSIS A DEPRESSIVE DISORDER BY HISTORY.  SO THAT

24   WHEN MR. ANTONE WAS BETWEEN 16 AND 18, I BELIEVE, THERE

25   WERE THREE SEPARATE SUICIDE ATTEMPTS.  CLEARLY HE WOULD

1    HAVE BEEN DEPRESSED DURING THAT TIME, AND WHEN HE WAS

2    FIRST PLACED IN PRISON, HE WAS TAKING TWO ANTIDEPRESSANT

3    MEDICATIONS, AND SO I AM NOT VERY CLEAR ABOUT EXACTLY

4    WHAT MOOD DISORDER HE HAS.

5         IT'S MY UNDERSTANDING FOR SEVERAL YEARS HE HAS NOT

6    TAKEN ANTIDEPRESSANT MEDICATIONS, BUT THERE ARE CLEAR

7    TIMES IN HIS LIFE WHEN HE HAS BEEN DEPRESSED.  THAT WOULD

8    BE CHARACTERIZED BY SAD MOOD, BEING TEARFUL EASILY, BY

9    LOW ENERGY, BY POOR APPETITE, BY DISTRACTABILITY.

10        AND SO THERE HAVE BEEN THESE EPISODES FOR HIM IN HIS

11   PAST, AND I PROVIDED THAT DIAGNOSIS TO IDENTIFY THAT HE

12   HAS BEEN DEPRESSED BEFORE.

13   Q   LET'S TALK ABOUT ANTISOCIAL PERSONALITY DISORDER, DR.

14   PHENIX, AND AGAIN, IS THIS -- IS THE DEFINITION OF

15   ANTISOCIAL PERSONALITY DISORDER, IS THAT INCLUDED IN YOUR

16   REPORT?

17   A   YES, IT IS.

18   Q   IF WE CAN PULL UP PAGE 2032.  AND DR. PHENIX, FIRST,

19   IF YOU CAN JUST TELL US WHAT ANTISOCIAL PERSONALITY

20   DISORDER IS?

21             THE COURT:  JUST BEFORE WE GET TO THAT, 2032

22   IS AN EXHIBIT?

23             MR. ROYSTER:  I AM SORRY.  EXHIBIT 2, JUDGE.

24             THE COURT:  THANK YOU.  YOU MAY PROCEED WITH

25   YOUR ANSWER, DR. PHENIX.

1          THE WITNESS:

2    A    ANTISOCIAL PERSONALITY DISORDER DESCRIBES AN

3    INDIVIDUAL WHO GENERALLY VIOLATES THE RIGHTS OF OTHERS.

4    THEY HAVE DONE SO SINCE THEY WERE AN ADOLESCENT AND THEY

5    CONTINUE TO DO SO THROUGHOUT ADULTHOOD.

6    Q    AND WHAT IS THE BASIS FOR THIS DIAGNOSIS?

7    A    THERE ARE A NUMBER OF CHARACTERISTICS OF A PERSON WHO

8    HAS ANTISOCIAL PERSONALITY DISORDER.  LET ME PREFACE THAT

9    WITH ABOUT 70 PERCENT OF THE INMATES IN PRISON HAVE

10   ANTISOCIAL PERSONALITY DISORDER, SO IT'S ASSOCIATED WITH

11   CRIMINALITY.

12        SO, THEY ARE INDIVIDUALS WHO COMMIT CRIMINAL ACTS

13   AND GET ARRESTED, AND OFTEN HAVE -- ARE INCARCERATED.

14   IT'S A PERSON WHO CAN LIE TO GET AWAY WITH THINGS, LIE TO

15   GAIN THINGS FOR THEMSELVES.  IT'S AN INDIVIDUAL WHO IS --

16   GENERALLY CAN BE VERY BEHAVIOR IMPULSIVE AND NOT THINK

17   THROUGH THE CONSEQUENCES OF THEIR BEHAVIOR.  A PERSON WHO

18   IS PRONE TO FIGHTING, IRRITABILITY AND HOSTILITY TOWARDS

19   OTHERS.

20        IT'S AN AGGRESSIVE PERSON.  SOMEONE WHO DISREGARDS

21   NOT ONLY THEIR OWN SAFETY, BUT THE SAFETY OF OTHER PEOPLE

22   BY VIOLATING THEM.  SOMEONE WHO HAS BEEN IRRESPONSIBLE IN

23   THEIR LIFE IN TERMS OF GAINFUL EMPLOYMENT, SUPPORTING

24   THEIR CHILDREN, TAKING BACK FROM SOCIETY AND NOT TAKING

25   FROM, BUT NOT GIVING BACK.

1          AND THEN ALSO A PERSON WHO HAS A GENERAL LACK OF

2     REMORSE, NOT NECESSARILY MEASURED BY WHAT THEY TELL YOU

3     THEY ARE SORRY ABOUT, BUT IF THEIR BEHAVIORS REFLECT THAT

4     THEY ARE SORRY ABOUT IT AND STOP VIOLATING THE RIGHTS OF

5     OTHERS.

6     Q    WHY DO YOU BELIEVE THAT MR. ANTONE HAS ANTISOCIAL

7     PERSONALITY DISORDER?

8     A    ONE OF THE REQUIREMENTS FOR ANTISOCIAL PERSONALITY

9     DISORDER IS SOME EVIDENCE OF CONDUCT DISORDER PRIOR TO

10    AGE 15.  CONDUCT DISORDER IS ASSOCIATED WITH ESSENTIALLY

11    WITH CHILDHOOD MISBEHAVIOR, AND SO THERE ARE MANY

12    INDICATIONS IN MR. ANTONE'S YOUTH THAT HE GOT INTO

13    TROUBLE.

14         IN TERMS OF HIS JUVENILE CRIMINAL HISTORY, AT BOTH

15    AGE 11 AND 12 HE WAS BROUGHT IN FRONT OF JUVENILE

16    AUTHORITIES FOR RUNNING AWAY FROM HOME.

17         ALSO, AT AGE 13, HE WAS HELD IN JUVENILE DETENTION

18    AS A RESULT OF TRESPASSING.  HE WAS DESCRIBED IN THE

19    RECORDS IN MANY INSTANCES AS HAVING CHILDHOOD

20    MISBEHAVIOR.

21         HE WAS PLACED WITH HIS GRANDMOTHER FROM HIS MOTHER'S

22    CUSTODY AT AGE 9 OR 10, AND HIS GRANDMOTHER DESCRIBED HIM

23    AS BEING OUT OF CONTROL.  HE WAS DESCRIBED AS A YOUTH --

24    HE DESCRIBED HIMSELF AS A PERSON WHO DRANK A LOT AND

25    DESTROYED THINGS.

1       HE ALSO DESCRIBED HIMSELF, NOT IN MY INTERVIEW, BUT

2   ELSEWHERE, AS BULLYING OTHER CHILDREN, AND HE WAS ALSO

3   FREQUENTLY TRUANT FROM SCHOOL FOR DRINKING, BECAUSE OF

4   DRINKING AND USING DRUGS.

5       SO HE HAS SUFFICIENT EVIDENCE OF CONDUCT DISORDER

6   AND AS AN ADULT HE HAS HAD EIGHT ARRESTS AND CONVICTIONS

7   FOR VARIOUS TYPES OF CRIMINAL ACTIVITY, DRUG OFFENCES,

8   PROPERTIES OFFENSES, NONSEXUAL VIOLENCE AND SEXUAL

9   VIOLENCE.

10      HE HAS COMMITTED DOMESTIC VIOLENCE WITHIN HIS

11  RELATIONSHIPS.  HE HAS FORCED HIS COMMON LAW WIFE TO

12  ENGAGE IN SEXUAL ACTIVITY.

13      HE HAS ASSAULTED A NUMBER OF, AS WE HAVE TALKED

14  ABOUT, FAMILY MEMBERS, PEOPLE THAT YOU WOULD THINK HE

15  WOULD BE MOST PROTECTIVE OF, RELATIVES.

16      HIS EMPLOYMENT WAS SPORADIC.  HE WORKED A COUPLE OF

17  MONTHS OF THE YEAR, I THINK, FOR A FEW YEARS FIGHTING

18  FIRES, BUT TANYA RECEIVED WELFARE BENEFITS AND HE LIVED

19  ON THAT AND MONEY FROM, AS HE SAID, FROM HIS MOTHER THE

20  REST OF THE YEAR.

21      IN TERMS OF PSYCHOLOGICAL TESTING, THE 1999

22  EVALUATION CONTAINED OBJECTIVE PERSONALITY TESTING AND ON

23  THAT TESTING HE WAS IDENTIFIED AS ENDORSING ITEMS SIMILAR

24  TO A PERSON WHO IS IMPULSIVE, NOT SURPRISINGLY, ANGRY,

25  ARGUMENTATIVE, NEGATIVISTIC.  THESE ARE ANTISOCIAL

1    CHARACTERISTICS.

2         AND FURTHERMORE, IN TERMS OF REMORSE, AS I SAID, ONE

3    THING YOU LOOK FOR TO SEE GENUINE REMORSE IS THAT THE

4    PERSON STOPS THE BEHAVIOR THAT HURTS AND HARMS OTHER

5    PEOPLE.  AND WHEN MR. ANTONE WAS IN THE COMMUNITY, HE

6    CONTINUED TO OFFEND DESPITE THE HURT AND HARM HE

7    PERPETRATED ON ALL HIS VICTIMS.  AND IN AT LEAST ONE

8    INSTANCE, HE REPEATEDLY OFFENDED AGAINST A COUSIN DESPITE

9    THE FACT THAT SHE WOULD PUSH HIM AWAY AND MAKE IT CLEAR

10   TO HIM THAT SHE WAS A NONCONSENTING PERSON.

11   Q   DR. PHENIX, HOW DOES HIS ANTISOCIAL PERSONALITY

12   DISORDER AFFECT HIS RISK OF COMMITTING ANOTHER SEX

13   OFFENSE?

14   A   I VIEW ANTISOCIAL PERSONALITY DISORDER AS A

15   PERMISSION GIVER.  SO, WE HAVE SOME DRIVING FORCES HERE.

16   WE HAVE AROUSAL TO NONCONSENTING SEX.  AND PERHAPS

17   SUBSTANCES THAT DISINHIBIT THAT, BUT THEN WE HAVE THESE

18   ATTITUDES THAT, YOU KNOW, I CAN TAKE WHAT I WANT WHEN I

19   WANT IT, AND A PERSON THAT DOESN'T SEE THE HURT AND HARM

20   THAT THEY PERPETRATE ON SOMEONE ELSE, THEY DON'T

21   EXPERIENCE EMPATHY OR REMORSE, THAT ALLOWS THE PERSON TO

22   ACT ON THEIR DEVIANT SEXUAL AROUSAL IF THEY DON'T CARE

23   WHAT HAPPENS TO THAT OTHER PERSON.

24   Q   ARE YOU ABLE TO TALK ABOUT HIS ANTISOCIAL PERSONALITY

25   DISORDER AS COMPARED TO THE OTHER 70 PERCENT OF THE

1    PRISON POPULATION WITHOUT TALKING ABOUT THE INFORMATION

2    THAT YOU OBTAINED IN THE CLINICAL INTERVIEW?

3    A    NO.

4              MR. ROYSTER:  JUDGE, WITH THAT, I WOULD JUST

5    ASK ANOTHER OPPORTUNITY TO JUST PROFFER TO THE COURT WHAT

6    SHE WOULD SAY WITH RESPECT TO HOW HE COMPARES TO THE

7    OTHER 70 PERCENT OF THE PRISON POPULATION SO THE COURT

8    CAN HAVE SOME IDEA AS TO HIS ANTISOCIAL PERSONALITY

9    DISORDER AND HOW THAT SEPARATES HIM FROM THE OTHER PRISON

10   POPULATION, AS A PROFFER.

11             MR. ROSS:  YOU KNOW, WE OBJECT, BUT I AM SURE

12   THE COURT IS AWARE OF HOW IT WOULD TAKE IN THIS

13   INFORMATION.

14             THE COURT:  YES.  AND ONE CONCERN I HAVE IS

15   THE TWO REASONS AT THIS POINT TO MAKE A PROFFER.  ONE IS

16   I DON'T KNOW WITHOUT HAVING LOOKED AT THE DEPOSITION

17   WHETHER THIS COMES WITHIN MY PRIOR ORDER EXCLUDING THE

18   OPINIONS AND UNDERLYING FACTS IN THE SUPPLEMENTAL REPORT.

19             AND THEN SECONDLY, I SUPPOSE -- I DON'T KNOW

20   -- THE GOVERNMENT IS TRYING TO PRESERVE THIS FOR ANY KIND

21   OF AN APPEAL.

22             BUT WITH RESPECT TO THE FIRST ISSUE, THAT MAY

23   BE WHETHER THIS IS ADDRESSED IN THE DEPOSITION THAT WE

24   CAN DISCUSS PERHAPS AT THE END OF THE HEARING.

25             I WOULD LIKE THE PARTIES TO TAKE THE LEAD ON

1    IDENTIFYING OR NARROWING THIS DOWN BECAUSE THERE MAY

2    BE -- IT APPEARS FROM YOUR COMMENTS, MR. ROYSTER, SOME OF

3    THIS INFORMATION THAT YOU ARE REQUESTING THAT DR. PHENIX

4    PROVIDE MAY FALL OUTSIDE THE SCOPE OF THE COURT'S ORDER.

5         MR. ROYSTER:  AND I THINK THAT -- AND I ASKED

6    THE QUESTION THAT WAY BECAUSE I DON'T RECALL THIS BEING

7    PART OF THE DEPOSITION.  SO I WANTED TO MAKE SURE I

8    DIDN'T ELICIT THAT TESTIMONY FROM HER.  THAT'S WHY I

9    ASKED THE QUESTION I DID.

10        IF THE COURT WOULD BE MORE COMFORTABLE WITH US

11   PERHAPS SUBMITTING A WRITTEN PROFFER AND ALLOWING IT SO

12   THAT IT WOULD STILL BE PRESERVED, BUT AT LEAST THIS FACT

13   FINDER WOULD NOT BE REVIEWING THAT.  THAT IS ANOTHER

14   ALTERNATIVE.

15        MR. ROSS:  YOUR HONOR, I WOULD PREFER THAT

16   WRITTEN PROFFER.

17        THE COURT:  I DO NOT PREFER THAT.  I PREFER

18   THAT YOU PROCEED WITH THE QUESTION, MR. ROYSTER, AND

19   WE'LL FLAG IT WITH A NOTATION THAT IT IS AT THIS POINT A

20   PROFFER.

21        MR. ROYSTER:  ALL RIGHT.  THANK YOU, JUDGE.

22   Q   ALL RIGHT, DR. PHENIX.  THIS IS SIMILAR TO WHAT WE

23   DID BEFORE.  I WANT YOU TO LIMIT YOUR QUESTION OR YOUR

24   ANSWER TO THIS QUESTION TO YOUR -- WHAT YOU GLEANED FROM

25   HIS CLINICAL INTERVIEW BECAUSE MY QUESTION IS HOW HE IS

1   DIFFERENT FROM THE OTHER 70 PERCENT OF THE PRISON

2   POPULATION.

3        AND I UNDERSTAND THAT YOU NEED TO TALK ABOUT THINGS

4   FROM YOUR CLINICAL INTERVIEW THAT HELPS YOU WITH THAT

5   EVALUATION; IS THAT CORRECT?

6   A    YES.

7   Q    ALL RIGHT.  SO WHAT MAKES HIM DIFFERENT THAN THE

8   OTHER 70 PERCENT OF THE PRISON POPULATION WITH ANTISOCIAL

9   PERSONALITY DISORDER?

10  A    MR. ANTONE HAS A NUMBER OF TRAITS WE KNOW THAT ARE

11  ASSOCIATED WITH AN INCREASE IN THE RISK OF FUTURE

12  VIOLENCE AND NONSEXUAL VIOLENCE AND SEXUAL VIOLENCE.

13       THESE ARE TWO CLUSTERS OF TRAITS.  ONE WOULD BE A

14  PERSONALITY CHARACTERISTIC, AND OTHERS WOULD BE

15  HISTORICAL TYPES OF CHARACTERISTICS.  HE HAS A GOOD SHARE

16  OF THESE PRESENT THAT WHEN COMPARED TO OTHER INDIVIDUALS

17  WITH ANTISOCIAL PERSONALITY DISORDER IN PRISON, HE WOULD

18  ESSENTIALLY HAVE GREATER PREVALENCE OF THOSE FACTORS

19  WHICH WE KNOW STATISTICALLY ARE RELATED TO AN INCREASE IN

20  FUTURE NONSEXUAL VIOLENCE AND SEXUAL VIOLENCE.

21  Q    CONTINUING ON WITH THE PROFFER, WHAT IS THE BASIS OF

22  THAT?

23  A    THE BASIS OF THAT WOULD BE HIS TOTAL SCORE ON A

24  PSYCHOLOGICAL INSTRUMENT WHICH I ADMINISTERED CALLED THE

25  HARE PSYCHOPATHY CHECKLIST REVISED, AND THAT IS AN

1   INSTRUMENT WITH 20 ITEMS.  ABOUT HALF OF THEM ARE

2   HISTORICALLY BASED, SO THE SCORE IS HIGHER WHEN YOU HAVE

3   MORE OF A CRIMINAL HISTORY.

4       AND THEN SEVERAL OF THE ITEMS ARE PERSONALITY BASED.

5   IT WOULD BE A PERSON WHO IS MORE IMPULSIVE, MORE

6   MANIPULATIVE, MORE DECEITFUL, MORE UNABLE TO EXPERIENCE A

7   NORMAL RANGE OF EMOTIONS.  A PERSONS WHO LACKS IN

8   EMPATHY.

9       THESE ARE ALL SCORED ON THIS INSTRUMENT TO COME UP

10  WITH AN OVERALL TOTAL, AND THE HIGHER THE SCORE, THE MORE

11  PSYCHOPATHY WOULD BE PRESENT FOR THAT PERSON, AND HENCE

12  THE GREATER THE RISK OF FUTURE VIOLENCE OR NONSEXUAL

13  VIOLENCE.

14  Q   WHAT WAS HIS SCORE?

15  A   HIS SCORE WAS 26.

16          MR. ROYSTER:  JUST FOR THE RECORD, THAT IS THE

17  END OF THE PROFFER.  MOVING ON TO ANOTHER ITEM.

18          THE COURT:  VERY GOOD.  THANK YOU.

19          MR. ROYSTER:  THANK YOU, JUDGE.

20          THE COURT:  WELL, WHILE WE ARE ON THAT, JUST

21  LET ME NOTE, OR LET ME IDENTIFY MORE SPECIFICALLY THE

22  ORDER THAT WE HAVE BEEN TALKING ABOUT.

23          I KNOW COUNSEL HERE KNOW, BUT JUST SO IT'S

24  CLEAR, IT'S AN ORDER THAT WAS ENTERED ON OCTOBER 7 AND

25  IT'S AT DOCKET ENTRY 91.  IT'S ALSO REFERENCED IN THE

1    PRE-HEARING ORDER WHICH IS DOCKET ENTRY 97.  THE ORDER IS

2    AT DOCKET ENTRY 91.  THE PRE-HEARING ORDER IS AT DOCKET

3    ENTRY 97 REFERENCED ON PAGE 10.

4             MR. ROYSTER.

5             MR. ROYSTER:  THANK YOU, JUDGE.

6    Q   DR. PHENIX, DID YOU CONSIDER WHETHER HE MET THE

7    CRITERIA FOR BORDERLINE PERSONALITY DISORDER WITH

8    ANTISOCIAL FEATURES?

9    A   YES.

10   Q   WHY DIDN'T YOU DIAGNOSE HIM WITH THAT?

11   A   FIRST OF ALL, I THINK THAT THE DIAGNOSIS THAT I

12   OFFERED ACCOUNT QUITE ADEQUATELY FOR THE SEXUALLY DEVIANT

13   BEHAVIORS THAT WE SEE IN MR. ANTONE'S HISTORY AS WELL AS

14   THE CRIMINAL BEHAVIORS AND SUBSTANCE DEPENDENCE PROBLEMS.

15       BORDERLINE PERSONALITY DISORDER WOULD BE ASSOCIATED

16   WITH A PERSON WHO HAS SEVERE INTERPERSONAL PROBLEMS WITH

17   OTHER PEOPLE.  THEY ARE A PERSON WHO HAS ESSENTIALLY WHAT

18   WE CALL ATTACHMENT PROBLEMS SO THAT IT'S A PERSON WHO

19   IDEALIZES ANOTHER PERSON, WHO ATTACHES TO THAT PERSON AND

20   THEN IF THAT PERSON WANTS TO SEPARATE FROM THEM, THE

21   INDIVIDUAL WOULD FEEL ABANDONED.

22       IT OFTEN RESULTS IN SEVERE MOOD SWINGS WHEN THAT

23   HAPPENS, VERY LABILE MOOD, OFTEN RESULTS IN

24   SELF-MUTILATION, CUTTING ONESELF TO TRY TO GET BACK THIS

25   RELATIONSHIP WITH THIS OTHER PERSON.

1        IT IS AN -- INDIVIDUALS WITH BORDERLINE PERSONALITY

2    DISORDER ARE MORE LIKELY TO USE SUBSTANCES.

3        I THINK THAT MR. ANTONE'S ALCOHOL DEPENDENCE FULLY

4    ACCOUNTS FOR HIS USE OF ALCOHOL RATHER THAN ANY

5    BORDERLINE TENDENCIES.  IN MY OPINION, HE HAS QUITE A

6    CLASSIC ANTISOCIAL PERSONALITY DISORDER, AND I THINK THAT

7    ACCOUNTS FOR HIS IMPULSIVITY AS WELL AS THE SUBSTANCE

8    ABUSE RATHER THAN REASONS OF BORDERLINE PERSONALITY

9    DISORDER.

10   Q   DR. PHENIX, WHAT DO YOU UNDERSTAND SERIOUS DIFFICULTY

11   REFRAINING TO MEAN UNDER THE ADAM WALSH ACT?

12   A   THAT WOULD BE DIFFICULTY WITH BEHAVIORAL CONTROLS,

13   HAVING A HARD TIME CONTROLLING YOURSELF.

14   Q   HOW DID YOU GO ABOUT DETERMINING THAT MR. ANTONE

15   WOULD HAVE SERIOUS DIFFICULTY REFRAINING FROM SEXUALLY

16   VIOLENT CONDUCT OR CHILD MOLESTATION IF RELEASED?

17   A   WELL, I THINK THAT THAT WAS EVIDENT FROM A HISTORICAL

18   EXAMINATION OF HIS BEHAVIORS.  SO FIRST THING I DO IS

19   LOOK AT THE PATTERN AND DURATION OF HIS OFFENDING TO SEE

20   HOW WELL HIS BEHAVIORAL CONTROLS WERE WHEN HE WAS IN THE

21   COMMUNITY.

22       AND FROM 1989 OR PERHAPS BEFORE, TO 1997, HE HAD

23   POOR BEHAVIORAL CONTROLS.  HE WAS DRINKING AND USING

24   DRUGS, WHICH I AGREE WITH HIM CLOUDED HIS JUDGMENT AND

25   MADE HIM MORE IMPULSIVE, AND HE REPEATEDLY ACTED OUT BY

1    MOLESTING CHILDREN AND COMMITTING RAPES.

2         IN FACT, HIS LAST TWO RAPES IN 1997 WERE ONLY FIVE

3    MONTHS APART.

4         SO, IN MY OPINION, THAT IS SERIOUS DIFFICULTY WITH

5    VOLITION IN AND OF ITSELF.

6         ON PSYCHOLOGICAL TESTING, ADDITIONALLY IN 1999, HE

7    ADMITTED THAT HIS BEHAVIOR WAS OUT OF CONTROL AND THAT HE

8    NEEDED HELP TO CONTROL HIS VOLITION.

9         AND FURTHERMORE, TODAY, IN COURT TESTIMONY, HE SAID

10   AND ADMITTED THAT HE HAD VERY POOR CONTROLS OVER HIS

11   BEHAVIOR.

12        I SEE A REAL DIFFERENCE IN MEASURING VOLITIONAL

13   CONTROLS INSTITUTIONALLY AND OUT IN THE COMMUNITY, AND

14   I THINK THE BEST MEASURE OF HIS VOLITION IS PRIOR TO

15   BEING IN A PRISON WHERE YOU HAVE SUCH STRICT STRUCTURE

16   AND RULES FOR YOUR BEHAVIOR, SO I AM EXAMINING WHAT WAS

17   HIS VOLITION LIKE BEFORE HE CAME INTO THE INSTITUTION.

18        OF COURSE, I LOOK AT HIS BEHAVIOR INSTITUTIONALLY,

19   BUT ALSO LOOK AT WHAT WOULD HIS VOLITION BE LIKE ONCE

20   RELEASED IN THE COMMUNITY.  AND IT'S MY OPINION THAT HE

21   WOULD HAVE SERIOUS DIFFICULTY WITH THIS VOLITION ONCE

22   AGAIN.

23   Q    LET'S TALK ABOUT THAT JUST FOR A MINUTE.  WHY THE

24   DIFFERENCE?  WHY DO YOU SEE THE TWO BEING SO DIFFERENT?

25   A    IT'S NOT -- WELL, BECAUSE OF THE KIND OF EXTERNAL

1    CONTROLS.  THERE ARE CERTAIN PEOPLE WHO HAVE TERRIBLE

2    TROUBLE WITH THEIR VOLITION AND THEIR BEHAVIORS,

3    CRIMINALLY, IN THE USE OF SUBSTANCES WHILE THEY ARE IN

4    THE COMMUNITY, BUT WITH THE STRUCTURE OF THE INSTITUTION,

5    THEY CAN DO VERY VERY WELL.  AND I THINK THAT IS WHAT WE

6    HAVE SEEN HERE.  I THINK MR. ANTONE IS A PERSON WHO HAS

7    RESPONDED VERY WELL TO THE STRUCTURE AND THE RULES AND

8    SUPPORT THAT HE HAS GOTTEN INSTITUTIONALLY.

9        HOWEVER, I ALSO THINK THAT CLINICALLY I NEED TO

10   ASSES WHAT WOULD THEY BE LIKE WITHOUT THOSE CONSTRAINTS.

11   AND IT'S VERY COMMON TO SEE SOMEONE, IF THEY HAVEN'T HAD

12   ENOUGH STRONG INTERVENTION FOR THEIR PROBLEM AREAS TO

13   CONTINUE TO STRUGGLE WITH THOSE SAME PROBLEM AREAS ONCE

14   THEY GET OUT AND THEY ARE RESPONSIBLE FOR THEIR OWN

15   BEHAVIOR.

16   Q   HAS HE HAD STRONG INTERVENTIONS?

17   A   NO.  IN MY OPINION, HE HAS NOT.  NOT FOR THOSE MOST

18   SERIOUS PROBLEM AREAS.

19   Q   WHAT ELSE DID YOU LOOK AT, IF ANYTHING, IN ASSESSING

20   WHETHER HE WOULD HAVE SERIOUS DIFFICULTY REFRAINING?

21   A   I BELIEVE THAT THAT WAS THE TOTAL OF WHAT I EXAMINED.

22   Q   DID YOU USE ANY ACTUARIALS?

23   A   YES, I DID.

24   Q   WHAT WAS THE PURPOSE OF USING THOSE?

25   A   THE PURPOSE OF THOSE WOULD BE FOR CONDUCTING A RISK

1    ASSESSMENT, WHAT LEVEL OF RISK WOULD HE BE ONCE RELEASED

2    TO THE COMMUNITY TO GO ON TO COMMIT FUTURE SEX OFFENSES

3    ESSENTIALLY.

4    Q    DR. PHENIX, WHAT IS AN ACTUARIAL?

5    A    AN ACTUARIAL INSTRUMENT FOR SEX OFFENDING, AT ANY

6    RATE, WOULD BE A LIST OF RISK FACTORS ESTABLISHED IN THE

7    RESEARCH THAT WHEN PRESENT INCREASE THE RISK OF FUTURE

8    SEXUAL RE-OFFENSE.

9         ACTUARIAL INSTRUMENTS ARE USED IN MANY FIELDS.  FOR

10   EXAMPLE, GETTING YOUR CAR INSURANCE, THEY ARE GOING TO

11   LOOK AT THOSE FACTORS THEY KNOW INCREASE YOUR RISK TO

12   HAVE AN ACCIDENT OR COST THE INSURANCE COMPANY MONEY.

13        SO IF YOU DON'T WEAR YOUR SEATBELTS AND IF YOU HAVE

14   HAD ACCIDENTS OR SPEEDING TICKETS OR TEENAGERS THAT

15   SPEED, THEN YOUR RATES WILL BE HIGHER BECAUSE YOU ARE

16   MORE RISK.  AND IT'S EXACTLY THE SAME WAY THAT AN

17   ACTUARIAL FOR SEX OFFENDING WORKS.

18   Q    HOW LONG HAVE THESE BEEN USED IN YOUR FIELD FOR

19   CONDUCTING RISK ASSESSMENTS?

20   A    THESE HAVE BEEN USED SINCE ABOUT 1996.

21   Q    ARE THEY WIDELY USED BY PROFESSIONALS IN YOUR FIELD

22   FOR PREDICTING RISK OF SEXUAL OFFENSE?

23   A    VERY WIDELY USED.

24   Q    DO THEY HAVE ANY WEAKNESSES?

25   A    THEY DO HAVE LIMITATIONS.  AND I WOULD SAY THE

1    PRIMARY LIMITATION IS WHAT WE CALL PREDICTIVE ACCURACY.

2    HOW WELL DOES THE INSTRUMENT WORK?  IS IT ABLE TO TELL

3    YOU EVERY TIME A PERSON HAS A HIGH SCORE THAT THEY WILL

4    GO ON TO REOFFEND, AND EVERY TIME THEY HAVE A LOW SCORE,

5    THEY WON'T?  NO.  WE DON'T HAVE THAT KIND OF PERFECT

6    PREDICTED ACCURACY.

7        THESE INSTRUMENTS HAVE WHAT WE CALL MODERATE

8    PREDICTIVE ACCURACY.  NOW, LET'S JUST SAY I AM NOT USING

9    THE INSTRUMENT AT ALL AND I AM USING MY JUDGMENT AND

10   EXPERIENCE OVER THE YEARS.  THAT WOULD BE LIKE FLIPPING A

11   COIN, SO HALF THE TIME, 50 PERCENT OF THE TIME I WOULD BE

12   RIGHT AND 50 PERCENT OF THE TIME I WOULD BE WRONG.

13       WE NEED AN INSTRUMENT THAT DOES BETTER THAN THAT IN

14   PREDICTING WHO WILL GO ON TO REOFFEND.  SO THE PREDICTED

15   ACCURACY FROM .5  TO 1 BEING PERFECT PREDICTION.  ON

16   THESE INSTRUMENTS IT'S ABOUT .7, .75, WE ARE ABOUT TO 20

17   PERCENT BETTER ACCURACY IF WE USE THE INSTRUMENT.

18       AT THE SAME TIME, YOU ASKED ABOUT LIMITATIONS.  THE

19   LIMITATION IS THAT IT WON'T ALWAYS IDENTIFY THE RISKY

20   PERSON AND MAY MISIDENTIFY A LOWER RISK PERSON SOME OF

21   THE TIME.

22   Q   DO ACTUARIALS TELL US WHETHER HE IS GOING TO

23   REOFFEND?

24   A   NO.

25   Q   WHAT ACTUARIALS DO YOU USE TO ASSESS HIS RISK?

1    A    I USED THREE ACTUARIAL INSTRUMENTS.  I USED THE

2    STATIC-99R -- IT HAS RECENTLY BEEN REVISED -- THE

3    STATIC-2002, REVISED, AND THE MINNESOTA SEX OFFENDER

4    SCREENING TOOL, REVISED.

5    Q    DO THESE -- WHY DID YOU USE THOSE?

6    A    THESE INSTRUMENTS ARE THE THREE MOST WIDELY ACCEPTED

7    INSTRUMENTS IN THIS FIELD.  THEY ARE -- ALL THREE HAVE

8    BEEN VALIDATED MULTIPLE TIMES OR TESTED ON DIFFERENT

9    GROUPS OF SEX OFFENDERS TO SEE HOW WELL THEY WORK.

10        AND THEY ALL HAVE MODERATE ACCEPTABLE PREDICTIVE

11   ACCURACY IN MEASURING RISK.

12   Q    DO YOU GET ANY ROYALTIES FROM USING THESE TESTS WHEN

13   YOU DO EVALUATIONS?

14   A    NO.

15   Q    NOW, JUST SO WE ARE ALL CLEAR, THAT WOULD ALSO

16   INCLUDE THE MNSOST-R, RIGHT, BECAUSE YOU ARE MARRIED TO

17   THE MAN THAT DEVELOPED THE MNSOST-R; IS THAT TRUE?

18   A    RIGHT.

19   Q    YOU DON'T GET ANY EXTRA MONEY FOR USING THAT?

20   A    NO.

21   Q    DO THESE ACTUARIALS GIVE YOU A PERCENTAGE OF WHETHER

22   MR. ANTONE WILL REOFFEND?

23   A    NO.  THEY -- THE PERCENTAGES FOR 5 OR 10 YEARS, AT

24   LEAST ON THE STATIC INSTRUMENTS, ARE FOR THE STUDY

25   SAMPLE, SO THE GROUP OF OFFENDERS ON WHICH THE INSTRUMENT

1    WAS DEVELOPED AND TESTED, WE HAVE PROBABILITIES OF SEXUAL

2    RE-ARRESTS FOR THEM.  FOR EXAMPLE, FOR FIVE AND TEN

3    YEARS.  THAT IS A STUDY SAMPLE.

4        IF THE INDIVIDUAL YOU ARE EVALUATING, IN THIS CASE,

5    MR. ANTONE, IS SIMILAR IN CHARACTERISTICS TO THE STUDY

6    SAMPLE, SUCH AS THE STUDY SAMPLE WAS ALL INDIVIDUALS WHO

7    COMMITTED SEX OFFENSES AGAINST MINORS OR NONCONSENTING

8    SEX, SO IN THAT WAY HE IS SIMILAR, THEN YOU CAN USE THOSE

9    PROBABILITIES AS A GENERAL GUIDE IN TERMS OF RE-OFFENSE

10   RISK, BUT IT WOULD NEVER BE HIS RE-OFFENSE RISK.

11   Q   THE SAMPLES THAT YOU HAVE TALKED ABOUT THAT ARE PART

12   OF THE ACTUARIALS, ARE THERE NATIVE AMERICANS IN THOSE

13   SAMPLES?

14   A   THERE WOULD BE VERY FEW.

15   Q   DOES THAT GIVE YOU CONCERN ABOUT USING THESE

16   ACTUARIALS IN ASSESSING MR. ANTONE'S RISK?

17   A   YES, IT DOES.

18   Q   WHY?

19   A   WELL, BECAUSE, FOR EXAMPLE, WE HAVE SOME -- WE HAVE

20   AT LEAST TWO STUDIES THAT HAVE EXAMINED THE PREDICTED

21   ACCURACY IN AN ABORIGINAL SAMPLE FROM CANADA WHO WAS A

22   NATIVE INDIAN, CANADIAN INDIAN, AND WE HAVE SEEN A

23   SOMEWHAT LOWER PREDICTED ACCURACY THAN WE SEE WITH OTHER

24   SAMPLES.

25       ALMOST ALL OF OUR SAMPLES OF SEX OFFENDERS ARE

1    CAUCASIAN, AND SO WHEN YOU HAVE ANY OTHER ETHIC MINORITY

2    WHO YOU ARE EVALUATING, IT'S IMPORTANT TO CONSIDER THE

3    LIMITATIONS.

4         NOW, IN TERMS OF THAT RESEARCH CONDUCTED BY DR.

5    HELMUS AND DR. NIKOLACHEK (PHONETIC) ON THE ABORIGINAL

6    SAMPLE, IT WAS STILL -- THE PREDICTED ACCURACY WAS STILL

7    GOOD ENOUGH THAT IT WOULD BE USEFUL.  IT WOULD BE

8    INFORMATIVE TO YOU, BUT WE ALWAYS HAVE TO HAVE THE CAVEAT

9    THAT THE PREDICTED ACCURACY MAY BE LOWER WITH ANOTHER

10   CULTURAL GROUP.

11   Q    LET'S TAKE A LOOK AT YOUR SCORING ON THE STATIC-99R.

12   AND FIRST OF ALL, YOU HAVE GOT, OBVIOUSLY, TWO DIFFERENT

13   REPORTS; RIGHT?

14   A    YES.

15   Q    NOW, YOU CHANGED YOUR SCORE FROM THE FIRST REPORT,

16   AND YOU HAVE CHANGED IT SINCE THAT FIRST REPORT; HAVEN'T

17   YOU?

18   A    YES.

19   Q    THAT IS REFLECTED IN THE SECOND REPORT?

20   A    YES, IT IS.

21   Q    WHY DID YOU CHANGE YOUR SCORE, FIRST OF ALL?

22   A    I CHANGED MY SCORE BECAUSE ON ITEM 4, PRIOR NONSEXUAL

23   VIOLENCE, ANY CONVICTIONS, I BELIEVED AT THE TIME THAT HE

24   HAD A CONVICTION FOR DOMESTIC VIOLENCE; HOWEVER, IT WAS

25   ONLY A CHARGE AND IT REQUIRES A CONVICTION TO BE SCORED

1    OF ONE RISK POINT.

2    Q   IF WE CAN PLEASE PULL UP FROM EXHIBIT 3, 2316 THROUGH

3    2317.

4             MR. ROYSTER:  AND JUDGE, JUST FOR THE RECORD,

5    THIS IS GOING TO BE HER SCORING FROM THE STATIC-99R.  IT

6    WAS ALREADY ADDRESSED IN HER FIRST REPORT, SO I AM

7    UNDERSTANDING THAT THAT IS SOMETHING THAT I CAN SHOW THE

8    COURT AND DO WITHOUT HAVING TO PROFFER OF EVIDENCE.

9             THE COURT:  YES, ASSUMING WHAT YOU ARE SAYING

10   IS TRUE, WHICH I BELIEVE IT IS, I WOULD BE HAPPY TO HEAR

11   ANY OBJECTION.  BUT IT WOULD FALL OUTSIDE THE SCOPE OF

12   THE EXCLUSION ORDER.

13            MR. ROYSTER:  THANK YOU, JUDGE.

14   Q   DR. PHENIX, TELL THE COURT HOW THIS WORKS AND HOW YOU

15   SCORED THE STATIC-99R.

16   A   THE STATIC-99R HAS TEN ITEMS.  SOME OF THEM PERTAIN

17   TO THE DIMENSION OF SEXUAL DEVIANCE AND SOME PERTAIN TO

18   THE DIMENSION OF CRIMINALITY.

19       THE FIRST ITEM ON STATIC-99R WOULD BE THE

20   INDIVIDUAL'S AGE.  AGE HAS FOUR CATEGORIES.  WE HAVE

21   RELATIVELY RECENT RESEARCH SINCE 2002 THAT INDICATES THAT

22   THERE IS A SIGNIFICANT DECLINE IN SEXUAL RECIDIVISM WITH

23   AGE, PARTICULARLY MORE ADVANCED AGE OVER AGE 50, AND

24   ESPECIALLY OVER AGE 60.

25       THE REVISION IN STATIC-99 TO STATIC-99R WAS, IN

1    FACT, A CHANGE ON THIS VERY ITEM.  WE NOW HAVE FOUR AGE

2    CATEGORIES.  MR. ANTONE IS 39, AND HE WOULD HAVE A ZERO

3    ON THIS.  SO ZERO RISK POINTS BECAUSE HE IS BETWEEN AGE

4    35 AND 39.9.

5    Q    BEFORE WE GO ANY FURTHER, HE IS GETTING READY TO TURN

6    40; RIGHT?

7    A    YES.

8    Q    SO THAT WOULD MAKE YOUR SCORE GO DOWN; WOULDN'T IT?

9    A    YES, IT WOULD, BY ONE POINT.

10   Q    JUST SO WE ARE ALL CLEAR, WOULD THAT AFFECT YOUR

11   ULTIMATE CONCLUSION AS TO HIS SEXUAL DANGEROUSNESS IF HE

12   IS ONE POINT LOWER ON THE STATIC-99R?

13   A    NO.

14   Q    GO AHEAD AND EXPLAIN WHY YOU SCORED IT THE WAY YOU

15   DID ON THE OTHER ITEMS AND WHAT THEY ARE.

16   A    ITEM TWO IS EVER LIVED WITH A LOVER FOR AT LEAST TWO

17   YEARS.  OFFENDERS WHO LIVE IN COMMITTED RELATIONSHIPS FOR

18   TWO YEARS OR MORE ARE LOWER RISK THAN THOSE WHO HAVE

19   NEVER BEEN IN A TWO YEAR LIVE-IN INTIMATE RELATIONSHIP.

20        IN THIS CASE, MR. ANTONE HAS LIVED WITH TANYA MCCLOUD

21   FOR AT LEAST FOUR YEARS, IF NOT MAYBE FIVE YEARS, SO HE

22   WOULD HAVE ZERO RISK POINTS ON THAT ITEM.

23   Q    ITEM THREE?

24   A    ITEM THREE AND ITEM FOUR ARE RELATED.  THIS IS INDEX,

25   THE INDEX OFFENSE WOULD BE THE MOST RECENT SEX OFFENSE.

1    THAT WOULD BE ALL OF THOSE OFFENSE -- SEX OFFENSE CHARGES

2    AND CONVICTIONS FOR THE 1997 OFFENSE.  SO THIS ASKS AT

3    THAT TIME WERE THERE ANY CONVICTIONS FOR NONSEXUAL

4    VIOLENCE WHICH IS DEFINED IN THE CODING, AND KIDNAP,

5    WHICH MR. ANTONE WAS CONVICTED OF IN 1997, WOULD QUALIFY

6    AS A NONSEXUAL VIOLENCE OFFENSE.

7         PRIOR NONSEXUAL VIOLENCE MEANS BEFORE THE 1997 SEX

8    OFFENSES WAS THERE ANY CONVICTION FOR NONSEXUAL VIOLENCE,

9    AND THERE WAS NOT.  THERE WAS A CHARGE, BUT NO

10   CONVICTION, AND THE CODING REQUIRES A CONVICTION.  SO

11   THAT WOULD BE A ZERO FOR ITEM FOUR.

12   Q    WHAT ABOUT PRIOR SEX OFFENSES?

13   A    WE KNOW THAT INDIVIDUALS WHO HAVE JUST ONE CHARGED OR

14   CONVICTED SEX OFFENSE, THAT THAT IS NOT PREDICTIVE.  WHAT

15   IS PREDICTIVE IS HISTORICAL SEX OFFENSES, WHAT WE CALL

16   PRIOR SEX OFFENSES.  SO DO YOU NOT COUNT THE MOST RECENT

17   SEX OFFENSE.  IT DOESN'T PREDICT ANYTHING.  AND YOU LOOK

18   PREVIOUS IN THEIR HISTORY HOW MANY CHARGES AND HOW MANY

19   CONVICTIONS THEY HAVE FOR SEX OFFENSES, AND IN THIS CASE,

20   IN 1990, MR. ANTONE HAD FIVE CHARGES, AND THAT HE PLED

21   THAT OUT TO ONE CONVICTION.  BOTH CHARGES AND CONVICTIONS

22   PREDICT FUTURE SEXUAL REOFFENSE.  SO YOU LOOK AT WHICH

23   WAS HIGHER, THE HIGHER SCORE, THE NUMBER OF CONVICTIONS

24   WHICH WAS ONE, OR THE NUMBER OF CHARGES, WHICH WAS FIVE.

25   SO HE RECEIVES A TOTAL RISK POINT OF TWO ON PRIOR SEX

1    OFFENSES.  THE RANGE OF THAT SCORE WOULD BE ZERO TO

2    THREE.

3    Q   AND BEFORE WE WERE TALKING ABOUT YOUR WORK IN THE

4    CODING RULES.  IS THIS THE TEST THAT YOU ASSISTED IN

5    PREPARING THE CODING RULES?

6    A   YES.  I AM ONE OF THE AUTHORS OF THE CODING RULES.

7    Q   ALL RIGHT.  GO AHEAD WITH THE NEXT ITEM, PRIOR

8    SENTENCING DATES.

9    A   ITEM SIX IS AN ITEM HAVING TO DO WITH THE DIMENSION

10   OF CRIMINALITY, SO THE LONGER THE RAP SHEETS OR THE

11   CRIMINAL HISTORY, ESSENTIALLY THE HIGHER RISK FOR FUTURE

12   SEXUAL REOFFENSE.  SO IF THE PERSON HAD THREE OR LESS

13   SENTENCING DATES BEFORE, IN THIS CASE, THE 1997 SEX

14   OFFENSE, IF HE HAD THREE OR LESS, HE WOULD GET NO RISK

15   POINTS OR ZERO.  IF HE HAD FOUR OR MORE CONVICTIONS WHICH

16   IS WHAT A SENTENCING DATE IS, THEN HE WOULD GET ONE RISK

17   POINT.

18        AN EXAMINATION OF MR. ANTONE'S CRIMINAL HISTORY

19   PRIOR TO 1997 WOULD INDICATE SIX SENTENCING DATES AND A

20   SCORE OF ONE RISK POINT.

21   Q   ITEM SEVEN?

22   A   ITEM SEVEN IS EXTRA POINTS FOR INDIVIDUALS THAT HAVE

23   THOSE PARAPHILIAS OR SEXUAL DISORDERS OF NONCONTACT.

24   THAT WOULD INCLUDE EXHIBITIONISM, GENERALLY,

25   EXHIBITIONISM, VOYEURISM, CHILD PORNOGRAPHY.  THERE WERE

1    NO OFFENSES OF NONCONTACT CONVICTIONS FOR MR. ANTONE, SO

2    HE RECEIVED A SCORE OF ZERO.

3    Q    ALL RIGHT.  EIGHT, NINE AND TEN RELATES TO THE

4    VICTIMS?

5    A    RIGHT.

6    Q    CAN YOU DISCUSS THOSE ITEMS AND WHY YOU SCORED THEM

7    THAT WAY?

8    A    THESE ARE THE VICTIM ITEMS.  LOWEST RISK IS SOMEONE

9    WHO COMMITS INCEST TYPE OF OFFENSES.  IF THERE ARE ANY

10   UNRELATED VICTIMS, THAT IS HIGHER RISK, AND ANY STRANGER

11   VICTIMS, THAT IS ALSO THE HIGHEST RISK OF ANY OF THE

12   RELATIONSHIPS.

13        IN THIS CASE, I GAVE MR. ANTONE A ONE FOR UNRELATED

14   VICTIMS BECAUSE OF HIS OFFENSE AGAINST RICHANDA AND ALSO

15   I GAVE HIM A ZERO FOR STRANGER VICTIMS.  A STRANGER

16   VICTIM WOULD BE SOMEONE YOU KNEW LESS THAN 24 HOURS AND

17   THEN YOU OFFENDED AGAINST THEM, AND THAT WAS NOT THE CASE

18   FOR MR. ANTONE WHO HAD KNOWN ALL OF HIS VICTIMS

19   SIGNIFICANTLY LONGER THAN THAT.

20        THE FINAL RISK POINT IS FOR MALE VICTIMS.  WE KNOW

21   THAT INDIVIDUALS WHO HAVE MALE VICTIMS ARE HIGHER RISK

22   THAN THOSE WITH FEMALE VICTIMS.  AND IN THIS CASE, MR.

23   ANTONE DID NOT HAVE ANY MALE VICTIMS.  HE RECEIVED A

24   ZERO.

25        THAT WOULD ADD UP TO A TOTAL SCORE OF FIVE, AND THAT

1    IS IN THE MODERATE-HIGH RANGE OF RISK.

2    A   EXPLAIN THE MODERATE TO HIGH RANGE?  I GUESS AS FAR

3    AS SCORES GO -- WELL, FIRST, HOW MANY DIFFERENT RISK

4    CATEGORIES ARE THERE?

5    A   THERE ARE FOUR.

6    Q   WHAT ARE THEY?

7    A   LOW RISK WOULD BE MINUS ONE.  YOU GET A MINUS SCORE

8    ON THIS INSTRUMENT THROUGH ONE.  A SCORE OF TWO TO THREE

9    IS LOW-MODERATE.  A SCORE OF FOUR AND FIVE IS

10   MODERATE-HIGH.  THAT IS WHAT MR. ANTONE SCORED, A FIVE.

11   AND SCORE OF SIX AND HIGHER IS IN THE HIGH RANGE.

12   Q   SO EVEN WHEN HE TURNS 40 AND HIS TOTAL SCORE GOES TO

13   FOUR, HE IS STILL GOING TO BE IN THE MODERATE TO HIGH

14   RANGE; IS THAT RIGHT?

15   A   IT'S THE SAME RISK LEVEL, YES.

16   Q   LET'S TALK A LITTLE ABOUT YOUR SCORING ON THE

17   MNSOST-R.

18            MR. ROYSTER:  AND IF WE COULD, JUDGE, THIS IS

19   NOT AN EXHIBIT, BUT I HAVE AN ILLUSTRATIVE EXHIBIT THAT

20   WILL ASSIST.

21   Q   WELL, DR. PHENIX, WOULD REVIEWING YOUR SCORING SHEETS

22   ASSIST YOU IN YOUR TESTIMONY?

23   A   YES, IT WOULD.

24            MR. ROYSTER:  I JUST USE THIS FOR THE PURPOSE

25   OF ILLUSTRATIVE TESTIMONY.  IT'S NOT AN EXHIBIT, JUDGE.

1          THE COURT:  THAT'S FINE.

2          MR. ROYSTER:  IF WE CAN PULL UP HER SCORING

3    SHEET.

4    Q   DO YOU RECOGNIZE WHAT IS ON THE SCREEN THERE?

5    A   YES.

6    Q   WHAT IS IT?

7    A   THIS WAS MY ORIGINAL SCORE SHEET FOR THE MNSOST-R, I

8    WOULD CALL IT.

9    Q   TELL THE COURT ABOUT THE ITEMS ON HERE AND JUST WALK

10   THROUGH HERE WHY YOU SCORED THEM THE WAY YOU DID.

11   A   IN TERMS OF THESE ITEMS, THE FIRST SET OF ITEMS, 1

12   THROUGH 12 ARE HISTORICAL STATIC ITEMS.  THE FIRST NUMBER

13   IS THE NUMBER OF SEX OR SEX RELATED CONVICTIONS,

14   INCLUDING THE CURRENT CONVICTION.  WE KNOW THAT MR. BYRON

15   (SIC) HAS WELL OVER TWO OR MORE CONVICTIONS FOR SEX

16   OFFENSES, AND SO I GAVE HIM A PLUS TWO ON THIS ITEM.

17          THE COURT:  YOU ARE REFERRING TO MR. ANTONE?

18          THE WITNESS:  YES.

19          THE COURT:  I BELIEVE YOU SAID MR. BYRON.

20   THAT IS WHY I WAS ASKING.

21          THE WITNESS:  I AM SORRY.  MR. ANTONE, YES.

22          MR. ROYSTER:

23   Q   ALL RIGHT.  KEEP GOING.

24   A   ANOTHER ITEM NOT ON THE STATIC INSTRUMENTS HERE IS

25   THE LENGTH OF SEX OFFENDING HISTORY.  SO LESS THAN ONE

1    YEAR IS A MINUS ONE.  THE HIGHEST RISK POINTS WOULD BE

2    ONE TO SIX YEARS, AND YOU COUNT FROM THE VERY FIRST KNOWN

3    INCIDENT OF SEX OFFENDING TO -- AND THIS NOT JUST CHARGED

4    AND CONVICTED, BUT KNOWN INCIDENTS, TO THE LAST TIME THAT

5    THAT OCCURRED.

6         AND IN MY PRIOR TESTIMONY, I SAID THAT THERE HAD

7    BEEN EIGHT YEARS OF SEX OFFENDING.  THEREFORE, ANYTHING

8    SIX YEARS OR MORE WOULD BE A ZERO.  HE RECEIVED A ZERO ON

9    THIS ITEM.

10   Q   GO AHEAD AND GO THROUGH ALL OF THESE, DR. PHENIX.

11   A   ITEM THREE WOULD BE WHETHER THE OFFENDER WAS UNDER

12   ANY FORM OF SUPERVISION WHEN THEY COMMITTED ANY SEX

13   OFFENSE FOR WHICH THEY WERE EVENTUALLY CHARGED AND

14   CONVICTED.

15        I HAVE SOME QUESTIONS ABOUT THIS PARTICULAR ITEM IN

16   TERMS OF THE DATES THAT I HAVE HERE.  ORIGINALLY, IT WAS

17   MY UNDERSTANDING -- I AM GOING TO REFRESH MY MEMORY

18   HERE -- THAT FOR AN OFFENSE COMMITTED ON JULY 4, 1990,

19   THAT MR. ANTONE HAD BEEN PLACED ON 180 DAYS OF SUPERVISED

20   PROBATION, AND THEN HE WENT ON TO COMMIT HIS FIRST

21   ADJUDICATED SEX OFFENSE ON SEPTEMBER 25, 1990.  IT WAS MY

22   BELIEF THAT HE WAS ON SUPERVISION AT THE TIME HE

23   COMMITTED THAT SEX OFFENSE IN SEPTEMBER 25, 1990, UNTIL I

24   REALIZED THAT THE CONVICTION WAS ACTUALLY NOVEMBER 16,

25   1990, SO THAT HE WAS PROBABLY NOT PLACED ON SUPERVISION

1  UNTIL AFTER HE COMMITTED THAT SEX OFFENSE.

2  Q   JUST SO WE ARE CLEAR, HE HAD BEEN ARRESTED.  HE JUST

3  HADN'T BEEN CONVICTED YET, IS THAT CORRECT?

4  A   EXACTLY.  WHICH WOULD HAVE MEANT HE WOULDN'T HAVE

5  BEEN GIVEN A SUPERVISORY SENTENCE YET.

6  Q   OKAY.

7  A   AND THEN HE WENT ON TO COMMIT, ON SEPTEMBER 25, 1990,

8  HIS OFFENSE AGAINST V.R. 1, SO IT'S POSSIBLE THAT THAT IS

9  A ZERO RATHER THAN A TWO.  IT'S DIFFICULT TO KNOW FROM

10 THE RECORDS.

11 Q   AND IF THAT WERE THE CASE, THEN YOUR TOTAL SCORE

12 WOULD BE A 13 INSTEAD OF A 15?

13 A   IT WOULD.

14 Q   ARE THERE ANY OTHER CHANGES, WHILE WE ARE ON THE

15 ISSUE OF CHANGE, ARE THERE ANY OTHER CHANGES THAT YOU

16 WOULD MAKE TO YOUR SCORING SHEET?

17 A   NO CHANGES.  PERHAPS SOME EXPLANATION IS INDICATED

18 FOR ITEM 14.

19 Q   WE'LL GET TO THAT.  I AM JUST ASKING GENERALLY RIGHT

20 NOW, WHILE WE ARE ON THE TOPIC OF CHANGES, ARE THERE ANY

21 OTHER CHANGES TO YOUR MNSOST-R SCORING SHEET?

22 A   NO.

23 Q   AND IF IT WERE A 13, WOULD THAT AFFECT YOUR

24 EVALUATION OR ULTIMATE CONCLUSION ON WHETHER HE IS A

25 SEXUALLY DANGEROUS PERSON?

1    A    NO, IT'S THE SAME RISK RANGE AND THE SAME

2    PROBABILITIES OF REOFFENSE.  ANYTHING FROM AN EIGHT AND

3    HIGHER.

4    Q    ALL RIGHT.  LET'S GO BACK TO ITEM FOUR, AND EXPLAIN

5    WHY YOU SCORED IT THE WAY YOU DID?

6    A    ITEM FOUR IS -- HAS TO DO WITH ANY SEX OFFENSE BEING

7    COMMITTED IN A PUBLIC PLACE.  I GAVE HIM A PLUS TWO ON

8    THIS BECAUSE HE RAPED V.R. 2, WHICH IS THE THIRD SEX

9    OFFENSE, BY GOING TO HER HOUSE, GETTING HER AND GOING

10   OUTSIDE AND RAPING HER OUTSIDE.  SO THAT IS A PUBLIC

11   PLACE.

12       ITEM FIVE, WAS THERE ANY FORCE OR THREAT OF FORCE

13   EVER USED TO ACHIEVE COMPLIANCE IN A SEX OFFENSE.  I

14   SCORED A ZERO WHICH IS THE RISK POINT.  MINUS THREE IS IF

15   HE HAD NOT.  HE USED FORCE IN MOST OF HIS SEX OFFENSES.

16   HE CERTAINLY USED PHYSICAL FORCE AND VIOLENCE WITH CHERYL

17   IN THE SEX OFFENSE ON JUNE 1, 1997, AND IN NOVEMBER, HE

18   PHYSICALLY ASSAULTED, MULTIPLE TIMES, R.J. WHILE HE WAS

19   RAPING HER.

20       OKAY.  IN TERMS OF ITEM SIX, HAS ANY SEX OFFENSE

21   CHARGED OR CONVICTED HAD MULTIPLE ACTS ON A SINGLE VICTIM

22   WITH ANY SINGLE CONTACT EVENT.  THAT WOULD BE R.A. WHO

23   WAS 12 YEARS OLD WHEN HE WAS NOTED IN THE POLICE REPORT

24   TO TRY TO KISS HER AS WELL AS FONDLING HER IN HER GENITAL

25   AREA.  ACCORDING TO THE RULES, THAT WOULD BE TWO ACTS.

1          AND THEN ITEM SEVEN, THIS REFERS TO HOW MANY

2     DIFFERENT AGE GROUPS, AND THE MORE AGE GROUPS THAT YOU

3     HAVE THAT YOU HAVE OFFENDED AGAINST, THE HIGHER THE

4     SCORE.

5          IN THIS CASE, MR. ANTONE HAS OFFENDED AGAINST A 13

6     YEAR OLD AND A 14 OR 15 YEAR OLD.  SO THAT AGE GROUP IS

7     CHECKED.  AND THEN THE REST OF HIS VICTIMS WERE OLDER

8     THAN 16.  SO HE GETS A RISK POINT OF POINT THREE ON THAT

9     ITEM.  AND THIS IS SOMEWHAT OF A DOUBLE DIP ACTUALLY IN

10    THIS INSTRUMENT.

11         THE NEXT ITEM EIGHT ALSO RELATES TO AN AGE GROUP.

12    IF YOU HAVE OFFENDED AGAINST A 13 AND 15 YEAR OLD VICTIM,

13    YOU GET TWO MORE RISK POINTS, AND IN FACT THAT HAS BEEN

14    THE CASE FOR MR. ANTONE.

15         ITEM NINE, HE HAS NOT COMMITTED A SEX OFFENSE

16    AGAINST A STRANGER.

17    Q   BEFORE WE GO FURTHER, LET'S GO BACK TO ITEM EIGHT.

18    WHAT IS THE CRITERIA FOR GETTING THE TWO POINTS THERE

19    SPECIFICALLY?

20    A   THE CRITERIA FOR THE TWO POINTS IS THAT HE HAS

21    OFFENDED AGAINST THE 13 TO 15 YEAR OLD VICTIM AND HE IS

22    MORE THAN FIVE YEARS OLDER THAN THE VICTIM AT THE TIME

23    THAT THE OFFENSE WAS CHARGED OR CONVICTED.

24    Q   WHICH VICTIM IS THAT?

25    A   THAT WOULD BE VICTIM R.A.  HE WAS 24 YEARS OF AGE

1   WHEN HE MOLESTED HER AND SHE WAS 12 YEARS OLD, SO

2   OBVIOUSLY IT'S MORE THAN FIVE YEARS OLDER.

3   Q    WOULD THAT ALSO INCLUDE --

4   A    IT WOULD ALSO INCLUDE V.R. 2.

5   Q    THAT IS VERONICA?

6   A    YES.

7   Q    I INTERRUPTED YOU.  I APOLOGIZE.  ITEM NINE?

8   A    ITEM NINE, THIS IS THE SAME AS STATIC-99.  YOU GET

9   THREE RISK POINTS IF YOU HAVE A STRANGER VICTIM.  HE DID

10  NOT, AS FAR AS I KNOW, HAVE A STRANGER VICTIM, SO HE

11  WOULD RECEIVE A MINUS ONE.

12       ITEM TEN REFERS TO EVIDENCE OF ADOLESCENT ANTISOCIAL

13  BEHAVIOR.  I TESTIFIED TO THAT WHEN I DISCUSSED MR.

14  ANTONE'S CONDUCT DISORDER IN DIAGNOSING ANTISOCIAL

15  PERSONALITY DISORDER.  SO I GAVE HIM A PLUS TWO ON THAT

16  ITEM.

17       ON ITEM ELEVEN, A PATTERN OF SUBSTANTIAL DRUG OR

18  ALCOHOL ABUSE, 12 MONTHS PRIOR TO THE ARREST, THAT WOULD

19  BE IN 1997, AND WE KNOW FROM MR. ANTONE'S OWN TESTIMONY

20  THAT THAT IS TRUE.  THAT WOULD BE A PLUS ONE.

21       AND THEN ITEM TWELVE, EMPLOYMENT HISTORY, I GAVE HIM

22  A PLUS ONE FOR A SIGNIFICANT HISTORY OF UNEMPLOYMENT IN

23  THIS ITEM.

24  Q    WHY?

25  A    BECAUSE -- WELL, BECAUSE HE WAS UNEMPLOYED AND LIVING

1    AT HOME WITH TANYA WHO WAS RECEIVING WELFARE MOST OF THE

2    YEAR.

3    Q    AND DOES MONTHS OF UNEMPLOYMENT QUALIFY AS

4    SIGNIFICANT HISTORY UNDER THE CRITERIA?

5    A    YES.

6    Q    OKAY.

7    A    IN TERMS OF THE NEXT FOUR ITEMS, THESE ARE WHAT WE

8    CALL DYNAMIC OR CHANGEABLE ITEMS.  THE OTHERS ARE

9    HISTORICALLY BASED AND THEY CAN'T EVER CHANGE EXCEPT THAT

10   THEY CAN GO UP, AND ALSO REFERS TO THE INSTITUTIONAL

11   HISTORY AS WELL.

12              THE COURT:  DR. PHENIX, CAN I INTERRUPT YOU?

13   MR. ROYSTER, ON MY SCREEN I SEE TWO BLUE ARROWS.

14              THE WITNESS:  I AM SORRY, YOUR HONOR.  I

15   ACCIDENTALLY TOUCHED IT AND IT MADE AN ARROW.

16              THE COURT:  I SEE.  OKAY.

17              THE WITNESS:  I DON'T KNOW HOW TO GET IT OFF.

18              THE COURT:  VERY GOOD.  I THINK IT HAS BEEN

19   REMOVED.

20              THE WITNESS:  THANK YOU.

21              THE COURT:  THANK YOU.  THE REASON I MENTION

22   THAT, IF THERE ARE GOING TO BE -- I KNOW THIS EQUIPMENT

23   HAS THAT CAPABILITY.  IF IT'S GOING TO BE DONE, IT NEEDS

24   TO BE STATED ON THE RECORD SO THAT SOMEONE JUST READING

25   THE TRANSCRIPT WOULD UNDERSTAND WHAT HAPPENS HERE WHICH

1    WE CAN SEE, BUT OTHERWISE THE READER WOULDN'T.

2              DR. PHENIX, YOU MAY CONTINUE.

3              THE WITNESS:  THANK YOU, YOUR HONOR.

4    A    THE FIRST ITEM UNDER THE DYNAMIC VARIABLES IS A

5    DISCIPLINE HISTORY WHILE INCARCERATED, AND IN FACT, MR.

6    ANTONE HAD A FIGHT.  HE ALSO USED A TELEPHONE, A

7    THREE-WAY TELEPHONE CALL WHICH IS AGAINST THE RULES, AND

8    THOSE ARE MAJOR DISCIPLINE RULES VIOLATIONS.  SO HE WOULD

9    GET A ONE.

10             I SCORED FOURTEEN AND FIFTEEN A ZERO.  THE REASON

11   FOR THIS IS THAT I WAS TRAINED TO SCORE A ZERO WHEN USING

12   THE INSTRUMENT OUTSIDE OF JURISDICTIONS WHERE I AM

13   FAMILIAR WITH THEIR TREATMENT PROGRAMS.

14             SO A ZERO DOESN'T PROVIDE ANY EXTRA RISK POINTS, BUT

15   THIS WAS DEVELOPED IN MINNESOTA IN THE DEPARTMENT OF

16   CORRECTIONS.  THEY HAVE A CHEMICAL DEPENDENCY PROGRAM AND

17   THEY HAVE A SEX OFFENDER TREATMENT PROGRAM.  BUT THERE

18   ARE ASPECTS OF THOSE PROGRAMS THAT ARE VERY DIFFERENT

19   THAN IN OTHER JURISDICTIONS, AND SO WE ARE ADVISED JUST

20   TO GIVE ZEROS BECAUSE, FOR EXAMPLE, THE 40-HOUR CHEMICAL

21   DEPENDENCY PROGRAM MR. ANTONE COMPLETED MIGHT BE VERY

22   VERY DIFFERENT FROM THE YEAR LONG CHEMICAL DEPENDENCY

23   PROGRAM THAT THEY HAVE IN MINNESOTA.  THEY CAN'T COMPARE.

24   SO I GAVE HIM ZEROS ON BOTH OF THOSE ITEMS.

25             THE COURT:  AND THE ZERO INDICATES -- IT HAS

1    THE AFFECT OF DECREASING THE RISK, OVERALL RISK; IS THAT

2    RIGHT?

3              THE WITNESS:  RIGHT.  RIGHT.  IT DOESN'T ADD

4    ANY RISK POINTS THERE.

5              THE COURT:  BUT IT DOESN'T GIVE CREDIT FOR HIM

6    HAVING COMPLETED A PROGRAM.

7              THE WITNESS:  BUT IT DOESN'T GIVE CREDIT.  SO

8    WHAT I WOULD DO IN THIS CASE BECAUSE I DON'T KNOW THE

9    NATURE OF THE 40-HOUR SUBSTANCE ABUSE PROGRAM COMPARED TO

10   MINNESOTA, IS THAT I CONSIDER THAT HE COMPLETED SUBSTANCE

11   TREATMENT OUTSIDE OF THE INSTRUMENT, SO IN TERMS OF MY

12   OVERALL RISK ASSESSMENT, I INCORPORATE THAT, BUT HIS

13   COMPLETION IS NOT INCORPORATED IN THE INSTRUMENT ITSELF.

14             THE COURT:  I SEE.  AND THE COMPARISON THEN,

15   IF I UNDERSTAND IT CORRECTLY, WOULD BE TO THE MINNESOTA

16   PROGRAM BECAUSE THAT IS WHAT THE ACTUARIALS ARE BASED ON?

17             THE WITNESS:  RIGHT.  THAT WAS WHERE IT WAS

18   DEVELOPED.  IT WAS ON THEIR TWO TREATMENT PROGRAMS, YES.

19   A    OKAY.  AND THEN SO ITEM FIFTEEN IS COMPLETING A SEX

20   OFFENDER TREATMENT PROGRAM.  AGAIN, I WOULD CONSIDER THAT

21   OUTSIDE OF THE ACTUARIAL INSTRUMENT IF IT HAPPENED, WHICH

22   IT IS NOT, AND ITEM FIFTEEN WOULD BE THE AGE OF THE

23   OFFENDER AT TIME OF RELEASE.  SO THIS IS THE AGE ITEM FOR

24   THE MNSOST-R, AND WE KNOW THAT MR. ANTONE IS CERTAINLY

25   OVER AGE 30, SO HE WOULD GET A REDUCTION IN RISK OF MINUS

1    ONE.

2    Q   ALL RIGHT.  DR. PHENIX, IF YOU WOULD FLIP OVER TO

3    EXHIBIT 3, PAGE 2322.

4              THE COURT:  IT APPEARS TO ME, MR. ROYSTER,

5    THAT WE ARE AT A STOPPING POINT, AND IT MIGHT BE WELL

6    ADVISED TO TAKE OUR AFTERNOON BREAK.  LET'S BREAK UNTIL

7    3:15.

8              (WHEREUPON, A SHORT RECESS WAS TAKEN.)

9              THE COURT:  LET ME JUST NOTE WHILE IT'S ON MY

10   MIND, GIVEN THE NATURE OF THE SCIENCE IN THIS AREA, THERE

11   ARE CERTAIN ACRONYMS THAT ARE USED FROM TIME TO TIME LIKE

12   THE MNSOST-R, AND I JUST WOULD ASK COUNSEL TO ASSIST THE

13   COURT REPORTER TO THE EXTENT -- SHE WON'T BE BASHFUL

14   ABOUT IT -- BUT TO THE EXTENT SHE NEEDS HELP WITH THE

15   SPELLING OF SOME OF THESE WHICH CAN BE DIFFICULT TO

16   DISCERN FROM THE PRONUNCIATION, AND ASK COUNSEL TO

17   PROVIDE THAT ASSISTANCE.

18             MR. ROYSTER.

19             MR. ROYSTER:  THANK YOU, JUDGE.

20   Q   DR. PHENIX, WHEN WE LEFT OFF, WE WERE GOING TO LOOK

21   AT THE CHART ON EXHIBIT 3 OF THE REPORT.  AND JUST FOR

22   THE RECORD, UNDERNEATH THAT CHART IS SOME OF THE

23   INFORMATION THAT HAS BEEN EXCLUDED BUT HAS BEEN OFFERED

24   IN THE PROFFER, SO WE ARE LOOKING AT THE INFORMATION JUST

25   ABOVE THAT.  OKAY.  THE CHART.  DO YOU SEE THAT?

1   A    YES.

2   Q    ON PAGE 2322?

3   A    YES.

4   Q    WHAT IS THAT CHART?

5   A    THAT IS A TABLE THAT SHOWS EACH SCORE ON THE THREE

6   ACTUARIAL INSTRUMENTS THAT I SCORED, WHAT THEIR RISK

7   CATEGORY IS FOR THAT PARTICULAR SCORE OF MR. ANTONE, AND

8   IT ALSO SHOWS A PERCENTILE, SO THAT IS A MEASURE OF

9   RELATIVE RISK AS COMPARED TO A LARGE GROUP OF OTHER SEX

10  OFFENDERS.  AND THEN IT SHOWS THE PROBABILITIES OF

11  RE-ARREST FOR FIVE YEARS AND FOR TEN YEARS FOR BOTH THE

12  STATIC INSTRUMENTS FOR THE STUDY SAMPLE AND REOFFENSE

13  RATES FOR A SIX YEAR FOLLOW-UP ON THE MNSOST-R.  WE HAVE

14  DATA IF A PERSON HAS COMMUNITY SUPERVISION AND IF THE

15  INDIVIDUAL DOES NOT.

16  Q    AND WALK THROUGH WITH US WHAT THIS INFORMATION TELLS

17  US WITH RESPECT TO MR. ANTONE?

18  A    FOR MR. ANTONE, WHAT WE SEE HERE IS THAT HE HAS

19  SCORED ONE INSTRUMENT, THE STATIC-2002R IN THE MODERATE

20  RANGE.

21      THE STATIC-99R WHICH IS FAR AND AWAY THE MOST WIDELY

22  USED INSTRUMENT AND THE MOST VALIDATED INSTRUMENT, HE

23  SCORED IN THE MODERATE-HIGH RANGE.

24      AND ON THE MNSOST-R, EVEN WITH A SCORE REDUCTION OF

25  TWO POINTS, HE WOULD BE SCORING IN THE HIGH RANGE.

1        SO HIS RISK OVERALL IS MODERATE TO HIGH.  AND IN

2   TERMS OF HIS PROBABILITY OF SEXUAL REOFFENSE, I WOULD

3   FOCUS ON THE COLUMN THAT SAYS HIS TEN YEAR RISK, HE IS A

4   YOUNG MAN, HE IS 39, SO HE IS -- I AM FOCUSING ON WHAT

5   WOULD BE HIS PROBABILITY OF REOFFENSE OR RISK FOR

6   REOFFENSE THROUGHOUT HIS LIFETIME, AND THROUGH THE MIDDLE

7   YEARS, THAT WOULD BE PRETTY MUCH SUSTAINED.

8        SO YOU CAN SEE HERE FOR THE STUDY SAMPLE, THERE WERE

9   PROBABILITIES OF REOFFENSE BETWEEN 28.4 PERCENT OF THE

10  SAMPLE REOFFENDED, AND FOR THE MNSOST-R, UP TO 72 PERCENT

11  REOFFENDED.  THAT WOULD BE SIX YEARS.  PROBABILITIES ARE

12  MUCH HIGHER IN THE MNSOST-R WITH THAT VERY HIGH SCORE

13  THAN THE TWO STATIC INSTRUMENTS.

14  Q   DR. PHENIX, WHAT OTHER FACTORS HAVE YOU CONSIDERED AS

15  PART OF YOUR EVALUATION?

16  A   I CONSIDERED, TO THE BEST OF MY ABILITY, I CONSIDERED

17  WHAT WE CALL DYNAMIC RISK FACTORS OR CHANGEABLE RISK

18  FACTORS.  ALL OF THE RISK FACTORS I HAVE CONSIDERED SO

19  FAR ON THE ACTUARIAL INSTRUMENTS ARE STATIC, HISTORICAL

20  FACTORS.  YOU CAN GET MORE OF THEM.  YOU CAN GET MORE SEX

21  OFFENSES.  BUT YOU CAN'T GO DOWN ON ANY OF THE ITEMS

22  EXCEPT AGE.  SO THAT IS KIND OF A BASELINE RISK THAT

23  CAN'T CHANGE NO MATTER WHAT HAPPENS IN YOUR LIFE.

24       SO WE HAVE TODAY QUITE ESTABLISHED DYNAMIC OR

25  CHANGEABLE RISK FACTORS THAT WHEN PRESENT INCREASE THE

1    RISK OF FUTURE SEXUAL REOFFENSE.  AND THOSE ARE THE

2    TARGETS OF TREATMENT.

3        SINCE WE CAN'T REDUCE AN OFFENDER'S STATIC RISK, WE,

4    IN SEX OFFENDER TREATMENT, YOU ARE GOING TO TRY TO REDUCE

5    THEIR RISK ON THE DYNAMIC OR CHANGEABLE RISK FACTORS.

6    Q   WHAT IS THE STABLE-2007?

7    A   THE STABLE-2007 IS AN INSTRUMENT DEVELOPED BY DRS.

8    HANSON AND HARRIS IN CANADA WHICH HAS A COLLECTION OF

9    MOST OF THE KNOWN DYNAMIC RISK FACTORS.  IT CAN BE

10   SCORED, SO EACH ITEM COULD GET A ZERO, ONE OR TWO, TWO

11   BEING HIGHER RISK POINT, BUT IT'S DIFFICULT TO SCORE EACH

12   ITEM ON AN INCARCERATED SAMPLE.  IT'S EASIER TO SCORE A

13   PERSON WHO IS OUT IN THE COMMUNITY ON ALL OF THESE

14   PARTICULAR ITEMS.

15       SO I USE THESE ITEMS IN WHAT WE CALL AN EMPIRICALLY

16   GUIDED WAY, SO THERE IS NO SCORE FOR THE ITEM.  I

17   CONSIDERED ITS PRESENCE OR ABSENCE, AND IF IT'S PRESENT,

18   THAT WOULD ADD NEW INFORMATION TO A STATIC RISK OVER AND

19   ABOVE WHAT THE ACTUARIALS TELL US ABOUT THE RISK.

20   Q   IS THE STABLE-2007 ONE OF THE INSTRUMENTS YOU USED TO

21   ADDRESS THE DYNAMIC FACTORS WITH RESPECT TO MR. ANTONE?

22   A   YES.

23   Q   COULD YOU WALK THROUGH THOSE DYNAMIC FACTORS THAT YOU

24   CONSIDERED AS PART OF THE STABLE-2007?

25   A   YES.  I CONSIDERED WHAT WE CALL SIGNIFICANT SOCIAL

1    INFLUENCES, PEOPLE THAT WILL BE AROUND MR. ANTONE WHEN HE

2    IS IN THE COMMUNITY.  A NUMBER OF ITEMS MEASURING

3    INTIMACY DEFICITS, THE QUALITY OF RELATIONSHIPS, NOT JUST

4    BEING IN ONE, BUT WHAT THEY ARE LIKE.  FACTORS HAVING TO

5    DO WITH THE SEXUAL SELF-REGULATION, HOW SEXUALLY

6    PREOCCUPIED IS A PERSON, DO THEY TEND TO GET DEVIANT

7    SEXUAL AROUSAL WHEN THEY HAVE TROUBLE COPING AND FEEL

8    OVERWHELMED, AND ALSO DO THEY HAVE A HISTORY OF DEVIANT

9    SEXUAL INTERESTS.  COOPERATION WITH SUPERVISION PREDICTS

10   SEXUAL REOFFENSE OR LACK THEREOF, AND THEN FACTORS HAVING

11   TO DO WITH GENERAL SELF-REGULATION.  IS THE PERSON

12   INCLINED TO BEHAVE IMPULSIVELY?  WHAT ARE THEIR PROBLEM

13   SOLVING SKILLS LIKE?  CAN THEY IDENTIFY THE PROBLEMS AND

14   DIFFICULTIES IN THEIR LIFE AND CREATE CONSTRUCTIVE WAYS

15   TO SOLVE THOSE PROBLEMS?

16       AND ALSO WE KNOW THAT NEGATIVE EMOTIONALITY AND

17   HOSTILITY, WHEN PRESENT, CAN INCREASE THE RISK OF FUTURE

18   SEXUAL REOFFENSE, SO I LOOK AT ALL OF THOSE FACTORS IN

19   THIS CASE.

20   A   LET'S TAKE THEM ONE BY ONE, ACTUALLY, AND START WITH

21   THE FIRST ONE, THE SIGNIFICANT SOCIAL INFLUENCES.  WHAT

22   DID YOU CONCLUDE THERE?

23   A   WELL, WITHOUT INFORMATION FROM AN INTERVIEW, I

24   CONCLUDED THAT THE RECORDS INDICATE THAT MR. ANTONE IS IN

25   CONTACT WITH -- WELL, FIRST OF ALL, HIS MOTHER AND HIS

1    GRANDMOTHER WHO WERE HIS PRIMARY SUPPORTS IN THE

2    COMMUNITY, AND PARTICULARLY LATER IN HIS LIFE WITH HIS

3    MOTHER AS WE HEARD ABOUT THIS MORNING, HAVE DIED, AND SO

4    THEY ARE NO LONGER IN THE COMMUNITY TO PROVIDE SUPPORT

5    FOR HIM.

6        HE HAS COMMUNICATED, WITH PERMISSION, WITH HIS

7    COMMON LAW WIFE, TANYA MCCLOUD, WHEN SHE WAS IN PRISON.

8    I SAW RECORDS INDICATING THAT WHEN SHE WAS IN FEDERAL

9    PRISON, SHE GOT PERMISSION TO COMMUNICATE WITH HIM BY

10   LETTER AND THAT THEY DID THAT, AND THAT SHE HAD INTEREST

11   IN REKINDLING THAT RELATIONSHIP WITH MR. ANTONE.

12       I OPINED THAT THAT WOULD NOT BE THE TYPE OF

13   PROSOCIAL INFLUENCE THAT WOULD BE HEALTHY FOR MR. ANTONE.

14   SHE HAS A DRUG AND ALCOHOL PROBLEM.  WE ALSO HEARD THAT

15   IN PRIOR TESTIMONY TODAY AS WELL AS THE FACT THAT SHE IS

16   A FELON.  AND SO THAT WOULD NOT BE A POSITIVE SOCIAL

17   SUPPORT FOR HIM.

18       SO, HE SAID THAT HE, IN TESTIMONY, HE SAID THAT HE

19   PLANNED TO MOVE TO TUCSON, ARIZONA, WHERE I BELIEVE HIS

20   SISTER IS.  AND I DON'T HAVE ANY INFORMATION ABOUT HIS

21   SISTER IN TERMS OF BEING A PROSOCIAL SUPPORT WHICH IS

22   WHAT MR. ANTONE NEEDS TO LOWER HIS RISK ONCE RELEASED TO

23   THE COMMUNITY.  SO, I DON'T HAVE A GOOD PICTURE OF THE

24   KIND OF PROSOCIAL SUPPORTS THAT MIGHT BE AVAILABLE TO

25   HIM.

1    A    ALL RIGHT.  WHAT ABOUT INTIMACY DEFICITS?  FIRST,

2    WHAT IS MEANT BY THAT?

3    A    WELL, FIRST THE ITEM ON STATIC-99 WHICH IS EVER LIVED

4    WITH A LOVER FOR TWO YEARS.  THAT IS DIFFERENT FROM

5    INTIMACY DEFICITS.  SO RATHER THAN LOOKING STATISTICALLY

6    IF YOU HAVE LIVED WITH SOMEONE FOR TWO YEARS WHICH IS ON

7    STATIC-99, IT IS HAVE YOU, AND IF YOU HAVE, WHAT IS THE

8    QUALITY OF THAT RELATIONSHIP BECAUSE WE KNOW THAT STABLE,

9    MORE MEANINGFUL AND SUSTAINED RELATIONSHIPS ARE

10   PROTECTIVE FOR INDIVIDUALS WHO COMMIT SEX OFFENSES.

11       SO WHEN A PERSON HAS BEEN INSTITUTIONALIZED FOR MANY

12   YEARS AS HAS MR. ANTONE, THEN I LOOK AT THEIR HISTORY OF

13   RELATIONSHIPS AND WHAT THOSE WERE LIKE.  AND IN THIS

14   CASE, MR. ANTONE WAS WITH TANYA FOR ABOUT FIVE YEARS.

15   THEY HAD A CHILD TOGETHER.  THEIR RELATIONSHIP WAS MARKED

16   BY A FAIRLY CONSTANT USE OF DRUGS AND ALCOHOL ON BOTH OF

17   THEIR PARTS.  IT WAS MARKED BY DOMESTIC VIOLENCE.

18       SO IT WOULD BE, FOR EXAMPLE, ALSO WHEN MR. ANTONE

19   RAPED RICHANDA IN NOVEMBER OF 1997, TANYA WAS IN THE

20   HOUSE AND KNOCKED ON THE DOOR.  SO THERE ARE VERY OBVIOUS

21   PROBLEMS WITH INTIMACY IN THAT RELATIONSHIP AND

22   INFIDELITY AT THE SAME TIME.

23       HE ALSO RAPED OR ATTEMPTED TO RAPE CHERYL, C.R. WHEN

24   HE WAS WITH TANYA, SO THAT RELATIONSHIP WAS FRAUGHT WITH

25   A MULTITUDE OF PROBLEMS.  THERE HAS BEEN NO TIME THAT MR.

1    ANTONE HAS MAINTAINED A MEANINGFUL SUSTAINED RELATIONSHIP

2    IN THE COMMUNITY.  HE HAS NEVER DONE THAT BEFORE AND IT'S

3    NOT THE EASIEST THING TO LEARN WHEN YOU HAVE NEVER DONE

4    THAT AT AGE 39.

5         AND SO I SUSPECT THAT MAY BE DIFFICULT FOR HIM TO

6    ESTABLISH AND MAINTAIN THAT TYPE OF RELATIONSHIP, BUT

7    WHAT I DO KNOW IS THERE IS NO RELATIONSHIP WAITING FOR

8    HIM IN THE COMMUNITY THAT MIGHT PROVIDE THAT KIND OF

9    STABILITY.

10   Q    ANYTHING ELSE WITH RESPECT TO INTIMACY DEFICITS?

11   A    ONE OF THE FACTORS UNDER INTIMACY DEFICITS IS

12   HOSTILITY TOWARDS WOMEN.  THAT, OF COURSE, SHOWS THAT YOU

13   HAVE INTIMACY DEFICITS.

14        LOOKING AT MR. ANTONE'S HISTORY AND THE WAY THAT HE

15   WENT ABOUT OFFENDING AND IGNORING HIS VICTIMS, HOW THEY

16   SUFFERED, ASSAULTING, FOR EXAMPLE, RICHANDA, ESSENTIALLY

17   BEATING HER DURING THE SEXUAL ASSAULT AND THERE BEING SO

18   MANY FEMALE VICTIMS WOULD INDICATE, AND HE HAS TALKED

19   ABOUT HAVING BEEN ANGRY, IN OTHER RECORDS, NOT MY

20   INTERVIEW, BUT HE HAS TALKED ABOUT ANGER KIND OF FEEDING

21   THIS BEHAVIOR.  SO I SEE SOME MEASURE OF HOSTILITY

22   TOWARDS WOMEN.

23        I DON'T SEE THAT CARRIED OUT INSTITUTIONALLY,

24   HOWEVER.  I DIDN'T SEE THAT HE TARGETED WOMEN AND IF THIS

25   IS PERVASIVE, YOU WOULD SEE HIM TARGET WOMEN IN THE

1    INSTITUTION, WOMEN THAT HE WORKED WITH, WOMEN CUSTODY

2    OFFICERS AND THE LIKE.  SO I HAVEN'T SEEN AN EXPRESSION

3    OF HOSTILITY TOWARDS WOMEN IN PRISON.  IT'S A CONCERN,

4    BUT I HAVEN'T SEEN IT INSTITUTIONALLY, WHICH IS POSITIVE.

5    Q    ANYTHING ELSE WITH RESPECT TO INTIMACY DEFICITS?

6    A    NO.

7    Q    ALL RIGHT.  WHAT ABOUT SEXUAL SELF-REGULATION?  WHAT

8    DID YOU CONCLUDE THERE?

9    A    SEXUAL SELF-REGULATION IS VERY DIFFICULT FOR ME TO

10   MEASURE INSTITUTIONALLY WHEN IT HAS BEEN SO MANY YEARS

11   THAT HE HAS BEEN, 14 YEARS, I BELIEVE, IN CUSTODY.  WHAT

12   I CAN DO IS LOOK BACK TO HIS PRIOR HISTORY AND SEE THAT

13   JUST FROM HIS OFFENDING HISTORY, WHEN MUCH OF THAT TIME

14   HE WAS IN A RELATIONSHIP, HE WAS OBVIOUSLY SEXUALLY

15   PREOCCUPIED WITH MULTIPLE FAMILY MEMBERS AND ALL OF HIS

16   VICTIMS.

17        AND HE HAS A FAIRLY STRIKING PATTERN OF OFFENDING

18   THROUGHOUT 1989 TO 1997.  I HAVEN'T SEEN ANY SIGNS

19   INSTITUTIONALLY OF SEXUAL PREOCCUPATION.  AT THE SAME

20   TIME, I AM NOT PRIVY TO WHAT HE FANTASIZES ABOUT, HOW

21   OFTEN HE MASTURBATES, WHICH ARE MEASURES OF SEXUAL

22   PREOCCUPATION.  I KNOW ABSOLUTELY NOTHING ABOUT THAT, SO

23   IT'S SOMETHING I JUST REALLY CAN'T COMMENT ON.

24        HE WAS FOUND WITH PORNOGRAPHY.  I BELIEVE IT WAS

25   2008.  IT WAS ADULT PORNOGRAPHY, SO OBVIOUSLY HE HAS

1    STILL SEXUAL INTERESTS.

2        IF YOU LOOK AT -- IF YOU LOOK AT PHYSIOLOGICAL

3    RESPONSES TO SEXUAL PREOCCUPATION, YOU EXAMINE -- YOU

4    EXAMINE TESTOSTERONE AND ITS ROLE IN LIBIDO AND SEXUAL

5    PREOCCUPATION.

6        IT'S NOT UNUSUAL FOR INDIVIDUALS WHO COMMIT MULTIPLE

7    SEX OFFENSES TO BE QUITE SEXUALLY PREOCCUPIED, SO YOU

8    WOULD EXPECT AT AGE 39 THAT TESTOSTERONE WOULD NOT HAVE

9    DROPPED TO A HUGELY SIGNIFICANT LEVEL AND THAT THERE

10   WOULD STILL BE SOME MEASURE OF SEXUAL PREOCCUPATION FOR

11   MR. ANTONE.  I JUST CAN'T SAY WHAT THAT IS WHEN HE IS IN

12   A PRISON.

13   Q   YOU ALSO MENTIONED GENERAL SELF-REGULATION; IS THAT

14   RIGHT?

15   A   YES.

16   Q   WHAT DID YOU CONCLUDE WITH RESPECT TO THAT?

17   A   GENERAL SELF-REGULATION IS LOOKING AT IMPULSIVITY AND

18   PROBLEM SOLVING PRIMARILY HERE.  WHAT WE SAW IS A PERSON

19   IN THE COMMUNITY WHO WAS HIGHLY IMPULSIVE.  HE WAS HIGHLY

20   IMPULSIVE IN PART BECAUSE OF HIS USE OF SUBSTANCES WHICH

21   MADE HIM VERY IMPULSIVE.

22       ON THE OTHER HAND, HIS BEHAVIORAL IMPULSIVITY

23   DECREASES QUITE A BIT WHEN HE IS IN A VERY STRUCTURED

24   SETTING.  AS I SAID, HE IS ONE OF THESE INDIVIDUALS WHO

25   HAS RESPONDED QUITE WELL TO THE STRUCTURE OF THE PRISON.

1        AND, YOU KNOW, HE HAS TALKED ABOUT MANY ACTIVITIES

2   THAT HE NOW ENJOYS AND WE HAVE SEEN -- I HAVE SEEN IN

3   EXAMINATION OF THE RECORDS FEW INCIDENTS OF RULES

4   VIOLATIONS AND ACTING OUT IMPULSIVELY.

5        SO SOBER, IN A STRUCTURED SETTING, HE HAS A

6   SIGNIFICANTLY IMPROVED ABILITY TO THINK THROUGH THE

7   CONSEQUENCES OF HIS BEHAVIOR.  I DO NOT OPINE THAT

8   RELEASE TO THE COMMUNITY THAT THAT WOULD BE SUSTAINED.

9   Q   WHY?

10  A   BECAUSE OF HIS PAST HISTORY OF STRUGGLING SO MUCH

11  WITH IT IN THE COMMUNITY.  THE BEST PREDICTOR OF FUTURE

12  BEHAVIOR IS PAST BEHAVIOR.  SO IN A SIMILAR SETTING TO

13  WHEN HE HAD THOSE DIFFICULTIES, I WANT TO EXAMINE IF HE

14  HAS THE SKILLS, IF HE KNOWS HOW TO MAKE THE SIGNIFICANT

15  CHANGES THAT CAUSED HIM TO HAVE REDUCED IMPULSIVITY AND

16  BETTER JUDGMENT INSTITUTIONALLY.

17       AS I SAID, I DEPEND ON HIM HAVING INTERVENTIONS THAT

18  HELP HIM TO MAKE THOSE SIGNIFICANT CHANGES SO THAT WE

19  WOULDN'T SEE THE IMPULSIVITY, THE SUBSTANCE ABUSE AGAIN,

20  AND THE THINGS THAT CONTRIBUTED TO HIS SEX OFFENDING.

21  Q   SO AFTER LOOKING AT ALL THESE DYNAMIC FACTORS, HOW DO

22  THOSE DYNAMIC FACTORS AFFECT YOUR RISK ASSESSMENT?

23  A   WELL, FROM WHAT I WAS ABLE TO GLEAN FROM THESE

24  DYNAMIC RISK FACTORS, I THINK THAT THEY ARE, YOU KNOW,

25  FAIRLY STRONGLY PRESENT, THE ONES THAT I TALKED ABOUT.

1    THEY ARE MITIGATED A BIT BY HIS INSTITUTIONAL BEHAVIOR,

2    BUT I HAVE SAID THAT I WOULD EXPECT TO SEE THEM REEMERGE

3    BECAUSE I DON'T THINK HE HAS THE SKILLS TO MAKE THOSE

4    CHANGES ONCE RELEASED TO THE COMMUNITY.

5    Q    WHAT ARE PROTECTED RISK FACTORS?

6    A    PROTECTED RISK FACTORS ARE THOSE THAT WOULD REDUCE A

7    PERSONS OVERALL RISK WHEN PRESENT RATHER THAN INCREASE

8    RISK WHEN PRESENT.  THINGS LIKE ADVANCED AGE, THAT WOULD

9    BE OVER THE AGE OF 70.  THINGS LIKE MEDICAL CONDITIONS

10   THAT CHANGE MOBILITY OR FUNCTIONING, OVERALL FUNCTIONING

11   FROM THE TIME THAT THE PERSON WAS SEX OFFENDING.

12        AND THEN A THIRD PROTECTIVE FACTOR WOULD BE TIME

13   FREE IN THE COMMUNITY.  WE KNOW THAT OFFENDERS WHO ARE

14   RELEASED TO THE COMMUNITY, THAT AFTER APPROXIMATELY TEN

15   YEARS OF NO SEX OFFENDING, THE RISK IS REDUCED BY ABOUT

16   HALF.

17        IN THIS CASE, NONE OF THOSE FACTORS WOULD BE

18   PERTINENT TO MR. ANTONE.

19   Q    DR. PHENIX, WERE YOU IN COURT THIS MORNING WHEN MR.

20   ROSS GAVE HIS OPENING STATEMENT?

21   A    YES, I WAS.

22   Q    AND YOU HEARD HIM TALK ABOUT ALL THE THINGS THAT MR.

23   ANTONE HAD TOLD HIM; RIGHT?

24   A    YES.

25   Q    HE TALKED ABOUT THE TELEPHONE CALL WITH HIS MOTHER?

1    A    YES.

2    Q    HE TALKED ABOUT HOW HE TOLD HIS MOM HOW HE CHANGED?

3    A    RIGHT.

4    Q    AND MR. ROSS ALSO MENTIONED ABOUT --

5              MR. ROSS:  OBJECTION.  LEADING.

6              THE COURT:  I THINK HE IS JUST LAYING THE

7    FOUNDATION FOR A MORE SUBSTANTIVE QUESTION.  OBJECTION IS

8    OVERRULED.

9              MR. ROYSTER:

10   Q    AND YOU HEARD MR. ROSS TALK ABOUT HOW MR. ANTONE HAD

11   LEARNED TO DEAL WITH HIS FAMILY?

12   A    YES.

13   Q    DID YOU HEAR MR. ROSS TALK ABOUT MR. ANTONE'S

14   RELATIONSHIP WITH HIS SON?

15   A    YES.

16   Q    AND YOU HEARD MR. ANTONE ANSWER QUESTIONS ABOUT THAT?

17   A    RIGHT.

18   Q    YOU HEARD MR. ANTONE OR MR. ROSS TALK ABOUT HOW MR.

19   ANTONE GREW UP?

20   A    RIGHT.

21   Q    AND YOU HEARD MR. ANTONE DISCUSS AND TESTIFY ABOUT

22   HOW HE GREW UP; IS THAT TRUE?

23   A    YES.

24   Q    ABOUT HOW HE WAS CUTTING SCHOOL?

25   A    RIGHT.

1    Q    AND DRINKING?

2    A    YES.

3    Q    HE PROVIDED -- MR. ANTONE WAS ABLE TO PROVIDE A FAIR

4    AMOUNT OF DETAIL ABOUT HIS LIFE BEFORE INCARCERATION;

5    WASN'T HE?

6    A    YES.

7    Q    DID YOU MAKE ANY CLINICAL OBSERVATIONS ABOUT HIS

8    TESTIMONY WITH RESPECT TO THE THINGS THAT HE WAS ABLE TO

9    REMEMBER AS OPPOSED TO THE THINGS THAT HE WAS NOT ABLE TO

10   REMEMBER?

11   A    YES.

12   Q    WHAT IS YOUR CLINICAL OBSERVATION AS TO THAT?

13   A    I THINK THAT HE IS REMEMBERING THINGS THAT HE MOST

14   WANTS TO REMEMBER ABOUT HIS LIFE AND THAT HE IS SAYING

15   THAT HE HAS NO MEMORY OF A LENGTHY HISTORY OF SEXUAL

16   DEVIANT BEHAVIOR.  IT WOULD BE VERY UNUSUAL TO HAVE NO

17   MEMORY OF ALL BUT ONE SEXUAL -- SEXUALLY DEVIANT ACT FROM

18   1989 TO 1997.

19   Q    WHAT IS YOUR UNDERSTANDING OF WHETHER HE HAS HAD ANY

20   SEX OFFENDER TREATMENT?

21   A    IT'S MY UNDERSTANDING THAT HE HAS NOT HAD ANY.

22   Q    AND HOW DOES THAT AFFECT, IF AT ALL, HIS RISK TO

23   REOFFEND?

24   A    THAT INCREASES HIS RISK TO REOFFEND.  IF HE HAD

25   PARTICIPATED IN TREATMENT, HIS RISK WOULD BE REDUCED.

1    Q    WHY DO YOU SAY THAT?

2    A    WELL, BECAUSE WE HAVE HUGE STUDIES THAT INDICATE A

3    REDUCTION IN RISK WITH SEX OFFENDER TREATMENT.

4    Q    ARE YOU AWARE OF WHAT HIS SUPERVISED RELEASE PERIOD

5    IS?

6    A    I BELIEVE IT'S FOUR YEARS.

7    Q    AND IS THAT RELEVANT TO YOUR ANALYSIS OF HIS RISK

8    AT ALL?

9    A    YES, IT'S RELEVANT.

10   Q    HOW SO?

11   A    WELL, IF HE HAS CONSTRAINTS IN THE COMMUNITY THAT ARE

12   SUFFICIENT GIVEN WHAT I BELIEVE HIS RISK IS, AND IF THEY

13   ARE TARGETING DYNAMIC RISK FACTORS THAT CAN BE REDUCED,

14   THEN THAT CAN BE A PROTECTIVE FACTOR IN MY OPINION.

15   Q    DR. PHENIX, IS THERE ANYTHING THAT YOU SPOKE WITH MR.

16   ANTONE ABOUT DURING YOUR INTERVIEW THAT REINFORCED YOUR

17   DECISION AND YOUR BELIEF THAT HE MET THE CRITERIA FOR

18   4248?

19   A    YES.

20   Q    AND YOU TALKED ABOUT THIS AT YOUR DEPOSITION; DIDN'T

21   YOU?

22   A    YES.

23   Q    WHAT IS YOUR ANSWER TO THAT?

24   A    WELL, I HAVE MAJOR CONCERNS ABOUT THE FACT THAT I

25   DON'T THINK HE HAS THE SKILLS AND ABILITIES AND

1    TECHNIQUES THAT HE WOULD LEARN IN TREATMENT IN ORDER TO

2    PREVENT HIMSELF FROM REOFFENDING.

3        THIS WAS A -- THIS IS A PERSON WHO, TODAY IN

4    TESTIMONY, HAD ONE IDEA ABOUT WHAT CONTRIBUTED TO ALL OF

5    THAT OFFENDING AND CAUSED IT, A CAUSAL RELATIONSHIP

6    BETWEEN USING ALCOHOL AND DRUGS AND ALL OF THOSE

7    OFFENSES.

8        I PERSONALLY BELIEVE THAT THE DYNAMICS BEHIND THIS

9    DIAGNOSES ARE FAR MORE COMPLICATED IN WHAT CONTRIBUTES TO

10   HIS OFFENDING, AND I THINK IT REQUIRES INTENSIVE

11   INTERVENTION SO THAT THIS TIME HE CAN REALLY BE

12   SUCCESSFUL IN HANDLING HIS SUBSTANCE DEPENDENCE IN

13   KNOWING ALL OF THE SKILLS, TECHNIQUES AND ABILITIES THAT

14   WOULD COMPROMISE A COMPREHENSIVE RELAPSE PREVENTION PLAN

15   TO STOP HIM FROM ACTING OUT ON HIS DEVIANT SEXUAL

16   AROUSAL.

17       I JUST DON'T THINK HE HAS THAT AT THIS POINT IN

18   TIME.

19           MR. ROYSTER:  THANK YOU, DR. PHENIX.  WE DON'T

20   HAVE ANY OTHER QUESTIONS AT THIS TIME, JUDGE.

21           THE COURT:  VERY GOOD.  THANK YOU, SIR.

22   COUNSEL FOR THE RESPONDENT MAY CROSS EXAMINE.

23           MR. ROSS:  MAY I HAVE A MOMENT, YOUR HONOR?

24           THE COURT:  YOU MAY, SIR.

25

1    CROSS-EXAMINATION BY MR. ROSS:

2    Q    CAN A PERSON CHANGE?

3    A    YES.

4    Q    WE JUST TALKED ABOUT SOME RELEVANT FACTORS THAT COULD

5    REDUCE HIS RISK IF HE HAD CONDITIONS ON HIM WHEN HE IS

6    RELEASED FROM PRISON.  DO YOU REMEMBER JUST TESTIFYING TO

7    THAT?

8    A    YES, IT'S POSSIBLE.

9    Q    CONDITIONS THAT YOU WOULD LIKE TO SEE SOMEONE

10   MONITORING HIM?

11   A    IF HE IS RELEASED, I WOULD LIKE TO SEE SOMEONE

12   MONITORING HIM, YES.

13   Q    YOU WOULD LIKE TO SEE THAT HE PARTICIPATES IN SEX

14   OFFENDER TREATMENT?

15   A    YES.

16   Q    AND YOU WOULD LIKE TO SEE SOME KIND OF POLYGRAPH TO

17   MAKE SURE THAT HE IS COMPLYING WITH TREATMENT AND MAKE

18   SURE HE DOESN'T DO ANYTHING OUTSIDE OF THE URGES WHICH

19   YOU SAY HE MIGHT HAVE?

20   A    THAT IS USEFUL.

21   Q    PLETHYSMOGRAPH?

22   A    THAT WOULD BE USEFUL.

23   Q    WOULD YOU MIND TURNING TO EXHIBIT NUMBER 7,

24   GOVERNMENT'S EXHIBIT NUMBER 7, TURNING TO PAGE 526.

25   DIRECTING YOUR ATTENTION TO PARAGRAPH NUMBER 3.

1    A    GOVERNMENT'S EXHIBIT 7.

2    Q    YES.

3    A    WHAT PAGE?

4    Q    GOVERNMENT'S EXHIBIT --

5              THE COURT:  IN MY COLLECTION OF EXHIBITS, MR.

6    ROSS, THERE IS NO PAGE 526.

7              MR. ROSS:  526.  DID I SAY PAGE 546?

8              THE COURT:  IT'S NUMBERED FROM PAGES 4 THROUGH

9    7.  IT'S A JUDGMENT.

10             MR. ROSS:  WE HAVE IT IN OUR BOOK AS EXHIBIT

11   NUMBER 7.

12             ALL RIGHT.  GOVERNMENT EXHIBIT 7 WHICH IS THE

13   JUDGMENT, THEY HAVE IT AS BOP_ANTO_PAGE NUMBER 4, 5, 6

14   AND 7?

15             THE COURT:  CORRECT.

16             MR. ROSS:

17   Q    ALL RIGHT.  SO LET'S GO TO PARAGRAPH NUMBER 3.

18   A    I AM SORRY.  COULD YOU CITE THE PAGE AGAIN?

19   Q    SURE.  IT'S PAGE BOP_ANTO_6.

20   A    YES.

21   Q    PARAGRAPH 3.  AND IT STATES, YOU SHALL PARTICIPATE IN

22   SEX OFFENDER TREATMENT AS DIRECTED BY THE PROBATION

23   OFFICER AND SUBMIT TO RISK ASSESSMENTS INCLUDING

24   PHYSIOLOGICAL TESTING WHICH MAY INCLUDE, BUT IS NOT

25   LIMITED TO POLYGRAPH, A PLETHYSMOGRAPH AND/OR ABEL

1    ASSESSMENT; IS THAT RIGHT?

2    A    YES.

3    Q    IT ALSO SAYS IN PARAGRAPH 1, YOU SHALL PARTICIPATE AS

4    INSTRUCTED BY THE PROBATION OFFICER IN A PROGRAM OF

5    SUBSTANCE ABUSE TREATMENT WHICH MAY INCLUDE TESTING FOR

6    SUBSTANCE ABUSE.  IS THAT RIGHT?

7    A    YES.

8    Q    IT ALSO SAYS IN THIS PARAGRAPH NUMBER 5, YOU SHALL

9    NOT HAVE CONTACT WITH CHILDREN UNDER AGE OF 18 WITHOUT

10   WRITTEN -- WITHOUT PRIOR WRITTEN PERMISSION OF A

11   PROBATION OFFICER, AND SHALL REPORT ANY UNAUTHORIZED

12   CONTACT IMMEDIATELY WITH THE PROBATION OFFICER; IS THAT

13   CORRECT?

14   A    YES.

15   Q    YOU SHALL NOT, WHICH IS AT PARAGRAPH NUMBER 7, YOU

16   SHALL NOT POSSESS ANY FORM OF PORNOGRAPHY, SEXUALLY

17   STIMULATING AND/OR SEXUALLY ORIENTED MATERIAL AS DEEMED

18   INAPPROPRIATE BY THE PROBATION OFFICER AND/OR TREATMENT

19   TEAM.  AND YOU SHALL NOT ENTER ANY LOCATION WHERE

20   PORNOGRAPHY OR EROTICA CAN BE ACCESSED OR OBTAINED OR

21   VIEWED.

22        THAT IS IN THIS JUDGMENT; RIGHT?

23   A    YES.

24   Q    PARAGRAPH NUMBER 10, YOU SHALL REGISTER -- EXCUSE ME

25   -- YOU SHALL MAINTAIN AN APPROPRIATE APPEARANCE AT ALL

1    TIMES WHICH INCLUDES THE WEARING OF UNDERGARMENTS AND

2    APPROPRIATE OUTER CLOTHING IN THE HOME OR PLACES WHERE

3    OTHERS MIGHT VIEW YOU OR BE PRESENT.

4         THAT IS IN THE JUDGMENT AS WELL?

5    A    YES.

6    Q    PARAGRAPH NUMBER 11, YOU MAY NOT POSSESS ANY KIND OF

7    CAMERA OR VIDEO RECORDING DEVICE?

8    A    YES.

9    Q    IN THE JUDGMENT.  YOU SHALL NOT, IN PARAGRAPH 3, YOU

10   SHALL NOT POSSESS OR USE A COMPUTER WITH ACCESS TO ANY

11   ONLINE COMPUTER SERVICE AT ANY LOCATION, INCLUDING PLACE

12   OF EMPLOYMENT WITHOUT PRIOR WRITTEN APPROVAL OF A

13   PROBATION OFFICER.  THIS INCLUDES ANY INTERNET

14   PROVIDER -- INTERNET SERVICE PROVIDER, BULLETIN BOARD

15   SYSTEM OR ANY OTHER PUBLIC OR PRIVATE NETWORK OR E-MAIL

16   SYSTEM.

17        THAT IS IN HIS JUDGMENT?

18   A    YES.

19   Q    YOU SHALL NOT UTILIZE ANY SEX RELATED ADULT TELEPHONE

20   NUMBERS.  THE PROBATION OFFICER WILL VERIFY COMPLIANCE

21   THROUGH THE SUBMISSION OF PERSONAL, BUSINESS TELEPHONE

22   RECORDS?

23   A    YES.

24   Q    THAT IS IN 14.  NUMBER 15, YOU SHALL PARTICIPATE IN

25   MENTAL HEALTH PROGRAM AS DIRECTED BY THE PROBATION

1    OFFICER, WHICH MAY INCLUDE TAKING PRESCRIBED MEDICATION?

2        THAT WAS PARAGRAPH 15 OF THE JUDGMENT; IS THAT RIGHT?

3    A    YES.

4    Q    NOW, THERE HAS BEEN TESTIMONY AND THERE HAS BEEN

5    QUESTIONS TO YOU FROM THE GOVERNMENT IN REFERENCE TO WHAT

6    MR. ANTONE SAID THIS MORNING.  AND THE QUESTION THAT WAS

7    PRESENTED WAS YOU HEARD MR. ANTONE WHEN HE SAID THIS

8    MORNING THAT DRINKING CAUSED HIS SEXUAL ACTIVITY.

9        CAN YOU TELL ME WHAT EXACT QUESTION AND WHAT EXACT

10   ANSWER MR. ANTONE GAVE TO THAT QUESTION?

11   A    NO, I CAN'T TELL YOU EXACTLY.

12   Q    CAN YOU TELL THIS COURT WHO ACTUALLY ASKED THAT TYPE

13   OF QUESTION TO MR. ANTONE?

14   A    I AM SORRY.  WHAT?

15   Q    CAN YOU TELL US WHO ASKED MR. ANTONE THAT QUESTION?

16   A    I BELIEVE MR. ROYSTER ASKED HIM.

17   Q    AND YOU ARE STATING TO THIS COURT THAT MR. ANTONE'S

18   ANSWER WAS DRINKING CAUSED ALL -- CAUSED HIS SEXUAL

19   ACTIVITY?

20   A    YES, I THINK THAT IS IN THE RECORDS.  IT'S CERTAINLY

21   WELL ESTABLISHED IN THE RECORDS, AND I BELIEVE IT'S WHAT

22   HE SAID HERE.

23   Q    YOU BELIEVE, BUT YOU ARE NOT CERTAIN THAT IS WHAT HE

24   SAID?

25   A    I DON'T KNOW A QUOTE OF WHAT HE SAID, BUT MY

1   UNDERSTANDING WAS THAT HE BELIEVED THAT HIS SUBSTANCE

2   ABUSE AND DEPENDENCE HAD CAUSED HIM TO ACT IN SEXUALLY

3   DEVIANT WAYS.

4   Q   HE USED THOSE EXACT WORDS, DEVIANT WAYS, SEXUALLY

5   DEVIANT WAYS?

6   A   NO.  THOSE ARE MY WORDS.

7   Q   WHEN IS MR. ANTONE'S BIRTHDAY?

8   A   I WOULD HAVE TO REFRESH MY MEMORY.  THAT WOULD BE MAY

9   26, 1972.

10  Q   AND AS A PSYCHOLOGIST, IN REVIEWING DOCUMENTS OVER

11  THE MANY YEARS THAT YOU HAVE BEEN DOING IT, HAVE YOU

12  FOUND MISTAKES IN DOCUMENTS?

13  A   YES.

14  Q   HAVE YOU MADE MISTAKES WHILE WRITING YOUR REPORTS?

15  A   YES.

16  Q   AND YOU HAVE SEEN MISTAKES IN OTHER PEOPLE'S REPORTS

17  AS WELL?

18  A   YES.

19  Q   IS THERE A POSSIBILITY THAT THE DOCTORS IN 1999, MAY

20  HAVE MADE A MISTAKE IN SOME OF THEIR CONCLUSIONS AND ALSO

21  SOME OF THEIR WRITINGS OF INFORMATION IN WHICH YOU RELIED

22  UPON?

23  A   ANYTHING IS POSSIBLE.

24  Q   ALSO, IN YOUR REPORTS, YOU WROTE THAT MR. ANTONE'S

25  MOTHER HAD DIED FROM A HEART ATTACK.  DO YOU REMEMBER

1    THAT?

2    A    YES.

3    Q    AND YOU HAVE HEARD TODAY THAT THAT IS NOT THE CASE;

4    THAT HIS MOM DIED IN A CAR ACCIDENT.

5    A    THEN HE MUST HAVE PROVIDED MISINFORMATION IN THE

6    INTERVIEW, BECAUSE THAT IS WHAT HE TOLD ME.  I HAVE A

7    QUOTE.

8    Q    SO YOUR ANSWER IS THAT MR. ANTONE LIED TO YOU BY

9    TELLING YOU THAT HIS MOM DIED OF A HEART ATTACK?

10   A    HE EITHER LIED OR HE COULDN'T RECOLLECT WHAT HAD

11   HAPPENED, BECAUSE THAT IS CLEARLY IN MY NOTES.

12   Q    LET'S TALK ABOUT YOUR EXPERIENCE.  YOU HAVE WORKED IN

13   PRISONS BEFORE?

14   A    YES.

15   Q    AND IN YOUR TIME WORKING WITH PRISONS, INSIDE

16   PRISONS, YOU KNOW THAT INMATES CAN GET ACCESS TO ALCOHOL?

17   A    YES.

18   Q    YOU KNOW THAT PRISONERS OR INMATES CAN GET ACCESS TO

19   DRUGS?

20   A    YES.

21   Q    WHILE IN A CONFINING SITUATION AS BEING IN A PRISON,

22   THEY CAN ALSO SEXUALLY ASSAULT OTHER FOLKS?

23   A    THEY CAN.

24   Q    AND SOME OF THESE INSTITUTIONS THAT YOU HAVE BEEN IN

25   HAVE HIGHER LEVELS OF SECURITY.  IN OTHER WORDS, THEY

1    COULD BE LOW; RIGHT?

2    A    YES.

3    Q    THEY COULD BE MEDIUM?

4    A    YES.

5    Q    AND THEY COULD BE HIGH FOR THE CAPACITY OF SOMEONE

6    WHO GETS INTO TROUBLE AND BECAUSE OF THEIR CRIMES FOR

7    WHICH THEY ARE CHARGED WITH?

8    A    YES.

9    Q    AND IN ALL THOSE FACILITIES, PEOPLE, INMATES HAVE

10   BEEN ABLE TO GET ALCOHOL?

11   A    I THINK LESS OFTEN IN THE HIGH SECURITY, BUT IT

12   HAPPENS.

13   Q    BUT IT HAPPENS.  AS A MATTER OF FACT, YOU ARE AWARE

14   THAT AT SOME OF THESE INSTITUTIONS, THAT INMATES ACTUALLY

15   MAKE THEIR OWN ALCOHOL WHILE THEY ARE IN THE PRISON?

16   A    YES.

17   Q    AND ALSO IN SOME OF THESE INSTITUTIONS, INMATES HAVE

18   SEX IN THE PRISON?

19   A    YES.

20   Q    NOT JUST WITH THE SAME SEX, BUT SOMETIMES SEX WITH

21   SOME OF THE GUARDS?

22   A    IT HAPPENS.

23   Q    YOU HAVE ALSO, WITH YOUR EXPERIENCE BEING IN PRISON

24   WITH THOSE WHO HAVE PARTAKEN IN USING ALCOHOL OR DRUGS,

25   SOME FOLKS WILL DECIDE IF THEY CAN GET IT, THEY WILL USE

1    IT ANY TIME THEY GET IT?

2    A    YES.

3    Q    AND SOMETIMES PEOPLE DECIDE NOT TO USE IT BECAUSE IF

4    THEY GET CAUGHT, THEY WOULD GET INTO TROUBLE?

5    A    YES.

6    Q    IN A STRUCTURED SETTING?  IN A STRUCTURED SETTING?

7    A    I AM SORRY.  YES.

8    Q    AND SOMETIMES PEOPLE DECIDE NOT TO USE THOSE THINGS

9    BECAUSE THEY HAVE MADE A CHANGE IN THEIR LIFE?

10   A    YES.

11            MR. ROSS:  IF I MAY HAVE A MOMENT, YOUR HONOR.

12            THE COURT:  YOU MAY, SIR.

13            MR. ROSS:

14   Q    WILL MR. ANTONE OFFEND IF HE IS RELEASED?

15   A    I AM THINKING YOU MEAN SEX OFFEND IF HE IS RELEASED?

16   Q    SEX OFFEND.  WILL HE OFFEND IF HE IS RELEASED?

17   A    I CAN'T SAY WHETHER HE WILL OR WILL NOT.  I CAN

18   SIMPLY SAY THAT I BELIEVE THAT THERE IS A PROBABILITY

19   THAT HE WILL.

20   Q    NOW, PART OF THIS PROBABILITY THAT YOU TALK ABOUT ARE

21   IN THESE RISK ASSESSMENT TOOLS; IS THAT RIGHT?

22   A    THOSE HAVE PROBABILITIES OF REOFFENSE; YES.

23   Q    AND SPECIFICALLY, WE ARE TALKING ABOUT THE STATIC-99;

24   IS THAT RIGHT?

25   A    YES.

1   Q   NOW, YOU SAID THERE WAS A GROUP OF FOLKS FOR THE

2   STATIC-99, WHICH IS PAGE 2322 OF GOVERNMENT'S EXHIBIT

3   NUMBER 3, THAT MR. ANTONE FIT THAT GROUPS MAKE-UP?

4   A   HE -- I SAID HE WAS SIMILAR TO THAT GROUP.

5   Q   SIMILAR.  OKAY.  HOW MANY NATIVE AMERICANS WERE IN

6   THAT GROUP?

7   A   I DON'T KNOW THE NUMBER.

8   Q   HOW MANY FOLKS FROM ARIZONA WERE IN THAT GROUP?

9   A   ABOUT -- LET'S SEE -- 350 OR SO.

10  Q   HOW MANY FROM TO TUCSON?

11  A   I DON'T KNOW.  IT'S JUST AN ARIZONA SAMPLE.

12  Q   HOW MANY OF THE SAMPLE WERE 39 YEARS OLD PRESENTLY

13  RIGHT NOW?

14  A   I AM NOT SURE, BUT THAT WAS ABOUT THE AVERAGE AGE OF

15  THE SAMPLE.  THERE WOULD HAVE BEEN MANY, OBVIOUSLY.

16  Q   HOW MANY IN THIS STATIC-99R STOP DRINKING FOR 14

17  YEARS?

18  A   I DON'T KNOW.

19  Q   HOW MANY IN THIS STATIC-99R STOPPED USING DRUGS FOR

20  14 YEARS?

21  A   I DON'T KNOW.

22  Q   HOW MANY IN THE STATIC-99R ASSESSMENT TOOL PICKED UP

23  NEW SKILLS OF LEARNING HOW TO PLAY A GUITAR?

24  A   I DON'T KNOW.  NONE OF THIS WOULD BE CODED IN THE

25  DATA.

1    Q    OR FLUTE?

2    A    I DON'T KNOW HOW MANY STARTED PLAYING THE FLUTE.

3    Q    HOW MANY OF THE STATIC-99R BUILT A RELATIONSHIP WITH

4    THEIR CHILD?

5    A    I DON'T KNOW.  THESE PSYCHOSOCIAL FACTORS ARE NOT

6    CONTAINED IN THE DATA BASIS THAT WE HAVE.

7    Q    I UNDERSTAND THAT.  BUT HE IS SIMILAR TO THIS GROUP

8    OF PEOPLE.  THAT IS WHAT YOU ARE TELLING THIS COURT, IS

9    THAT HE IS SIMILAR TO THIS STATIC -- TO THESE FOLKS IN

10   THE STATIC-99R.

11   A    ACTUALLY, I DIDN'T SEE HE WAS SIMILAR IN EVERY

12   DEMOGRAPHIC WAY.  AS A MATTER OF FACT, I ACKNOWLEDGED

13   CULTURAL DIFFERENCES.  THE WAY THAT HE IS SIMILAR IS THAT

14   HE HAS A VERY SIMILAR SEX OFFENSE HISTORY TO THOSE

15   INDIVIDUALS WHO WERE IN ALL OF THESE SAMPLES.

16   Q    BUT THIS STATIC-99R DOES NOT TAKE INTO CONSIDERATION

17   ALL THE CHANGES IN WHICH HE HAS MADE; IS THAT RIGHT?

18   A    NO.  THE DYNAMIC RISK FACTORS WOULD TAKE INTO

19   CONSIDERATION CHANGES THAT A PERSON MAKES, NOT THE STATIC

20   FACTORS.  THOSE ARE JUST SIMPLY HISTORICAL FACTORS.

21   Q    SO, LET ME SEE.  FROM THE FIVE TO SIX YEAR RANGE FOR

22   THE STATIC-99R IN FIVE YEARS, THE PEOPLE THAT ARE

23   SUPPOSED TO BE SIMILAR TO MR. ANTONE, 25.2 PERCENT OF

24   THEM REOFFEND WITHIN FIVE YEARS; IS THAT RIGHT?

25   A    YES.

1    Q    IS MR. ANTONE ONE OF THE 25.2 PERCENT?

2    A    I CAN'T SAY THAT.

3    Q    NOW, FOR THE TEN YEAR PERCENTAGE OF RISK, 35.5

4    PERCENT OF THOSE FOLKS HAVE BEEN KNOWN TO REOFFEND; IS

5    THAT RIGHT?

6    A    THEY DID.

7    Q    IN THIS STUDY?

8    A    YES, THEY DID.  THEY DID GET REARRESTED FOR A SEX

9    OFFENSE.

10   Q    SO DO YOU KNOW IF MR. ANTONE IS ONE OF THE 35.5

11   PERCENT THAT WILL REOFFEND?

12   A    NO.

13   Q    DO YOU KNOW IF MR. ANTONE -- AND QUITE FRANKLY, MR.

14   ANTONE COULD ACTUALLY BE IN THE 64.5 PERCENT THAT WON'T

15   REOFFEND?

16   A    THAT IS POSSIBLE.

17   Q    AND IF YOU LOOK AT THE FIVE TO SIX YEAR RANGE, HE

18   COULD ACTUALLY BE IN THE 74.8 PERCENT THAT WOULD NOT

19   REOFFEND IN FIVE TO SIX YEARS.

20   A    WELL, I DON'T THINK THE FIVE TO SIX YEAR RANGE IS

21   APPROPRIATE FOR LOOKING -- CONSIDERING THOSE

22   PROBABILITIES.

23        FIRST OF ALL, I THINK THE TEN YEAR PROBABILITIES ARE

24   GOING TO BE MORE USEFUL.

25   Q    I APPRECIATE THAT.  BUT HE COULD ACTUALLY BE IN THE

1    74.8 PERCENT OF FOLKS WITHIN THE FIVE TO SIX YEAR RANGE

2    OF THE INSTRUMENT THAT YOU HELPED DEVISE WHERE HE WILL

3    NOT REOFFEND; IS THAT RIGHT?

4    A    THAT'S CORRECT.

5    Q    NOW, LET'S TALK ABOUT YOUR STATIC-99 -- EXCUSE ME

6    YOUR STATIC-2000R, AND I AM GOING TO GO OVER THE RATES

7    AGAIN BECAUSE I AM PRETTY CERTAIN YOU DON'T KNOW HOW MR.

8    ANTONE IS COMPARED WITH THOSE FOLKS IN THE 2000R; DO YOU?

9    A    I AM NOT SURE WHAT YOU MEAN BY COMPARED WITH.

10   Q    WELL, THE AGE.  YOU DON'T KNOW ALL THE AGES OF THE

11   PEOPLE IN THERE; DO YOU?

12   A    NO.  I JUST KNOW THE AVERAGE AGE.

13   Q    YOU DON'T KNOW HOW MANY NATIVE AMERICANS ARE IN

14   THERE?

15   A    NO.

16   Q    DO YOU KNOW HOW MANY PEOPLE FROM ARIZONA ARE IN

17   THERE?

18   A    IT WOULD BE THE SAME NUMBER AS IN STATIC-99R.

19   Q    SO IT'S THE SAME GROUP OF FOLKS?

20   A    WELL, IT'S A COLLECTION OF A MULTITUDE OF SAMPLES,

21   ONE OF THEM BEING FROM ARIZONA.

22   Q    SO IF I UNDERSTAND THIS RIGHT, 19.4 PERCENT OF THE

23   FOLKS IN THE 2002R, THEIR RISK FACTORS THAT ARE

24   SUPPOSEDLY SIMILAR TO MR. ANTONE, WILL REOFFEND; 19.4

25   PERCENT OF THOSE FOLKS WILL REOFFEND; IS THAT RIGHT?

1    A    THEY ACTUALLY DID REOFFEND IN FIVE YEARS.

2    Q    DO YOU KNOW IF MR. ANTONE WILL REOFFEND IN FIVE

3    YEARS?

4    A    NO.

5    Q    DO YOU KNOW IF MR. ANTONE WILL REOFFEND IN TEN YEARS?

6    A    NO.  I CAN'T SAY HE WILL OR WILL NOT REOFFEND.

7    Q    YOU CAN'T SAY THAT MR. ANTONE WILL REOFFEND EVER IN

8    LIFE; CAN YOU?

9    A    AS I SAID, I CAN'T SAY IF HE WILL OR WILL NOT

10   REOFFEND EVER IN HIS LIFE.

11   Q    NOW, THIS MNSOST, MNSOST-R, THIS WAS DEVISED BY YOUR

12   HUSBAND?

13   A    HE DEVELOPED IT.

14   Q    DR. EPPELTON?

15   A    EPPERSON.

16   Q    EPPERSON.  I AM SORRY.  DR. EPPERSON.  DO YOU GIVE

17   LECTURES?

18   A    YES.

19   Q    DOES HOUR HUSBAND GIVE LECTURES?

20   A    SOMETIMES.

21   Q    DO YOU GET PAID FOR DOING LECTURES?

22   A    YES.

23   Q    DOES YOUR HUSBAND GET PAID FOR DOING LECTURES?

24   A    YES.  HE HARDLY EVER DOES, BUT WHEN HE GIVES A

25   LECTURE, HE GETS PAID.

1    Q    YOU GET PAID TO TRAIN PEOPLE ON THE STATIC-99R?

2    A    I HAVE BEEN, YES.

3    Q    THIS YEAR YOU HAVE BEEN PAID TO TRAIN PEOPLE ON THE

4    STATIC-99R?

5    A    NO, I HAVEN'T GIVEN A TRAINING FOR QUITE AWHILE ON

6    THE STATIC-99R.

7    Q    BUT YOU HAVE GIVEN TRAININGS THIS YEAR?

8    A    I HAVE, YES.

9    Q    YOU DON'T WORK FOR FREE; FAIR ENOUGH?

10   A    YES.

11   Q    YOU GET PAID $250 AN HOUR FOR DOING THESE

12   EVALUATIONS?

13   A    YES.

14   Q    YOU HAVE YOUR OWN WEBSITE?

15   A    I DO.

16   Q    AND YOUR PICTURE IS ON YOUR WEBSITE?

17   A    RIGHT.

18   Q    NOW, I THINK YOU MADE SOMEWHERE BETWEEN $250,000 TO

19   $300,000 LAST YEAR DOING THESE EVALUATIONS?

20   A    I BELIEVE SO, YES.

21   Q    COULD BE MORE?

22   A    IT MIGHT BE.  I DON'T KNOW EXACTLY.

23   Q    YOU SAID YOU HAVE 20 CASES THAT YOU HAVE EVALUATED IN

24   THE FEDERAL SYSTEM?

25   A    20, YES.

1   Q    HOW MANY OF THESE HAVE YOU TESTIFIED IN THUS FAR?

2   A    I BELIEVE THIS IS MY SIXTH.

3   Q    AND SINCE YOU HAVE TESTIFIED IN ALL SIX OF THEM, YOU

4   TESTIFIED FOR THE GOVERNMENT?

5   A    YES, I DID.

6   Q    HOW MANY OF THOSE SIX PEOPLE THAT YOU TESTIFIED

7   AGAINST WILL ACTUALLY REOFFEND?

8   A    I DON'T KNOW.

9   Q    OUT OF THE PEOPLE THAT YOU SAY WERE SEXUALLY VIOLENT

10  PREDATORS -- BY THE WAY, DO YOU KNOW HOW MANY TIMES YOU

11  SAID FOLKS MET THE CRITERIA, WHETHER IT WAS FEDERAL,

12  WHETHER IT WAS STATE, THAT THEY MET THE CRITERIA FOR

13  SEXUALLY VIOLENT PREDATOR STANDPOINT?

14  A    I KNOW IN GENERAL HOW OFTEN IN CERTAIN JURISDICTIONS.

15  Q    SO HOW MANY TIMES HAVE YOU -- HOW MANY TIMES HAVE YOU

16  SAID SOMEONE HAS MET THE CRITERIA?

17  A    I AM NOT SURE WHICH JURISDICTION YOU ARE --

18  Q    I WANT ALL.  ALL OF THOSE.

19  A    IN THE FEDERAL JURISDICTIONS, I FOUND 17 TO MEET THE

20  CRITERIA AND THREE TO NOT.  IN THE STATE OF FLORIDA, I

21  FOUND EVERY CASE I HAVE EVALUATED, WHICH IS ABOUT 15 OR

22  16, NOT TO MEET THE CRITERIA.

23       IN THE STATE OF WASHINGTON, I HAVE FOUND -- I HAVE

24  PROBABLY CONDUCTED, I WOULD SAY, 35 EVALUATIONS WITH ONLY

25  MAYBE THREE OF THOSE NOT TO MEET THE CRITERIA OF THE LAW.

1        IN CALIFORNIA, WHERE I HAVE WORKED QUITE A BIT,

2   BEFORE JESSICA'S CASE LAW IN -- IN 2006, I FOUND 45

3   PERCENT OF MY EVALUATIONS TO MEET THE CRITERIA OF THE LAW

4   AND 55 PERCENT NOT TO.

5        AFTER JESSICA'S LAW, I FOUND 5 TO 10 PERCENT TO MEET

6   THE CRITERIA OF THE LAW, AND THE OTHER 90 TO 95 PERCENT

7   NOT THE MEET THE CRITERIA OF THE LAW.

8   Q   ALL RIGHT.  START WITH THE 17 IN THE FEDERAL SYSTEM.

9   HOW MANY OF THOSE 17 WILL REOFFEND?

10  A   I DON'T KNOW -- I CANNOT SAY WHO WILL OR WHO WILL NOT

11  REOFFEND.  I CAN ONLY SAY WHO I BELIEVE IS HIGH RISK TO

12  REOFFEND.

13  Q   IN WASHINGTON, OUT OF THE 35 -- EXCUSE ME, THE 32 YOU

14  FOUND TO MEET THE WASHINGTON STATE DEFINITION, HOW MANY

15  OF THOSE FOLKS WILL REOFFEND?

16  A   WELL, I KNOW ONE REOFFENDED ALREADY.  BUT I DON'T

17  HAVE ANY DATA ON THE REST OF THEM, WHETHER THEY WOULD GO

18  ON TO REOFFEND OR NOT.

19  Q   LET'S TALK ABOUT PARAPHILIA NOS.  IT'S 302.9.

20  A   YES.

21  Q   IN THE DSM-IV?

22  A   YES.

23  Q   NOW, PARAPHILIA NOS IS IN THE BOOK, AND UNDER 302.9,

24  IT SAYS THE FOLLOWING:  "THIS CATEGORY IS INCLUDED FOR

25  CODING PARAPHILIAS THAT DO NOT MEET THE CRITERIA FOR ANY

1   OF THE SPECIFIC CATEGORIES.  EXAMPLES INCLUDE, BUT ARE

2   NOT LIMITED TO, TELEPHONE SCATOLOGIA, OBSCENE PHONE

3   CALLS; NECROPHILIA, CORPSES; PARTIALISM, EXCLUSIVE FOCUS

4   ON PART OF THE BODY; ZOOPHILIA, ANIMALS; COPROPHILIA,

5   FECES; KLISMAPHILIA, ENEMAS; AND UROPHILIA, URINE."

6   THAT'S UNDER 302.9?

7   A   THAT'S CORRECT.

8   Q   IT DOESN'T SAY ANYTHING ABOUT NONCONSENTING FEMALES;

9   DOES IT?

10  A   WHAT IT SAYS IS THAT IF IT DOESN'T FIT UNDER ANY

11  SPECIFIC CATEGORY, YOU USE PARAPHILIA NOS.  THOSE WERE

12  SIMPLY EXAMPLES THAT YOU WOULD USE PARAPHILIA NOS JUST

13  LIKE THE PARAPHILIA NOS THAT I HAVE USED THAT IS NOT

14  UNDER ANY SPECIFIC CATEGORY.

15  Q   SO I WANT TO MAKE SURE I UNDERSTAND IT NOW THAT YOU

16  HAVE EXPLAINED WHAT IT SAYS.  WHAT IT DOESN'T SAY IS

17  ANYTHING ABOUT NONCONSENTING FEMALES; RIGHT?  IT DOESN'T

18  SAY THAT?

19  A   NOT IN PARAPHILIA NOS.

20  Q   COULD YOU POINT ME TO THE PAGE WHERE IT SAYS

21  NONCONSENTING FEMALES?

22  A   IT SAYS NONCONSENT IN THE DEFINITION OF A PARAPHILIA.

23  Q   NOW, YOU TOLD THIS COURT ABOUT THE DSM-V COMMITTEE

24  CONSIDERING PARAPHILIA NOS NONCONSENTING.  YOU DID

25  MENTION THAT TODAY?

1    A    AS A SPECIFIC CATEGORY, YES, I DID.

2    Q    AND YOU ARE WELL AWARE THAT THE DSM-V COMMITTEE

3    REJECTED PARAPHILIA NOS NONCONSENTING AS A DIFFERENT

4    CATEGORY; AREN'T YOU?

5    A    YES.

6    Q    NOT ONLY ARE YOU AWARE THAT THEY DENIED THAT, YOUR

7    STATE, WHERE YOU HAVE BEEN TRAINING, DEPARTMENT OF MENTAL

8    HYGIENE, HAS REJECTED PARAPHILIA NOS NONCONSENTING;

9    HAVEN'T THEY?

10   A    NO.

11   Q    SO, THE FACT THAT IT HAS BEEN REPORTED IN OTHER

12   LITERATURE THAT THE MISDIAGNOSIS OF A MENTAL DISORDER HAS

13   BEEN A FORENSIC DISASTER, YOU ARE NOT AWARE OF THAT?

14   A    I HAVE NO IDEA WHAT YOU ARE QUOTING.

15   Q    OKAY.

16   A    I WOULD HAVE TO REVIEW IT.

17   Q    YOU ARE NOT FAMILIAR WITH PSYCHIATRIC TIMES?

18   A    WELL, I DON'T TRADITIONALLY READ PSYCHIATRIC TIMES.

19   IT'S CERTAINLY NOT A RESEARCH JOURNAL, BUT I HAVE SEEN IT

20   FROM TIME TO TIME.

21   Q    YOU ARE NOT FAMILIAR WITH AN ARTICLE FROM OCTOBER 10,

22   2011?

23   A    NO, I DON'T MEMORIZE EVERY ARTICLE, SO YOU WOULD

24   ACTUALLY HAVE TO TELL ME THE NAME OF THE ARTICLE OR SHOW

25   ME THE DOCUMENT YOU ARE REFERRING TO.

1   Q    ANOTHER STEP TOWARDS ENDING THE PARAPHILIA NOS FAD.

2   THE CALIFORNIA DMH TAKES A STAND?

3   A    I HAVE SEEN THAT.

4   Q    OKAY.  YOU HAVE SEEN THAT?

5   A    I HAVE SEEN THAT.

6   Q    CALIFORNIA DEPARTMENT OF MENTAL HYGIENE; IS THAT

7   RIGHT?

8   A    ACTUALLY, THE NAME IS THE DEPARTMENT OF MENTAL

9   HEALTH, BUT THEY WERE NOT FAMILIAR APPARENTLY WITH THE

10  NAME OF THE DEPARTMENT.

11  Q    THEY WERE CONCERNED ABOUT THE QUALIFICATIONS OF

12  SOMEONE USING PARAPHILIA NOS NONCONSENT?

13  A    I BELIEVE THEY IS DR. FIRST.

14  Q    YES.  DR. FIRST.

15  A    SO THIS IS ONE PERSON WHO IS OPPOSED TO A DIAGNOSIS

16  OF PARAPHILIA NOT OTHERWISE SPECIFIED NONCONSENT.

17  Q    NOW, THE STANDARD THERE FOR PSYCHOLOGISTS IS

18  DEFINITELY THE DSM-IV AND POSSIBLY NOW THE DSM-V, THAT IS

19  POTENTIALLY COMING OUT; RIGHT?

20  A    YES.  WE USE THAT AS A GUIDELINE FOR DIAGNOSES.

21  Q    AND THEY WILL NOT ACCEPT THAT AS A NEW CATEGORY;

22  RIGHT?

23  A    THE AMERICAN PSYCHIATRIC ASSOCIATION WHO PUBLISHES

24  THAT HAS DECIDED NOT TO GIVE A SPECIFIC CATEGORY IN THE

25  PARAPHILIAS TO PARAPHILIA NOT OTHERWISE SPECIFIED.

1    Q    IS IT POSSIBLE THAT A GIRL WHO GOT CAUGHT HAVING SEX

2    BY HER PARENTS WOULD LIE ABOUT A YOUNG MAN SHE WAS HAVING

3    SEX WITH?

4    A    YES.

5    Q    HAVE YOU DONE STUDIES ON BLACK OUTS?

6    A    NO.

7    Q    SO YOU ARE NOT FAMILIAR THAT HUFFING CAN CAUSE BLACK

8    OUTS AND MEMORY LOSS?

9    A    I AM FAMILIAR WITH THAT.

10   Q    AND YOU ARE AWARE THEN THAT HUFFING CAN CAUSE MEMORY

11   LOSS?

12   A    MEMORY LOSS, BRAIN DAMAGE, SURE.

13   Q    NOW, I ASKED YOU EARLIER ON IF MISTAKES CAN BE MADE

14   BY YOU?

15   A    YES.

16   Q    AND LOOKING AT THE FIRST ONE, JANUARY 1, 1989, WITH

17   T.F., IT SAYS THAT HE WAS 18 YEARS OLD?

18   A    IT DOES.

19   Q    HE WAS ACTUALLY 16.  HE WOULDN'T HAVE TURNED 17 UNTIL

20   MAY OF 1989.

21   A    I BELIEVE HE WAS 17 RATHER THAN 18.

22   Q    WELL, LET'S SEE.  LET'S DO THE MATH JUST SO THAT I

23   UNDERSTAND IT.  SO MAY 26 OF 1988, MINUS '72 WOULD BE 16?

24   A    I AM NOT SEEING WHERE YOU ARE SEEING JANUARY 1.

25   Q    IT LOOKS LIKE JANUARY 1 AT THE BOTTOM; JANUARY 1,

1    1989.

2    A   ALL I AM SEEING IS 1989.  I AM NOT SURE WHY I AM NOT

3    SEEING --

4    Q   IT'S THE BLACK PORTION WITH THE WHITE.

5    A   OH, I AM SORRY.  THANK YOU FOR POINTING THAT TO MY

6    ATTENTION.  RIGHT.

7              THE COURT:  ARE YOU REFERRING TO A SPECIFIC

8    DOCUMENT?

9              MR. ROSS:  I AM REFERRING TO THE BULLETIN

10   BOARD.  I AM SORRY.  THIS BYRON ANTONE CHRONOLOGY, THE

11   CHART THAT THE GOVERNMENT PUT UP, I AM REFERRING TO THE

12   FIRST ONE WHICH STATES 1989, AND AT THE BOTTOM OF THAT

13   LINE IT SAYS JANUARY 1, 1989.

14             THE COURT:  OKAY.  THANK YOU.

15             MR. ROSS:  I AM SORRY.

16             THE COURT:  THAT IS ALL RIGHT.

17             THE WITNESS:

18   A   YOU ARE CORRECT.  THAT WOULD BE 16.

19   Q   ALL RIGHT.  NOW, THAT SECOND CHART THAT YOU TALKED

20   ABOUT THAT YOU TALKED ABOUT HIM MOLESTING R.A. WHEN SHE

21   WAS 12 YEARS OLD.  YOU ARE AWARE THAT HAPPENED JULY 1,

22   1996.  HE WAS ACQUITTED OF THAT?

23   A   YES, I AM AWARE OF IT.

24   Q   BUT YOU STILL TALK AS THOUGH IT ACTUALLY HAPPENED;

25   RIGHT?

1    A    I BELIEVE IT DID.

2    Q    YOU BELIEVE IT DID?

3    A    CORRECT.

4    Q    NOW, YOU ALSO SAID THAT TWO RAPES HAPPENED IN A VERY

5    SHORT PERIOD OF TIME.  THE ONE -- AND IT APPEARS IT COULD

6    BE EITHER THE FEBRUARY 17, 1997, OR THE JUNE 1, 1997, OR

7    THE NOVEMBER 8, 1997 WITH R.J.

8         AND IF I NOTICE THIS, THE FEBRUARY 17, 1997 HE

9    RUBBED ON T.F.'S BUTT.  SO THERE WAS NO RAPE THERE;

10   RIGHT?

11   A    NO.  I WAS REFERRING TO JUNE '97 AND NOVEMBER '97.

12   Q    SO YOU CALLED JUNE '97 A RAPE, AND IT SAYS ATTEMPTED

13   TO.  SO THAT ACTUALLY A RAPE DIDN'T OCCUR; DID IT?

14   A    NO, IT WAS AN ATTEMPTED RAPE.

15   Q    BUT THAT IS NOT WHAT YOU TESTIFIED TO WHEN ON DIRECT.

16   YOU TALKED ABOUT THESE RAPES HAPPENED AROUND THE SAME

17   AMOUNT OF TIME.  ISN'T THAT WHAT YOUR TESTIMONY WAS?

18   A    YES.  SO I STAND CORRECTED.  ONE WAS AN ATTEMPTED

19   RAPE, AND IF SHE HADN'T ESCAPED, THEN HE WOULD HAVE RAPED

20   HER.

21   Q    NOW THIS R.J. PERSON THAT MR. ANTONE SAYS HE DOESN'T

22   REMEMBER WHAT HAPPENED, YOU NOW KNOW THAT R.J. WAS MY

23   CLIENT'S -- MY CLIENT'S BROTHERS HALF-SISTER?

24   A    I DO.

25   Q    I KNOW THIS IS DIFFICULT.  AND WERE YOU AWARE THAT

1    MR. ANTONE HAS MAINTAINED THAT HE DOESN'T REMEMBER WHAT

2    HAPPENED ON THAT PARTICULAR DAY?  WERE YOU AWARE OF THAT?

3    A   WELL, I KNOW HE TOLD ME THAT IN MY INTERVIEW, THAT HE

4    DIDN'T REMEMBER, AND HE SAID HERE THAT HE COULDN'T RECALL

5    IT.

6    Q   ALL RIGHT.  NOW, YOU HAVE REVIEWED SEVERAL DOCUMENTS

7    AS IT RELATES TO MR. ANTONE, TANYA MCCLOUD.  YOU HAVE

8    READ SEVERAL DOCUMENTS?

9    A   I HAVE.

10   Q   YOU EVEN QUOTED A PORTION TODAY THAT MR. ANTONE

11   ADMITTED TO FORCING HIMSELF ON MS. MCCLOUD?

12   A   YES.

13   Q   YOU ALSO ARE AWARE THAT -- OR I PRESUME YOU ARE AWARE

14   THAT YOU HAVE HAD AN OPPORTUNITY TO READ THE AFFIDAVIT

15   FROM MS. MCCLOUD; HAVEN'T YOU?

16   A   I HAVE NOT.

17   Q   WELL, WHY DON'T I GIVE YOU RESPONDENT'S EXHIBIT

18   NUMBER 16.

19             MR. ROYSTER:  OBJECTION.  HEARSAY.  HEARSAY.

20             THE COURT:  WHAT USE ARE YOU MAKING OF THIS?

21             MR. ROSS:  YOUR HONOR, SHE MADE A DECISION TO

22   STATE BASED ON HEARSAY INFORMATION THAT MY CLIENT

23   SEXUALLY ASSAULTED HIS PARTNER OF SIX YEARS, AND BECAUSE

24   OF THAT ASSAULT, BECAUSE OF THAT, THAT WAS NOT A

25   MEANINGFUL RELATIONSHIP, AND BECAUSE OF THAT, SHE

1    ENHANCED THE RISK FACTORS BY GIVING HIM ADDITIONAL

2    POINTS.

3              WELL, SHE WAS NOT GIVEN ALL THE INFORMATION

4    AND SHE CAN TAKE INFORMATION, INCLUDING TESTIMONY FROM MY

5    CLIENT, WHICH SHE HEARD THIS MORNING, AND I PRESUME THAT

6    ONCE SHE READS RESPONDENT'S EXHIBIT NUMBER 16, SHE WILL

7    HAVE ADDITIONAL INFORMATION AS TO WHAT MS. MCCLOUD'S

8    POSITION WAS.

9              SHE HAS ALSO ALREADY STATED TO THE COURT THAT

10   PEOPLE MAKE MISTAKES, INCLUDING THE REPORT THAT SHE READ

11   FROM 1999 WHICH SAID THAT MR. ANTONE STATED THAT HE

12   FORCED HIMSELF ON TANYA MCCLOUD.

13             NOW, I WOULD ASK THAT THIS COURT ALLOW THE DR.

14   TO READ THIS AFFIDAVIT, SEE IF SHE GETS SOME NEW

15   INFORMATION WHICH MAY ALSO CHANGE HER MIND.  IT MAY NOT,

16   BUT NOW SHE WILL BE PRIVY TO THAT INFORMATION.

17             THE COURT:  IT SOUNDS TO ME, MR. ROYSTER, AS

18   IF HE IS OFFERING IT FOR THE PURPOSES OF ELICITING AN

19   OPINION FROM THE WITNESS, AND OF COURSE AN EXPERT ISN'T

20   LIMITED.  AN EXPERT CAN PROPERLY CONSIDER HEARSAY IN

21   FORMING OPINIONS.

22             I AM GOING TO ALLOW THE EXHIBIT TO THE EXTENT

23   THAT IT'S BEING OFFERED.  I WILL ALLOW MR. ROSS TO

24   PRESENT THE EXHIBIT TO THE WITNESS TO ENABLE HER TO

25   REVIEW IT FOR THE PURPOSE OF FORMING AN OPINION.

1          MR. ROYSTER:  MAY I APPROACH, YOUR HONOR?

2          THE COURT:  YOU MAY.

3          MR. ROSS:

4     Q   I AM HANDING YOU WHAT HAS BEEN MARKED AS RESPONDENT'S

5     EXHIBIT NUMBER 16.

6          MR. ROYSTER:  JUDGE, BEFORE WE GET THERE, IT

7     WOULD SEEM TO ME THAT SOME FOUNDATION WOULD NEED TO BE

8     LAID AS TO WHETHER THIS IS THE TYPE OF INFORMATION THAT

9     SHE WOULD ACTUALLY RELY ON IN FORMING HER OPINION BEFORE

10    SHE ACTUALLY REVIEWS IT TO SEE IF IT HAS ANY AFFECT ON

11    HER OPINION.

12         THE COURT:  WELL, I THINK IN ORDER TO RENDER

13    AN OPINION WHETHER IT'S THE TYPE OF INFORMATION SHE WOULD

14    NEED TO RELY ON, SHE IS GOING TO HAVE TO FIRST REVIEW IT,

15    AND IF THAT LINE OF INQUIRY ISN'T PURSUED BY MR. ROSS,

16    YOU CERTAINLY MAY BE ALLOWED TO PURSUE IT.

17         MR. ROSS:  YES, YOUR HONOR.  WHAT I AM

18    PURSUING IS ELICITING MORE INFORMATION SO SHE CAN MAKE A

19    DECISION AND SHE CAN RELY UPON HEARSAY INFORMATION.  IF

20    SHE CAN RELY UPON THIRD HAND POLICE REPORTS, AND IF SHE

21    CAN RELY UPON THIRD HAND DOCTORS REPORTS, CERTAINLY SHE

22    CAN RELY ON SOMETHING THAT IS SIGNED BY THE PERSON.

23         THE COURT:  I HAVE ALREADY RULED ON THE

24    OBJECTION.

25         MR. ROSS:  OKAY.  I AM SORRY.

```
 1              THE COURT:  THAT IS QUITE ALL RIGHT.  IS THERE

 2   A QUESTION PENDING, MR. ROSS?

 3              THE COURT:  SHE IS READING RIGHT NOW.

 4              MR. ROSS:  OKAY.

 5   Q   DOCTOR, I SEE THAT YOU HAVE LOOKED UP.  HAVE YOU READ

 6   THE ENTIRE DOCUMENT?

 7   A   YES.

 8   Q   YOU ARE AWARE THAT THERE IS A SIGNATURE ON IT FROM

 9   TANYA MCCLOUD?

10   A   YES.

11   Q   YOU ARE ALSO AWARE THAT IN PARAGRAPH NUMBER 5 SHE

12   SAYS THAT MR. ANTONE AND I HAD A NORMAL SEX LIFE.  I

13   WOULD WITHHOLD SEX DURING TIMES WHEN WE FOUGHT AND WOULD

14   TEMPORARILY MOVE IN WITH MY MOTHER.  DID YOU READ THAT?

15   A   YES.

16   Q   I WAS SURPRISED -- PARAGRAPH NUMBER 6 -- I WAS

17   SURPRISED WHEN MR. ANTONE WAS ARRESTED FEBRUARY 28, 1998,

18   BECAUSE I CANNOT IMAGINE HIM -- IMAGINE THAT HE WOULD

19   EVER BE SEXUALLY AGGRESSIVE TOWARDS WOMEN.

20       NEXT SENTENCE.  I WAS NEVER A VICTIM OF SEXUAL

21   ABUSE.

22       DO YOU SEE THAT?

23   A   YES.

24   Q   NOW, THAT YOU HAVE ADDITIONAL INFORMATION FROM A

25   SO-CALLED VICTIM IN WHICH IT'S ON THE GOVERNMENT'S CHART
```

1  WHICH IS THE FIRST CHART FROM 1993, YOU NOW HAVE

2  INFORMATION THAT THERE WAS NEVER ANY SEXUAL ABUSE FROM

3  MS. MCCLOUD; RIGHT?

4  A   THAT IS WHAT SHE ALLEGES, YES.

5  Q   AND THE FACT THAT SHE ALLEGES THAT, THAT COULD

6  ACTUALLY BE THE TRUTH?

7  A   IT'S POSSIBLE.

8  Q   AND IT'S ALSO POSSIBLE THAT MR. ANTONE NEVER FORCED

9  HIMSELF ON HIS GIRLFRIEND OF SIX YEARS; ISN'T THAT ALSO

10 POSSIBLE?

11 A   ANYTHING IS POSSIBLE.  IT WOULD BE SURPRISING IN THAT

12 HE MADE THAT ADMISSION VERY CLEARLY THAT IT HAPPENED

13 SEVERAL TIMES IN 1999 WHEN HE WAS QUERIED ABOUT IT BY DR.

14 GRAY.  SO IT WOULD SURPRISE ME IF THAT DID NOT HAPPEN.

15 Q   IN A REVIEW OF OTHER DOCUMENTATION SINCE 1999, HAVE

16 YOU SEEN ANYWHERE WHERE MR. ANTONE SAID THAT HE SEXUALLY

17 ASSAULTED TANYA MCCLOUD?

18 A   NO.

19            (WHEREUPON, THERE WAS A PAUSE.)

20            THE COURT:  MR. ROSS, IS THERE A QUESTION,

21 SIR?

22            MR. ROSS:  YES, YOUR HONOR.  THERE WILL BE,

23 YES SIR.  I AM SORRY.

24 Q   I AM JUMPING BACK TO THE ACTUARIALS.  YOU STATED THAT

25 THERE WAS MODERATE PREDICTED ACCURACY WHICH WAS ROUGHLY

1   BETWEEN 70 AND 75 PERCENT ACCURATE.  DID YOU SAY THAT?

2   A   YES.

3   Q   AS COMPARED TO 50 TO 55 PERCENT CLINICAL JUDGMENT; IS

4   THAT RIGHT?

5   A   YES.

6   Q   AND JUST SO THAT WE ARE AWARE THAT THE PREDICTED

7   ACCURACY WAS LOWER FOR NATIVE AMERICANS; IS THAT RIGHT?

8   A   WELL, IT WAS LOWER FOR -- WE DO NOT HAVE ANY STUDIES

9   ON NATIVE AMERICANS.  WE HAVE STUDIES ON ABORIGINAL

10  OFFENDERS IN CANADA, AND SO THAT JUST MEANS THAT IT'S

11  POSSIBLE IN CERTAIN SUBGROUPS OF OFFENDERS, INCLUDING

12  AMERICAN INDIANS, THAT THE PREDICTED ACCURACY COULD BE

13  LOWER THAN WHAT WE GENERALLY SEE.

14  Q   AND WE ARE TALKING ABOUT A LAW THAT COULD POTENTIALLY

15  KEEP MR. ANTONE IN CUSTODY FOR THE REST OF HIS LIFE, THIS

16  ADAM WALSH LAW?

17  A   IT'S POSSIBLE.

18  Q   IT'S POSSIBLE THAT NOT ONLY HAS HE WORKED WELL WHILE

19  HE HAS BEEN IN PRISON OF NOT USING ALCOHOL, THERE IS A

20  CHANCE THAT HE WILL CONTINUE NOT TO USE ALCOHOL WHEN HE

21  IS ON THE OUTSIDE?

22  A   THAT IS TRUE.

23  Q   THERE IS ALSO A POSSIBILITY THAT HE WILL COMPLY WITH

24  WHAT PROBATION SAYS IF HE NEEDS TO GO TO DRUG OR ALCOHOL

25  TREATMENT?  THAT IS POSSIBLE?

1    A    YES.

2    Q    IT'S ALSO POSSIBLE THAT MR. ANTONE, IF PROBATION

3    TELLS HIM THAT HE HAS TO GO TO SEXUAL TREATMENT ON THE

4    OUTSIDE, IT IS POSSIBLE THAT HE WILL COMPLY?

5    A    YES.

6    Q    BECAUSE WHEN WE LOOK AT WHAT HE HAS DONE WHILE HE HAS

7    BEEN IN THE PRISON SETTING OVER THE 14 YEARS, HE HAS

8    COMPLIED WITH MANY OF THE RULES?

9    A    YES, HE HAS.

10   Q    NOW, YOU SAID THAT MANY OF THE PEOPLE WHO COMMIT

11   THESE HAVE FANTASIES?

12   A    YES.

13   Q    AND PART OF YOUR DIAGNOSIS IS THAT THE FOLKS WHO

14   COMMIT THESE PARAPHILIAS NOS, NONCONSENTING HAVE

15   FANTASIES?

16   A    YES.

17   Q    YOU DON'T KNOW WHETHER -- YOU DON'T KNOW WHAT MR.

18   ANTONE'S FANTASIES ARE; DO YOU?

19   A    NO.  HE WOULDN'T TELL ME IN THE INTERVIEW.

20   Q    YOU DON'T KNOW WHETHER HE HAS A FANTASY OF RAPING

21   SOMEONE; DO YOU?

22   A    I DON'T KNOW CURRENTLY IF HE IS HAVING THAT FANTASY.

23   I BELIEVE THAT HE WAS CERTAINLY HAVING IT AT THE TIME

24   THAT HE TOOK A POLYGRAPH IN 1999 AND WAS FOUND DECEPTIVE

25   WHEN HE SAID HE DID NOT.

1   Q    HAVE YOU SEEN THE RESULTS OF THAT?

2   A    NO.  I HAVE ONLY SEEN --

3   Q    DO YOU KNOW WHAT THE NUMBER IS THAT HE SCORED ON THAT

4   POLYGRAPH?

5   A    NO.  I DON'T HAVE THE RAW DATA.

6   Q    DID YOU SPEAK WITH THE PERSON WHO GAVE THE POLYGRAPH?

7   A    NO.

8   Q    HAVE YOU TALKED WITH PEOPLE WHO WHEN THEY TALK ABOUT

9   POLYGRAPHS, NOT TO COMBINE QUESTIONS?

10  A    YES.

11  Q    NOW, YOU MENTIONED SOMETHING THAT YOU HAD CONCERNS

12  ABOUT, WHICH WAS AA, AND HIS DRUG TREATMENT.  YOU

13  MENTIONED TO THIS COURT THAT HE WENT TO SOME AA

14  TREATMENT?

15  A    HE DID, YES.

16  Q    AND THEN YOU MENTIONED THAT HE DID DRUG TREATMENT

17  THAT WAS 40 HOURS?

18  A    RIGHT.

19  Q    AND THEN YOU SAID FOR HALF THE TIME, HE DID NOT GO TO

20  DRUG OR ALCOHOL TREATMENT FOR THOSE OTHER DIFFERENT

21  PROGRAMS?

22  A    I SAW NO RECORDS OF DRUG OR ALCOHOL TREATMENT AFTER

23  2002.

24  Q    YOU ARE AWARE, BECAUSE OF YOUR EXPERIENCE, THAT

25  SEXUAL OFFENDERS ARE LOOKED AT DIFFERENTLY IN SOME PRISON

1    POPULATIONS?

2    A    YES.

3    Q    YOU DO UNDERSTAND BECAUSE YOU WORKED AT THE MEN'S

4    COLONY IN THE CENTRAL COAST OF CALIFORNIA THAT MANY OF

5    THESE FOLKS ARE SEGREGATED; IS THAT RIGHT?

6    A    NOT IN THE INSTITUTIONS I WORKED IN, THEY WERE NOT

7    SEGREGATED UNLESS THEY WENT INTO LOCK-UP.

8    Q    AND THERE IS THE POSSIBILITY THAT MR. ANTONE WAS IN

9    LOCK-UP DURING PART OF THAT TIME?

10   A    WELL, I KNOW HE WAS IN LOCK-UP PART OF THAT TIME.

11   Q    YOU KNOW HE WAS IN LOCK-UP FOR PART OF THE TIME AND

12   BECAUSE HE WAS IN LOCK-UP, HE DIDN'T HAVE ACCESS TO MANY

13   OF THESE PROGRAMS THAT YOU SAID HE FAILED TO APPEAR AT?

14   A    DURING THE TIME HE WOULD HAVE BEEN IN A LOCKED

15   SETTING, I DOUBT THAT HE WOULD HAVE HAD ACCESS.  I DON'T

16   KNOW IF THEY WOULD BE ABLE TO TAKE HIM OUT TO THOSE

17   PROGRAMS OR NOT.

18   Q    SO HE COULD ACTUALLY HAVE A LEGITIMATE REASON AS TO

19   WHY HE DID NOT ATTEND THOSE PROGRAMS BECAUSE HE WAS IN

20   LOCK-UP?

21   A    RIGHT.  BUT THAT WAS AN EIGHT-YEAR PERIOD, HOWEVER.

22   Q    NOW, WERE YOU AWARE THAT -- BY THE WAY, HAVE YOU BEEN

23   TO THE MARYLAND UNIT UP AT BUTNER?

24   A    NO.

25   Q    SO YOU HAVEN'T LOOKED AROUND AND SEEN WHERE THE MEN

1   ARE KEPT?

2   A    NO.

3   Q    SO YOU HAVEN'T BEEN THROUGH THE GATE THAT SEPARATES

4   PART OF BUTNER FROM THE REST OF BUTNER?

5   A    I HAVE CERTAINLY BEEN THROUGH THE GATEHOUSE, BUT I AM

6   NOT SURE WHICH GATE YOU ARE TALKING ABOUT.

7   Q    WERE YOU AWARE THAT THE MARYLAND HOUSE, THAT DOOR IS

8   LOCKED FOR MOST OF THE TIME, EXCEPT FOR WHEN THEY ALLOW

9   AND LOCK DOWN THE REST OF THE FACILITY FOR THE MEN OF THE

10  MARYLAND UNIT TO GO AND GET SOMETHING TO EAT?

11  A    I WAS AWARE OF THAT, YES.

12  Q    YOU ARE AWARE THAT THEY LOCK DOWN THE REST OF BUTNER

13  TO ALLOW THEM TO GO TO THE GYM?

14  A    YES.

15  Q    SO, ARE YOU AWARE THAT BUTNER'S PROGRAMS ARE NOT IN

16  THE MARYLAND UNIT?

17  A    NO, I AM NOT AWARE OF IT.

18  Q    SO, YOU TOLD THIS COURT -- AND I WANT TO MAKE SURE I

19  UNDERSTAND -- YOU TOLD THIS COURT THAT MR. ANTONE DID NOT

20  TAKE ADVANTAGE OF THE PROGRAMS THAT WERE AT BUTNER,

21  WHETHER IT'S DRUG TREATMENT OR ALCOHOL TREATMENT.

22       WERE YOU AWARE THAT THEY WERE ACTUALLY NOT AVAILABLE

23  FOR MR. ANTONE BECAUSE HE WAS A PRETRIAL DETAINEE IN THE

24  MARYLAND UNIT AT BUTNER?

25  A    IT'S MY UNDERSTANDING THAT HE IS GOING TO AA RIGHT

1   NOW AND IT IS AVAILABLE TO HIM AS A PRETRIAL DETAINEE.

2   Q   WERE YOU AWARE THAT THE AA PROGRAM JUST STARTED ABOUT

3   TWO MONTHS AGO?

4   A   NO.  I WAS CONCERNED ABOUT THAT EIGHT YEARS OF TIME.

5   THAT WAS, YOU KNOW, LONGER THAN JUST THE RECENT TIME THAT

6   HE HAS BEEN ON THE MARYLAND UNIT.

7   Q   BUT, DURING THE EIGHT YEARS, YOU HAVE NOTHING THAT

8   SAYS HE TURNED UP POSITIVE FOR ALCOHOL; RIGHT?

9   A   WELL, THAT IS TRUE.

10  Q   SO THIS EIGHT YEARS THAT YOU ARE TALKING ABOUT, IT'S

11  FOUR YEARS AT THE PENITENTIARY AT FLORENCE, AND NOW WE

12  ARE TALKING ABOUT FOUR PLUS YEARS THAT HE HAS BEEN AT

13  BUTNER IN THE MARYLAND UNIT; RIGHT?

14  A   RIGHT.

15  Q   AND THE BUTNER UNIT WHERE HE HAS NOT BEEN ALLOWED TO

16  GO TO DIFFERENT PROGRAMS?

17  A   RIGHT.  I UNDERSTAND THAT.

18  Q   YOU STATED IN 2008 HE HAD PORN.  WAS IT A MAGAZINE?

19  A   I WOULD HAVE TO REFRESH MY MEMORY.

20  Q   OKAY.

21          THE COURT:  MR. ROSS, ARE YOU ABLE TO DIRECT

22  HER TO A PARTICULAR PAGE?

23          MR. ROSS:  SHE SAID SHE WAS REVIEWING HER

24  NOTES, BUT IT'S GOVERNMENT EXHIBIT NUMBER 23.

25          THE WITNESS:  THANK YOU.

1    A    YES.  IT WAS MAGAZINES AND PICTURES CUT OUT OF

2    MAGAZINES.

3    Q    SWIMSUITS AND UNDERGARMENTS CUT OUT OF MAGAZINES;

4    RIGHT?

5    A    AND SMOOTH MAGAZINE AND LOWRIDER WHICH HAD SEMI-NUDE

6    IMAGES OF ADULT WOMEN.  THERE WAS ALSO ONE ADULT NOVEL

7    THAT CONTAINED WRITTEN DESCRIPTIONS OF ADULTS ENGAGING IN

8    SEXUAL ACTIVITY.

9    Q    DID YOU SEE A WRITE-UP FOR THAT?

10   A    NO.

11   Q    NO WRITE-UP?

12   A    NO.

13   Q    NO PRIVILEGES TAKEN AWAY FROM HIM?

14   A    NO, NOT THAT I SAW.

15   Q    YOU ALSO MENTIONED ABOUT A DEPRESSIVE DISORDER NOS

16   BASED ON HISTORY?

17   A    YES.

18   Q    AND WHAT EVIDENCE DO YOU SEE THAT HE SUFFERS OF THAT

19   TODAY?

20   A    I DON'T THINK HE IS SUFFERING FROM IT AT THIS TIME.

21   I WOULD SAY IT IS IN REMISSION, BUT HE HAD RECURRENT

22   BOUTS OF DEPRESSION PREVIOUSLY.  THAT IS WHY I GAVE THAT

23   DIAGNOSIS BY HISTORY.

24   Q    ALCOHOL DEPENDENCE IS IN REMISSION AS WELL?

25   A    WE CALL IT IN A CONTROLLED ENVIRONMENT RATHER THAN IN

1    REMISSION SO THAT IN THE ENVIRONMENT HE IS IN, HE IS NOT

2    USING SUBSTANCES.

3    Q    SO SOME FOLKS WOULD GET -- IF THEY TURN UP POSITIVE

4    FOR ALCOHOL WHILE THEY ARE IN PRISON, THAT WOULD SAY

5    ALCOHOL DEPENDENCE WHILE IN PRISON, WHILE IN CUSTODY?

6    A    JUST SAY ALCOHOL DEPENDENCE, YES.

7    Q    HIS ALCOHOL DEPENDENCE COULD ACTUALLY BE IN REMISSION

8    ON THE OUTSIDE AS WELL; IS THAT CORRECT?

9    A    THAT IS POSSIBLE.

10   Q    ARE YOU AWARE THAT THE MNSOST THAT YOUR HUSBAND

11   DEVISED IS LARGELY FROWNED UPON NOW IN YOUR FIELD?

12   A    NO, I AM NOT AWARE OF THAT.  IT'S WIDELY USED IN

13   THESE TYPES OF PROCEEDINGS.

14   Q    DO YOU KNOW OF ANY PRESENTATIONS WHERE PEOPLE HAVE

15   TALKED ABOUT THE MNSOST AND THAT IT SHOULD NOT BE USED OR

16   CRITICIZED IT?

17   A    I HAVE BEEN TO PRESENTATIONS FOR YEARS WHERE ALL THE

18   ACTUARIAL INSTRUMENTS HAVE BEEN CRITICIZED, SO INEVITABLY

19   THAT HAS HAPPENED.  I CAN'T IDENTIFY THAT PARTICULAR

20   PLACE.

21   Q    HAVE YOU EVER BEEN TO A PRESENTATION WHERE THEY HAVE

22   CRITICIZED MNSOST BECAUSE OF LACK OF VALIDATION?

23   A    NO.  ACTUALLY, THE MNSOST HAS BEEN VALIDATED SIX

24   TIMES, SO I CAN'T IMAGINE THAT WOULD BE A CRITICISM.

25   Q    ISN'T THE SIX TIMES THAT MNSOST HAS BEEN VALIDATED

1   FAR LESS THAN THE OTHERS?

2   A    YES.   IT'S HARD TO CODE ALL OF THE ITEMS ON THE

3   MNSOST-R BECAUSE THEY ARE VERY SPECIFIC TO MINNESOTA'S

4   CORRECTIONAL DEPARTMENT, SO THAT DATA ISN'T READILY

5   AVAILABLE IN MOST JURISDICTIONS IN ORDER TO VALIDATE IT,

6   SO INDEED THAT WOULD BE WHY IT HAS BEEN VALIDATED LESS

7   OFTEN.

8   Q    FOR THAT REASON, THAT IS WHY FOLKS DON'T USE IT?

9   A    NO, FOLKS DO USE ALL THE INSTRUMENTS THAT HAVE BEEN

10  VALIDATED.   THEY MAY HAVE THEIR OWN REASONS FOR CHOOSING

11  TO USE ONE INSTRUMENT OR ANOTHER, BUT I WILL SAY THAT

12  IT'S USED FAR LESS WIDELY THAN THE STATIC-99R WHICH IS

13  THE MOST WIDELY USED ACTUARIAL INSTRUMENT IN THE WORLD

14  THAT IS USED INTERNATIONALLY.

15  Q    AND SOME PEOPLE USE THESE ACTUARIALS TO GET THE SCORE

16  UP; WOULD YOU AGREE WITH THAT?

17  A    NO.

18  Q    SO NO PSYCHOLOGIST HAS EVER USED DIFFERENT ACTUARIALS

19  IN ORDER TO ENHANCE THE SCORE?

20              THE COURT:   MR. ROSS, I AM NOT SURE I

21  UNDERSTAND WHAT THAT MEANS, ENHANCE THE SCORE.

22              MR. ROYSTER:   OBJECTION.

23              MR. ROSS:   I WILL SEE IF I CAN ASK IT A LITTLE

24  BIT BETTER.

25              THE COURT:   THANK YOU, SIR.

1              MR. ROSS:  AND LET ME BREAK IT DOWN.

2   Q   ON THE STATIC-99R, YOU SCORED IT THE FIRST TIME AS A

3   6; IS THAT RIGHT?

4   A   RIGHT.

5   Q   AND THE STATIC-99R ON THE SECOND TIME, YOU SCORED IT

6   AS A 5?

7   A   RIGHT.

8   Q   AND IN THE STATIC-99 BECAUSE HE IS ABOUT TO TURN 40,

9   YOU SCORED -- IT COULD BE SCORED AS A 4?

10  A   AFTER HE TURNS 40.

11  Q   ON THE MNSOST, YOU SCORED 15 POINTS ON THAT; IS THAT

12  RIGHT?

13  A   YES, AND I REVISED IT TO 13 THROUGH MY PRIOR

14  TESTIMONY.

15  Q   AND IN THE MNSOST, YOU DID NOT GIVE HIM CREDIT FOR

16  HIM BEING IN A TREATMENT CENTER BECAUSE IT WASN'T IN

17  MINNESOTA?

18  A   RIGHT.

19  Q   BUT IF HE WAS IN MINNESOTA, HE WOULD HAVE HAD REDUCED

20  POINTS FOR TAKING A 40-HOUR TREATMENT?

21  A   RIGHT.  SO INSTEAD OF 11, HE WOULD HAVE HAD A 9 WHICH

22  IS STILL IN THE HIGH RANGE.

23  Q   ALSO, EACH DIFFERENT ACTUARIAL COULD HAVE A DIFFERENT

24  SCORE; IS THAT RIGHT?

25  A   YES, THEY OFTEN DO HAVE.

1   Q    AND AS A RESULT OF THE DIFFERENT SCORES, MAKE THE

2   RISK GO FROM MODERATE TO HIGH?

3   A    WELL, I THINK YOU SAW THAT IN THIS CASE.

4   Q    YOU HAVE THREE DIFFERENT OPINIONS, YOU HAVE THREE

5   DIFFERENT SCORES, AND THREE DIFFERENT RISKS ASSOCIATED

6   WITH MR. ANTONE?

7   A    RIGHT.

8   Q    YOU HAVE MODERATE ON ONE?

9   A    YES.

10  Q    MODERATE-HIGH ON ANOTHER?

11  A    YES.

12  Q    AND HIGH ON ANOTHER?

13  A    RIGHT.

14  Q    AND IN ALL THREE OF THOSE ACTUARIALS, YOU HAVE NO

15  IDEA IF MR. ANTONE WILL GET OUT OF PRISON AND REOFFEND.

16  YOU CAN'T TELL THIS COURT THAT HE WILL REOFFEND; CAN YOU?

17  A    NO, I CANNOT.

18            MR. ROSS:  THANK YOU.  NOTHING FURTHER.

19            THE COURT:  MR. ROYSTER.

20            MR. ROYSTER:  GO AHEAD.

21            THE COURT:  I WAS GOING TO ASK YOU HOW MUCH

22  TIME YOU ANTICIPATE YOU NEED.

23            MR. ROYSTER:  I HOPE LESS THAN TEN MINUTES.

24  MAYBE SIX.

25            THE COURT:  OKAY.  LET'S PROCEED THEN.

1    REDIRECT EXAMINATION BY MR. ROYSTER:

2    Q    DR. PHENIX, FIRST, THIS CHART, DID YOU PREPARE IT?

3    A    NO.

4    Q    WHO DID?

5    A    YOU DID.

6    Q    WHEN YOU -- ARE YOU EVEN FAMILIAR WITH THE TIME MAP

7    SOFTWARE?

8    A    NO, I DON'T KNOW HOW TO DO IT.

9    Q    DO YOU KNOW WHAT THOSE LITTLE SQUIGGLY SIGNS MEAN IN

10   FRONT OF THE DATES UP THERE ON THE RED BOXES?

11   A    NO.

12   Q    THAT BLACK BOX DOWN THERE, THAT JANUARY 1, 1989, DID

13   YOU UNDERSTAND THAT TO MEAN WHEN HE COMMITTED THAT

14   OFFENSE?

15            MR. ROSS:  OBJECTION.  LEADING.

16            MR. ROYSTER:  I AM JUST TRYING TO MOVE ALONG.

17   I WILL ASK AN OPEN ENDED QUESTION.  WOULD YOU LIKE FOR ME

18   TO DO THAT, JUDGE?

19            THE COURT:  YES, PLEASE.

20            MR. ROYSTER:  ALL RIGHT.

21   Q    JANUARY 1, 1989, WHAT DOES THAT MEAN?

22   A    THAT THE OFFENSE HAPPENED SOMETIME AROUND THEN.  THE

23   VICTIM WAS UNABLE TO PINPOINT WHEN IT ACTUALLY OCCURRED.

24   Q    AND IF YOU WILL TAKE A LOOK AT EXHIBIT -- WELL, LET

25   ME ASK YOU THIS.  YOU SAW THE PLEA AGREEMENT?

1    A    YES.

2    Q    DID YOU RELY ON THE PLEA AGREEMENT TO FORM YOUR

3    OPINION WITH RESPECT TO THE INFORMATION ABOUT HIS SEX

4    OFFENSES?

5    A    YES.

6    Q    AND DID YOU HEAR HIM TESTIFY THAT HE AGREED THOSE

7    WERE THE FACTS AS HE AGREED TO THEM IN THE PLEA

8    AGREEMENT?

9    A    YES.

10   Q    MR. ROSS WALKED YOU THROUGH EXHIBIT 7 AND HE READ TO

11   YOU SOME OF THE PROVISIONS IN THE JUDGMENT.  DO YOU

12   REMEMBER THAT?

13   A    I DO.

14   Q    AND YOU WERE ABLE TO AFFIRM THAT HE READ THEM

15   CORRECTLY; RIGHT?

16   A    YES, YES.

17   Q    IS THAT A RELAPSE PREVENTION PLAN?

18   A    NO.

19   Q    WHY NOT?

20   A    IT'S JUST CONTAINMENT.  IT'S THINGS THAT -- EXTERNAL

21   TO HIM THAT CAN TRY TO DISCOURAGE HIM FROM REOFFENDING.

22   I THINK IT'S IMPORTANT THAT HE HAVE A RELAPSE PREVENTION

23   PLAN THAT INVOLVES INTERNAL CONTROLS DEVELOPED FROM SEX

24   OFFENDER TREATMENT SO HE HAS IDENTIFIED ALL OF HIS HIGH

25   RISKS.  HE HAS IDENTIFIED CYCLES OF OFFENDING SO THAT HE

1    CAN INTERVENE IN THOSE CYCLES WHEN HE FINDS HIMSELF

2    LAPSING, WHICH I BELIEVE IS LIKELY TO HAPPEN ONCE HE IS

3    RELEASED.

4         SO HE NEEDS TO BE IN A PROGRAM TO DEVELOP THE

5    INTERNAL CONTROLS RATHER THAN JUST RELYING ON THOSE

6    EXTERNAL CONTROLS BECAUSE I THINK THAT JUST SETS HIM UP

7    FOR FAILURE.

8    Q   WHAT RESEARCH, IF ANY, ARE YOU AWARE OF THAT PLAYING

9    THE GUITAR AND FLUTE AND BEADING DECREASES ONE'S RISK TO

10   REOFFEND SEXUALLY?

11   A   THERE IS NO RESEARCH THAT INDICATES RECREATIONAL

12   ACTIVITIES OR ART DECREASES THE RISK OF SEXUAL REOFFENSE

13   IN THE FUTURE.

14   Q   YOU TESTIFIED ON DIRECT EXAMINATION ABOUT YOUR INCOME

15   LAST YEAR?

16   A   YES.

17   Q   AND ONE OF THE THINGS THAT MR. ROSS ASKED YOU WAS HOW

18   MUCH MONEY YOU MADE DOING THESE EVALUATIONS.  DO YOU

19   REMEMBER THAT?

20   A   YES.

21   Q   WHAT DID YOU MEAN BY THESE?  WHAT DID YOU UNDERSTAND

22   HIM TO MEAN BY THESE EVALUATIONS?

23   A   EVALUATIONS FOR SEXUALLY DANGEROUS PERSONS OR

24   SEXUALLY VIOLENT PERSONS.

25   Q   JUST IN FEDERAL COURT?

1    A    OH, NO.  ALL OF MY YEAR'S WORK.

2    Q    AND YOUR INCOME LAST YEAR, DID IT INCLUDE THINGS

3    OTHER THAT EVALUATIONS FOR CIVIL COMMITMENT?

4    A    I DID A FEW TRAININGS LAST YEAR.

5    Q    YOU READ THE AFFIDAVIT FROM MS. MCCLOUD.  HOW DOES

6    THAT AFFECT YOUR ULTIMATE OPINION WITH RESPECT TO WHETHER

7    HE IS SEXUALLY DANGEROUS?

8    A    IT DOESN'T MITIGATE HIS RISK IN MY OPINION.  SHE IS

9    IN A RELATIONSHIP WITH HIM AND HAS A VESTED INTEREST IN

10   HIS WELL BEING, AND SO I HAVE TO BE CAREFUL TO RELY ON

11   COLLATERAL SOURCES SUCH AS FAMILY MEMBERS WHO MAY BE

12   PROTECTIVE OF THE ONES THAT THEY LOVE AND CARE ABOUT.

13        I RELY ON HIS ADMISSIONS TO DR. GRAY IN 1999 AS TO

14   THE FACT OF THAT MATTER AND HOW IT AFFECTS HIS SEXUAL

15   DANGEROUSNESS.

16   Q    MR. ROSS ASKED YOU ABOUT HIS RELATIONSHIP WITH HIS

17   SON.  DO YOU KNOW WHEN THE LAST TIME HE SAW HIS SON WAS?

18   A    WHEN HIS SON WAS SIX MONTHS OLD.

19   Q    AND JUST TO CLARIFY ON NEAR THE END OF THE

20   CROSS-EXAMINATION YOU INDICATED THAT IF HE HAD DONE THE

21   TREATMENT, HIS SCORE WOULD GO FROM 11 TO 9.  DID YOU MEAN

22   FROM 13 TO 11?

23   A    YES.  I AM SORRY.  I MISQUOTED.  THAT WOULD BE FROM

24   THE 13 WHICH WAS MY REVISED SCORE TO AN 11, ALL STILL

25   BEING IN THE HIGH RISK RANGE.

1    Q    YOU WERE ASKED ON CROSS-EXAMINATION ABOUT THIS BEING

2    A LIFETIME COMMITMENT.  ARE YOU AWARE AS TO WHETHER THAT

3    IS A DEFINITE?

4    A    NO, THAT IS NOT DEFINITE.

5    Q    WHY NOT?

6    A    WELL, BECAUSE WHAT WE HOPE IS THAT INDIVIDUALS WHO

7    ARE COMMITTED WILL PARTICIPATE IN TREATMENT AND BE SAFELY

8    RELEASED TO THE COMMUNITY AS SOON AS POSSIBLE.

9    Q    ON THE DIAGNOSIS OF PARAPHILIA NOT OTHERWISE

10   SPECIFIED, WHY IS IT NOT GOING TO BE INCLUDED IN THE

11   DSM-V?

12   A    I THINK IT'S A POLITICAL DECISION BY THE AMERICAN

13   PSYCHIATRIC ASSOCIATION.  THEY ARE VERY STRONGLY OPPOSED

14   AND HAVE WRITTEN A TASK FORCE REPORT, SCATHING REPORT

15   ABOUT THE SEXUALLY VIOLENT PREDATOR LAW AND THEIR

16   OPPOSITION TO IT AS AN ORGANIZATION AND THEY BELIEVE THAT

17   THE DOCTORS THAT CONDUCT THESE EVALUATIONS USE

18   PSYCHIATRIC DIAGNOSES TO LOCK PEOPLE UP, IN SOME CASES

19   INDEFINITELY, AND THEY ARE VERY STRONGLY, PHILOSOPHICALLY

20   OPPOSED TO THAT, AND SO THEY ARE NOT GOING TO, IN MY

21   OPINION, INCLUDE ANY DIAGNOSES THAT THEY BELIEVE COULD BE

22   USED IN A WAY THAT THEY BELIEVE IS INAPPROPRIATE OR

23   UNETHICAL.

24   Q    IS THIS A LARGE NUMBER OF PEOPLE?

25   A    WELL, THE AMERICAN PSYCHIATRIC ASSOCIATION IS LARGE,

1    BUT THE OUTSPOKEN MEMBERS OF THE AMERICAN PSYCHIATRIC

2    ASSOCIATION ARE TWO PSYCHIATRISTS THAT WORKED ON THE DSM

3    IN TERMS OF EDITING IT.

4    Q    DOES THE LARGE MAJORITY OF THE MENTAL HEALTH

5    COMMUNITY BELIEVE THAT PARAPHILIA NOT OTHERWISE SPECIFIED

6    NONCONSENT IS A VALID DIAGNOSIS?

7    A    YES, THEY DO.

8              MR. ROYSTER:  NO OTHER QUESTIONS, JUDGE.

9              THE COURT:  THANK YOU, MR. ROYSTER.  MR. ROSS.

10             MR. ROSS:  DO YOU WANT ME TO WAIT UNTIL

11   TOMORROW?

12             THE COURT:  IF POSSIBLE, I WOULD LIKE TO

13   FINISH WITH THIS WITNESS SO SHE CAN BE ON HER WAY.

14             MR. ROSS:  ALL RIGHT.

15   RECROSS EXAMINATION BY MR. ROSS:

16   Q    YOU WERE JUST ASKED ABOUT PART OF THIS $250,000

17   THAT -- OR $250,000 TO $300,000 THAT YOU MADE LAST YEAR

18   FOR EVALUATIONS OF THE SDP OR SVP PERSONS WAS FOR

19   TRAINING; IS THAT RIGHT?

20   A    NO, IT WAS FOR CONDUCTING EVALUATIONS.  I WAS PAID

21   FOR NOT MORE THAN A FEW TRAININGS LAST YEAR.  ONE DAY

22   TRAININGS AT $1,000 A TRAINING, SO I MADE NO MORE THAN A

23   COUPLE THOUSAND DOLLARS FOR TRAININGS LAST YEAR TO THE

24   BEST OF MY RECOLLECTION.

25   Q    INCLUDING THE TRAINING THAT YOU DID AT THE U.S.

1    ATTORNEY'S OFFICE?

2    A    YES.  THAT WAS A ONE DAY TRAINING AND I CHARGED

3    EITHER $1,000 OR $1,500 FOR THAT.

4    Q    YOU WANT THIS EVALUATION OF PARAPHILIA NOS NONCONSENT

5    IN THE DSM-V.  YOU ARE IN THAT POLITICAL CAMP THAT WANTED

6    IT; RIGHT?

7    A    YES, I BELIEVE IT WOULD BE USEFUL IN TERMS OF

8    TREATING AND EVALUATING OFFENDERS.

9    Q    NOT ONLY DID YOU WANT IT, YOU ADVOCATED FOR IT?

10   A    NO, I HAVE NEVER ADVOCATED FOR ANY DIAGNOSIS IN THE

11   DSM.

12   Q    YOU DON'T KNOW WHETHER DR. GRAY IN 1999 MADE ANY

13   MISTAKES IN HIS REPORT; DO YOU?

14            MR. ROYSTER:  OBJECTION.  I BELIEVE THAT IS

15   OUTSIDE THE SCOPE OF MY REDIRECT.

16            MR. ROSS:  YOU TALKED ABOUT DR. GRAY IN THE

17   REPORT.

18            THE COURT:  I WILL ALLOW IT.

19            THE WITNESS:

20   A    I DON'T KNOW.  IT'S AN AMAZINGLY THOROUGH,

21   COMPREHENSIVE EVALUATION, BUT INDEED HE COULD HAVE MADE A

22   MISTAKE.

23   Q    AND THE REASON WHY YOU SAY IT'S THOROUGH IS BECAUSE

24   YOU HAD AN OPPORTUNITY TO SPEAK TO HIM?

25   A    NO.  THE REASON I SAID IT'S THOROUGH IS BECAUSE --

1    Q   THE REASON WHY --

2              MR. ROYSTER:  OBJECTION.

3              THE COURT:  LET HER ANSWER THE QUESTION, MR.

4    ROSS.

5              THE WITNESS:

6    Q   IT'S BECAUSE IT CONTAINED A VERY THOROUGH

7    PSYCHOSOCIAL HISTORY, IT CONTAINED A POLYGRAPH

8    EXAMINATION, IT CONTAINED PENILE PLETHYSMOGRAPH TESTING.

9    SO IT WAS VERY COMPREHENSIVE IN TERMS OF ALL THE

10   DIFFERENT METHODOLOGY HE USED TO ASSESS DEVIANCE.

11   Q   SO WHAT YOU SAY THOROUGH, IT'S NOT BECAUSE HE CHECKED

12   UP ON THE INFORMATION FROM MS. MCCLOUD TO SEE IF SHE WAS

13   FORCED -- IF SHE HAD TO PERFORM SEXUAL ACTS AND SHE WAS

14   FORCED TO PERFORM SEXUAL ACTS WITH MR. ANTONE?

15   A   I DON'T KNOW THAT.

16   Q   NOW, YOU SAID THAT THESE ISSUES IN THE JUDGMENT ARE

17   CONTAINMENT, THEY WILL ALLOW FOR CONTAINMENT?

18   A   YES.

19   Q   CONTAINMENT WORKED REALLY WELL WHILE HE WAS

20   INCARCERATED; DIDN'T IT?

21   A   YES, BUT IT'S DIFFERENT IN THE COMMUNITY THAN IT IS

22   INSTITUTIONALLY.

23   Q   HE MAY NOT LAPSE IF HE IS RELEASED?

24              MR. ROYSTER:  OBJECTION.  ASKED AND ANSWERED.

25              MR. ROSS:  YOU ASKED ABOUT LADDERS.

1                  THE COURT:  FOLKS, I WILL ALLOW THE QUESTION.

2    YOU MAY ANSWER.

3                  THE WITNESS:

4    A   HE MAY NOT LAPSE.  IT'S POSSIBLE.

5    Q   AND HE MAY BE ABLE TO DEAL WITH HIS INTERNAL CONTROLS

6    TO ALLOW HIM NEVER TO DRINK AGAIN?

7    A   THAT IS POSSIBLE.  I THINK --

8                  MR. ROSS:  THANK YOU.  NOTHING FURTHER.

9                  THE COURT:  MR. ROYSTER.

10                 MR. ROYSTER:  I WOULD JUST ASK THAT IF THE

11   WITNESS HAD SOMETHING ELSE TO SAY, THAT SHE BE ALLOWED AN

12   OPPORTUNITY TO FINISH HER ANSWER.

13                 THE WITNESS:  I THINK HE IS HIGH RISK TO

14   ENGAGE IN THE USE OF SUBSTANCES ONCE RELEASED TO THE

15   COMMUNITY DESPITE THE PROBATION CONDITIONS.

16                 THE COURT:  I HADN'T NOTICED, DR. PHENIX, THAT

17   YOU HADN'T COMPLETED YOUR ANSWER.  I AM SORRY.  I WOULD

18   HAVE GIVEN YOU THAT OPPORTUNITY.

19                 THE WITNESS:  I AM SORRY.

20                 THE COURT:  I HAD JUST A COUPLE OF QUESTIONS.

21   I GUESS MY MAIN ONE, DR. PHENIX, IS HOW DO YOU

22   DISTINGUISH MR. ANTONE FROM A PERSON WHO DOES NOT HAVE

23   PARAPHILIA WHO JUST HAPPENS TO BE A SERIAL RAPIST,

24   DOESN'T HAVE PARAPHILIA THAT IS JUST A MEAN, NASTY PERSON

25   THAT LIKES TO RAPE WOMEN?

1           THE WITNESS:  IN PART FOR TWO REASONS.  ONE IS

2   THE PATTERN AND DURATION OF THE OFFENDING.  QUITE

3   FRANKLY, MOST SERIAL RAPISTS OFTEN DO HAVE A PARAPHILIC

4   CONDITION, SO WHEN YOU SEE -- MOST INDIVIDUALS WHO ARE

5   ANTISOCIAL, JUST CRIMINALLY MINDED, CRIMINAL ATTITUDE,

6   WILL OCCASIONALLY COMMIT A SEX OFFENSE.  SO THEY MAY HAVE

7   A WHOLE STRING OR BURGLARIES AND THEN THEY COMMIT A SEX

8   OFFENSE BECAUSE THE WOMAN IS ALONE IN THE HOUSE AND THEY

9   CAN TAKE THAT IF THEY WANT THAT.

10          IT'S VERY UNUSUAL FOR THAT PERSON TO CONTINUE

11  TO PLACE THEMSELVES IN SITUATIONS WHERE THEY GET TO

12  CONTINUE TO RAPE WOMEN.

13          AND SO WHEN YOU SEE THE PATTERN AND DURATION

14  BECOME MORE FREQUENT, AND IT HAPPENED MULTIPLE TIMES,

15  IT'S LIKELY THAT ITS AS A RESULT OF THE PERSON HAVING

16  DEVELOPED SEXUAL AROUSAL TO DO THAT, AND SO THEY MAY SEEK

17  OUT SITUATIONS WHERE THEY CAN DO THAT RATHER THAN JUST

18  HAPPEN UPON IT.  SO THAT IS ONE REASON.

19          THE OTHER INSTANCE IS THE ADMISSIONS THAT I

20  TALKED ABOUT.  WHEN A PERSON ADMITS TO HAVING SEXUAL

21  FANTASIES AND URGES OF NONCONSENTING SEX, THEN THAT IS

22  PART OF THE DEFINITION OF A PARAPHILIC DISORDER.  IT'S

23  VERY ABNORMAL TO BE AROUSED TO SEX WHERE A WOMAN IS

24  SCREAMING AND YOU ARE BEATING HER AND YOU STAY ERECTED

25  AND YOU ARE AROUSED.  IT'S A HIGHLY UNUSUAL CONDITION.

1            AND SO WHEN YOU SEE THAT, YOU ARE HAVING TO

2     SEE PARAPHILIC AROUSAL, AND FURTHERMORE IN THIS CASE, A

3     POLYGRAPH ABOUT, AND THE REASON THEY ASKED THAT QUESTION,

4     IS TO TRY TO DETECT PARAPHILIC AROUSAL OR DO YOU

5     MASTURBATE TO RAPE FANTASIES, AND OF COURSE IN THIS CASE

6     MR. ANTONE WAS FOUND DECEPTIVE NOT TO THE WHOLE

7     POLYGRAPH, BUT JUST TO THAT QUESTION.

8            SO THAT INDICATES MORE OF A PARAPHILIC

9     CONDITION BECAUSE THEY HAVE FANTASIES AND URGES THAT LEAD

10    TO THE BEHAVIOR.

11           THE COURT:  THE FACT THAT IN ONE OF THESE

12    OFFENSES HE WAS STATING TO THE VICTIM SOMETHING TO THE

13    EFFECT OF YOU KNOW YOU WILL LIKE IT, IS THAT INCONSISTENT

14    WITH HIM BEING AROUSED BY THE NONCONSENT ASPECT?

15           THE WITNESS:  I THINK THAT OFFENDERS SAY A LOT

16    OF THINGS WHEN THEY ARE ENGAGING IN FORCED SEXUAL

17    ACTIVITY.  I THINK HE WAS USING IT AS AN EXCUSE TO SAY,

18    WELL, I AM GOING TO DO THIS.  SEX OFFENDERS HAVE

19    COGNITIVE DISTORTIONS IN THEIR MIND, AND HE WILL SAY IT

20    WILL BE OKAY IF I DO IT BECAUSE YOU ARE GOING TO LIKE IT,

21    BUT HE KNEW, HE KNEW THAT THIS WAS FORCED SEX.  THAT WAS

22    ONE OF THE MOST FORCEFUL SEXUAL ENCOUNTERS THAT HE HAD,

23    AND I THINK HE WAS VERY AWARE THAT IT WAS COMPLETELY

24    FORCED AND THAT IT WAS SEXUAL, AND I DON'T THINK THAT

25    STATEMENT INDICATES THAT HE THOUGHT IN SOME WAY IT WAS --

1    SHE WAS ATTRACTED TO HIM OR IT WAS A DATING SITUATION.

2              THE COURT:  IF, JUST HYPOTHETICALLY, IF SAY

3    THE COURT WERE NOT TO ACCEPT -- AND BY THIS QUESTION I

4    TRULY MEAN THIS SHOULD NOT BE MISINTERPRETED AS AN

5    INDICATION OF A RULING -- I AM QUITE A WAYS FROM THAT,

6    BUT IF THE COURT WERE TO NOT ACCEPT THE -- WELL, LET US

7    PUT IT A DIFFERENT WAY.

8              IF YOU HAD NOT DIAGNOSED MR. ANTONE WITH THIS

9    PARAPHILIA, WOULD THE OTHER TWO SERIOUS ILLNESSES THAT

10   YOU IDENTIFY, WOULD THOSE BE SUFFICIENT, IN YOUR MIND, TO

11   STILL QUALIFY HIM AS IS SEXUALLY DANGEROUS PERSON?

12             THE WITNESS:  YES.  THOSE CONDITIONS HAVE BEEN

13   USED IN ALL STATES I AM AWARE OF IN TERMS OF BEING

14   DIAGNOSED MENTAL ABNORMALITIES, MENTAL DISORDERS OR

15   ILLNESSES IN THESE TYPES OF CASES, SO YES.

16             THE COURT:  SO EVEN IF THE PARAPHILIA WERE TO

17   BE DISREGARDED, YOU WOULD STILL CONSIDER MR. ANTONE A

18   SEXUALLY DANGEROUS PERSON?

19             THE WITNESS:  I WOULD BECAUSE I BELIEVE THAT

20   HE WILL GO ON TO COMMIT CRIMINAL SEXUAL BEHAVIOR.

21             THE COURT:  AS A RESULT OF THOSE -- THE TWO

22   OTHER CONDITIONS, THE ALCOHOL DEPENDENCE AND THE

23   ANTISOCIAL PERSONALITY DISORDER?

24             THE WITNESS:  RIGHT.  GIVEN ALL THE FACTS

25   BEING THE SAME IN THIS CASE, YES, I WOULD.

1              THE COURT:  CORRECT.

2              THE WITNESS:  YES, I WOULD.

3              THE COURT:  MR. ROYSTER, ANY FOLLOW-UP TO MY

4     QUESTIONS?

5              MR. ROYSTER:  NO, JUDGE.

6              THE COURT:  MR. ROSS, SIR?

7     FURTHER EXAMINATION BY MR. ROSS:

8     Q   YOU WOULD AGREE WITH ME THAT YOU ARE SPECULATING THAT

9     MR. ANTONE WOULD GO OUT AND REOFFEND?  I WILL -- HOW

10    ABOUT A BETTER WORD.  YOU ARE GUESSING AS TO WHETHER MR.

11    ANTONE WILL GO OUT AND REOFFEND?

12    A   I DIDN'T SAY MR. ANTONE WOULD GO OUT AND REOFFEND, SO

13    NO, I AM NOT GUESSING THAT HE WILL OR THAT HE WON'T.  I

14    AM TELLING YOU THAT I BELIEVE THAT THERE IS A HIGH RISK

15    THAT HE WILL.

16    Q   AND A HIGH RISK THAT YOU DON'T KNOW WHETHER HE IS IN

17    THOSE ACTUARIAL NUMBERS TO RISK IN TEN YEARS; RIGHT?

18    A   WELL, I KNOW HE IS NOT IN THOSE ACTUARIAL NUMBERS

19    BECAUSE THAT WAS THE STUDY SAMPLE.

20             MR. ROSS:  NOTHING FURTHER.

21             THE COURT:  VERY GOOD.  MR. ROYSTER, ANYTHING?

22             MR. ROYSTER:  NO, JUDGE.

23             THE COURT:  THANK YOU.  VERY GOOD.  THANK YOU,

24    DR. PHENIX, FOR COMING HERE.

25             THE WITNESS:  THANK YOU, YOUR HONOR.

1             THE COURT:  ANY HOUSEKEEPING MATTERS BEFORE WE

2   ADJOURN FOR THE DAY?

3             MR. ROYSTER:  NOT FROM THE GOVERNMENT.

4             THE COURT:  MR. ROSS, SIR?

5             MR. ROSS:  NO, YOUR HONOR.

6             THE COURT:  VERY GOOD.  WE WILL BE IN RECESS

7   UNTIL 9:00 TOMORROW MORNING.

8             (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED.)

9

10

11                       CERTIFICATE

12

13        THIS IS TO CERTIFY THAT THE FOREGOING

14   TRANSCRIPT OF PROCEEDINGS TAKEN IN THE UNITED STATES

15   DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF

16   THE SHORTHAND NOTES OF THE PROCEEDINGS TAKEN BY ME IN

17   MACHINE SHORTHAND AND TRANSCRIBED BY COMPUTER UNDER MY

18   SUPERVISION.

19             DATED THIS 10TH DAY OF DECEMBER, 2011.

20

21

22                                  /S/ SHARON K. KROEGER
                                     COURT REPORTER
23

24

25