1              UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NORTH CAROLINA
2                   WESTERN DIVISION

3

4    UNITED STATES OF AMERICA,      )
                                    )
5                                   )
                    PETITIONER,     )
6                                   )
              VS                    ) CASE NO. 5:07-HC-2042-FL
7                                   )
                                    )
8    BYRON NEIL ANTONE,             )
                                    )
9                   RESPONDENT.     )

10

11

12                        BENCH TRIAL

13                     OCTOBER 21, 2011

14           HONORABLE JAMES E. GATES, PRESIDING

15

16   APPEARANCES:

17       MR. JOSHUA ROYSTER
         ASSISTANT UNITED STATES ATTORNEY
18       310 NEW BERN AVENUE
         RALEIGH, NC   27601
19       (FOR THE GOVERNMENT)

20       MR. MICHAEL BREDENBERG
         ASSISTANT UNITED STATES ATTORNEY
21       310 NEW BERN AVENUE
         RALEIGH, NC   27601
22       (FOR THE GOVERNMENT)

23       MR. JOSEPH ROSS
         ASSISTANT FEDERAL PUBLIC DEFENDER
24       150 FAYETTEVILLE STREET
         SUITE 450
25       RALEIGH, NC   27601
         (FOR THE DEFENDANT)

1    APPEARANCES:

2          MR. ROBERT WATERS
             ASSISTANT FEDERAL PUBLIC DEFENDER
3          150 FAYETTEVILLE STREET
             SUITE 450
4          RALEIGH, NC   27601
             (FOR THE DEFENDANT)
5
             MS. SONYA ALLEN
6          ASSISTANT FEDERAL PUBLIC DEFENDER
             150 FAYETTEVILLE STREET
7          SUITE 450
             RALEIGH, NC   27601
8          (FOR THE DEFENDANT)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    SHARON K. KROEGER, COURT REPORTER
        MACHINE SHORTHAND REPORTER, COMPUTER AIDED TRANSCRIPTION

1                THE COURT:  GOOD MORNING, FOLKS.

2                MR. ROYSTER:  GOOD MORNING, YOUR HONOR.

3                MR. ROSS:  GOOD MORNING, YOUR HONOR.

4                THE COURT:  ANY HOUSEKEEPING MATTERS WE NEED

5        TO DISCUSS THIS MORNING, MR. ROYSTER?

6                MR. ROYSTER:  NOT FROM THE GOVERNMENT.

7                THE COURT:  MR. ROSS?

8                MR. ROSS:  NO, YOUR HONOR.

9                THE COURT:  VERY GOOD.  I BELIEVE THEN WE ARE

10       STILL WITH THE GOVERNMENT'S CASE, AND MR. ROYSTER, I

11       WOULD BE HAPPY TO HEAR ANY FURTHER EVIDENCE THE

12       GOVERNMENT CARES TO OFFER.

13               MR. BREDENBERG:  YOUR HONOR, MIKE BREDENBERG.

14               THE COURT:  YES, SIR.

15               MR. BREDENBERG:  THE GOVERNMENT CALLS DR.

16       MANUEL GUTIERREZ.

17               DR. MANUEL GUTIERREZ, CALLED AS A WITNESS,
                 HAVING BEEN FIRST DULY SWORN, ON HIS OATH,
18               TESTIFIED AS FOLLOWS:

19               THE CLERK:  PLEASE STATE YOUR NAME FOR THE

20       RECORD.

21               THE WITNESS:  MY NAME IS MANUEL GUTIERREZ.

22       DIRECT EXAMINATION BY MR. BREDENBERG:

23       Q    GOOD MORNING, DR. GUTIERREZ.

24       A    GOOD MORNING.

25       Q    WILL YOU PLEASE STATE YOUR OCCUPATION AND EMPLOYER

1    AND LOCATION OF EMPLOYMENT FOR THE RECORD.

2    A   I AM A FORENSIC PSYCHOLOGIST AND I AM EMPLOYED BY THE

3    FEDERAL BUREAU OF PRISONS AT THE FEDERAL CORRECTIONAL

4    INSTITUTION IN BUTNER, NORTH CAROLINA.

5    Q   CAN YOU I TURN YOUR ATTENTION TO GOVERNMENT'S EXHIBIT

6    4 IN THE NOTEBOOK.  CAN YOU IDENTIFY THAT, PLEASE?

7    A   YES.  THAT IS MY CURRICULUM VITAE.

8    Q   IS THAT CURRENT?

9    A   I BELIEVE I HAVE A MORE UPDATED VERSION OF THE VITAE

10   SINCE THIS ONE, BUT THIS IS PERHAPS JUST TWO OR THREE

11   MONTHS OLD.

12   Q   WHAT WOULD BE THE DIFFERENCES?

13   A   THE DIFFERENCES WOULD BE A COUPLE OF ADDITIONAL

14   TRAININGS THAT I HAVE ATTENDED SINCE THE SPRING OF 2011.

15   Q   ACCORDING TO YOUR C.V., YOU HAVE A DOCTORATE DEGREE

16   IN PSYCHOLOGY?

17   A   THAT'S CORRECT.

18   Q   WHAT OTHER DEGREES DO YOU HAVE?

19   A   I ALSO HAVE A BACHELOR OF SCIENCE FROM JAMES MADISON

20   UNIVERSITY, AND A MASTER OF ARTS IN EXPERIMENTAL

21   PSYCHOLOGY FROM GEORGE MASON UNIVERSITY, AND THE

22   DOCTORATE FROM NOVA SOUTHEASTERN UNIVERSITY.

23   Q   WHAT IS EXPERIMENTAL PSYCHOLOGY?

24   A   EXPERIMENTAL PSYCHOLOGY IS A BRANCH OF PSYCHOLOGY

25   THAT IS MORE FOCUSED ON HUMAN BEHAVIOR, PHYSIOLOGICAL

1    REACTIONS AND HOW THEY EFFECT PSYCHOLOGICAL AND

2    PHYSIOLOGICAL RESPONSES.

3    Q    DOES THAT APPLY TO YOUR CURRENT POSITION?

4    A    NOT DIRECTLY.  IT WAS MORE LOOKING AT RESPONSES IN

5    ANIMALS, DOING SOME TESTING WITH ANIMALS, AND THEN ALSO

6    SOME TESTING WITH HUMANS, BUT IT WASN'T CLINICAL IN

7    NATURE.

8    Q    YOUR DOCTORATE DEGREE, IS THERE A SPECIALTY IN

9    CONNECTION WITH THAT?

10   A    THE SPECIALTY WOULD BE IN CLINICAL PSYCHOLOGY.

11   Q    AND DOES YOUR CURRENT -- WELL, DO YOU CURRENTLY HOLD

12   A LICENSE TO PRACTICE PSYCHOLOGY?

13   A    YES, I DO.

14   Q    WHAT STATE OR STATES?

15   A    CURRENTLY LICENSED IN NORTH CAROLINA.

16   Q    LET'S TALK A LITTLE ABOUT YOUR CURRENT JOB.  HOW LONG

17   HAVE YOU HAD THAT POSITION?

18   A    I HAVE BEEN AT BUTNER FOR JUST OVER FIVE YEARS.

19   Q    AND WHAT DO YOU DO SPECIFICALLY AT BUTNER?

20   A    SPECIFICALLY, I CONDUCT FORENSIC EVALUATIONS IN THE

21   AREA OF GENERAL FORENSICS, MEANING COMPETENCE TO STAND

22   TRIAL, CRIMINAL RESPONSIBILITY, THINGS OF THAT NATURE,

23   AND I ALSO CONDUCT EVALUATIONS FOR RISK ASSESSMENT

24   PURPOSES FOR INDIVIDUALS WHO ARE BEING CONSIDERED UNDER

25   THE ADAM WALSH LAW.

1    Q    AND THAT IS A FEDERAL STATUTE?

2    A    THAT'S CORRECT.

3    Q    HOW LONG HAVE YOU BEEN DOING THE EVALUATIONS UNDER

4    THE ADAM WALSH LAW?

5    A    I HAVE BEEN DOING THOSE FOR APPROXIMATELY FOUR AND

6    HALF YEARS.

7    Q    WHAT PRIOR POSITIONS HAVE YOU HELD IN THE FIELD OF

8    PSYCHOLOGY?

9    A    PRIOR TO MY EMPLOYMENT AT BUTNER, I WAS A FORENSIC

10   PSYCHOLOGIST AND A STAFF PSYCHOLOGIST AT THE FEDERAL

11   PRISON IN MIAMI, FLORIDA, AND I WAS THERE FOR

12   APPROXIMATELY FIVE YEARS.

13   Q    AND AS A FORENSIC PSYCHOLOGIST THERE, WHAT DID YOU

14   DO?

15   A    SIMILAR TO WHAT I DO NOW IN TERMS OF THOSE GENERAL

16   FORENSIC EVALUATIONS, COMPETENCY TO STAND TRIAL, CRIMINAL

17   RESPONSIBILITY, SOME GENERAL RISK ASSESSMENTS FOR INMATES

18   THAT HAD BEEN CHARGED WITH CRIMES BUT THAT WAS BEFORE THE

19   ADAM WALSH LAW, SO NONE OF THOSE PERTAINED TO CIVIL

20   COMMITMENT, PER SE.

21   Q    AND HAVE YOU HAD ANY OTHER POSITIONS WHERE YOU HAVE

22   CONDUCTED FORENSIC EVALUATIONS?

23   A    AS PART OF MY INTERNSHIP, MY -- THAT WAS PART OF MY

24   DOCTORAL PROGRAM, I COMPLETED AN INTERNSHIP AT THE

25   FEDERAL PRISON IN PETERSBURG, VIRGINIA, AND THE FOCUS OF

1    THAT WAS CONDUCTING FORENSIC EVALUATIONS.

2    Q    DID YOU ALSO WORK IN THE STATE HOSPITAL IN VIRGINIA?

3    A    I DID.

4    Q    DID YOU CONDUCT FORENSIC EVALUATIONS THERE?

5    A    I CONDUCTED EVALUATIONS OF INDIVIDUALS WHO WERE IN A

6    SECURE FORENSIC FACILITY, BUT THEY WEREN'T COMPETENCY OR

7    RESPONSIBILITY EVALUATIONS.  THEY WERE MORE GENERAL

8    EVALUATIONS FOR TREATMENT PLANNING PURPOSES.

9    Q    IN YOUR JOBS WITH THE BUREAU OF PRISONS, ABOUT HOW

10   MANY FORENSIC EVALUATIONS HAVE YOU PREPARED?

11   A    I WOULD SAY OVER 400.

12   Q    AND THE PURPOSES OF THOSE EVALS WERE?

13   A    CRIMINAL RESPONSIBILITY, COMPETENCE TO STAND TRIAL,

14   AND ALSO ADAM WALSH EVALUATIONS, 4248 EVALUATIONS.

15   A    AND YOU STATED THAT YOUR CURRENT DUTIES DO INVOLVE

16   EVALUATIONS OF SEX OFFENDERS UNDER THE ADAM WALSH ACT?

17   A    THAT IS CORRECT.

18   Q    APPROXIMATELY HOW MANY EVALUATIONS HAVE YOU CONDUCTED

19   UNDER THAT ACT?

20   A    I HAVE CONDUCTED 47 EVALUATIONS UNDER THAT ACT.

21   Q    WHAT PERIOD OF TIME HAS THAT BEEN?

22   A    THAT HAS BEEN SINCE EARLY 2007 UNTIL THE PRESENT.

23   Q    DO YOU HAPPEN TO KNOW HOW MANY OF THOSE 47 EVALS YOU

24   DETERMINED THAT THE INDIVIDUAL MET CRITERIA AND HOW MANY

25   YOU DETERMINED THAT DIDN'T MEET CRITERIA?

1    A    YES.  OF THOSE 47, IT WAS MY OPINION THAT 24 OF THE

2    INDIVIDUALS MET CRITERIA FOR CIVIL COMMITMENT UNDER THE

3    ADAM WALSH LAW AND 23 DID NOT.

4    Q    DO YOU USE ACTUARIAL INSTRUMENTS AS PART OF YOUR 4248

5    EVALUATIONS?

6    A    YES, I DO.

7    Q    WHICH EVALUATIONS OR WHICH MEASURES DO YOU USE?

8    A    I HAVE USED THE STATIC-99.  MORE RECENTLY I HAVE BEEN

9    USING THE STATIC-99R, AND IN THE PAST, I ALSO USED THE

10   RRASOR, THE RAPID RISK ASSESSMENT FOR SEX OFFENDER

11   RECIDIVISM.

12   Q    AND YOU HAVE RECEIVED TRAINING UNDER THOSE MEASURES?

13   A    YES, I HAVE.

14   Q    HAVE YOU EVER TESTIFIED IN COURT AS AN EXPERT IN

15   FORENSIC PSYCHOLOGY?

16   A    YES, I HAVE.

17   Q    HOW MANY TIMES?

18   A    APPROXIMATELY 40 TIMES.

19   Q    HAS THAT BEEN FEDERAL COURT?

20   A    YES.  ALL OF THOSE HAVE BEEN IN FEDERAL COURT.

21   Q    AND HAVE YOU EVER TESTIFIED IN A 4248 PROCEEDING?

22   A    NO, I HAVE NOT.

23   Q    THIS WILL BE YOUR FIRST?

24   A    YES.

25            MR. BREDENBERG:  YOUR HONOR, AT THIS TIME WE

1    WOULD PROFFER DR. GUTIERREZ AS AN EXPERT IN THE FIELD OF

2    FORENSIC PSYCHOLOGY.

3             THE COURT:  THANK YOU, SIR.  MR. ROSS.

4             MR. ROSS:  NO OBJECTION.

5             THE COURT:  THE COURT RECOGNIZES DR. GUTIERREZ

6    AS AN EXPERT IN THE FIELD OF FORENSIC PSYCHOLOGY.

7             MR. BREDENBERG:  THANK YOU, YOUR HONOR.

8    Q   DR. GUTIERREZ, ARE YOU FAMILIAR WITH THE RESPONDENT,

9    MR. ANTONE?

10   A   YES, I AM.

11   Q   HOW DO YOU KNOW HIM?

12   A   I HAVE HAD OCCASION TO MEET HIM SINCE HIS DETAINMENT

13   AT THE FEDERAL CORRECTIONAL INSTITUTION AT BUTNER.  THERE

14   HAVE BEEN THREE OCCASIONS IN WHICH I HAVE WRITTEN REPORTS

15   TO ADDRESS HIS SEXUAL DANGEROUSNESS.

16   Q   AND WHEN WAS THE FIRST OCCASION?

17   A   THE FIRST OCCASION WAS IN FEBRUARY OF 2007.

18   Q   AND WHAT WAS THE PURPOSE OF THAT?

19   A   THE PURPOSE OF THAT WAS TO CONDUCT A PRECERTIFICATION

20   REPORT.  THE PRECERTIFICATION REPORT WAS WRITTEN AND

21   FORWARDED TO OUR CENTRAL OFFICE IN WASHINGTON, D.C., AND

22   IT WAS THE CERTIFICATION REVIEW PANEL THAT ULTIMATELY

23   MADE THE DECISION TO CERTIFY MR. ANTONE.

24   Q   AND IN THAT PRECERTIFICATION, WOULD YOU CONSIDER THAT

25   TO BE SORT OF A PRELIMINARY REPORT?

1    A    YES.

2    Q    AND IN CONDUCTING THAT PRELIMINARY REPORT, DID YOU

3    HAVE AN INTERVIEW WITH MR. ANTONE?

4    A    I DID NOT INTERVIEW MR. ANTONE.  I MET WITH HIM

5    BRIEFLY TO ADVISE HIM THAT I WOULD BE WRITING THIS REPORT

6    AND I ASKED HIM IF HE WANTED TO PARTICIPATE IN AN

7    INTERVIEW.  HE DECLINED AT THAT TIME.

8    Q    DID YOU -- WERE YOU ABLE TO COME UP WITH A DIAGNOSIS

9    IN THAT PARTICULAR REPORT?

10   A    I DID.

11   Q    AND I WILL REFER YOU TO RESPONDENT'S EXHIBIT NUMBER

12   4, WHICH IS AT THE BACK, SORT OF THE BACK, PAGE 4 OF THAT

13   EXHIBIT?

14   A    YES.

15   Q    THE BOTTOM, IS THAT YOUR DIAGNOSIS AREA?

16   A    YES, IT IS.

17   Q    AND WHAT DID YOU DIAGNOSE HIM WITH AT THAT POINT?

18   A    I DIAGNOSED MR. ANTONE WITH POLYSUBSTANCE DEPENDENCE

19   IN A CONTROLLED ENVIRONMENT, PARAPHILIA NOT OTHERWISE

20   SPECIFIED, PROVISIONAL, AND ANTISOCIAL PERSONALITY

21   DISORDER.

22   Q    AND WHAT DOES THE QUALIFIER PROVISIONAL MEAN?

23   A    PROVISIONAL MEANS THAT AT THE TIME THE EVALUATOR DOES

24   NOT HAVE ENOUGH INFORMATION TO FORMALLY OR FULLY ASSIGN

25   THE DIAGNOSIS, SO THE DSM-IV-TR INDICATES THAT IN THOSE

1    CASES WHERE THERE MIGHT BE A LITTLE BIT OF DIAGNOSTIC

2    UNCERTAINTY OR THERE IS NOT ENOUGH INFORMATION TO FULLY

3    RENDER A DIAGNOSIS, THAT IT CAN BE PROVIDED ON A

4    PROVISIONAL BASIS.

5    Q    WHY IS IT THAT AT THAT TIME THAT YOU DIDN'T HAVE

6    ENOUGH INFORMATION TO MAKE A FULL DIAGNOSIS?

7    A    AT THAT TIME, I HAD VERY LITTLE IN TERMS OF

8    COLLATERAL RECORDS TO REVIEW.  AT THAT TIME, I BELIEVE I

9    ONLY HAD HIS PRESENTENCE INVESTIGATION REPORT AND THE

10   ADDENDUM TO IT, AND THE BUREAU OF PRISONS RECORDS, BUT

11   THOSE WERE ALL THE RECORDS THAT I HAD TO REVIEW AT THAT

12   TIME.

13   Q    AND SOME LATER DATE, DID YOU END UP WITH MORE, COMING

14   UP WITH MORE RECORDS?

15   A    YES, I DID.

16   Q    FLIP TO THE PAGE 6 OF THAT EXHIBIT.  IS THERE

17   ANYTHING THAT YOU NOTE ABOUT THAT PAGE?

18   A    I NOTICE THAT THERE IS NO SIGNATURE.  MY SIGNATURE IS

19   NOT ON THAT PAGE.

20   Q    DOES THAT HAVE ANY SIGNIFICANCE TO YOU?

21   A    NO.  I HAPPEN TO HAVE A SIGNED COPY OF IT.  MY GUESS

22   WOULD BE THAT WHEN RECORDS WERE BEING COLLECTED FOR

23   DISCOVERY PURPOSES, THAT AN UNSIGNED COPY WAS

24   INADVERTENTLY PROVIDED INSTEAD OF THE SIGNED COPY.

25   Q    BUT YOUR REVIEW OF THIS DOCUMENT, IS THAT, IN FACT,

1    ACCURATE AND CONSISTENT WITH YOUR SIGNED VERSION?

2    A    YES.

3    Q    PLEASE TURN TO GOVERNMENT'S EXHIBIT NUMBER 5.

4                THE COURT:  DR. GUTIERREZ, LET ME ASK YOU MORE

5    SPECIFICALLY, IS THIS EXHIBIT, RESPONDENT'S NUMBER 4, IS

6    THAT, ASIDE FROM THE LACK OF A SIGNATURE OR A HAND

7    WRITTEN DATE ON PAGE 6, IS IT EXACTLY THE SAME AS YOUR

8    SIGNED COPY?

9                THE WITNESS:  YES, YOUR HONOR, IT APPEARS TO

10   BE EXACTLY THE SAME.

11               THE COURT:  OKAY.  THANK YOU.  MR. BREDENBERG.

12               MR. BREDENBERG:  OKAY.

13   Q    HAVE YOU FOUND GOVERNMENT'S EXHIBIT NUMBER 5?

14   A    YES, I HAVE.

15   Q    WHAT IS THAT?

16   A    THAT IS MY FORENSIC EVALUATION FROM MAY OF 2007.

17   Q    AND HOW DID YOU COME ABOUT DOING THAT EVALUATION?

18   A    THAT EVALUATION WAS CONDUCTED PURSUANT TO A COURT

19   ORDER THAT WAS ISSUED BY JUDGE BRITT TO DETERMINE WHETHER

20   OR NOT MR. ANTONE MET CRITERIA FOR CIVIL COMMITMENT UNDER

21   4248.

22   Q    WHAT KIND OF THINGS DID YOU CONSIDER WHEN CONDUCTING

23   THAT EVALUATION?

24   A    I CONSIDERED MANY THINGS, INCLUDING THE DOCUMENTS I

25   HAD MENTIONED BEFORE, THE PRESENTENCE INVESTIGATION

1    REPORT, THE ADDENDUM TO IT, MR. ANTONE'S BUREAU OF

2    PRISONS RECORDS, MY PRIOR REPORT, THE PRECERTIFICATION

3    REPORT THAT HAD BEEN COMPLETED A FEW MONTHS EARLIER.

4        I ALSO HAD ACCESS TO RECORDS FROM THE TOHONO O'ODHAM

5    TRIBAL POLICE AS WELL AS THE JUDICIAL COURT FOR THE

6    TRIBE.

7        I ALSO HAD ACCESS TO INVESTIGATIVE REPORTS FROM THE

8    FEDERAL BUREAU OF INVESTIGATION AND OTHER JUDICIAL

9    RECORDS PERTAINING TO MR. ANTONE.

10   Q   DID YOU SCORE ANY ACTUARIAL MEASURES WITH REGARD TO

11   THAT EVALUATION?

12   A   YES, I DID.

13   Q   DID YOU CONDUCT AN INTERVIEW OF MR. ANTONE IN

14   CONNECTION WITH THAT EVALUATION?

15   A   NO, I DID NOT.  AGAIN, I MET WITH HIM BRIEFLY TO

16   INDICATE THAT I WOULD BE DOING ANOTHER REPORT THAT HAD

17   BEEN ORDERED BY THE COURT IN THIS CASE, AND AT THAT TIME

18   HE DECLINED TO PARTICIPATE.

19   Q   DID YOU RENDER AN OPINION AT THE END OF THAT

20   EVALUATION AS TO WHETHER HE MET CRITERIA FOR COMMITMENT

21   UNDER THE ADAM WALSH ACT?

22   A   YES, I DID.

23   Q   WHAT WAS YOUR OPINION AT THAT TIME?

24   A   IT WAS MY OPINION THAT MR. ANTONE DID MEET CRITERIA

25   FOR CIVIL COMMITMENT UNDER 4248.

1    Q    DID YOU HAVE A SUBSEQUENT OPPORTUNITY TO CONDUCT

2    ANOTHER EVALUATION OF MR. ANTONE?

3    A    YES, I DID.

4    Q    HOW DID THAT COME ABOUT?

5    A    THAT CAME ABOUT JUST A LITTLE BIT MORE THAN A YEAR

6    AGO.  THAT WAS IN RESPONSE TO A STANDING ORDER FROM THE

7    COURT ESSENTIALLY TO PROVIDE AN UPDATE TO THE FORENSIC

8    EVALUATION THAT I HAD CONDUCTED EARLIER.

9    Q    AND WHEN DID YOU DO THAT UPDATE?

10   A    THAT UPDATE WAS CONDUCTED IN SEPTEMBER OF 2010.

11   Q    IS THAT PROVIDED AS GOVERNMENT'S EXHIBIT NUMBER 6?

12   A    YES, IT IS.

13   Q    WERE THERE ANY CHANGES IN THIS REPORT FROM YOUR 2007

14   REPORT?

15   A    THE CHANGES WOULD BE THAT I, IN THE UPDATED REPORT

16   FROM LAST YEAR, I FOCUSED ON MR. ANTONE'S BEHAVIOR

17   ESSENTIALLY AND HIS HISTORY SINCE MY LAST REPORT.  SO IT

18   WASN'T AS LENGTHY OF A REPORT.  BUT THERE WERE REALLY NO

19   SUBSTANTIVE CHANGES IN TERMS OF HIS DIAGNOSIS REMAINED

20   THE SAME.  HIS SCORE ON THE UPDATED ACTUARIAL REMAINED

21   THE SAME.  AND MY OPINION REGARDING HIS SEXUAL

22   DANGEROUSNESS, THAT ALSO REMAINED THE SAME.

23   Q    SO YOU MENTIONED AN UPDATED ACTUARIAL.  DID YOU

24   ACTUALLY DO A NEW ACTUARIAL?

25   A    I DID.

1    Q    WHAT WAS THAT?

2    A    I UTILIZED THE STATIC-99R IN SEPTEMBER OF 2010 AS

3    OPPOSED TO THE REGULAR STATIC-99 THAT I HAD USED FOUR AND

4    HALF YEARS AGO.

5    Q    WHY DID YOU DO THAT?

6    A    WELL, BECAUSE THE -- THAT IS WHAT IS ACCEPTED IN THE

7    FIELD NOW.  THE RESEARCHERS OR THE DEVELOPERS OF THE

8    INSTRUMENT RECOMMEND USING THE 99R AS OPPOSED TO THE 99

9    AT THIS TIME.

10   Q    WERE THERE ANY ADDITIONAL DOCUMENTS THAT YOU CAME

11   ABOUT IN PREPARING YOUR UPDATE?

12   A    THERE WERE SOME ADDITIONAL DOCUMENTS IN TERMS OF

13   BUREAU OF PRISONS RECORDS, BUT THERE WERE NO OTHER

14   DOCUMENTS NECESSARILY PERTAINING TO HIS CRIMINAL HISTORY

15   THAT I HAD TO REVIEW.

16   Q    DID YOU RENDER AN OPINION AT THE CONCLUSION OF THAT

17   REPORT?

18   A    YES, I DID.

19   Q    WHAT WAS THAT OPINION?

20   A    THAT MR. ANTONE MET THE CRITERIA FOR CIVIL COMMITMENT

21   PURSUANT TO 4248.

22   Q    SO WHEN YOU WERE DOING YOUR EVALUATIONS, AND

23   SPECIFICALLY THE MOST RECENT CONCLUSION, WHAT QUESTIONS

24   WERE YOU LOOKING AT OR WHAT STANDARD WERE YOU USING TO

25   DETERMINE WHETHER MR. ANTONE MET CRITERIA UNDER THE ADAM

1   WALSH ACT?

2   A    WELL, I WAS ESSENTIALLY LOOKING AT THREE THINGS.

3   FIRST OF ALL, WHETHER OR NOT MR. ANTONE HAD COMMITTED OR

4   ATTEMPTED ANY SEXUALLY VIOLENT CONDUCT OR CHILD

5   MOLESTATION.

6        I ALSO LOOKED AT WHETHER OR NOT MR. ANTONE SUFFERED

7   FROM A SERIOUS MENTAL ILLNESS ABNORMALITY OR DISORDER,

8   AND I ALSO LOOKED AT WHETHER OR NOT MR. ANTONE WOULD

9   EXPERIENCE SERIOUS DIFFICULTY IN REFRAINING FROM SEXUALLY

10  VIOLENT CONDUCT OR CHILD MOLESTATION IF RELEASED TO THE

11  COMMUNITY.

12  Q    DID YOU HAVE ANY DEFINITIONS TO GUIDE YOU ON

13  ANSWERING THOSE QUESTIONS?

14  A    YES, I DID.

15  Q    WHERE DID THOSE COME FROM?

16  A    FROM THE FEDERAL REGISTER.

17  Q    DOES THE FEDERAL REGISTER THEN DEFINE CERTAIN TERMS?

18  A    YES, IT DOES.

19  Q    LET'S TALK ABOUT -- IS IT FAIR TO CALL THEM PRONGS,

20  PRONG ONE, PRONG TWO AND PRONG THREE?

21  A    I WOULD SAY THAT IS FAIR.

22  Q    LET'S TALK ABOUT PRONG ONE.  HAD YOU FORMULATED AN

23  OPINION AS TO WHETHER OR NOT MR. ANTONE HAS ENGAGED IN OR

24  ATTEMPTED TO ENGAGE IN SEXUALLY VIOLENT CONDUCT OR CHILD

25  MOLESTATION?

1    A    YES, I CAME TO THAT OPINION.

2    Q    WHAT WAS YOUR OPINION ON THAT?

3    A    MY OPINION IS -- OR WAS AND IS, THAT HE HAS ENGAGED

4    IN SEXUALLY VIOLENT CONDUCT AND CHILD MOLESTATION.  IF

5    YOU LOOK, FOR INSTANCE, AT HIS CHRONOLOGY UP ON THE

6    BOARDS, YOU CAN SEE THAT MR. ANTONE HAS RAPED FOUR

7    INDIVIDUALS, AND ATTEMPTED TO RAPE A FIFTH PERSON.  SO

8    THAT WOULD CERTAINLY BE CONSIDERED SEXUALLY VIOLENT

9    CONDUCT.

10        AS FOR THE CHILD MOLESTATION, MR. ANTONE HAS ABUSED

11   SEVERAL INDIVIDUALS UNDER THE AGE OF 18, AND FEDERAL

12   REGISTER NOTES THAT CHILD MOLESTATION CONSISTS OF

13   UNLAWFUL SEXUAL CONDUCT WITH A PERSON UNDER THE AGE OF

14   18.

15   Q    NOW, IN YOUR REVIEW OF THE RECORDS, WERE THERE

16   CONVICTIONS FOR THESE SEXUAL OFFENSES THAT YOU RELIED

17   UPON?

18   A    IN MOST OF THE CASES, YES, THERE WERE CONVICTIONS.

19   Q    AND ARE YOU ALSO AWARE OF WHETHER MR. ANTONE HIMSELF

20   HAS ADMITTED TO ANY OF THESE CRIMES?

21   A    YES.  IN PARTICULAR, ONE OF THE VICTIMS LISTED ON THE

22   CHRONOLOGY, HIS GIRLFRIEND TANYA MCCLOUD, HE WAS NEVER

23   CHARGED OR CONVICTED FOR RAPING HER, BUT DURING A PRIOR

24   PSYCHOLOGICAL EVALUATION IN 1999 HE ADMITTED TO RAPING

25   HER ON SEVERAL OCCASIONS.

1    Q    AND ARE YOU FAMILIAR WITH A PLEA AGREEMENT THAT HE

2    ENTERED INTO IN HIS FEDERAL COURT CRIME?

3    A    YES, I AM.

4    Q    DID HE ADMIT TO THE CRIMES IN THE PLEA AGREEMENT?

5    A    YES, HE DID.

6    Q    AND DID YOU ALSO WITNESS HIS TESTIMONY YESTERDAY?

7    A    YES, I DID.

8    Q    DURING HIS TESTIMONY YESTERDAY, DID HE ALSO ADMIT TO

9    ANY OF THE CRIMES?

10   A    YES, HE DID.

11   Q    ALL RIGHT.  WITH REGARD TO WHAT I WILL CALL PRONG

12   TWO, WHAT IS THAT IN YOUR MIND, THE SERIOUS MENTAL

13   ILLNESS ABNORMALITY OR DISORDER; WHAT ARE YOU LOOKING FOR

14   IN ANSWERING THAT QUESTION?

15   A    I AM LOOKING FOR WHETHER OR NOT THE INDIVIDUAL

16   SUFFERS FROM A SERIOUS MENTAL ILLNESS ABNORMALITY OR

17   DISORDER.  IN THE CASE OF MR. ANTONE, I DETERMINED THAT

18   HE SUFFERED FROM SUCH CONDITIONS.  THOSE WOULD BE

19   PARAPHILIA NOT OTHERWISE SPECIFIED, NONCONSENT, AND

20   PEDOPHILIA, AS WELL AS ANTISOCIAL PERSONALITY DISORDER.

21   Q    ANYTHING ELSE?

22   A    I ALSO DIAGNOSED HIM WITH POLYSUBSTANCE DEPENDENCE IN

23   A CONTROLLED ENVIRONMENT.

24   Q    ARE ALL OF THOSE DIAGNOSES FOUND IN ANY PARTICULAR

25   MANUAL OR TREATISES USED IN YOUR FIELD?

1    A    THOSE ARE LISTED IN THE DIAGNOSTIC AND STATISTICAL

2    MANUAL FOR MENTAL DISORDERS, THE DSM WHICH IS USED BY

3    MENTAL HEALTH PROFESSIONALS TO RENDER DIAGNOSES.

4    Q    IS THAT ORDINARILY AND ROUTINELY USED IN THE FIELD?

5    A    YES, IT IS.

6    Q    AND IS IT WELL ACCEPTED IN THE FIELD OF FORENSIC

7    PSYCHOLOGY?

8    A    YES, IT IS.

9    Q    LET'S TALK ABOUT YOUR FIRST DIAGNOSIS.  WHAT WAS YOUR

10   FIRST DIAGNOSIS?

11   A    MY FIRST DIAGNOSIS WAS PARAPHILIA NOT OTHERWISE

12   SPECIFIED, NONCONSENT, AND HEBEPHILIA.

13   Q    WHAT IS PARAPHILIA NOT OTHERWISE SPECIFIED?

14   A    PARAPHILIA NOT OTHERWISE SPECIFIED -- WELL, I WOULD

15   SAY THAT PARAPHILIA, IN GENERAL, IS SEXUALLY RECURRENT

16   INTENSE FANTASIES, URGES, AND BEHAVIORS INVOLVING

17   NON-LIVING THINGS, THE SUFFERING OR HUMILIATION OF

18   ONESELF OR ONE'S PARTNER, OR WITH CHILDREN OR

19   NON-CONSENTING PERSONS.

20        MORE SPECIFICALLY, PARAPHILIA NOT OTHERWISE

21   SPECIFIED IS LISTED IN THE DSM AS A DIAGNOSTIC CATEGORY.

22   Q    AND GENERALLY, HOW WOULD YOU EXPLAIN WHY THERE IS

23   SORT OF A QUALIFIER ON THE END OF PARAPHILIA NOT

24   OTHERWISE SPECIFIED.  WHY IS THAT QUALIFIER ON THERE?

25   A    THAT QUALIFIER, NOT OTHERWISE SPECIFIED, IS PROVIDED

1    BECAUSE SIMPLY NOT ALL OF THE PARAPHILIAS CAN BE LISTED

2    SPECIFICALLY IN THE DSM.

3         DSM DOES LIST SEVERAL OF THEM, INCLUDING PEDOPHILIA,

4    VOYEURISM, EXHIBITIONISM, FETISHISM, FROTTEURISM, BUT

5    THERE ARE DOZENS, LITERALLY DOZENS OF PARAPHILIAS, SO

6    THEY AREN'T ALL LISTED IN THE DSM.  SO THAT CATEGORY OF

7    NOT OTHERWISE SPECIFIED IS PROVIDED AS IT IS FOR OTHER

8    TYPES OF DISORDERS IN THE DSM, MOOD DISORDERS, PSYCHOTIC

9    DISORDERS, ANXIETY DISORDERS.  THEY ALL HAVE THAT NOT

10   OTHERWISE SPECIFIED CATEGORY TO THEM AS WELL.

11        SO IT'S PROVIDED IN THE DSM SO THAT ONE CAN LIST A

12   DIAGNOSIS, IN THIS CASE, PARAPHILIA NOT OTHERWISE

13   SPECIFIED, EVEN IF IT'S NOT -- THAT PARTICULAR AREA OF

14   DEVIANCE ISN'T LISTED IN THE DSM.

15   Q    SO IT'S ESSENTIALLY A CATCH-ALL FOR SOME THINGS THAT

16   HAVEN'T BEEN LISTED?

17   A    THAT'S CORRECT.  IF YOU LOOK AT THE DEFINITION FOR

18   PARAPHILIA NOT OTHERWISE SPECIFIED IN THE DSM, IT

19   PROVIDES SOME EXAMPLES THAT WERE DISCUSSED YESTERDAY LIKE

20   COPROPHILIA, TELEPHONE SCATALOGIA, THINGS OF THAT NATURE,

21   BUT IF YOU READ THE DEFINITION, IT SAYS EXAMPLES THAT

22   INCLUDE, BUT ARE NOT LIMITED TO.

23   Q    SO THERE CAN BE OTHER THINGS IN ADDITION TO THOSE

24   EXAMPLES, BUT DO THEY THEN COME BACK TO THE GENERAL

25   DEFINITION OF A PARAPHILIA AND THEY FIT WITHIN THAT?

1    A    CORRECT.  THEY WOULD FIT UNDERNEATH THAT UMBRELLA OF

2    PARAPHILIA NOT OTHERWISE SPECIFIED.

3    Q    AND SO YOUR FIRST SORT OF SPECIFIER OF PARAPHILIA NOT

4    OTHERWISE SPECIFIED IS NON-CONSENT; IS THAT CORRECT?

5    A    THAT'S CORRECT.

6    Q    AND HOW DO YOU EXTRAPOLATE THAT?  HOW DID YOU COME

7    ABOUT THAT PARTICULAR DIAGNOSIS?

8    A    IN MR. ANTONE'S CASE, I ARRIVED AT THAT PARTICULAR

9    DIAGNOSIS IN LOOKING AT HIS PATTERN OF OFFENDING.  AS I

10   MENTIONED EARLIER, HE RAPED FOUR WOMEN.  HE HAD

11   NON-CONSENSUAL INTERCOURSE WITH FOUR WOMEN AND HE

12   ATTEMPTED TO DO SO WITH A FIFTH PERSON.

13        SO I HAVE THOSE ESSENTIALLY FACTUAL BEHAVIORAL

14   INDICATORS OF MR. ANTONE'S SEXUAL DEVIANCE IN THAT

15   REGARD.  IN ADDITION, THERE ARE OTHER FACTORS THAT I

16   CONSIDERED RELEVANT TO MR. ANTONE.

17        IN 1999 HE UNDERWENT AN EVALUATION, AND PART OF THE

18   EVALUATION WAS THE ADMINISTRATION OF A POLYGRAPH.  DURING

19   THAT ADMINISTRATION, MR. ANTONE DENIED HAVING SEXUAL

20   FANTASIES OF RAPE.  AND HIS -- THE RESULTS OF THE

21   POLYGRAPH INDICATED THAT HE WAS DECEPTIVE WITH RESPECT TO

22   THAT PARTICULAR QUESTION REGARDING THE RAPE FANTASIES.

23             THE COURT:  DR. GUTIERREZ, LET ME STOP YOU.

24   THERE IS SOME MATERIAL ON THE SCREEN.  COULD THAT BE

25   REMOVED, PLEASE?

1            MR. BREDENBERG:  TAKE IT OFF, DID YOU SAY?

2            THE COURT:  YES, SIR.  THE GROUND RULES ARE

3    THAT NOTHING IS TO BE PUT ON THE SCREEN UNLESS IT'S

4    STATED ON THE RECORD THAT IT'S BEING PUT ON THE SCREEN.

5            MR. BREDENBERG:  YES, YOUR HONOR.

6            THE COURT:  I THINK OTHERWISE IT MISREPRESENTS

7    WHAT IS HAPPENING IN THE COURTROOM.

8            MR. BREDENBERG:  SORRY, YOUR HONOR.

9            THE COURT:  DR. GUTIERREZ, YOU MAY CONTINUE

10   WITH YOUR ANSWER.

11           THE WITNESS:  THANK YOU.

12   A   SO THAT FROM THAT 1999 EVALUATION, WE HAVE THE

13   EVIDENCE THAT HE WAS DECEPTIVE ON THE POLYGRAPH WITH

14   RESPECT TO FANTASIES OF RAPE.

15       ALSO, AS PART OF THAT EVALUATION, MR. ANTONE

16   COMPLETED AN OBJECTIVE TEST KNOWN AS THE MULTIPHASIC SEX

17   INVENTORY.  IT'S ESSENTIALLY AN INVENTORY OR A LENGTHY

18   QUESTIONNAIRE IN WHICH AN INDIVIDUAL HAS TO PROVIDE

19   RESPONSES, TRUE OR FALSE, TO CERTAIN STATEMENTS.

20       MR. ANTONE APPROACHED THAT PARTICULAR TESTING IN A

21   DEFENSIVE MANNER AND THAT WAS NOTED IN THE REPORT BY GRAY

22   AND SADLER.  DESPITE ANSWERING THE QUESTIONNAIRE IN A

23   GUARDED OR DEFENSIVE MANNER, HE STILL ENDORSED ITEMS IN

24   SUCH A WAY SO THAT HIS RESPONSE STYLE OR HIS RESPONSE

25   PATTERN WAS CONSISTENT WITH THOSE WHO HAVE -- WHO ARE

1    RAPISTS ESSENTIALLY, THE NORMATIVE GROUP THAT WAS USED

2    FOR THAT PARTICULAR TEST.

3         MR. ANTONE'S RESPONSE STYLE WAS CONSISTENT WITH

4    RAPISTS.  SO, THOSE ARE TWO ELEMENTS THAT I CONSIDERED

5    FROM THAT 1999 EVALUATION AS FAR AS MY OWN DIAGNOSIS OF

6    PARAPHILIA NOT OTHERWISE SPECIFIED, NON-CONSENT.

7    Q    LET ME ASK YOU SOMETHING ABOUT THAT PARTICULAR

8    REPORT.  IS THAT REPORT, THE 1999 REPORT BY GRAY AND

9    SADLER, IS THAT SOMETHING ORDINARILY USED BY EXPERTS IN

10   THE FIELD IN THESE KIND OF EVALUATIONS?

11   A    YES, THEY ARE.  THOSE INSTRUMENTS, THOSE METHODS ARE

12   ORDINARILY USED WHEN POSSIBLE.

13   Q    YOU HAVE REVIEWED THAT PARTICULAR ONE THAT YOU ARE

14   TALKING ABOUT?

15   A    YES, I HAVE.

16   Q    IS THERE ANY INDICATION TO YOU THAT ANYTHING IN THAT

17   EVALUATION WAS INCORRECT OR MISTAKEN?

18   A    NO.  THERE IS NOTHING THAT WOULD SUGGEST TO ME THAT

19   THERE WAS AN ERROR OR MISTAKE IN THAT REPORT.

20            THE COURT:  DR. GUTIERREZ, WHICH TEST

21   SPECIFICALLY WAS IT THAT YOU WERE REFERRING TO WHERE THE

22   RESPONSE PATTERNS BY MR. ANTONE WERE CONSISTENT WITH

23   THOSE OF RAPISTS?

24            THE WITNESS:  THAT WAS THE MULTIPHASIC SEX

25   INVENTORY, SECOND EDITION.

1                  THE COURT:  THANK YOU.

2                  MR. BREDENBERG:

3    Q    IN ADDITION TO YOUR DETERMINATION THAT THERE WERE

4    RECURRING SEXUAL OFFENSES OVER A PERIOD OF TIME AND THE

5    INFORMATION THAT YOU GLEANED FROM THE GRAY AND SADLER

6    REPORT, WHAT ELSE, IF ANYTHING, DID YOU CONSIDER IN

7    DIAGNOSING THE PARAPHILIA NOT OTHER SPECIFIED WITH THE

8    SPECIFIER OF NON-CONSENT?

9    A    SOME OF THE OTHER THINGS THAT I CONSIDERED WERE, FOR

10   INSTANCE, MR. ANTONE WAS ENGAGING IN THESE INSTANCES OF

11   NON-CONSENSUAL INTERCOURSE WITH WOMEN EVEN THOUGH HE WAS

12   INVOLVED IN A RELATIONSHIP WITH MS. MCCLOUD AT THE TIME,

13   AND THAT CERTAINLY IS AN INDICATOR OF A PARAPHILIA.

14        IN THIS CASE, PARAPHILIA NOT OTHERWISE SPECIFIED,

15   NON-CONSENT, THAT IN INDIVIDUALS ENGAGING IN THESE

16   ACTIVITIES, ESSENTIALLY RAPING WOMEN, EVEN THOUGH HE HAS

17   A CONSENSUAL PARTNER AVAILABLE TO HIM.

18   Q    HOW IS THAT SIGNIFICANT TO YOUR OPINION?

19   A    THAT IS SIGNIFICANT BECAUSE HE ALREADY ESSENTIALLY

20   HAS AN OUTLET OR A PERSON TO HAVE SEXUAL INTERCOURSE

21   WITH, SOMEBODY WHO IS WILLING AND CONSENSUAL.  AND THE

22   FACT THAT HE IS STILL ENGAGING IN THESE NON-CONSENSUAL

23   ACTS WITH OTHER WOMEN AND WITH OTHER INDIVIDUALS

24   INDICATES THAT THERE IS AN ISSUE THERE WITH RESPECT TO

25   SEXUAL DEVIANCE.

1   Q   AND SO THIS DETERMINATION THAT ALL THE FACTORS THAT

2   YOU JUST TALKED ABOUT, DOES THAT MATCH UP THEN WITH THE

3   GENERAL DEFINITION OF PARAPHILIA?

4   A   IT MATCHES UP WITH THE GENERAL DEFINITION OF

5   PARAPHILIA IN THAT THERE IS EVIDENCE OF RECURRENT AND

6   INTENSE BEHAVIORS INVOLVING NON-CONSENTING PERSONS.

7   THERE IS ALSO EVIDENCE OF FANTASIES IN THIS CASE, RAPE

8   FANTASIES, AND CERTAINLY THERE WOULD BE EVIDENCE OF URGES

9   CONSIDERING THAT THESE ACTS HAVE OCCURRED MANY TIMES OVER

10  A PERIOD OF APPROXIMATELY TEN YEARS.  THERE IS EVIDENCE

11  OF THAT AS WELL.

12  Q   NOW, YOU WERE IN THE COURTROOM YESTERDAY; CORRECT?

13  A   CORRECT.

14  Q   AND DID YOU HEAR THE QUESTIONS REGARDING WHETHER THIS

15  IS A VALID DIAGNOSIS?

16  A   YES, I DID.

17  Q   AND WHAT IS YOUR RESPONSE TO THAT?

18  A   MY RESPONSE TO THAT IS THAT IT IS A VALID DIAGNOSIS;

19  THAT IT'S GENERALLY ACCEPTED IN THE FIELD.  CERTAINLY

20  THERE IS SOME DEBATE ABOUT THAT, BUT I WOULD SAY THAT

21  THERE IS DEBATE ABOUT MANY THINGS IN SCIENCE.  I THINK

22  IT'S IMPORTANT TO RECOGNIZE THAT THERE ARE APPROXIMATELY

23  20 STATES IN THIS COUNTRY THAT HAVE CIVIL COMMITMENT LAWS

24  IN WHICH INDIVIDUALS HAVE BEEN CIVILLY COMMITTED AS

25  SEXUALLY DANGEROUS PERSONS, AND A SURVEY WAS TAKEN A FEW

1    YEARS AGO AND OF ALL OF THOSE STATES, EVERY SINGLE ONE OF

2    THEM HAD INDIVIDUALS CIVILLY COMMITTED AS SEXUALLY

3    DANGEROUS PERSONS WITH THIS PARTICULAR DIAGNOSIS,

4    PARAPHILIA NOT OTHERWISE SPECIFIED, NON-CONSENT.

5    Q    YOU ALSO -- WHAT IS THE NEXT DIAGNOSIS THAT YOU

6    DIAGNOSED MR. ANTONE WITH?

7    A    WELL, IT'S ESSENTIALLY ALONG THE SAME LINES, BUT IT'S

8    PARAPHILIA NOT OTHERWISE, HEBEPHILIA, ANOTHER SPECIFIER

9    THAT I THINK APPLIES TO MR. ANTONE.

10   Q    SO TO BE CLEAR, YOU ARE DIAGNOSING WITH PARAPHILIA

11   NOT OTHERWISE SPECIFIED?

12   A    CORRECT.

13   Q    THAT IS THE DIAGNOSIS.  AND THEN YOU ADD THE

14   SPECIFIER OF HEBEPHILIA; WHY IS THAT?

15   A    LIKE I DID FOR THE SPECIFIER OF NON-CONSENT, I

16   PROVIDED THE SPECIFIER OR CLARIFICATION OF HEBEPHILIA FOR

17   THAT PURPOSE, TO NOTE SOME DIAGNOSTIC CLARITY FOR THE

18   INDIVIDUAL READING THE REPORTS SO THAT THEY KNOW WHAT

19   PARTICULAR AREA OF PARAPHILIA NOT OTHERWISE SPECIFIED IS

20   APPLICABLE TO THE RESPONDENT.

21   Q    AND WHAT IS HEBEPHILIA?

22   A    HEBEPHILIA IS A PARAPHILIA.  IT'S RECURRENT SEXUAL

23   FANTASIES, URGES, OR BEHAVIORS INVOLVING CHILDREN WHO ARE

24   PUBESCENT IN TERMS OF THEIR DEVELOPMENT.

25        PEDOPHILIA, WHICH IS MORE COMMONLY KNOWN,

1    SPECIFICALLY APPLIES TO THESE URGES, FANTASIES,

2    BEHAVIORS, INVOLVING PREPUBESCENT CHILDREN.  SO

3    HEBEPHILIA COVERS THOSE CHILDREN, THOSE VICTIMS, WHO ARE

4    PUBESCENT IN TERMS OF THEIR DEVELOPMENT.

5    Q    SO -- BUT THEY ARE STILL CHILDREN?

6    A    THAT'S CORRECT.

7    Q    JUST AN OLDER AGE?

8    A    AN OLDER AGE GROUP.

9    Q    AND SO HOW DID YOU FIND THAT MR. ANTONE MET THE

10   CRITERIA FOR THIS PARTICULAR DIAGNOSIS?

11   A    IN LOOKING AT HIS CRIMINAL HISTORY, I NOTICED THAT

12   THERE WERE SEVERAL VICTIMS THAT FIT THAT PUBESCENT AGE

13   CATEGORY, SO TO SPEAK.  IF YOU LOOK ON THE BOARD THERE,

14   T.F. WAS APPROXIMATELY 13 YEARS OLD.  WE DON'T HAVE AN

15   EXACT DATE AS TO WHEN THAT FIRST INSTANCE OCCURRED, BUT

16   SHE WAS APPROXIMATELY 13 YEARS OLD WHEN MR. ANTONE WAS

17   ABOUT 17 OR 18 YEARS OLD.

18        V.R. NUMBER 1 WAS 16 YEARS OLD AND MR. ANTONE WAS 18

19   YEARS OLD.  I DON'T REALLY CONSIDER THAT PARTICULAR

20   INSTANCE AS FALLING UNDER THAT HEBEPHILIA DIAGNOSIS

21   BECAUSE THERE REALLY WASN'T ENOUGH OF AN AGE DIFFERENCE

22   THERE BETWEEN THE TWO.  YOU TYPICALLY LOOK FOR

23   APPROXIMATELY ABOUT A FIVE YEAR AGE DIFFERENCE WHEN

24   ASSIGNING A DIAGNOSIS OF PEDOPHILIA OR HEBEPHILIA.

25        V.R. NUMBER 2 WAS 14 OR 15 YEARS OLD AND THAT

1   PUBESCENT AGE RANGE OR RANGE OF DEVELOPMENT WHEN MR.

2   ANTONE WAS 20 OR 21 YEARS OLD.

3        AND THEN FINALLY R.A. WAS APPROXIMATELY 12 YEARS OLD

4   AND MR. ANTONE WAS TWICE HER AGE AT THAT TIME.  SO, THERE

5   WERE INDICATORS, ESSENTIALLY THOSE THREE INDIVIDUALS THAT

6   I MENTIONED THERE FIT UNDER THAT HEBEPHILIA RANGE.

7   Q   SO WAS THAT EVIDENCE OF BEHAVIOR THEN THAT YOU ARE

8   USING?

9   A   I WOULD SAY THAT THOSE INSTANCES OF MOLESTATION AND

10  THE ONE CASE WITH V.R. NUMBER 2, RAPE -- WHEN HE RAPED

11  HER, THAT THOSE WERE BEHAVIORAL INDICATORS OF A

12  PARAPHILIA PERTAINING TO PUBESCENT CHILDREN.

13            THE COURT:  LET ME JUST STOP YOU, MR.

14  BREDENBERG.

15            MR. BREDENBERG:  I AM SORRY.

16            THE COURT:  SO DR. GUTIERREZ, THE THREE

17  EPISODES OF HEBEPHILIA, THE THREE MANIFESTATIONS HERE IN

18  THE CHRONOLOGY ARE THE EPISODE WITH T.F., THE INCIDENT

19  WITH V.R. NUMBER 2, AND THEN THE INCIDENT WITH R.A.?

20            THE WITNESS:  THAT'S CORRECT, YOUR HONOR.

21            THE COURT:  OKAY.  THANK YOU.  MR.

22  BREDENBERG.

23            MR. BREDENBERG:  THANK YOU.

24  Q   SO IS A PERIOD OF SIX MONTHS SIGNIFICANT?

25  A   IT IS.

1    Q    AND HOW IS THAT SIGNIFICANT?

2    A    TYPICALLY WITH ANY PARAPHILIA, YOU ARE LOOKING FOR

3    EVIDENCE OF THE BEHAVIOR OR THE DISORDER OVER A PERIOD OF

4    AT LEAST SIX MONTHS IN ORDER TO ASSIGN THE DIAGNOSIS.  IF

5    IT'S LESS THAN THAT, THEN THE DSM RECOMMENDS THAT, YOU

6    KNOW, A SUFFICIENT AMOUNT OF TIME HAS NOT ELAPSED FOR

7    RENDERING THAT DIAGNOSIS.

8         AND THAT IS COMMON WITH MANY DIAGNOSES IN THE DSM IN

9    TERMS OF HAVING A PERIOD OF DURATION, WHETHER IT BE FOR

10   DEPRESSION OR SCHIZOPHRENIA, THAT IS FAIRLY COMMON IN THE

11   DSM TO HAVE SOME SORT OF TIME FRAME.

12   Q    DID YOU FIND THAT SIX MONTHS WITH MR. ANTONE?

13   A    YES, I DID, WITH RESPECT TO THE PARAPHILIA NOT

14   OTHERWISE SPECIFIED, NON-CONSENT, AND THE PARAPHILIA NOT

15   OTHERWISE SPECIFIED, HEBEPHILIA, THE RANGE OF HIS

16   OFFENSES CERTAINLY PASSED SIX MONTHS.

17   Q    WERE THERE OTHER THINGS THAT YOU CONSIDERED TO

18   DIAGNOSE THE PARAPHILIA NOT OTHERWISE SPECIFIED, THE

19   HEBEPHILIA SPECIFIER?

20   A    THERE WERE.

21   Q    WHAT WERE THOSE?

22   A    IN THE CASE OF MR. ANTONE, GOING BACK TO THAT 1999

23   GRAY AND SADLER EVALUATION, THE MSI-II THAT I HAD

24   MENTIONED BEFORE, NOT ONLY DID HIS RESPONSE STYLE

25   ESSENTIALLY MATCH UP WITH THOSE THAT HAD -- THAT WERE

1   RAPISTS, BUT HIS RESPONSE STYLE WAS ALSO CONSISTENT AND

2   INDICATIVE OF CHILD MOLESTERS, SO THAT WAS ANOTHER PIECE

3   OF INFORMATION THAT I CONSIDERED.

4        PART OF THAT EVALUATION BACK IN 1999 WAS THE

5   ADMINISTRATION OF ANOTHER INSTRUMENT KNOWN AS THE ABEL

6   ASSESSMENT.  AND MR. ANTONE'S RESULTS ON THAT MEASURE

7   INDICATED THAT HE HAD SEXUAL ATTRACTION TO MINORS IN THAT

8   PUBESCENT AGE GROUP.  IN FACT, THE ADMINISTRATION OF THAT

9   MEASURE INDICATED THAT THAT WAS HIS PREFERENCE GROUP.

10  HIS PREFERENTIAL GROUP WERE FEMALES BETWEEN THE AGE OF 14

11  AND 17, MORE SO THAN ADULT FEMALES.

12       SO THOSE PIECES OF INFORMATION, IN ADDITION TO THE

13  BEHAVIOR INDICATORS, AS WE SEE UP ON THE CHRONOLOGY, WERE

14  THE BASIS FOR MY DIAGNOSIS OF PARAPHILIA NOT OTHERWISE

15  SPECIFIED, HEBEPHILIA.

16  Q   LET ME ASK YOU THIS.  WE ARE TALKING ABOUT -- WHAT I

17  HAVE HEARD YOU SAY IS THAT IN SOME CASES WE ARE TALKING

18  ABOUT TEENAGE GIRLS THAT MAY FIT INTO THIS CRITERIA OF

19  HEBEPHILIA; IS THAT CORRECT?

20  A   THAT'S CORRECT.

21  Q   IS IT ORDINARY OR IS IT NORMAL FOR -- I HATE TO USE

22  THE WORD NORMAL, BUT FOR NORMAL, UNDIAGNOSED MALES TO BE

23  ATTRACTED TO TEENAGE GIRLS?

24  A   YES, IT IS.  RESEARCH HAS SHOWN AND THERE HAS BEEN

25  MUCH WRITTEN AND DISCUSSED ABOUT IT, THAT IT WOULD BE

1    NORMAL FOR MEN, ADULT MEN, TO HAVE SOME SEXUAL ATTRACTION

2    TO TEENAGE GIRLS, ADOLESCENT GIRLS; HOWEVER, THE

3    DIFFERENCE IS IN TERMS OF THE DEGREE TO WHICH AN

4    INDIVIDUAL IS SEXUALLY ATTRACTED TO ADOLESCENTS.  THE

5    DIFFERENCE IS ALSO IN TERMS OF WHETHER OR NOT AN

6    INDIVIDUAL ACTS UPON ANY ATTRACTION, URGES, OR FANTASIES

7    REGARDING ADOLESCENT TEENAGE GIRLS.

8    Q    AND WITH REGARD TO MR. ANTONE, DID YOU FIND THOSE

9    DIFFERENTIATING FACTORS?

10   A    I DID.  IN HIS CASE, THERE IS EVIDENCE THAT HE HAS

11   ACTED UPON HIS URGES TOWARDS THE VICTIMS WITHIN THIS

12   RANGE OF DEVELOPMENT, THIS PUBESCENT GROUP OF GIRLS.  WE

13   HAVE EVIDENCE OF THAT IN HIS CRIMINAL HISTORY.

14   Q    DO YOU CONSIDER PARAPHILIA NOT OTHERWISE SPECIFIED A

15   SERIOUS MENTAL ILLNESS, ABNORMALITY OR DISORDER?

16   A    YES, I DO.

17   Q    AND SIMILARLY TO THE LAST QUESTION OR THE LAST

18   DIAGNOSIS, IS THERE DEBATE IN YOUR FIELD REGARDING THE

19   DIAGNOSIS WITH THE SPECIFIER HEBEPHILIA?

20   A    YES, THERE IS SOME DEBATE AND SOME DISCUSSION ABOUT

21   THE SPECIFIC DIAGNOSIS OF PARAPHILIA NOT OTHERWISE

22   SPECIFIED, HEBEPHILIA.

23   Q    BUT YOU STILL FIND THAT IT'S AN APPROPRIATE

24   DIAGNOSIS?

25   A    YES, I DO.

1    Q   WHY IS THAT?

2    A   WELL, BECAUSE IT'S GENERALLY ACCEPTED IN THE FIELD.

3    MANY PSYCHOLOGISTS USE THIS DIAGNOSIS IN THE EVALUATION

4    AND TREATMENT OF SEX OFFENDERS, AND IT HAS BEEN USED AS A

5    DIAGNOSIS FOR THE PURPOSE OF THESE TYPES OF EVALUATIONS.

6        THERE WAS A RECENT CASE UP IN THE FIRST CIRCUIT, U.S.

7    VERSUS CARTA (PHONETIC), IN WHICH THE COURT RULED THAT

8    PARAPHILIA NOT OTHERWISE SPECIFIED, GENERALLY SPEAKING,

9    AND PARAPHILIA NOT OTHERWISE SPECIFIED, HEBEPHILIA, MORE

10   SPECIFICALLY QUALIFIED AS A SERIOUS MENTAL ILLNESS,

11   ABNORMALITY OR DISORDER.

12   Q   AND WAS THAT UNDER THE ADAM WALSH ACT?

13   A   YES.

14   Q   HAVE YOU DIAGNOSED MR. ANTONE WITH ANYTHING ELSE?

15   A   I ALSO DIAGNOSED MR. ANTONE WITH POLYSUBSTANCE

16   DEPENDENCE IN A CONTROLLED ENVIRONMENT.

17   Q   WHAT DOES THAT MEAN?

18   A   ESSENTIALLY THAT DIAGNOSIS HAS TO DO WITH MR.

19   ANTONE'S LENGTHY HISTORY OF DEPENDENCE ON VARIOUS

20   SUBSTANCES, NOT ONLY ALCOHOL BUT THE RECORDS INDICATE A

21   PATTERN OF DEPENDENCE AND DAILY IF NOT A VERY FREQUENT

22   USE OF COCAINE AND MARIJUANA AS WELL AS WE HEARD

23   YESTERDAY HUFFING WITH GASOLINE AND USE OF OTHER

24   SUBSTANCES SUCH AS LSD, PCP.

25       I AM NOT SURE IF I HAVE NAMED THEM ALL, BUT THERE

1    CERTAINLY IS AN EXTENSIVE HISTORY OF POLYSUBSTANCE

2    DEPENDENCE IN HIS CASE.

3    Q    DOES ANYTHING ELSE GO INTO THAT DIAGNOSIS?

4    A    WELL, ASIDE FROM THE SELF REPORTS THAT HE HAS MADE IN

5    THE PAST, AND THE TESTIMONY THAT I HEARD YESTERDAY, THERE

6    -- MANY OF THE RECORDS THAT I REVIEWED CERTAINLY

7    CORROBORATE THAT DIAGNOSIS.  THE PAST EVALUATION, AND

8    THAT WAS CONDUCTED IN 1999, HIS PRESENTENCE INVESTIGATION

9    REPORT CERTAINLY DETAILED THE EXTENT OF HIS USAGE.

10   Q    DOES TREATMENT OF EITHER THE FACT THAT HE DID IT OR

11   DIDN'T DO IT PLAY INTO THAT DIAGNOSIS?

12   A    I AM NOT SURE I UNDERSTAND YOUR QUESTION.

13            MR. BREDENBERG:  I AM NOT SURE I DO EITHER.

14   Q    DOES THE FACT THAT MR. ANTONE MAY OR MAY NOT HAVE

15   RECEIVED TREATMENT EFFECT YOUR DIAGNOSIS?

16   A    IT DOES NOT AT THIS TIME BECAUSE HE IS IN A

17   CONTROLLED ENVIRONMENT.  THAT IS THE LAST PART OF THAT

18   DIAGNOSIS.  ESSENTIALLY, HIS ACCESS TO THE SUBSTANCES IS

19   RESTRICTED.  CERTAINLY WE HEARD ABOUT IT YESTERDAY THAT

20   IT IS POSSIBLE FOR INMATES, FOR INDIVIDUALS WHO ARE IN

21   CUSTODY, TO OBTAIN ALCOHOL AND DRUGS, BUT THEIR USE AND

22   AVAILABILITY IS CERTAINLY RESTRICTED TO A GREAT DEGREE.

23   Q    IN ADDITION TO THAT, HAVE YOU DIAGNOSED HIM WITH

24   ANYTHING ELSE?

25   A    I ALSO DIAGNOSED MR. ANTONE WITH ANTISOCIAL

1    PERSONALITY DISORDER.

2    Q    WHAT IS THAT?

3    A    PERSONALITY DISORDER IS GENERALLY THE WAY THAT A

4    PERSON INTERACTS WITH HIS OR HER ENVIRONMENT.  ANTISOCIAL

5    PERSONALITY IS MARKED BY ESSENTIALLY NOT TAKING INTO

6    ACCOUNT OTHERS RIGHTS AND VIOLATING OTHERS RIGHTS,

7    DECEITFULNESS, DISHONESTY, IRRESPONSIBILITY, IMPULSIVITY.

8    THOSE ARE SOME OF THE HALLMARKS OF ANTISOCIAL PERSONALITY

9    DISORDER.

10   Q    AND DOES MR. ANTONE EXHIBIT ANY OF THOSE BEHAVIORS?

11   A    YES, HE DOES.  IT'S MY OPINION THAT HE MEETS MANY OF

12   THE CRITERIA FOR ANTISOCIAL PERSONALITY DISORDER,

13   CERTAINLY ENOUGH FOR DIAGNOSIS.

14        FIRST OF ALL, YOU HAVE TO HAVE EVIDENCE OF CONDUCT

15   DISORDER PRIOR TO THE AGE OF 15, AND WE HAVE THAT WITH

16   MR. ANTONE WITH RESPECT TO HIS INTERACTIONS WITH THE

17   JUVENILE JUSTICE SYSTEM.  A SUSPENSION OR EXPULSION FROM

18   SCHOOL, FIGHTING AND BULLYING WITH OTHER KIDS THAT HAVE

19   BEEN NOTED IN PRIOR RECORDS.  SO THAT IS THE FIRST STEP.

20        THEN WE ALSO HAVE EVIDENCE OF NUMEROUS ARRESTS OVER

21   TIME FOR A VARIETY OF OFFENSES.  WE HAVE EVIDENCE OF

22   IMPULSIVITY WITH RESPECT TO HIS OFFENSES, BOTH SEXUAL AND

23   NON-SEXUAL.  AND WE ALSO HAVE EVIDENCE OF AGGRESSIVENESS

24   OR FIGHTING OR PHYSICAL ALTERCATIONS WITH OTHER

25   INDIVIDUALS, AND THAT IS ONE OF THE CRITERIA FOR

1    ANTISOCIAL PERSONALITY DISORDER.

2         AND I BELIEVE IN MR. ANTONE'S CASE, THERE IS ALSO

3    EVIDENCE OF SOME IRRESPONSIBILITY ON HIS PART OVER THE

4    YEARS IN TERMS OF MAINTAINING CONSISTENT EMPLOYMENT AND

5    PROVIDING FOR HIMSELF.

6    Q    AS APPLIED TO MR. ANTONE'S CASE, DO YOU CONSIDER HIS

7    DIAGNOSIS OF ANTISOCIAL PERSONALITY DISORDER A SERIOUS

8    MENTAL ILLNESS, ABNORMALITY OR DISORDER?

9    A    YES, I DO.

10   Q    NOW, YOU HAVE MENTIONED -- HOW WOULD YOU CALCULATE

11   THE NUMBER OF DIAGNOSES THAT YOU HAVE DONE?  IS IT THREE,

12   IS IT FOUR?

13   A    I WOULD SAY IT'S THREE.

14   Q    OKAY.  THE PARAPHILIA NOT OTHERWISE SPECIFIED WITH

15   THE -- ESSENTIALLY WITH THE TWO SPECIFIERS, THE

16   POLYSUBSTANCE DEPENDENCE IN A CONTROLLED ENVIRONMENT, AND

17   THE ANTISOCIAL PERSONALITY DISORDER.

18   Q    NOW, DO YOU LOOK AT AN INDIVIDUAL DIAGNOSED WITH

19   MULTIPLE THINGS, YOU KNOW, WITH THE INDIVIDUAL DIAGNOSIS

20   OR DO THE DIAGNOSES SORT OF HAVE A COMBINATION EFFECT?

21   A    I WOULD SAY THAT THEY HAVE A COMBINATION EFFECT.

22   I THINK IT'S IMPORTANT TO LOOK AT IT IN THAT WAY BECAUSE

23   THESE ARE ALL THE FACTORS THAT PLAY INTO AN INDIVIDUAL'S

24   BEHAVIOR.  THESE THINGS DON'T NECESSARILY ACT IN

25   ISOLATION.  IT'S A CUMULATIVE OR SYNERGISTIC EFFECT,

1    ESSENTIALLY, ON HOW THEY AFFECT A PERSON.

2    Q    NOW, YOU WERE HERE PRETTY MUCH ALL OF YESTERDAY;

3    RIGHT?

4    A    YES.

5    Q    DID YOU HEAR THE JUDGE'S QUESTIONS TO DR. PHENIX

6    ABOUT IF YOU WERE TO TAKE AWAY THE PARAPHILIA NOT

7    OTHERWISE SPECIFIED DIAGNOSIS FROM MR. ANTONE, WOULD YOU

8    STILL -- WELL, THE QUESTION WAS, WOULD SHE STILL HAVE AN

9    OPINION AS TO WHETHER HE HAD A SERIOUS MENTAL ILLNESS,

10   BUT THE QUESTION FOR YOU IS, IF YOU WERE TO TAKE AWAY

11   THAT PARAPHILIA NOT OTHERWISE SPECIFIED DIAGNOSIS AND THE

12   TWO SPECIFIERS, DO YOU HAVE AN OPINION AS TO WHETHER MR.

13   ANTONE WOULD STILL HAVE A SERIOUS MENTAL ILLNESS,

14   ABNORMALITY OR DISORDER?

15   A    YES.  IT WOULD STILL BE MY OPINION THAT HE SUFFERS

16   FROM SERIOUS MENTAL ILLNESS, ABNORMALITY OR DISORDER.

17   Q    AND WOULD THAT ABNORMALITY OR DISORDER CAUSE HIM TO

18   HAVE SERIOUS DIFFICULTY REFRAINING?

19   A    YES, IT'S MY OPINION THAT IT WOULD.

20   Q    AND CONSEQUENTLY, HE WOULD THEN BE, IN YOUR OPINION,

21   CONSIDERED SEXUALLY DANGEROUS?

22   A    YES.  IT'S MY OPINION THAT HE WOULD STILL REMAIN

23   SEXUALLY DANGEROUS EVEN WITH JUST THAT ANTISOCIAL

24   PERSONALITY DIAGNOSIS.

25   Q    WOULD YOU CONSIDER THE POLYSUBSTANCE DEPENDENCE IN

1    CONJUNCTION WITH THAT?

2    A   I CERTAINLY WOULD IN MR. ANTONE'S CASE.  IT'S AN

3    IMPORTANT ASPECT OF HIS OFFENDING.  I DIDN'T HAVE THE

4    OPPORTUNITY TO INTERVIEW HIM, BUT I BELIEVE THAT IN MOST,

5    IF NOT ALL OF THE OFFENSES, THAT SUBSTANCE ABUSE PLAYED A

6    FACTOR.

7    Q   DID YOU CONSIDER OTHER DIAGNOSES IN FORMULATING YOUR

8    REPORT?

9    A   I DID.  MAY I GET SOME MORE WATER?

10   Q   SURE.

11           THE COURT:  CERTAINLY.

12           MR. BREDENBERG:

13   Q   SO MY QUESTION WAS DID YOU CONSIDER OTHER DIAGNOSES

14   IN YOUR EVALUATION OF MR. ANTONE?

15   A   YES, I DID.

16   Q   WHAT WERE THEY?

17   A   I CONSIDERED WHETHER PEDOPHILIA WAS APPLICABLE TO MR.

18   ANTONE BECAUSE OF THE FACT THAT HE HAD OFFENDED AGAINST

19   MINORS.  HOWEVER; I DETERMINED THAT THE AGE RANGE OR THE

20   POOL OF VICTIMS, SO TO SPEAK, WAS MORE CONSISTENT WITH A

21   DIAGNOSIS OF HEBEPHILIA AS OPPOSED TO PEDOPHILIA, SO I

22   DECIDED NOT TO RENDER A DIAGNOSIS OF PEDOPHILIA.

23   Q   OKAY.  DID YOU CONSIDER ANY OTHER DIAGNOSIS?

24   A   I ALSO CONSIDERED A DIAGNOSIS OF DEPRESSION.  MR.

25   ANTONE HAD PREVIOUSLY BEEN TREATED FOR DEPRESSION AND

1    HAD -- THERE WAS A HISTORY OF PRIOR SUICIDE ATTEMPTS AND

2    GESTURES BETWEEN THE AGES OF 16 AND 20, AND HE HAD BEEN

3    TAKING PSYCHOTROPIC MEDICATION FOR A PERIOD OF TIME.

4    HOWEVER, AT THE TIME THAT I HAD DONE MY REPORT, IT HAD

5    BEEN MANY YEARS SINCE MR. ANTONE HAD TAKEN MEDICATION.

6    THERE WAS NO RECURRENCE OF THAT SUICIDALITY IN TERMS OF

7    GESTURES OR ATTEMPTS SINCE THE AGE OF 20, SO I DETERMINED

8    THAT A DIAGNOSIS OF DEPRESSION WAS NOT APPROPRIATE AT

9    THAT TIME, THAT HE WAS NOT SUFFERING FROM SYMPTOMS --

10   CLINICALLY SIGNIFICANT SYMPTOMS OF DEPRESSION AT THE TIME

11   THAT I DID MY REPORT.

12   Q   WOULD IT BE ACCURATE TO HAVE IDENTIFIED THAT

13   DIAGNOSIS BY HISTORY OR --

14   A   IT CERTAINLY COULD.  ONE CAN LIST IT, IN TERMS OF THE

15   DIAGNOSIS, ONE CAN LIST DEPRESSION BY HISTORY.  IN MY

16   CASE, I JUST SIMPLY CHOOSE TO DESCRIBE THAT PERIOD OF

17   DEPRESSION AND THE SUICIDE ATTEMPTS IN THE BODY OF MY

18   REPORT, BUT I DIDN'T ACTUALLY RENDER IT AS A DIAGNOSIS,

19   BUT THAT IS CERTAINLY AN OPTION.

20   Q   DID YOU CONSIDER ANY OTHER DIAGNOSES?

21   A   I ALSO CONSIDERED A DIAGNOSIS OF BORDERLINE

22   PERSONALITY DISORDER.  ONE OF THE MORE COMMON

23   CHARACTERISTICS OF THAT DISORDER IS WRIST CUTTING, AND

24   MR. ANTONE HAD SOME -- THERE WAS SOME DOCUMENTATION

25   INDICATING THAT HE HAD ENGAGED IN SUCH BEHAVIORS IN THE

1    PAST.  SO I LOOKED AT BORDERLINE PERSONALITY DISORDER TO

2    SEE IF IT WOULD BE APPLICABLE TO HIM.

3    Q    AND WHAT DID YOU DETERMINE?

4    A    I DETERMINED THAT IT WAS NOT, ALTHOUGH MR. ANTONE HAD

5    ENGAGED IN THESE TYPES OF BEHAVIORS AND HAD ENGAGED OR

6    HAD EXPERIENCED PERHAPS SOME OF THE CHARACTERISTICS OF

7    BORDERLINE PERSONALITY DISORDER WHEN HE WAS YOUNGER,

8    MAYBE BETWEEN THE AGES OF 16 AND 20, SOME OF THOSE

9    RECURRENT THOUGHTS OF SUICIDE, SOME OF THAT MOOD

10   INSTABILITY, SOME OF THOSE GESTURES LIKE THE WRIST

11   CUTTING.

12        THE RECORDS THAT I HAD TO REVIEW INDICATED THAT

13   THOSE REALLY OCCURRED ONLY DURING THE AGES OF 16 AND 20,

14   PER SE.  THERE WAS NO EVIDENCE OF ANY OF THOSE BEHAVIORS

15   DURING HIS PERIOD OF INCARCERATION IN THE BUREAU OF

16   PRISONS.  AND WE ARE COMING UP ON APPROXIMATELY 12 YEARS

17   OF THAT NOW.

18        BORDERLINE PERSONALITY DISORDER, IF YOU HAVE EVER

19   WORKED WITH ONE OR HAD TO DEAL WITH ONE ON A CLINICAL

20   BASIS, THOSE INDIVIDUALS ARE FREQUENTLY AND TYPICALLY IN

21   SOME SORT OF CRISIS, SOME SORT OF PERSONAL CRISIS,

22   THOUGHTS OF SUICIDE, WANTING TO HURT THEMSELVES.  THEY

23   NEED FREQUENT REDIRECTION OR FREQUENT CONTACT FROM

24   PSYCHOLOGISTS.

25        AND THAT HASN'T BEEN THE CASE WITH MR. ANTONE.

1    ESSENTIALLY HE HAS BEEN ABLE TO DO OKAY IN THE B.O.P.

2    THERE HAS BEEN NO EVIDENCE OF THESE TYPES OF BEHAVIORS.

3    AND WITH BORDERLINE PERSONALITY DISORDER, YOU WOULD

4    EXPECT THAT ACROSS THE PERSON'S LIFETIME.  YOU WOULDN'T

5    EXPECT THOSE SYMPTOMS TO JUST STOP WHEN A PERSON REACHES

6    ADULTHOOD.

7    Q    DID YOU CONSIDER ANY OTHER DIAGNOSES?

8    A    NO, I DID NOT.

9    Q    DID -- SO YOU DIDN'T CONSIDER FROTTEURISM?

10   A    NO, I DID NOT.

11   Q    AND WHY WOULDN'T YOU HAVE CONSIDERED FROTTEURISM?

12   A    WELL, FROTTEURISM, IT'S A DIAGNOSIS -- IT'S A

13   PARAPHILIA.  IT'S LISTED IN THE DSM-IV.  BUT FROTTEURISM

14   IS ESSENTIALLY WHEN AN INDIVIDUAL RUBS HIS GENITALS UP

15   AGAINST A NON-CONSENTING PERSON OR FONDLES THE PERSON,

16   AND IT'S TYPICALLY DONE IN A CROWDED AREA SUCH AS A BUS

17   OR SUBWAY OR A CONCERT OR A SHOPPING CENTER.  YOU KNOW,

18   IT'S TYPICALLY DONE IN A PUBLIC PLACE, AND IT'S DONE

19   USUALLY ANONYMOUSLY AND VERY QUICKLY.

20      IF YOU LOOK -- EXCUSE THE EXPRESSION -- IT'S ALMOST

21   LIKE A HIT AND RUN TYPE OF OFFENSE.  A PERSON WILL GO UP

22   TO A PERSON, ANOTHER PERSON, AND COMMIT THE ACT, WHETHER

23   IT BE RUBBING THE GENITALS OR QUICK FONDLING, AND THEN

24   WILL GO AWAY, AND BEFORE THE VICTIM KNOWS WHAT HAS

25   HAPPENED, THE PERSON WHO HAS ENGAGED IN THE FROTTEURISM

1    HAS ALREADY DISAPPEARED AND HAS GONE AWAY SO AS TO AVOID

2    IDENTIFICATION, PROSECUTION, THINGS OF THAT NATURE.

3        SO I REALLY DIDN'T THINK THAT FROTTEURISM REALLY

4    CAPTURED THE EXTENT OF MR. ANTONE'S SEXUAL DEVIANCE AND

5    OFFENSE BEHAVIOR.  IT REALLY DOESN'T EVEN SCRATCH THE

6    SURFACE.

7        IT WOULD BE LIKE GOING TO THE DOCTOR AND FINDING OUT

8    THAT YOU HAVE A MALIGNANT BRAIN TUMOR AND THE DOCTOR

9    LISTS HEADACHES AS THE PROBLEM IN THE CHART.  YOU KNOW,

10   IT'S REALLY MISSING THE BIG PICTURE, I THINK.

11   Q   SO TELL ME IF THIS IS AN INCORRECT CHARACTERIZATION.

12   SO YOU DON'T HAVE THE IDEA OF LESSER INCLUDED OFFENSES IN

13   THE WORLD OF PSYCHOLOGICAL DIAGNOSES?

14   A   I AM SORRY.  CAN YOU REPEAT THE QUESTION?

15   Q   HAVE YOU EVER HEARD OF THE TERM OF ART, LESSER

16   INCLUDED OFFENSE?

17   A   I HAVE HEARD IT.

18   Q   I WILL JUST WITHDRAW THE QUESTION.

19       SO ARE THOSE ALL OF THE DIAGNOSES THEN THAT YOU

20   CONSIDERED?

21   A   YES.

22   Q   SO THEN DID YOU CONSIDER THE THIRD QUESTION, THE

23   THIRD PRONG, WHETHER MR. ANTONE WOULD HAVE SERIOUS

24   DIFFICULTY REFRAINING FROM SEXUALLY VIOLENT CONDUCT OR

25   CHILD MOLESTATION?

1    A    YES, I DID.

2    Q    WHAT DID YOU CONSIDER IN DETERMINING THAT?

3    A    WELL, WHEN I CONSIDERED IT, THINKING WHETHER OR NOT

4    MR. ANTONE WOULD HAVE SERIOUS DIFFICULTY IN REFRAINING

5    FROM SEXUALLY VIOLENT CONDUCT IF RELEASED, I WAS ABLE TO

6    DETERMINE THAT HE ALREADY HAS HAD SERIOUS DIFFICULTY IN

7    REFRAINING FROM SEXUALLY VIOLENT CONDUCT.

8         MR. ANTONE WAS CONVICTED IN 1990 OF RAPING V.R.

9    NUMBER 1, AND HE WAS CONVICTED -- HE WAS PUNISHED,

10   SANCTIONED, AND DESPITE THAT INTERACTION WITH THE

11   CRIMINAL JUSTICE SYSTEM, HE STILL CONTINUED TO ENGAGE IN

12   SIMILAR BEHAVIORS OVER A PERIOD OF TIME.  SO THAT WAS

13   SIGNATURE TO ME IN TERMS OF MAKING THAT DETERMINATION AS

14   TO WHETHER OR NOT HE WOULD HAVE SERIOUS DIFFICULTY IN

15   REFRAINING.

16        I ALSO LOOKED AT HIS PATTERN OF OFFENSES OVER TIME.

17   THERE WERE NUMEROUS OFFENSES THAT OCCURRED AFTER THAT

18   INITIAL 1990 CONVICTION, AND IF WE LOOK AT THE

19   CHRONOLOGY, THERE APPEARS TO BE A LITTLE BIT OF AN UPTICK

20   IN TERMS OF THE FREQUENCY WITH WHICH HE IS ENGAGING IN

21   THESE BEHAVIORS BEFORE HE WAS FINALLY APPREHENDED IN

22   1997.

23        A NUMBER OF THEM OCCUR IN THAT 14 MONTHS WINDOW FROM

24   JULY OF 1996 UP UNTIL NOVEMBER OF 1997, SO THAT INCREASE

25   IN FREQUENCY SUGGESTS TO ME THAT THERE IS SOME SERIOUS

1    DIFFICULTY IN REFRAINING FROM SEXUALLY VIOLENT CONDUCT OR

2    CHILD MOLESTATION.

3         ANOTHER ITEM OF INFORMATION THAT I CONSIDERED WAS

4    HIS SCORE ON THE ACTUARIAL, THE STATIC-99R WHICH MY

5    SCORING INDICATED THAT HE WAS AT THE HIGH RISK OF

6    OFFENDING.

7         SO, THAT IN AND OF ITSELF WAS A SUGGESTION OR AN

8    INDICATOR THAT HE WOULD HAVE SERIOUS DIFFICULTY IN

9    REFRAINING FROM SEXUALLY VIOLENT CONDUCT OR CHILD

10   MOLESTATION.

11   Q   WOULD IT ASSIST YOUR TESTIMONY IF WE ARE GOING TO

12   TALK ABOUT THE STATIC-99R AND YOUR SCORING, WOULD IT

13   ASSIST YOU IF YOUR SCORE SHEET WAS UP AS AN EXHIBIT UP ON

14   THE SCREEN?

15   A   YES.

16   Q   WE HAVE PULLED UP WHAT HAS BEEN IDENTIFIED AS B.O.P.

17   2170.  DO YOU RECOGNIZE THAT DOCUMENT?

18   A   YES, I DO.

19   Q   WHAT IS THAT?

20   A   THAT IS THE CODING FORM THAT I USED FOR MR. ANTONE

21   FOR THE STATIC-99R.

22   Q   NOW, AGAIN, THE QUESTION WAS WERE YOU HERE YESTERDAY

23   FOR THE PORTION OF DR. PHENIX'S TESTIMONY WHERE MR.

24   ROYSTER WENT THROUGH HER SCORING WITH HER?

25   A   YES.

1    Q    AND IS YOUR SCORE SHEET CONSISTENT WITH HERS?

2    A    IT IS NOT.

3    Q    AND HOW IS IT NOT CONSISTENT OR NOT THE SAME AS HERS?

4    A    THERE IS ONE ITEM IN WHICH OUR SCORES ARE DIFFERENT.

5    THAT WOULD BE ITEM NUMBER FIVE.

6    Q    AND WHAT IS THAT?

7    A    THAT REFERS TO PRIOR SEX OFFENSES.

8    Q    AND HOW IS IT DIFFERENT?

9    A    I ASSIGNED A SCORE OF THREE WHEREAS DR. PHENIX

10   ASSIGNED A SCORE OF TWO.

11   Q    AND DO YOU STAND BY YOUR SCORE OF THREE?

12   A    I DO.

13   Q    AFTER LISTENING TO HER TESTIMONY YESTERDAY?

14   A    I DO.

15   Q    WHY IS THAT?

16   A    IT WAS MY DETERMINATION THAT MR. ANTONE HAD SIX OR

17   GREATER PRIOR CHARGES RELATED TO SEX OFFENDING.

18   Q    AND SO AS SHE EXPLAINED YESTERDAY, YOU TAKE -- WELL,

19   CAN YOU EXPLAIN HOW YOU DO THE SCORING?

20   A    SURE.  WITH THAT PARTICULAR ITEM, YOU LOOK AT A

21   NUMBER -- AT THE PRIOR SEX OFFENSES.  YOU LOOK AT THE

22   CHARGES AND CONVICTIONS, AND YOU TOTAL UP EACH, THE TOTAL

23   NUMBER OF CHARGES AND CONVICTIONS, AND THEN YOU LOOK ON

24   THIS PAGE OR ON THIS LITTLE CHART, AND THE SCORE THAT IS

25   ASSIGNED FOR THAT ITEM IS DEPENDENT ON WHICH ONE IS

1    GREATER, SO TO SPEAK, WHETHER IT BE CHARGES OR

2    CONVICTIONS.

3        IF AN INDIVIDUAL HAS, FOR EXAMPLE, TWO TO THREE

4    CONVICTIONS, AND SIX PLUS CHARGES, THEN YOU WOULD TAKE

5    THE GREATER BEING THE SIX PLUS CHARGES, AND THAT WOULD

6    CORRESPOND TO A SCORE OF THREE.

7    Q    THAT IS WHAT YOU DID IN THIS CASE?

8    A    I DID.

9    Q    HOW DID YOU COME ABOUT THE CONCLUSION THAT THERE WERE

10   SIX PLUS CHARGES?

11   A    I CAME ABOUT THAT CONCLUSION BY REVIEWING MR.

12   ANTONE'S PRESENTENCE INVESTIGATION REPORT WHICH DETAILED

13   PRIOR CHARGES PERTAINING TO HIS SEXUAL OFFENDING.

14   Q    AND YOU CAME UP WITH SIX?

15   A    I CAME UP WITH GREATER THAN SIX.

16   Q    AND SO IT IS YOUR TESTIMONY THAT THIS IS AN ACCURATE

17   SCORE?

18   A    IT IS.

19   Q    NOW, --

20        THE COURT:  MR. BREDENBERG, LET ME INTERJECT

21   JUST TO NOTE THAT THIS DOCUMENT, BATES NUMBER 2170 DOES

22   APPEAR AS THE LAST PAGE OF GOVERNMENT'S EXHIBIT 6.  VERY

23   GOOD, SIR.

24        MR. BREDENBERG:  THANK YOU, YOUR HONOR.

25   Q    NOW, LET'S JUST ASSUME FOR SAKE OF ARGUMENT THAT THIS

1    SCORE WAS ACTUALLY THE WAY THAT DR. PHENIX PRESENTED IT

2    AND THAT THE FINAL SCORE, THE TOTAL SCORE, WAS A FIVE.

3    A    OKAY.

4    Q    IF THAT WERE A FIVE, WOULD THAT AFFECT YOUR OVERALL

5    OPINION IN THIS CASE?

6    A    IT WOULD NOT.  MY SCORE OF SIX CORRESPONDED TO A

7    CLASSIFICATION OF HIGH RISK.  IF IT DID GO DOWN TO A

8    SCORE OF FIVE, THAT WOULD STILL BE INDICATIVE OF MODERATE

9    TO HIGH RISK.

10        SO MY OPINION, ALTHOUGH NOT NECESSARILY GROUNDED

11   JUST TO THE STATIC-99R OVERALL WOULD NOT CHANGE.

12   Q    NOW, THERE WAS ALSO SOME TESTIMONY YESTERDAY ABOUT

13   THE FACT THAT MR. ANTONE MAY BE APPROACHING THE AGE OF

14   40?

15   A    YES.

16   Q    AND IF THAT IS THE CASE, WOULD HIS SCORE GO DOWN EVEN

17   MORE?

18   A    YES.  WHEN HE TURNS 40, I BELIEVE IT WILL BE IN MAY

19   OF 2012, THEN HIS SCORE WILL DROP ONE POINT.

20   Q    AND THEN THAT WOULD, AGAIN, FOR SAKE OF ARGUMENT

21   SAKE, THAT WOULD BE A FOUR?

22   A    ASSUMING THAT ITEM NUMBER FIVE WOULD DROP A SCORE OF

23   TWO AND THEN REDUCING IT ONE MORE POINT WITH THE AGE,

24   THEN YES, IT WOULD SCORE A FOUR.

25   Q    HOW WOULD THAT AFFECT YOUR OPINION?

1    A    IT WOULD NOT CHANGE MY OPINION.

2    Q    AND SO IN ORDER -- JUST TO CLARIFY IN YOUR SCORING,

3    YOU RELIED ON THE REPORT IN THE PSR; CORRECT?

4    A    THAT'S CORRECT.

5    Q    IS THAT SOMETHING THAT IS ORDINARILY RELIED ON BY

6    DOCTORS IN YOUR FIELD?

7    A    YES, I WOULD SAY SO.  I WOULD SAY THAT THE MAJORITY

8    OF INDIVIDUALS WILL LOOK AT THAT AS IT'S TYPICALLY A VERY

9    COMPREHENSIVE DOCUMENT PERTAINING TO CRIMINAL HISTORY.

10    Q    AND ARE THERE OTHER DOCUMENTS THAT PROFESSIONALS IN

11    YOUR FIELD MAY RELY ON IN DETERMINING THE INFORMATION

12    NEEDED TO SCORE NUMBER FIVE?

13    A    YES.

14    Q    SUCH AS?

15    A    THOSE COULD INCLUDE INDIVIDUAL ARREST REPORTS, POLICE

16    REPORTS, THINGS OF THAT NATURE.

17    Q    IS IT POSSIBLE DR. PHENIX MAY HAVE USED THOSE TYPES

18    OF THINGS IN HER SCORING?

19    A    IT'S POSSIBLE.

20    Q    DID YOU PERSONALLY SEE A DISCREPANCY WHEN YOU WERE

21    DOING YOUR SCORING?

22    A    I DO NOT.

23    Q    WHAT ELSE DID YOU CONSIDER IN DETERMINING WHETHER MR.

24    ANTONE WOULD HAVE A SERIOUS DIFFICULTY REFRAINING FROM

25    SEXUALLY VIOLENT CONDUCT OR CHILD MOLESTATION?

1    A    I ALSO CONSIDERED THAT MR. ANTONE HASN'T HAD ANY SEX

2    OFFENDER TREATMENT.  PSYCHOLOGISTS WILL TELL YOU THAT THE

3    BEST PREDICTOR OF FUTURE BEHAVIOR IS PAST BEHAVIOR.  AND

4    IN THE ABSENCE OF ANY TREATMENT OR INTERVENTION TO

5    ADDRESS THESE AREAS OF SEXUAL DEVIANCE, I THINK IT'S

6    HIGHLY LIKELY THAT MR. ANTONE WILL ENGAGE IN SIMILAR ACTS

7    IF RELEASED TO THE COMMUNITY.

8    Q    DID MR. ANTONE HAVE SEX OFFENDER TREATMENT AVAILABLE

9    TO HIM AT ANY TIME?

10   A    YES, HE DID.

11   Q    AND WHAT WAS THAT?

12   A    FOLLOWING HIS CERTIFICATION IN FEBRUARY OF 2007, HE

13   WAS DETAINED AND HAS BEEN DETAINED AT THE FEDERAL

14   CORRECTIONAL INSTITUTION IN THE MARYLAND UNIT, AND SEX

15   OFFENDER TREATMENT HAS BEEN AVAILABLE TO INDIVIDUALS IN

16   THAT UNIT SINCE THAT TIME.

17   Q    AND WOULD MR. ANTONE HAVE BEEN ACCEPTED INTO THE

18   PROGRAM OR ALLOWED TO PARTICIPATE IN TREATMENT IF HE HAD

19   SO CHOSEN?

20   A    YES, HE WOULD HAVE.

21   Q    BUT HE DIDN'T DO THAT?

22   A    HE DID NOT.

23   Q    WHAT OTHER FACTORS DID YOU CONSIDER IN DETERMINING

24   PRONG THREE?

25   A    WELL, TO REFRESH MY MEMORY HERE TO THE ONES I HAVE

1   ALREADY DISCUSSED, THOSE WOULD BE THE PATTERN OF

2   OFFENDING OVER YEARS, THE ACTUARIAL RESULTS, THE FACT

3   THAT HE HASN'T HAD SEX OFFENDER TREATMENT, THE FACT THAT

4   HE HAS CONTINUED TO ENGAGE IN THESE BEHAVIORS, THESE

5   SEXUALLY VIOLENT ACTS AND CHILD MOLESTATION DESPITE PRIOR

6   SANCTION FROM THE COURT.

7            ALSO THE FACT, ALTHOUGH HE HAS RECEIVED SOME

8   TREATMENT AND EDUCATION REGARDING HIS PROBLEMS WITH

9   SUBSTANCE ABUSE, I DON'T THINK THAT THOSE HAVE BEEN

10  SUFFICIENTLY ADDRESSED TO DATE, SO THAT IS ANOTHER AREA

11  OF CONCERN THAT MR. ANTONE HAS IN THAT IF HIS

12  DIFFICULTIES WITH SUBSTANCE ABUSE DEPENDENCE HAVEN'T BEEN

13  CORRECTED, SO TO SPEAK, THEN THAT WILL BE A CONTRIBUTING

14  FACTOR FOR HIM WITH POSSIBLE FUTURE OFFENDING.

15  Q   DID YOU CONSIDER HIS SOCIAL INFLUENCES?

16  A   I DID.  I ALSO CONSIDERED THOSE, IN A SENSE, MOST, IF

17  NOT ALL, WITHOUT HAVING THE OPPORTUNITY TO INTERVIEW HIM,

18  IT APPEARS THAT MOST OF THE INFLUENCES THAT HE HAS HAD IN

19  HIS LIFE HAVE HAD SOME NEGATIVE EFFECT ON HIM, WHETHER IT

20  BE HIS MOTHER, HIS GIRLFRIEND.  WE HAVE HEARD ABOUT AND

21  THE RECORD CERTAINLY INDICATES THAT THERE WAS AN

22  EXTENSIVE PROBLEM WITH SUBSTANCE ABUSE IN HIS IMMEDIATE

23  FAMILY AND WITH THOSE THAT HE ASSOCIATED WITH.  SOME OF

24  THOSE THAT HAVE BEEN CLOSE TO HIM, INCLUDING HIS

25  EX-GIRLFRIEND, AND I BELIEVE HIS BROTHER, HAVE BEEN

1    INCARCERATED.

2         SO IT JUST DOESN'T APPEAR THAT HE HAS HAD VERY MANY,

3    IF ANY, INFLUENCES IN HIS LIFE THAT HAVE BEEN POSITIVE.

4    AND MY CONCERN WOULD BE THAT GOING BACK TO THAT

5    ENVIRONMENT, GOING BACK TO SOME OF THOSE INFLUENCES,

6    COULD HAVE A NEGATIVE AFFECT ON HIM.

7    Q    AND IS IT YOUR DETERMINATION BASED ON WHAT YOU KNOW

8    THAT HE WOULD BE GOING BACK TO THAT SAME ENVIRONMENT?

9    A    HE SPOKE YESTERDAY ABOUT GOING BACK TO ARIZONA, AND

10   HE MENTIONED TUCSON, AND I AM NOT SURE WHAT THE PROXIMITY

11   IS OF TUCSON TO THE TRIBAL NATION, BUT IT DIDN'T APPEAR

12   TO BE A VERY THOUGHT OUT PLAN NECESSARILY AS TO WHERE HE

13   WOULD BE GOING AND WITH WHOM HE WOULD BE LIVING.

14        HE MENTIONED HIS SISTER, BUT I BELIEVE HIS SISTER

15   HAS ALSO HAD SOME DIFFICULTIES IN HER LIFE AND MIGHT NOT

16   BE THE BEST INFLUENCE FOR HIM AT THIS TIME.

17   Q    WERE YOU HERE FOR HIS TESTIMONY YESTERDAY?

18   A    YES, I WAS.

19   Q    DID YOU HEAR HIM SAY THAT HE KNOWS THAT THERE IS

20   ALWAYS A CHANCE HE MIGHT DRINK?

21   A    YES.

22   Q    AND DID THAT AFFECT YOUR OPINION?

23   A    WELL, MY OPINION -- I ALREADY FORMULATED MY OPINION,

24   BUT IT CERTAINLY REINFORCED OR SOLIDIFIED MY OPINION TO

25   HEAR HIM SAY THAT THAT WAS A POSSIBILITY, REINFORCE MY

1  OPINION REGARDING HIS DIAGNOSIS OF DEPENDENCE AND THE

2  EXTENT TO WHICH HIS PROBLEMS WITH ALCOHOL AND DRUGS COULD

3  CONTRIBUTE TO FUTURE OFFENDING.

4  Q   YOU HAVE EXPRESSED YOUR OPINION ON THE THREE PRONGS.

5  LET ME JUST SUMMARIZE THAT FOR YOU.  HAVE YOU FORMULATED

6  AN OPINION AS A RESULT OF YOUR EVALUATIONS, THE TESTIMONY

7  YOU HAVE HEARD, HAVE YOU FORMULATED AN OPINION AS TO

8  WHETHER MR. ANTONE IS PRESENTLY SUFFERING FROM A SERIOUS

9  MENTAL ILLNESS, ABNORMALITY, OR DISORDER AS A RESULT OF

10 WHICH HE WOULD HAVE SERIOUS DIFFICULTY REFRAINING FROM

11 SEXUALLY VIOLENT CONDUCT OR CHILD MOLESTATION?

12 A   YES.

13 Q   AND WHAT IS THAT OPINION?

14 A   MY OPINION IS THAT HE HAS ENGAGED IN SEXUALLY VIOLENT

15 CONDUCT AND CHILD MOLESTATION AND THAT HE SUFFERS FROM

16 SERIOUS MENTAL ILLNESSES, ABNORMAL DISORDERS THAT WOULD

17 CAUSE HIM TO EXPERIENCE SERIOUS DIFFICULTY IN REFRAINING

18 FROM SEXUALLY VIOLENT CONDUCT AND CHILD MOLESTATION IF HE

19 WAS RELEASED TO THE COMMUNITY.

20 Q   DID YOU CONSIDER -- DID YOU READ DR. PHENIX'S

21 EVALUATION?

22 A   I DID.

23 Q   ARE HER ASSESSMENTS AND OPINIONS CONSISTENT GENERALLY

24 WITH YOURS?

25 A   YES, THEY ARE.

1    Q   HAVE YOU READ THE FORENSIC EVALUATION PREPARED BY DR.

2    DAUM?

3    A   YES, I HAVE.

4    Q   AND ARE HIS ASSESSMENTS AND OPINIONS CONSISTENT WITH

5    YOURS?

6    A   NO, THEY ARE NOT.

7    Q   HOW ARE THEY NOT?

8    A   DR. DAUM DIFFERED IN TERMS OF HIS DIAGNOSES.  I

9    BELIEVE THAT HE ASSIGNED A DIAGNOSIS OF FROTTEURISM AND

10   BORDERLINE PERSONALITY DISORDER WITH ANTISOCIAL FEATURES.

11   I DON'T RECALL OFF THE TOP OF MY HEAD IF THERE WAS

12   ANOTHER DIAGNOSIS THAT HE RENDERED, BUT OVERALL, THE BIG

13   PICTURE, HE OPINED THAT MR. ANTONE DID NOT MEET CRITERIA

14   FOR CIVIL COMMITMENT, AND THAT WOULD BE THE MAJOR

15   DIFFERENCE BETWEEN MY REPORT AND HIS.

16            MR. BREDENBERG:  THANK YOU, DOCTOR.  NO

17   FURTHER QUESTIONS AT THIS TIME.

18            THE COURT:  VERY GOOD, SIR.

19            COUNSEL FOR THE RESPONDENT, MR. ROSS.

20            MR. ROSS:  THANK YOU, YOUR HONOR.

21   CROSS EXAMINATION BY MR. ROSS:

22   Q   DR. GUTIERREZ, PEOPLE CAN CHANGE; RIGHT?

23   A   YES, THEY CAN.

24   Q   AND THAT IS PART OF THE PSYCHOLOGIST'S JOB TO HELP

25   THEM CHANGE; RIGHT?

1    A    I AM SORRY.  COULD YOU REPEAT THE QUESTION?

2    Q    PART OF THE PSYCHOLOGISTS' JOBS ARE TO HELP PEOPLE

3    CHANGE?

4    A    DEPENDING ON THE PSYCHOLOGIST'S JOB, YES.

5    Q    NOW, AT THE TIME MR. ANTONE WAS ARRESTED, HE WAS 25

6    YEARS OLD?

7    A    THAT'S CORRECT.

8    Q    AND ADOLESCENT BRAIN IS WHAT, FROM -- GOES ALL THE

9    WAY UP TO 25?

10   A    I DON'T KNOW THAT IT GOES PRECISELY TO 25, BUT --

11   Q    CLOSE?

12   A    THERE ARE CHANGES IN THE BRAIN THAT OCCUR CERTAINLY

13   THROUGHOUT ADOLESCENCE AND EARLY ADULTHOOD, EARLY 20'S.

14   Q    ALL RIGHT.  NOW, IF WE ACCEPT THE PREMISE THAT PEOPLE

15   CAN CHANGE, THEY CAN CHANGE BY MATURING; FAIR ENOUGH?

16   A    I AM SORRY.  THEY CAN CHANGE BY?

17   Q    MATURING.

18   A    MATURING.

19   Q    GETTING OLDER?

20   A    YES.

21   Q    UNDERSTANDING WHAT THEY HAVE DONE IN THE PAST?

22   A    YES.

23   Q    NOW, YOU HAVE WORKED IN PRISONS, I GUESS, SINCE YOU

24   GRADUATED IN 2001?

25   A    THAT'S CORRECT.

1    Q    AND PART OF WORKING IN PRISON, YOU COME IN CONTACT

2    WITH INDIVIDUALS WHO ARE INMATES; IS THAT RIGHT?

3    A    YES.

4    Q    AND SINCE 2001, HOW MANY INMATES HAVE YOU TREATED IN

5    SOME FORM OR FASHION, OR IS IT JUST ABOUT EVALUATIONS?

6    A    IT'S NOT JUST ABOUT EVALUATIONS.  I WOULDN'T KNOW THE

7    NUMBER OF INDIVIDUALS THAT I HAVE TREATED OFF THE TOP OF

8    MY HEAD, BUT IN ADDITION TO MY DUTIES WHICH ARE

9    ESSENTIALLY TO EVALUATE INDIVIDUALS, I ALSO SERVE AS THE

10   ON-CALL PSYCHOLOGIST APPROXIMATELY ONCE -- ONE WEEK EVERY

11   TWO MONTHS WHERE I AM ON CALL.

12        SO IF THERE IS AN ISSUE WITH INMATES IN THE

13   INSTITUTION, I AM THE ONE THAT HAS TO RESPOND TO THAT.

14   SO IF AN INDIVIDUAL NEEDS TO BE ASSESSED FOR PLACEMENT ON

15   SUICIDE WATCH OR IF THERE IS SOME SORT OF CRISIS

16   INTERVENTION THAT NEEDS TO OCCUR, BRIEF COUNSELING,

17   THINGS OF THAT NATURE, I WOULD BE THE ONE TO DO IT DURING

18   THOSE PERIODS OF TIME.

19   Q    NOW, YOUR OFFICE IS AT BUTNER FCI-1?

20   A    YES, IT IS.

21   Q    AND ARE YOU UP IN THE UNITS WHERE MARYLAND, NORTH

22   CAROLINA, DUKE --

23   A    YES.  MY OFFICE IS IN THE DUKE UNIT.

24   Q    THAT UNIT IS WHERE THEIR EVALUATIONS HAPPEN?

25   A    THAT UNIT IS WHERE I DO MY CLINICAL INTERVIEWS, IF I

1   WERE TO DO CLINICAL INTERVIEWS AT THIS TIME.  HOWEVER, MY

2   OFFICE USED TO BE ACTUALLY IN MARYLAND UNIT.  I BELIEVE

3   AT THE TIME THAT I DID MY FIRST TWO REPORTS OF MR.

4   ANTONE, MY OFFICE WAS IN THE MARYLAND UNIT.

5   Q    ALL RIGHT.  AND THAT WOULD BE IN 2007?

6   A    2007, BOTH OF THOSE, IF I AM NOT MISTAKEN, MY OFFICE

7   MOVED TWO YEARS AGO, 2009.

8   Q    LET'S TALK ABOUT THE FIRST ONE WHICH IS DATED IN

9   FEBRUARY OF 2007 WHICH IS THE PRECERTIFICATION; OKAY?

10  A    OKAY.

11  Q    NOW, YOU WOULD AGREE WITH ME THAT MR. ANTONE WAS

12  SUPPOSED TO LEAVE THE BUREAU OF PRISONS WITHIN TWO WEEKS

13  OF HIM ARRIVING AT BUTNER?

14  A    THAT IS CORRECT.

15  Q    AND HE GOT TO THE PRISON ON FEBRUARY 14, 2007?

16  A    I DON'T RECALL THE EXACT DATE THAT HE ARRIVED THERE,

17  BUT I BELIEVE IT WAS SOMETIME IN THAT MONTH OF FEBRUARY

18  OF '07.

19  Q    AND THIS PERSON WHO WAS SUPPOSED TO LEAVE THE BUREAU

20  OF PRISONS IN TWO MONTHS WAS TAKEN TO THE SHU?

21  A    HE MAY HAVE BEEN TAKEN TO SHU OR TO THE MARYLAND

22  ANNEX INITIALLY, BUT I BELIEVE HE WAS WITHIN A SHORT

23  PERIOD OF TIME MOVED TO ONE OF THE GENERAL ROOMS IN THE

24  MARYLAND UNIT.

25            THE COURT:  MR. ROSS, BY SHU, I AM ASSUMING

1    YOU MEAN SPECIAL HOUSING UNIT.

2              MR. ROSS:  YES.  I WAS ABOUT TO ASK THAT.

3              THE COURT:  THANK YOU.

4    Q   TO AGREE WITH THE COURT, THE SPECIAL HOUSING UNIT?

5    A   CORRECT, THE SPECIAL HOUSING UNIT, OR THERE IS A

6    SPECIAL HOUSING UNIT IN BUTNER.  IT ACTUALLY IS AT THE

7    LOW INSTITUTION.  MAYBE IT'S JUST A MATTER OF SEMANTICS,

8    BUT IT'S CALLED THE MARYLAND ANNEX WHICH IS A LOCKED UNIT

9    SIMILAR TO A SHU, BUT THAT IS WHERE MR. ANTONE WOULD HAVE

10   BEEN.

11   Q   WHEN WE SAY LOCKED, AWAY FROM THE POPULATION; RIGHT?

12   A   YES.

13   Q   LOCKED IN THEIR CELL?

14   A   CORRECT.

15   Q   FOR 23 HOURS A DAY?

16   A   YES.

17   Q   AND THIS IS SOMEBODY WHO IS SUPPOSED TO BE RELEASED

18   IN LESS THAN TWO WEEKS FROM THE BUREAU OF PRISONS;

19   CORRECT?

20   A   CORRECT.

21   Q   AND YOU SPOKE TO MR. ANTONE IN THE ANNEX?

22   A   I DON'T RECALL IF I SPOKE TO HIM IN THE ANNEX.  I

23   DON'T THINK I DID.

24   Q   DO YOU RECALL IF YOU SPOKE TO HIM IN YOUR OFFICE?

25   A   I DID SPEAK TO HIM IN MY OFFICE PRIOR TO THE MAY OF

1    2007 REPORT.  BUT I DON'T RECALL SPECIFICALLY IF I MET

2    WITH MR. ANTONE FOR THE FIRST TIME WHEN HE WAS IN THE

3    ANNEX.

4         MY REPORT INDICATES THAT THE DATE OF EVALUATION WAS

5    FEBRUARY 21, 2007, SO I WOULD HAVE MET WITH HIM ON THAT

6    DATE, AND I DON'T RECALL IF HE WAS IN THE ANNEX OR JUST

7    IN THE GENERAL MARYLAND UNIT IN A REGULAR ROOM AT THAT

8    TIME.

9    Q    SO ON THE 21ST WHICH APPEARS TO BE BE SEVEN DAYS

10   BEFORE ANTONE WAS SUPPOSED TO BE RELEASED FROM THE BUREAU

11   OF PRISONS; IS THAT CORRECT?

12   A    YES.

13   Q    NOW, WITH MR. ANTONE, YOU EXPLAINED TO HIM ON THE

14   21ST OF FEBRUARY OF 2007, WHAT YOU WERE THERE TO DO, A

15   PRECERTIFICATION FOR THE ADAM WALSH ACT?

16   A    YES, I DID.

17   Q    AND WHEN YOU EXPLAINED THAT TO MR. ANTONE, DID YOU

18   EXPLAIN TO HIM THAT THIS WOULD MEAN CIVIL COMMITMENT

19   AFTER HE IS SUPPOSED TO BE RELEASED FROM THE BUREAU OF

20   PRISONS?

21   A    I EXPLAINED TO HIM THAT CIVIL COMMITMENT WAS A

22   POSSIBILITY FOLLOWING CERTIFICATION BECAUSE I KNEW THAT

23   EVENTUALLY THERE WOULD BE A TRIAL TO DETERMINE WHETHER OR

24   NOT HE WOULD BE CIVILLY COMMITTED, BUT I EXPLAINED TO HIM

25   THAT THE CERTIFICATION, IF IT OCCURRED IN HIS CASE, WOULD

1    BE THE FIRST STEP TOWARDS POSSIBLE CIVIL COMMITMENT.

2    Q    WHICH MEANT -- AND I PRESUME YOU EXPLAINED TO HIM

3    THAT MEANT THAT HE WOULD BE KEPT AFTER HE WAS SUPPOSED TO

4    BE RELEASED FROM THE BUREAU OF PRISONS?

5    A    I DID EXPLAIN THAT TO HIM, YES.

6    Q    AND YOU EXPLAINED TO HIM THAT ANYTHING THAT HE SAID

7    TO YOU WOULD NOT BE HELD IN CONFIDENCE.  YOU DID SAY

8    THAT; RIGHT?

9    A    I DID EXPLAIN THOSE LIMITS OF CONFIDENTIALITY.

10   Q    AND YOU EXPLAINED TO HIM THAT YOU WORKED FOR THE

11   BUREAU OF PRISONS?

12   A    YES.

13   Q    AND MR. ANTONE, HE DIDN'T CUSS AT YOU?

14   A    NO, HE DID NOT.

15   Q    HE DIDN'T YELL AT YOU?

16   A    NO, HE DID NOT.

17   Q    HE DIDN'T BREAK DOWN AND CRY IN FRONT OF YOU?

18   A    NO, HE DID NOT.

19   Q    HE DID NOT SEXUALLY ASSAULT YOU?

20   A    NO, HE DID NOT.

21   Q    NOW, WITH YOU BEING ON THE MARYLAND UNIT AT THAT

22   TIME, DO YOU KNOW HOW MANY PEOPLE WERE THERE IN ABOUT

23   2007?

24   A    I DON'T KNOW SPECIFICALLY HOW MANY THERE WERE AT THAT

25   TIME.

1  Q   AT ONE TIME, ARE YOU AWARE THERE WAS UPWARDS OF CLOSE

2  TO 100 PEOPLE IN THE MARYLAND UNIT?

3  A   YES, I BELIEVE SO.  I THINK THAT WAS A LITTLE LATER

4  ON THOUGH AFTER MORE INDIVIDUALS HAD BEEN CERTIFIED.

5  I THINK MR. ANTONE WAS FAIRLY EARLY ON IN TERMS OF BEING

6  CERTIFIED COMPARED TO SOME OF THE OTHER INDIVIDUALS, SO I

7  DON'T THINK THAT THERE WERE THAT MANY PEOPLE WHEN HE WAS

8  INITIALLY CERTIFIED.

9  Q   EARLY ON, THE FIRST FEW MONTHS OF THE 4248 PRE-CERTS,

10  THAT IS WHAT YOU ARE TALKING ABOUT; RIGHT?

11  A   YES.

12  Q   AND AROUND THAT TIME, 2006 AND EARLY 2007, THERE WERE

13  ABOUT 40 PEOPLE ON THE MARYLAND UNIT?

14  A   I DON'T KNOW FOR SURE, BUT THAT IS POSSIBLE.

15  Q   NOW, AT THE TIME YOU SPOKE TO MR. ANTONE ON FEBRUARY

16  21, 2007, HAD YOU HAD AN OPPORTUNITY TO REVIEW HIS PRISON

17  RECORDS?

18  A   YES, I HAD.

19  Q   HAD YOU HAD AN OPPORTUNITY TO REVIEW THE FACT THAT HE

20  HAD ISSUES RELATING TO ALCOHOL AND OTHER SUBSTANCES?

21  A   YES.

22  Q   AND AT THE TIME THAT YOU REVIEWED THIS INFORMATION ON

23  FEBRUARY 21, 2007, YOU WERE ABLE TO TAKE NOTICE THAT MR.

24  ANTONE HAD NOT HAD ANY ALCOHOL FOR THOSE MANY YEARS?

25  A   I HAD NOTICED THAT HE HAD NOT BEEN SANCTIONED OR

1    DISCOVERED DRINKING ALCOHOL DURING THOSE YEARS, YES.

2    Q    NOW, LET'S TALK ABOUT THAT FOR A MOMENT.  YOU

3    QUALIFIED THAT HE HAD NOT BEEN SANCTIONED.  YOU ARE

4    AWARE, BECAUSE YOU WORK AT THE PRISON, THAT THEY DO HAVE

5    A BREATHALYZER THAT CHECKS THE INMATES FOR ALCOHOL?

6    A    YES.

7    Q    AND THEY ACTUALLY KEEP A LOG BOOK OF THAT INFORMATION

8    ON THE UNITS?

9    A    YES.

10   Q    AND ON THE UNITS, I AM TALKING ABOUT MARYLAND UNIT,

11   HAVE YOU HAD AN OPPORTUNITY TO LOOK AT THE LOG BOOK TO

12   SEE HOW MANY TIMES MR. ANTONE HAS BEEN CHECKED FOR THAT

13   BREATHALYZER?

14   A    I HAVE NOT.

15   Q    YOU ARE AWARE, BECAUSE YOU WORK AT THE BUREAU OF

16   PRISONS, EVEN THOUGH YOU SAY IT'S RATHER LIMITED, THAT

17   PEOPLE ARE ABLE TO GET ALCOHOL, PEOPLE DO TURN UP

18   POSITIVE FOR ALCOHOL?

19   A    THAT IS TRUE.

20   Q    THEY WERE VERY CREATIVE IN THE WAY IN WHICH THEY MAKE

21   ALCOHOL?

22   A    YES, THEY ARE.

23   Q    VERY CREATIVE IN THE THE WAY IN WHICH THEY HIDE THE

24   ALCOHOL?

25   A    YES.

1    Q    NOW, WITH MR. ANTONE, YOU HAD AN OPPORTUNITY TO

2    REVIEW HIS SANCTIONS OVER THE YEARS?

3    A    YES.

4    Q    YOU HAVE HAD OPPORTUNITIES IN THE PAST TO REVIEW

5    OTHER PERSONS SANCTIONS OVER THE YEARS?

6    A    YES.

7    Q    AND THEY CAN VARY?

8    A    CERTAINLY.

9    Q    FROM PERSON TO PERSON?

10   A    THAT'S CORRECT.

11   Q    SOME PEOPLE THEY VIOLATE ANY CHANCE THEY GET?

12   A    YES, THEY DO.

13   Q    SOME PEOPLE NEVER VIOLATE?

14   A    THAT'S CORRECT.

15   Q    AND SOMETIMES THERE ARE PEOPLE IN THE MIDDLE?

16   A    YES, I WOULD AGREE WITH THAT.

17   Q    NOW, WITH MR. ANTONE, YOU DID NOT FIND ANYTHING THAT

18   SAID HE VIOLATED ANYONE SEXUALLY?

19   A    THAT'S CORRECT.

20   Q    HE INTERACTED WELL WHILE HE WAS AT THE BUREAU OF

21   PRISONS IN THE MARYLAND UNIT?

22   A    YES.

23   Q    YOU HEARD OF NO FIGHTS?

24   A    NOT IN THE MARYLAND UNIT, NO.

25   Q    NO DISAGREEMENTS?

1    A    NO.

2    Q    YOU ARE AWARE THAT WITH CHANGE, A PERSON HAS TO ASK

3    FOR HELP WHEN THEY NEED IT; IS THAT RIGHT?

4    A    MANY TIMES, YES.

5    Q    AND THE FACT THAT A PERSON ASKS FOR CHANGE IS A GOOD

6    THING?

7    A    GENERALLY SPEAKING, I WOULD SAY SO, YES.

8    Q    AND YOU NOTED IN YOUR UPDATED REPORT THAT ON

9    GOVERNMENT'S EXHIBIT NUMBER 9, WHICH IS YOUR PAGE 2, IT'S

10   DATED FOR SEPTEMBER 13, 2010?

11              MR. BREDENBERG:  YOUR HONOR, I THINK THE

12   NUMBERING IS OFF AGAIN.  IF HE IS TALKING ABOUT --

13              MR. ROSS:  I AM SORRY.  I AM LOOKING AT IT

14   BACKWARDS.

15              THE COURT:  NUMBER 6.

16              MR. ROSS:  THANK YOU, SIR.

17   Q    NOW, YOU NOTATED THAT MR. ANTONE PARTICIPATED IN

18   BRIEF COUNSELING SESSIONS; IS THAT RIGHT?

19   A    YES.

20   Q    TO ADDRESS A VARIETY OF ISSUES?

21   A    CORRECT.

22   Q    DEATHS OF FAMILY MEMBERS, CONCERNS OF HIS SON, AND

23   DAY-TO-DAY STRESSORS ABOUT BEING DETAINED AND SYMPTOMS OF

24   ANXIETY; IS THAT RIGHT?

25   A    THAT'S CORRECT.

1    Q    NOW, IT'S A GOOD THING WHEN SOMEBODY ON THEIR OWN

2    ASKS FOR HELP; RIGHT?

3    A    SURE.

4    Q    HOW MANY NATIVE AMERICANS HAVE YOU TREATED WHILE YOU

5    HAVE BEEN AT BUTNER?

6    A    I CAN'T GIVE YOU AN EXACT AMOUNT, BUT I CERTAINLY

7    HAVE HAD OCCASION TO PROVIDE COUNSELING AND CRISIS

8    INTERVENTION TO SOME NATIVE AMERICANS WHEN I HAVE BEEN ON

9    CALL DURING THOSE PERIODS OF TIME.

10   Q    HOW MANY OF THE NATIVE AMERICANS HAVE VOLUNTEERED FOR

11   THE SEX TREATMENT PROGRAM?

12   A    OFF THE TOP OF MY HEAD, I CAN THINK OF ONE.  I CAN'T

13   RECALL IF ANY OTHERS HAVE DONE SO OVER THE LAST FOUR AND

14   HALF YEARS THOUGH.

15   Q    HOW MANY OF THE 100 PLUS THAT HAVE BEEN PRETRIAL

16   DETAINEES WHILE AT BUTNER HAVE VOLUNTEERED FOR THE

17   TREATMENT PROGRAM?

18   A    I DON'T KNOW EXACTLY, BUT I BELIEVE IT'S ANYWHERE

19   BETWEEN HALF A DOZEN AND EIGHT, SOMEWHERE IN THAT

20   NEIGHBORHOOD.

21   Q    HOW MANY HAVE BEEN KICKED OUT OF THE PROGRAM SINCE

22   THEY VOLUNTEERED?

23   A    I CAN RECALL ONE WHO WAS KICKED OUT OF THE PROGRAM,

24   BUT I DON'T RECALL IF ANYBODY ELSE HAS.  SINCE I AM NOT

25   AFFILIATED, PER SE, WITH THE TREATMENT ASPECT, I DON'T

1    HAVE ACCESS TO THOSE NUMBERS OR DON'T KNOW OF ALL THE

2    INSTANCES.

3    Q    HOW MANY HAVE DECIDED TO LEAVE THE PROGRAM ON THEIR

4    OWN?

5    A    I DON'T KNOW IF ANYBODY HAS.

6    Q    HOW MANY OF THOSE PEOPLE WHO VOLUNTEERED FOR THE

7    PROGRAM HAVE BEEN RELEASED FROM THE BUREAU OF PRISONS?

8    A    NONE.

9    Q    AND THAT IS IN THE FOUR YEARS?

10   A    THAT IS IN THE FOUR YEARS, ALTHOUGH OF THOSE THAT

11   HAVE PARTICIPATED, I COULDN'T TELL YOU HOW LONG THEY WERE

12   IN TREATMENT FOR.  SOME TREATMENT WITH SOME INDIVIDUALS

13   HAS BEEN OF SHORT OR MODERATE DURATION.  I DON'T KNOW OF

14   ANYBODY THAT VOLUNTEERED FOR TREATMENT THAT HAS STAYED

15   WITH IT FOR AN EXTENDED PERIOD OF TIME.

16   Q    YOU WOULD LIKE TO SEE PSYCHOLOGISTS TREAT MR. ANTONE

17   FOR HIS POLYSUBSTANCE ADDICTION; IS THAT RIGHT?

18   A    YES, I THINK THAT IS VERY IMPORTANT FOR MR. ANTONE.

19             THE COURT:  MR. ROSS, IF WE ARE ENTERING A NEW

20   AREA, WHY DON'T WE TAKE OUR MORNING BREAK AT THIS TIME.

21             MR. ROSS:  YES, SIR.

22             THE COURT:  WE'LL RECONVENE AT 10:45.

23             (WHEREUPON, A SHORT RECESS WAS TAKEN.)

24             THE COURT:  MR. ROSS, YOU MAY CONTINUE.

25             MR. ROSS:  THANK YOU, YOUR HONOR.

1    Q    YOU TOOK TRAINING, EVALUATION OF SEXUALLY DANGEROUS

2    PERSONS, IN SEPTEMBER 2010; IS THAT RIGHT?

3    A    THAT'S CORRECT.

4    Q    AND THE PRESENTER THERE WAS AMY PHENIX WHO IS PRESENT

5    HERE IN THE COURTROOM?

6    A    YES.

7    Q    AND SHE WORKED ON THE STATIC-99, THE STATIC 99-R?

8    A    YES.

9    Q    ALL RIGHT.  AND YOU HAVE ALSO BEEN TO TRAINING, USING

10   ASSESSMENT OF PSYCHOLOGICAL RISK FACTORS TO REVISE

11   RELATIVE RISK ASSESSMENTS DERIVED FROM STATIC -- THAT "A"

12   WORD -- ACTUARIAL INSTRUMENTS?

13   A    I AM NOT SURE WHICH TRAINING YOU ARE REFERRING TO.

14   Q    OCTOBER 2009 IN DALLAS, TEXAS?

15   A    CAN YOU REMIND ME WHICH EXHIBIT THAT IS?

16   Q    THAT IS EXHIBIT NUMBER 4.

17   A    THANK YOU.

18          THE COURT:  LOOKING AT GOVERNMENT'S EXHIBIT

19   NUMBER 4, DR. GUTIERREZ'S CV.

20          MR. ROSS:  YES.  SORRY.

21   Q    UNDER RELEVANT TRAINING.

22   A    YES.  WHICH TRAINING WAS THAT AGAIN THAT YOU

23   MENTIONED?

24   Q    IT'S THE FIFTH ONE DOWN.

25          THE COURT:  WHAT PAGE?  I GUESS THE PAGES

1    AREN'T NUMBERED.

2              MR. ROSS:  IT IS THE THIRD PAGE -- THE FOURTH

3    PAGE OF THE CV.

4              THE WITNESS:

5    A    YES.

6    Q    AND DR. THORNTON, DR. HANSON, DR. HARKINS, DR.

7    WAKELING, AND THE ASSOCIATION FOR THE TREATMENT OF SEXUAL

8    ABUSERS.  THIS WAS AT THAT CONFERENCE AND THEY PRESIDED?

9    A    THAT'S CORRECT.

10   Q    NOW, DO YOU BELONG TO THE ASSOCIATION FOR THE

11   TREATMENT OF SEXUAL ABUSERS?

12   A    NO, I DON'T.

13   Q    I SEE THAT YOU WENT TO ONE TRAINING IN OCTOBER 2009

14   WITH THEM.  YOU WENT TO ANOTHER TRAINING BY DR. HARRIS

15   AND THE ASSOCIATION FOR THE TREATMENT OF SEXUAL ABUSERS

16   IN SEPTEMBER OF 2009; IS THAT RIGHT?

17   A    CORRECT.  THAT WAS PART OF THE ANNUAL CONFERENCE FOR

18   THE ASSOCIATION FOR THE TREATMENT OF SEXUAL ABUSERS AND

19   IT SPANNED THE LAST DAY OR TWO OF SEPTEMBER 2009 INTO

20   OCTOBER 2009.

21   Q    ALL RIGHT.  AND THE TRAININGS THAT YOU HAVE HAD, YOU

22   HAVE HAD THEM AT BUTNER; IS THAT RIGHT?

23   A    SOME OF THEM, YES.

24   Q    YOU HAVE HAD TRAININGS DEALING AT FCI-SPRINGFIELD?

25   A    YES.

1  Q   YOU EVEN HAD A TRAINING WITH DR. HEILBRUN IN JUNE OF

2  2009?  THAT IS ON THE FIFTH PAGE OF YOUR CV.

3  A   YES.

4  Q   ALL RIGHT.  NOW, OUT OF THE TRAINING SESSIONS THAT

5  YOU HAVE HAD WITH THE ASSOCIATION FOR THE TREATMENT OF

6  SEXUAL ABUSERS, THEY ACCEPT THAT HEBEPHILIA DIAGNOSIS OF

7  YOURS; DON'T THEY?  THE HEBEPHILIA?

8  A   I AM NOT SURE WHO ACCEPTS THAT.

9  Q   DR. THORNTON, DR. HANSON, DR. HARKINS, DR. WAKELING?

10 A   TO MY KNOWLEDGE, THEY DO.

11 Q   AND OF COURSE THE ASSOCIATION FOR THE TREATMENT OF

12 SEXUAL ABUSERS?

13 A   TO MY KNOWLEDGE.

14 Q   ALL RIGHT.  NOW, THIS IS ALSO THE SAME ORGANIZATION

15 AND THE SAME DOCTORS THAT ACCEPT PARAPHILIA NOS,

16 NON-CONSENT; IS THAT RIGHT?

17 A   I WOULD SAY THAT AS A WHOLE THE ORGANIZATION ACCEPTS

18 THAT, YES.

19 Q   IN OTHER WORDS, THERE ARE NO DISSENTING VOICES IN THE

20 ASSOCIATION FOR THE TREATMENT OF SEXUAL ABUSERS?

21 A   NO, I WOULD DISAGREE WITH THAT.  THERE ARE SOME

22 DISSENTING VOICES, SOME MEMBERS ATSA, THE ASSOCIATION FOR

23 THE TREATMENT OF SEXUAL ABUSERS.  THERE ARE SOME MEMBERS

24 THAT TAKE THE POSITION AGAINST THESE DIAGNOSES.

25 Q   I PRESUME THEY ARE MINORITY?

1    A    I QUANTIFIED IT, BUT I BELIEVE SO.

2    Q    NOW, YOU SAID THE BULK -- OR WHAT YOU USE AS A

3    REFERENCE IS THE DIAGNOSIS, THE DSM-IV; IS THAT WHAT YOU

4    USE?

5    A    YES.  THE DSM-IV-TR.

6    Q    THIS IS A BOOK THAT TELLS YOU HOW TO PUT PEOPLE IN

7    CATEGORIES?

8    A    ESSENTIALLY IT'S THE GUIDELINES THAT WE USE, MENTAL

9    HEALTH PROFESSIONALS, TO CONSIDER AND RENDER DIAGNOSES AS

10   THEY APPLY TO AN INDIVIDUAL.

11   Q    AND WITH YOUR TRAINING, YOU HAVE KEPT UP ON THE

12   POSSIBILITY OF THERE BEING A DSM-V?

13   A    YES, I AM AWARE OF THAT.

14   Q    YOU ARE ALSO AWARE THAT THE DSM-V COMMITTEE HAS

15   CHOSEN NOT TO PUT PARAPHILIA NOS, NON-CONSENTING AS ONE

16   OF THE CATEGORIES?  YOU ARE AWARE OF THAT; RIGHT?

17   A    THAT IS MY UNDERSTANDING, YES.

18   Q    NOW, WITH YOUR ASSUMPTIONS THAT YOU MADE, ONE OF THE

19   ASSUMPTIONS THAT YOU MADE WAS IN YOUR DIRECT TESTIMONY

20   WHICH IS THAT THERE WERE FOUR RAPES.  THAT IS THE REASON

21   THAT YOU DECIDED THAT -- WAS ONE OF THE REASONS WHY YOU

22   DECIDED MY CLIENT HAS SERIOUS DIFFICULTY WITH SEXUAL

23   ISSUES OR ABNORMALITIES.

24        NOW, THAT WAS YOUR TESTIMONY THAT THERE WERE FOUR

25   RAPES?

1    A    IF I DID TESTIFY TO THAT, I WOULD CORRECT THAT AND

2    SAY THAT THERE WERE FOUR VICTIMS WHOM HE HAD RAPED.

3    THERE WERE APPARENTLY MULTIPLE INSTANCES WITH MS.

4    MCCLOUD, SO IT WOULD STAND TO REASON THAT THERE WERE AT

5    LEAST FOUR RAPES, IF NOT MORE.

6    Q    ASSUMING THAT WE ARE TALKING ABOUT TANYA MCCLOUD.

7    A    YES.

8    Q    ONE OF THE ASSUMPTIONS YOU MADE IS THAT THIS 1999

9    REPORT FROM DR. GRAY WAS ALL CORRECT?

10   A    I HAD NO REASON TO THINK OTHERWISE.

11   Q    YOU DID QUESTION THE FACT OF THE SCHIZOPHRENIC

12   EPISODES THAT THEY MENTION IN THEIR REPORT.  YOU DID

13   QUESTION THAT; RIGHT?

14   A    I DID QUESTION THAT.  I DID NOTE THAT IN MY OPINION

15   THERE WAS NO EVIDENCE OF PSYCHOSIS FOR PERTAINING TO MR.

16   ANTONE IN THE TIME THAT I HAD EVALUATED HIM AND THERE

17   DIDN'T APPEAR TO BE ANY CORROBORATING EVIDENCE OF THAT IN

18   PRIOR MENTAL HEALTH RECORDS.

19   Q    HOW LONG DID IT TAKE YOU TO TELL MR. ANTONE WHAT YOU

20   WERE THERE TO DO AS FAR AS YOUR PRE-CERTIFICATION

21   EVALUATION AND YOUR CERTIFICATION?  SOMEWHERE ABOUT FIVE

22   MINUTES EACH TIME?

23   A    I WOULD SAY MAYBE TEN MINUTES EACH TIME.

24   Q    SO TWENTY MINUTES?

25   A    A TOTAL OF TWENTY MINUTES, PERHAPS.  IN THE FIRST TWO

1    REPORTS THAT I DID, AND THEN I HAD A FEW OCCASIONS TO

2    SPEAK WITH HIM SINCE THAT TIME, AND INCLUDING PRIOR TO

3    THE MOST RECENT REPORT.

4    Q   DID YOU MENTION ANYTHING IN YOUR PRIOR REPORTS THAT

5    YOU HAD SPOKEN TO MR. ANTONE OVER THE LAST FOUR YEARS?

6    A   IN MY UPDATE, I INDICATED THAT I SPOKE WITH HIM

7    AGAIN, THAT I WOULD BE DOING AN UPDATED REPORT TO THE

8    COURT, AND HE INDICATED THE FIRST TIME I MET WITH HIM IN

9    SEPTEMBER OF 2010, THAT HE WAS NOT CERTAIN ABOUT

10   PARTICIPATING IN AN EVALUATION.  HE INDICATED HE WANTED

11   TO CONSULT WITH HIS ATTORNEY.

12        AND I MET WITH HIM A FEW DAYS LATER -- I BELIEVE HE

13   APPROACHED ME -- AND INDICATED THAT HE WOULD NOT BE

14   PARTICIPATING, SO I DID MENTION THAT, YES.

15   Q   SO THAT TOOK ALL OF ANOTHER TEN MINUTES?

16   A   APPROXIMATELY TEN MINUTES OR SO.

17   Q   SO THE INTERACTION YOU HAD WITH MR. ANTONE WAS

18   APPROXIMATELY A HALF AN HOUR?

19   A   PERHAPS ABOUT HALF AN HOUR OVER THE LAST FOUR AND

20   HALF, CLOSE TO FIVE YEARS.

21   Q   NOW, I WAS TALKING ABOUT THE ASSUMPTIONS THAT YOU

22   MADE ABOUT THE RAPES, AND I AM TRYING TO FIND IT IN MY

23   NOTES.

24        FIRST OF ALL, ONE OF THE ASSUMPTIONS AND ONE OF THE

25   REASONS WHY YOU MADE IT HEBEPHILIA IS BECAUSE OF THE

1   FIRST ONE THAT IS ON THIS CHART, BYRON ANTONE CHRONOLOGY.

2   YOU SAID IT HAPPENED IN 1989.  YOU ALSO CLARIFY -- FIRST

3   OF ALL, YOU SAID IT HAPPENED IN 1989; RIGHT?

4   A   APPROXIMATELY 1989, YES.

5   Q   YOU DON'T KNOW WHEN IT HAPPENED?

6   A   NO, I DON'T KNOW.

7   Q   YOU DON'T KNOW IF IT HAPPENED JANUARY, FEBRUARY, OR

8   ANY OF THE MONTHS; CORRECT?  YOU DON'T KNOW WHICH MONTH

9   IT HAPPENED?

10  A   I DO NOT KNOW WHICH MONTH IT HAPPENED.

11  Q   ALL RIGHT.  SO WHAT HAS BEEN MENTIONED IS THAT T.F.

12  WAS 13 AT THE TIME; IS THAT RIGHT?

13  A   SHE WAS APPROXIMATELY 13 YEARS OLD, YES.

14  Q   SINCE YOU DON'T KNOW WHETHER THIS HAPPENED AFTER MAY

15  26 OF 1989, YOU DON'T KNOW WHETHER MR. ANTONE, IF THIS

16  HAPPENED, WAS EITHER 16 OR 17 YEARS OLD; IS THAT RIGHT?

17  A   HE COULD HAVE BEEN WITHIN THAT AGE RANGE, 16 TO 17.

18  PERHAPS 18.  WELL, I GUESS NOT 18 IF IT'S 1989.  HE WOULD

19  HAVE BEEN 17.  SO AROUND THAT TIME, 16 OR 17 YEARS OLD.

20  Q   SO ONE OF THE REASONS WHY YOU MADE THIS HEBEPHILIA

21  DIAGNOSIS, YOU SAID THAT IT HAS TO BE AT LEAST FIVE YEAR

22  AGE DIFFERENCE.  SO ASSUMING IF HE IS AT THE 17 YEAR AGE,

23  YOU WOULD AGREE WITH ME THAT IS FOUR YEARS?

24  A   THAT IS FOUR YEARS, BUT THE DSM INDICATES THAT IT'S A

25  GUIDELINE.  IT DOESN'T HAVE TO BE ABSOLUTE WHEN APPLYING

1    DIAGNOSES.  THE DIAGNOSES ARE MEANT TO BE GUIDELINES,

2    SO --

3    Q   LET'S TALK ABOUT THAT OTHER GUIDELINE.  IF HE IS 16

4    YEARS OLD, THAT WOULD MAKE IT AROUND THREE YEARS AGE

5    DIFFERENCE; RIGHT?

6    A   IF YOU WOULD ASSUME THAT SHE WAS JUST 13 YEARS OLD AT

7    THAT TIME.

8    A   RIGHT.

9    Q   THAT WOULD BE THREE YEARS DIFFERENCE BETWEEN THE TWO?

10   A   IF YOU USE THAT MATH, YES.

11   Q   SO YOU WOULDN'T USE THAT AS ONE OF THE CRITERIA FOR

12   DECIDING WHETHER HE IS A HEBE -- IF HE SUFFERS FROM

13   HEBEPHILIA BECAUSE OF THE THREE YEAR AGE DIFFERENCE;

14   WOULD YOU?

15   A   WELL, IT DEPENDS ON IF I DETERMINED WITH CERTAINTY

16   WHAT THE AGES WERE OF BOTH THE VICTIM AND MR. ANTONE AT

17   THE PRECISE TIME OF THE OFFENDING.  THEN PERHAPS I MIGHT

18   NOT USE THAT IN TERMS OF ARRIVING AT THAT HEBEPHILIA

19   DIAGNOSIS.

20   Q   BUT UNTIL YOU KNOW FOR CERTAIN IF MR. ANTONE WAS 16

21   OR IF MR. ANTONE IS 17, YOU WON'T CHANGE YOUR OPINION?

22   A   I WILL NOT CHANGE MY OPINION, NO.

23   Q   OKAY.  NOW, LET'S SEE.  LET'S TALK ABOUT THE OTHER

24   ONE THAT YOU SAID YOU DID NOT CONSIDER WHEN DIAGNOSING

25   HIM AS HEBEPHILIA, WHICH WAS V.R. NUMBER 1.  YOU SAID THE

1    AGES WERE 16 AND 18, TWO YEAR AGE DIFFERENCE, IS THAT

2    RIGHT?

3    A    THAT'S CORRECT.

4    Q    AND YOU ALSO ARE AWARE BECAUSE YOU READ THE POLICE

5    REPORTS AND YOU READ THE INFORMATION ABOUT THAT INCIDENT

6    IN MR. ANTONE'S RECORD; RIGHT?

7    A    THAT'S RIGHT.

8    Q    AND YOU WERE AWARE THAT MR. ANTONE AND V.R. NUMBER 1

9    HAD A RELATIONSHIP FOR AT LEAST SIX MONTHS.  WERE YOU

10   AWARE OF THAT?

11   A    YES.

12   Q    AND WERE YOU AWARE OR CAN YOU TELL THIS COURT IF V.R.

13   NUMBER 1'S BIRTHDAY WAS NEAR SEPTEMBER 26 OF THAT YEAR OR

14   WHEN V.R. NUMBER 1'S BIRTHDAY WAS?

15   A    I DON'T KNOW WHEN HER BIRTHDAY WAS.

16   Q    SO IF WE ASSUME THAT THEY HAD BEEN TOGETHER FOR SIX

17   MONTHS, THAT WOULD PUT US BACK ALL THE WAY TO MARCH OF

18   1990?

19   A    THAT APPEARS SO.

20   Q    SO THERE COULD HAVE BEEN AS CLOSE AS ONE YEAR

21   DIFFERENCE BETWEEN THE TWO, WHICH WOULD MAKE HER 16 AND

22   MAKE HIM 17?

23   A    CORRECT.

24   Q    AND IT COULD MAKE IT AS MUCH AS TWO YEARS APART;

25   RIGHT?

1    A    IT APPEARS TO BE SOMEWHERE IN THAT WINDOW, YES.

2    Q    AND WERE YOU AWARE THAT THE PARENTS PUSHED THIS

3    CHARGE ON MR. ANTONE?  WERE YOU AWARE OF THAT?

4    A    I AM AWARE OF THAT ACCOUNT FROM MR. ANTONE.

5    Q    AND ARE YOU AWARE OF PARENTS -- STRIKE THAT.  I AM

6    NOT GOING TO ASK THAT QUESTION.

7         SO, WE HAVE THAT ONE.  SO, YOU CAN CONSIDER THAT

8    ONE.  THAT IS EITHER TWO AGE DIFFERENCE BETWEEN TWO OR

9    ONE, T.F. WHICH WAS THE FIRST ONE FROM '89, YOU WON'T

10   CONSIDER UNLESS YOU HAVE SOME DEFINITE INFORMATION THAT

11   THERE IS A THREE AGE DIFFERENCE OR LESS WITH MR. ANTONE

12   AND T.F.; RIGHT?

13        I JUST WANT TO MAKE SURE I HAVE QUANTIFIED THOSE TWO

14   RIGHT, OR QUALIFIED THEM RIGHT?

15   A    CORRECT.  I THINK THAT THE INSTANCES OR INSTANCE WITH

16   T.F. STILL FALLS WITHIN THAT DESCRIPTION OF HEBEPHILIA,

17   AND AS I TESTIFIED EARLIER, I DID NOT CONSIDER THE RAPE

18   OF V.R. 1 WITH RESPECT TO THE HEBEPHILIA SPECIFIER.  I

19   THOUGHT THAT THAT WAS ONLY APPLICABLE TO THE NON-CONSENT

20   SPECIFIER BECAUSE OF THAT PROXIMITY IN AGE BETWEEN MR.

21   ANTONE AND V.R. 1.

22   Q    LET'S ASSUME THAT YOU KNOW THAT THERE IS A THREE AGE

23   DIFFERENCE BETWEEN T.F. AND ANTONE ON NUMBER 1, AND

24   ACCORDING TO YOUR DIRECT TESTIMONY, IT APPEARS THAT YOU

25   SHOULD NOT AND WOULD NOT CONSIDER THAT FOR THE HEBEPHILIA

1    DIAGNOSIS IF YOU KNEW FOR CERTAIN?

2              THE COURT:  LET ME JUST CLARIFY, MR. ROSS.

3    WHEN YOU SAY THREE AGE DIFFERENCE, YOU MEAN THREE YEAR

4    DIFFERENCE?

5              MR. ROSS:  YES.  THANK YOU, SIR.

6              THE WITNESS:

7    A    CAN YOU REPEAT THE QUESTION, PLEASE?

8    Q    SURE.  ASSUMING THAT YOU KNEW FOR CERTAIN THAT T.F.

9    AND MR. ANTONE, THERE WAS A THREE YEAR AGE DIFFERENCE

10   BETWEEN THE TWO, THAT WOULD NOT MEET YOUR CRITERIA FOR

11   DECIDING WHETHER HE IS A HEBEPHILIA; IS THAT RIGHT?

12   A    THAT IS PROBABLY RIGHT.  THAT PROBABLY WOULD NOT

13   FACTOR INTO A HEBEPHILIA DIAGNOSIS IF I KNEW FOR CERTAIN

14   THAT THERE WAS ONLY A THREE YEAR AGE DIFFERENCE BETWEEN

15   MR. ANTONE AND T.F.

16   Q    SO FOR THE PURPOSES OF WHAT I AM ASKING, WE CAN CROSS

17   OFF T.F. AND WE CAN CROSS OFF V.R. NUMBER 1 ASSUMING THAT

18   THIS IS CORRECT.

19        LET'S GO TO R.A.  THAT IS THE ONE FROM 1996.  ALL

20   RIGHT.  THAT IS ON THE SECOND CHART.  DO YOU SEE IT?

21   A    YES.

22   Q    YOU ARE AWARE THAT MR. ANTONE WAS ACQUITTED FOR THAT

23   CHARGE.  YOU ARE AWARE OF THAT; RIGHT?

24   A    I AM NOT AWARE THAT HE WAS ACQUITTED.  MY

25   UNDERSTANDING IS THAT THE CHARGES WERE DISMISSED AS PART

1   OF A PLEA AGREEMENT.

2   Q   YOU ARE AWARE THAT HE WAS NOT CONVICTED OF THAT;

3   AREN'T YOU?

4   A   I AM.  I AM NOT AN ATTORNEY THOUGH, BUT I THINK THAT

5   THERE IS A DIFFERENCE BETWEEN ACQUITTAL AND DISMISSAL FOR

6   ATTORNEYS.

7   Q   THERE IS.

8   A   OKAY.

9   Q   ARE YOU ASSUMING THAT IT HAPPENED?

10  A   I AM TAKING IT -- I CONSIDERED THAT THOSE OFFENSES

11  AGAINST R.A. DID, IN FACT, HAPPEN.

12  Q   ALL RIGHT.  ASSUME THAT IT DIDN'T HAPPEN.  ASSUME

13  THAT R.A. DIDN'T HAPPEN.

14  A   ASSUME -- OKAY.

15  Q   SO WE ARE ASSUMING T.F., IF THERE IS A THREE YEAR AGE

16  DIFFERENCE BETWEEN MY CLIENT AND MR. ANTONE (SIC), YOU

17  WOULD NOT CONSIDER THAT FOR HEBEPHILIA.  V.R. NUMBER 1,

18  YOU DID NOT CONSIDER THAT BECAUSE YOU RULED THAT OUT.

19  AND THEN R.A. NUMBER 1 FROM 1996, ASSUME THAT IT DIDN'T

20  HAPPEN.  THEN THAT WOULD LEAVE YOU WITH V.R. NUMBER 2; IS

21  THAT RIGHT?

22  A   IF I MAKE ALL OF THOSE ASSUMPTIONS, YES, THEN I AM

23  ONLY LEFT WITH V.R. NUMBER 2.

24  Q   AND THERE WOULD BE NO HEBEPHILIA DIAGNOSIS BECAUSE

25  YOU ONLY HAVE ONE.  YOU DON'T HAVE SIX MONTHS RECURRING.

1    YOU DON'T HAVE ANY OF THAT?

2    A    I WOULDN'T SAY THAT, ALTHOUGH I JUST HAVE THE ONE

3    INSTANCE OF HANDS ON OFFENDING THERE WITH OR CONTACT

4    OFFENSE WITH V.R. NUMBER 2, I WOULD ALSO CONSIDER THE

5    INFORMATION THAT WAS REPORTED IN THE 1999 PSYCHOLOGICAL

6    REPORT WHICH INDICATED THIS SEXUAL DEVIANCE TOWARDS

7    ADOLESCENTS OF THIS AGE RANGE, THOSE BEING THE MSI-II

8    FINDINGS, AND ALSO THE FINDINGS OF THE ABEL ASSESSMENT

9    WHICH CLEARLY INDICATED SEXUAL ATTRACTION TO MINORS

10   WITHIN THIS AGE RANGE.

11        SO IT WOULDN'T, IN MY MIND, IT WOULDN'T JUST BE THAT

12   ONE CONVICTION WITH V.R. 2.

13   Q    THIS AGE RANGE WHERE THERE ARE STUDIES THAT MOST MEN

14   ARE ATTRACTED TO THAT AGE RANGE?

15   A    CORRECT.  AND AS I TESTIFIED EARLIER, MEN ARE

16   SOMETIMES SEXUALLY ATTRACTED TO INDIVIDUALS WITHIN THIS

17   AGE RANGE, HOWEVER THE DIFFERENCE BETWEEN SOMEBODY WITH

18   THIS PARAPHILIA AND YOUR AVERAGE MAN WOULD BE THE DEGREE

19   TO WHICH THAT PERSON WOULD HAVE RECURRING SEXUAL URGES,

20   FANTASIES OR BEHAVIORS INVOLVING THIS PARTICULAR AGE

21   GROUP.

22   Q    SO REALLY MY QUESTION WAS ONLY THE FACT THAT OTHER

23   PEOPLE ARE ATTRACTED TO THIS AGE GROUP AND THAT WAS A YES

24   OR NO ANSWER; RIGHT?

25   A    SOMETIMES THEY ARE.

1    Q    DID YOU SPEAK WITH DR. GRAY?

2    A    NO, I DID NOT.

3    Q    DID YOU REVIEW THE POLYGRAPH EXAMINATION?

4    A    NO, I DID NOT.

5    Q    SO YOU HAVE NO WAY OF KNOWING IF THAT INFORMATION WAS

6    ACTUALLY CORRECT?

7    A    I HAVE NO REASON TO BELIEVE OTHERWISE.

8    Q    YOU HAVE NO IDEA IF THE INFORMATION IN WHICH THE

9    DOCTORS TRANSLATED AND MADE CONCLUSIONS ARE CORRECT?

10   A    I HAVE NO REASON TO BELIEVE OTHERWISE.

11   Q    DOES HEBEPHILIA APPEAR IN THE DSM-IV?

12   A    THE TERM "HEBEPHILIA" IN AND OF ITSELF DOES NOT

13   APPEAR IN THE DSM-IV.

14   Q    WHAT ABOUT THE DSM-5 POTENTIAL?

15   A    THAT HAS YET TO BE DETERMINED.

16   Q    DR. PHENIX DIDN'T FIND HEBEPHILIA; IS THAT RIGHT?

17   A    THAT'S CORRECT.

18   Q    DR. DAUM DIDN'T FIND HEBEPHILIA?

19   A    THAT'S CORRECT.

20   Q    YOU ALSO ASSUMED SOME THINGS ON FACTS ABOUT MR.

21   ANTONE.  ONE OF THE THINGS YOU TESTIFIED TO WAS THAT MR.

22   ANTONE DIDN'T HAVE ANY GOOD FAMILY RELATIONSHIPS WHICH

23   INCLUDED HIS SISTER.  HAVE YOU TALKED TO ANY OF HIS

24   FAMILY MEMBERS?

25   A    I HAVE NOT.  I THOUGHT I HAD TESTIFIED THAT I WASN'T

1    SURE ABOUT ALL OF HIS RELATIONSHIPS, BUT THE ONES THAT I

2    KNEW OF, CERTAINLY APPEARED TO BE --

3    Q    WELL, YOU MADE A COMMENT ABOUT HIS SISTER SAYING IT

4    APPEARED THAT SHE HAD PROBLEMS, TOO?

5    A    CORRECT.

6    Q    DID YOU GET THAT FROM ANY DOCUMENTATION?

7    A    I BELIEVE I HAD SEEN SOMETHING TO THAT EFFECT IN SOME

8    OF THE RECORDS REGARDING PRIOR ISSUES WITH SUBSTANCE

9    ABUSE.

10            MR. BREDENBERG:  OBJECTION.

11            MR. ROSS:

12   Q    CAN YOU TELL ME WHICH RECORDS --

13            MR. BREDENBERG:  YOUR HONOR, WOULD HE PLEASE

14   ALLOW THE WITNESS TO FINISH.

15            THE COURT:  PLEASE TAKE CARE OF THAT REGARD,

16   MR. ROSS.

17            MR. ROSS:

18   Q    CAN YOU TELL ME WHICH RECORDS?

19   A    I DON'T RECALL OFF THE TOP OF MY HEAD.

20   Q    IN YOUR 30 MINUTES OF SPEAKING WITH MR. ANTONE OVER

21   THE LAST FOUR AND HALF YEARS, DID YOU FIND HIM TO BE

22   DECEPTIVE IN ANY FORM OR FASHION?

23   A    NO, I DID NOT.

24   Q    IN YOUR 30 MINUTES OF SPEAKING WITH MR. ANTONE OVER

25   THE LAST FOUR AND HALF YEARS, DID YOU FIND OUT IF HE HAD

1   BEEN DRINKING ALCOHOL OR HE SMELLED OF ALCOHOL WHILE HE

2   WAS IN YOUR PRESENCE?

3   A   NO.

4   Q   IN YOUR 30 MINUTES OF SPEAKING WITH MR. ANTONE, DID

5   YOU FIND OUT IF HE HAD BEEN SEXUALLY VIOLENT TO ANYONE OR

6   ACTED OUT WHILE HE WAS AT THE PRISON?

7   A   NO.

8   Q   YOU ARE AWARE, BECAUSE YOU HAVE READ THE RECORD, THAT

9   HE HAS SEVERAL RESTRICTIONS ON HIM IF HE IS ALLOWED TO

10  LEAVE THE BUREAU OF PRISONS.  YOU ARE AWARE OF THAT?

11  A   YES.

12  Q   AND YOU HEARD THE TESTIMONY YESTERDAY IN REFERENCE TO

13  HIM BEING PLACED IN A HALFWAY HOUSE IN ARIZONA?

14  A   THAT'S CORRECT.

15  Q   AND ONE OF THE CONDITIONS IS IT'S NOT "MAY", THAT HE

16  "SHALL" PARTICIPATE IN DRUG OR ALCOHOL REHABILITATION IF

17  PROBATION TELLS HIM HE IS SUPPOSED TO?

18  A   THAT'S CORRECT.

19  Q   ALSO, IT'S NOT "MAY", BUT "SHALL" -- HE SHOULD AND

20  WOULD DO SEXUAL TREATMENT IF HE IS TOLD BY THE PROBATION

21  OFFICE, IS THAT RIGHT?

22  A   THAT'S CORRECT.

23  Q   YOU WOULD AGREE WITH ME PEOPLE CAN GET TREATMENT FOR

24  DRUG AND ALCOHOL, AND IT DOES NOT HAVE TO BE BEHIND THE

25  GATE?

1    A    I WOULD AGREE THAT THAT IS POSSIBLE FOR SOME

2    INDIVIDUALS, YES.

3    Q    YOU WOULD AGREE WITH ME THAT PEOPLE CAN GET TREATMENT

4    FOR SEXUAL ISSUES FROM OUTSIDE OF THE GATE?

5    A    SOME PEOPLE CAN, YES.

6    Q    YOU WOULD AGREE WITH ME THAT IN THE LAST 14 YEARS,

7    YOU HAVE NO EVIDENCE -- THERE IS NOTHING IN THE RECORD,

8    NOTHING IN THE CONVERSATIONS OVER THE LAST 30 MINUTES

9    THAT YOU HAD WITH MY CLIENT, THAT HE HAS ACTED OUT IN ANY

10   FORM OR FASHION, AND THAT HE WAS SEXUALLY DANGEROUS TO

11   ANYONE WHILE HE WAS IN THE BUREAU OF PRISONS?

12        DO YOU HAVE THAT INFORMATION?

13   A    NO, THERE IS NO INFORMATION TO THAT EFFECT.

14   Q    HE WENT INTO THE PRISON SYSTEM AFTER THE FULL

15   DEVELOPMENT OF HIS BRAIN; IS THAT RIGHT?

16   A    IT WOULD APPEAR SO, YES.

17   Q    CHANGE COMES FROM PEOPLE MATURING; RIGHT?

18   A    IT CAN.

19   Q    MR. ANTONE MAY HAVE MATURED IN THE LAST 14 YEARS?

20   A    CERTAINLY.

21   Q    HE HAS OBVIOUSLY GOTTEN OLDER IN THE LAST 14 YEARS;

22   IS THAT RIGHT?

23   A    YES, HE HAS.

24   Q    LET'S TALK ABOUT ANOTHER ASSUMPTION THAT YOU MADE AND

25   THAT DR. GRAY HAD IN HIS REPORT WHICH WAS THAT MS.

1   MCCLOUD WAS SEXUALLY ASSAULTED BY MR. ANTONE WHICH IS ON

2   THAT CHART?

3   A   THAT'S CORRECT.

4   Q   YOU WERE IN THE COURTROOM WHEN WE READ ALOUD MS.

5   MCCLOUD'S AFFIDAVIT.  YOU WERE IN THE COURTROOM; RIGHT?

6   A   I WAS IN THE COURTROOM.  I DON'T RECALL IF IT WAS

7   READ ALLOWED.

8           MR. ROSS:  YOUR HONOR, IF I MAY HAVE A MOMENT.

9   I AM GOING TO GET EXHIBIT NUMBER 7.

10          THE COURT:  YOU MAY, SIR.  AND THAT IS

11  RESPONDENT'S NUMBER 7?

12          MR. ROSS:  YES, I BELIEVE THAT IS THE NUMBER.

13          MR. BREDENBERG:  WE OBJECT TO THIS, YOUR

14  HONOR, AS WE PRESENTED IT ON THE RECORD YESTERDAY.

15          MR. ROSS:  RESPONDENT'S 16.

16          THE COURT:  RESPONDENT'S 16.  THAT IS THE

17  AFFIDAVIT OF MS. MCCLOUD.  I WILL ALLOW COUNSEL TO READ

18  FROM THAT TO THE WITNESS FOR THE PURPOSE OF ELICITING AN

19  OPINION FROM THE WITNESS.

20          MR. ROSS:  THANK YOU.

21  Q   LET'S GO OVER THIS RESPONDENT'S EXHIBIT NUMBER 16.

22  DO YOU HAVE IT IN FRONT OF YOU?

23  A   YES, I DO.

24  Q   ALL RIGHT.  IT'S UNITED STATES VERSUS BYRON NEIL

25  ANTON, AND IT SAYS AFFIDAVIT OF TANYA MCCLOUD, AND IT

1    READS THE FOLLOWING:  I, TANYA MCCLOUD, BEING FIRST DULY

2    SWORN, HEREBY STATE THE FOLLOWING:

3        NUMBER 1.  MY NAME IS TANYA MCCLOUD.  MY BIRTHDAY

4    IS, AND IT'S BLANK, 1974, AND MY SOCIAL SECURITY IS

5    (BLANK).

6        NUMBER 2.  I MET BYRON NEIL ANTONE WHEN I WAS 20

7    YEARS AND HE WAS 22 YEARS OLD, APPROXIMATELY 1994.

8        NUMBER 3.  MR. ANTONE AND I DRANK ALCOHOL TO EXCESS

9    AND ABUSED DRUGS, MARIJUANA AND COCAINE, ON A REGULAR

10   BASIS.

11       NUMBER 4.  MY RELATIONSHIP WITH MR. ANTONE CONSISTS

12   OF ABUSE ON BOTH OF OUR PARTS, PRIMARILY WHEN WE WERE

13   DRINKING AND ABUSING DRUGS.

14       NUMBER 5.  MR. ANTONE AND I HAD A NORMAL SEX LIFE.

15   I WOULD WITHHOLD SEX DURING THE TIME WHEN WE FOUGHT AND

16   WOULD TEMPORARILY MOVE IN WITH MY MOTHER.

17       NUMBER 6.  I WAS SURPRISED WHEN MR. ANTONE WAS

18   ARRESTED FEBRUARY 28, 1998, BECAUSE HE -- I CANNOT

19   IMAGINE THAT HE WOULD EVER BE SEXUALLY AGGRESSIVE TOWARDS

20   WOMEN.  I WAS NEVER A VICTIM OF SEXUAL ABUSE.

21       NUMBER 7.  MR. ANTONE AND I HAVE A 14 YEAR OLD SON

22   TOGETHER, PERNELL, WHO WAS BORN IN 1997.  MR. ANTONE HAS

23   ALWAYS BEEN A GOOD FATHER TO OUR SON.

24       NUMBER 8.  I HAVE AN 18 YEAR OLD DAUGHTER.  MR.

25   ANTONE HAS ALWAYS -- WAS ALWAYS A GOOD FATHER TO MY

1    DAUGHTER.

2         NUMBER 9.  I HAVE CONTACTED -- I HAVE BEEN IN

3    CONTACT WITH MR. ANTONE BECAUSE I STILL CARE ABOUT HIM.

4         UNDERNEATH THAT IT IS SIGNED TANYA MCCLOUD, DATED

5    SEPTEMBER 13, 2011.

6         AND IT IS SWORN BEFORE A NOTARY IN ARIZONA, IN THE

7    STATE OF ARIZONA.

8         ASSUMING THAT YOU ASSUME MR. - DR. GRAYS REPORT HAS

9    TO BE RIGHT, THAT SHE WAS SEXUALLY ASSAULTED BY MY

10   CLIENT, THEN I AM ASSUMING THAT YOU ASSUME TANYA MCCLOUD

11   IS LYING IN HER AFFIDAVIT?

12   A   I WOULD SAY THAT I PLACE GREATER EMPHASIS OR GREATER

13   WEIGHT ON THE ADMISSION THAT MR. ANTONE MADE IN 1999 TO

14   DR. GRAY AND SADLER.

15   Q   BECAUSE THEY ARE DOCTORS?

16   A   WELL, BECAUSE THEY ARE DOCTORS, BECAUSE THEY ARE

17   OBJECTIVE IN TERMS OF HOW THEY ARE REPORTING THE FACTS.

18   WHEN FAMILY MEMBERS, FRIENDS, MAKE STATEMENTS ON BEHALF

19   OF A DEFENDANT OR A RESPONDENT, SOMETIMES YOU HAVE TO

20   TAKE THOSE WITH A GRAIN OF SALT BECAUSE THEY MIGHT HAVE A

21   TENDENCY TO SUGARCOAT THINGS A BIT, SO I THINK IT'S

22   IMPORTANT TO TAKE IT IN THE CONTEXT OF THE BIG PICTURE.

23   Q   WHAT YOU SAID WAS AN INTERESTING WORD, OBJECTIVE.

24   YOUR JOB IS TO BE OBJECTIVE; RIGHT?

25   A   THAT'S CORRECT.

1   Q   SO WHEN YOU LOOK AT A SITUATION, YOU ARE SUPPOSED TO

2   STATE WHAT YOU SEE AND WHAT YOU HEAR; IS THAT RIGHT?

3   A   THAT'S CORRECT.

4   Q   AND NOT MAKE A CONCLUSION ONE WAY OR THE OTHER OR BE

5   JUDGMENTAL ABOUT THAT?

6   A   WELL, ULTIMATELY I HAVE TO MAKE CONCLUSIONS ABOUT THE

7   INFORMATION THAT I REVIEW.  BUT IT'S DONE IN AN OBJECTIVE

8   WAY.

9   Q   SO OBJECTIVELY, MATURING IS A GOOD THING?

10  A   GENERALLY SPEAKING, YES, BUT INDIVIDUALS CAN MATURE

11  INTO -- THEY MIGHT DEVELOP NEGATIVE ASPECTS TO THEIR

12  PERSONALITY OR TO THE BEHAVIOR, SO I WOULDN'T SAY THAT

13  IT'S ALWAYS A GOOD THING, BUT GENERALLY SPEAKING, SURE.

14  Q   GENERALLY SPEAKING.  BUT SPECIFICALLY, WHEN WE TALK

15  ABOUT MR. ANTONE MATURING AND NOT DOING THE SAME THINGS

16  HE DID WHEN HE WAS 25 YEARS OLD IS A GOOD THING,

17  OBJECTIVELY?

18  A   OBJECTIVELY, YES.  IT'S COMMENDABLE THAT HE HAS BEEN

19  ABLE TO MAINTAIN CLEAR CONDUCT SINCE HE WAS INCARCERATED,

20  BUT I WOULD EMPHASIZE THAT HAS BEEN WHILE HE HAS BEEN

21  INCARCERATED.  IT'S A DIFFERENT SET OF ENVIRONMENTAL

22  CIRCUMSTANCES THAT PERTAIN TO HIM WHEN HE IS IN PRISON AS

23  OPPOSED TO WHEN HE IS OUT IN THE COMMUNITY.

24  Q   OBJECTIVELY, YOU KNOW WITH THOSE CIRCUMSTANCES OF

25  BEING IN A PRISON SYSTEM, SOME PEOPLE ACT OUT

1   OBJECTIVELY?

2   A   YES, THEY DO.

3   Q   NOW, YOUR CONCERN HE DID NOT PARTICIPATE IN SOTP

4   PROGRAM; THAT IS YOUR CONCERN?

5   A   IT'S A CONCERN THAT HE HAS NOT HAD ANY SEX OFFENDER

6   TREATMENT IN HIS LIFE, NOT JUST PARTICIPATION IN THE

7   TREATMENT AT BUTNER.

8   Q   NOW, YOU LOOKED AT THE STATIC-99R AND YOU CAME UP

9   WITH THE NUMBER 6?

10  A   YES, I DID.

11  Q   NOW THERE ARE PERCENTAGES ASSOCIATED WITH THAT NUMBER

12  6, WITH THE STATIC-99R?

13  A   YES.

14  Q   ARE ANY OF THOSE FOR LIKE, LET'S ASSUME WE ARE

15  TALKING ABOUT WITHIN FIVE YEARS OF RECIDIVISM.  CAN YOU

16  TELL ME WHAT YOUR FIGURE WAS FOR THAT?

17  A   TO REFRESH MY MEMORY HERE, FOR A SCORE OF 6 ON THE

18  STATIC-99R, I LISTED A RECIDIVISM RATE OF 31.2 PERCENT,

19  FIVE YEARS.

20  Q   DO YOU KNOW IF MR. ANTONE IS IN THAT GROUP THAT WILL

21  RECIDIVATE WITHIN FIVE YEARS?

22  A   NO, I DO NOT.

23  Q   SO WITH THAT, YOU DON'T KNOW WHETHER MR. ANTONE IS IN

24  A GROUP THAT WON'T RECIDIVATE WITHIN FIVE YEARS?

25  A   I DON'T KNOW SPECIFICALLY IF HE WILL OR WILL NOT

1    RECIDIVATE.

2    Q    THAT NUMBER IN FIVE YEARS IS LESS THAN 50 PERCENT;

3    ISN'T IT?

4    A    YES, IT IS.

5    Q    IT'S NOT MORE LIKELY THAN NOT?

6    A    IT'S LESS THAN 50 PERCENT, NOT MORE LIKELY THAN NOT.

7    Q    LET'S GO WITH THE TEN YEAR RANGE.  WHAT IS THE

8    PERCENT FOR THAT ONE?

9    A    41.9 PERCENT IN TEN YEARS.

10   Q    YOU DON'T KNOW WHETHER MR. ANTONE IN THAT 41 PERCENT

11   THAT WILL -- SUPPOSED TO RECIDIVATE?

12   A    NO, I DON'T KNOW IF HE SPECIFICALLY IS.

13   Q    AND, OF COURSE, YOU DON'T KNOW WHETHER HE IS IN THE

14   59 OR 58-POINT-SOMETHING PERCENT THAT WON'T RECIDIVATE?

15   A    NO, I DO NOT.

16           THE COURT:  DR. GUTIERREZ, ARE YOU LOOKING AT

17   A PARTICULAR PAGE OF YOUR REPORT?

18           THE WITNESS:  YES, YOUR HONOR.  I AM LOOKING

19   AT PAGE 3 OF THE FORENSIC EVALUATION UPDATE, GOVERNMENT'S

20   EXHIBIT 6.  IT'S THE MIDDLE PARAGRAPH ON THAT PAGE.

21           THE COURT:  I SEE.  I BELIEVE THAT IS BATES

22   STAMP 1919.

23           THE WITNESS:  RIGHT.

24           THE COURT:  VERY GOOD.  THANK YOU.

25           MR. ROSS:

1    Q   ACTUALLY, THE NUMBER THAT IS OVER 50 PERCENT IS THE

2    RATE OF THE PEOPLE WHO WON'T RECIDIVATE IN TEN YEARS?

3    A   WELL, IT'S THE RATE OF INDIVIDUALS THAT WILL NOT BE

4    DETECTED OF HAVING REOFFENDED WITHIN TEN YEARS.  BECAUSE

5    THE RATES ARE ONLY APPLICABLE TO INDIVIDUALS THAT ARE

6    CAUGHT OR DETECTED FOR HAVING REOFFENDED.  THERE ARE

7    OSTENSIBLY GOING TO BE SOME THAT REOFFEND THAT AREN'T

8    CAUGHT OR IDENTIFIED FOR THESE RESEARCH CENTERS.

9    Q   SINCE YOU WENT THERE, HOW MANY OF THE 58 PERCENT DO

10   YOU KNOW WERE NOT CAUGHT OF DOING ANYTHING?

11   A   I DON'T KNOW THAT.

12             MR. ROSS:  NOTHING FURTHER.

13             THE COURT:  MR. BREDENBERG.

14             MR. BREDENBERG:  THANK YOU, YOUR HONOR.

15   REDIRECT EXAMINATION BY MR. BREDENBERG:

16   Q   DR. GUTIERREZ, MR. ROSS ASKED YOU ABOUT SEX OFFENDER

17   TREATMENT AND WHAT YOU KNEW ABOUT THE PEOPLE THAT HAD

18   BEEN IN IT OR KICKED OUT OR VOLUNTEERED FOR IT.

19        ARE YOU AWARE OF ANYBODY THAT HAS ACTUALLY COMPLETED

20   THE TREATMENT AND BEEN RELEASED FROM BUTNER?

21   A   YES.  I AM AWARE OF AN INDIVIDUAL WHO WAS COMMITTED

22   UNDER 4248 IN THE DISTRICT OF MASSACHUSETTS.  HE

23   PARTICIPATED IN TREATMENT FOR APPROXIMATELY TWO YEARS AND

24   HAS SUBSEQUENTLY BEEN RELEASED TO THE COMMUNITY.

25        THERE IS ANOTHER INDIVIDUAL ALSO FROM THE DISTRICT OF

1    MASSACHUSETTS WHO IS NEARING COMPLETION AND IT'S

2    ANTICIPATED THAT HE WILL BE RELEASED TO THE COMMUNITY IN

3    THE NEAR FUTURE.

4    Q    MR. ROSS MADE A SIGNIFICANT POINT ABOUT THE 30

5    MINUTES THAT YOU SPENT WITH MR. ANTONE.  WHY SO LITTLE

6    TIME?

7    A    BECAUSE THE TIMES THAT I HAD MET WITH HIM, HE

8    DECLINED TO PARTICIPATE IN A CLINICAL INTERVIEW.  IF HE

9    HAD DONE SO, IT CERTAINLY WOULD HAVE BEEN MORE TIME THAN

10   THAT.

11   Q    HE SPECIFICALLY SAID HE DIDN'T WANT TO TALK TO YOU?

12   A    ON THE OCCASIONS THAT I MET WITH HIM, YES.

13   Q    WHY WOULD YOU NOT TRY TO FORCE HIM TO TALK TO YOU

14   MORE?

15   A    HE ESSENTIALLY WAS CERTAIN OF HIS DECISION OR

16   INDICATION THAT HE WAS NOT GOING TO PARTICIPATE.  ON AT

17   LEAST TWO OCCASIONS HE INDICATED THAT HE WOULD NOT DO SO

18   AT THE ADVICE OF COUNSEL.  AND IT'S JUST MY CLINICAL

19   PRACTICE THAT IF AN INDIVIDUAL REFUSES TO PARTICIPATE, TO

20   ACCEPT THAT AND TO CONDUCT THE EVALUATION AS BEST I CAN

21   EVEN WITHOUT THAT INTERVIEW.

22   Q    BUT DO YOU HAVE ANY ETHICAL CONCERNS IF YOU DIDN'T

23   HAVE THAT PRACTICE?

24   A    I WOULD HAVE ETHICAL CONCERNS IF I ATTEMPTED TO

25   COERCE OR BADGER AN INDIVIDUAL INTO AN INTERVIEW OR

1    PARTICIPATION IN AN EVALUATION.

2    Q    MR. ROSS ALSO TALKED TO YOU ABOUT A HYPOTHETICAL

3    SITUATION WITH REGARD TO YOUR HEBEPHILIA DIAGNOSIS OR

4    YOUR HEBEPHILIA SPECIFIER, AND HE SUGGESTED A

5    HYPOTHETICAL AND ASSUMED OR ASKED YOU TO ASSUME THAT YOU

6    KNOW FOR SURE THAT THESE THINGS DIDN'T HAPPEN.

7         DO YOU KNOW FOR SURE THE FACTS THAT MR. ROSS

8    PRESENTED IN THE HYPOTHETICAL?

9    A    CAN YOU REPHRASE YOUR QUESTION, PLEASE?

10   Q    SURE.  HE PROVIDED YOU A HYPOTHETICAL AND SAID

11   ASSUMING YOU KNOW FOR SURE THAT THIS STUFF HAPPENED OR

12   DIDN'T HAPPEN, AND THEN HE GAVE YOU THE HYPOTHETICAL AND

13   ASKED YOUR OPINION ON IT.

14        DID YOU KNOW FOR SURE WHETHER THESE THINGS HAPPENED

15   OR NOT?

16   A    I KNEW TO A REASONABLE DEGREE OF PROFESSIONAL

17   CERTAINTY THAT THESE INSTANCES OCCURRED BASED ON THE

18   RECORDS THAT I REVIEWED, THE POLICE RECORDS, THE

19   PRESENTENCE INVESTIGATION REPORT.  THE TOTALITY OF THE

20   INFORMATION THAT I REVIEWED INDICATED TO ME THAT THESE

21   OFFENSES HAD OCCURRED.

22   Q    MR. ROSS READ TO YOU AND YOU READ ALONG RESPONDENT'S

23   EXHIBIT 16 WHICH WAS THE TANYA MCCLOUD AFFIDAVIT.

24   A    CORRECT.

25   Q    DO YOU KNOW WHERE THAT AFFIDAVIT CAME FROM?

1    A    I DO NOT KNOW IF IT'S LISTED HERE, BUT I WOULD ASSUME

2    IT WAS COMPLETED BY MS. MCCLOUD WHILE SHE WAS

3    INCARCERATED AT A FEDERAL FACILITY IN ARIZONA.

4    Q    DO YOU KNOW FOR SURE THAT SHE DID THAT?

5    A    I DO NOT KNOW FOR CERTAIN, BUT I DO KNOW THAT SHE HAS

6    BEEN IN CUSTODY FOR A PERIOD OF TIME AND CONSIDERING THAT

7    THIS AFFIDAVIT WAS TAKEN LAST MONTH, I THINK IT'S A

8    REASONABLE ASSUMPTION THAT SHE WAS FEDERALLY INCARCERATED

9    AT THE TIME THAT SHE COMPLETED THIS AFFIDAVIT.

10   Q    DO YOU KNOW THE CIRCUMSTANCES UNDER WHICH IT WAS

11   OBTAINED?

12   A    NO, I DO NOT.

13   Q    DO YOU KNOW WHO WROTE IT?

14   A    NO, I DO NOT.

15   Q    DO YOU KNOW WHETHER IT'S ACCURATE?

16            MR. ROSS:  OBJECTION.  LEADING.

17            THE COURT:  OVERRULED.

18            MR. BREDENBERG:

19   Q    DO YOU KNOW WHETHER IT'S ACCURATE?

20   A    NO, I DO NOT KNOW WHETHER IT'S ACCURATE.

21   Q    EVEN CONSIDERING THAT IT WAS ACCURATE AND IT

22   WAS TRUE, WOULD THAT AFFECT YOUR OPINION?

23   A    NO, IT WOULD NOT.

24   Q    IS IT REASONABLE TO THINK THAT MS. MCCLOUD, WHO IS

25   MR. ANTONE'S FORMER GIRLFRIEND, WOULD NOT KNOW OF ALL OF

1    THE ALLEGATIONS OF SEXUAL ASSAULT, ALL OF THE ARRESTS AND

2    ALL OF THE CONVICTIONS?

3              MR. ROSS:  OBJECTION.  SPECULATION.

4              THE COURT:  OVERRULED.  YOU MAY ANSWER, SIR.

5              THE WITNESS:

6    A   I WOULD THINK THAT MS. MCCLOUD WOULD KNOW OF AT LEAST

7    SOME OF THESE ALLEGATIONS AND CONVICTIONS, PERHAPS IT'S

8    POSSIBLE THAT SHE DOES NOT KNOW OF ALL OF THESE

9    INSTANCES.

10   Q   MR. ROSS ASKED YOU ABOUT THE SUPERVISED RELEASE

11   CONDITIONS AS HE DID WITH DR. PHENIX YESTERDAY, AND

12   TALKED A LITTLE BIT ABOUT THE REQUIREMENTS THAT MR.

13   ANTONE WOULD HAVE IF RELEASED.

14       I WILL ASK THE SAME QUESTION THAT MR. ROYSTER ASKED

15   DR. PHENIX.  IS THIS A SUFFICIENT RISK REDUCTION PLAN, IN

16   YOUR MIND?

17   A   NO, IT'S NOT.

18   Q   WHY NOT?

19   A   WELL, A RELAPSE PREVENTION PLAN THAT AN INDIVIDUAL

20   WORKS ON AND DEVELOPS DURING THE COURSE OF SEX OFFENDER

21   TREATMENT IS AN EXTENSIVE PREPARATION.  IT'S AN EXTENSIVE

22   EXERCISE IN WHICH THE INDIVIDUAL WILL IDENTIFY WHAT THE

23   TRIGGERS ARE FOR SEXUAL OFFENDING OR WHATEVER TYPE OF

24   OFFENDING IS GERMANE TO THE CASE, BUT IN THIS CASE,

25   SEXUAL OFFENDING.  SO THE INDIVIDUAL WILL IDENTIFY WHAT

1    THOSE TRIGGERS ARE, WHAT THOSE STRESSORS ARE, WHAT NEEDS

2    TO BE DONE IN ORDER TO AVOID CERTAIN SITUATIONS.

3         IF A SITUATION PRESENTS ITSELF, IF FOR INSTANCE "A"

4    HAPPENS, WHAT DO I DO SO THAT I DON'T GET ALL THE WAY TO

5    "B" AND "C" AND "D" WHICH WOULD LEAD TO POSSIBLY

6    OFFENDING.  SO IT'S SOMETHING THAT AN INDIVIDUAL WORKS ON

7    IN TREATMENT WITH TREATMENT PROVIDERS SO THAT IT'S A

8    SOUND STRATEGY AND PLAN FOR AVOIDING FUTURE REOFFENSE.

9         CONDITIONS THAT ARE PART OF SUPERVISED RELEASE KIND

10   OF PROVIDE SOME STRUCTURE FOR THAT PERSON OUT IN THE

11   COMMUNITY, BUT THEY AREN'T A RELAPSE PREVENTION PLAN, SO

12   TO SPEAK.

13        AND WE HEARD MR. ANTONE TALK ABOUT THAT A LITTLE BIT

14   YESTERDAY, AND HE MENTIONED ABOUT HAVING SOMEBODY TO TALK

15   TO OR SOMEBODY TO CONFIDE IN, AND THAT WOULD BE NICE TO

16   HAVE THAT, BUT THAT ISN'T A SUBSTITUTE FOR HAVING AN

17   ACTUAL RELAPSE PREVENTION PLAN, HAVING A PHONE NUMBER OR

18   SOMEBODY TO CALL IF YOU WERE TO GET INTO TROUBLE BECAUSE

19   YOU NEED TO HAVE THE STEPS IN PLACE, THE TOOLS IN PLACE,

20   THE SKILLS, THAT YOU OBTAIN THROUGH TREATMENT AND DEVELOP

21   IN THAT RELAPSE PREVENTION PLAN.

22   Q   IS IT YOUR OPINION THAT THAT TREATMENT NEEDS TO BE

23   DONE IN AN IN-PATIENT OR IN A STRUCTURED SETTING?

24   A   YES, IT IS MY OPINION THAT THAT IS NECESSARY.

25        MR. BREDENBERG:  NO FURTHER QUESTIONS, YOUR

1    HONOR.

2              THE COURT:  MR. ROSS.

3              MR. ROSS:  YES.

4    RECROSS EXAMINATION BY MR. ROSS:

5    Q   THERE COULD BE A STRUCTURED PROGRAM FOR DRUG

6    TREATMENT, THAT IS NOT BEHIND THE BARS OF A PRISON?

7    A   THAT IS POSSIBLE.

8    Q   IT'S ALSO POSSIBLE THAT THERE IS A STRUCTURED PROGRAM

9    IN TUCSON, ARIZONA FOR SEXUAL TREATMENT THAT WOULD FIT

10   THE CRITERIA THAT YOU ARE LOOKING FOR AND HELP MR. ANTONE

11   DEVELOP A RELAPSE PLAN; ISN'T THAT POSSIBLE?

12   A   THAT IS POSSIBLY.  I DON'T KNOW IF THERE IS, BUT I

13   SUPPOSE THAT IS POSSIBLE.

14   Q   NOW, THE GOVERNMENT, THROUGH MR. BREDENBERG, ASKED

15   YOU QUESTIONS ABOUT THIS AFFIDAVIT.  YOU NEVER SPOKE TO

16   MS. MCCLOUD; RIGHT?

17   A   THAT'S CORRECT.

18   Q   YOU NEVER SPOKE TO T.F.

19   A   THAT'S CORRECT.

20   Q   YOU NEVER SPOKE TO V.R. NUMBER 1?

21   A   THAT'S CORRECT.

22   Q   V.R. NUMBER 2?

23   A   THAT'S CORRECT.

24   Q   R.J.?  R.A.?  EXCUSE ME.

25   A   THAT'S CORRECT.

1    Q    YOU NEVER SPOKE TO ANY OF THOSE FOLKS OVER THERE?

2    A    NO, I NEVER DID.  IT REALLY ISN'T MY PRACTICE TO DO

3    SO, TO SPEAK TO VICTIMS OF PRIOR OFFENSES, PARTICULARLY

4    SEX OFFENSES.  THERE ARE ETHICAL CONCERNS ABOUT DOING SO.

5    PRIMARILY, THE RISK THAT ONE COULD TAKE IN TERMS OF

6    RESUBJECTING AN INDIVIDUAL TO FURTHER PSYCHOLOGICAL

7    TRAUMA, SO THAT WOULDN'T BE SOMETHING THAT I WOULD

8    IMPLEMENT AS PART OF MY EVALUATION.

9    Q    SO ACTUALLY THE ONLY THING THAT YOU HAVE BEEN ABLE TO

10   SEE FROM A SO CALLED VICTIM THAT WAS SIGNED IS THIS

11   AFFIDAVIT FROM TANYA MCCLOUD.  THAT IS AS CLOSE TO

12   ANYTHING WRITTEN, SPOKEN ABOUT SINCE THE INCIDENT?

13   A    NO.  I WOULD SAY THAT IS INACCURATE.  I WAS ABLE TO

14   REVIEW POLICE REPORTS AND THINGS OF THAT NATURE THAT WENT

15   INTO THE INVESTIGATION AND FAIRLY CERTAIN THAT THERE WERE

16   SOME WRITTEN STATEMENTS OR AT LEAST VERBAL STATEMENTS

17   FROM THE VICTIMS PERTAINING TO THE OFFENSES THAT MR.

18   ANTONE COMMITTED.

19   Q    LET ME SEE.  DO YOU HAVE ANYTHING FROM 2011 FROM ANY

20   OF THESE PEOPLE?

21   A    NO, I DO NOT.

22   Q    2010?

23   A    NO, I DO NOT.

24   Q    2009?

25   A    NO, I DO NOT.

1    Q   SO WHAT YOU HAVE IS FROM 14 YEARS AGO?

2    A   YES, FROM 14 YEARS AGO, APPROXIMATELY.

3              MR. ROSS:  NOTHING FURTHER.

4              THE COURT:  MR. BREDENBERG?

5              MR. BREDENBERG:  NOTHING, YOUR HONOR.

6              THE COURT:  VERY GOOD.  DR. GUTIERREZ, I DID

7    HAVE SOME QUESTIONS FOR YOU, SIR.  LET ME BEGIN WITH

8    SOMETHING OF A PROSAIC ONE IS THE BEST TERM.

9              IN YOUR REFERENCES TO THE DSM-V, HAVE YOU BEEN

10   REFERRING TO THE DSM-IV-TR?

11             THE WITNESS:  YES, I HAVE, YOUR HONOR.

12             THE COURT:  AM I CORRECT THERE IS ANOTHER

13   VERSION OF THE DSM-IV?

14             THE WITNESS:  THERE IS A DSM-IV AND THEN

15   APPROXIMATELY SIX OR SEVEN YEARS AGO THERE WAS THE

16   DSM-IV-TR WHERE THE TEXT FOR SOME OF THE DISORDERS LISTED

17   IN THERE WAS REVISED A LITTLE BIT, SO IT'S A TEXT

18   REVISION.  THERE WERE NO ADDITIONS OR DELETIONS IN TERMS

19   OF THE DISORDERS LISTED FROM DSM-IV TO THE DSM-IV-TR.

20   THE DISORDERS REMAIN THE SAME.  THE NUMBERS THAT

21   CORRESPOND TO THEM REMAIN THE SAME, BUT JUST THE

22   DESCRIPTIONS OR A LITTLE BIT OF THE TEXT DESCRIBING THEM

23   WAS ALTERED IN SOME OF THOSE DISORDERS.

24             THE COURT:  OKAY.  ARE THERE INDIVIDUALS WHO

25   COMMIT MULTIPLE RAPES WHO DO NOT OR ATTEMPT TO COMMIT

1    MULTIPLE RAPES WHO DO NOT SUFFER FROM PARAPHILIC

2    CONDITION?

3            THE WITNESS:  I THINK THAT THAT IS A

4    POSSIBILITY, BUT I HAVEN'T ENCOUNTERED THAT IN MY

5    PRACTICE NECESSARILY.  I THINK WHEN YOU ARE GETTING INTO

6    THE NUMBERS OF RAPES THAT ARE OCCURRING, IT WOULD DEPEND

7    ON THE NUMBER OF RAPES THAT OCCUR AND WHAT IS FUELING

8    THOSE RAPES OR WHAT IS THE PRECURSOR TO THOSE.

9            IF AN INDIVIDUAL COMMITTED SOME RAPES IN A

10   SITUATION PERHAPS LIKE AN ARMED ROBBERY OR SOMETHING LIKE

11   THAT AND IT WAS JUST KIND OF IT OCCURRED AFTER THE FACT

12   AND WASN'T NECESSARILY THE INTENTION INITIALLY OF THE

13   CRIME, THEN I THINK IT COULD BE POSSIBLE WHERE AN

14   INDIVIDUAL WOULD COMMIT MULTIPLE RAPES BUT NOT

15   NECESSARILY BE DIAGNOSED WITH PARAPHILIA NOT OTHERWISE

16   SPECIFIED, NON-CONSENT.

17           THE COURT:  IS THERE -- I USED THE TERM

18   MULTIPLE.  IS THERE SOME NUMBER OF RAPES THAT WOULD BE

19   CONSIDERED A VALID INDICATOR OF WHETHER A RAPIST DID HAVE

20   THIS PARAPHILIA NOS, NON-CONSENT?

21           THE WITNESS:  NO, THERE IS NO SPECIFIC NUMBER

22   THAT IS A THRESHOLD FOR DETERMINING NON-CONSENT VERSUS

23   MAYBE JUST GENERAL ANTISOCIAL BEHAVIOR.  I THINK WHAT I

24   ATTEMPT TO DO AND WHAT OTHER PRACTITIONERS DO WOULD BE TO

25   LOOK AT IT ON A CASE BY CASE BASIS TO SEE WHAT THE

1    CIRCUMSTANCES WERE PERTAINING TO THE RAPES AND IF THERE

2    WAS EVIDENCE OF THAT PARAPHILIA, NOT JUST FROM THE

3    ACTIONS THEMSELVES, BUT OTHER EVIDENCE, PERHAPS WHETHER

4    IT BE POLYGRAPH OR PRIOR ADMISSIONS, OR THINGS OF THAT

5    NATURE THAT MIGHT LEND ITSELF TO DIFFERENTIATING BETWEEN

6    PARAPHILIA AND A RAPIST WHO IS NOT PARAPHILIC.

7              THE COURT:  IS THERE ANY DATA OUT THERE IN

8    YOUR FIELD, SIR, THAT TRIES TO MAKE ANY KIND OF AN

9    ESTIMATION AS TO THE PERCENTAGE OF SERIAL RAPISTS, IF

10   THAT IS THE CORRECT TERM TO USE, PEOPLE WHO -- MEN WHO

11   COMMIT MULTIPLE RAPES, THE BREAKDOWN OF THOSE WHO ARE

12   PARAPHILIC AND THOSE WHO ARE NOT?

13             THE WITNESS:  I AM NOT AWARE OF THAT TYPE OF

14   DATA MAKING THAT DIFFERENTATION, YOUR HONOR.

15             THE COURT:  THE FACTORS THAT YOU JUST

16   MENTIONED THAT YOU LOOK TO TO DETERMINE WHETHER A

17   PARAPHILIA IS IN PLAY FOR A RAPIST, ARE THESE FACTORS

18   SUCH AS THE CIRCUMSTANCES OF THE RAPES, PRIOR ADMISSIONS

19   BY THE PERSON, YOU HAVE RELIED ON OTHER PSYCHOLOGICAL

20   TESTING, PERSONALITY INVENTORY I BELIEVE YOU MENTIONED --

21             THE WITNESS:  CORRECT.

22             THE COURT:  -- IS THIS PART OF A STANDARD SET

23   OF TESTS OR FACTORS THAT PSYCHOLOGISTS, FORENSIC

24   PSYCHOLOGISTS LOOK AT IN TRYING TO DETERMINE WHETHER A

25   RAPIST HAS A PARAPHILIA AND DISTINGUISH THAT PERSON FROM

1   SOMEBODY WHO DOESN'T?

2           THE WITNESS:  YES.  I WOULD SAY THAT THERE ARE

3   A NUMBER OF FACTORS THAT WE LOOK AT THAT ARE GENERALLY

4   ACCEPTED IN THE FIELD IN TERMS OF TRYING TO DIFFERENTIATE

5   PARAPHILIA NOT OTHERWISE SPECIFIED, NON-CONSENT, TO AN

6   INDIVIDUAL WHO JUST COMMITS SOME RAPES BUT MIGHT NOT FIT

7   THAT DIAGNOSTIC CLASSIFICATION, AND WE LOOK AT SOME OF

8   THE THINGS I MENTIONED BEFORE ABOUT ENGAGING IN RAPE OR

9   FORCIBLE SEXUAL INTERCOURSE WHEN THERE IS AN AVAILABLE

10  CONSENTING PARTNER, BEING ABLE TO CONTINUE WITH THE

11  SEXUAL ASSAULT, MAINTAINING AN ERECTION EVEN WHEN AN

12  INDIVIDUAL IS RESISTING OR FIGHTING BACK, OTHER

13  INDICATORS ABOUT REPEATED OFFENDING AGAINST A PARTICULAR

14  INDIVIDUAL IS SUGGESTIVE OF AN INDIVIDUAL WHO MIGHT BE

15  PARAPHILIC AS OPPOSED TO JUST AN ANTISOCIAL IN NATURE.

16          SO THERE ARE CERTAIN THINGS THAT WE DO LOOK AT

17  AS PSYCHOLOGISTS, AS FORENSIC PSYCHOLOGISTS, TO TRY TO

18  DIFFERENTIATE THE PERSON WHO HAS THE PARAPHILIA COMPARED

19  TO THE PERSON WHO DOES NOT.

20          THE COURT:  AND I GATHER FROM YOUR TESTIMONY

21  AND THERE IS WITHIN THE FORENSIC PSYCHOLOGICAL COMMUNITY

22  THERE IS A RECOGNIZED SET OF CONSIDERATIONS THAT ARE

23  TAKEN INTO ACCOUNT?

24          THE WITNESS:  I WOULD SAY THAT IT'S GENERALLY

25  ACCEPTED.  I WOULDN'T SAY THAT THERE IS A LIST, PER SE,

1    THAT IS RECOGNIZED BY A GOVERNING BODY OF ANY SORT, BUT

2    MOST, IF NOT ALL OF THE EVALUATORS WHO CONSIDER THIS

3    DIAGNOSIS WILL LOOK AT SOME OF THESE BEHAVIORAL AND

4    PSYCHOLOGICAL INDICATORS AS EVIDENCE OF A PARAPHILIA.

5              THE COURT:  ARE THERE EMPIRICAL STUDIES THAT

6    YOU ARE AWARE OF THAT VALIDATE USE OF THOSE FACTORS AS

7    ACCURATE TOOLS TO DIAGNOSIS THIS PARAPHILIA NOS,

8    NONCONSENT?

9              THE WITNESS:  THERE ARE SOME STUDIES THAT LOOK

10   AT DIFFERENTIATING BETWEEN PARAPHILIA NOT OTHERWISE

11   SPECIFIED AND PEOPLE WITH ANTISOCIAL PERSONALITY DISORDER

12   OR SEXUAL SADISM, ANOTHER DIAGNOSIS THAT MIGHT BE

13   APPLICABLE TO AN INDIVIDUAL WHO COMMITS VARIOUS RAPES,

14   AND THESE STUDIES DO LOOK AT BEHAVIORAL INDICATORS THAT

15   DISTINGUISH ONE GROUP FROM ANOTHER.

16             THE COURT:  HAVE THERE BEEN ANY STUDIES LIKE

17   THAT THAT YOU ARE AWARE OF THAT DEAL SPECIFICALLY WITH

18   THIS PARAPHILIA NOT OTHERWISE SPECIFIED, NONCONSENT, AND

19   PERSONS WHO DON'T HAVE, TO DISTINGUISH THAT FROM PERSONS

20   WHO DO NOT HAVE PARAPHILIA?

21             THE WITNESS:  I CAN'T THINK OF ANY OFF THE TOP

22   OF MY HEAD, YOUR HONOR.

23             THE COURT:  DO YOU UNDERSTAND, SIR, OR CAN YOU

24   JUST EXPLAIN TO ME BRIEFLY, IF YOU KNOW, THE BASIS FOR

25   THE AMERICAN PSYCHIATRIC ASSOCIATION'S REJECTION OF THIS

1    PARAPHILIA NOT OTHERWISE SPECIFIED, NONCONSENT DIAGNOSIS?

2              THE WITNESS:  MY UNDERSTANDING OF THAT IS THAT

3    IT WAS ESSENTIALLY A POLITICAL DECISION.  THERE IS, AS WE

4    HAVE TALKED ABOUT, SOME DEBATE AND DISCUSSION ABOUT

5    WHETHER IT'S AN APPROPRIATE DIAGNOSIS FOR THESE TYPES OF

6    PROCEEDINGS.

7              THE AMERICAN PSYCHIATRIC ASSOCIATION HAS LONG

8    TAKEN A VIEW THAT IS OPPOSED TO CIVIL COMMITMENT FOR

9    INDIVIDUALS WHO ARE BEING CONSIDERED AS SEXUALLY

10   DANGEROUS.  SO IT'S -- IT WASN'T AN UNEXPECTED DECISION

11   FOR MANY THAT THE APA DECIDED NOT TO INCLUDE THIS

12   DIAGNOSIS IN THE DSM-V.

13             THE COURT:  YOU SEE THAT DECISION AS BASED

14   MORE ON VALUE JUDGMENTS OUTSIDE THE REALM OF SCIENCE?

15             THE WITNESS:  I DO.

16             THE COURT:  NOW, MY UNDERSTANDING OF YOUR

17   TESTIMONY IS THAT EVEN IF YOU HAD NOT DIAGNOSED MR.

18   ANTONE WITH THIS PARAPHILIA NOT OTHERWISE SPECIFIED,

19   NONCONSENT, YOU WOULD STILL DEEM HIM TO BE A SEXUALLY

20   DANGEROUS PERSON UNDER THE ADAM WALSH ACT; IS THAT

21   CORRECT?

22             THE WITNESS:  THAT IS CORRECT.

23             THE COURT:  CAN YOU EXPLAIN WHY HE WOULD

24   STILL, IN YOUR OPINION, QUALIFY AS SUCH NOTWITHSTANDING

25   THE ABSENCE OF THAT DIAGNOSIS?

1           THE WITNESS:  SURE.  MR. ANTONE STILL HAS THE

2    OTHER DIAGNOSIS OF ANTISOCIAL PERSONALITY DISORDER WHICH

3    IS ESSENTIALLY CHARACTERIZED BY HIS REPEATED INSTANCES OF

4    BREAKING THE LAW, OF ARRESTS, AND WHEN YOU LOOK AT THE

5    TOTALITY OF HIS CRIMINAL RECORD, THERE ARE SOME

6    RELATIVELY MINOR OFFENSES THAT WERE NONSEXUAL IN NATURE,

7    BUT THE BULK, THE MAJORITY OF HIS OFFENDING HAS BEEN

8    SEXUAL IN NATURE.

9           ONE OF THE MAIN FACTORS OF ANTISOCIAL

10   PERSONALITY DISORDER IS THAT IMPULSIVITY THAT IS LISTED

11   AS ONE OF THE CRITERIA, AND IN MY OPINION, IMPULSIVITY

12   HAS PLAYED A LARGE ROLE IN HIS PATTERN OF OFFENDING

13   AGAINST FEMALES.  SO IT'S NOT JUST THE PARAPHILIA THAT

14   I THINK IS APPLICABLE TO MR. ANTONE, BUT ALSO THE

15   ANTISOCIAL PERSONALITY DISORDER AS WELL AS THE SUBSTANCE

16   DEPENDENCE THAT HAS BEEN, IF NOT ALL OF THE INSTANCES OF

17   SEXUAL OFFENDING, MOST, HAS PLAYED AN IMPORTANT FACTOR.

18           SO HE STILL HAS THESE OTHER CONDITIONS THAT

19   ADVERSELY AFFECT HIS FUNCTIONING EVEN IN ABSENCE OF THE

20   PARAPHILIA.

21           THE COURT:  BUT THOSE ILLNESSES WOULD EXPRESS

22   THEMSELVES IN THE CONTINUATION OF THE RAPE CONDUCT, THE

23   OFFENSE CONDUCT?

24           THE WITNESS:  I BELIEVE THEY WOULD BECAUSE

25   THAT, AS I MENTIONED, THAT HAS BEEN ESSENTIALLY THE CRUX

1    OF HIS OFFENDING HAS BEEN SEXUAL IN NATURE.

2                THE COURT:  NOW, MY UNDERSTANDING IS THAT YOU

3    DEEM ALL OF THE DIAGNOSIS -- DIAGNOSES, THE THREE

4    DIAGNOSES THAT YOU MADE, EACH ONE OF THE ILLNESS THAT YOU

5    DIAGNOSED TO BE SERIOUS MENTAL ILLNESSES, ABNORMALITIES

6    OR DISORDERS; IS THAT CORRECT?

7    A    I LISTED IN MY REPORT, I LISTED THE PARAPHILIA AND

8    THE ANTISOCIAL PERSONALITY DISORDER AS SERIOUS MENTAL

9    ILLNESSES, ABNORMALITIES OR DISORDERS.  I DID NOT LIST

10   THE POLYSUBSTANCE DEPENDENCE IN THAT FINAL PARAGRAPH

11   BECAUSE IT WAS MY UNDERSTANDING THAT JUST A SUBSTANCE

12   DEPENDENCE DIAGNOSIS ALONE COULD NOT ESSENTIALLY STAND BY

13   ITSELF AS A REASON FOR CIVIL COMMITMENT, AND I MIGHT BE

14   INCORRECT IN THAT DETERMINATION OR THAT ASSESSMENT, BUT

15   EVEN THOUGH I DIDN'T LIST IT THERE WITH THE OTHER TWO, I

16   CERTAINLY THINK IT'S AN IMPORTANT, VITAL PART OF MR.

17   ANTONE'S DIAGNOSTIC PICTURE AND HOW HE RELATES TO OTHERS

18   IN HIS ENVIRONMENT.

19                THE COURT:  I SEE.  OKAY.  WELL, MY QUESTION

20   IS, THEN WITH RESPECT TO THE TWO DIAGNOSES THAT YOU HAVE

21   CONSIDERED TO BE FOR SERIOUS MENTAL ILLNESSES AND

22   ABNORMALITY OR DISORDERS, THE PARAPHILIA NOS, NONCONSENT,

23   AND THEN THE ANTISOCIAL PERSONALITY DISORDER, WHY DO YOU

24   DEEM THEM TO BE SERIOUS MENTAL ILLNESSES, ABNORMALITIES

25   OR DISORDERS?

1                 THE WITNESS:  I DEEM THEM TO BE SERIOUS BASED

2     ON THE SERIOUS IMPLICATIONS THAT THEY HAVE HAD ON MR.

3     ANTONE'S LIFE AND ALSO ON THE SERIOUS IMPLICATIONS THAT

4     THEY HAVE -- THAT THESE DISORDERS HAVE HAD ON THE LIVES

5     OF HIS VICTIMS.

6                 THERE IS CERTAINLY VERY -- YOU KNOW, THE

7     SERIOUSNESS OF IT IS VERY SIGNIFICANT IN THAT RESPECT, IN

8     THOSE RESPECTS.

9                 THE COURT:  SO IN THE FIELD OF FORENSIC

10    PSYCHOLOGY, WHEN ONE SPEAKS OF SERIOUS MENTAL ILLNESSES,

11    DISORDERS OR ABNORMALITIES, THE FOCUS IS ON THE IMPACT

12    THAT THE ILLNESS HAS ON THE PERSON'S LIFE AND THE LIVES

13    OF OTHERS THAT THE PERSON HAS INTERACTIONS WITH; IS THAT

14    ACCURATE?

15                THE WITNESS:  WELL, I WOULD SAY FOR FIRST AND

16    FOREMOST YOU ARE LOOKING AT THE INDIVIDUAL, HOW IT

17    AFFECTS THAT PERSON'S DAY-TO-DAY FUNCTIONING, AND BY

18    NATURE, OR BY DEFINITION, PART OF THE DEFINITION OF THE

19    PARAPHILIA IS THAT IF YOU LOOK IN THE DSM-IV-TR, IT HAS

20    TO HAVE SOME SORT OF -- THERE NEEDS TO BE SOME SORT OF

21    MARKED IMPAIRMENT, OR YOU KNOW, SOME SORT OF NEGATIVE

22    CONSEQUENCES ASSOCIATED TO IT, AND IN MR. ANTONE'S CASE,

23    IT CERTAINLY HAS WITH RESPECT TO THE RELATIONSHIPS WITH

24    FAMILY AND FRIENDS AND ALSO AS SEEN IN HIS NUMEROUS

25    CONVICTIONS AND INCARCERATIONS.  SO THAT IS THE FIRST

1    PART OF IT, THE SERIOUSNESS OF IT AS IT AFFECTS HIM.

2            BUT THEN ALSO IT'S REASONABLE, I THINK, TO

3    LOOK AT THE SERIOUSNESS OF HIS ACTIONS AS THEY RELATE TO

4    THE VICTIMS.

5            THE COURT:  OKAY.  WHY IS IT -- WELL, YOU MAY

6    HAVE TOUCHED ON THIS BEFORE -- BUT I STILL WANT TO MAKE

7    SURE I HAVE A FULL UNDERSTANDING OF THIS.

8            AS I UNDERSTAND THE RECORD THAT WE HAVE BEFORE

9    US, MR. ANTONE DOES NOT HAVE A HISTORY WHILE BEING IN

10   PRISON OF ENGAGING IN BEHAVIOR THAT MANIFESTS THIS

11   PARAPHILIA NOS, NONCONSENT?

12           THE WITNESS:  CORRECT.

13           THE COURT:  AND THAT EXPANDS OVER A

14   SIGNIFICANT PERIOD OF TIME?

15           THE WITNESS:  THAT'S RIGHT.

16           THE COURT:  WHAT, AGAIN, DO YOU MAKE OF THAT?

17   IN OTHER WORDS, HOW DOES THAT FIGURE INTO YOUR ANALYSIS?

18           THE WITNESS:  WHAT I MAKE OF THAT, YOUR HONOR,

19   IS THAT IT'S COMMENDABLE THAT HE HAS BEEN ABLE TO

20   ESSENTIALLY DISPLAY CLEAR CONDUCT OVER THE APPROXIMATELY

21   14 YEARS THAT HE HAS BEEN IN CUSTODY, BUT THERE IS A

22   TREMENDOUS DIFFERENCE IN TERMS OF MANAGING ONE'S BEHAVIOR

23   IN A STRUCTURED ENVIRONMENT LIKE A PRISON COMPARED TO

24   BEING ABLE TO CONTROL ONESELF OR CHOOSING TO CONTROL

25   ONESELF WHEN OUT IN THE COMMUNITY.

1            IN MY WORK OVER THE LAST TEN YEARS, I HAVE

2       SEEN NUMEROUS CASES OF INDIVIDUALS WHO HAVE OFFENDED,

3       BEEN IN CUSTODY AND DONE RELATIVELY WELL IN CUSTODY, BUT

4       WHEN THEY GO BACK OUT ON THE STREET, THEY REOFFEND.  THIS

5       ISN'T JUST FOR SEXUAL OFFENDERS, BUT OFFENDERS IN

6       GENERAL.

7            MANY OF THE INDIVIDUALS THAT I HAVE HAD THE

8       OCCASION TO EVALUATE FOR THIS ADAM WALSH LAW HAVE HAD

9       PRIORS THAT THEY SERVED TIME FOR, AND IT'S NOT UNUSUAL

10      FOR THEM TO DISPLAY OR ENGAGE IN APPROPRIATE BEHAVIOR

11      WHEN IN CUSTODY.  THAT COULD BE FOR A VARIETY OF FACTORS.

12      IT MIGHT BE DUE TO THE LIKELIHOOD OF BEING DETECTED OR

13      THE IMMEDIATE SANCTIONS THAT MIGHT OCCUR IF THEY WERE TO

14      ENGAGE IN ANY TYPE OF SEXUAL ACTING OUT OR OTHER

15      ANTISOCIAL BEHAVIORS.

16            FOR SOME INDIVIDUALS IT MIGHT REALLY HAVE TO

17      DO WITH THE ENVIRONMENT AND NOT NECESSARILY BEING AROUSED

18      OR STIMULATED BY THE ENVIRONMENT THAT ONE IS IN.

19            MR. ANTONE'S CASE, ALL OF HIS -- ALL OF HIS

20      OFFENSES WERE OUT IN THE COMMUNITY.  HE WAS AMONG

21      ACQUAINTANCES, SUBSTANCE ABUSE WAS INVOLVED.  I AM NOT

22      CERTAIN, BUT IT APPEARS THAT MOST OF THE -- IF NOT ALL OF

23      THE VICTIMS WERE NATIVE AMERICANS, SO THOSE CONDITIONS

24      THAT WERE PRESENT IN THAT ENVIRONMENT WHEN HE OFFENDED

25      ARE NOT PRESENT IN HIS CURRENT ENVIRONMENT.

1              SO I DON'T KNOW THAT -- I DON'T BELIEVE THAT

2      DEMONSTRATION OF GOOD CONDUCT WHILE INCARCERATED, NOT

3      JUST FOR MR. ANTONE, BUT FOR OTHER INDIVIDUALS, I DON'T

4      THINK THAT THAT IS NECESSARILY A GOOD BAROMETER OF HOW

5      THEY WILL BEHAVE IN THE COMMUNITY.

6              THE COURT:  ONE REASON FOR MY QUESTION WAS

7      THAT ONE OF THE ELEMENTS, AS I UNDERSTAND, ONE OF THE

8      DEFINING CHARACTERISTICS OF THIS PARAPHILIA IS THAT THE

9      PERSON FEELS AN URGE THAT I ASSUME IS FAIRLY INTENSE OR

10     ELSE IT WOULDN'T BE A MENTAL ILLNESS, AN URGE TO ENGAGE

11     IN THESE NONCONSENSUAL SEXUAL ENCOUNTERS, AND I GATHER

12     FROM WHAT YOU ARE SAYING, DR. GUTIERREZ, THAT THE

13     STRUCTURE CAN FACILITATE THE PERSON CONTROLLING THAT

14     URGE, BUT IF THEY GET OUT INTO THE COMMUNITY WITHOUT SOME

15     OF THESE CONTROLS THAT EXIST IN THE PRISON ENVIRONMENT,

16     ABSENT THOSE CONTROLS, THE CONDUCT MAY REOCCUR.

17             IS THAT A FAIR STATEMENT AND AN ACCURATE

18     STATEMENT?

19             THE WITNESS:  I WOULD SAY THAT IS FAIR.  I

20     DON'T KNOW THAT BEING IN THIS ENVIRONMENT NECESSARILY HAS

21     EXTINGUISHED ANY OF HIS URGES.

22             I MEAN, IT'S POSSIBLE THAT HE IS STILL

23     EXPERIENCING SOME URGES, BUT JUST CHOOSING NOT TO ACT ON

24     THEM OR IT'S POSSIBLE THAT HE IS -- HE HAS ANOTHER

25     RELEASE, WHETHER IT BE MASTURBATION OR SOMETHING ELSE, SO

1    THAT HE IS NOT OFFENDING AGAINST WOMEN AT THIS TIME, BUT

2    IT IS MY OPINION THAT THESE URGES, WITHOUT TREATMENT,

3    WOULD STILL BE PRESENT FOR HIM IF RELEASED OUT INTO THE

4    COMMUNITY.

5              THE COURT:  HOW EFFECTIVE IS SEX OFFENDER

6    TREATMENT?  DO YOU HAVE AN OPINION ON THAT?

7              THE WITNESS:  I KNOW THAT -- I AM NOT A SEX

8    OFFENDER TREATMENT PROVIDER.  BUT I DO KNOW THAT IT CAN

9    BE HELPFUL FOR SOME INDIVIDUALS.  IT DOESN'T ALWAYS WORK.

10   IT DOESN'T WORK WITH EVERYBODY.  BUT FOR SOME

11   INDIVIDUALS, IT CAN BE EFFECTIVE IN TERMS OF REDUCING

12   THEIR RISK OF RECIDIVISM.

13             THE COURT:  AT VARIOUS TIMES YOU AND COUNSEL

14   HAVE BOTH USED TERMS LIKE THIS STRUCTURED TREATMENT

15   PROGRAM OR STRUCTURED SETTING.  CAN YOU EXPLAIN WHAT

16   THOSE TERMS MEAN TO YOU?

17             THE WITNESS:  SURE.  WELL, STRUCTURED SETTING,

18   WHAT I MEAN BY THAT IS ESSENTIALLY A PRISON WHERE THERE

19   IS SOME STRUCTURE AND THERE IS MORE CONTROL OF AN

20   INMATE'S MOVEMENT AND BEHAVIOR.  CERTAINLY MORE

21   RESTRICTION THAN AN INDIVIDUAL WOULD FIND IN THE

22   COMMUNITY OR EVEN A HALFWAY HOUSE.  THERE IS CERTAINLY

23   MORE RESTRICTION IN TERMS OF WHAT AN INDIVIDUAL CAN DO

24   AND WHERE HE CAN MOVE AROUND TO WHILE INCARCERATED.

25             AS FAR AS STRUCTURED TREATMENT, BY THAT I MEAN

1    REALLY AN EMPHASIS ON THE TREATMENT OF THE INDIVIDUAL.  I

2    KNOW THAT MR. ANTONE HAS HAD A LITTLE BIT OF TREATMENT IN

3    THE BUREAU OF PRISONS, GENERALLY, OR IN GENERAL MATTERS,

4    STRESS MANAGEMENT, A LITTLE BIT OF ANGER MANAGEMENT, I

5    BELIEVE, A LITTLE BIT OF TREATMENT PERTAINING TO

6    SUBSTANCE ABUSE, BUT THE STRUCTURED TREATMENT I AM

7    ESSENTIALLY REFERRING TO WOULD BE MORE EXTENSIVE AND IN

8    DEPTH TREATMENT TO ADDRESS SEXUAL OFFENDING AND SUBSTANCE

9    ABUSE.

10             THE COURT:  OKAY.  THANK YOU, DR. GUTIERREZ.

11   IS THERE ANY FOLLOW-UP, MR. BREDENBERG, TO MY QUESTIONS?

12             MR. BREDENBERG:  YES, YOUR HONOR.  JUST A

13   COUPLE OF THINGS.

14   FURTHER EXAMINATION BY MR. BREDENBERG:

15   Q   ARE THERE SCIENTIFIC TOOLS OUT THERE IN WHICH YOU CAN

16   IDENTIFY AROUSAL TO NONCONSENSUAL SEX?

17   A   YES.  THERE IS A TOOL, A PENILE PLETHYSMOGRAPH WHICH

18   IS USED TO ESSENTIALLY ASCERTAIN WHETHER AN INDIVIDUAL IS

19   AROUSED BY NONCONSENSUAL SEX, CHILDREN, WHATEVER THE

20   STIMULI MIGHT BE FOR PPG, PENILE PLETHYSMOGRAPH.

21   Q   ARE THERE OTHER MEASURES OF OTHER TESTS THAT YOU KNOW

22   OF?

23   A   THERE IS THE ABEL SCREENING THAT I HAD MENTIONED

24   EARLIER FOR AN INDIVIDUAL PRESENTED WITH SOME VISUAL

25   STIMULI AND BASED ON THE AMOUNT OF TIME THAT THE PERSON

1    IS LOOKING AT PICTURES, THE EVALUATOR CAN MAKE A

2    DETERMINATION AS TO WHETHER OR NOT THERE IS ANY SEXUAL

3    AROUSAL THERE.

4    Q    DID YOU TESTIFY AS TO THE USE OF POLYGRAPHS?

5    A    POLYGRAPHS AS WELL, WHILE NOT DIRECTLY MEASURING

6    PHYSIOLOGICAL AROUSAL, POLYGRAPHS ARE USED TO ASCERTAIN

7    WHETHER OR NOT AN INDIVIDUAL IS BEING DECEPTIVE OR NOT

8    WITH RESPECT TO QUESTIONS, AND IN THIS CASE, COULD BE

9    APPLICABLE TO QUESTIONS ABOUT SEXUAL OFFENDING.

10   Q    JUDGE GATES ASKED YOU ABOUT, YOU KNOW, THE FACT THAT

11   MR. ANTONE MAY HAVE BEEN IN PRISON FOR A LONG TIME

12   WITHOUT OFFENDING.  MOST OF HIS VICTIMS, OR ALL OF THE

13   VICTIMS WERE WOMEN OR GIRLS; RIGHT?

14   A    CORRECT.

15   Q    DOES HE HAVE ACCESS TO THAT TYPE OF VICTIM IN THE

16   PRISON SYSTEM?

17   A    HE HAS ACCESS TO WOMEN WHO ARE STAFF MEMBERS AT THE

18   INSTITUTION, AND IF HE WAS EVER IN THE VISITING ROOM, FOR

19   INSTANCE, THERE MIGHT BE WOMEN THERE.  THERE MIGHT,

20   PERHAPS, BE CHILDREN IN THAT ENVIRONMENT AS WELL, BUT

21   THERE WOULDN'T BE ANY CHILDREN INSIDE THE PRISON.

22   Q    WHAT IS THE LIKELIHOOD OF THE OPPORTUNITY HE WOULD BE

23   ABLE TO ACCESS THOSE VICTIMS IN THAT SETTING?

24   A    IT WOULD BE A LOW LIKELIHOOD.

25            MR. BREDENBERG:  NOTHING ELSE, YOUR HONOR.

1            THE COURT:  THANK YOU, SIR.  MR. ROSS?

2            MR. ROSS:  I DO.

3    FURTHER EXAMINATION BY MR. ROSS:

4    Q    PICKING UP ON WHAT HIS HONOR ASKED YOU, HE ASKED YOU

5    ABOUT PARAPHILIA NOS, NONCONSENT.  THAT IS ONE OF -- THAT

6    DIAGNOSIS IS A SERIOUS MENTAL DISORDER; RIGHT?

7    A    YES, IT IS.

8    Q    ALSO, THE ONLY OTHER SERIOUS MENTAL DISORDER IS THE

9    ANTISOCIAL PERSONALITY DISORDER; IS THAT RIGHT?

10   A    AS I LISTED THEM IN THE REPORT, PARAPHILIA NOT

11   OTHERWISE SPECIFIED AND THE ANTISOCIAL PERSONALITY

12   DISORDER AS DIAGNOSES THAT I CONSIDERED WOULD BE RELEVANT

13   TO POTENTIAL CIVIL COMMITMENT, EXCLUDING THE

14   POLYSUBSTANCE DEPENDENCE, AS I MENTIONED BEFORE.

15   Q    SO ASSUMING THAT THE PARAPHILIA NOS, NONCONSENTING IS

16   GONE, THAT WOULD LEAVE THE ANTISOCIAL PERSONALITY

17   DISORDER ONLY AS A SERIOUS MENTAL DISORDER?

18   A    YES.

19   Q    AND YOU ARE AWARE THAT DR. PHENIX HAS WRITTEN AN

20   ARTICLE STATING ANTISOCIAL PERSONALITY DISORDER IS NOT

21   ENOUGH?

22   A    I AM NOT AWARE OF THAT ARTICLE.

23   Q    SO YOU AREN'T AWARE THAT -- AND I AM QUOTING FROM HER

24   FROM HER ARTICLE -- "IN OUR OPINION, AN ANTISOCIAL

25   PERSONALITY DISORDER DIAGNOSIS ALONE IS NOT A SUFFICIENT

1    DIAGNOSTIC CONDITION FOR AN SVP/(SLASH)SDP CIVIL

2    COMMITMENT WITHOUT AN INTENDED DIAGNOSIS OF PARAPHILIA

3    THAT INDICATES AN ESTABLISHED DEVIANT SEXUAL PREFERENCE."

4         YOU WEREN'T AWARE OF THAT IN HER ARTICLE?

5    A    NO.

6    Q    ALSO, WERE YOU AWARE OF THIS COMMENT, AGAIN, "THE

7    DIAGNOSIS OF ANTISOCIAL PERSONALITY DISORDER" -- WHICH IS

8    ON THE LAST PAGE OF HER ARTICLE -- "ALONE, WITHOUT AN

9    ATTENDING DIAGNOSIS OF PARAPHILIA, WOULD ALMOST NEVER

10   LEAD TO A FINDING THAT AN OFFENDER WOULD BE LIKELY OR

11   VERY LIKELY TO REOFFEND WITHOUT ANOTHER SEXUAL VIOLENT

12   ACT" -- I AM SORRY -- "WITH ANOTHER SEXUALLY VIOLENT

13   ACT."

14        YOU WEREN'T AWARE OF THAT IN THE ARTICLE EITHER?

15   A    I AM SORRY.  CAN YOU REPEAT THAT?

16   Q    SURE.  SHE WILL READ IT.

17            MS. ALLEN:  YOUR HONOR, SONYA ALLEN.  I AM

18   GOING TO READ THIS FOR MR. ROSS.

19            THE COURT:  I AM NOT GOING TO ALLOW THAT.  MR.

20   ROSS, IF YOU CAN, YOU NEED TO STAY --

21            MR. BREDENBERG:  YOUR HONOR, AT THIS POINT I

22   WOULD OBJECT BECAUSE HE HAS ALREADY SAID HE IS NOT AWARE

23   OF THE ARTICLE, SO IT'S CERTAINLY LIKELY THAT HE WOULDN'T

24   BE AWARE OF THE COMMENTS IN THE ARTICLE.

25            THE COURT:  I AM GOING TO ALLOW IT.

1              MR. ROSS:  LET'S TRY THIS AGAIN.

2     Q   AGAIN, "THE DIAGNOSIS OF ANTISOCIAL PERSONALITY

3     DISORDER ALONE, WITHOUT AN ATTENDING DIAGNOSIS OF

4     PARAPHILIA, WOULD ALMOST NEVER LEAD TO A FINDING THAT AN

5     OFFENDER WOULD BE LIKELY OR VERY LIKELY TO REOFFEND WITH

6     ANOTHER SEXUALLY VIOLENT ACT."

7          YOU WEREN'T AWARE OF THAT COMMENT EITHER?

8     A   NO, I WASN'T.

9     Q   LASTLY, YOU WEREN'T AWARE OF, "IN SUMMARY, CAREFUL

10    CONSIDERATION OF THE ACTIVITIES WITH WHICH THE FORENSIC

11    MENTAL HEALTH EXPERT IS CONCERNED INDICATES THAT A

12    DIAGNOSIS OF ANTISOCIAL PERSONALITY DISORDER ALONE IS NOT

13    ENOUGH TO CALL FOR AN SVP/(SLASH)SDP DESIGNATION."

14         YOU WEREN'T AWARE OF THAT IN DR. PHENIX'S ARTICLE?

15    A   NO.

16    Q   NOW, SVP IS SEXUALLY VIOLENT PREDATOR; IS THAT RIGHT?

17    A   YES.

18    Q   AND SDP IS SEXUALLY DANGEROUS PREDATOR -- PERSON.

19    EXCUSE ME.

20    A   CORRECT.

21    Q   YOU HAVE REVIEWED SEVERAL DOCUMENTS ASSOCIATED WITH

22    THIS CASE?

23    A   YES, I HAVE.

24    Q   IS THERE ANYTHING IN THOSE DOCUMENTS WHERE MR. ANTONE

25    REPORTED HE HAD AN URGE TO RAPE?

1    A    NOT THAT I RECALL.

2              MR. ROSS:  NOTHING FURTHER.

3              THE COURT:  MR. BREDENBERG?

4              MR. BREDENBERG:  NOTHING, YOUR HONOR.

5              THE COURT:  VERY GOOD.  LET'S TAKE OUR

6    AFTERNOON -- OUR LUNCH BREAK.  EXCUSE ME.  WE'LL BE IN

7    RECESS UNTIL 1:15.

8              (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

9              THE COURT:  MR. ROSS, SIR?

10             MR. ROSS:  IF I MAY, CAN I GIVE THE WHOLE CITE

11   OF THE ARTICLE I WAS QUOTING FROM?

12             THE COURT:  I WILL ALLOW YOU TO PUT THAT INTO

13   THE RECORD.

14             MR. ROSS:  THANK YOU.  ANTISOCIAL PERSONALITY

15   DISORDER IS NOT ENOUGH:  A REPLY TO -- I AM GOING TO

16   SPELL THE NAME -- SREENIBASAN, WEINBERGER AND GARRIC, BY

17   JACK VOGNSEN, PHD., AND AMY PHENIX, AND THE CITE FOR THAT

18   IS JOURNAL OF AMERICAN ACADEMY OF PSYCHIATRY AND THE LAW,

19   VOLUME 32, NUMBER IV, 2004 ARTICLE, AND IT'S ON PAGE --

20   STARTS ON PAGE 440.

21             THE COURT:  OKAY.  THANK YOU.

22             IS THERE ANY OTHER EVIDENCE FOR THE

23   GOVERNMENT?

24             MR. ROYSTER:  NO, YOUR HONOR.  THE GOVERNMENT

25   RESTS.

1              THE COURT:  THANK YOU, SIR.  MR. ROSS, IS

2    THERE ANY EVIDENCE FOR THE RESPONDENT?

3              MR. WATERS:  YOUR HONOR, BEFORE THE

4    RESPONDENT --

5              THE COURT:  MR. WATERS.

6              MR. WATERS:  YOUR HONOR, BEFORE THE RESPONDENT

7    BEGINS TO PUTS ON EVIDENCE, THE RESPONDENT WOULD LIKE TO

8    MOVE AT THIS TIME FOR A DIRECTED VERDICT ON THE BASIS

9    THAT THERE IS NO EVIDENCE THAT RISES TO THE LEVEL OF MORE

10   LIKELY THAN NOT THAT THE RESPONDENT MEETS THE CRITERIA

11   FOR COMMITMENT UNDER 18 U.S.C. 4248, LET ALONE THE LEVEL

12   OF CLEAR AND CONVINCING EVIDENCE AS REQUIRED BY THAT

13   STATUTE.

14             THE RESPONDENT ALSO NOTES THAT THE ACTUARIALS

15   WHICH MANY OF THE EXPERTS CONSIDER THE STRONGEST EVIDENCE

16   WITH RESPECT TO THE RISK OF RECIDIVISM AND REOFFENDING DO

17   NOT EVEN SUPPORT A FINDING OF MORE LIKELY THAN NOT THAT

18   HE WILL REOFFEND.

19             THE COURT:  THAT MOTION IS DENIED.

20             IS THERE ANY EVIDENCE FOR THE RESPONDENT?

21             MR. WATERS:  YES, YOUR HONOR.  THE RESPONDENT

22   CALLS ALLAN DUPREY, WHO IS NOT IN THE COURTROOM AT THIS

23   TIME.

24             MR. ROSS:  WE'LL CALL ANDRE TAYLOR TO THE

25   STAND.

1           ANDRE TAYLOR, CALLED AS A WITNESS, HAVING
            BEEN FIRST DULY SWORN, ON HIS OATH, TESTIFIED
2           AS FOLLOWS:

3           MR. BREDENBERG:  YOUR HONOR, AT THIS POINT, WE

4   WOULD LIKE TO LODGE AN OBJECTION TO ANY TESTIMONY FROM

5   THIS WITNESS REGARDING ANY KIND OF OPINIONS.  THE SAME AS

6   MR. GALLOP FROM YESTERDAY.

7           THE COURT:  VERY GOOD.  SO NOTED.

8           THE CLERK:  SIR, COULD YOU STATE YOUR NAME FOR

9   THE RECORD.

10          THE WITNESS:  ANDRE TAYLOR.

11          THE COURT:  MR. WATERS?  OR MR. ROSS?

12          MR. ROSS:  YES, I HAVE HIM.

13  DIRECT EXAMINATION BY MR. ROSS:

14  Q   MR. TAYLOR, WHERE DO YOU WORK?

15  A   AT THE FEDERAL PRISON IN BUTNER, NORTH CAROLINA.

16  Q   WHAT IS YOUR JOB TITLE?

17  A   I AM A CORRECTION COUNSELOR.

18  Q   HOW LONG HAVE YOU BEEN WORKING THERE?

19  A   I HAVE BEEN AT BUTNER FOR 16 YEARS AND COUNSELLOR FOR

20  THE LAST THREE YEARS, SINCE 2008.

21  Q   IN 2008 -- BEFORE 2008, WHAT WAS YOUR JOB?

22  A   PRIOR TO 2008, I WAS AN ISM OFFICER WHICH IS INMATE

23  SYSTEM'S OFFICER, WHICH BASICALLY PROCESS AND OUTPROCESS

24  INMATES, PROCESS THE MAIL AND INMATE'S PROPERTY.

25  Q   NOW, AS COUNSELLOR, WHAT ARE SOME OF YOUR JOB DUTIES?

1    A    THEY DEAL WITH BASICALLY TRYING TO COUNSEL INMATES ON

2    GETTING JOB SKILLS, TALKING TO THE INMATES ON THE LEVEL

3    OF TRYING TO PROBLEM SOLVE, DOING PROGRESS REPORTS WHICH

4    IS THE CASE MANAGER, WE HAVE LIKE A UNIT TEAM AND WE GET

5    TOGETHER AND GET THE INMATE IN THERE AND GIVE THEM SOME

6    TYPE OF -- YOU KNOW, WHAT IS DOING GOOD AND WHAT HE IS

7    DOING BAD, AND WHAT HE NEEDS TO WORK ON.

8         ALSO, WE TRY TO GIVE THE INMATE SOME SORT OF

9    DIRECTION AS TO WHEN THEY GET OUT.

10   Q    NOW, WHERE ARE YOU WORKING AT BUTNER PRESENTLY?

11   A    I CURRENTLY WORK INSIDE OF THE MARYLAND HOUSING UNIT.

12   MY OFFICE IS INSIDE THE MARYLAND HOUSING UNIT.

13   Q    ARE THERE OTHER UNITS NEXT TO THE MARYLAND HOUSING

14   UNIT?

15   A    YES, SIR.  I WORK -- THERE IS A DUKE UNIT, NORTH

16   CAROLINA UNIT AND THE MARYLAND ANNEX, AND IT'S CONNECTED

17   TO THE MARYLAND UNIT.

18   Q    WE'LL GET BACK TO THE MARYLAND ANNEX AND THE MARYLAND

19   UNIT, BUT DO YOU KNOW WHAT GOES ON IN THE DUKE AND THE

20   CAROLINA FACILITIES?

21   A    YES, SIR, BECAUSE I AM ALSO THE COUNSELLOR FOR THOSE

22   TWO WINGS AS WELL.

23   Q    NOW, THE MARYLAND UNIT, WHAT -- WHO IS IN THE

24   MARYLAND UNIT?

25   A    THOSE ARE THE ADAM WALSH OR CIVIL DETAINEE INMATES

1    CURRENTLY THAT IS HOUSED IN THE MARYLAND UNIT.

2    Q    ARE THEY IN THE GENERAL POPULATION?

3    A    NO, SIR.

4    Q    WHAT IS DIFFERENT ABOUT THEIR HOUSING AND THE GENERAL

5    POPULATION?

6    A    BASICALLY, GENERAL POPULATION, THEY ARE ON A 10

7    MINUTE MOVE, WHICH BASICALLY MEANS EVERY HALF HOUR ON THE

8    HOUR, THE INMATES HAVE TEN MINUTES TO MOVE FROM POINT "A"

9    TO POINT "B".  THE MARYLAND UNIT INMATES ARE SECURED

10   ONLY IN THE UNIT.  I MEAN, THEY CAN ROAM AROUND THE UNIT,

11   BUT THEY CAN'T GO OUTSIDE OF THE DOOR.  THEY ARE

12   LOCKED -- IN OTHER WORDS, THEY ARE LOCKED INSIDE THE

13   UNIT.

14   Q    LET'S TALK ABOUT THE MARYLAND UNIT FOR A WHILE?

15               MR. BREDENBERG:  OBJECTION, YOUR HONOR.  THIS

16   INFORMATION, FIRST OF ALL, ISN'T IN THE PRETRIAL ORDER.

17   WELL, FIRST OF ALL, IT'S NOT RELEVANT TO THE PROCEEDINGS

18   HERE AND WHETHER MR. ANTONE IS SEXUALLY DANGEROUS, BUT

19   ALSO THE INFORMATION IS PROPOSED TESTIMONY FOR MR. TAYLOR

20   IS SIMPLY INSTITUTIONAL CONDUCT OF THE RESPONDENT AND

21   WHERE HE LIVES WOULDN'T BE RELEVANT TO THAT ISSUE EITHER.

22               THE COURT:  WELL, I AM OVERRULING THE

23   OBJECTION.  THE PHYSICAL ARRANGEMENTS OF WHERE MR. ANTONE

24   IS HOUSED COULD CONCEIVABLY BE RELEVANT TO HIS

25   INSTITUTIONAL CONDUCT.

1           YOU MAY ANSWER THE QUESTION, SIR.

2           THE WITNESS:  CAN YOU REPEAT THE QUESTION?

3           MR. ROSS:  SURE.

4    Q   LET'S TALK ABOUT THE MARYLAND UNIT AND HOW IT'S SET

5    UP.  ARE THE INMATES IN CELLS?  LET'S TALK ABOUT THAT,

6    HOW THAT IS SET UP?

7    A   THEY ARE NOT IN CELLS.  EACH INMATE HAS A ROOM AND

8    THERE IS PROBABLY -- THERE IS LIKE EIGHT ROOMS TO A POD

9    AND A POD IS LIKE FIVE PODS AND THERE IS EIGHT ROOMS TO A

10   POD.  EACH POD IS SEPARATED BY A SLIDING DOOR.

11       THE ONLY TIME THE SLIDING DOOR COMES INTO EFFECT IS

12   AT 11:00 O'CLOCK WHEN THEY DO THE COUNT.  THEN THE DOORS

13   ARE SECURED.  THAT IS THE ONLY TIME THE INMATES ARE

14   SECURED BEHIND IN THAT PARTICULAR POD THAT THEY LIVE IN,

15   BUT THEIR DOORS TO THEIR ROOMS ARE NOT LOCKED.

16   Q   SO DURING THE DAY, ARE THEY ABLE TO GO OUT WITH OPEN

17   POPULATION?

18   A   NO, SIR.

19   Q   WHEN YOU SAY SECURED, YOU MEAN DOORS ARE LOCKED AND

20   THEY ARE NOT ABLE TO GET OUTSIDE?

21   A   RIGHT.  EXACTLY.

22   Q   NOW, DO YOU HAVE INTERACTION WITH THE INMATES ON THE

23   UNIT?

24   A   YES, SIR, ON DAILY BASIS.

25   Q   HOW MANY ARE ON THERE AT THE PRESENT?

1    A    I THINK IT'S LIKE 69.  MY LAST COUNT WAS LIKE 69 ON

2    THERE.

3    Q    BEFORE WE STARTED HAVING THESE ADAM WALSH HEARINGS,

4    WHAT WAS THE NUMBER?  WAS THE NUMBER HIGHER THAN 69 AT

5    SOME POINT?

6    A    TO MY RECOLLECTION, I THINK THE HIGHEST NUMBER I CAN

7    REMEMBER WAS LIKE 84 OR 85.

8    Q    NOW, DO YOU HAVE SOME RULES ASSOCIATED WITH CONDUCT

9    WITH INMATES IN THE MARYLAND UNIT?

10   A    YES, SIR.  BASICALLY THE SAME RULES APPLY TO THE ADAM

11   WALSH INMATES AS THEY APPLY TO THE GENERAL POPULATION.

12   WHERE THAT COMES INTO PLAY IS IF THEY VIOLATE SOME OF THE

13   SANCTIONS, OR SOME OF THE RULES, THEN THEY ARE HELD

14   ACCOUNTABLE FOR THOSE ACTS AND WE SANCTION THEM ACCORDING

15   TO THE ACTION -- TO THE ACTS THEY COMMITTED.

16   Q    SO LET'S TALK ABOUT SOME OF THESE RULES.  ARE THERE

17   RULES ABOUT ALCOHOL?

18   A    YES, SIR.  IT'S NOT ALLOWED.

19   Q    NOT ALLOWED?

20   A    NOT ALLOWED.

21   Q    ARE THERE RULES ABOUT FIGHTING?

22   A    YES, SIR.  NOT ALLOWED, ALSO.

23   Q    WHAT ABOUT DRUGS?

24   A    DEFINITELY NOT ALLOWED.

25   Q    WHAT ABOUT SEX?

1    A    NO, SIR.  NOT ALLOWED.

2    Q    IN A PRISON SETTING, THE RULES THAT I JUST MENTIONED,

3    ALCOHOL, SEX, FIGHTING AND DRUGS, DO THEY SOMEHOW MAKE

4    THEIR WAY INTO THE PRISON SETTING?

5    A    YES, SIR.

6    Q    ALL RIGHT.  LET'S TALK ABOUT ALCOHOL FIRST.  IN THE

7    THREE YEARS THAT YOU HAVE BEEN AN OFFICER -- EXCUSE ME --

8    A COUNSELOR IN THE MARYLAND UNIT, HAVE YOU OBSERVED

9    ANYBODY WHO HAS BEEN WRITTEN UP FOR ALCOHOL?

10   A    YES, SIR.

11   Q    DO YOU KNOW HOW MANY TIMES OVER THE LAST THREE YEARS?

12   A    NOT AN ACCURATE NUMBER, BUT I WOULD HAVE TO SAY AT

13   LEAST FIVE.

14   Q    NOW, HOW DOES -- HOW DOES A COUNSELLOR OR HOW DOES AN

15   OFFICER DETECT SOMEONE HAS USED ALCOHOL?

16   A    WELL, FOR ONE, THE ALCOHOL THAT THEY MAKE IN THE

17   PRISON HAS A VERY DISTINCT SMELL, AND THEN YOU CAN --

18   SOMEBODY MAY ACT OUT WHEN THEY ARE UNDER THE INFLUENCE OF

19   ALCOHOL.  AND THEN WE HAVE THESE THINGS CALLED

20   ALCOSENSORS.  YOU WALK AND YOU MIGHT, MAYBE AT A RANDOM,

21   GET 10 GUYS TO BLOW AN ALCOSENSOR, AND IF IT DON'T COME

22   UP ZERO, ZERO, ZERO, THEY DO SOME TESTS, AND THEN MORE

23   THAN LIKELY IT COMES BACK A POSITIVE READING FOR ALCOHOL.

24   Q    IS THAT LIKE A BREATHALYZER THAT YOU ARE TALKING

25   ABOUT?

1    A    YES, SIR.

2    Q    NOW, IN THAT LOCKED UNIT OF MARYLAND, HAVE YOU FOUND

3    ALCOHOL?

4    A    YES, SIR.

5    Q    AND THIS IS -- HAVE YOU FOUND ALCOHOL EVEN RECENTLY

6    IN THE MARYLAND UNIT?

7    A    YES, SIR.

8    Q    WHAT ABOUT INTOXICATED INMATES?  HAVE YOU SEEN THAT

9    WHILE YOU HAVE BEEN AT THE PRISON?

10   A    I HAVE SEEN THEM INTOXICATED, YES, SIR.

11   Q    HAVE YOU SMELLED ALCOHOL WHILE YOU HAVE BEEN THERE?

12   A    YES, SIR.

13   Q    SPECIFICALLY, AS TO MR. ANTONE, HAVE YOU SEEN HIM

14   WITH ANY ALCOHOL OR SMELLED ANY ALCOHOL ON HIS PERSON?

15   A    NO, SIR.

16   Q    NOW, ALSO WITH DRUGS, THAT IS SOMETHING THAT YOU WANT

17   TO MAKE SURE YOU KEEP OUT OF THE PRISON AS WELL?

18   A    YES, SIR.

19   Q    SEX IS ANOTHER THING THAT YOU WANT TO KEEP OUT OF THE

20   PRISON SETTING.  AND THERE ARE VIOLATIONS IF PEOPLE ARE

21   CAUGHT WITH DRUGS OR SEX?

22            MR. BREDENBERG:  OBJECTION, LEADING.

23            THE COURT:  WELL, OVERRULED TO THIS POINT.  I

24   HAVEN'T HEARD THE QUESTION YET.

25            MR. ROSS:  YES, SIR.

1    Q    WHEN PEOPLE ARE CAUGHT WITH COMMITTING THE OFFENSE OF

2    SEX, DRUGS, ALCOHOL, WHAT ARE THE SANCTIONS?

3    A    WELL, DRUGS AND ALCOHOL IS THE U.D.C. WHICH IS THE

4    UNIT DISCIPLINARY COMMITTEE.  WE CAN'T SANCTION INMATES

5    CAUGHT WITH DRUGS, ALCOHOL OR HAVING SEX.  THAT ACTUALLY

6    GOES TO THE D.H.O. WHICH IS THE DISCIPLINARY HEARING

7    OFFICER BECAUSE HE HAS GREATER SANCTIONS THAT HE CAN

8    PLACE ON THE INMATE THAT THE UNIT TIME OR THE UNIT

9    DISCIPLINARY COMMITTEE CAN'T PLACE ON INMATES, AND THAT

10   COULD BE ANYWHERE FROM 30 DAYS IN THE SHU.

11   Q    AND THE SHU IS --

12   A    SPECIAL HOUSING UNIT, OR IN THE MARYLAND ANNEX WHICH

13   IS THE SAME AS THE SPECIAL HOUSING UNIT, OR HE CAN

14   RESTRICT THEM TO THE UNIT WHEREAS NOW THEY GET A CHANCE

15   TO GO OUTSIDE EVERY NOW AND AGAIN, BUT HE CAN ACTUALLY

16   RESTRICT THEM TO THE UNIT AND THEY WILL BE LOCKED IN THE

17   SHU.

18   Q    NOW, YOU HAVE HAD AN OPPORTUNITY TO OBSERVE MR.

19   ANTONE OVER A FEW YEARS AT THIS POINT?

20   A    YES, SIR.

21   Q    HAVE YOU OBSERVED HIM WITH THE GUITAR?

22   A    YES, SIR.

23   Q    AND WHAT HAVE YOU OBSERVED HIM DO WITH THIS GUITAR?

24   A    ACTUALLY, HE CAN -- I MEAN, HE PLAYS IT VERY WELL.

25   AND ACTUALLY, HE USUALLY SITS ON THE BACK OF THE YARD OR

1    THE COURTYARD, WE CALL IT, THE COURTYARD, AND HE JUST

2    SITS THERE AND PLAYS HIS GUITAR AND SINGS AT THE SAME

3    TIME.  SO HE IS QUITE TALENTED WITH THE GUITAR.

4    Q    HAVE YOU SEEN HIM TEACH OTHER FOLKS?

5    A    I SEEN HIM TRYING TO TEACH OTHER PEOPLE HOW TO PLAY

6    THE GUITAR.

7    Q    WHAT ABOUT HIS ART SKILLS?  HAVE YOU SEEN ANY OF THAT

8    WHILE YOU HAVE BEEN AT PRISON?

9    A    YES, SIR.

10   Q    TELL US ABOUT THAT?

11   A    WELL, I DO MY ROOM INSPECTIONS AND WHEN I GO THROUGH

12   THERE, HE HAS HIS PAINTINGS ON A TABLE, AND A LOT OF

13   TIMES I COMMENT ON HIS ART, AND I TELL HIM, YOU KNOW, YOU

14   COULD PROBABLY SEND THESE OUT TO SOME OF THE FAMILY

15   MEMBERS AND POSSIBLY HAVE THEM -- LIKE TAKE THEM TO A

16   SWAP MEET OR SOMETHING AND POSSIBLY GET SOME MONEY FOR

17   THEM, BECAUSE THEY ARE ACTUALLY PRETTY GOOD.

18   Q    HAVE YOU SEEN SOME OF HIS JEWELRY OR THE BEADS THAT

19   HE HAS DONE?

20   A    YES, SIR.

21   Q    IS THERE A CLASS UP THERE FOR BEADING?

22   A    YES, SIR.  THEY HAVE BEADING CLASS AND I THINK IT'S

23   PROBABLY -- I THINK MAYBE FIVE OR SIX INMATES THAT

24   STARTED IN THAT BEADING CLASS.

25   Q    NOW, YOU ALSO -- WHAT ABOUT JOBS THAT ARE UP IN THE

1    MARYLAND UNIT?  WHO DECIDES WHO GETS WHAT?

2    A    BASICALLY WHAT HAPPENS IS THE INMATE COMES TO ME, AND

3    BY ME BEING THE UNIT COUNSELOR, AND I HAVE PARTICULAR

4    JOBS, ESPECIALLY LIKE SANITATION, CLEAN THE SHOWERS,

5    BATHROOMS AND STUFF, AND SO THEY SEND ME A COP OUT OR

6    COME TALK TO ME AND SAY, I NEED A JOB.  YOU KNOW, THEY

7    HAVE LIMITED FUNDS, AND SO IF I HAVE A JOB AVAILABLE, I

8    GIVE INMATES THE JOB.

9    Q    WHAT ABOUT MR. ANTONE?  WHAT IS HIS JOB?

10   A    HE CURRENTLY IS ONE OF MY UNIT ORDERLIES.  HE TAKES

11   CARE OF THE TRASH.  HE TAKES CARE OF -- I HAVE LIKE FIVE

12   SEPARATE OFFICES THAT HE TAKES CARE, DO THE VACUUMING,

13   CLEAN UP THE OFFICES, WATER THE PLANTS, AND THEN

14   BASICALLY ANYTHING ELSE I ASK HIM TO DO FOR ME, THAT IF

15   SOMEBODY ELSE IS SLACKING OFF, HE WOULD DO IT FOR ME.

16   Q    WHAT IS A WRITE UP CALLED?

17   A    INCIDENT REPORT OR A SHOT.

18   Q    HAVE YOU HAD TO WRITE UP SHOTS FOR OTHER INMATES?

19   A    YES, SIR.

20   Q    NOW, GETTING BACK TO THAT BREATHALYZER, HOW DOES THE

21   MARYLAND UNIT OR YOUR UNIT RECORD THAT INFORMATION?

22   A    THERE IS ACTUALLY A LOG BOOK THAT IS IN THE OFFICER

23   STATION THAT THEY HAVE LIKE A RANDOM -- THEY MIGHT DO

24   FIVE OR TEN INMATES IN THE UNIT, AND THEY ACTUALLY RECORD

25   THEM IN THE LOG BOOK.

1    Q    HAVE YOU HAD -- DO YOU KNOW OF ANY TIME IN WHICH MR.

2    ANTONE HAS TURNED UP POSITIVE FROM THAT LOG BOOK?

3    A    I CAN'T SAY THAT I HAVE, SIR.

4    Q    WHAT ABOUT HIS INTERACTION WITH THE INMATES?  CAN YOU

5    DESCRIBE THAT?  POSITIVE?  NEGATIVE?

6    A    I WOULD SAY HE HAS A POSITIVE RAPPORT WITH THE

7    MAJORITY OF THE INMATES IN THE UNIT.  THEY HAVE THEIR OWN

8    PARTICULAR BREAK YARD, SO THEY GET IN THERE AND PLAY

9    FOOTBALL, FRISBEE, SO I WOULD SAY HE HAS A POSITIVE

10   REACTION TO ALL THE INMATES.

11   Q    CAN YOU SAY THAT ABOUT ALL THE INMATES THAT ARE UP

12   THERE?

13   A    I CAN'T SAY THAT ABOUT ALL OF THEM.

14            MR. ROSS:  THANK YOU, MR. TAYLOR.

15            THE WITNESS:  YES, SIR.  YOU ARE WELCOME.

16            MR. BREDENBERG:  NO QUESTIONS, YOUR HONOR.

17            THE COURT:  VERY GOOD.  SIR, YOU MAY STEP

18   DOWN.  THANK YOU.

19            MR. BREDENBERG:  YOUR HONOR, MAY MR. TAYLOR BE

20   RELEASED FROM THE SUBPOENA?

21            THE COURT:  HE MAY BE.  I ASSUME NO OBJECTION.

22            MR. ROSS:  NO, OBJECTION.

23            THE COURT:  THANK YOU, MR. TAYLOR.

24            MR. WATERS:  THE RESPONDENT NOW CALLS ALLAN

25   DUPREY.

1          MR. BREDENBERG:  YOUR HONOR, WE OBJECT TO THIS

2     WITNESS AS WELL.  FIRST OF ALL, THERE IS NO INDICATION IN

3     THE PRETRIAL ORDER WHAT HIS TESTIMONY IS ABOUT.  ALL

4     THERE IS IS AN AFFIDAVIT PROVIDED BY HIM.  BUT CERTAINLY

5     THE AFFIDAVIT AND THE INFORMATION THEREIN DOESN'T APPEAR

6     TO HAVE ANY RELEVANCE TO THE ACTUAL ISSUES IN THIS CASE

7     AS TO WHETHER MR. ANTONE IS A SEXUALLY VIOLENT PERSON.

8          MR. WATERS:  YOUR HONOR --

9          THE COURT:  MR. WATERS.

10          MR. WATERS:  MR. DUPREY WILL BE TESTIFYING AS

11     TO THE CIRCUMSTANCES INVOLVING HOW MR. ANTONE WENT FROM

12     TRIBAL DETENTION INTO FEDERAL DETENTION.  IT'S RELEVANT

13     UNDER 18 U.S.C. 4248 BECAUSE ONLY PERSONS IN BOP CUSTODY

14     ARE LIABLE FOR DETENTION UNDER THE -- CERTIFICATION UNDER

15     THE ADAM WALSH ACT.

16          MR. DUPREY ALSO WILL BE TALKING ABOUT MR.

17     ANTONE'S ATTITUDES TOWARDS TREATMENT PROGRAMS EVEN AS FAR

18     BACK AS 1999.

19          MR. BREDENBERG:  YOUR HONOR, WITH REGARD TO

20     THE FIRST POINT, WE HAVEN'T MADE NOTICE OF ANY CHALLENGES

21     TO THE JURISDICTION OF THIS COURT ON THIS ISSUE.

22          MR. WATERS:  THERE IS NO CHALLENGE TO THE

23     JURISDICTION, YOUR HONOR.  WE ARE SIMPLY DISCUSSING THE

24     CIRCUMSTANCES.

25          MR. BREDENBERG:  AND SO THAT WOULD BE TO THE

1    POINT THAT FIRST ISSUE HAS NO RELEVANCE TO THIS

2    PROCEEDING WHATSOEVER, AND THE SECOND ISSUE ABOUT HIS

3    ATTITUDES TOWARDS TREATMENT HAVE NEVER BEEN DISCLOSED TO

4    THE GOVERNMENT EITHER.

5              MR. WATERS:  YOUR HONOR, NOT ONLY IS THERE THE

6    AFFIDAVIT THAT WAS FILED WITH THE PRETRIAL ORDER, THERE

7    ARE LETTERS FROM MR. DUPREY CONCERNING MR. ANTONE IN THE

8    GOVERNMENT'S DISCOVERY, ONE OF WHICH HAS BEEN ACCEPTED

9    INTO EVIDENCE AS AN EXHIBIT WITHOUT OBJECTION BY THE

10   GOVERNMENT.  THAT WOULD BE RESPONDENT'S EXHIBIT 7, I

11   BELIEVE, YOUR HONOR.  EXCUSE ME.  EXCUSE ME.

12   RESPONDENT'S EXHIBIT 6, YOUR HONOR.  I AM SORRY.

13             THE COURT:  I AM GOING TO ALLOW MR. DUPREY TO

14   TESTIFY AND RESERVING RULING ON THE GOVERNMENT'S

15   OBJECTION.

16             MR. BREDENBERG:  THANK YOU, YOUR HONOR.

17             ALLAN DUPREY CALLED AS A WITNESS, HAVING BEEN
               FIRST DULY SWORN, ON HIS OATH, TESTIFIED AS
18             FOLLOWS:

19             THE CLERK:  PLEASE STATE YOUR NAME FOR THE

20   RECORD.

21             THE WITNESS:  I AM SORRY.  I DIDN'T HEAR YOU.

22             THE CLERK:  PLEASE STATE YOUR NAME FOR THE

23   RECORD.

24             THE WITNESS:  ALLAN DUPREY, A-L-L-A-N

25   D-U-P-R-E-Y.

1    DIRECT EXAMINATION BY MR. WATERS:

2    Q   GOOD AFTERNOON, MR. DUPREY.

3    A   GOOD AFTERNOON.

4    Q   CAN YOU HEAR ME OKAY?

5    A   I CAN.

6    Q   DO YOU KNOW THE RESPONDENT, MR. ANTONE?

7    A   I KNOW MR. ANTONE, YES.

8    Q   HOW LONG HAVE YOU KNOWN HIM?

9    A   I MET HIM INITIALLY, I BELIEVE, IN 1999.  I HAD SOME

10   RATHER CONTINUOUS CONTACT WITH HIM FOR ABOUT THE NEXT

11   YEAR, AND I RECENTLY MET HIM AGAIN YESTERDAY.

12   Q   IN WHAT CAPACITY DID YOU FIRST BECOME INVOLVED WITH

13   MR. ANTONE'S CASE?

14   A   I WAS AT THE TIME LIVING WITH THE HEAD PSYCHOLOGIST

15   AT THE NATION, THE TRIBE, WHOSE NAME WAS DR. CORNELIA

16   JONES AND SHE MADE ME AWARE OF BYRON'S CIRCUMSTANCES IN

17   THAT HE HAD BEEN CONVICTED OF TEN MISDEMEANORS AND WAS

18   SERVING A TEN CONSECUTIVE ONE YEAR TERMS IN THE TRIBE'S

19   JAIL.

20        SHE ASKED ME TO GO AND TALK WITH HIM AND SEE IF I

21   COULD DO ANYTHING TO HELP HIM.

22   Q   WHAT WAS YOUR PROFESSION AT THAT TIME?

23   A   I WAS A PRACTICING ATTORNEY IN THE STATE OF ARIZONA.

24   Q   SO YOU HOLD A LAW DEGREE?

25   A   I DO.

1    Q    DO YOU HOLD ANY OTHER ADVANCED DEGREES?

2    A    I HAVE A MASTER'S DEGREE IN CLINICAL PSYCHOLOGY.  I

3    PRACTICED FOR A COUPLE YEARS IN THAT FIELD, BUT I DIDN'T

4    LIKE IT, SO I WENT BACK TO LAW SCHOOL.  BAD MISTAKE.

5    Q    I FEEL YOUR PAIN.  SO WERE YOU THEN ABLE TO MEET WITH

6    MR. ANTONE?

7    A    I DID.

8    Q    WHERE WAS THAT?

9    A    IN THE JAIL, AT THE NATION CAPITAL IN SELLS, ON THE

10   TOHONO O'ODHAM RESERVATION.

11   Q    CAN YOU DESCRIBE THE CONDITIONS THERE AT THE JAIL

12   WHERE HE WAS?

13   A    THEY WERE APPALLING.  I COULDN'T BELIEVE IT.  I HAD

14   BEEN A LAWYER FOR A NUMBER OF YEARS.  I HAD BEEN TO A

15   NUMBER OF JAILS AND FACILITIES ACROSS THE COUNTRY, AND

16   THIS WAS BY FAR THE WORST.  THE CELLS WERE MAYBE 5 FOOT

17   BY 5 FOOT.  IT OCCURRED TO ME THAT THERE COULDN'T

18   POSSIBLY BE ANY REHABILITATIVE SERVICES.  SELLS IS 75

19   MILES FROM TUCSON, AND I WAS JUST APPALLED, AND SO I SET

20   OUT TO SEE IF I COULD HELP HIM SOMEHOW.

21   Q    WHAT SORT OF HELP WERE YOU SEEKING TO GET FOR MR.

22   ANTONE?

23   A    WELL, INITIALLY I TALKED WITH SOME OF THE TRIBAL

24   ATTORNEYS AND DISCOVERED, AS I IMPLIED EARLIER, THAT

25   THERE WASN'T A LOT OF REHABILITATIVE SERVICES AVAILABLE

1    FOR HIM, SO THEN I BEGAN TO TALK WITH SOME OF THE PEOPLE

2    IN THE FEDERAL SYSTEM, MOST NOTABLY SANDY HANSON, WHO WAS

3    THE UNITED STATES DISTRICT ATTORNEY FOR THE DISTRICT IN

4    TUCSON, AND BETWEEN HER AND ME, WE CAME UP WITH A PLAN TO

5    TRANSFER BYRON, ESSENTIALLY TRANSFER HIM TO FEDERAL

6    CUSTODY, SO THAT HE COULD GET ESPECIALLY SEXUAL OFFENDER

7    TREATMENT AT A FACILITY NAMED BUTNER, WHICH I WAS NOT

8    FAMILIAR WITH AT THE TIME, BUT HAVE SINCE BECOME A LITTLE

9    FAMILIAR WITH.

10        IN ORDER TO ACCOMPLISH THAT, SANDY WENT WAY OUT OF

11   HER WAY.  FEDERAL PROSECUTORS IN ARIZONA ARE AS SWAMPED

12   TODAY WITH ILLEGAL IMMIGRATION AND ILLEGAL DRUG

13   TRAFFICKING AS THEY WERE BACK IN '99.

14        NONETHELESS, SHE WENT OUT OF HER WAY TO ACCEPT

15   JURISDICTION OF THE CASE.  THE TRIBES ONLY HAVE

16   JURISDICTION OVER MISDEMEANORS, SO SHE HAD HIM INDICTED

17   FOR A FELONY.  SHE DRAFTED A PLEA AGREEMENT.  SHE DRAFTED

18   THE JUDGMENT THAT THE ORDER SIGNED, AND ULTIMATELY WE GOT

19   HIM TRANSFERRED TO FEDERAL CUSTODY ON A TEN YEAR TERM

20   WITH THE CONDITION THAT FIVE YEARS OF THOSE TEN YEARS

21   WERE TO BE SERVED AT BUTNER WHERE HE COULD RECEIVE A

22   PROGRAM THAT WE WERE TOLD WAS SPECIALLY DESIGNED FOR

23   NATIVE AMERICAN SEXUAL OFFENDERS, AND THAT WAS WHERE I

24   ANTICIPATED AND EXPECTED HE WAS GOING TO GO.

25   Q    CAN YOU TURN TO GOVERNMENT EXHIBIT 12 IN THAT BINDER.

1    IT WILL BE IN THE FIRST SET OF NUMBERS?

2    A    YES.  I HAVE IT.

3    Q    DO YOU RECOGNIZE THAT DOCUMENT?

4    A    YES.

5    Q    CAN YOU DESCRIBE IT?

6    A    IT'S THE PLEA AGREEMENT THAT SANDY AND I WORKED OUT

7    FOR MR. ANTONE.  AND IF I CAN FIND THE LAST PAGE, IT'S

8    SIGNED BY BYRON ON JUNE 18, 1999, AND BY ME ON -- IT

9    LOOKS LIKE JUNE 28, 1999.

10   Q    AND THAT IS ON THE PAGES MARKED BOP_ANTO_1224 AND

11   1225, RESPECTIVELY?

12   A    THAT'S CORRECT, YES.

13   Q    AND YOU STATED THAT YOU HELPED NEGOTIATE THE TERMS OF

14   THIS AGREEMENT WITH THE ASSISTANT U.S. ATTORNEY?

15   A    I DID.

16   Q    DIRECTING YOUR ATTENTION TO THE BOTTOM OF THE SECOND

17   PAGE OF THE PLEA AGREEMENT, BOP-1217?

18   A    YES, I HAVE IT.

19   Q    THOSE LAST TWO SENTENCES?

20   A    "THE DEFENDANT AGREES TO PARTICIPATE IN SEX OFFENDER

21   COUNSELING AND TREATMENT AND TO ABIDE BY SEX OFFENDER

22   CONDITIONS AS MORE SPECIFICALLY SET FORTH IN 12 OF THE

23   PLEA AGREEMENT, IF SO ORDERED BY THE COURT."

24   Q    AND THE SENTENCE BEFORE THAT ACTUALLY?

25   A    "THE PARTIES REQUEST THE COURT RECOMMEND THE

1    DEFENDANT BE PLACED IN FCI-BUTNER, NORTH CAROLINA, SEX

2    OFFENDER TREATMENT PROGRAM DURING HIS INCARCERATION."

3    (ENDS OF QUOTE.)

4    Q   AGAIN, AND CAN YOU DESCRIBE AGAIN WHY YOU

5    PARTICULARLY SOUGHT FCI-BUTNER?

6    A   WELL, I WAS AS I SAID EARLIER, I WAS UNAWARE OF WHAT

7    BUTNER EVEN WAS, BUT IN CONVERSATIONS WITH PEOPLE ON THE

8    NATION AT THE RESERVATION AND WITH SANDY PARTICULARLY, I

9    BECAME AWARE THAT BUTNER IS KNOWN THROUGH THE FEDERAL

10   SYSTEM FOR ITS NATIVE AMERICAN SEXUAL OFFENDER TREATMENT

11   PROGRAMS, AND WE THOUGHT THAT WOULD BE BEST FOR BYRON AND

12   HE AGREED AND THAT IS WHAT WE SOUGHT AND THAT WAS WHAT WE

13   GOT.

14   Q   AND CAN YOU TURN TO EXHIBIT 11 IN THAT BINDER?

15   A   I HAVE IT.

16   Q   AND DO YOU RECOGNIZE THAT?

17   A   YES, I DO.  IT WAS SIGNED BY JUDGE -- (WITNESS

18   CRYING) -- JUDGE ROLL WAS KILLED IN TUCSON ON JANUARY 8

19   THIS YEAR, AND IT'S THE FIRST TIME I HAVE SEEN HIM NAME

20   SINCE THAT TIME.  I AM SORRY.

21              MR. ROSS:  YOUR HONOR, MAY I APPROACH THE

22   WITNESS?  (BRINGING KLEENEX)

23              THE COURT:  YOU MAY.

24              THE WITNESS:  THANK YOU.  HE WAS A GOOD MAN.

25              THE COURT:  SO I UNDERSTAND.

1    A    YES.  THIS WAS AN ORDER SIGNED FEBRUARY 16, 2000 BY

2    JUDGE JOHN M. ROLL OF TUCSON COMMITTING MR. ANTONE TO A

3    SENTENCE TO RUN CONCURRENT WITH ALL OF HIS MISDEMEANOR

4    CHARGES.

5    Q    SO WAS YOUR AND THE ASSISTANT U.S. ATTORNEY'S

6    UNDERSTANDING THAT THE FEDERAL GOVERNMENT WOULD TAKE OVER

7    JURISDICTION IN MR. ANTONE'S CASE?

8    A    THAT'S CORRECT.

9    Q    AND THAT HIS SENTENCE WOULD BE CONCURRENT?  ANY

10   SENTENCED IMPOSED BY THE FEDERAL GOVERNMENT WOULD BE

11   CONCURRENT WITH THE SENTENCE HE WAS ALREADY SERVING BY

12   THE TRIBAL GOVERNMENT?

13   A    THAT'S CORRECT.

14   Q    AND TURNING BACK TO THE PLEA AGREEMENT FOR JUST A

15   MOMENT, EXHIBIT 12, WERE YOU ABLE TO DISCUSS THIS PLEA

16   AGREEMENT WITH MR. ANTONE?

17   A    YES, EXTENSIVELY.

18   Q    DID YOU GO OVER ALL THE TERMS WITH HIM?

19   A    YES.  I WAS CONCERNED THAT LIKE MANY LAY PEOPLE, HE

20   MIGHT NOT HAVE UNDERSTOOD SOME OF THE LEGAL LANGUAGE, SO

21   I LITERALLY READ IT TO HIM AND WE DISCUSSED IT AND I WAS

22   QUITE CERTAIN IN MY MIND THAT HE UNDERSTOOD WHAT WAS

23   HAPPENING.  HE WAS GOING TO BE SHIPPED FROM HIS NATIVE

24   HOME TO THE FEDERAL SYSTEM, AND WE WEREN'T SURE WHERE

25   THAT WAS GOING TO BE, AND IT MIGHT BE AS FAR AWAY AS

1    NORTH CAROLINA, WHICH WOULD MAKE IT MORE DIFFICULT FOR

2    PARENTS AND FRIENDS AND EVERYBODY TO SEE HIM, BUT HE

3    UNDERSTOOD THAT AND HE AGREED IT AND HE SIGNED IT.

4    Q    DID YOU DISCUSS WITH HIM THE SEX OFFENDER TREATMENT

5    PROGRAM?

6    A    I DID I AM SURE, BUT IN SOME VERY GENERIC SENSE.  I

7    DIDN'T KNOW MUCH ABOUT IT THEN AND I KNOW AS LITTLE ABOUT

8    IT NOW.  I UNDERSTAND, AS A FORMER PSYCHOLOGIST, THAT SEX

9    OFFENDER TREATMENT IS GOING TO DEAL WITH ISSUES OF ANGER

10   AND MAYBE DRUGS, ET CETERA, BUT I DIDN'T HAVE SPECIFIC

11   KNOWLEDGE OF WHICH TO TALK TO HIM ABOUT AT THAT TIME.

12   Q    DID YOU DISCUSS WITH HIM DRUG TREATMENT PROGRAMS?

13   A    I DID.

14   Q    AND WHAT WAS MR. ANTONE'S REACTION TO THE POSSIBILITY

15   OF ENTERING THESE PROGRAMS?

16   A    HE WANTED -- HE INDICATED TO ME QUITE CLEARLY HE WAS

17   VERY INTERESTED IN GETTING REHABILITATION FOR WHAT HE

18   ACKNOWLEDGED WAS A DRUG AND ALCOHOL PROBLEM.

19       HE DIDN'T LIKE BLACKING OUT.  HE WAS AWARE THAT HE

20   HAD BLACKED OUT AND TOLD ME THAT AS A FUNCTION OF THOSE

21   BLACKOUTS, A NUMBER OF THESE CHARGES HAD ARISEN AGAINST

22   HIM.

23       I DIDN'T REPRESENT HIM IN THE TRIBAL COURT AT ALL,

24   AND SO I REALLY HAD NO OPINION ABOUT THOSE THINGS, BUT HE

25   EXPRESSED REMORSE AND A DESIRE TO NOT DO THAT ANYMORE.

1  Q    AND WHILE MR. ANTONE WAS -- I ASSUME HE WAS IN

2  CUSTODY?

3  A    HE WAS IN CUSTODY ALL THE TIME I DEALT WITH HIM.  HE

4  WAS IN CUSTODY.

5  Q    DID YOU TAKE ANY STEPS TO TRY TO GET HIM ACCESS TO

6  TREATMENT?

7  A    I DID.  WHEN HE WAS ADDITIONALLY IN TUCSON AT OUR

8  LOCAL FEDERAL PRISON THERE, I BELIEVE I WROTE A LETTER TO

9  THE WARDEN BECAUSE WHILE HE WAS IN THE JAIL, AND I DIDN'T

10 REALIZE IT AT THE TIME, BUT THESE LAST COUPLE OF DAYS

11 MADE ME AWARE HOW LONG HE HAD BEEN IN JAIL BEFORE I HAD

12 EVEN GOTTEN INVOLVED, AND APPARENTLY IT WAS A COUPLE OF

13 YEARS.

14      AND I THINK THERE WAS A THERAPIST AT THE NATION'S

15 BEHAVIORAL HEALTH UNIT NAMED MAUREEN SOMEBODY WHO HAD

16 WORKED WITH BYRON WHILE HE WAS IN THE LOCAL JAIL, AND

17 AFTER HE WAS TRANSFERRED TO THE FEDS, SHE AND HE BOTH

18 WANTED TO CONTINUE THAT RELATIONSHIP.

19      AND SO WHEN I DISCOVERED IT WAS NOT BEING ALLOWED BY

20 THE LOCAL WARDEN OF THE FEDERAL PRISON IN TUCSON, I

21 BELIEVE I WROTE HIM A LETTER ASKING HIM TO ALLOW THAT

22 RELATIONSHIP TO CONTINUE.

23 Q    AND DID YOU GET A RESPONSE?

24 A    I DID.  AND BASICALLY IT SAID, LOOK, WE HAVE OUR OWN

25 SHRINKS AND WE'LL DEAL WITH HIM THE WAY WE WANT AND WE

1    ARE NOT GOING TO LET A STRANGER COME IN HERE AND TELL US

2    HOW TO RUN OUR PRISON.

3    Q    IF YOU COULD PLEASE TURN GOVERNMENT'S EXHIBIT 7,

4    PLEASE, MR. DUPREY?

5    A    YES.  I HAVE IT.

6    Q    CAN YOU IDENTIFY THIS DOCUMENT?

7    A    YES.  THIS IS THE JUDGMENT ACTUALLY RENDERED BY JUDGE

8    ROLL IN THIS CASE.

9    Q    AND DID THIS JUDGMENT CONFORM WITH THE TERMS IN THE

10   PLEA AGREEMENT THAT YOU HELPED NEGOTIATE?

11   A    TO THE BEST OF MY RECOLLECTION, IT DID.  I HAVEN'T

12   READ IT IN THE LAST FEW DAYS, BUT I AM QUITE SURE IT

13   ACCURATELY REFLECTED WHAT WE ALL WANTED AT THE TIME.

14   Q    AND TURNING YOUR ATTENTION TO THE END OF THE THIRD

15   PARAGRAPH, FIRST PAGE, DID THE COURT CONFORM WITH YOUR OR

16   AGREE WITH YOUR RECOMMENDATION AS TO TREATMENT?

17   A    YES.  IT SAYS, (QUOTE) "THE COURT'S RECOMMENDS THE

18   DEFENDANT PARTICIPATE IN THE BUREAU OF PRISONS DRUG ABUSE

19   TREATMENT PROGRAM AND SEXUAL OFFENDER PROGRAM."  (END OF

20   QUOTE.)  THAT WAS EXACTLY WHAT WE WANTED.

21   Q    SO, FOLLOWING THE ENTRY OF THIS JUDGMENT, MR. ANTONE

22   WAS SENTENCED TO A FEDERAL TERM.  WAS IT YOUR

23   UNDERSTANDING AT THAT POINT THAT HE WOULD BE PLACED AT

24   BUTNER AND BE ABLE TO ENTER INTO SEX OFFENDER TREATMENT?

25   A    THAT WAS MY UNDERSTANDING AT THE TIME.

1    Q    DO YOU KNOW IF THAT ACTUALLY OCCURRED?

2    A    IT DID NOT.

3    Q    CAN YOU TELL ME HOW YOU FIRST DISCOVERED THIS?

4    A    I BELIEVE I GOT A CALL FROM EITHER ANTONE HIMSELF OR

5    SOME MEMBER OF HIS FAMILY COMPLAINING THAT HE HAD BEEN

6    SENT TO A PLACE IN COLORADO, I THINK CALLED FLORENCE.  I

7    DON'T KNOW WHAT FLORENCE WAS, BUT IT CLEARLY WASN'T

8    BUTNER, AND SO I BELIEVE I WROTE TO THE WARDEN THERE OR

9    PERHAPS JUST MADE A PHONE CALL THERE, BUT I INQUIRED AS

10   TO WHY HE WASN'T AT BUTNER GETTING THE FIVE-YEAR

11   TREATMENT PROGRAM WE THOUGHT WE HAD AGREED TO.

12        AND THE RESPONSE WAS THAT HE HAS A TEN YEAR TERM, WE

13   ARE NOT GOING TO WASTE FIVE YEARS ON SEX OFFENDER

14   TREATMENT INITIALLY.  WE ARE GOING TO GIVE IT TO HIM LAST

15   SO THAT HE HAS THOSE MEMORIES AND THAT LEARNING FRESH IN

16   HIS MIND WHEN WE RELEASE HIM.

17        AND I THOUGHT, WELL, THAT IS RATIONAL, THAT MAKES

18   SENSE, SO I LET BYRON AND/OR HIS FAMILY KNOW THAT THE

19   FIRST YEARS ARE GOING TO BE KIND OF DRY.  YOU ARE NOT

20   GOING TO GET A LOT OF TREATMENT.  YOU ARE CERTAINLY NOT

21   GOING TO GET THE SPECIFIC SEXUAL OFFENDER, NATIVE

22   AMERICAN TREATMENT WE WANTED, BUT YOU WILL GET IT FOR

23   YOUR LAST FIVE YEARS.

24   Q    I ASK YOU TO TURN ONE MORE TIME IN THE BOOK TO

25   RESPONDENT'S EXHIBIT 6.  IT WILL BE IN THE SECOND SET OF

1    TABS.

2    A   YES.  I HAVE IT.

3    Q   DO YOU RECOGNIZE THAT?

4    A   YES.  THIS IS THE LETTER I JUST REFERRED TO.  I WROTE

5    TO APPARENTLY A MS. BOSTICK, B-O-S-T-I-C-K, AT THE UNITED

6    STATES PENITENTIARY IN FLORENCE, COLORADO, AND BASICALLY

7    I WAS COMPLAINING THAT HE WASN'T GETTING THE TREATMENT WE

8    THOUGHT HE WAS GOING TO GET, HE BEING BYRON, OF COURSE,

9    AND WE BEING SANDY HANSON, THE JUDGE WHO ORDERED IT, AND

10   ME.

11       AND THEREAFTER, I GOT THE RESPONSE I HAD PREVIOUSLY

12   INDICATED THAT IT WAS GOING TO BE THE LAST FIVE YEARS OF

13   HIS TERM THAT HE WOULD GET THIS TREATMENT.

14   Q   SO EVEN AT THIS POINT WERE YOU -- DID YOU BELIEVE

15   THAT YOU HAD AN AGREEMENT WITH THE FEDERAL GOVERNMENT

16   CONCERNING --

17   A   I KNEW WE HAD THE AGREEMENT.  IT WAS WRITTEN AND

18   SIGNED BY A UNITED STATES FEDERAL JUDGE.  WE HAD AN

19   AGREEMENT.

20   Q   DID YOU BELIEVE THAT MR. ANTONE WOULD BE ALLOWED TO

21   ACCESS SEXUAL OFFENDER TREATMENT PROGRAMS?

22   A   ABSOLUTELY.  I WOULD NOT HAVE DONE THIS WITHOUT IT.

23   THE ONLY REASON I GOT INVOLVED TO GET HIM OUT OF THE

24   TOHONO O'ODHAM NATION JAIL WAS BECAUSE THERE WAS NOTHING

25   THERE FOR HIM.  THIS WAS THE ONLY OTHER OPTION.  THIS WAS

1    THE SINE QUA NON OF THE DEAL.  WITHOUT SEXUAL OFFENDER

2    TREATMENT, HE WOULD HAVE STAYED IN SELLS, BUT AT LEAST HE

3    WOULD HAVE HAD ACCESS TO HIS FAMILY AND TO HIS FRIENDS ON

4    A DAILY BASIS.  WHEN HE IS 3,000 MILES AWAY IN BUTNER OR

5    1,000 MILES AWAY IN FLORENCE, NEITHER OF THOSE THINGS ARE

6    POSSIBLE.  THIS WAS THE DEAL.

7    Q    SO DO YOU BELIEVE THAT THE FEDERAL GOVERNMENT LIVED

8    UP TO ITS END OF THE DEAL?

9    A    I DON'T KNOW WHAT THEY DID, BUT IF HE IS NOT GETTING

10   THE TREATMENT AND HASN'T GOTTEN THE TREATMENT, I DO NOT

11   BELIEVE THEY HAVE LIVED UP TO THE DEAL.

12           MR. WATERS:  NOTHING FURTHER, YOUR HONOR.

13           THE COURT:  MR. BREDENBERG.

14           MR. BREDENBERG:  THANK YOU.

15   CROSS EXAMINATION BY MR. BREDENBERG:

16   Q    MR. DUPREY, IS IT YOUR TESTIMONY THAT --

17   A    I AM SORRY, SIR.  I SHOULD HAVE TOLD YOU I AM REALLY

18   HARD OF HEARING.  IF YOU WOULD SPEAK UP A LITTLE, I WOULD

19   REALLY APPRECIATE IT.

20   Q    THAT IS FINE.

21   A    I LEFT TUCSON IN SUCH A HURRY, I FORGOT MY EAR

22   PIECES.

23   Q    CAN YOU HEAR ME NOW?

24   A    YES.

25   Q    IS IT YOUR TESTIMONY THAT YOU PLED MR. ANTONE FROM A

1    MISDEMEANOR TO A FELONY?

2    A   YES.  THAT IS VERY UNUSUAL.  I HAVE NEVER DONE THAT

3    BEFORE OR SINCE IN MY CAREER.

4    Q   AND THE REASON YOU DID THAT WAS BECAUSE YOU WANTED

5    HIM TO GET SEX OFFENDER AND DRUG TREATMENT?

6    A   CORRECT.

7    Q   IS THAT BECAUSE YOU KNEW THAT HE NEEDED IT?

8    A   I BELIEVED HE NEEDED IT.  HE BELIEVED HE NEEDED IT.

9    AND MY CONVERSATION WITH DR. JONES AND WITH MAUREEN, HIS

10   THERAPIST, ALL INDICATED THE SAME.

11   Q   AND WHAT RESEARCH DID YOU SPECIFICALLY DO YOURSELF TO

12   CONFIRM THAT THERE WAS A SPECIALIZED NATIVE AMERICAN SEX

13   OFFENDER TREATMENT PROGRAM AT BUTNER?

14   A   I TALKED TO SANDY.  I TALKED TO THE PEOPLE ON THE

15   RES, AND I CALLED BUTNER.  I DON'T RECALL WHEN AND I

16   DON'T HAVE PHONE CALLS FROM 11 YEARS AGO, BUT I FAIRLY

17   ASSURED MYSELF THAT THERE WAS SUCH A THING.  I WASN'T

18   HALLUCINATING THAT, YOU KNOW, THERE WAS SOMETHING OUT

19   THERE THAT WAS DESIGNED FOR HIM AND SHOULD BE GIVEN TO

20   HIM, AND THAT IS WHAT WE STROVE TO GET.

21   Q   ARE YOU SUGGESTING THAT SOMEONE AT BUTNER TOLD YOU

22   THAT THERE WAS A SPECIALIZED NATIVE AMERICAN TREATMENT

23   PROGRAM AT BUTNER?

24   A   ELEVEN YEARS AGO, I CAN'T RECALL.  I HONESTLY CAN'T

25   RECALL SPECIFICALLY WHAT BUTNER TOLD ME, SO I CAN'T.

1    Q    WAS THERE SOME POINT IN TIME THAT YOU FOUND OUT THAT

2    THERE WAS NO SUCH THING AS A SPECIALIZED NATIVE AMERICAN

3    SEX OFFENDER TREATMENT PROGRAM?

4    A    I DIDN'T FIND THAT OUT UNTIL A NUMBER OF MONTHS AGO

5    WHEN JOE AND HIS ASSOCIATES SHOWED UP AT MY HOUSE IN

6    TUCSON, ARIZONA.

7    Q    AND HAVE YOU SPOKEN WITH THE DEFENDANT SINCE HIS

8    CERTIFICATION?

9    A    ONLY TO SAY HELLO YESTERDAY.

10   Q    ARE YOU AWARE THAT HE HAS HAD SEX OFFENDER TREATMENT

11   AVAILABLE TO HIM AT BUTNER SINCE HE WAS CERTIFIED IN

12   FEBRUARY OF '07?

13   A    I AM NOT AWARE OF THAT.

14   Q    DO YOU HAVE A COPY OF THE LETTER FROM THE BUREAU OF

15   PRISONS THAT SAYS, AND I AM QUOTING YOU, "WE DON'T WANT

16   TO WASTE FIVE YEARS OF HIS LIFE PROVIDING HIM WITH

17   TREATMENT THAT IS NOT GOING TO WORK."?

18   A    THAT IS NOT WHAT I SAID, AND IF THAT IS WHAT YOU

19   INFERRED, LET ME CORRECT THAT.  IT WOULDN'T HAVE BEEN

20   WASTED FIVE YEARS, IT WAS JUST I THOUGHT THE POINT THEY

21   WERE MAKING WAS WE WANT THIS INFORMATION TO BE FRESH IN

22   HIS MIND, SO THE FIRST FIVE YEARS I TOLD HIM WERE GOING

23   TO BE COLD YEARS, YOU ARE NOT GOING GET A LOT OF HELP IN

24   THIS AREA, BUT THE LAST FIVE IS WHERE YOU ARE GOING TO

25   GET THE FOCUS SO THAT WHEN YOU LEAVE, YOU WILL HAVE THAT

1    INFORMATION FRESH IN YOUR MIND.  THAT IS WHAT I MEANT.

2    IF I MISSTATED THAT, I APOLOGIZE.

3    Q    WELL, FORGET ABOUT THE SUBSTANCE OF THE LETTER, BUT

4    DO YOU HAVE COPIES OF THE LETTERS YOU RECEIVED BACK FROM

5    THE BUREAU OF PRISONS ANSWERING YOUR QUESTIONS?

6    A    NO, I NEVER GOT A LETTER BACK.  I DIDN'T WRITE

7    A LETTER TO BUTNER.  I WROTE A LETTER TO FLORENCE.

8    Q    WHAT ABOUT THE FIRST ONE THAT YOU SAID YOU GOT A --

9    A    I AM SORRY.  I CAN'T HEAR YOU.

10   Q    WHAT ABOUT THE FIRST TIME WHEN YOU CONTACTED THE

11   BUREAU OF PRISONS AND YOU SAID YOU GOT A RESPONSE BACK?

12   A    IN TUCSON, YES.

13   Q    DO YOU HAVE A COPY OF THAT LETTER?

14   A    I BELIEVE -- I DON'T KNOW.  IF IT'S NOT IN

15   DISCLOSURE, THAN I DON'T HAVE IT.

16              MR. BREDENBERG:  NO FURTHER QUESTIONS, YOUR

17   HONOR.

18              THE COURT:  MR. WATERS, ANYTHING FURTHER?

19              MR. WATERS:  JUST A FEW QUESTIONS, YOUR HONOR.

20   REDIRECT EXAMINATION BY MR. WATERS:

21   Q    MR. DUPREY, WAS IT YOUR UNDERSTANDING AFTER

22   DISCUSSING THESE MATTERS WITH THE WARDEN AT FCI- --

23   EXCUSE ME -- AT U.S.P. FLORENCE THAT MR. ANTONE WOULD BE

24   GIVEN ACCESS TO SEX OFFENDER TREATMENT BEFORE THE END OF

25   HIS BOP SENTENCE?

1    A    YES.

2    Q    AND TO THE BEST OF YOUR KNOWLEDGE, DID HE RECEIVE

3    SUCH OPPORTUNITY BEFORE?

4    A    NO, HE DID NOT.

5              MR. WATERS:  NOTHING FURTHER, YOUR HONOR.

6              THE COURT:  ANY FOLLOW UP, MR. BREDENBERG?

7              MR. BREDENBERG:  NOTHING, YOUR HONOR.

8              THE COURT:  MR. DUPREY, YOU MAY STEP DOWN.

9              THE WITNESS:  MAY I BE EXCUSED, YOUR HONOR?

10             THE COURT:  ANY OBJECTION?

11             MR. ROSS:  YES.  I HAVE NO OBJECTION TO HIM

12   BEING RELEASED.

13             MR. BREDENBERG:  I HAVE NO OBJECTION.

14             THE COURT:  YOU ARE EXCUSED FROM YOUR

15   SUBPOENA, SIR.

16             THE WITNESS:  THANK YOU.

17             THE COURT:  SAFE TRAVELS.

18             THE WITNESS:  THANK YOU, SIR.

19             MR. BREDENBERG:  YOUR HONOR, FOR THE RECORD,

20   WE WOULD RENEW OUR OBJECTION BECAUSE IT APPEARS BASED ON

21   THE TESTIMONY THAT THERE IS STILL NO RELEVANCE TO THE

22   ISSUE PRESENTED IN THIS CASE.

23             THE COURT:  THAT IS FINE.

24             MR. BREDENBERG:  THANK YOU.

25             THE COURT:  DULY NOTED.  ANY OTHER WITNESSES

1    FOR THE RESPONDENT?

2              MS. ALLEN:  YES, YOUR HONOR.  AT THIS TIME THE

3    RESPONDENT WOULD CALL ANNE SCHAUDER TO THE STAND.

4              MR. ROYSTER:  JUDGE, IF WE MIGHT BE HEARD.  WE

5    OBJECT TO THE TESTIMONY OF THIS WITNESS AS WELL.  IT'S

6    OUR UNDERSTANDING SHE IS GOING TO TESTIFY REGARDING HER

7    EXPERIENCE SUPERVISING NATIVE AMERICANS AS A UNITED

8    STATES PROBATION OFFICER, SO OUR OBJECTION WOULD BE THAT

9    IT'S NOT RELEVANT, AND I WOULD CITE TO THE COURT THIS

10   COURT'S RULINGS IN THE COMSTOCK CASE, CITING GLAUCHAY AND

11   WISEMAN, THAT A PRESCRIBED REGIMEN OF TREATMENT OR CARE

12   AFTER RELEASE IS NOT RELEVANT WITH RESPECT TO THE

13   PROCEEDINGS.

14             IT'S OUR BELIEF THAT THAT WOULD ALSO

15   ENCAPSULATE OR INCLUDE TESTIMONY ABOUT WHAT IT MAY BE

16   LIKE, HIM BEING SUPERVISED ON SUPERVISED RELEASE.

17             THE COURT:  MS. ALLEN?

18             MS. ALLEN:  YOUR HONOR, IN RESPONSE TO THAT,

19   WE WOULD OFFER MS. SCHAUDER TO INFORM THE COURT AS TO

20   WHAT SHE DOES AS A U.S. PROBATION OFFICER IN THE STATE OF

21   ARIZONA WHERE MR. ANTONE HAS FIVE YEARS OF SUPERVISED

22   RELEASE.

23             THE MATTER OF TREATMENT AND WHAT IS AVAILABLE

24   IN A STRUCTURED ENVIRONMENT VERSUS A CONTAINED

25   ENVIRONMENT VERSUS WHAT HE CAN GET IN OR OUT HAS BEEN AT

1    ISSUE ALL DAY YESTERDAY AND TODAY.

2              MS. SCHAUDER CAN SPEAK DIRECTLY TO THAT.  SHE

3    CAN ALSO SPEAK TO WHAT STEPS HAVE BEEN TAKEN IN THIS

4    PARTICULAR CASE AS FAR AS MR. ANTONE WITH REGARD TO

5    CONDITIONS OF HIS SUPERVISED RELEASE UPON HIS RELEASE

6    FROM PRISON.

7              WE BELIEVE THAT IS HIGHLY RELEVANT TO THIS

8    MATTER AND THAT IT WOULD INFORM THE COURT IN A POSITIVE

9    MATTER.

10             THE COURT:  I WILL ALLOW MS. SCHAUDER TO

11   TESTIFY.  I AM RESERVING RULING ON THE OBJECTION BY THE

12   GOVERNMENT.

13             YOU MAY TAKE THE STAND, MA'AM.

14             ANNE SCHAUDER, CALLED AS A WITNESS, HAVING
               BEEN FIRST DULY SWORN, ON HER OATH, TESTIFIED
15             AS FOLLOWS:

16             THE CLERK:  PLEASE HAVE A SEAT.

17   DIRECT EXAMINATION BY MS. ALLEN:

18   Q   MS. SCHAUDER, IF YOU WOULD STATE YOUR FULL NAME AND

19   SPELL IT FOR THE RECORD.

20   A   ANNE SCHAUDER, S-C-H-A-U-D-E-R.  ANNE IS A-N-N-E.

21   Q   MS. SCHAUDER, WHAT DO YOU DO FOR A LIVING?

22   A   A UNITED STATES PROBATION OFFICER.

23   Q   WHERE ARE YOU A PROBATION OFFICER?

24   A   FLAGSTAFF, ARIZONA.

25   Q   HOW LONG HAVE YOU BEEN A PROBATION OFFICER IN

1    ARIZONA?

2    A    IN ARIZONA FOR EIGHT YEARS.  FOR THE DISTRICT OF

3    ARIZONA, FIVE YEARS.

4    Q    AND AS A PROBATION OFFICER IN ARIZONA, WHAT ARE SOME

5    OF YOUR DUTIES?

6    A    BASICALLY A LIAISON TO THE COURT.  I SUPERVISE

7    INDIVIDUALS WHO HAVE BEEN RELEASED INTO THE COMMUNITY

8    EITHER DIRECTLY FROM COURT OR FROM BOP, AND ATTEMPT TO

9    ENFORCE THE CONDITIONS AS ORDERED BY THE COURT AND REPORT

10   BACK COMPLIANCE OR NON-COMPLIANCE OF THOSE CONDITIONS TO

11   THE COURT.

12   Q    AND WITH REGARD TO SUPERVISING, HOW MANY PEOPLE WOULD

13   YOU SAY YOU SUPERVISE ON A DAILY BASIS?

14   A    BETWEEN 50 AND 55.

15   Q    AND OF THOSE PEOPLE THAT YOU SUPERVISE, ARE THOSE

16   FOLKS SERVING A TERM OF SUPERVISED RELEASE FROM PRISON?

17   A    SOME OF THEM, YES.

18   Q    NOT ALL OF THEM?

19   A    NO.  SOME ARE PROBATION.

20   Q    OF THE ONES THAT YOU SUPERVISE, ARE ANY OF THOSE

21   NATIVE AMERICANS?

22   A    YES.

23   Q    WHAT PERCENTAGE OF THE PEOPLE YOU SUPERVISE WOULD YOU

24   SAY ARE NATIVE AMERICAN?

25   A    I CAN'T GIVE YOU A PERCENTAGE.  I AM NOT INTO MATH.

1    THE MAJORITY OF MY CLIENTELE ARE NATIVE AMERICANS.

2    Q    AND OF THE CLIENTELE THAT YOU SERVE, WHAT PERCENT OF

3    THEM LIVE ON A FEDERAL RESERVATION?

4    A    AGAIN, THE MAJORITY OF THE NATIVE AMERICANS I

5    SUPERVISE ARE ACTUALLY ON THE RESERVATION.

6    Q    WOULD YOU SAY THAT YOUR SUPERVISION OF THE PEOPLE ON

7    THE RESERVATION HAS ANY -- LET ME STRIKE THAT.  WHAT ARE

8    SOME OF THE -- DO YOU SUPERVISE ANY SEX OFFENDERS?

9    A    I DO.

10   Q    DO YOU SUPERVISE ANY SEX OFFENDERS WHO ARE ACTUALLY

11   RESIDING ON A RESERVATION?

12   A    I DO.

13   Q    IN THE STATE OF ARIZONA, DO SEX OFFENDERS HAVE

14   SPECIAL SUPERVISED RELEASE CONDITIONS?

15   A    THEY DO.

16   Q    ARE THOSE STANDARDIZED CONDITIONS THROUGHOUT THE

17   STATE OF ARIZONA?

18   A    FOR THE DISTRICT OF ARIZONA, YES.

19   Q    WHAT ARE SOME OF THOSE CONDITIONS THAT ARE SPECIFIC

20   TO SEX OFFENDERS?

21   A    SOME OF THE CONDITIONS ARE SEX OFFENDER TREATMENT,

22   REGISTRATION WITHIN THE STATE AS WELL AS TRIBE.  NO

23   CONTACT WITH MINORS.  MENTAL HEALTH TREATMENT IS

24   TYPICALLY IN THERE AS WELL.  NO VICTIM CONTACT IS A

25   PRETTY MAJOR CONDITION.  WE UTILIZE SEARCH IN ARIZONA.

1    WE ARE ABLE TO HAVE WARRANTLESS SEARCHES AND WHICH

2    INCLUDES ELECTRONIC DEVICES, AND THE MORE TECHNOLOGICAL

3    THINGS THAT WEREN'T NECESSARILY AROUND WHEN MR. ANTONE

4    WAS CONVICTED, BUT NOW THEY ARE INCLUDED IN THOSE

5    CONDITIONS.

6    Q    WHAT KINDS OF ELECTRONIC DEVICES DO YOU USE?

7    A    CELLULAR PHONES, COMPUTERS, INTERNET SERVICE

8    PROVIDERS, THINGS OF THAT NATURE.  WE HAVE ACCESS TO

9    SEARCH.

10   Q    WHAT KIND OF -- IS THERE ANY-- WHAT KIND OF

11   MONITORING DEVICES DO YOU USE WITH YOUR SEX OFFENDERS?

12   A    AS FAR AS ACTUAL DEVICES, WHAT WE HAVE AVAILABLE TO

13   US ARE G.P. S. SYSTEMS, THE ELECTRONIC MONITORING

14   BRACELET OF WHETHER OR NOT SOMEONE COMES IN AND OUT OF

15   THEIR RESIDENCE AS DIRECTED.

16       OUR, AS PROBATION, OUR ACCESS TO SOME OF THESE ARE

17   NOT QUITE AS EXTENSIVE AS SOME OF THE HALFWAY HOUSES THAT

18   WE UTILIZE THAT IS PART OF THEIR PROGRAM, BUT NOT

19   NECESSARILY OURS.

20   Q    OKAY.  YOU TALKED ABOUT HALFWAY HOUSES THAT UTILIZE.

21   IS THAT A TYPICAL OPTION FOR PEOPLE THAT YOU SUPERVISE?

22   A    YES.

23   Q    AND WHAT DOES THAT ENTAIL AS FAR AS STRUCTURE?

24   A    IT GIVES A LOT OF STRUCTURE, ESPECIALLY VERSUS

25   RESERVATION LIFESTYLE.  THE HALFWAY HOUSES ARE LOCATED IN

1    A METROPOLITAN AREA, WHICH VERSUS A RESERVATION, THERE IS

2    EMPLOYMENT AVAILABLE.  THEY ACTUALLY HAVE TO FOLLOW

3    ITINERARIES.

4         TYPICALLY WHEN THEY LEAVE THE HALFWAY HOUSE, THEY

5    ARE -- THEY HAVE THE ABILITY TO SPEAK WITH CASE MANAGERS

6    AT THE HALFWAY HOUSE WHICH LEADS TO THE STRUCTURE OF WHAT

7    THEY CAN AND CAN'T DO OR THE DIRECTION IN WHICH THEY MAY

8    WANT TO GO AS FAR AS A VOCATION OR CERTAIN TYPES OF

9    TREATMENT THAT THEY MAY WANT TO ENTER INTO THAT MAY NOT

10   HAVE BEEN ORDERED BY THE COURT.

11        SO IT PROVIDES A LOT OF DIFFERENT FACETS TO THE

12   OFFENDER.

13   Q   YOU TALKED ABOUT SOME OF THE STANDARD SEX OFFENDER

14   CONDITIONS, AND AT THAT TIME YOU MENTIONED THAT

15   TREATMENT -- SEX OFFENDER TREATMENT WAS USUALLY ONE OF

16   THOSE CONDITIONS; IS THAT RIGHT?

17   A   YES.

18   Q   NOW, THAT IS A MANDATORY CONDITION; IS THAT RIGHT?

19   A   NO, I WOULDN'T SAY IT'S A MANDATORY CONDITION,

20   HOWEVER, WITH THE MAJORITY OF SEX OFFENDERS, IT IS

21   RECOMMENDED BY THE PROBATION DEPARTMENT AT PRESENTENCE,

22   THE PRESENTENCE PHASE, AND IT IS TYPICALLY ORDERED BY THE

23   COURT.

24   Q   AND IF IT'S ORDERED BY THE COURT, YOU, THE PROBATION

25   OFFICER, WOULD EXPECT YOUR CLIENT TO ABIDE BY THAT?

1    A    ABSOLUTELY.

2    Q    AND IN THE EVENT THAT YOUR CLIENT DID NOT COMPLY WITH

3    CONDITIONS ORDERED BY A JUDGE, WHAT WOULD HAPPEN?

4    A    WE WOULD SUBMIT A PETITION TO THE COURT AND A REPORT

5    REQUESTING THE OFFENDER'S RETURN TO THE COURT TO ADDRESS

6    THE NON-COMPLIANCE.

7    Q    WHAT ARE SOME OF THE WAYS THAT YOU DETERMINE WHETHER

8    SOMEONE IS COMPLYING WITH WHAT THE JUDGE HAS ORDERED?

9    A    FOR THE MOST PART, IT'S A BLACK AND WHITE ISSUE.  IF

10   THEY GET KICKED OUT OF THE HALFWAY HOUSE FOR HALFWAY

11   HOUSE INFRACTIONS, SAY DRUGS OR ALCOHOL OR NOT FOLLOWING

12   THEIR ITINERARY, THAT IS A PRETTY DEFINITE VIOLATION THAT

13   WE WOULD BRING THEM BACK TO COURT FOR.

14        IF THEY FAIL TO ATTEND TREATMENT AS THEY ARE

15   DIRECTED, WHICHEVER TREATMENT THAT MAY BE, WE WOULD BRING

16   THEM BACK TO THE COURT TO HAVE THEM ANSWER TO THE COURT,

17   TO THE JUDGE.

18   Q    WHAT IF IT'S A SITUATION WHERE YOU THINK MAYBE

19   SOMEONE MIGHT -- SAY IT'S A SEX OFFENDER, AND AS A

20   PROBATION OFFICER YOU HAVE SOME SUSPICION THAT PERHAPS

21   THEY MAY BE THINKING ABOUT REOFFENDING.

22        DO YOU HAVE ANY METHODS THAT YOU USE TO EXPLORE

23   THAT?

24   A    TO A DEGREE, WE DO.  THINGS ARE A LITTLE DIFFERENT IN

25   THE DISTRICT OF ARIZONA.  WE ARE PART OF THE NINTH

1    CIRCUIT, SO AS FAR AS QUESTIONS REGARDING -- THAT WOULD

2    BE CONTAINED WITHIN A POLYGRAPH.  WE DO NOT NECESSARILY

3    ASK THE QUESTION OF REOFFENSE.  HOWEVER, WE DO ASK

4    QUESTIONS SPECIFICALLY RELEVANT TO THE CONDITIONS OF

5    PROBATION, HAS THERE BEEN CONSUMPTION OF ALCOHOL, HAVE

6    YOU VIEWED PORNOGRAPHY, THINGS OF THAT NATURE THAT WE TRY

7    TO EXPLORE.

8    Q   SO DO YOU, IN FACT, USE A POLYGRAPH IF YOU THINK YOU

9    NEED TO?

10   A   WE USE POLYGRAPHS EVERY SIX MONTHS, AND IF THERE IS A

11   NEED, EVERY QUARTER.

12   Q   ARE THERE ANY OTHER ELECTRONIC TESTS THAT YOU USE?

13   A   AVAILABLE TO US, WE HAVE THE PLETHYSMOGRAPH.

14   Q   THE PLETHYSMOGRAPH?

15   A   YES.

16   Q   CAN YOU TELL US WHAT THAT IS?

17   A   THE PENILE PLETHYSMOGRAPH IS AN ELECTRONIC DEVICE --

18   I HAVE NEVER ACTUALLY SEEN ONE, BUT FROM WHAT I AM TOLD,

19   THERE IS A MERCURY DEVICE THAT IS CONNECTED TO THE

20   OFFENDER'S PENIS WHEREIN THEY ARE THEN SHOWN PICTURES, I

21   BELIEVE, OR SCENARIOS, AND IF THEY ARE PHYSICALLY --

22   PHYSIOLOGICALLY AROUSED TO THAT PHOTO, THE ELECTRONIC

23   DEVICE PICKS UP ON THAT AND IS ABLE TO READ THAT AROUSAL.

24   Q   IS THAT SOMETHING THAT IS USED ON A SCHEDULE OR WOULD

25   THAT BE A CASE BY CASE BASIS?

1    A    IT'S A CASE BY CASE BASIS.

2    Q    BACK TO THE SUBJECT OF TREATMENT, WE TALKED A LITTLE

3    ABOUT SEX OFFENDER TREATMENT.  HOW IS THAT PROVIDED TO --

4    AS A PROBATION OFFICER, DOES YOUR OFFICE PLAY A ROLE IN

5    ASSISTING SOMEONE LIKE MR. ANTONE UPON RELEASE AND

6    GETTING SEX OFFENDER TREATMENT?

7    A    ABSOLUTELY.  WE MAKE THE REFERRALS TO THE TREATMENT

8    PROVIDER.

9    Q    AND IS THERE -- DO YOU PERSONALLY KNOW OF THE

10   TREATMENT PROVIDER IN YOUR AREA?

11   A    IN MY AREA, YES.

12   Q    IS THERE MORE THAN ONE?

13   A    IN MY AREA?

14   Q    OR IN THE STATE OF ARIZONA?

15   A    IN THE STATE OF ARIZONA, THERE IS MORE THAN ONE, YES.

16   Q    AND SO WOULD SOMEONE WHO IS TYPICALLY IN A SEX

17   OFFENDER PROGRAM AND UNDER YOUR SUPERVISION, WOULD THEY

18   TYPICALLY STAY IN A HALFWAY HOUSE?

19   A    SOME, YES.

20   Q    BUT NOT ALL?

21   A    NO.

22   Q    SOME WOULD JUST STAY WHEREVER THEY CHOOSE; IS THAT

23   WHAT THE OPTION IS THERE?

24   A    ALL RESIDENCES HAVE TO BE PRE-APPROVED BY THE

25   PROBATION OFFICER.  IF THEY WANT TO MOVE TO ANOTHER

1    LOCATION, IT HAS TO BE PRE-APPROVED BY THE PROBATION

2    OFFICER.  A LOT OF TIMES IT'S DIFFICULT FOR SEX OFFENDERS

3    TO FIND AN APPROPRIATE RESIDENCE ON THE RESERVATION, AND

4    IN SOME OF THOSE CASES WE WILL UTILIZE THE HALFWAY HOUSE.

5    Q   DOES THE HALFWAY HOUSE ALLOW FOR -- IS THERE ANY

6    SUBSTANCE ABUSE TREATMENT AVAILABLE TO THOSE THAT LIVE IN

7    HALFWAY HOUSES?

8    A   YES.

9    Q   AND IS THAT AGAIN PROVIDED THROUGH CONTRACTS THAT YOU

10   SECURE FOR YOUR CLIENT?

11   A   YES.

12   Q   THROUGH THE PROBATION OFFICE?

13   A   YES.

14   Q   SO YOU HAVE TESTIFIED THAT SEX OFFENDER TREATMENT --

15   YOUR OFFICE CONTRACTS WITH THAT FOR YOUR CLIENTS, AND

16   THAT FOR DRUG TREATMENT, YOUR OFFICE ALSO CONTRACTS AND

17   HELPS YOUR CLIENT GET SERVICES FOR DRUG TREATMENT?

18   A   CORRECT.

19   Q   DOES YOUR OFFICE ASSIST THE CLIENT WITH PLACEMENT IN

20   LIVING ARRANGEMENTS UPON THEIR RELEASE FROM PRISON?

21   A   IF POSSIBLE, AND ESPECIALLY WITH SEX OFFENDERS, WE

22   TRY TO GET INVOLVED AS EARLY IN THE PROCESS AS WE CAN.

23   IT'S NOT NECESSARILY ALWAYS A POSSIBILITY, BUT WE ATTEMPT

24   TO, YES.

25   Q   DO YOU KNOW WHETHER -- I KNOW YOU HAVE BEEN HERE FOR

1    THE LAST TWO DAYS, BUT I DON'T KNOW HOW MUCH INFORMATION

2    YOU WERE ABLE TO GLEAN FROM SITTING IN THE AUDIENCE.

3         DO YOU HAVE KNOWLEDGE AS TO WHETHER MR. ANTONE HAS

4    MADE A DECISION ABOUT WHETHER HE WILL LIVE IN A HALFWAY

5    HOUSE UPON RELEASE?

6    A   MR. ANTONE HAS SIGNED A WAIVER AND ORDER FOR THE

7    PROBATION DEPARTMENT TO -- AND AGREED TO RESIDE IN A

8    HALFWAY HOUSE FOR UP TO 365 DAYS UNLESS RELEASED EARLIER

9    BY THE PROBATION OFFICER.

10   Q   SO HE HAS SIGNED A WAIVER THAT WILL ALLOW HIM TO LIVE

11   THERE?

12   A   YES.

13   Q   IS THAT SOMETHING THAT MR. ANTONE DID VOLUNTARILY AS

14   FAR AS YOU KNOW?

15   A   AS FAR AS I KNOW, YES.  I SPOKE WITH HIM BRIEFLY

16   ABOUT SOME LEGAL MATTERS AS FAR AS REPRESENTATION AND

17   HAVING AN APPEARANCE BEFORE THE ARIZONA DISTRICT COURT

18   AND HE WAIVED THOSE RIGHTS AND SIGNED THE WAIVER.

19   Q   SO WHAT IS YOUR UNDERSTANDING OF THAT DOCUMENT AGAIN?

20   A   MY UNDERSTANDING IS THAT HE IS AGREEING TO THE

21   MODIFICATION OF HIS CONDITIONS OF SUPERVISED RELEASE AND

22   IS AGREEING TO ENTER THE HALFWAY HOUSE OR THE RESIDENTIAL

23   REENTRY CENTER FOR UP TO 365 DAYS, UNLESS RELEASED

24   EARLIER BY THE PROBATION OFFICER.

25   Q   SO THAT WOULD MEAN THAT HE IS AGREEING TO ADDITIONAL

1    LIMITATIONS ON HIS LIVING ARRANGEMENTS?

2    A    YES.

3    Q    WOULD THAT BE ACCURATE?

4    A    YES.

5    Q    WOULD IT BE SAFE TO SAY THAT THE HALFWAY HOUSE

6    PROVIDES MORE RESTRICTIONS THAN HE WOULD HAVE SAY LIVING

7    WITH A FAMILY MEMBER OR SOMEWHERE ELSE?

8    A    YES.

9    Q    YOU TESTIFIED ABOUT SEX OFFENDER TREATMENT AND

10   SUBSTANCE ABUSE TREATMENT, BUT YOU ALLUDED TO THE FACT

11   THAT THERE ARE OTHER TREATMENTS AVAILABLE THAT MANY

12   PEOPLE OFTEN ELECT TO TAKE.  CAN YOU TELL ME WHAT SOME OF

13   THOSE ARE?

14   A    THEY COULD BE ANGER MANAGEMENT CLASSES, PARENTING

15   CLASSES, DOMESTIC VIOLENCE TREATMENT, SELF-HELP GROUPS

16   SUCH AS NA, AA, THINGS OF THAT NATURE.

17   Q    AND THOSE PROGRAMS WOULD BE AVAILABLE TO MR. ANTONE

18   AS WELL?

19   A    NOT DIRECTLY AT THE HALFWAY HOUSE, BUT WITHIN THE

20   COMMUNITY OF TUCSON IF THAT IS WHERE HE ENDED UP, YES.

21   Q    AND SO IF HE WANTED TO CONTINUE TO BETTER HIMSELF AS

22   HE HAS OVER THE LAST YEARS IN PRISON, HE WOULD CERTAINLY

23   HAVE DIFFERENT OPTIONS AVAILABLE TO HIM?

24   A    YES.

25   Q    IN TUCSON?

1    A    YES.

2    Q    OF THE SEX OFFENDERS THAT YOU SUPERVISE, WHAT WOULD

3    YOU SAY IS A TYPICAL LENGTH OF TIME FOR A SUPERVISED

4    RELEASE TERM?

5    A    THREE TO FIVE YEARS.

6    Q    AND ARE YOU AWARE OF HOW LONG MR. ANTONE HAS?

7    A    FIVE YEARS.

8    Q    IS THERE, IN THAT FIVE YEAR PLAN, IS THERE A -- I

9    WILL WITHDRAW THAT, YOUR HONOR.

10              MS. ALLEN:  THANK YOU.

11              THE COURT:  MR. BREDENBERG OR MR. ROYSTER?

12              MR. ROYSTER:  THANK YOU, JUDGE

13   CROSS EXAMINATION BY MR. ROYSTER:

14   Q    ARE YOU GOING TO BE HIS PROBATION OFFICER WHEN HE

15   GETS OUT; IF HE DOES?

16   A    NOT IF HE IS IN TUCSON, NO, SIR.

17   Q    WHY NOT?

18   A    I SUPERVISE NORTHERN ARIZONA.  TUCSON IS SOUTHERN

19   ARIZONA.

20   Q    HOW FAR IS THAT FROM WHERE YOU ARE?

21   A    TUCSON IS APPROXIMATELY FOUR -- THREE AND A HALF

22   HOURS FROM FLAGSTAFF, ARIZONA.

23   Q    SO HE IS NOT EVEN GOING TO BE IN THE AREA WHERE YOU

24   ARE SUPERVISING; IS THAT RIGHT?

25   A    CORRECT.

1    Q    NOW, SEX OFFENDERS THAT YOU HAVE SUPERVISED

2    PERSONALLY, HAVE ANY OF THEM EVER COMMITTED A NEW SEX

3    OFFENSE?

4    A    NOT THAT THEY HAVE BEEN CHARGED AND CONVICTED OF THAT

5    I AM AWARE OF.

6    Q    HAVE ANY OF THEM COMMITTED A NEW SEX OFFENSE WHILE

7    THEY HAVE BEEN ON SUPERVISED RELEASE?

8    A    I DON'T KNOW.

9    Q    YOU INDICATED THAT THERE WAS SOME SORT OF AGREEMENT

10   ABOUT A HALFWAY HOUSE.  DO YOU KNOW WHERE THE HALFWAY

11   HOUSE IS?

12   A    IT WOULD BE IN TUCSON.

13   Q    HOW ARE THE SERVICES ON THE RESERVATION THERE, THAT

14   TOHONO O'ODHAM RESERVATION?  HOW ARE THE SERVICES THERE?

15   A    I DON'T UNDERSTAND YOUR QUESTION.  HOW ARE THEY AS

16   FAR AS --

17   Q    ARE THE SERVICES FEW AND FAR BETWEEN?

18   A    THERE ARE SEX OFFENDER TREATMENT PROVIDERS THAT WE

19   HAVE CONTRACTED ON THE T.O. AS WELL AS SUBSTANCE ABUSE

20   TREATMENT PROVIDERS ON THE T.O.

21   Q    WOULD YOU DESCRIBE IT AS ALMOST LIKE A THIRD WORLD

22   COUNTRY?

23   A    THE RESERVATIONS THAT I HAVE BEEN TO, YES, AND FROM

24   WHAT I UNDERSTAND, THE T.O. IS NOT DIFFERENT FROM WHAT I

25   HAVE PERSONALLY SUPERVISED.

1           MR. ROYSTER:  NO OTHER QUESTIONS.  THANK YOU.

2           THE COURT:  MS. ALLEN, ANYTHING FURTHER?

3           MS. ALLEN:  YES.  THANK YOU.

4   REDIRECT EXAMINATION BY MS. ALLEN:

5   Q   MS. SCHAUDER, DO YOU KNOW WHO WILL SUPERVISE MR.

6   ANTONE UPON HIS RELEASE?

7   A   I DO.

8   Q   AND WHO IS THAT?

9   A   SENIOR PROBATION OFFICER EDWARD MARTIN.

10  Q   AND DOES SENIOR PROBATION OFFICER EDWARD MARTIN

11  SUPERVISE THE SAME NUMBER OF PEOPLE THAT YOU SUPERVISE?

12  A   NO, HE DOES NOT.

13  Q   HOW MANY DOES HE SUPERVISE?  IS IT MORE OR LESS?

14  A   IT'S LESS.

15  Q   WHY IS IT LESS?

16  A   SENIOR OFFICERS HAVE A LOWER CASE LOAD DUE TO THE

17  TYPES OF CASES THAT THEY GENERALLY SUPERVISE.  MR.

18  MARTIN'S CASELOAD IS GOING TO BE PRIMARILY MADE UP OF SEX

19  OFFENDERS, AND SOME OTHER HIGH RISK TYPE OFFENSES SUCH AS

20  MURDER, BUT MOSTLY HE WILL SUPERVISE SEX OFFENDERS.

21  Q   YOU TESTIFIED THAT YOU DON'T LIVE IN THAT AREA, BUT

22  ARE YOU AWARE OF THE SERVICES THAT ARE AVAILABLE THROUGH

23  MR. MARTIN'S AREA?

24  A   TO DEGREE, YES.

25  Q   AND HAVE YOU TESTIFIED TO ANYTHING THAT YOU DID NOT

1    KNOW ABOUT?

2    A    NO.

3    Q    ARE THERE MORE SERVICES AVAILABLE IN TUCSON THAN YOU

4    WOULD SAY ARE AVAILABLE ON THE RESERVATION?

5    A    ABSOLUTELY, YES.

6    Q    WHAT ABOUT IN FLAGSTAFF?

7    A    YES.  MORE SERVICES IN TUCSON THAN IN FLAGSTAFF.

8    Q    SO THERE ARE MORE SERVICES AVAILABLE IN TUCSON.  WHAT

9    ABOUT OPPORTUNITIES FOR EMPLOYMENT?  WOULD YOU SAY THERE

10   ARE MORE OPPORTUNITIES FOR EMPLOYMENT IN TUCSON?

11   A    ABSOLUTELY.

12   Q    IN TUCSON THAN ON THE RESERVATION?

13   A    ABSOLUTELY.

14   Q    AND IN TUCSON THAN IN FLAGSTAFF?

15   A    UNFORTUNATELY, YES.

16   Q    SO YOUR TESTIMONY IS THAT HE WILL HAVE A SENIOR

17   OFFICER WHO SPECIALIZES IN SEX OFFENDERS WHO HAS LESS

18   PEOPLE TO SUPERVISE AND MORE SERVICES AVAILABLE?

19   A    CORRECT.

20             MS. ALLEN:  THANK YOU.

21             THE COURT:  MR. ROYSTER?

22             MR. ROYSTER:  NO QUESTION.  THANK YOU, JUDGE.

23             THE COURT:  MA'AM, YOU MAY STEP DOWN.

24             THE WITNESS:  THANK YOU.

25             MS. ALLEN:  YOUR HONOR, WE WOULD ASK THAT MS.

1    SCHAUDER BE RELEASED AT THIS TIME.

2              THE COURT:  ANY OBJECTION TO THAT?

3              MR. ROYSTER:  NOT FROM THE GOVERNMENT.  BUT WE

4    DO RENEW OUR OBJECTION WITH RESPECT TO THE RELEVANCE OF

5    HER TESTIMONY.

6              THE COURT:  THAT IS FINE.  MS. SCHAUDER IS

7    RELEASED FROM HER SUBPOENA.

8              ANY FURTHER EVIDENCE FOR THE RESPONDENT?

9              MS. ALLEN: YES, YOUR HONOR.  NEXT THE

10   RESPONDENT WILL CALL DR. ROY DAUM.

11             DR. ROY DAUM, CALLED AS A WITNESS,
               HAVING BEEN FIRST DULY SWORN, ON HIS
12             OATH, TESTIFIED AS FOLLOWS:

13             THE CLERK:  PLEASE HAVE A SEAT AND STATE YOUR

14   NAME FOR THE RECORD.

15             THE WITNESS:  MY NAME IS ROY DAUM, R-O-Y

16   D-A-U-M.

17   DIRECT EXAMINATION BY MS. ALLEN:

18   Q   DR. DAUM, WHERE DO YOU LIVE?

19   A   I LIVE IN LARNED, KANSAS.

20   Q   WHERE DID YOU GO TO COLLEGE?

21   A   I GOT A BACHELOR'S OF ART IN -- FROM WEST TEXAS STATE

22   UNIVERSITY IN CANYON, TEXAS.  I GOT A MASTER'S IN

23   EDUCATIONAL ADMINISTRATION FROM STEVENVILLE A & M.  I GOT

24   A DOCTORATE IN EDUCATION FROM COMMERCE, TEXAS.

25        AND I WENT BACK AND GOT A MASTER'S IN COUNSELING AND

1    PSYCHOLOGY FROM TROY STATE.  I HAVE A DOCTORATE IN

2    PSYCHOLOGY FROM ARGOSY AT DALLAS.

3    Q    DO YOU HAVE ANY POST DOCTORATE TRAINING?

4    A    YES.

5    Q    CAN YOU TELL US ABOUT THAT?

6    A    ARE YOU ASKING ABOUT FORENSIC TRAINING?

7    Q    YES, SPECIFICALLY.  THANK YOU.

8    Q    I DID A PRACTICUM IN -- I AM NOT SURE IF YOU CALL IT

9    FCI OR HOW YOU CALL IT, BUT IT'S IN CARLSVILLE WITH A

10   MEDICAL CENTER WITH THE BOP IN WHICH I WORKED WITH THE

11   CHIEF PSYCHIATRIST -- OR CHIEF PSYCHOLOGIST IN FORENSIC

12   TRAINING.

13       HE WAS DOING COMPETENCY EVALS.  HE DID EVALS FOR

14   DIFFERENT -- COMPETENCY TO STAND TRIAL, PRESENTENCE, THAT

15   KIND OF THING, AND I ALSO TAUGHT THE 40 HOUR DRUG AND

16   ALCOHOL CLASSES AT THAT PRISON.

17       AT MY SECOND PRACTICUM, I WENT WITH A PSYCHOLOGIST

18   THROUGHOUT THE NORTHERN PART OF NEW MEXICO GOING FROM

19   JAIL TO JAIL DOING FORENSIC EVALUATIONS IN REGARDS,

20   AGAIN, TO COMPETENCY, THE ABILITY TO WAIVE RIGHTS FOR

21   VARIOUS OFFENSES THAT THEY DID.

22       MY INTERNSHIP WAS, I WAS FORTUNATE TO BE ACCEPTED AS

23   AN INTERN AT LARNED STATE HOSPITAL WHERE THEY HAVE THE

24   FIRST SEXUAL TREATMENT.  IT'S CALLED SOTP, SEX OFFENDER

25   TREATMENT PROVIDER.  THIS IS THE ONE THAT -- WHERE WE

1    HAVE 212 CIVILLY COMMITTED INDIVIDUALS.

2        MY POST DOC THEN I WAS FORTUNATE TO STAY THERE, AND

3    I WAS -- STARTED MY TRAINING IN FORENSICS THERE IN A

4    DIFFERENT UNIT.

5    Q    WHAT KIND OF TRAINING DID YOU GET IN THE UNIT?

6    A    AS AN INTERN, I WAS ALLOWED TO WORK WITH A --

7    SOMETHING WE CALL ANNUAL REPORTS WHERE ONCE THE RESIDENT

8    IS IN THE PROGRAM, THEN OUR STATE REQUIRES EACH YEAR AN

9    ANNUAL REPORT AS TO DO THEY STILL MEET REQUIREMENTS FOR

10   SEXUAL CONTAINMENT OR CIVILLY COMMITTED, AND SO WE HAVE

11   TO SUBMIT REPORTS ON EVERY RESIDENT THAT IS THERE EACH

12   YEAR.  I WAS FORTUNATE TO BE ABLE TO ASSIST IN THAT.

13       THE OTHER PART I DID WAS I DID DBT, DIALECTICAL

14   BEHAVIOR THERAPY.

15   Q    WHAT IS THAT, DR. DAUM?

16   A    IT'S A PROGRAM THAT MARSHAL LANAHAN DESIGNED FOR

17   BORDERLINE PERSONALITY DISORDERS.  BECAUSE THE MAJORITY

18   OF THE CIVILLY COMMITTED INDIVIDUALS NORMALLY HAVE SOME

19   KIND OF PERSONALITY DISORDER.  IT'S A NICE FIT FOR A

20   TREATMENT PROGRAM.

21       AND OUR UNIT, OUR STATE HAS BEGUN TO USE THAT.  I

22   HAD A CASE LOAD OF LIKE FOUR GROUPS A WEEK FOR AN HOUR

23   AND A HALF PLUS ANYWHERE BETWEEN 5 AN 10 THERAPY SESSIONS

24   A WEEK WITH THAT.

25   Q    WAS THAT -- WERE YOU ACTUALLY PROVIDING SEX OFFENDER

1    TREATMENT?  IS WHAT WHAT YOU WOULD CALL THAT?  WAS THAT

2    PART OF A SEX OFFENDER TREATMENT PROGRAM?

3    A    THAT WAS THE PROGRAM; YES, MA'AM.

4    Q    THAT WAS THE PROGRAM AT THE HOSPITAL?

5    A    WITHIN -- LARNED STATE HOSPITAL IS AN UMBRELLA

6    ORGANIZATION THAT HAS A SEXUAL PREDATOR, SEXUAL -- HOW DO

7    YOU CALL CIVILLY COMMITTED PROGRAM, AND THEN IT HAS ADULT

8    PSYCHOLOGY OR PSYCHIATRIC SERVICES AS WELL AS A PRISON

9    PROGRAM.

10   Q    SO YOUR TESTIMONY IS THAT YOU HAVE PROVIDED SEX

11   OFFENDER TREATMENT ON A WEEKLY BASIS TO PEOPLE THAT HAVE

12   BEEN CIVILLY COMMITTED; IS THAT WHAT YOU SAID?

13   A    YES.  THEN THE LATTER PART OF THE TRAINING DURING MY

14   POST DOC, THE YEAR AFTER I GRADUATED, WAS TO WORK ON

15   UNITS WHERE THESE ARE DEPARTMENT OF CORRECTION

16   INDIVIDUALS WHO HAVE A MENTAL DISORDER.

17        AND I PROVIDED -- WE HAD OR FORMULATED A PROGRAM FOR

18   SEXUAL OFFENDER TREATMENT FOR THAT PARTICULAR GROUP.  I

19   TAUGHT THAT GROUP FOR A YEAR AND A HALF, ALMOST A YEAR

20   AND A HALF.

21   Q    WHEN YOU SAY YOU TAUGHT THAT GROUP, WHO WERE YOU

22   TEACHING?

23   A    THESE WOULD BE INDIVIDUALS THAT FOR ONE REASON OR

24   ANOTHER WERE INCARCERATED IN THE STATE OF KANSAS, BUT

25   THEY ALSO HAVE SEX OFFENDER CONVICTIONS.

1    Q    I JUST WANT TO BACK UP FOR JUST A SECOND.  WHERE ARE

2    YOU LICENSED TO PRACTICE, DOCTOR?

3    A    I HAVE A LICENSE TO PRACTICE IN KANSAS.  I AM

4    TEMPORARILY LICENSED IN INDIANA.  AND I HAVE A LICENSE IN

5    NEW MEXICO.

6    Q    HAVE YOU DONE ANY WORK FOR FEDERAL PROBATION?

7    A    YES.

8    Q    CAN YOU TELL US ABOUT IT?

9    A    I HAVE.  YES, I CAN.  AFTER I GOT MY MASTER'S IN

10   PSYCHOLOGY AND COUNSELING, I CONTRACTED WITH THE

11   DEPARTMENT -- FEDERAL DEPARTMENT OF CORRECTIONS AND WAS

12   ONE OF THE CONTRACT INDIVIDUALS TO PROVIDE SEX OFFENDER

13   TREATMENT TO THAT REGION OF NORTHERN -- NOT NORTHERN, BUT

14   SOUTHERN NEW MEXICO.

15       AND I PUT TOGETHER A PROGRAM CALLED PASA, WHICH

16   STANDS FOR PROGRAM FOR ADULT SEX ABUSERS, SEX OFFENDERS,

17   IN WHICH I GOT THE INDIVIDUALS THAT HAD LONG TERM

18   SENTENCES, THAT HAD -- THAT WERE CONVICTED FOR SEX

19   OFFENSES, AND THEY WERE RELEASED AND I HELPED THEM

20   DEVELOP PROGRAMS OR TECHNIQUES FOR NOT RECIDIVATING.

21       I HELPED THEM LEARN HOW TO REINTEGRATE INTO THE

22   COMMUNITY ALONG WITH DOING SEX OFFENDER TREATMENT

23   PROVIDERS.

24   Q    I AM GOING TO ASK YOU MORE ABOUT SOME OF THE THINGS

25   YOU DID TO HELP PEOPLE PREPARE TO REINTEGRATE INTO

1    SOCIETY.  I WANT TO ASK YOU JUST A LITTLE BIT MORE ABOUT

2    YOUR TRAINING.

3        HAVE YOU TESTIFIED IN COURT BEFORE REGARDING A SEX

4    OFFENDER DANGEROUS MATTER SUCH AS THIS?

5    A    YES, I HAVE.

6    Q    CAN YOU TELL US WHAT STATES YOU HAVE TESTIFIED IN?

7    A    I WANT TO TO BE CLEAR ABOUT THIS BECAUSE WHEN I DID

8    MY DEPOSITION, I WAS HAVING TROUBLE ANSWERING SOME OF

9    THOSE QUESTIONS.

10       IN NEW MEXICO, I TESTIFIED TWICE CONCERNING -- THEY

11   DON'T CALL IT SEXUAL -- BEING A SEXUAL PREDATOR, BUT THEY

12   WANTED TO KNOW IF THIS PERSON WAS A SEXUAL PREDATOR.  I

13   DID THAT TWICE.

14   Q    OKAY.

15   A    AND THAT WAS BEING -- THAT WAS PART OF OUR PROGRAM.

16       ALSO, IN THE STATE OF NEW MEXICO, I TESTIFIED THREE

17   DIFFERENT TIMES WITH REGARD TO -- IN COURT WITH REGARDS

18   TO SEX OFFENSES, BUT THE COURT WAS NOT ASKING ABOUT SEX

19   OFFENSES.  THEY WERE ASKING ABOUT SOMETHING ELSE, BUT

20   THEY BROUGHT ME IN AS A COLLATERAL WITNESS.

21   Q    OKAY.

22   A    SINCE I HAVE BEEN IN NEW MEXICO -- I AM SORRY --

23   SINCE I HAVE BEEN IN KANSAS, I HAVE TESTIFIED OVER A

24   PERIOD OF TIME NOT FOR SEXUAL PREDATORS, BUT I HAVE

25   TESTIFIED FOR COMPETENCY EVALS.

1    Q    HOW MANY TIMES DO YOU THINK YOU HAVE TESTIFIED FOR

2    COMPETENCY?

3    A    THAT IS REALLY HARD TO SAY.

4    Q    WOULD YOU SAY MORE THAN TEN?

5    A    YES.  MAYBE 10 OR 20.  SOMETHING IN THAT AREA.

6    Q    SO WERE THOSE -- THE TIMES YOU TESTIFIED, WERE THOSE

7    IN STATE COURT?

8    A    IT WAS ALL IN STATE, STATE DISTRICT COURT, YES,

9    MA'AM.

10   Q    HAVE YOU EVER TESTIFIED IN FEDERAL COURT?

11   A    NO, MA'AM.  THIS IS MY FIRST TIME.  AND OBVIOUSLY I

12   AM NERVOUS.

13   Q    SO THIS WILL BE THE FIRST ADAM WALSH CASE?

14   A    THIS IS MY FIRST TESTIMONY IN THAT, YES.

15   Q    HAVE YOU BEEN INVOLVED IN ANY OTHER ADAM WALSH CASES

16   BESIDES THIS CASE?

17   A    I HAVE.  I HAVE BEEN ASKED TO WORK WITH SIX OTHER

18   INDIVIDUALS.

19   Q    SO THIS IS YOUR FIRST TIME TESTIFYING, BUT THIS IS

20   NOT YOUR FIRST ADAM WALSH CASE?

21   A    THAT'S CORRECT.

22   Q    YOU SAID LARNED STATE HOSPITAL IS IN THE STATE OF

23   KANSAS.  IS THAT THE HOSPITAL WHERE MR. HENDRICKS FROM

24   KANSAS VERSUS HENDRICKS WAS HOUSED?

25   A    YES, MA'AM.

1    Q    IS HE STILL HOUSED THERE?

2    A    HE WAS RECENTLY.  I DON'T KNOW WHERE THE MAN IS AT

3    NOW.

4              MS. ALLEN:  YOUR HONOR, AT THIS TIME I WOULD

5    LIKE TO PROFFER DR. ROY DAUM AS AN EXPERT IN THIS MATTER.

6              THE COURT:  MR. ROYSTER?

7              MR. ROYSTER:  I DO HAVE A COUPLE OF QUESTIONS.

8              THE COURT:  THAT WILL BE FINE.

9    VOIR DIRE BY MR. ROYSTER:

10   Q    DR. DAUM, YOU WERE ASKED ON DIRECT ABOUT -- OR YOU

11   INDICATED ON DIRECT YOU HAD SOME TROUBLE ANSWERING

12   QUESTIONS AT THE DEPOSITION, AND YOU INDICATED YOU HAD

13   TESTIFIED TWICE IN NEW MEXICO ABOUT SEXUAL PREDATORS.

14   THOSE WEREN'T CIVIL COMMITMENT CASES THOUGH; WERE THEY?

15   A    NO, SIR.  THAT WAS ONE OF THE THINGS WHERE YOU AND I

16   KIND OF -- I ASKED FOR CLARIFICATION, IF YOU REMEMBER.

17   NEW MEXICO DOES NOT HAVE OR DID NOT HAVE AT THAT TIME A

18   COMMITMENT.  WHAT THEY HAD IS WHAT WAS DISCUSSED EARLIER

19   HERE ABOUT THEY RELEASE AND GO INTO TREATMENT FACILITIES.

20   IN FACT, MEXICO (SIC) DOES NOT EVEN HAVE HALFWAY HOUSES.

21   THEY CONTRACT WITH A PERSON LIKE MYSELF AND THEN THAT

22   PERSON SETS UP A PROGRAM AND THEN THE RESIDENT HAS TO

23   ATTEND THE PROGRAM, AND THEN REPORT TO PROBATION

24   OFFICERS.  THAT IS WHAT I DID.

25   Q    SO YOU HAVE NEVER TESTIFIED IN STATE OR FEDERAL COURT

1    IN ANY CIVIL COMMITMENT CASE RELATING TO SEX OFFENDERS?

2    A    NO, SIR.

3    Q    IS THAT RIGHT?

4    A    THAT'S CORRECT.

5    Q    NOW, I THOUGHT I UNDERSTOOD YOU TO SAY THAT YOU ARE

6    DOING CIVIL -- YOU ARE DOING SEX OFFENDER TREATMENT ON A

7    WEEKLY BASIS FOR THOSE CIVILLY COMMITTED?

8    A    I DID, YES, SIR.

9    Q    I UNDERSTOOD YOU TO SAY THAT YOU ARE DOING THAT NOW.

10   IS THAT ACCURATE?

11   A    NO, SIR.  NO.  NOT NOW.

12   Q    YOU HAVEN'T BEEN DOING ANY SEX OFFENDER TREATMENT FOR

13   SOME TIME; IS THAT RIGHT?

14   A    NO, SIR, THAT IS NOT RIGHT.

15   Q    WHAT WAS THE LAST TIME YOU DID ANY SEX OFFENDER

16   TREATMENT?

17   A    ABOUT A YEAR OR A YEAR AND A HALF AGO.  CAN I CLARIFY

18   THAT, SIR?

19   Q    SURE.

20   A    THE INTERNSHIP WAS WITHIN THE SOTP PROGRAM.  THAT IS

21   WHERE I WORKED FOR A SOLID YEAR AS AN INTERN, AND POST

22   DOC, WHEN I MOVED TO A DIFFERENT PROGRAM, I PROVIDED SEX

23   OFFENDER TREATMENT TO RESIDENT DOC INDIVIDUALS.

24   Q    HOW MANY PEOPLE ARE HOUSED OR CIVILLY COMMITTED IN

25   KANSAS AS SEXUALLY VIOLENT PREDATORS?

1    A   WE ARE AVERAGING ABOUT 18 A YEAR.  WE ARE UP TO 214

2    AT THIS TIME.

3    Q   DO YOU WORK WITH ANY OF THOSE INDIVIDUALS?

4    A   NOT AT THIS TIME, NO, SIR.

5    Q   HAVE YOU EVER DONE ANY FORENSIC EVALUATIONS WITH

6    RESPECT TO ANY OF THOSE INDIVIDUALS?

7    A   YES, SIR.

8    Q   WHAT ABOUT ARE RESPECT TO WHETHER THEY ARE SEXUALLY

9    DANGEROUS?

10   A   IN KANSAS, THAT WOULD BE CIVILLY COMMITTED, AND NO,

11   SIR, I HAVE NOT.

12   Q   SO YOU HAVEN'T DONE ANY FORENSIC EVALUATIONS ON

13   SEXUAL DANGEROUSNESS FOR ANY OF THE 214 THAT ARE AT THE

14   FACILITY WHERE YOU ARE LOCATED?

15   A   NO, SIR, THEY ALREADY HAVE THAT.

16          MR. ROYSTER:  YOUR HONOR, AT THIS TIME WE

17   OBJECT TO THE QUALIFICATIONS OF DR. DAUM TO TESTIFY IN

18   THIS PROCEEDING AS A FORENSIC PSYCHOLOGIST WITH RESPECT

19   TO SEXUAL DANGEROUSNESS.

20          THE COURT:  IS HE BEING PROFFERED AS AN EXPERT

21   IN FORENSIC PSYCHOLOGY?

22          MS. ALLEN:  YES, HE IS, YOUR HONOR.

23          THE COURT:  WHAT IS THE BASIS FOR THE

24   GOVERNMENT'S POSITION, MR. ROYSTER?

25          MR. ROYSTER:  THAT THEY HAVE NOT ESTABLISHED

1      THAT HE ACTUALLY DOES FORENSIC EVALUATIONS WITH RESPECT

2      TO DETERMINING SEXUAL DANGEROUSNESS.

3                  THE COURT:  WELL, THAT IS NOT A REQUIREMENT TO

4      RECOGNIZE HIM AS AN EXPERT IN THE FIELD; IS IT?

5                  MR. ROYSTER:  CERTAINLY WITH RESPECT TO WHAT

6      THE ISSUES THAT HE IS GOING TO BE ASKED TO OPINE ON.

7                  THE COURT:  CAN HE NOT BE QUALIFIED BY

8      TRAINING?

9                  MR. ROYSTER:  HE CAN, BUT I AM NOT CERTAIN

10     THAT THEY HAVE ESTABLISHED THAT EITHER.  ON THE ISSUE

11     OF -- AGAIN, I UNDERSTAND THAT HE CAN BE TENDERED TO THE

12     COURT AS A FORENSIC EVALUATOR, BUT HE IS GOING TO BE

13     ASKED TO GIVE OPINIONS ABOUT WHETHER SOMEONE IS SEXUALLY

14     DANGEROUS, AND I AM FAIRLY CERTAIN I HAVEN'T HEARD THAT

15     HE HAS EVER DONE THAT.  EVER.

16                 THE COURT:  SO --

17                 MR. ROYSTER:  OR BEEN TRAINED TO DO IT.  I AM

18     SORRY TO INTERRUPT THE COURT.

19                 THE COURT:  MS. ALLEN, WHAT IS YOUR VIEW ON

20     THAT?  DOES DR. DAUM HAVE TRAINING OR EXPERIENCE THAT IS

21     RELEVANT TO RENDERING AN OPINION?

22                 THE WITNESS:  I DISAGREE WITH THAT, YOUR

23     HONOR.

24                 THE COURT:  SIR, YOU MAY NOT SPEAK AT THIS

25     TIME.  YOU MAY ANSWER QUESTIONS, BUT OTHERWISE, SIR, YOU

1    ARE NOT PERMITTED.

2              MS. ALLEN.

3              MS. ALLEN:  YOUR HONOR, I TOTALLY DISAGREE

4    WITH THE GOVERNMENT'S POSITION.  HE IS MORE THAN

5    QUALIFIED.  HE TESTIFIED THAT HE HAD PROVIDED SEX

6    OFFENDER TREATMENT FOR SEVERAL YEARS.  HE HAS ALSO WORKED

7    IN THAT HOSPITAL WHERE THEY DO -- THEY DO SEX OFFENDER

8    TREATMENT.  HE WORKED WITH THE NEW MEXICO GOVERNMENT

9    PROVIDING COUNSELING AND THERAPY TO SEX OFFENDERS.

10             HE WORKS IN A HOSPITAL WHERE EVERYONE THAT IS

11   HOUSED THERE IN A PARTICULAR UNIT HAS BEEN CIVILLY

12   COMMITTED BECAUSE THEY HAVE BEEN DETERMINED TO BE

13   SEXUALLY DANGEROUS.

14             I THINK IF WE CAN GO THROUGH SOME MORE OF HIS

15   TESTIMONY, I COULD ALSO ASK HIM ABOUT WHAT HIS EXPERIENCE

16   IS WITH COMPLETING ACTUARIALS AND DOING FORENSIC

17   EVALUATIONS AS WELL.  HE HAS DONE THEM IN THE PAST.  AND

18   HE IS CURRENTLY WORKING ON CASES, 4248 CASES AS WELL.  HE

19   DOES HAVE THE FORENSIC EXPERTISE TO GO FORWARD.

20             THE COURT:  I WOULD BE INTERESTED IN HEARING

21   MORE ABOUT THAT.

22   CONTINUED DIRECT EXAMINATION BY MS. ALLEN:

23   Q   DR. DAUM, IF YOU COULD TELL US A LITTLE BIT MORE

24   ABOUT YOUR TRAINING IN FORENSICS.  WHEN DID YOU GET

25   INVOLVED WITH SEX OFFENDERS?

1    A    IN NEW MEXICO.

2    Q    HOW DID YOU GET INVOLVED WITH THEM IN NEW MEXICO?

3    A    I STARTED WORKING WITH A PSYCHOLOGIST WHO HAD A

4    PROGRAM FOR A DRUG AND ALCOHOL TREATMENT, AND IN THAT

5    PROCESS, THE PROBATION OFFICE APPROACHED US ABOUT THE

6    NEED FOR SEX OFFENDER TREATMENT PROVIDER.

7         BASED UPON MY TRAINING, I APPLIED FOR THAT CONTRACT,

8    AND THEN I WENT FOR TRAINING WITH THE BOP UP IN

9    ALBUQUERQUE.  AFTER THE TRAINING, I ESTABLISHED THE

10   PROGRAM, AND IT WAS VERY SUCCESSFUL OVER A PERIOD OF

11   TIME.

12        WHEN I WENT BACK AND GOT MY DOCTORATE, I LEFT THAT

13   PROGRAM AND WENT TO LARNED, AND I SPECIFICALLY CHOSE

14   LARNED BECAUSE OF THE TRAINING AVAILABLE.  WHAT KANSAS

15   REQUIRES IS THEY REQUIRE -- THEY REQUIRE, IN A SEXUAL

16   PREDATOR PROGRAM, YEARLY UPDATES, WHICH MEANS THAT YOU

17   HAVE TO BE ABLE TO DETERMINE THE DANGEROUSNESS OF THAT

18   PERSON.

19        SO I HAVE EXPERIENCE WITH THAT.  I HAVE NOT AUTHORED

20   A REPORT WITH THAT, BECAUSE THAT IS A GROUP DECISION

21   WHERE THE MAJORITY OF THE PEOPLE COME TOGETHER TO

22   FORMULATE THE OPINION AND THE SUPERVISING PSYCHOLOGIST

23   SIGNS OFF ON THE REPORT.  I HAVE EXPERIENCE WITH THAT.

24        WHEN I WENT BACK ACROSS THE STREET TO DO MY POST

25   DOC, I FOUND A GROUP OF PSYCHOLOGISTS THAT I WORK WITH,

1    THAT WE MEET EVERY TUESDAY, AND WE GO THROUGH THE ITEMS

2    OF FORENSIC EVALUATION.

3        I HAVE BEEN TRAINED AND ALLOWED TO TRAIN, GOING TO

4    WORKSHOPS AND FORENSIC EVALUATION WORKSHOPS.  I AM A

5    MEMBER OF ATSA, AND I FEEL I AM VERY QUALIFIED TO DO THIS

6    WORK.

7            THE COURT:  DR. DAUM, HOW MANY OF THESE

8    UPDATES THAT YOU REFERENCED WHERE THE TEAM ULTIMATELY

9    AUTHORS THE REPORT, HOW MANY OF THOSE HAVE YOU DONE OR

10   BEEN INVOLVED IN?

11           THE WITNESS:  WITHIN THAT YEAR, THERE WERE

12   185, I BELIEVE, DURING THAT YEAR.  EVERY ONE OF THOSE

13   PEOPLE HAD TO HAVE A PLAN, A TREATMENT PLAN.  THEY ALSO

14   HAD TO HAVE A REPORT TO COURT.  I WAS INVOLVED IN ABOUT A

15   THIRD OF THOSE.  THERE WERE THREE OF US, AND THE

16   SUPERVISING PSYCHOLOGIST DIVIDED US UP, AND WE WORKED ON

17   EACH OF THOSE PLANS.

18           THE COURT:  SO THAT WOULD BE ABOUT 60 THAT YOU

19   WERE DIRECTLY INVOLVED IN?

20           THE WITNESS:  YES, SIR.

21           THE COURT:  AND I GATHER -- WERE THE ISSUES IN

22   THOSE CASES, WERE THEY AT LEAST PART OF THE EVALUATION,

23   DID IT CONCERN SEXUAL DANGEROUSNESS DEALING WITH THE RISK

24   OF REOFFENSE, VOLITIONAL CONTROL, THOSE TYPE OF ISSUES?

25           THE WITNESS:  KANSAS WAS THE FIRST STATE OR IT

1    WAS AMONG THE FIRST STATES THAT PUT IN CIVIL COMMITMENT

2    OR HAD CIVIL COMMITMENT LAWS.  WE FEEL LIKE THAT THOSE OF

3    US THAT DO THAT WORK AND WORK WITH A PARTICULAR CIVIL

4    COMMITMENT PEOPLE, THAT WE ARE WELL TRAINED WITH THAT

5    BECAUSE WE ARE AT THE FOREFRONT IN THE COURTS, BUT NEVER

6    IN A DISTRICT COURT.  THIS IS ALWAYS -- NEVER IN A

7    FEDERAL COURT.  THIS IS ALWAYS DISTRICT, BUT WE FIND THAT

8    WE HAVE PEOPLE FROM ALL OVER THE COUNTRY COMING TO US TO

9    LOOK AT OUR PROGRAM, EMULATE THAT, ESPECIALLY AMONG THE

10   FORENSIC PEOPLE AS EVIDENCED BY SOME OF THE ARGUMENTS

11   THAT WE GET INTO WHEN WE MEET.

12            THE COURT:  SO THE CIVIL, IF I AM

13   UNDERSTANDING YOU CORRECTLY, THE CIVIL COMMITMENT

14   STANDARD THAT YOU ARE USED TO DEALING WITH IN KANSAS IS

15   SIMILAR TO THE FEDERAL STANDARD UNDER THE ADAM WALSH ACT?

16            THE WITNESS:  EXCEPT FOR THE VOCABULARY, I

17   DON'T SEE ANY DIFFERENCE AT ALL, YOUR HONOR.

18            THE COURT:  MS. ALLEN.

19   Q    DR. DAUM, IF YOU COULD TALK A LITTLE BIT, YOU SAID

20   YOU DON'T PROVIDE TREATMENT ANY MORE, BUT YOU HAVE BEEN

21   INVOLVED WITH THE WEEKLY MEETINGS WHERE YOU REVIEW

22   FORENSIC, I THINK YOU SAID, FORENSIC EVALUATIONS?

23   A    THAT IS TRUE.

24   Q    CAN YOU TELL US ABOUT THAT, PLEASE?

25   A    I CAN.  THERE ARE NINE OF US IN THAT PARTICULAR UNIT.

1    WE MEET EVERY TUESDAY FROM 1:00 TO 2:00.  EVERY OTHER

2    WEEK WE TALK ABOUT SEXUAL PREDATOR EVALUATIONS AND HOW

3    THAT IS DONE.

4        WE AGREE UPON WHAT TESTS WE ARE GOING TO USE.  WE

5    AGREE UPON HOW WE DO INTERROGATORIES.  WE BEGIN TO TALK

6    ABOUT HOW WE WORK WITH COURTS, HOW THE COURTS FEED BACK

7    TO US ABOUT THE QUALITY OF THE REPORTS.  WE DEBRIEF ON

8    THAT.

9        I DON'T DO THAT TREATMENT AGAIN BECAUSE I AM

10   COMPLETELY WORKING TOTALLY WITH FORENSIC REPORTS.  I WILL

11   MEET EACH OF THE PEOPLE IN KANSAS THAT COMES INTO OUR

12   DEPARTMENT.  I DO AN HOUR, HOUR AND A HALF OF ADMISSION

13   PROCESS WITH THEM.  WE ASCERTAIN THE DEGREE OF

14   SERIOUSNESS OF THE DANGEROUSNESS OF THAT PERSON AND

15   PERHAPS WE HAVE A TOTAL OF, A WEEK, WE'LL HAVE SIX TO

16   EIGHT ADMISSIONS, PROBABLY TWO TO THREE OR FOUR OF THOSE

17   WILL BE FOR SEX PREDS.

18       WE WILL ALSO HAVE A NUMBER OF THOSE THAT WILL HAVE

19   SEX OFFENSES.  SO WE DO ASSESS THE SEXUAL DANGEROUSNESS

20   OF AN INDIVIDUAL WHEN HE COMES ON TO THE UNIT.

21   Q    DO YOU HAVE EXPERIENCE WITH ACTUARIALS?

22   A    YES.

23   Q    AND HAVE YOU BEEN TRAINED TO COMPLETE ACTUARIALS?

24   A    YES.

25   Q    TELL ME ABOUT YOUR TRAINING WITH THAT?

1    A   WE DISCUSS IN THAT MEETING BASE RATES, PROBLEMS WITH

2    MNSOST, THE NEED TO GO FROM A STATIC-99 TO STATIC-99R,

3    FROM 2000 TO 2000R, WHY WE DO THAT, WHAT TO LOOK FOR AS

4    FAR AS MAKING CLINICAL JUDGMENTS WITH RELATION TO THAT.

5    WE ARE WELL VERSED ON THE VARIOUS INSTRUMENTS TO USE AND

6    WHEN TO USE THOSE INSTRUMENTS.  AGAIN, ALL AT THE

7    DISTRICT LEVEL.  NEVER ON THE FEDERAL LEVEL.

8              MS. ALLEN:  THANK YOU.  AGAIN, YOUR HONOR, WE

9    WOULD OFFER DR. DAUM AS AN EXPERT IN THIS MATTER.

10             THE COURT:  MR. ROYSTER ANYTHING FURTHER?

11             MR. ROYSTER:  I DO HAVE ONE QUESTION.

12             THE COURT:  YES, SIR.

13             MR. ROYSTER:  AND THEN I WOULD GO AHEAD AND

14   LET THE COURT KNOW I AM GOING TO GO AHEAD AND RENEW MY

15   OBJECTION.

16   FURTHER VOIR DIRE BY MR. ROYSTER:

17   Q   DR. DAUM, I ASKED YOU AT YOUR DEPOSITION HOW MUCH OF

18   YOUR PRACTICE FOR THE FORENSIC -- OF THE FORENSIC

19   PSYCHOLOGY INVOLVES VALUATION OF SEX OFFENDERS.  DO YOU

20   REMEMBER WHAT YOU SAID?

21   A   THE EVALUATION OF SEX OFFENDERS, RIGHT.

22   Q   HOW MUCH OF YOUR PRACTICE FOR THE FORENSIC PSYCHOLOGY

23   INVOLVES EVALUATIONS OF SEX OFFENDERS?

24   A   I DON'T REMEMBER WHAT -- HOW I ANSWERED THAT.

25   WOULD YOU ASK ME THAT AGAIN, BUT ASK IT IN A DIFFERENT

1    WAY.  ARE YOU ASKING ME FOR COMMITMENT?  ARE YOU ASKING

2    ME FOR HOW TO DETERMINE IF A PERSON HAS A SEX OFFENSE.  I

3    AM NOT SURE OR CLEAR ON YOUR QUESTION.

4    Q    I ASKED YOU AT YOUR DEPOSITION HOW MUCH OF YOUR

5    PRACTICE FOR THE FORENSIC PSYCHOLOGY INVOLVES EVALUATIONS

6    OF SEX OFFENDERS, AND YOU ANSWERED, I DON'T DO THAT.

7    THERE ARE OTHERS ASSIGNED TO THAT.

8    A    THAT IS TRUE.  YOU ARE ASKING ABOUT COMMITMENT, YES.

9    I DO NOT DO COMMITMENT IN THE STATE OF KANSAS.  OTHER

10   PSYCHOLOGISTS HAVE THAT PARTICULAR POSITION.

11            MR. ROYSTER:  JUDGE, WE RENEW OUR OBJECTION.

12   I HAVE HEARD HIM TALK ABOUT TREATMENT, AND I UNDERSTAND

13   THAT KANSAS HAS A CIVIL COMMITMENT PROGRAM AND I

14   UNDERSTAND THAT IT SOUNDS LIKE OCCASIONALLY HE

15   PARTICIPATES IN MEETINGS WHERE THERE ARE DISCUSSIONS, AND

16   I UNDERSTAND HE IS BEING TENDERED AS AN EXPERT IN

17   FORENSIC PSYCHOLOGY, BUT HE IS GOING TO BE ASKED TO OPINE

18   ON A PERSON'S SEXUAL DANGEROUSNESS AND I DO NOT THINK

19   THAT HE HAS BEEN QUALIFIED TO RENDER AN OPINION AS TO

20   THAT ISSUE AT THIS TIME.

21            THE COURT:  WELL, I UNDERSTOOD HIS TESTIMONY

22   TO BE THAT HE HAS HELD AT LEAST 60 CASES DURING THAT ONE

23   YEAR PERIOD HE SPOKE ABOUT WHEN HE WAS PART OF THIS GROUP

24   THAT MADE THOSE ASSESSMENTS, THAT HE WAS, IN FACT,

25   INVOLVED IN MAKING PRECISELY THOSE DANGEROUSNESS

1    ASSESSMENTS IN 60 CASES.

2              MR. ROYSTER:  I UNDERSTOOD THAT HE SAID THAT

3    WAS PART OF DEVELOPING TREATMENT PLANS, NOT THAT IT WAS A

4    FORENSIC EVALUATION.  PERHAPS SOME CLARITY.  MAYBE I

5    MISUNDERSTOOD.

6              THE COURT:  LET'S SEE WHAT MS. ALLEN HAS TO

7    SAY ABOUT IT.

8              MS. ALLEN:  YOUR HONOR, I BELIEVE HIS

9    TESTIMONY IS THERE HAS BEEN A TIME WHEN HE HAS DONE

10   FORENSIC EVALUATIONS AND NOW THERE IS A TIME WHEN HE DOES

11   SOMETHING ELSE, THAT HE HAS A DIFFERENT ROLE AT THE

12   HOSPITAL, BUT THAT HE HAS PERFORMED EVALUATIONS OF THAT

13   KIND IN THE PAST.

14             HE ALSO TESTIFIED THAT HE DOES ACTUARIALS.  HE

15   DOES ALL OF THE FORENSIC CONSIDERATIONS THAT DR. PHENIX

16   AND DR. GUTIERREZ HAVE TESTIFIED TO HERE TODAY, AND HE

17   DOES NOT HAVE TO BE AN OFFICIAL FORENSIC EVALUATOR TO

18   QUALIFY AS AN EXPERT TO TESTIFY IN THIS CASE ABOUT SEXUAL

19   DANGEROUSNESS.  THAT IS NOT A REQUIREMENT.

20             THE COURT:  WELL, I AM CERTAINLY GOING TO

21   ALLOW DR. DAUM TO TESTIFY.  I GUESS, OUT OF AN ABUNDANCE

22   OF CAUTION, I WILL RESERVE THE ISSUE ON WHETHER TO

23   RECOGNIZE HIM, ALTHOUGH I DO NOT FIND AT THIS TIME

24   PARTICULARLY PERSUASIVE THE GOVERNMENT'S ARGUMENTS

25   BECAUSE THE STANDARD THAT IS BY EVIDENCE RULE 702,

1    I THINK THE STANDARD THE GOVERNMENT IS HOLDING DR. DAUM

2    TO, ASSUMING IT'S FACTUALLY BASED, AND I AM NOT CONVINCED

3    NECESSARILY THAT IT IS, IS -- DOES NOT ACCURATELY REFLECT

4    THE STANDARD UNDER 702 BECAUSE I MEAN IT EXPRESSLY

5    PROVIDES THAT A WITNESS MAY QUALIFY IN ANY NUMBER OF

6    WAYS, BY KNOWLEDGE, SKILL, EXPERIENCE, TRAINING OR

7    EDUCATION, AND ON THE FACE OF HIS CV, IT'S CLEAR THAT HE

8    HAS HAD -- THAT HE HAS HAD EDUCATION AND THEN THERE ARE

9    MULTIPLE WORKSHOPS AND PROGRAMS DEALING WITH FORENSIC

10   PSYCHOLOGY.  HE HAS EXPERIENCE THAT -- IF IT'S NOT

11   PRECISELY THIS CURRENT SETTING THAT WE ARE DEALING WITH,

12   IF THAT IS TRUE, IT CERTAINLY IS IN AN AREA THAT IS VERY

13   VERY CLOSELY RELATED.

14          I WILL RESERVE RULING, BUT I DO HAVE AND AM

15   VERY MUCH SKEPTICAL OF THE GOVERNMENT'S POSITION.  I WILL

16   ALLOW HIM TO TESTIFY ON THAT BASIS, AS AN EXPERT IN THE

17   FIELD OF FORENSIC PSYCHOLOGY.

18          MS. ALLEN:  THANK YOU, YOUR HONOR.

19   CONTINUED DIRECT EXAMINATION BY MS. ALLEN:

20   Q   DR. DAUM, YOU TESTIFIED THAT -- YOU TALKED ABOUT A

21   PROGRAM CALLED PASA?

22   A   PASA.

23   Q   CAN YOU TELL ME WHAT THAT IS?

24   A   THAT IS THE PROGRAM THAT I DEVELOPED FOR THE BUREAU

25   OF PRISONS FOR SEX OFFENDERS THAT WERE RELEASED AFTER

1    SERVING THEIR TIME TO PROVIDE SEX OFFENDER TREATMENT TO

2    THOSE PARTICULAR INDIVIDUALS.  ALONG WITH THAT, I DID

3    ALSO -- I THINK IT'S CALLED PRESENTENCE.  THESE WOULD BE

4    INDIVIDUALS WHO WERE GETTING READY TO BE SENTENCED, BUT

5    THEY WANTED TO KNOW MORE ABOUT THEM SO THEY ATTENDED

6    THERAPY CLASSES.

7         I ALSO, WITH THE SAME GROUP, HAD STATE PEOPLE THAT

8    WERE PEOPLE COMING OUT OF STATE PRISONS, ALSO

9    PARTICIPATING IN THAT.  ALONG WITH THAT, WE HAD FAMILY

10   REUNIFICATION WHERE WE DEVELOPED PROGRAMS FOR THE FAMILY

11   TO MEET AND REUNIFY WITH THEM.

12        WE DEVELOPED A PROGRAM WE CALLED THE CHAPERONE

13   PROGRAM IN WHICH WE FOUND PEOPLE THAT WOULD BE A

14   CHAPERONE TO A PARTICULAR SEXUAL OFFENDER, AND THAT

15   PROVIDED SECURITY FOR BOTH THE PUBLIC AS WELL AS FOR THE

16   OFFENDER.

17        THEN OVER A PERIOD OF TIME, WE REQUIRED THAT THEY

18   WORK IN GROUPS.  WE ALSO REQUIRED THAT THEY DO INDIVIDUAL

19   TREATMENT.  AND THEN WE ADVISED THE PROBATION OFFICERS

20   AND PAROLE OFFICERS TO COME IN AND SET WITH US AT THAT

21   SAME TIME AND MEET THESE PARTICULAR INDIVIDUALS AND SEE

22   WHAT IS GOING ON WITH THE CURRICULUM.

23        THE CURRICULUM IS MANDATED BY THE BOP.  YOU HAVE TO

24   MEET CERTAIN SPECIFICITIES AS FAR AS THE PROGRAM IS

25   CONCERNED.  AND THEN THEY REQUIRE WRITTEN REPORTS OVER A

1    PERIOD OF TIME CALLED M-PSYCHOLOGICAL EVALUATIONS ON A

2    PARTICULAR INDIVIDUAL AS HE GOES THROUGH THE TREATMENT

3    PROGRAM.

4    Q    HOW LONG DID YOU RUN THAT PROGRAM?

5    A    I BELIEVE THREE YEARS.

6    Q    HOW MANY PEOPLE -- DO YOU HAVE AN IDEA OF HOW MANY

7    PEOPLE YOU TREATED IN THE PROGRAM OR YOU PROVIDED

8    SERVICES TO?

9    A    WE STARTED WITH FIVE, AND I BELIEVE WE GOT UP TO 13

10   OR 14 FROM THE BOP; FOUR OR FIVE FROM THE STATE, AND THEN

11   TWO OR THREE FROM THE LOCAL COUNTY THAT WAS THERE.

12        FROM TIME TO TIME ONE WOULD BE ADDED, ONE WOULD

13   LEAVE THE PROGRAM, EXIT, BECAUSE THEY MOVED OR HAD GONE

14   BACK, BUT IT WAS A GROUP OF ABOUT 15 OR 20 OVER A PERIOD

15   OF TIME.

16   Q    WAS THAT PROGRAM SUCCESSFUL?

17   A    I HAVE NO REASON TO BELIEVE THAT IT WASN'T.  NONE OF

18   THE PEOPLE THAT WE HAD IN THE PROGRAM WAS ARRESTED OR

19   RECIDIVATED.

20   Q    AND THAT WAS OVER A THREE YEAR PERIOD?

21   A    YES.  THAT WAS OVER A THREE YEAR PERIOD.

22   Q    NOW, AT THE REQUEST OF THE COURT, DID YOU EXAMINE MR.

23   ANTONE?

24   A    I DID.

25   Q    AND WHEN DID YOU EXAMINE HIM?

1    A    I DATED MY REPORT MARCH 1, 2011.

2    Q    WHERE DID YOU EXAMINE HIM?

3    A    I EXAMINED HIM AT BUTNER.

4    Q    HOW LONG DID YOUR EXAMINATION TAKE?

5    A    I WAS WITH HIM FOR FIVE HOURS.

6    Q    AND TELL US ABOUT HOW YOU PERFORMED YOUR EVALUATION?

7    A    I WANTED TO KNOW FIRST HIS MENTAL STATE, HOW HE WAS.

8    AND I GAVE -- I USED A MNSE MENTAL STATE EXAM TO SEE HOW

9    HE WAS AS FAR AS MENTAL WISE.

10   Q    NOW, IS THAT AN EXAM THAT HE TAKES HIMSELF, OR IS

11   THAT SOMETHING THAT YOU ORALLY GIVE TO HIM AND THEN YOU

12   SCORE IT YOURSELF?

13   A    YOU ORALLY GIVE IT TO HIM AND SCORE IT YOURSELF.

14   Q    HOW DID THAT TEST GO?

15   A    I AM SORRY?

16   Q    CAN YOU TELL US WHAT RESULTS YOU GOT FROM THAT TEST?

17   A    CERTAINLY.  HE SCORED 27 OUT OF A POSSIBLE 30 POINTS,

18   AND YOU ARE LOOKING FOR A COGNITIVE DYSFUNCTION, AND HE

19   IS TELLING YOU WITH A SCORE OF THAT THAT HE HAS A GOOD

20   CONNECTION TO REALITY AT THE TIME THAT YOU ARE

21   INTERVIEWING HIM.

22   Q    SO THIS TEST IS CALLED THE -- THIS IS THE MNSE?

23   A    THAT'S CORRECT.

24   Q    AND WHAT WAS IT DESIGNED TO DETERMINE?

25   A    IT'S DESIGNED TO DETERMINE IF THERE IS THE PRESENCE

1   OF ANY GROSS COGNITIVE DYSFUNCTION.

2   Q   WHY DID YOU PERFORM THAT TEST?

3   A   WELL, FOR ME, WHEN I WANT TO KNOW THE STATE OF MIND

4   OF THE CLIENT I AM WORKING WITH.  I WANT TO KNOW IF HE IS

5   MENTALLY RETARDED.  I WANT TO KNOW IF HE IS PSYCHOTIC.  I

6   WANT TO KNOW WHERE HE STANDS OVER A SERIES OF QUESTIONS.

7   I WANT TO CHECK HIS REMOTE MEMORY, HIS LONG TERM AND

8   SHORT TERM MEMORY, AND YOU DO THAT THROUGH A SERIES OF 30

9   QUESTIONS.

10  Q   DID THE RESULTS OF THAT TEST RAISE ANY CONCERNS IN

11  YOUR MIND ABOUT MR. ANTONE?

12  A   NO, MA'AM.  IT SIMPLY TOLD ME THAT HE WAS ABLE TO

13  CONVERSE AND THAT THERE WERE NO GROSS COGNITIVE

14  DEFICIENCIES THERE.

15  Q   AND WHAT OTHER TEST DID YOU PERFORM?

16  A   I PERFORMED THE NAVACO ANGER SCALE AND PROVOCATION

17  INVENTORY, THE NAVACO.

18  Q   NOW, WHAT IS THE NAVACO DESIGNED TO DO?

19  A   IT'S A TWO-PART TEST DESIGNED TO ASSESS ANGER AND HOW

20  ANGER PLAYS INTO HIS PSYCHOLOGICAL FUNCTIONING AND THEN

21  BEGIN TO LOOK AND SEE HOW HE -- NOT ONLY THE STATE OF

22  ANGER, BUT HOW HE HANDLES CERTAIN PROVOCATIVE SITUATIONS.

23  Q   AND HOW IS THAT TEST GIVEN?

24  A   THAT IS A SELF-ADMINISTERED PENCIL, PAPER TEST OVER A

25  SERIES OF QUESTIONS.  IT HAS A LIKERT SCALE GIVING YOU

1    THREE AND FOUR DIFFERENT POSSIBILITIES.

2    Q    DID YOU HAVE A SCORE SHEET ASSOCIATED WITH THAT TEST?

3    A    YES.

4    Q    CAN I ASK YOU TO TURN TO WHAT HAS BEEN LABELED

5    RESPONDENT'S EXHIBIT -- IT'S ACTUALLY A DEPOSITION

6    EXHIBIT NUMBER 4.

7              MS. ALLEN:  I AM SORRY, YOUR HONOR.  I THINK I

8    MIGHT NEED TO REFERENCE A DIFFERENT NUMBER.  I AM TRYING

9    TO FIGURE THAT OUT NOW.

10   Q    I HAVE PLACED ON THE ELMO WHAT HAS BEEN MARKED

11   DEPOSITION EXHIBIT NUMBER 4.  DR, DAUM WOULD LOOKING AT

12   YOUR SCORE SHEET HELP YOU TO ILLUSTRATE YOUR TESTIMONY

13   HERE TODAY?

14   A    YES, MA'AM.

15   Q    DO YOU RECOGNIZE WHAT IS ON THE MONITOR?

16   A    I DO.

17   Q    WHAT IS THAT?

18   A    THAT IS THE RESULT OF THE NAVACO.  IF YOU LOOK AT THE

19   BOTTOM, IT IS GIVING YOU THE RAW SCORE AND THEN IT'S --

20   THE RAW SCORE IS CONVERTED INTO T-SCORES, AND OVER THE

21   T-SCORES MEANS IT WILL DESIGNATE CATEGORIES FOR THE

22   VARIOUS AREAS OF ANGER.

23        HIS OVERALL SCORE OF 48 T-SCORE PUT HIM IN AN

24   AVERAGE CATEGORY AS FAR AS THE HOW HE CARRIES ANGER WHICH

25   WOULD INDICATE THAT HE EXPERIENCES ANGER JUST ABOUT THE

1    SAME WAY THAT OTHER PEOPLE DO.

2         IF YOU LOOK AT THE COGNITIVE PART, IT SHOWS A

3    T-SCORE OF 48 WHICH PUTS HIM IN AN AVERAGE CATEGORY OF

4    HOW HE THINKS ABOUT ANGER, HOW HE PROCESSES SITUATIONS IN

5    WHICH ANGER WOULD BE EXPRESSED.

6         IF YOU LOOK AT THE REGULATION OR REGULATORY COLUMN,

7    YOU WILL SEE THAT THAT SCORE, THAT T-SCORE IS HIGH OF 61,

8    AND THAT IS INDICATING THAT HE HAS ACQUIRED THOSE SKILLS

9    TO PROCESS HIS ANGER IN AN APPROPRIATE MANNER.

10   Q   NOW, HOW DID YOU ARRIVE AT THESE SCORES?

11   A   THE SCORES ARE TAKEN AND THEY COME OFF OF A SHEET

12   LIKE THAT, YES.

13   Q   I HAVE TURNED TO PAGE 2 WHICH IS NOW DISPLAYED ON THE

14   MONITOR.

15   A   THAT IS THE TEST ITSELF.  THAT IS THE PROTOCOL

16   ITSELF.

17   Q   WITHOUT GOING ON EACH LINE ITEM, CAN YOU GIVE ME ONE

18   OR TWO SAMPLES OF WHAT KIND OF QUESTIONS MR. ANTONE WAS

19   ASKED TO RESPOND TO?

20   A   SURE.  THE KINDS OF QUESTIONS WOULD BE WHEN SOMETHING

21   IS WRONG THAT IS DONE TO ME, I AM GOING TO GET ANGRY, AND

22   I HAVE A CHOICE OF NEVER, TRUE, SOMETIMES TRUE, OR ALWAYS

23   TRUE.

24        OR A QUESTION LIKE WHEN I HAVE A CONFLICT WITH

25   SOMEONE, I SPEAK TO THAT PERSON ABOUT THE PROBLEM.  AND

1    AGAIN, THAT IS NEVER TRUE, SOMETIMES TRUE, OR ALWAYS

2    TRUE.

3        AND THEN THE SECOND PART OF THAT IS HE IS GIVEN

4    SITUATIONS AND ASKED TO ASSESS TO WHAT DEGREE OF ANGER HE

5    NORMALLY FEELS, NORMALLY EXPERIENCES.  AND FOR INSTANCE,

6    YOU MAKE PLANS TO DO SO SOMETHING WITH A PERSON WHO BACKS

7    OUT AT THE LAST MINUTE.  DOES THAT MAKE YOU NOT AT ALL

8    ANGRY, A LITTLE ANGRY, FAIRLY ANGRY OR VERY ANGRY.

9        OR BEING CRITICIZED IN FRONT OF OTHER PEOPLE FOR

10   SOMETHING THAT YOU HAVE DONE.  NOT AT ALL ANGRY, A LITTLE

11   ANGRY, FAIRLY ANGRY, OR VERY ANGRY.  THOSE ARE THE SAMPLE

12   QUESTIONS.

13   Q   THE RESULTS OF THE TEST, YOU COMMENTED -- YOU

14   TESTIFIED WHILE WE LOOKED AT THE SCORING SHEET THAT THE

15   SCORES WERE AVERAGE?

16   A   YES.

17   Q   AND I SEE AN "A", "B" -- I BELIEVE IS THAT "A, B, C"

18   OR "A,B, G" BELOW EACH ONE?

19   A   THAT IS "A, B, E" OR "A, B, M" FOR AVERAGE.

20   Q   SO, WHAT IS YOUR OPINION WITH REGARD TO HOW MR.

21   ANTONE HANDLES ANGER BASED UPON THIS TEST?

22   A   HOW HE SHOWED HIMSELF IS HE HANDLES ANGER

23   APPROPRIATELY.

24   Q   NOW, WOULD SOMEONE WITH AN ANGER MANAGEMENT PROBLEM

25   HAVE SCORED DIFFERENTLY?

1    A    MOST OF THE TIME, YES.

2    Q    WHAT OTHER TESTS DID YOU PERFORM WHEN YOU EVALUATED

3    MR. ANTONE?

4    A    I --

5    Q    DID YOU PERFORM THE MNSOST?

6    A    I PERFORMED THE MNSOST.

7    Q    WHAT WAS YOUR SCORE ON THE MNSOST FOR MR. ANTONE?

8    A    11.

9    Q    DO YOU RECALL WHAT DR. PHENIX'S SCORE WAS ON THE

10   MNSOST FOR MR. ANTONE?

11   A    13, AND THEN COMING DOWN.

12   Q    WOULD YOU SAY THERE WAS ANY APPRECIABLE DIFFERENCE

13   BETWEEN YOUR SCORING AND HER SCORING ON THE MNSOST?

14   A    NO, BECAUSE AS I LISTENED TO THE CLARIFICATION OF

15   SOME OF THE INFORMATION I WAS GIVEN, THAT CHANGED SOME

16   SCORES.

17       IF YOU WILL NOTICE ON MY REPORT, I AM SHOWING A 4 ON

18   THE WRITTEN, BUT THE DOCUMENTATION I SUBMITTED SHOWED A

19   13, I BELIEVE.

20   Q    SO THAT WAS A TYPO THEN?

21   A    YES.  THAT WAS A TYPO.

22            MS. ALLEN:  YOUR HONOR, I WANTED TO DIRECT YOU

23   TO PAGE 7 OF DR. DAUM'S REPORT WHICH IS EXHIBIT NUMBER --

24   RESPONDENT'S EXHIBIT NUMBER 1.

25   Q    JUST TO CLARIFY, YOUR OFFICIAL SCORE ON THE MNSOST

1    WAS, IN FACT, AN 11, AND NOT A 4, AND WHAT WE SEE IN THE

2    REPORT IS A TYPO; IS THAT RIGHT?

3    A    THAT'S CORRECT.

4    Q    SO IS IT YOUR OPINION THAT YOUR SCORE ON THE MNSOST

5    AND DR. PHENIX'S SCORE ON THE MNSOST DID NOT VARY WITH

6    MUCH SIGNIFICANCE?

7    A    NO, MA'AM.  WELL, YES, MA'AM, THAT IS MY TESTIMONY.

8    WHEN YOU LOOK AT -- WHEN YOU LOOK AT THE EFFECT SIDE, NO,

9    MA'AM, IT'S THE SAME.

10   Q    NOW, HOW OFTEN DO YOU USE THE MNSOST, DR. DAUM?

11   A    I DON'T ANYMORE.

12   Q    WHY DON'T YOU USE THE MNSOST ANYMORE?

13   A    BECAUSE IN OUR MEETINGS, WE HAVE DISCUSSED AND WE

14   HAVE HAD PEOPLE COME IN. --

15            MR. ROYSTER:  OBJECTION.  HEARSAY.

16            THE COURT:  OBJECTION OVERRULED.

17            THE WITNESS:

18   A    WE HAVE HAD TRAINING THAT IT HAS TOO HIGH OF A FALSE

19   POSITIVE PREDICTIVE POWER, AND THAT IT HASN'T BEEN

20   UPDATED, SO IN OUR AREA, WE NO LONGER USE THE MNSOST.

21   Q    AND WHEN YOU SAY IN OUR AREA, YOU ARE REFERRING TO

22   WHO?

23   A    I AM REFERRING TO LARNED.

24   Q    TO LARNED STATE HOSPITAL?

25   A    TO LARNED STATE HOSPITAL.

1          THE COURT; DR. DAUM, IF I COULD JUST ASK ONE

2    FOLLOW UP ABOUT THIS TYPOGRAPHICAL ERROR IN YOUR REPORT

3    ON PAGE 7. DID I UNDERSTAND CORRECTLY -- IT DOES READ 4,

4    AND I AM LOOKING AT THE THIRD LINE UNDER THE HEADING THAT

5    READS ACTUARIAL RESULTS. IT SAYS MR. ANTONE SCORED A 4,

6    BUT THAT SHOULD READ 11?

7          THE WITNESS: YES, SIR. THAT IS WHAT I AM

8    TRYING TO SAY.

9          THE COURT: OKAY. WHAT I WANTED TO MAKE SURE

10   WAS THAT THE PERCENTAGES THAT FOLLOW IN THAT PARAGRAPH 19

11   TO 46 PERCENT, THOSE APPLY TO A SCORE OF 11?

12         THE WITNESS: NO. THEY APPLY TO THE 4, AND IF

13   I CAN EXPLAIN THAT AS WE GO THROUGH.

14         THE COURT: OKAY. WELL, THAT IS AN AREA

15   THAT -- I WILL LET YOU HANDLE THAT, MS. ALLEN, BUT THAT

16   IS WHAT I AM NOT CLEAR ABOUT. I MEAN, HE HAS CLARIFIED

17   IT, BUT THESE PERCENTAGES DO NOT APPLY TO AN 11, AND I AM

18   GOING TO NEED TO HEAR MORE ABOUT THAT.

19         MS. ALLEN:

20   Q   DR. DAUM, IF YOU CAN EXPLAIN FOR US WHAT HAPPENED

21   WITH YOUR SCORING THERE?

22   A   WELL, WHAT I WAS LOOKING AT, I DON'T REALLY KNOW --

23   DO YOU JUST WANT TO GO THROUGH IT, OR HOW DO YOU WISH TO

24   DO THIS?

25   Q   IT WAS NOT MY INTENTION TO GO THROUGH EACH ONE, BUT

1    WE CERTAINLY CAN, YOUR HONOR, IF YOU BELIEVE THAT WOULD

2    BE HELPFUL.

3            THE COURT:  NO, MA'AM.  MY CONCERN IS THAT --

4    IT SOUNDS ALTHOUGH IT HAS BEEN CHARACTERIZED AS A

5    TYPOGRAPHICAL ERROR OF ONE NUMBER, IT SOUNDS LIKE IT'S

6    MORE THAN THAT.  IF THE PERCENTAGES GIVEN HERE IN THE

7    MNSOST-R PARAGRAPH HERE ARE NOT ACCURATE, IF 19 TO 46

8    PERCENT DOES NOT APPLY TO THE SCORE OF 11, THEN THAT IS

9    MORE THAN JUST A SIMPLE TYPOGRAPHICAL ERROR FOR BEING 11,

10   SO --

11           THE WITNESS:  YOUR HONOR --

12           THE COURT:  AND SO I RAISE THE ISSUE.  I CAN

13   ASK QUESTIONS LATER IF YOU DON'T CARE TO.

14           MS. ALLEN:  I UNDERSTAND THE CONFUSION, YOUR

15   HONOR.  IF I CAN HAVE JUST A MOMENT.  I AM TRYING TO

16   LOCATE MY SCORE SHEET.

17           THE COURT:  YOU MAY.  WHY DON'T WE TAKE OUR

18   AFTERNOON BREAK AND WE'LL RECONVENE AT 3:15.

19           (WHEREUPON, A SHORT RECESS WAS TAKEN.)

20           MR. ROYSTER:  JUDGE --

21           THE COURT:  MR. ROYSTER.

22           MR. ROYSTER:  I WOULD LIKE TO BRING SOMETHING

23   TO THE COURT'S ATTENTION THAT I THINK IS IMPORTANT THAT

24   WE ADDRESS RIGHT NOW.  DR. DAUM TESTIFIED THAT THE FOUR

25   IS A TYPOGRAPHICAL ERROR, THAT HIS SCORE SHOULD BE AN 11,

1    AND I WANT THIS COURT TO KNOW BEFORE WE GO ANY FURTHER

2    THAT WHEN I TOOK HIS DEPOSITION, I WALKED THROUGH EACH

3    AND EVERY ITEM, AND WE HAVE A SCORING SHEET AND I CAN

4    MAKE THAT AVAILABLE TO THE COURT AS PART OF HIS

5    DEPOSITION, AND IT EQUATES -- IT ALL EQUALS UP TO THE

6    NUMBER 4, SO CLEARLY THERE MAY BE A CHANGE IN THE

7    SCORING.  I UNDERSTAND THAT, BUT FOR HIM TO TESTIFY THAT

8    THIS WAS A TYPOGRAPHICAL ERROR, I THINK NOW GOES TO NOT

9    ONLY HIS CREDIBILITY BEFORE THIS COURT, BUT POTENTIALLY

10   HIS QUALIFICATIONS TO TESTIFY AS AN EXPERT IN THIS CASE.

11   AND BEFORE WE GO ANY FURTHER, I WANTED TO COURT TO BE

12   AWARE OF THAT.

13            THE COURT:  YOU WILL HAVE A CHANCE TO

14   CROSS-EXAMINE MR. DAUM.

15            MS. ALLEN.

16            MS. ALLEN:  YOUR HONOR, DO YOU WANT ME TO GO

17   FORWARD WITH THE QUESTIONING AT THIS POINT?

18            THE COURT:  PLEASE.

19   Q   DR. DAUM, WITH REGARD TO THE MNSOST, WE HAVE SOME

20   CONFUSION, AND YOU HAVE HAD A CHANCE TO LOOK OVER YOUR

21   SCORE SHEET.  PRIOR TO THE BREAK YOU TESTIFIED THAT THE

22   SCORE OF -- YOU INITIALLY TESTIFIED THAT YOUR SCORE WAS

23   SIMILAR TO DR. PHENIX'S; IS THAT RIGHT?

24   A   YES.

25   Q   AND YOU SAID THAT YOUR SCORE WAS AN 11; IS THAT

1    RIGHT?

2    A    THAT'S CORRECT.

3    Q    AND I THINK YOU ALSO SAID THAT SOME OF -- SOME OF THE

4    CHANGE WAS BASED ON WHAT YOU HAD HEARD HERE?

5    A    THAT'S CORRECT.

6    Q    THEN WE WENT ON BREAK BECAUSE WE WERE TRYING TO

7    DETERMINE ABOUT THE PERCENTAGES?

8    A    YES, MA'AM.

9    Q    WHEN YOU TESTIFIED THAT THE SCORE OF 4 IN YOUR REPORT

10   WAS TYPOGRAPHICAL, WHAT DID YOU MEAN?

11   A    I MEANT THAT AT THE TIME WHEN I SUBMITTED THIS IT WAS

12   A 4.  BASED UPON WHAT I HAVE HEARD THE LAST TWO DAYS, IT

13   CHANGED.

14   Q    SO WHEN YOU USE THE WORD TYPOGRAPHICAL, WHY DID YOU

15   CHOOSE THAT WORD?  WHAT DID YOU MEAN BY THAT WORD?

16   A    WHAT I MEANT WAS AT THE TIME THAT -- AT THE TIME OF

17   THIS REPORT, THIS WAS VALID WITH THE INFORMATION I HAD.

18   WHAT I MEAN IS THAT AT THE TIME NOW, THIS REPORT IS NOT

19   VALID BECAUSE OF INFORMATION THAT HAS BEEN DISCLOSED IN

20   THE COURT.

21   Q    SO, WOULD YOU BE -- IS IT YOUR TESTIMONY THAT BASED

22   UPON WHAT YOU HAVE HEARD, YOU ARE ADJUSTING THE SCORE?

23   A    THAT'S CORRECT.

24   Q    WOULD THE WORD "MISTAKE" HAVE BEEN PROBABLY A BETTER

25   WORD TO USE THAN "TYPOGRAPHICAL"?

1    A    PROBABLY, YES.  THANK YOU.

2    Q    WHY WOULD YOU TERM WHAT YOU HAVE DOWN THERE AS A

3    MISTAKE?

4    A    BECAUSE AT THE TIME THAT I AM TESTIFYING, THIS

5    INSTRUMENT IS NO LONGER VALID THE WAY IT WAS PRESENTED AT

6    THE TIME IT WAS PRESENTED TO THE COURT.

7    Q    YOU ALSO TESTIFIED ABOUT THE MNSOST RIGHT BEFORE OUR

8    BREAK.  YOU SAID THAT YOU NO LONGER USE THE TEST.

9    A    THAT'S CORRECT.

10   Q    WHEN DID YOU STOP USING THE MNSOST?

11   A    THREE OR FOUR WEEKS AGO.

12   Q    AND BASED UPON WHAT -- WHY DID YOU STOP USING THE

13   MNSOST?

14   A    WE ATTENDED A TRAINING BY ANN PSALTER THAT BEGAN TO

15   SHOW US HOW TO LOOK AT BASE RATES, FALSE AND NEGATIVE

16   POSITIVES, AND WE DISCUSSED THE ISSUE THAT THE

17   RELIABILITY OF THE MNSOST HAS BEEN LOOKED AT AS A (POINT)

18   .45.  IT HAS HIGH RELIABILITY.

19        HOWEVER, IT ALSO HAS A PROCLIVITY TO GIVE A HIGH

20   RATE OF FALSE POSITIVES, MEANING THAT THE -- OF THE

21   NUMBER IT SAYS THAT MEET CRITERIA OR THAT ARE IN A 6 OR A

22   7, THAT THERE IS MORE FALSE POSITIVES IN THAT THAN THERE

23   SHOULD BE.

24   Q    WHEN YOU SCORE AN ACTUARIAL, WHAT INFORMATION DO YOU

25   USE?

1    A    STATIC INFORMATION

2    Q    SO YOU ONLY USE WHAT HAS BEEN GIVEN TO YOU?

3    A    YES.

4    Q    SO YOU TESTIFIED TODAY THAT YOUR SCORE CHANGED

5    BECAUSE NEW INFORMATION WAS PROVIDED TO YOU?

6    A    YES.

7    Q    AND HOW WAS THAT PROVIDED TO YOU?

8    A    IN LISTENING IN THE COURT.

9    Q    SO WERE YOU HERE YESTERDAY WHEN DR. PHENIX TESTIFIED

10   ABOUT HER MNSOST SCORE?

11   A    YES.

12   Q    DO YOU RECALL HER CHANGING HER SCORE AS WELL?

13   A    YES.

14   Q    WHEN SHE WAS TESTIFYING?

15   A    YES.

16   Q    SO IS IT YOUR TESTIMONY THAT YOU HAVE MADE AN

17   ADJUSTMENT TO YOUR SCORE BASED UPON NEW INFORMATION

18   GLEANED FROM THIS CIVIL COMMITMENT HEARING?

19   A    THAT'S CORRECT.

20   Q    THANK YOU.  LET'S MOVE ON TO THE STATIC-99R.  YOU

21   SCORED THAT TEST, AND I WOULD LIKE YOU TO TELL ME WHAT

22   YOUR SCORE WAS?

23   A    CAN YOU SHOW ME WHERE THAT IS IN THE BOOK, PLEASE?

24   Q    YES.  JUST A MOMENT.  RESPONDENT'S NUMBER 1, PAGE 12.

25   WE ARE LOOKING AT WHAT IS CALLED THE STATIC-99R CODING

1    FORM.  HAVE YOU FOUND IT?

2    A   NO, MA'AM, I HAVEN'T.

3    Q   YOU TURN HALFWAY THROUGH THE BINDER.  THAT IS WHERE

4    THE RESPONDENT'S EXHIBITS START.  IT'S THE SECOND SET OF

5    EXHIBITS.

6    A   NO.  I AM LOST.

7              THE COURT:  MS. ALLEN, YOU MAY APPROACH TO

8    ASSIST THE WITNESS.

9              MS. ALLEN:  THANK YOU.  YOUR HONOR, I HAVE

10   JUST HANDED DR. DAUM WHAT HAS BEEN MARKED AS DEFENDANT'S

11   EXHIBIT NUMBER 1.

12   Q   DR. DAUM, DO YOU RECOGNIZE THAT?

13   A   YES.

14   Q   WHAT IS THAT?

15   A   THAT IS MY REPORT TO THE COURT.

16   Q   CAN YOU TURN TO THE LAST PAGE AND TELL ME WHAT YOU

17   SEE ON PAGE 12?

18   A   THAT IS A STATIC-99 CODING FORM.

19   Q   DID YOU COMPLETE THIS FORM IN YOUR EXAMINATION OF MR.

20   ANTONE?

21   A   I DID.

22   Q   HOW DID YOU GO ABOUT COMPLETING THIS FORM?

23   A   I LOOKED AT DOCUMENTATION THAT ADDRESSED THESE

24   PARTICULAR STATEMENTS.

25   Q   AND HOW DID YOU -- WHAT IS YOUR TOTAL SCORE ON THIS

1    FORM?

2    A   2, 3, 4.

3    Q   A SCORE OF 4?

4    A   4.

5    Q   IS THAT NOTED ON YOUR FORM?

6    A   IT IS.

7    Q   AND WHERE IS IT NOTED ON YOUR FORM, DR. DAUM?

8    A   NEXT TO EACH PARTICULAR ITEM.

9    Q   SO OUTSIDE OF THE CHART, TO THE RIGHT OF THE CHART,

10   ARE THOSE YOUR SCORES?

11   A   YES, THEY ARE.

12   Q   AND YOU REACHED A TOTAL SCORE BY ADDING UP THAT

13   COLUMN ON THE OUTSIDE?

14   A   YES, I DID.

15   Q   SO IT'S YOUR TESTIMONY THAT YOUR SCORE IS A 4 ON THE

16   STATIC-99R?

17   A   YES.  THAT'S CORRECT.

18            MS. ALLEN:  YOUR HONOR, I HAVE PLACED THE

19   STATIC-99R CODING FORM ON THE MONITOR.

20            THE COURT:  THANK YOU.

21            MS. ALLEN:

22   Q   DO YOU RECALL THAT DR. GUTIERREZ AND DR. PHENIX HAD

23   SCORES OF 4 OR 5 ON THIS STATIC-99?

24   A   YES, I DO.

25   Q   DO YOU AGREE WITH THEIR CALCULATIONS OF THE

1    STATIC-99R?

2    A    YES, MA'AM.

3    Q    SO THERE IS NO DIFFERENCE IN HOW YOU SCORED THIS ONE

4    VERSUS HOW THEY DID?

5    A    NO, BECAUSE YOU ARE LOOKING AT STATIC INFORMATION.

6    Q    LET ME BACK UP A MINUTE, DR. DAUM.  IF WE COULD

7    REFLECT ON DR. GUTIERREZ'S SCORE, DO YOU REMEMBER HOW HE

8    SCORED THE STATIC-99R?

9    A    DID HE DO A 6?

10   Q    THAT'S CORRECT.  DO YOU RECALL WHAT THE DIFFERENCE

11   WAS IN HIS SCORING SHEET VERSUS YOURS?

12   A    NO, I DON'T.

13   Q    LET ME DIRECT YOUR ATTENTION TO QUESTION NUMBER 5.

14   DO YOU REMEMBER EARLIER TESTIMONY ABOUT THE CALCULATION

15   OF PRIOR SEX OFFENSES?

16   A    YES.

17   Q    HOW DID YOU ACTUALLY CALCULATE YOUR ITEM NUMBER 5?

18   A    IF YOU LOOK AT -- IF YOU LOOK AT CHARGES, CONVICTIONS

19   3 TO 5, CONVICTIONS 2 TO 3, YOU GET A SCORE OF 2.

20   Q    DO YOU RECALL DR. PHENIX SCORING THE SAME TEST WITH A

21   SCORE OF 5?

22   A    YES.  I THINK I DO.  I HEARD HER SAY THAT.

23   Q    DO YOU AGREE THAT THE STATIC-99R SCORE FOR MR. ANTONE

24   IS SOMEWHERE BETWEEN A 4 AND A 5?

25   A    YES, MA'AM.

1    Q   DO YOU AGREE WITH THE EARLIER TESTIMONY THAT HIS

2    SCORE WOULD IN FACT DECREASE BY ONE POINT WHEN HE TURNS

3    40 NEXT MAY OF 2012?

4    A   YES, ACCORDING TO THE PROTOCOL.

5    Q   IS THAT SOMETHING THAT YOU WOULD CONSIDER IN YOUR

6    EVALUATION AT THIS TIME, OR WOULD YOU HAVE TO WAIT UNTIL

7    HIS ACTUAL BIRTHDAY TO DO THAT?

8    A   WELL, I SCORED A ZERO WITH THAT BECAUSE OF THE AGE,

9    BUT IN ACTUAL -- IN LOOKING AT THE CLINICAL JUDGMENT PART

10   OF THAT, I THINK THAT WOULD CERTAINLY BE PART OF THAT.

11   ONE OF THE ISSUES IS THAT YOU DON'T REALLY KNOW WHEN HE

12   IS GOING TO BE RELEASED.

13       IF IT'S SHORTLY, THAT WOULD BE ONE THING.  IF IT'S

14   MUCH LONGER, THAT WOULD BE SOMETHING ELSE.  BUT YOU

15   WOULDN'T -- I DON'T THINK YOU WOULD SCORE IT RIGHT NOW,

16   TODAY, BECAUSE HE DOESN'T QUALIFY FOR THAT.

17   Q   IF YOU SCORED THE TEST IN MAY OF 2012 FOR A CIVIL

18   COMMITMENT HEARING IN MAY OF 2012, HOW WOULD YOU SCORE

19   IT?

20   A   IF HE WAS AGE 40 TO 59, I WOULD GIVE HIM MINUS ONE.

21   Q   AND THEN THE TOTAL SCORE WOULD BE WHAT?

22   A   3.

23   Q   SINCE WE ARE NOT THERE, YOUR TESTIMONY TODAY IS THAT

24   YOUR SCORE IS A 4; IS THAT CORRECT?

25   A   THAT'S CORRECT.

1  Q    WHAT RISK CATEGORY DOES THAT PLACE HIM IN FOR THE

2  STATIC-99 RECIDIVISM RATES?

3  A    OVER A 4 OR 5, IT PUTS HIM IN A MODERATE TO HIGH

4  CATEGORY.

5  Q    DID YOU COMPARE HIM TO A SAMPLE GROUP?

6  A    I DID.  YES, I DID.

7  Q    NOW, WHAT DOES THAT MEAN WHEN YOU COMPARE HIM TO A

8  SAMPLE GROUP?  WHAT ARE YOU DOING WHEN YOU ARE DOING

9  THAT?

10 A    YOU ARE LOOKING AT RESEARCH WHERE SAMPLE GROUPS HAVE

11 BEEN PUT TOGETHER FROM PEOPLE THAT HAVE GONE THROUGH THIS

12 AND HAVE RECIDIVATED, SO YOU WILL HAVE A SAMPLE GROUP OF

13 PERHAPS 2,000, 4,000, AND THEN BASED UPON THAT, YOU

14 ESTABLISH A BASE RATE.  BASED UPON THE BASE RATE, THEN

15 YOU CAN ESTABLISH A POSSIBILITY OF RECIDIVATING BETWEEN

16 FIVE YEARS AND TEN YEARS.

17 Q    NOW, WHAT WAS THE -- YOU PLACED HIM -- WHAT SAMPLE

18 GROUP DID YOU COMPARE HIM TO?

19 A    I COMPARED HIM --

20 Q    PAGE 7?

21 A    YES.  I COMPARED HIM TO THE MANY -- I COMPARED HIM TO

22 THE HIGH RISK, HIGH NEED GROUP.

23 Q    WHAT WERE THE PREDICTIVE RISK VALUES THAT YOU GOT

24 WHEN YOU COMPARED HIM TO THOSE?

25 A    INDIVIDUALS THAT OBTAINED A SCORE SIMILAR TO MR.

1    ANTONE, OF THOSE 12.3 PERCENT MAY REOFFEND WITHIN FIVE

2    YEARS.  AND 18.2 MAY REOFFEND WITHIN TEN YEARS.

3    Q   DOES THAT MEAN THAT MR. ANTONE WILL REOFFEND?

4    A   NO.  IT MEANS THAT HE HAS BEEN PLACED IN A GROUP

5    WITHIN WHICH THAT GROUP, 12.3 PERCENT HAS BEEN KNOWN TO

6    REOFFEND.  THAT IS PREDICTED OVER -- AFTER FIVE YEARS.

7    Q   DOES THAT MEAN THAT HE IS IN THAT 12.3 PERCENT?

8    A   NO.  THE TROUBLE WITH ACTUARIALS IS YOU DON'T KNOW

9    WHERE THEY ARE AT.  ALL YOU KNOW IS THEY ARE WITHIN A

10   GROUP THAT HAS BEEN PRESELECTED.  THE NUMBER OF -- THE

11   NUMBER FROM THAT GROUP PRESELECTED FOR TREATMENT NEED IS

12   WITHIN 13.3 TO 18.2 OVER FIVE TO TEN YEARS.

13   Q   BASED UPON THE DATA THAT YOU COLLECTED WHICH YOU

14   HEARD HERE TODAY AND YESTERDAY, AND BASED UPON YOUR

15   EXPERIENCE AND TRAINING AND EDUCATION, DO YOU HAVE AN

16   OPINION AS TO WHETHER MR. ANTONE MEETS CRITERIA FOR CIVIL

17   COMMITMENT AS A SEXUALLY DANGEROUS PERSON?

18   A   IN MY OPINION HE DOES NOT, NO.

19   Q   CAN YOU TELL US A LITTLE ABOUT YOUR DIAGNOSTIC

20   CONCLUSIONS?

21   A   WELL, MR. ANTONE HAS A PERSONALITY DISORDER.  HE ALSO

22   HAS A PARAPHILIA.  HE ALSO HAS A POLYSUBSTANCE

23   DEPENDENCE.  IN LOOKING AT IT OVERALL, IN MY OPINION, IF

24   YOU LOOK AT WHAT DRIVES THE MAN, YOU CAN LOOK AT THE

25   POLYSUBSTANCE DEPENDENCE AND YOU CAN LOOK AT HIS

1    BORDERLINE PERSONALITY DISORDER.

2    Q    WELL, START WITH POLYSUBSTANCE DEPENDENCE.  WHAT IS

3    POLYSUBSTANCE DEPENDENCE?  WHAT IS THIS AND WHAT DID YOU

4    BASE YOUR DIAGNOSIS ON?

5    A    THAT MEANS OVER A PERIOD OF TIME THAT WHAT HE HAS

6    DONE IS HE HAS TAKEN -- HE HAS ABUSED AND BECOME

7    DEPENDENT ON THREE DIFFERENT CATEGORIES OF DRUGS.  IN

8    THIS INSTANCE, ALCOHOL, CANNABIS, COCAINE AND

9    HALLUCINOGENS, AND SO OVER A PERIOD OF TIME, HE HAS

10   BECOME DEPENDENT ON THOSE DRUGS.

11   Q    AND WHAT ABOUT THE NEXT ONE; FROTTEURISM?

12   A    FROTTEURISM.

13   Q    WHAT IS THAT, AND WHAT IS YOUR BASIS FOR THIS

14   DISORDER?

15   A    FROTTEURISM IS A DIAGNOSIS DESIGNED AS WAS TESTIFIED

16   EARLIER BY MR. GUTIERREZ, THAT IT NORMALLY HAPPENS IN A

17   PUBLIC PLACE.  IT'S UNWANTED TOUCHING FROM ONE INDIVIDUAL

18   TO ANOTHER.

19        BUT IT DOESN'T MEAN JUST THAT.  IT REALLY MEANS IT'S

20   AN UNWANTED TOUCHING OR RUBBING OF ANY PART OF AN

21   INDIVIDUAL THAT DOESN'T WANT TO BE RUBBED OR TOUCHED.

22        IN THE INSTANCE THAT YOU HAD MR. ANTONE, THAT IS

23   EXACTLY WHAT HE DID.  HE RUBBED WHERE THE PEOPLE DID NOT

24   WANT TO BE RUBBED.  HE TOUCHED WHERE THEY DID NOT WANT TO

25   BE TOUCHED.  ALSO, AT THE SAME TIME, HE RAPED.

1    Q    WOULD THE RAPE BE PART OF THE FROTTEURISM DIAGNOSIS?

2    A    NO.

3    Q    IS RAPE LISTED IN THE DSM?

4    A    NO.

5    Q    IS FROTTEURISM IN THE DSM?

6    A    YES.

7    Q    SO YOUR BASIS FOR THE FROTTEURISM DIAGNOSIS IS THE

8    UNWANTED TOUCHING AS WELL AS THE RAPE, THE PRIOR RAPE?

9    A    THE ISSUE IS IF MR. ANTONE HAD SEXUALLY OFFENDED

10   CHILDREN UNDER THE AGE OF 12, 10, OR 9, THAT WOULD BE --

11   HE WOULD QUALIFY FOR A DEFINITION OF PEDOPHILIA.  THAT IS

12   EASY TO DIAGNOSE.  BUT WHAT HE DID IS HE ABUSED, SEXUALLY

13   ABUSED PUBESCENT WOMEN AND OLDER WOMEN, AND THAT IS HARD

14   TO DIAGNOSE.

15        DR. GUTIERREZ USES A TERM HEBEPHILIA, AND THAT IS

16   CERTAINLY WITHIN THE FIELD, PEOPLE USE THAT TERM, AND IT

17   DESIGNATES A CERTAIN CATEGORY OF ACTIONS.

18        OTHER PSYCHOLOGISTS DO NOT RECOGNIZE THAT TERM AND

19   IT'S VERY DIFFICULT TO DIAGNOSE THAT PARTICULAR ACTION.

20        IN MR. ANTONE'S CASE, THE RAPE BECOMES A CRIMINAL

21   ACT.  AND I UNDERSTAND THAT THROUGH A BORDERLINE

22   PERSONALITY AND ANTISOCIAL.

23   Q    WHAT IS BORDERLINE PERSONALITY DISORDER WITH

24   ANTISOCIAL FEATURES?

25   A    BORDERLINE PERSONALITY DISORDER IS AN INDIVIDUAL WHO

1    DOES ANTISOCIAL PERSONALITY THINGS, BUT HE GETS SOMETHING

2    FROM IT.  HE DOES IT BECAUSE HE NEEDS TO.  AN ANTISOCIAL

3    DOES THE SAME THINGS, BUT HE DOES IT BECAUSE HE CAN.

4        MAY I GIVE YOU SOME DESCRIPTORS ON THAT?

5    Q    WELL, JUST TO CLARIFY, YOU ARE SAYING IT'S THE SAME

6    ACTION, BUT FOR A DIFFERENT REASON?

7    A    I AM SAYING THAT THERE ARE OVERLAPPING ACTIONS FOR

8    DIFFERENT REASONS.

9    Q    OKAY.  PLEASE EXPLAIN.

10   A    BORDERLINE PERSONALITY DISORDER BY THE DSM-IV TALKS

11   ABOUT A PATTERN OF UNSTABLE AND INTENSE INTERPERSONAL

12   RELATIONSHIPS.  THE FOCUS IS ON SOCIAL INTERACTION,

13   INAPPROPRIATE.  IT TALKS ABOUT DISTURBANCE IN TWO AREAS,

14   SEX, SUBSTANCE ABUSE, RECKLESS DRIVING, AND BINGE

15   DRINKING.  HE MEETS CRITERIA FOR BOTH OF THOSE AS FAR AS

16   SEXUAL IMPULSIVITY AND SUBSTANCE ABUSE.  IT TALKS ABOUT

17   RECURRENT SUICIDAL BEHAVIOR, GESTURES.  HE MEETS THE

18   CRITERIA FOR THAT.  IT TALKS ABOUT AN EFFECTIVE

19   INSTABILITY OF MOOD, MARKED REACTIVITY OF MOOD.  HE MEETS

20   THAT DIAGNOSIS FOR THAT.

21       CHRONIC FEELINGS OF EMPTINESS.  HE TALKED ABOUT THAT

22   IN OUR INTERVIEW, ABOUT NOT FEELING LIKE THERE IS ANYBODY

23   THERE FOR ME.  LIKE HE FEELS LONELY INSIDE, LIKE HE IS

24   EMPTY.

25       INAPPROPRIATE AND INTENSE ANGER.  DIFFICULTY

1    CONTROLLING ANGER.  HE DOES NOT MEET CRITERIA FOR THAT.

2         NOW, FOR ANTISOCIAL, IT TALKS ABOUT FAILURE TO

3    CONFORM TO SOCIAL NORMS.  HE MEETS CRITERIA FOR THAT.

4    IMPULSIVITY OR FAILURE TO PLAN AHEAD.  HE MEETS CRITERIA

5    FOR THAT.

6    A    RECKLESS DISREGARD FOR SAFETY FOR HIMSELF AND FOR

7    OTHERS.  HE MEETS CRITERIA FOR THAT.  NOW, WHEN YOU PUT

8    BOTH OF THOSE TOGETHER, THERE IS A REASON WHY HE IS DOING

9    THAT.  IT'S NOT BECAUSE -- IN MY OPINION, IT'S NOT

10   BECAUSE HE CAN'T.  IT'S BECAUSE HE IS LOOKING FOR

11   SOMETHING.  HE WANTS SOMETHING.  AND YOU WILL FIND THAT

12   FROM PEOPLE THAT HAVE A BONDING ISSUE, AN ATTACHMENT

13   ISSUE AS THEY ARE GROWING UP.  YOU WILL FIND THAT FROM

14   PEOPLE THAT DON'T FEEL LIKE THEY BELONG.  THEY FEEL LIKE

15   THEY NEED TO HAVE SOMEBODY MAKE THEM OKAY.  AND SO THEY

16   ARE SEARCHING FOR THAT, AND ANTISOCIAL DOES NOT DO THAT.

17   Q    SO THE ANTISOCIAL DOES NOT HAVE -- THE ANTISOCIAL

18   DOESN'T CARE HOW ANYBODY ELSE FEELS ABOUT IT?  IS THAT

19   WHAT YOU ARE SAYING?

20   A    THAT IS MY OPINION, YES.

21   Q    BUT THE BORDERLINE CARES VERY MUCH WHICH IS ONE OF

22   THE REASONS THEY ARE DOING IT?

23   A    THEY STRUGGLE WITH THAT, YES.

24   Q    IS THAT WHY YOU DID NOT DIAGNOSE HIM WITH ANTISOCIAL

25   PERSONALITY DISORDER?

1    A    THAT IS WHY I DIAGNOSED HIM WITH BORDERLINE WITH

2    ANTISOCIAL FEATURES, YES, BECAUSE HE MEETS CRITERIA IN

3    BOTH OF THOSE AREAS.  THERE ARE CRITERIA IN BOTH AREAS

4    THAT HE MEETS.

5    Q    SO HE MEETS CRITERIA IN BOTH AREAS, BUT YOU CHOSE

6    BORDERLINE PERSONALITY DISORDER RATHER THAN ANTISOCIAL

7    PERSONALITY DISORDER, AND YOU CHOOSE BORDERLINE

8    PERSONALITY DISORDER OVER THE OTHER ONE BECAUSE?

9    A    BECAUSE IN MY OPINION HE IS DOING THAT FOR A REASON.

10   THERE IS A REASON BEHIND HIS ACTIONS.

11   Q    AND YOU FEEL THAT YOU GOT THOSE REASONS IN YOUR

12   INTERVIEW WITH HIM?

13   A    I THINK THE REASONS ARE ALSO FOUND IN THE INTERVIEWS

14   THAT THE BOP DID OVER A PERIOD OF TIME ALONG WITH THE

15   PRESENTENCING EVAL.  I THINK THEY COME OUT PRETTY CLEAR

16   BECAUSE THEY ALWAYS ARE TESTING TO HIS ACTIONS.

17       YES, I THINK I GOT THAT PLUS FROM THE STATIC AS WELL

18   AS THE INTERVIEW THAT I HAD WITH HIM.

19   Q    WHAT DO YOU THINK ABOUT THE DIAGNOSIS OF DR. PHENIX

20   AND DR. GUTIERREZ THAT MR. ANTONE IS SUFFERING FROM

21   PARAPHILIA NOT OTHERWISE SPECIFIED, NONCONSENTING,

22   FEMALES?

23   A    THE DSM REALLY DOESN'T HAVE THAT DIAGNOSIS AS STATED.

24   THERE ARE SOME PEOPLE THAT USE THAT.  THEY DO HAVE A

25   DIAGNOSIS OF PARAPHILIA NOS.

1    Q    PARAPHILIA NOS, DOES THE DSM REFER SPECIFICALLY TO

2    NOS WITH THE NONCONSENTING FEMALES INDICATOR?

3    A    NO.   THERE IS SPECIFIERS FOR THAT THAT I CAN FIND.

4    Q    WHERE ARE SPECIFIERS USUALLY CHOSEN FROM?  IS THERE A

5    LIST OF SPECIFIERS THAT FORENSIC PSYCHOLOGISTS USE?

6    A    YES, MA'AM.  DEPENDING ON THE DIAGNOSIS, WHETHER MOOD

7    DISORDER OR ANTISOCIAL DISORDER PERSONALITY, THERE ARE

8    CERTAINLY SPECIFIERS THAT GO WITH THAT.

9    Q    AND WHERE WILL THOSE BE FOUND?

10   A    WELL, THEY ARE NORMALLY FOUND IN THE DSM AS THEY ARE

11   DESCRIBING THE PARTICULAR DIAGNOSIS OR MOOD DISORDER.

12   Q    BUT YOU SAID THEY ARE NORMALLY FOUND IN THE DSM, BUT

13   THE NONCONSENTING FEMALES IS NOT THERE?

14   A    NOT UNDER THE NOS DIAGNOSIS, NO.

15   Q    YOU MENTIONED THAT HEBEPHILIA WAS USED, AND THEN YOU

16   ALSO, THE NEXT SENTENCE, YOU SAID THAT IT WAS -- THAT

17   MANY PEOPLE DON'T USE IT.  IS THAT A DEBATE WITHIN YOUR

18   FIELD OF FORENSIC PSYCHOLOGY?

19   A    I BELIEVE SO, YES.

20   Q    WHY DO YOU THINK IT IS UP FOR DEBATE?

21   A    WELL, FOR ONE THING, IT'S NOT LISTED IN THE DSM.

22   SOME RESEARCHERS CALLED IT A MADE UP TERM, THAT IT SHOULD

23   NOT BE USED.  OTHERS AGREE THAT IT SHOULD BE USED.  SO IT

24   IS DEBATED.

25   Q    IS THAT COMMON FOR PSYCHOLOGISTS TO USE TERMS THAT

1   ARE NOT IN THE DSM?

2   A   NO, NOT NORMALLY.  NO, NOT NORMALLY.

3   Q   IN YOUR REVIEW OF THE RECORDS THAT WERE PROVIDED TO

4   YOU ABOUT MR. ANTONE, YOU WERE PROVIDED WITH THE 1999

5   EVALUATION OF DR. GRAY AND MR. SADLER, DO YOU REMEMBER

6   THAT?

7   A   I DO.

8   Q   WE HAVE REFERRED TO THAT REPORT IN VARIOUS TESTIMONY

9   FROM DIFFERENT WITNESSES.  IN THAT REPORT, DID YOU FEEL

10  THAT THE REPORT WAS EXTENSIVE ENOUGH?

11  A   YES.

12  Q   TO BE ACCURATE?

13  A   YES.

14  Q   DID YOU RELY ON THAT REPORT WHEN YOU FORMULATED YOUR

15  OPINION?

16  A   I USED THE INFORMATION FROM THAT REPORT, YES.

17  Q   DO YOU RECALL WHETHER DR. GRAY OR MR. SADLER SPOKE TO

18  THE TARGET OF MR. ANTONE'S SEXUAL INTERESTS?  AND WHO WAS

19  THE TARGET OF MR. ANTONE'S SEXUAL INTEREST?

20  A   I RECALL THAT -- I THINK I RECALL A STATEMENT THAT

21  THERE WAS NO -- THAT CHILDREN WAS NOT A TARGET OF HIS

22  INTEREST, IF I AM REMEMBERING CORRECTLY.

23      DO YOU HAVE THAT REPORT HERE?

24  Q   I DO.  JUST A MOMENT.  DO YOU RECALL AN AGE GROUP

25  BEING GIVEN?

1   A   I AM SORRY?

2   Q   DO YOU RECALL DR. GRAY GIVING AN AGE GROUP OF THE --

3   THAT MR. ANTONE IS SEXUALLY INTERESTED IN?

4   A   THAT WAS OLDER TEENAGERS AND OLDER LADIES.

5   Q   WAS THAT TEENAGE FEMALES, OR TEENAGE MALES AND

6   FEMALES?

7   A   TEENAGE FEMALES.

8   Q   WAS THERE ANY SEXUAL INTEREST NOTED FOR PREADOLESCENT

9   FEMALES?

10  A   NOT THAT I RECALL.

11  Q   WE ARE GOING TO GET THE EXHIBIT NUMBER SO THAT YOU

12  CAN REFER TO IT.

13  A   I HAVE MY COPY, IF THAT HELPS.

14  Q   IF YOU HAVE A COPY, IF YOU WOULD TAKE A MINUTE TO

15  REVIEW IT, I WOULD LIKE TO ASK YOU A FEW THINGS ABOUT

16  THAT?

17  A   CERTAINLY.

18          MS. ALLEN:  YOUR HONOR, WHAT DR. DAUM IS

19  REVIEWING IS MARKED DEPOSITION EXHIBIT NUMBER 5 WHICH IS

20  WHY IT IS NOT INCLUDED IN THE TRIAL EXHIBIT, BUT I CAN

21  ACTUALLY PLACE IT ON THE ELMO.

22  Q   DR. DAUM, DO YOU RECOGNIZE WHAT IS ON THE MONITOR AS

23  WHAT IS DR. GRAY'S REPORT?

24  A   I DO.

25          MR. ROYSTER:  JUST FOR THE RECORD, IT'S

1   GOVERNMENT EXHIBIT 10.

2              MS. ALLEN:  THANK YOU.  IT'S GOVERNMENT

3   EXHIBIT 10.

4   Q   HAVE YOU HAD A CHANCE TO FIND THAT INFORMATION ABOUT

5   HIS SEXUAL INTERESTS, DR. DAUM?

6   A   YES.  ON PAGE 1261.

7   Q   WHAT DID DR. GRAY SAY WAS MR. ANTONE'S TARGET?

8   A   HIS GREATEST SEXUAL INTERESTS TO BE IN FEMALES AGE 14

9   TO 17.

10  Q   DO YOU SEE ANYTHING IN THAT REPORT THAT WOULD

11  INDICATE THAT ANY TESTS REVEALED THAT MR. ANTONE WAS

12  ATTRACTED TO PREADOLESCENT FEMALES?

13  A   NO, I DO NOT.

14  Q   OR PREADOLESCENT MALES?

15  A   NO, I DO NOT.

16  Q   DOES MR. ANTONE'S SEXUAL INTERESTS IN ADOLESCENT AND

17  ADULT FEMALES CAUSE YOU CLINICAL CONCERN WITH REGARD TO

18  WHETHER HE IS SEXUALLY DANGEROUS?

19  A    IT BRINGS CLINICAL SIGNIFICANCE TO HIS PAST BEHAVIORS

20  OF RAPE, YES.

21  Q   AND HOW DO YOU ADDRESS THAT WITHIN YOUR

22  CONSIDERATION?

23  A    IT BEGINS TO TALK TO THE IDEA OF THE NEED FOR

24  TREATMENT AND THE NEED FOR THERAPY.

25  Q   DO YOU BELIEVE MR. ANTONE NEEDS SEX OFFENDER

1    TREATMENT?

2    A    YES, I DO.

3    Q    DO YOU BELIEVE THAT HE NEEDS TO BE CIVILLY COMMITTED

4    IN ORDER TO RECEIVE THAT TREATMENT?

5    A    IN ORDER TO RECEIVE THE TREATMENT, NO.

6    Q    DO YOU BELIEVE THAT MR. ANTONE CAN DEVELOP A RELEASE

7    PREVENTION PLAN WHILE HE IS NO LONGER IN PRISON?

8    A    A RELAPSE PREVENTION PLAN?

9    Q    YES.

10   A    YES I DO, WITH CERTAIN STIPULATIONS.

11   Q    WELL, WHAT DO YOU THINK THAT MR. ANTONE NEEDS?

12   A    AS FAR AS TREATMENT?

13   A    I THINK MR. ANTONE NEEDS A STRUCTURED ENVIRONMENT IN

14   WHICH HE HAS COUNSELING AND THERAPY AVAILABLE IN ORDER

15   FOR HIM TO ASSIST TO FORMULATE A RECIDIVISM PLAN.  AND AS

16   HE GOES THROUGH THE TREATMENT, THAT PLAN BECOMES ENHANCED

17   AND BECOMES TO WHERE HE CAN EVENTUALLY MOVE INTO THE

18   COMMUNITY STILL ATTENDING SEXUAL TREATMENT AND BECOME A

19   GAINFUL EMPLOYEE.

20   Q    DO YOU THINK A STRUCTURED ENVIRONMENT CAN BE PROVIDED

21   FOR HIM IN A HALFWAY HOUSE?

22   A    YES.

23   Q    HAVE YOU SEEN THAT BE EFFECTIVE WITH OTHER SEX

24   OFFENDERS?

25   A    YES.

1    Q   IT'S EFFECTIVE WITH HALFWAY HOUSES OR EFFECTIVE WITH

2    PEOPLE BEING RELEASED FROM PRISON FOR HOW TO BE

3    REINTEGRATED INTO THE COMMUNITY, TO BE ON SUPERVISED

4    RELEASE FOR A PERIOD OF TIME SO EVENTUALLY THEY MOVE BACK

5    INTO THE COMMUNITY; YES.

6    Q   HOW DO YOU ADDRESS THE PROPOSITION THAT THE REASON

7    MR. ANTONE HAS NOT VIOLATED RULES AND DRANK WHEN HE

8    WASN'T SUPPOSED TO AND BEEN A BEHAVIOR PROBLEM, HOW DO

9    YOU ADDRESS THE POSITION THAT THE REASON THAT HE -- THAT

10   THE PRISON, THE STRUCTURE OF PRISON KEEPS HIM FROM DOING

11   THAT?  DO YOU BELIEVE THAT WITHOUT THE STRUCTURE OF

12   PRISON, HE IS LIKELY TO DO SOMETHING DIFFERENT?

13   A   I THINK THAT IS A TWO PART QUESTION.  AND THE FIRST

14   PART OF THAT IS I DON'T BELIEVE THAT PRISON, WHILE IT

15   LIMITS AVAILABILITY, I DO NOT BELIEVE IT STOPS

16   AVAILABILITY.  THAT HAS NOT BEEN MY EXPERIENCE.

17       MY EXPERIENCE WITH THE PEOPLE THAT I HAVE WORKED

18   WITH ARE GOING TO HAVE THE KIND OF ACTING OUT OVER A

19   PERIOD OF TIME NO MATTER WHERE THEY ARE.  IT CERTAINLY

20   MAKES IT HARDER TO ACT OUT WHEN YOU HAVE INCARCERATION,

21   BUT IT DOES NOT MAKE IT IMPOSSIBLE.

22       SECONDLY, I DON'T BELIEVE THAT MR. ANTONE NEEDS TO

23   BE IN A STRUCTURED ENVIRONMENT LOCK DOWN AS MUCH AS HE

24   NEEDS TO BE SUPERVISED IN A HALFWAY HOUSE SETTING TO

25   WHERE HE CAN MOVE AROUND WITHIN A CERTAIN AREA.  I

1  BELIEVE THAT WOULD HELP, YES.

2  Q   WE HAD TESTIMONY EARLIER ABOUT SEXUAL URGES, AND I

3  BELIEVE THAT DR. GUTIERREZ TESTIFIED AS TO SEXUAL URGES

4  TO WANT FORCED SEX.

5      WITHIN YOUR REVIEW OF THE DOCUMENTS THAT YOU WERE

6  PROVIDED, TESTIMONY THAT YOU HAVE HEARD, HAVE YOU SEEN

7  ANY EVIDENCE OR SEEN ANY ADMISSIONS BY MR. ANTONE OR

8  ANYTHING THAT WOULD INDICATE TO YOU THAT MR. ANTONE, IN

9  FACT, SUFFERS FROM OR HAS SEXUAL URGES TO WANT FORCED

10  SEX?

11  A   I HAVE BEEN PROVIDED NO DOCUMENTATION WITH THAT AND

12  IN SPEAKING WITH HIM FOR AN INTERVIEW OVER THE FIVE

13  HOURS, I DID NOT WALK AWAY WITH THAT IMPRESSION, NO.

14  Q   DID DR. GRAY, IN HIS REPORT IN 1999, SPEAK TO THAT?

15  A   HE DOES IN A NUMBER OF WAYS, AND HE IS SAYING ALSO

16  THAT THAT IS NOT THERE.

17  Q   AND WHAT WAYS DID DR. GRAY SPEAK TO THAT?

18  A   LET'S ME GET HIS REPORT AGAIN.

19  Q   GOVERNMENT'S EXHIBIT NUMBER 10.

20  A   I HAVE WHAT I HAVE IS DEPOSITION EXHIBIT 5.

21  Q   THAT IS FINE.  IT'S THE SAME THING.  AND I MIGHT BE

22  ABLE TO HELP YOU.  IF YOU TURN TO PAGE 5, THERE ARE

23  SEVERAL BEHAVIORS THAT DR. GRAY TALKED ABOUT.  I DON'T

24  KNOW IF THOSE ARE THE ONES YOU ARE REFERRING TO, BUT THAT

25  MIGHT GIVE YOU SOME GUIDANCE ON WHERE YOU MAY WANT TO

1    LOOK.

2    A    YOU ARE LOOKING AT PAGE -- WHAT PAGE?

3    Q    DR. GRAY'S PAGE 5, BOP ANTONE, PAGE 1254.  AND I AM

4    JUST ASSUMING THAT YOU MIGHT BE ON THAT PAGE.  I HAVE NO

5    IDEA WHAT YOU WERE GOING TO SAY.  I JUST WANTED TO GIVE

6    YOU SOME GUIDANCE.

7    A    WHAT YOU ARE LOOKING AT ON PAGE 5 ARE ALSO THE KINDS

8    OF QUESTIONS I ASKED HIM DURING THE INTERVIEW.  IT HAS TO

9    DO WITH DEVIANT SEXUAL BEHAVIORS, AND WHAT THE REPORT IS

10   SHOWING IS THAT HE IS NOT SHOWING DEVIANT SEXUAL

11   BEHAVIORS OUTSIDE OF HIS -- OUTSIDE OF HIS CRIMINAL ACTS.

12       I ASKED HIM AS WELL AS DID THIS PARTICULAR PERSON IF

13   HE GOES TO PROSTITUTES AND HE SAID THAT HE HAD ONE

14   PROSTITUTE BUT HE DIDN'T PAY THE PRICE.

15       HE DOESN'T ENGAGE IN BONDAGE.  HE DOESN'T ENGAGE IN

16   BESTIALITY.  HE DOESN'T ENGAGE IN THE KINDS OF THINGS YOU

17   WOULD THINK A PERSON OF DEVIANT SEXUAL AROUSAL WOULD

18   ENGAGE IN.

19            THE COURT:  LET ME JUST NOTE FOR THE RECORD

20   THAT IN THE EXHIBIT BOOK, THE BATES PAGE IS 1850 WHICH

21   I THINK IS DIFFERENT FROM THE NUMBER THAT COUNSEL GAVE.

22   IF YOU COULD REMOVE THE DOCUMENT FROM THE PROJECTOR

23   SCREEN, PLEASE.

24            MS. ALLEN:  THANK YOU, YOUR HONOR.

25   Q    WELL, DR. DAUM, I UNDERSTAND THAT ONE OF THE

1    ARGUMENTS THAT HAS BEEN ADVANCED IS THAT MR. ANTONE DOES

2    NOT ACT OUT SEXUALLY BECAUSE TO SOME DEGREE THE

3    OPPORTUNITY IS NOT AVAILABLE TO HIM.  BUT THAT DOES NOT

4    NECESSARILY PROVE THAT HE IS NOT SEXUALLY DANGEROUS.

5        HAVE YOU HAD, IN YOUR EXPERIENCE, PERHAPS AT THE

6    HOSPITAL OR IN SOME OF YOUR OTHER EXPERIENCE AS A

7    FORENSIC PSYCHOLOGIST, HAVE YOU HAD AN OPPORTUNITY TO

8    OBSERVE PEOPLE WHO DO ACT OUT BASED UPON STRONG SEXUAL

9    URGES?

10   A    YES.  VERY MUCH SO.

11   Q    ARE THOSE PEOPLE IN A CONFINED ENVIRONMENT?

12   A    YES.  THAT IS ONE OF THE THINGS THAT LARNED HAS AS

13   FAR AS TRAINING IS CONCERNED.  IT MAKES IT A VALUABLE

14   INSTITUTION.  I HAVE OBSERVED PEOPLE THAT HAVE SUCH A

15   PEDOPHILIC INTENT THAT THEY WOULD LICK THE TELEVISION.  I

16   HAVE SEEN THEM TRY AND SEDUCE NURSES TO HAVE ORAL SEX.  I

17   HAVE SEEN THEM DO DEVIANT HOMOSEXUAL KINDS OF ACTIVITIES.

18   I HAVE NOT FOUND IN MY EXPERIENCE THAT A PERSON WHO HAS A

19   PEDOPHILIC DIAGNOSIS TO BE ABSOLUTELY HINDERED IN LOCK

20   UP.  I THINK IT'S JUST THE OPPOSITE.

21   Q    WHEN YOU SAY JUST THE OPPOSITE, WHAT DO YOU MEAN?

22   A    I THINK IT CONTINUES.

23   Q    YOU REFERRED TO SOMEONE -- YOU HAVE SEEN SOMEONE LICK

24   THE TV.  CAN YOU EXPLAIN THAT?

25   A    YES.  YOU WOULD EXPECT A PERSON THAT IS A PEDOPHILE,

1    FOR INSTANCE, TO WANT TO ORDER -- HAVE CATALOGS SENT IN,

2    J.C. PENNY CATALOGS, OR WATCH WALT DISNEY MOVIES OR

3    ANYTHING THAT HAS CHILDREN IN IT, AND ESPECIALLY WITH

4    TELEVISION, YOU WOULD SEE A PERSON -- THIS INDIVIDUAL

5    THAT WE HAVE CURRENTLY IN TREATMENT WILL WALK UP, AND

6    WHEN THERE IS A CHILDREN'S PROGRAM ON, HE GETS AN

7    ERECTION AND HE WALKS UP TO THE TV AND KISSES IT IN FRONT

8    OF THE GUARD, IN FRONT OF SECURITY, IN FRONT OF THE

9    TREATMENT.  IT DOESN'T MAKE ANY DIFFERENCE AT ALL.  THAT

10   IS WHAT HE DOES.  AND HE HAS A COMPULSION TOWARDS DOING

11   THAT.

12       IT DOESN'T -- THE TREATMENT DOESN'T STOP HIM FROM

13   DOING THAT.

14   Q   HAVE YOU HAD ANY -- HAS THERE BEEN ANY INFORMATION

15   PROVIDED TO YOU THAT MR. ANTONE HAS ACTED IN ANY SEXUALLY

16   DEVIANT WAYS SUCH AS PROPOSITIONING GUARDS FOR SEX?

17   A   NO.  I ASKED ABOUT THAT.  NO.  HE DENIED THAT AND I

18   HAVE NO DOCUMENTATION PROVIDED THAT SHOWED ANY KIND OF

19   DEVIANT BEHAVIOR ON HIS PART SINCE HE HAS BEEN

20   INCARCERATED.

21   Q   DID YOU SEE ANY INCIDENT REPORTS REGARDING

22   PROPOSITIONING SOMEONE FOR SEX?

23   A   NO.

24   Q   OR ANY INCIDENT REPORTS RELATED TO ANY SEXUAL CONTACT

25   WITH ANYONE?

1    A    NO.

2    Q    OR ANY INCIDENT REPORTS WITH REGARD TO HIS -- THAT HE

3    HAD AN INTEREST IN PREPUBESCENT FEMALES?

4    A    NO.

5    Q    DID YOU SEE ANYTHING IN THE -- IN ANY OF THE REPORTS,

6    IN ANY OF THE DOCUMENTATION THAT YOU WERE PROVIDED OR

7    TESTIMONY THAT WOULD LEAD YOU TO BELIEVE THAT HE HAS AN

8    URGE TO RAPE?

9    A    NO.  AND I LOOKED FOR THAT.  BUT I COULD NOT FIND

10   THAT.  I WAS LOOKING TO SEE IF WHAT -- IF THERE WAS A

11   PLANNED -- IF THERE WAS A PLANNED, A STALKING, A

12   GROOMING, AN INTENTIONAL, OVER A PERIOD OF TIME, OF

13   TRYING TO SET UP A VICTIM, AND I DID NOT FIND THAT.

14        I FOUND -- WHAT I FOUND WAS A LOT OF IMPULSIVITY.

15   Q    CAN YOU GIVE AN EXAMPLE OF WHAT YOU MEAN BY A PLANNED

16   SET UP?

17   A    A PLANNED SET UP MAY BE STALKING A PERSON OR GROOMING

18   AN INDIVIDUAL, TO GETTING TO KNOW THEM, DOING THINGS OVER

19   A PERIOD OF TIME.  IT TAKES A PERIOD OF TIME TO DO THAT.

20   IN MR. ANTONE'S CASE WHAT I FOUND WAS JUST AN IMMEDIATE

21   GRATIFICATION.  IT'S ALMOST LIKE A DISINHIBITED

22   EXPLOITATION.  IT'S OPPORTUNISTIC.

23   Q    WHEN YOU SAY THAT IT WAS OPPORTUNISTIC, WOULD THAT

24   LEAD -- WOULD THAT BE MORE SIMILAR TO SAY THE GARDEN

25   VARIETY CRIMINAL ACTIVITY VERSUS A SEX OFFENDER WHO HAS A

1    COMPULSION TO RAPE?

2    A    THE PEOPLE THAT I HAVE DEALT WITH THAT ARE SEX

3    OFFENDERS HAVE A HISTORY OF SETTING VICTIMS UP.  THEY

4    HAVE A HISTORY OF KNOWING WHAT THEY HAVE DONE.  THEY HAVE

5    A PATTERN THAT THEY CAN IDENTIFY WITH.  THEY HAVE ALMOST

6    LIKE A MODUS OPERANDI.

7         WHAT I FOUND WITH MR. ANTONE IS MR. ANTONE HAS A

8    PERIOD OF SUBSTANCE ABUSE, OF BEING COMPLETELY BLACKED

9    OUT, OF HAVING ALCOHOLIC AMNESIA.  THAT IS NOT -- THAT IS

10   NOT A PATTERN THAT I WOULD THINK FOR A (QUOTE) "SEX

11   OFFENDER", THAT IS OFFENDING BECAUSE HE IS PLANNING THAT

12   PARTICULAR PROGRAM, THAT PARTICULAR CRIME.

13   Q    SO WHEN YOU TALK ABOUT MR. ANTONE'S BLACKOUTS -- AND

14   WE HAVE HEARD A LITTLE BIT ABOUT THAT -- YOU WROTE IN

15   YOUR REPORT THAT HE TOLD YOU HE DID NOT REMEMBER, BUT HE

16   HAD NO REASON TO BELIEVE HIS VICTIMS WERE LYING ABOUT

17   WHAT THEY HAD ACCUSED HIM OF?

18   A    YES, I HEARD HIM SAY THAT.

19   Q    AND HE ACTUALLY SAID THAT TO YOU IN YOUR INTERVIEW AS

20   WELL?

21   A    YES.

22   Q    DID YOU HAVE ANY REASON TO BELIEVE THAT HE JUST

23   DIDN'T WANT TO TALK ABOUT IT?

24   A    NO.  JUST THE OPPOSITE.  HE WAS VERY OPEN IN TALKING.

25   WHAT I UNDERSTOOD FROM MR. ANTONE AS HE SPOKE WAS IF I

1  WAS DRUNK, I WAS OUT.  I DON'T KNOW THIS.  IF THEY SAID

2  IT HAPPENED, THEN IT PROBABLY HAPPENED.  THAT IS WHAT I

3  UNDERSTOOD HIM TO SAY.

4  Q   WELL, WHEN YOU REFER TO A BLACKOUT, THEN YOU ARE NOT

5  SAYING THAT HE WAS PASSED OUT UNCONSCIOUS SOMEWHERE.  YOU

6  MEAN A BLACKOUT WITH RELATION TO HIS MEMORY OR A PHYSICAL

7  SHUTTING DOWN OF HIS BODY?

8  A   NO.  THERE IS NO PHYSICAL SHUTTING DOWN.  THERE IS

9  A -- I GET MY PAYCHECK ON FRIDAY AT 3:00 O'CLOCK AND IT'S

10 MONDAY MORNING AND I HAVE NO IDEA WHAT HAPPENED AND I AM

11 AT WORK.

12 Q   SO MORE LIKE AN AMNESIA, WOULD THAT BE A BETTER WAY

13 TO DESCRIBE IT?

14 A   THAT IS THE TERMINOLOGY, ALCOHOLIC AMNESIA, YES.

15 Q   IS THAT SOMETHING YOU HAVE SEEN IN OTHER CLIENTS THAT

16 YOU HAVE DEALT WITH?

17 A   YES.

18 Q   AND OTHER PATIENTS THAT HAVE ALCOHOL DEPENDENCE?

19 A   I HAVE BEEN ON A RESERVATION WHERE I HAVE DONE THREE

20 OF THOSE, WORKED WITH THREE OF THOSE.

21 Q   AND BLACKOUTS WERE A COMMON OCCURRENCE?

22 A   YES.

23 Q   DOES THAT INDICATE -- STRIKE THAT.

24      NOW, WOULD YOU SAY THAT BECAUSE OF WHERE YOU WORK,

25 IT'S PROBABLY EASIER FOR YOU THAN MOST TO RECOGNIZE WHEN

1    SOMEBODY NEEDS TO BE CIVILLY COMMITTED?

2    A    EVERYONE IN KANSAS COMES THROUGH OUR INSTITUTION FOR

3    CIVIL COMMITMENT.  I SEE EACH ONE OF THOSE INDIVIDUALS.

4    I WORK WITH INDIVIDUALS.  I DON'T DO THE REPORT, BUT I AM

5    PRIVY TO THE INTERACTION THAT GOES ON WITH EACH

6    INDIVIDUAL.  SO YES, IT'S A GREAT TRAINING INSTITUTION

7    FOR THIS PARTICULAR KIND OF WORK, YES.

8    Q    SO YOU HAVE THE ABILITY TO SEE EXTREME CASES AND TO

9    KNOW WHEN SOMETHING MAY NOT BE EXTREME?

10   A    THAT IS TRUE.

11   Q    HOW DIFFERENT IS MR. ANTONE FROM SOMEONE THAT YOU

12   WOULD SEE WHO HAS BEEN CIVILLY COMMITTED?  OR IN WHAT

13   WAYS IS MR. ANTONE THE SAME OR DIFFERENT?

14   A    I BELIEVE THERE ARE MANY FACTORS THAT YOU LOOK AT AS

15   FAR AS A CIVIL COMMITMENT IS CONCERNED.  CERTAINLY YOU

16   HAVE HEARD THE LAST TWO DAYS OF A LOT OF DISCUSSION ABOUT

17   ACTUARIALS.  ONE OF THE THINGS THAT IS REALLY MISSING IS

18   THE DYNAMIC FACTORS OF HOW THAT PERSON IS NOW IN

19   RELATIONSHIP TO THE ACTS.  STATIC, MEANING IT'S ALL SAID

20   AND DONE AND IT'S EASY TO SCORE, IN A WAY, HOW YOU

21   INTERPRET THAT, BUT THE DYNAMIC FACTORS ALLOW FOR THE

22   GROWTH OF A PERSON TO CHANGE OR IT ALLOWS FOR THE PERSON

23   NOT TO CHANGE.

24        AND SO WHEN YOU LOOK AT MR. ANTONE, YOU ARE LOOKING

25   AT IS THERE A PATTERN OF ANTISOCIAL BEHAVIORS OVER A

1    PERIOD OF TIME SINCE INCARCERATION, AND YOU DIDN'T SEE

2    THAT.  IS HE WELL MANAGED IN INCARCERATION?  YOU SAY HE

3    IS.

4         YOU ARE LOOKING AT VARIOUS THINGS THAT ANTISOCIAL OR

5    BORDERLINE PEOPLE DO, AND YOU ARE NOT SEEING THOSE

6    BEHAVIORS.  IF YOU SEE THOSE BEHAVIORS, THAT IS

7    INDICATING THAT PERSON IS CONTINUING ON THE KINDS OF

8    BEHAVIORS THAT GOT HIM IN TROUBLE IN THE PAST.  YOU DON'T

9    SEE THAT WITH MR. ANTONE.  SO IN THAT WAY, IT'S

10   DIFFERENT.

11   Q   WHAT WOULD YOU SAY ARE DYNAMIC RISK FACTORS THAT

12   SHOULD BE CONSIDERED?

13   A   I THINK THERE ARE -- WELL, I DON'T THINK MY COMMUNITY

14   AGREES ON ALL OF THEM SINCE THERE IS A NUMBER, BUT THEY

15   DO AGREE ON SOME.  THEY ARE LOOKING AT A PERSONALITY

16   DISORDER.  THEY ARE LOOKING AT A PARAPHILIA.  THEY ARE

17   NOT LOOKING AT BEING SEXUALLY ABUSED.  THEY ARE NOT

18   LOOKING AT LACK OF EMPATHY FOR A VICTIM.  THEY ARE NOT

19   LOOKING FOR LONELINESS.

20        WHAT THEY ARE LOOKING FOR IS SUBSTANCE ABUSE.  THEY

21   ARE LOOKING FOR HOW THAT PARTICULAR PERSON IS

22   INTERACTING, SOCIAL SKILLS.  THAT IS THE KIND OF

23   PERSONALITY AND DYNAMIC FACTORS THAT WE ARE LOOKING AT.

24   Q   WOULD SEXUAL PREOCCUPATION BE A DYNAMIC RISK FACTOR?

25   A   VERY MUCH SO.

1    Q    DO YOU HAVE ANY EVIDENCE THAT MR. ANTONE HAS BEEN

2    SEXUALLY PREOCCUPIED OVER THE LAST DECADE THAT HE HAS

3    BEEN IN PRISON?

4    A    NO.  I WAS LOOKING FOR THAT.  I WAS LOOKING TO SEE --

5    I THINK THEY CALL THEM SHOTS.

6    Q    UM-HUM.

7    A    OR BEING IN SPECIAL HOUSING UNITS FOR ANY KIND OF

8    SEXUAL ACTING OUT.  I FOUND NONE.  I WAS LOOKING FOR

9    EVIDENCE OF PORNOGRAPHY OVER A PERIOD OF TIME, EXCHANGING

10   FILMS, CARDS, THAT KIND OF THING.  I FOUND NONE OF THAT.

11   I FOUND NO BEHAVIORS OF TRYING TO ENTICE STAFF OR

12   INTERACTING WITH STAFF IN AN INAPPROPRIATE MANNER.  I

13   FOUND NONE OF THAT.

14   Q    DID YOU FIND ANY GENERAL SELF REGULATION PROBLEMS?

15   A    NO.  JUST THE OPPOSITE.  MOST OF THE REPORTS THAT I

16   WAS PRIVY TO SEE FROM THE BOP SHOWED THAT HE WAS A GOOD

17   WORKER, THAT HE HAD SATISFACTORY REPORTS OVER A PERIOD OF

18   TIME SINCE HIS INCARCERATION.

19   Q    SO WHAT ABOUT EMPLOYMENT INSTABILITY.  IS THAT A

20   DYNAMIC RISK FACTOR?

21   A    IT IS, BUT -- IT IS, AND THERE IS AN ISSUE WITH THAT.

22   AND THAT IS A CULTURAL ISSUE.  ON MANY RESERVATIONS, IT'S

23   NOT POSSIBLE TO HAVE STEADY EMPLOYMENT.  WHAT YOU HAVE IS

24   YOU HAVE SEASONAL EMPLOYMENT.  AN EXAMPLE, AND FOR THE

25   MESCALERO APACHE, THERE ARE NO -- THERE IS NO WAY TO

1    HAVE, IF YOU LIVE ON A RESERVATION, THEY SHUT THE SAWMILL

2    DOWN, SO THERE IS NO YEAR ROUND WORK.  WHAT THEY DO IS IN

3    THE  WINTERTIME THEY HAVE A SKI LODGE AND THE PEOPLE ARE

4    EMPLOYED IN THE SKI LODGE.  IN THE SUMMERTIME, THEY CUT

5    WOOD.  SO THAT IS THEIR SEASON.

6         BUT IF YOU SAY, HAVE YOU HAD STEADY EMPLOYMENT, HE

7    WILL SAY NO.  AND THEN THE FLAG GOES UP.  BUT THAT IS NOT

8    REALLY VALID IF YOU ARE ON THE RESERVATION BECAUSE THE

9    ONLY THING POSSIBLE IS TO HAVE SEASONAL WORK.

10        SO YOU ARE LOOKING AT HAVE YOU HAD SEASONABLE WORK

11   CONSISTENTLY.  YES.  OKAY.  THEN THERE IS NO FLAG THAT

12   GOES UP.

13   Q   SO THAT WOULD BE SOMETHING THAT IS UNIQUE TO NATIVE

14   AMERICANS?

15   A   YES.

16   Q   IS IT YOUR OPINION THAT IN THE ABSENCE OF A

17   PARAPHILIA, THAT SOMEONE CAN BE COMMITTED AS A SEXUALLY

18   VIOLENT PREDATOR OR A SEXUALLY DANGEROUS PERSON?

19   A   THE LITERATURE SPEAKS TO THE NEED FOR A PARAPHILIA

20   DIAGNOSIS.  ONE OF THE THINGS THAT IS INTERESTING IN MY

21   FIELD IS THE IDEA OF CIVIL COMMITMENT IS CHANGING AS WE

22   GO THROUGH.

23        AT FIRST WHEN THE ACTUARIALS CAME OUT, THE

24   RECIDIVISM RATES WERE HERE, AND WE KNOW THAT OVER A

25   PERIOD OF TIME, NO MATTER WHAT CATEGORY YOU ARE,

1   RECIDIVISM RATES ARE GOING DOWN.  SO OUR INFORMATION WHEN

2   WE FIRST STARTED WAS NOT CORRECT.  WHEN WE FIRST STARTED,

3   WE BEGAN TO THINK SOME OF THE DYNAMIC FACTORS WE WERE

4   LOOKING AT WAS VERY IMPORTANT.  WE HAVE SINCE LEARNED

5   THAT THOSE FACTORS ARE NO LONGER IMPORTANT.  THERE ARE

6   OTHER RISK FACTORS TO LOOK AT.  SO WE CHANGE AS WE ARE

7   GOING THROUGH WITH CIVIL COMMITMENT.

8   Q   OF THE PEOPLE THAT YOU COME INTO CONTACT WITH DAILY

9   THAT ARE CIVILLY COMMITTED WHERE YOU WORK, DO YOU HAVE A

10  RECOLLECTION OF WHAT PERCENTAGE OF THOSE PEOPLE ARE

11  ACTUALLY SUFFERING FROM A PARAPHILIA OF THE PEOPLE THAT

12  ARE CIVILLY COMMITTED?

13  A   I REALLY DON'T.  I WOULD ASSUME, JUST BASED UPON

14  KANSAS LAW, THAT ALMOST ALL OF THEM WILL HAVE A

15  PARAPHILIA.

16          MS. ALLEN:  IF I CAN HAVE JUST A MOMENT YOUR

17  HONOR.

18          THE COURT:  YOU MAY.

19          MS. ALLEN:

20  Q   WHO ARE SOME OF THE RESEARCHERS IN YOUR FIELD THAT

21  YOU RELY ON FOR MAKING SURE YOU ARE USING DYNAMIC -- THE

22  RIGHT DYNAMIC RISK FACTORS AND STAYING UP ON THE CHANGES

23  THAT ARE GOING ON IN YOUR FIELD?

24  A   WE RELY A LOT ON THE WORK OF HANSON.  WE RELY ON THE

25  WORK OF DR. PHENIX.  WE RELY ON THE WORK OF ANN PSALTER.

1    LIKE THAT.

2    Q    I WOULD LIKE TO ASK YOU TO LOOK AGAIN AT GOVERNMENT'S

3    EXHIBIT NUMBER 10 AND IT'S DR. GRAY'S REPORT.  IT'S PAGE

4    20 OF THE REPORT.  IT'S PAGE 20 OF DR. GRAY'S REPORT.

5    IT'S ACTUALLY BATES PAGE NUMBER 1865.  THERE IS PARAGRAPH

6    5 ON THAT PAGE, AND THERE IS ITEM NUMBER 1.  HAVE YOU

7    FOUND WHERE I AM?

8    A    YES.  LINE PAGE 20?

9    Q    YES.

10   A    OKAY.

11   Q    THIS IS A -- WHY DON'T YOU TELL ME WHAT THIS IS AND

12   WHAT YOU GATHERED FROM THIS REPORT?

13   A    IT'S TITLED EVALUATION OF ISSUES, SITUATIONS OR

14   CONDITIONS WHICH MAY EITHER ENHANCE OR INTERFERE WITH OR

15   PROMOTE A SUCCESSFUL COMPLETION OF TREATMENT.

16   Q    WHAT DOES THAT MEAN?

17   A    IT APPEARS LIKE WHAT THE DOCTOR IS LISTING IS HE HAS

18   A SERIES OF FACTORS HE IS LOOKING AT TO SEE IF THEY ARE

19   EITHER PRESENT OR ABSENT AND WHAT THEY WILL DO IS THEY

20   WILL EITHER INHIBIT TREATMENT OR PROMOTE TREATMENT.

21   Q    LET'S LOOK AT NUMBER 1, "PHALLOMETRIC ASSESSMENT OF

22   SEXUAL PREFERENCE FOR CHILDREN, VISUAL REACTION TIME

23   USED:  ABSENT."

24        DR. DAUM, CAN YOU TELL ME WHAT THE PHALLOMETRIC

25   ASSESSMENT OF SEXUAL PREFERENCE IS AND WHAT THAT MEANS?

1    A   AS I UNDERSTAND IT, THEY ARE TAKING, AS DESCRIBED,

2    I THINK THE PROBATION OFFICER DESCRIBED IT EARLIER, THEY

3    TAKE AN INSTRUMENT AND ATTACH IT TO THE PENIS AND THEN

4    THEY WILL SHOW -- THEY WILL PUT EARPHONES ON YOUR HEAD

5    AND LET YOU LISTEN TO SOMETHING AND ALSO WATCH A TV

6    CAMERA OF SOME SORT WHERE THEY SHOW THINGS THAT GO ON AND

7    ON AND ON AND THEN YOU ARE TO PRESS A BUTTON OR YOU ARE

8    TO SIT AND WATCH, AND IF THE PENIS INCREASES IN SIZE OR

9    VOLUME, IT'S INDICATING THAT YOU ARE AROUSED TO THAT.

10   Q   AND WHAT WAS THE CONCLUSION OF THAT IN DR. GRAY'S

11   REPORT?

12   A   THERE DOES NOT SEEM TO BE ANYTHING ABNORMAL, THAT HE

13   SHOWS NO SEXUAL PREFERENCE FOR CHILDREN.

14   Q   DR. DAUM, YOU JUST TESTIFIED THAT YOU LOOKED AT THE

15   RESEARCH, YOU LOOKED AT THE RESEARCH FROM DR. HANSON, AND

16   YOU ALSO SAID YOU LOOK AT RESEARCH BY DR. PHENIX?

17   A   YES.

18   Q   YET YOU DID NOT REACH THE SAME CONCLUSION THAT DR.

19   PHENIX REACHED IN THIS CASE, SO WHY IS SHE WRONG AND WHY

20   ARE YOU RIGHT?

21   A   I DON'T THINK IT'S ABOUT RIGHT OR WRONG.  I THINK

22   IT'S ABOUT HOW YOU INTERPRET THE FACTS.  OR AT LEAST THAT

23   IS MY OPINION.  OTHERS MAY DISAGREE, BUT I THINK MY JOB

24   IS SIMPLY TO PRESENT HOW I SEE SOMETHING, AND THEN LET

25   THE COURT DECIDE ON THAT.  SO IT'S NOT ABOUT RIGHT OR

1    WRONG.  IT'S ABOUT I INTERPRET DATA THIS WAY.  SHE

2    INTERPRETS DATA THAT WAY, ALL WITHIN CONFINES OF DSM-IV

3    AND HOW WE ARE TRAINED.

4         SO IT'S VERY POSSIBLE FOR ONE PSYCHOLOGIST TO SAY I

5    SEE IT THIS WAY AND ANOTHER TO SAY I SEE IT THAT WAY.

6    Q    WHAT ARE YOUR THOUGHTS ABOUT ANTISOCIAL PERSONALITY

7    DISORDER?  DO YOU BELIEVE THAT ALONE IS SUFFICIENT TO --

8    I REALIZE THAT YOU DID NOT REACH THAT DIAGNOSIS WITH MR.

9    ANTONE, BUT IN THE EVENT THAT THE COURT WERE TO CONCLUDE

10   THAT PERHAPS HE DOES HAVE ANTISOCIAL PERSONALITY

11   DISORDER, DO YOU BELIEVE THAT A DIAGNOSIS OF ANTISOCIAL

12   PERSONALITY DISORDER IS SUFFICIENT, STANDING ALONE, TO

13   JUSTIFY A SEXUALLY DANGEROUS PERSON'S CIVIL COMMITMENT?

14   A   NO, NOT AS YOU ARE STATING IT; NO, I DON'T BELIEVE

15   THAT.  IT'S ABOUT THE DEGREE OF MORE SO THAN ANYTHING

16   ELSE.  IT'S -- THE COURTS, AS I UNDERSTAND IT, THE COURTS

17   ARE LOOKING TO SEE IF THERE IS A PARAPHILIA, BUT THEY ARE

18   ALSO LOOKING TO SEE -- THERE HAS TO BE SOME KIND OF

19   MENTAL ABNORMALITY, SOMETHING THAT STARTS AT AN

20   INDIVIDUAL WHERE THEY ARE COMPULSIVE, WHERE THEY CANNOT

21   OR THEY HAVE DIFFICULTY CONTROLLING THEIR EMOTIONS, THEIR

22   REACTIONS TO WHERE THEY ARE GOING TO REOFFEND, AND

23   PERSONALITY CERTAINLY FIGURES INTO THAT AS WELL AS MOOD

24   DISORDERS.

25   Q   IS MR. ANTONE PRESENTLY SUFFERING FROM A MENTAL

1    ILLNESS, SERIOUS MENTAL ILLNESS, ABNORMALITY OR DISORDER

2    IN YOUR OPINION?  STRIKE THAT.  WE'LL START OVER.

3         IS MR. ANTONE SUFFERING, PRESENTLY, TODAY, SUFFERING

4    FROM A SERIOUS MENTAL ILLNESS, ABNORMALITY, OR DISORDER

5    AS A RESULT OF WHICH HE WOULD HAVE SERIOUS DIFFICULTY IN

6    REFRAINING FROM SEXUALLY VIOLENT CONDUCT OR CHILD

7    MOLESTATION IF RELEASED?

8         DO YOU BELIEVE THAT HE IS A PERSON THAT SUFFERS FROM

9    A MENTAL ILLNESS, ABNORMALITY OR DISORDER AS A RESULT OF

10   WHICH HE WOULD HAVE SERIOUS DIFFICULTY IN REFRAINING FROM

11   SEXUALLY VIOLENT CONDUCT OR CHILD MOLESTATION IF HE WERE

12   RELEASED?

13   A    PRESENTLY?

14   Q    YES.

15   A    NO.

16   Q    SO YOUR TESTIMONY IS THAT ALTHOUGH HE HAS A DIAGNOSIS

17   OF -- LET ME ASK YOU THIS.  WHAT IS THE QUESTION YOU

18   BELIEVE YOU HAVE BEEN ASKED HERE TODAY TO ANSWER FOR THE

19   COURT?

20   A    THE QUESTION THAT I THINK THAT I HAVE ANSWERED FOR

21   THE COURT OR RECOMMENDED TO THE COURT IS WILL MR.

22   ANTONE -- DOES HE HAVE A MENTAL DISORDER THAT WILL MAKE

23   IT SUCH THAT HE CANNOT GO OUT INTO THE COMMUNITY.  THAT

24   IS WHAT I THINK MY QUESTION THAT I AM SUPPOSED TO ANSWER

25   OR TO RECOMMEND.

1      HE HAS A MENTAL DISORDER.  HE HAS A PERSONALITY

2  DISORDER, BUT HE DOES NOT AT THIS POINT HAVE IT SUCH THAT

3  HE CANNOT CONTROL HIS SEXUAL URGES.

4  Q    SO YOU BELIEVE THAT WITH REGARD TO THE LANGUAGE OF

5  THE STATUTE, YOUR TESTIMONY IS THAT YOU DO NOT -- YOU

6  BELIEVE HE DOES HAVE A DISORDER, HOWEVER, YOU DO NOT

7  BELIEVE THAT HE WOULD HAVE SERIOUS DIFFICULTY IN

8  REFRAINING FROM SEXUALLY VIOLENT CONDUCT?

9  A    THAT'S CORRECT.

10  Q    OR CHILD MOLESTATION IF HE WERE RELEASED?

11  A    THAT'S CORRECT.

12          MS. ALLEN:  THANK YOU.

13          THE COURT:  THANK YOU.  HAVE YOU COMPLETED

14  YOUR EXAMINATION OF DR. DAUM?

15          MS. ALLEN:  I HAVE.  THANK YOU.

16          THE COURT:  VERY GOOD.  MR. ROYSTER.

17          MR. ROYSTER:  THANK YOU, JUDGE.

18  CROSS EXAMINATION BY MR. ROYSTER:

19  Q    DR. DAUM, CERTAINLY YOU WOULD AGREE THAT MR. ANTONE'S

20  CONDUCT BEFORE HIS INCARCERATION IS RELEVANT TO YOUR

21  EVALUATION; RIGHT?

22  A    VERY MUCH, SIR.

23  Q    BECAUSE YOU BELIEVE THAT PAST BEHAVIOR IS A GOOD

24  PREDICTOR OF FUTURE BEHAVIOR; DON'T YOU?

25  A    I BELIEVE THAT PEOPLE BELIEVE THAT, YES.

1    Q    YOU BELIEVE THAT; DON'T YOU?

2    A    NO, I DON'T.

3    Q    YOU DID NOT TELL ME AT YOUR DEPOSITION THAT PAST

4    BEHAVIOR IS A GOOD PREDICTOR OF FUTURE BEHAVIOR; IS THAT

5    YOUR TESTIMONY?

6    A    YES, I DID, AND I WANT TO CLARIFY THAT IF I CAN.

7    Q    PLEASE.

8    A    BECAUSE WHEN -- AND I HEARD THAT SAID TODAY.  WHAT IS

9    NOT SAID IS THE ABILITY FOR A HUMAN TO CHANGE.  I HAVE

10   SEEN OVER THE YEARS WITH PEOPLE I WORK WITH, PEOPLE THAT

11   I HAVE TREATED, THAT THEY WILL HAVE THIS DISORDER AND

12   HAVE DONE THIS OVER A PERIOD OF TIME.  BUT THE IDEA OF

13   TREATMENT AND THERAPY IS THAT IT CAN CHANGE.  IF NOT, WE

14   WOULD HAVE NO JOBS.

15       SO OVER A PERIOD OF TIME, I WOULD SAY THAT A PERSON

16   THAT HAS A SEXUAL DEVIANT BEHAVIOR HAS THE CHANCE AND THE

17   POSSIBILITY OF NO LONGER HAVING THAT ANYMORE.  WHERE THE

18   FIRST PART OF THAT STATEMENT COMES IN IS IT GIVES YOU A

19   CAUTION AND YOU BEGIN TO ASK SO WHAT CHANGES, WHAT KINDS

20   OF THERAPY HAVE YOU HAD.  THEREFORE, YOU CAN PROVE

21   CHANGE.  THAT IS WHAT I MEANT TO SAY, SIR.

22   Q    SO THE THERAPY AND THE SEX OFFENDER TREATMENT IS WHAT

23   WOULD HELP THE PERSON CHANGE; RIGHT?

24   A    YES, SIR.

25   Q    NOW, YOU HAVE NEVER AUTHORED OR CO-AUTHORED A PEER

1   REVIEW ARTICLE REGARDING SEX OFFENDER TREATMENT; HAVE

2   YOU?

3   A   NO, SIR, I HAVE NOT BEEN PRIVILEGED TO DO THAT.

4   Q   YOU HAVE NEVER AUTHORED OR CO-AUTHORED A PEER REVIEW

5   ARTICLE REGARDING SEX OFFENDER EVALUATIONS; HAVE YOU?

6   A   NO, SIR, I HAVE NOT BEEN PRIVILEGED TO DO THAT.

7   Q   AND ACTUALLY THIS IS THE FIRST REPORT THAT YOU HAVE

8   PREPARED FOR -- AS A FORENSIC EVALUATION FOR THE CIVIL

9   COMMITMENT OF A SEXUALLY DANGEROUS PERSON; RIGHT?

10  A   THAT'S CORRECT.

11  Q   IN FACT, YOU ACTUALLY USED A GO-BY REPORT OF ANOTHER

12  FORENSIC EVALUATION TO HELP PREPARE YOU OR HELP TO PUT

13  YOUR REPORT TOGETHER IN THIS CASE; RIGHT?

14  A   I AM NOT SURE WHAT YOU MEAN.

15  Q   YOU ACTUALLY USED A GO-BY, AN OLDER REPORT THAT

16  SOMEBODY ELSE HAD DONE, A FORENSIC EVALUATION THAT HELPED

17  PUT YOUR REPORT TOGETHER IN THIS CASE; DIDN'T YOU?

18  A   WHAT IS A GO-BY?

19  Q   YOU USED A FORM -- WELL, LET ME STRIKE THAT.  YOU

20  ACTUALLY USED AN OLDER REPORT THAT SOMEBODY ELSE DID TO

21  HELP PUT YOUR REPORT TOGETHER IN THIS CASE; DIDN'T YOU?

22  A   YOU MEAN THIS REPORT?

23  Q   YES.

24  A   I AM NOT SURE I UNDERSTAND WHAT YOU ARE ASKING.  THIS

25  IS MY REPORT.

1    Q   RIGHT.

2    A   THIS IS MY FORM.  THIS IS WHAT WE USE.

3    Q   NOW, YOUR PRIMARY WORK ON PRESENTENCE EVALUATIONS --

4    WELL, YOU ARE PRIMARILY WORKING ON PRESENTENCE

5    EVALUATIONS IN YOUR WORK NOW?

6    A   NO.  THAT IS NOT CORRECT.

7    Q   OKAY.  ISN'T THAT WHAT YOU TOLD ME AT THE DEPOSITION,

8    THAT YOU PRIMARILY WORK ON PRESENTENCE EVALUATIONS?

9    A   IT WAS AT THAT TIME, YES, SIR.  IT'S NOT CORRECT NOW.

10   Q   OKAY.  WHAT ABOUT COMPETENCY TO STAND TRIAL?  IS THAT

11   DIFFERENT, TOO?

12   A   NO, SIR.  THAT IS PREDOMINANTLY, RIGHT NOW IN THE

13   PAST MONTH OR MONTH AND A HALF, THAT IS WHAT I HAVE BEEN

14   DOING MORE OF.  MY WORK CHANGES, SIR, AS I GO THROUGH,

15   DEPENDING ON WHAT THE COURT ASKS ME TO DO.

16   Q   LET'S TAKE A LOOK AT YOUR REPORT.  THERE IS A SECTION

17   IN YOUR REPORT TITLED PSYCHIATRIC HISTORY.  IT'S ON PAGE

18   3.

19   A   YES, SIR.

20   Q   DO YOU SEE THAT?

21   A   YES, SIR.

22   Q   IT INCLUDES SOME INFORMATION THAT HE GAVE YOU DURING

23   YOUR CLINICAL INTERVIEW; RIGHT?

24   A   YES, SIR.

25   Q   YOU ASKED HIM IF HE THOUGHT HE HAD A MENTAL ILLNESS;

1    RIGHT?  AND HE TOLD YOU NO.  THAT IS ONE OF THE THINGS

2    YOU PUT IN YOUR PSYCHIATRIC HISTORY?

3              THE COURT:  ARE YOU REFERRING, MR. ROYSTER, TO

4    RESPONDENT'S EXHIBIT 1, PAGE 3?

5              MR. ROYSTER:  YES, SIR.

6              THE COURT:  THANK YOU.

7              MR. ROYSTER:

8    Q   UNDER THE HEADING PSYCHIATRIC HISTORY?

9    A   OKAY.

10   Q   NOW, YOU HAVE INCLUDED INFORMATION THAT YOU ASKED HIM

11   IF HE HAD A MENTAL ILLNESS; RIGHT?

12   A   LET ME FINISH.  I DON'T QUOTE THAT, BUT I THINK IN

13   THE PROCESS OF GOING THROUGH IT, I WOULD HAVE ASKED THAT

14   QUESTION, YES.

15   Q   DO YOU REMEMBER ASKING HIM IF HE HAD A MENTAL

16   ILLNESS?

17   A   I NORMALLY DO.

18   Q   AND HE TOLD YOU NO; RIGHT?

19   A   THEY NORMALLY SAY, YES, I DON'T HAVE A MENTAL

20   ILLNESS.

21   Q   BUT MR. ANTONE TOLD YOU, NO, I DON'T; ISN'T THAT

22   RIGHT?

23   A   SIR, I DON'T REMEMBER THAT.  I DON'T HAVE IT WRITTEN.

24   Q   NOW, HE ALSO TOLD YOU, DIDN'T HE, THAT HE BELIEVED HE

25   LEARNED A LOT ABOUT HIS DRINKING AND HIS DRUGS FROM

1    CLASSES IN PRISON; RIGHT?

2    A    YES, SIR.

3    Q    AND HE ALSO TOLD YOU THAT HE LEARNED ABOUT HIS ANGER

4    AND HOW TO CONTROL IT; RIGHT?  HE TOLD YOU THAT?

5    A    YES, SIR.

6    Q    NOW, YOUR PSYCHIATRIC HISTORY THERE ON YOUR REPORT,

7    THAT IS LIMITED TO THE INFORMATION THAT HE GAVE YOU IN

8    HIS INTERVIEW; RIGHT?

9    A    YES AND NO.  THE PSYCHIATRIC HISTORY IS -- IT'S MORE

10   ABOUT WHAT HIS HISTORY IS.  AND I WILL HAVE OTHER DATA TO

11   ASK ABOUT THAT OR I SHOULD HAVE OTHER DATA, PAST, TO ASK

12   THE KINDS OF QUESTIONS THAT WILL ELICIT THE RESPONSES OF

13   THE KIND OF -- OF HIS HISTORY, SO IN THAT INSTANCE.

14   Q    GO AHEAD.

15   A    I THINK IN THAT INSTANCE I AM USING A DIALOG.  I AM

16   USING AN INTERVIEW PROCESS WITH HIM, YES.

17   Q    BUT IN YOUR REPORT TO THIS COURT, THE ONLY

18   INFORMATION YOU HAVE LISTED ABOUT HIS PSYCHIATRIC HISTORY

19   IS THE INFORMATION THAT HE GAVE YOU; RIGHT?

20   A    YES.

21   Q    AND ACTUALLY IF YOU WILL LOOK DOWN THERE, THE FOURTH

22   LINE AT THE END, MR. ANTONE WAS ASKED IF HE BELIEVED HE

23   HAD A MENTAL ILLNESS; THAT IS WHAT IT SAYS; RIGHT?

24   A    YES, IT DOES.

25   Q    AND IT SAYS HE REPLIED NO.  SO THAT IS IN YOUR

1    REPORT?

2    A   IT IS, YES, SIR.

3    Q   NOW, YOU DID -- YOU HAVE TESTIFIED TODAY THAT YOU SAW

4    THE PSYCHE EVALUATION FROM DR. GRAY AND SADLER; RIGHT?

5    A   YES.

6    Q   YOU DIDN'T EVEN MENTION THAT IN YOUR REPORT TO THIS

7    COURT; DID YOU?

8    A   NO.

9    Q   DID IT NOT HAVE ANY RELEVANCE WHATSOEVER TO YOUR

10   EVALUATION OF MR. ANTONE WITH RESPECT TO THIS, FOR THIS

11   COURT?

12   A   IT DOES HAVE RELEVANCE, SIR.

13   Q   WHY WAS IT NOT INCLUDED IN YOUR REPORT?

14           MR. ROSS:  OBJECTION.

15           THE COURT:  OVERRULED.

16           THE WITNESS:

17   A   IT WASN'T INCLUDED BECAUSE THE COURT ALREADY HAS THAT

18   INFORMATION.

19   Q   NOW, THE -- YOU WILL AGREE, WON'T YOU, THAT THE GRAY

20   AND SADLER REPORT DEALT IN LARGE PART WITH HIS SEXUAL

21   DEVIANCY?

22   A   VERY MUCH SO.

23   Q   YOU MENTIONED EARLIER THAT THERE WAS NO EVIDENCE OF

24   ANY URGES THAT HE WANTED TO HAVE FORCED SEX.  THAT WAS

25   YOUR TESTIMONY; RIGHT?  THERE WAS NOTHING?

1        WAS YOUR TESTIMONY THAT THERE IS NO EVIDENCE THAT

2   YOU ARE AWARE OF THAT HE HAS URGES TO FORCED SEX?

3   A    WHILE INCARCERATED?

4   Q    PERIOD.  AT ANY POINT IN HIS LIFE?

5   A    I CAN'T ANSWER THAT.  I ONLY KNOW WHAT HE IS TELLING

6   ME DURING INCARCERATION.  THE OTHER DOCUMENTS WILL ATTEST

7   TO THAT.  BUT THE PSYCHIATRIC HISTORY HAS TO DEAL WITH

8   HOW HE IS DURING DURING THE PERIOD OF TIME THROUGH

9   COUNSELORS.

10  Q    AND I AM OFF THE PSYCHIATRIC HISTORY NOW.  I AM

11  ASKING A SEPARATE QUESTION.  YOU TESTIFIED ON DIRECT THAT

12  THERE WAS NOTHING IN THE RECORD THAT YOU WERE AWARE OF

13  THAT INDICATED HE HAD URGES TO FORCED SEX?

14  A    YES.  IN -- AS INCARCERATED.

15  Q    OKAY.  SO YOU ARE JUST SAYING WHILE HE HAS BEEN

16  INCARCERATED?

17  A    YES, SIR.

18  Q    BECAUSE CERTAINLY THE RAPES, THE PRIOR RAPES, WOULD

19  BE INDICATIVE OF URGES TO HAVE FORCED SEX?  YOU WILL

20  AGREE WITH THAT?

21  A    ARE INDICATIVE OF THAT HE COMMITTED THOSE PARTICULAR

22  CRIMES, YES, BUT I DIDN'T ADDRESS THAT.  THAT WAS NOT

23  WHAT I WAS ADDRESSING.

24  Q    AND CERTAINLY HIS DECEPTIVE ANSWER ON THE POLYGRAPH

25  THAT HE FANTASIZED ABOUT NONCONSENSUAL ACTIVITY, THAT

1    WOULD BE INDICATIVE OF AT LEAST SOME EVIDENCE THAT HE HAD

2    AN URGE TO HAVE FORCED SEX?  YOU WILL AGREE WITH THAT,

3    WON'T YOU?

4    A    I WILL AGREE THAT THERE WAS SOME DISCREPANCY IN THE

5    POLYGRAPH, YES, SIR.

6    Q    NOW, YOU ADMINISTER THE MMSE, THE MINI MENTAL STATE

7    EXAM?

8    A    YES.

9    Q    THAT IS DESIGNED TO DETECT GROSS COGNITIVE IMPAIRMENT

10   AND ITS SEVERITY?

11   A    YES.

12   Q    AND HIS SCORE INDICATED NO GROSS COGNITIVE

13   IMPAIRMENT?

14   A    YES.

15   Q    AND THIS TEST THOUGH DOESN'T TELL YOU ANYTHING ABOUT

16   HIS AROUSAL TO NONCONSENSUAL SEX; DOES IT?

17   A    I AM GLAD YOU ASKED THAT.

18   Q    WHAT IS YOUR ANSWER FIRST?

19   A    NO.  IT HAS NOTHING TO DO WITH THAT.

20   Q    DO YOU WANT TO TALK ABOUT IT?

21   A    YES, I DO.

22   Q    OKAY.  GO AHEAD.

23   A    IT ALLOWS ME TO KNOW THE CONDITION, THE MENTAL STATE

24   OF THE PERSON I AM TALKING TO AT THE TIME.  THAT IS ONE

25   OF THE MOST IMPORTANT THINGS YOU WILL DO IS TO KNOW WHERE

1    YOUR EVALUATEE IS AS YOU ARE TALKING TO THEM.

2    Q   IS IT ASSOCIATED IN ANY WAY THAT YOU ARE AWARE OF

3    WITH THE FUTURE RISK OF SEXUAL RECIDIVISM?

4    A   YES, SIR.

5    Q   CAN YOU TELL US WHAT STUDIES YOU ARE AWARE OF THAT

6    SHOW THAT A SCORE ON THIS TEST IS ASSOCIATED WITH SEXUAL

7    RECIDIVISM?

8    A   NO, I CAN'T TELL YOU A STUDY.  I CAN TELL YOU WHAT

9    COMMON SENSE SAYS, THAT IF A PERSON BEGINS -- IS

10   PSYCHOTIC AND YOU IDENTIFY HIM AS PSYCHOTIC, THEN ALL

11   BETS ARE OFF AS FAR AS TRYING TO TALK ABOUT SEXUAL

12   RECIDIVISM WITH HIM.

13   Q   YOU USED THE NAVACO ANGER SCALE; RIGHT?

14   A   YES, I DID.

15   Q   THIS IS A TEST DESIGNED TO ASSESS ANGER AS A PROBLEM

16   OF PSYCHOLOGICAL FUNCTIONING AND PHYSICAL HEALTH AND TO

17   ASSESS THERAPEUTIC CHANGE; RIGHT?

18   A   YES, I DID.

19   Q   HE SCORED IN THE AVERAGE RANGE OVERALL?

20   A   YES, I DID.  YES, HE DID.

21   Q   AND THIS RANGE INDICATED HE EXPERIENCES AN EMOTIONAL

22   LIFE AS WOULD BE NORMALLY EXPECTED WITHIN THE AVERAGE

23   POPULATION?

24   A   THAT'S RIGHT.

25   Q   AND HE SCORED IN THE AVERAGE RANGE ON THE AROUSAL

1    SCALE; RIGHT?

2    A   IF THAT IS WHAT IT SAYS, YES, SIR.

3    Q   WELL, IS THAT WHAT IT SAYS?

4    A   LET ME SEE IT.  CAN YOU PUT THAT UP FOR ME, PLEASE?

5              MR. ROYSTER:  I DON'T HAVE IT.

6              THE WITNESS:  I HAVE IT HERE.

7              THE COURT:  I BELIEVE THE PAGE HE IS REFERRING

8    TO, DR. DAUM, IS PAGES 6 THROUGH 7.

9              THE WITNESS:  YES.

10             MS. ALLEN:  YOUR HONOR, MAY I PLACE IT ON THE

11   ELMO?

12             THE COURT:  YOU MAY.

13             THE WITNESS:  WHAT WAS YOUR QUESTION AGAIN,

14   SIR?

15             MR. ROYSTER:

16   Q   HE SCORED IN THE AVERAGE RANGE ON THE AROUSAL SCALE?

17   A   THAT IS CORRECT.

18   Q   THAT IS AROUSAL WITH RESPECT TO ANGER; CORRECT?

19   A   THAT'S CORRECT.

20   Q   NOT SEXUAL AROUSAL, JUST SO WE ARE CLEAR.

21   A   THAT'S RIGHT.

22   Q   NOW, THIS TEST DOESN'T TELL YOU ANYTHING ABOUT HIS

23   AROUSAL TO NONCONSENSUAL SEX; DOES IT?

24   A   IT'S NOT DESIGNED TO DO THAT.

25   Q   NOW, YOU -- IN ORDER FOR THIS TEST TO HAVE ANY

1    VALIDITY, YOU HAVE TO RELY ON HIM TELLING YOU THE TRUTH;

2    RIGHT?

3    A    YES.

4    Q    AND, OF COURSE, THERE IS CERTAINLY SOME EVIDENCE AT

5    LEAST FROM THE GRAY AND SADLER REPORT THAT HE IS

6    DECEPTIVE AT TIMES; RIGHT?

7    A    THE TEST IS AS HE IS NOW.

8    Q    RIGHT.  I AM TALKING ABOUT HIS DECEPTION.  YOU HAVE

9    GOT TO RELY ON HIS ANSWERS TO BE ACCURATE; CORRECT?

10   A    YES, SIR.

11   Q    BUT THERE IS EVIDENCE THAT HE HAS CERTAINLY LIED IN

12   THE PAST ABOUT THINGS.  YOU WOULD AGREE WITH THAT; RIGHT?

13   A    I WOULD THINK THAT -- YES, I WOULD AGREE WITH THAT.

14   Q    THIS TEST, IS IT ASSOCIATED IN ANY WAY THAT YOU ARE

15   AWARE OF WITH FUTURE RISK OF SEXUAL RECIDIVISM?

16   A    YES, SIR.

17   Q    CAN YOU IDENTIFY THE STUDIES THAT SHOW THIS TEST --

18   A    NO, SIR.

19   Q    I AM SORRY.  JUST A SECOND.  CAN YOU IDENTIFY THE

20   STUDIES THAT SHOW THIS TEST IS ASSOCIATED IN ANY WAY WITH

21   SEXUAL RECIDIVISM?

22   A    NO.

23   Q    AND IS THAT JUST A COMMON SENSE KIND OF THING AGAIN?

24   A    NO, SIR.

25   Q    HOW DOES HIS AROUSAL TO ANGER AFFECT HIS SEXUAL

1    RECIDIVISM?

2    A    YOU WOULD THINK THAT A PERSON THAT IS ANTISOCIAL OR

3    BORDERLINE HAS AN ANGER REGULATION, EMOTIONAL REGULATION

4    DYSFUNCTION.  YOU WOULD THINK A PERSON THAT HAS THAT KIND

5    OF HISTORY, BE IT SEXUAL, BE IT ANY KIND OF HISTORY,

6    WOULD HAVE AN ANGER ISSUE.  PROBABLY HE HAD AN ANGER

7    ISSUE.  BUT OVER A PERIOD OF TIME, BEING IN

8    INCARCERATION, YOU WOULD EXPECT SOME KIND OF TREATMENT.

9    THIS WOULD SHOW TREATMENT.

10        IT SAYS AT THIS POINT IN TIME THIS PARTICULAR

11   INDIVIDUAL DOES NOT HAVE AN ANGER ISSUE.  THAT IS

12   IMPORTANT IN SETTING UP TREATMENT PROGRAMS, IN SETTING UP

13   TALKING ABOUT RECIDIVISM, IN KNOWING THE INDIVIDUAL SO

14   YOU CAN ADDRESS THE PROBLEM.

15   Q    BUT YOU ARE NOT AWARE OF ANY RESEARCH OR STUDIES THAT

16   SHOW THAT A SCORE ON THIS TEST IS ASSOCIATED WITH SEXUAL

17   RECIDIVISM?

18   A    I AM AWARE OF STUDIES THAT WILL SHOW THAT ANTISOCIAL

19   PERSONALITY AND BORDERLINE, WHICH IS CONNECTED TO THIS,

20   IS IMPORTANT IN RECIDIVISM.  YES, SIR, I DO THAT.

21   Q    NOW, YOU ARE FAMILIAR WITH THE MCMI TEST?

22   A    YES.

23   Q    AND THAT IS ACTUALLY A TEST FOR -- USED TO ASSESS

24   PERSONALITY DISORDERS; RIGHT?

25   A    YES, IT IS.

1    Q   YOU DIDN'T USE THAT THOUGH; DID YOU?

2    A   NO, SIR, I DID NOT.

3    Q   NOW, YOU HAVE DIAGNOSED MR. ANTONE WITH POLYSUBSTANCE

4    DEPENDENCE AND FROTTEURISM AND BORDERLINE PERSONALITY

5    DISORDER WITH ANTISOCIAL FEATURES; IS THAT RIGHT?

6    A   I DID.

7    Q   JUST SO WE ARE CLEAR, YOUR TESTIMONY -- THAT IS --

8    THOSE DIAGNOSES ARE THE SAME DIAGNOSES THAT YOU HAD WHEN

9    YOU INITIALLY DID THIS REPORT; IS THAT RIGHT?

10   A   I BELIEVE SO.

11   Q   AND SO IT HASN'T CHANGED SINCE WE LAST SPOKE AT YOUR

12   DEPOSITION?

13   A   I DON'T BELIEVE SO IT HAS.

14   Q   NOW, WITH RESPECT TO THE ALCOHOL, HE -- YOU HEARD HIM

15   TESTIFY YESTERDAY THAT HE DESCRIBES HIMSELF AS AN

16   ALCOHOLIC; RIGHT?

17   A   YES.

18   Q   AND HE TOLD YOU EVERYBODY WAS DRUNK AT HIS HOUSE WHEN

19   HE WAS GROWING UP?

20   A   YES.

21   Q   IN FACT, HE STARTED DRINKING WHEN HE WAS 11 OR 12?

22   A   YES.  EARLY ONSET.

23   Q   AND IT WASN'T LONG AFTER THAT THAT HE STARTED HAVING

24   BLACKOUTS; RIGHT?

25   A   THAT IS WHAT HE SAID.

1    Q    AND HE COULDN'T REMEMBER WHAT HE DID THE NIGHT BEFORE

2    IN MANY INSTANCES?

3    A    THAT IS WHAT HE SAID.

4    Q    HE WAS EXPELLED HIS FRESHMAN YEAR OF HIGH SCHOOL FOR

5    DRINKING?

6    A    THAT IS WHAT HE SAID.

7    Q    THAT WAS ABOUT THE TIME THAT HE STARTED DRINKING

8    REALLY HEAVILY; IS THAT RIGHT?

9    A    I WOULD ASSUME SO, YES.  THAT IS WHAT HE IS TALKING

10   ABOUT.  HE SAID THAT AS AN EARLY -- IN EARLY SCHOOL, HE

11   STARTED TO DRINK.  AS HE GOT OLDER, HE DRANK MORE HEAVILY

12   AND BEGAN TO USE DRUGS.

13   Q    AND THAT WAS ABOUT THE TIME OF HIS FRESHMAN YEAR IN

14   HIGH SCHOOL?

15   A    YES, SIR.

16   Q    AND THAT WAS ABOUT THE SAME TIME HE STARTED USING

17   DRUGS?

18   A    IF I RECALL CORRECTLY, THAT WAS WHEN HE STARTED TO

19   HUFF, MAYBE A LITTLE EARLIER.

20   Q    NOW, YOU DIDN'T INCLUDE IN YOUR REPORT THAT HE DOES

21   QUALIFY FOR THE DIAGNOSIS OF ALCOHOL DEPENDENCE IN A

22   CONTROLLED ENVIRONMENT.  YOU DIDN'T INCLUDE THAT IN YOUR

23   REPORT, THAT QUALIFIER IN THE REPORT; DID YOU?

24   A    NO, I DID NOT.

25   Q    BUT HE DOES QUALIFY FOR THAT DIAGNOSIS; DOESN'T HE?

1    A    HE DOES.

2    Q    BUT YOU DIDN'T INCLUDE IT IN YOUR REPORT; RIGHT?

3    A    I DID NOT.

4    Q    AND THAT IS THE MOST SEVERE THAT YOU CAN BE WITH

5    REGARD TO ALCOHOL DEPENDENCE; ISN'T IT?

6    A    HOW DO YOU MEAN SEVERE?

7    Q    WELL, I AM USING THAT WORK BECAUSE THAT IS WHAT YOU

8    TOLD ME.  WE AGREE THAT YOU TESTIFIED AT YOUR DEPOSITION

9    THAT THAT IS THE MOST SEVERE YOU CAN BE WITH REGARD TO

10   ALCOHOL DEPENDENCE?

11   A    YES.

12   Q    AND THE SPECIFIER IN A CONTROLLED ENVIRONMENT IS USED

13   IF THE INDIVIDUAL WITH ALCOHOL DEPENDENCE IS IN AN

14   ENVIRONMENT WHERE ACCESS TO ALCOHOL AND SUBSTANCE IS

15   RESTRICTED.  THAT IS WHAT THAT MEANS; RIGHT?

16   A    THAT IS WHAT THAT MEANS.  CAN I FINISH?

17   Q    SURE.

18   A    IT ALSO CAN MEAN THAT YOU ARE SAYING THE PERSON WOULD

19   CONTINUE TO USE ALCOHOL IN A CONTROLLED ENVIRONMENT.  I

20   DID NOT FIND THAT.

21   Q    AND IT ACTUALLY MEANS THAT NO MATTER WHERE HE IS, HE

22   CRAVES ALCOHOL?

23   A    YES.

24   Q    AND HE TOLD YOU HE DOESN'T IT; RIGHT?

25   A    THAT'S CORRECT.

1    Q   BUT YOU STILL BELIEVE HE QUALIFIES FOR THIS DIAGNOSIS

2    THAT MEANS NO MATTER WHERE HE IS, HE CRAVES ALCOHOL?

3    A   BASED ON HIS TESTIMONY, YES.

4    Q   NOW, IT'S ALSO YOUR OPINION THAT IF HE DOES GET OUT,

5    THERE IS NO REASON TO BELIEVE HE WOULD RELAPSE AND START

6    DRINKING AGAIN?  THAT IS YOUR OPINION; ISN'T IT?

7    A   IT IS.

8    Q   THERE IS NO REASON TO BELIEVE HE WOULD RELAPSE?

9    A   RELAPSE WITH SEXUAL?

10   Q   THAT IS NOT WHAT I ASKED.

11   A   OKAY.  ASK IT DIFFERENTLY.

12   A   THERE IS NO REASON TO BELIEVE HE WOULD RELAPSE AND

13   START DRINKING AGAIN?  THAT IS WHAT YOU TESTIFIED TO AT

14   THE DEPOSITION; ISN'T IT?

15   A   THERE IS NO REASON TO BELIEVE THAT IF HE IS IN

16   TREATMENT.

17   Q   WELL, DR. DAUM, I JUST WANT TO MAKE SURE I UNDERSTAND

18   YOUR TESTIMONY.  AT LEAST FROM THE DEPOSITION, YOU TOLD

19   ME THERE IS NO REASON TO BELIEVE HE WOULD RELAPSE AND

20   START DRINKING AGAIN, PERIOD.  THAT IS WHAT YOU TESTIFIED

21   TO AT YOUR DEPOSITION?

22   A   I CERTAINLY DID.

23   Q   NOW, YOU BELIEVE THAT PRISON HAS PROVIDED STRUCTURE

24   FOR HIM; RIGHT?

25   A   YES, IT HAS.

1    Q    YOU BELIEVE PRISON HAS PROVIDED AN ENVIRONMENT FOR

2    HIM TO LEARN ABOUT HIMSELF AND TO DEVELOP SKILLS?

3    A    YES, I DO.

4    Q    NOW, YOU WILL AGREE, WON'T YOU, THAT HE OFFENDED WHEN

5    HE WAS INTOXICATED?

6    A    YES.

7    Q    AND PART OF THE REASON, IN YOUR OPINION, THAT HE

8    BECAME INTOXICATED WAS BECAUSE HE LACKED SOCIAL SKILLS;

9    IS THAT RIGHT?

10   A    YES.

11   Q    YOU BELIEVE THAT PART OF THE REASON HE EXPRESSED HIS

12   ANGER -- WELL, HE EXPRESSED HIS ANGER THROUGH SUBSTANCE

13   ABUSE AND ALCOHOL ABUSE; IS THAT RIGHT?

14   A    YES.

15   Q    SO CLEARLY IN THE PAST, HE HAD ISSUES WITH HIS ANGER;

16   IS THAT YOUR TESTIMONY?

17   A    YES.  YES.  IF YOU RECALL, SIR, THAT IS WHY I DID THE

18   NAVACO.

19   Q    WELL, AND HIS ANGER WAS FURTHER EXPRESSED THROUGH HIS

20   SEXUAL OFFENSES; RIGHT?

21   A    YES.

22   Q    NOW, WHEN YOU ASKED HIM IN YOUR INTERVIEW IF HE WOULD

23   HAVE CONTINUED WITH HIS SEX OFFENSES HAD HE NOT BEEN

24   ARRESTED, HE SAID I THINK AS LONG AS I WAS DRINKING AND

25   DRUGGING, I WOULD HAVE DONE THOSE THINGS.  THAT IS WHAT

1    HE TOLD YOU; RIGHT?

2    A    THAT IS EXACTLY CORRECT.

3    Q    AND HE TOLD YOU THAT IT WASN'T NECESSARILY ABOUT THE

4    SEX, BUT IT WAS ABOUT BEING AN ALCOHOLIC AND NOT BEING IN

5    CONTROL?

6    A    YES.

7    Q    SO CERTAINLY HE HAS ACKNOWLEDGED THAT AT LEAST IN THE

8    PAST, HE WAS NOT IN CONTROL?

9    A    THAT IS EVIDENT, YES.

10   Q    NOW, HE HAS ONLY COMPLETED ONE 40-HOUR SUBSTANCE

11   ABUSE CLASS; RIGHT?

12   A    THAT IS WHAT BOP DOES.

13   Q    HE HAS ONLY COMPLETED ONE 40-HOUR SUBSTANCE ABUSE

14   CLASS; IS THAT TRUE?

15   A    THAT IS WHAT BOP DOES; YES, SIR.

16   Q    HE HAS NEVER HAD ANY SEX OFFENDER TREATMENT; RIGHT?

17   A    THAT IS MY UNDERSTANDING, YES.

18   Q    DO YOU HAVE ANY REASON TO BELIEVE THAT YOUR

19   UNDERSTANDING IS INCORRECT?

20   A    NO, SIR.  I DON'T HAVE A REASON TO BELIEVE IT'S

21   INCORRECT.

22   Q    OKAY.

23   A    OKAY.

24   Q    AND YOU BELIEVE THAT HE WOULD BENEFIT FROM ADDITIONAL

25   TREATMENT FOR ALCOHOL AND SEX OFFENDER TREATMENT; DON'T

1    YOU?

2    A    THAT SHOULD BE IN HIS RELAPSE PREVENTION PLAN.

3    Q    WHICH HE DOESN'T HAVE; DOES HE?

4    A    NO.  I WOULD NOT EXPECT HIM TO HAVE ONE.

5    Q    NOW, YOU WILL AGREE, WON'T YOU, DR. DAUM, THAT IN THE

6    PAST HE DID NOT HAVE EMOTIONAL REGULATION; RIGHT?

7    A    YES, SIR.  I WOULD AGREE WITH THAT.

8    Q    AND IN FACT, WHATEVER HE FELT, HE JUST DID IT; ISN'T

9    THAT TRUE?

10   A    YES, SIR.

11   Q    AND HE HAS AN EXTENSIVE PATTERN OF IMPULSIVITY WITH

12   SUBSTANCE ABUSE AND SEXUAL RELATIONS?

13   A    VERY MUCH SO.

14   Q    IN OTHER WORDS, HE HAD SERIOUS DIFFICULTY CONTROLLING

15   HIMSELF IN THE PAST; DIDN'T HE?

16   A    AS EVIDENCED.

17   Q    BUT YOU ACTUALLY BELIEVE HE CAN CONTROL HIMSELF NOW;

18   RIGHT?  IS THAT YOUR TESTIMONY?

19   A    I BELIEVE IN CHANGE, YES, SIR, I DO.

20   Q    DR. DAUM, YOU DON'T HAVE AN OPINION ABOUT WHETHER IF

21   HE RELAPSES WITH DRUGS OR ALCOHOL THAT THAT WILL AFFECT

22   HIS LIKELIHOOD TO REOFFEND; DO YOU?

23   A    I FIND THAT HARD TO ANSWER, SIR.  I DON'T REALLY KNOW

24   HOW TO ANSWER THAT.

25   Q    DO YOU HAVE AN OPINION AS WHETHER IF HE RELAPSES AND

1    STARTS DRINKING AGAIN, WILL YOU AGREE THAT THAT WILL MAKE

2    HIM MORE LIKELY TO RECIDIVATE?

3    A    WELL, I AM NOT SURE THAT THAT IS A YES OR NO ANSWER.

4    I THINK THERE IS CERTAIN CIRCUMSTANCES, HYPOTHETICALLY.

5    HYPOTHETICALLY, IF HE IS INVOLVED IN SEXUAL OFFENDER

6    TREATMENT AND GOES TO AA, AND EVERYTHING WORKS FINE, BUT

7    WHAT IF HE GOES TO SEXUAL OFFENDER TREATMENT AND BEGINS

8    TO CHANGE HIS PATTERNS AND RELAPSES WITH THE ALCOHOL.  I

9    DON'T THINK THAT IS A FOR CERTAIN FACT IS WHAT I AM

10   TRYING TO SAY.

11   Q    WILL YOU ACKNOWLEDGE AT LEAST THAT IF HE STARTS

12   DRINKING AGAIN, HIS RISK TO COMMIT ANOTHER SEX OFFENSE IS

13   GOING TO INCREASE?

14   A    CERTAINLY.

15   Q    NOW, YOU HAVE DIAGNOSED FROTTEURISM.  THAT IS A

16   PARAPHILIA; RIGHT?

17   A    YES, SIR.

18   Q    IT'S A SEXUAL DISORDER; RIGHT?

19   A    YES, SIR.

20   Q    AND YOU WILL AGREE THAT IT'S A SERIOUS MENTAL

21   ILLNESS, ABNORMALITY OR DISORDER, WON'T YOU?

22   A    I WILL.

23   Q    INCLUDING UNDER THE ADAM WALSH ACT; RIGHT?

24   A    YES.

25   Q    AND YOU AGREE THAT HE, IN THE PAST, HAS EXHIBITED

1    ELEMENTS OF SEXUAL DEVIANCE; RIGHT?

2    A    YES.

3    Q    NOW, FROTTEURISM IS UNWANTED TOUCHING; RIGHT?

4    A    YES, SIR.

5    Q    AND DID YOU HEAR DR. GUTIERREZ'S EXPLANATION TO THE

6    COURT ABOUT WHAT FROTTEURISM IS?

7    A    THAT WAS A GOOD EXPLANATION.

8    Q    SO YOU WILL AGREE THAT DR. GUTIERREZ'S EXPLANATION

9    WAS FAIR AND ACCURATE?

10   A    OF COURSE.

11   Q    NOW, BUT YOU BELIEVE, DON'T YOU, THAT FROTTEURISM CAN

12   LAST UP TO 30 MINUTES?

13   A    I BELIEVE FROTTEURISM CAN GO AS LONG AS YOU WANT IT

14   TO GO.

15   Q    BUT YOU BELIEVE THAT THE ACT ITSELF CAN ACTUALLY

16   HAPPEN FOR UP TO 30 MINUTES?

17   A    CERTAINLY.

18   Q    THAT IS DIFFERENT FROM WHAT DR. GUTIERREZ SAID; ISN'T

19   IT?

20   A    BUT DR. GUTIERREZ, HIS EXPLANATION IS VALID, BUT MINE

21   IS ALSO VALID.  I AM ADDING TO IT.

22   Q    ADDING TO THE ELEMENT OF FROTTEURISM THAT IT CAN LAST

23   -- THE ACT CAN LAST UP TO --

24   A    THERE IS NO REASON TO BELIEVE IT CANNOT LAST THAT.

25   Q    GO AHEAD.

1    A    I AM DONE.

2    Q    ALL RIGHT.

3    A    AND I APOLOGIZE, SIR, FOR INTERRUPTING YOU.

4    Q    THAT IS OKAY.  YOU TESTIFIED AT YOUR DEPOSITION THAT

5    FROTTEURISM IS A MOOD DISORDER; DIDN'T YOU?

6    A    I DID.

7    Q    IT'S NOT A MOOD DISORDER; IS IT?

8    A    IT IS A MOOD DISORDER.

9    Q    IT'S YOUR TESTIMONY TO THIS COURT THAT FROTTEURISM IS

10   A MOOD DISORDER?

11   A    IT'S A PARAPHILIA.  IT EXISTS IN YOUR MIND.  IT'S A

12   MOOD DISORDER.  IT'S NOT A PERSONALITY DISORDER.  IT'S

13   CODED ON AXIS 1.  IT'S SOMETHING YOU DEAL WITH.  IT'S AN

14   EMOTIONAL MOOD DYSFUNCTION, YES.

15   Q    SO IF I LOOKED UP -- IF I GOT A COPY OF THE DSM, I

16   WOULD FIND FROTTEURISM UNDER MOOD DISORDERS?

17   A    NO, SIR.  YOU WOULD FIND FROTTEURISM UNDER

18   PARAPHILIA.

19   Q    NOT MOOD DISORDERS?

20   A    MOOD DISORDERS IS -- SIR, YOU EITHER HAVE A MOOD

21   DISORDER OR PERSONALITY DISORDER.  THEY ARE SEPARATE.

22   THAT IS WHAT I AM TRYING TO SAY.  IT'S LIKE DEPRESSION.

23   IT'S LIKE MENTAL RETARDATION.  IT'S LIKE -- I DON'T KNOW

24   HOW TO EXPLAIN THAT.

25   Q    YOU WILL AGREE, WON'T YOU, THAT THE DISORDERS, THE

1   PARAPHILIC DISORDERS TEND TO BE CHRONIC AND LIFELONG;

2   RIGHT?

3   A   YES.

4   Q   BUT YOU TESTIFIED AT YOUR DEPOSITION WITH RESPECT TO

5   FROTTEURISM THAT IT CAN JUST KIND OF COME AND GO?

6   A   YES.

7   Q   SO IT'S NOT CHRONIC?

8   A   NOT IF IT'S -- NOT IF YOU GO THROUGH THERAPY.

9   Q   SO YOU DISAGREE THAT IT'S CHRONIC, IT TENDS TO BE

10  CHRONIC AND LIFELONG?

11  A   NO, I DON'T DISAGREE WITH THAT AT ALL.  WHAT I AM

12  SAYING IS JUST BECAUSE IT'S WRITTEN THERE DOESN'T MEAN

13  THAT ALL OF THE CASES ARE THE SAME.

14  Q   NOW, YOU WILL AGREE THAT THE BEHAVIOR USUALLY OCCURS

15  IN CROWDED PLACES; WON'T YOU?

16  A   YES.

17  Q   AND RAPE IS NOT PART OF FROTTEURISM?

18  A   NO.

19  Q   SO EVEN THOUGH HE HAS RAPED MORE VICTIMS THAN HE HAS

20  TOUCHED, YOU BELIEVE THAT FROTTEURISM IS THE APPROPRIATE

21  DIAGNOSIS?

22  A   I BELIEVE IT'S PART OF THE APPROPRIATE DIAGNOSIS,

23  YES, SIR.

24  Q   WHAT IS THE OTHER PART?

25  A   I GAVE THEM TO YOU.  ANTISOCIAL, POLYSUBSTANCE.  YOU

1    HEARD OTHER PSYCHOLOGISTS TALK ABOUT DEPRESSION.

2    Q    AND, WELL, I HEARD OTHER ONES TALK ABOUT IT, BUT YOU

3    DIDN'T DIAGNOSIS ANY DEPRESSION?

4    A    NO, BECAUSE AT THE TIME IT WASN'T PRESENTED, BUT

5    PERHAPS THE OTHER PSYCHOLOGISTS SAW THAT.

6    Q    NOW, DR. GUTIERREZ ALSO TESTIFIED THAT IT USUALLY

7    OCCURS IN CROWDED PLACES?

8    A    YES.

9    Q    NONE OF HIS OFFENSES OCCURRED IN CROWDED PLACES; DID

10   THEY?

11   A    THAT'S CORRECT.  BUT IT DOESN'T HAVE TO BE IN A

12   CROWDED PLACE.

13   Q    SURE.

14   A    IT USUALLY DOES.

15   Q    NOW, MR. ANTONE ACTUALLY TOLD YOU HE DIDN'T HAVE

16   FROTTEURISM; DIDN'T HE?

17   A    I DON'T RECALL THAT, SIR.

18   Q    YOU TESTIFIED AT YOUR DEPOSITION, DIDN'T YOU, THAT

19   YOU ASKED HIM IF HE HAD FROTTEURISM AND HE TOLD YOU NO?

20   A    DO YOU HAVE -- IS THAT -- DID I SAY THAT IN THE

21   DEPOSITION?  BECAUSE I AM NOT -- I DON'T EVEN THINK THAT

22   MR. ANTONE EVEN KNOWS WHAT THAT WORD MEANS.

23   Q    WELL, I ACTUALLY ASKED YOU IN THE DEPOSITION IF YOU

24   EXPLAINED IT TO HIM AND YOU SAID YES?

25   A    WELL, YES, I EXPLAINED IT TO HIM, BUT I DIDN'T USE

1    THE WORD.  I SAID IS THAT WHAT YOU ARE DOING, AND HE SAID

2    YES.

3    Q    NO.  HE TOLD YOU THAT HE DIDN'T DO THAT?

4    A    NO.  HERE IS HOW THIS WENT.  I ASKED -- I ASKED, SO

5    WHAT ARE YOU DOING?  AND HE IS TELLING ME THAT.  AND I AM

6    SAYING SO YOU ARE TOUCHING, AND HE SAID, NO, I AM NOT.

7    BUT THAT IS WHAT HE WAS DOING.

8    Q    YOU BROUGHT UP A GOOD POINT, DR. DAUM, BECAUSE HIS

9    MEMORY WAS A LOT BETTER WITH YOU THAN IT WAS IN COURT

10   YESTERDAY; WASN'T IT?

11   A    YES, IT WAS.  I NOTICED THAT, YES.

12   Q    IN FACT, YOU TOLD ME AT YOUR DEPOSITION, DIDN'T YOU,

13   THAT HE ADMITTED TO ALL THE CHARGES; RIGHT?  RIGHT?

14   A    YES, SIR  AND HE ALSO TOLD ME --

15   Q    AND YOU ALSO --

16            MS. ALLEN:  OBJECTION.

17            THE COURT:  LET HIM FINISH.  HE WAS NOT

18   FINISHED WITH HIS ANSWER.

19            MR. ROYSTER:  I AM SORRY.  I DIDN'T REALIZE

20   YOU WERE STILL GOING.

21   Q    GO AHEAD.

22   A    LET ME FINISH.  WHAT HE SAID TO ME WAS HE STARTS AS

23   HIS CUSTOM, HE USES THE WORD "PROBABLY".  PROBABLY I WAS

24   DRUNK AND IF THEY SAID I DID IT, THEN THAT IS PROBABLY

25   WHAT I DID.

1       NOW, THAT WAS HOW THE QUESTIONS WENT.  BECAUSE HE

2   TELLS ME I HAVE NO REASON TO BELIEVE THAT THEY WOULD LIE

3   ABOUT THIS.

4   Q   AND YOU ALSO TOLD ME AT YOUR DEPOSITION THAT HE

5   ACTUALLY DESCRIBED THE EVENTS.  YOU TOLD ME THAT AT YOUR

6   DEPOSITION; DIDN'T YOU?

7   A   YES.

8   Q   SO HE DESCRIBED THE EVENTS TO YOU?

9   A   HE KNEW WHERE HE WAS, YES.

10  Q   HE DESCRIBED THE EVENTS THAT HAD OCCURRED?

11  A   HE KNEW WHERE HE WAS AND HE SAYS, LIKE I WAS

12  DRINKING.  I WAS IN THIS HOUSE.  AND THAT IS THE EVENT.

13  AND IF THEY SAID I DID THAT, THEN I PROBABLY DID.

14  Q   YOU HEARD HIM YESTERDAY DENY THAT HE RAPED THE GIRL

15  FROM 1990; DIDN'T YOU?

16  A   I DID.

17  Q   AND THAT IS SIGNIFICANT TO YOU DENYING A RAPE WHEN

18  YOU DID IT; THAT IS SIGNIFICANT; ISN'T IT?

19  A   IT'S SIGNIFICANT -- IT'S SIGNIFICANT IF YOU KNEW THAT

20  HE IS LYING ABOUT HIS PERCEPTION OF WHAT HAPPENED.  IF HE

21  IS COVERING FOR SOMETHING OR HE IS SAYING I DIDN'T DO

22  THAT BECAUSE IT WASN'T REALLY RAPE, THEN THAT IS A

23  DIFFERENT PERCEPTION.

24  Q   YOU DID NOT DIAGNOSIS HIM WITH PARAPHILIA NOT

25  OTHERWISE SPECIFIED, NONCONSENT; RIGHT?

1    A    NO, SIR, I DID NOT.

2    Q    AND YOU DID ASK HIM IF HE WAS AROUSED TO FORCED SEX;

3    DIDN'T YOU?

4    A    I AM GOING TO HAVE TO SAY I DON'T REMEMBER YES OR NO

5    TO THAT.  DO YOU HAVE IT IN MY DEPOSITION?

6    Q    I DO.  DID YOU ASK HIM -- THIS IS THE DEPOSITION --

7    DID YOU ASK HIM -- THIS IS MY QUESTION.  I AM SORRY.  DID

8    YOU ASK HIM DURING YOUR INTERVIEW IF HE WAS AROUSED TO

9    FORCED SEX?  ANSWER:  YES, I DID.

10   A    ALL RIGHT.

11   Q    AND HE TOLD YOU NO; RIGHT?

12   A    YES.

13   Q    AND YOU DON'T BELIEVE THAT IT'S THE FORCE THAT TURNED

14   HIM ON; DO YOU?

15   A    NO, I DO NOT.

16   Q    YOU BELIEVE THAT THE FORCE WAS JUST NEEDED IN ORDER

17   TO ACCOMPLISH WHAT HE WANTED TO DO ANYWAY?

18   A    I BELIEVE THE FORCE WAS NECESSARY TO ACCOMPLISH WHAT

19   HE WANTED TO DO AT THAT PARTICULAR TIME, YES.

20   Q    NOW, PART OF THE REASON THAT YOU DIDN'T DIAGNOSE

21   PARAPHILIA NOT OTHERWISE SPECIFIED, NONCONSENT, IS

22   BECAUSE YOU THINK THAT THAT DIAGNOSIS ACTUALLY TALKS

23   ABOUT CHILDREN; RIGHT?

24   A    NO.

25   Q    YOU DON'T THINK THAT?

1    A    NO.  I DON'T THINK THAT.

2    Q    SO AT WHAT POINT DID YOU LEARN THAT THAT -- FROM THE

3    TIME OF YOUR DEPOSITION WHEN YOU TOLD ME THAT THAT

4    APPLIES TO CHILDREN, TO NOW --

5    A    PARAPHILIA?  I AM SORRY.

6    Q    I AM SORRY.

7    A    SAY IT AGAIN.

8    Q    THE DEFINITION OF PARAPHILIA NOT OTHERWISE SPECIFIED,

9    NONCONSENT --

10   A    PARAPHILIA, YOU ARE SAYING?  LET ME BACK UP TO BE

11   SURE I AM HEARING YOU CORRECTLY.  ARE YOU SAYING

12   PEDOPHILIA, OR ARE YOU SAYING PARAPHILIA?

13   Q    I AM SAYING PARAPHILIA, NOT OTHERWISE SPECIFIED,

14   NONCONSENT.  YOU TESTIFIED AT YOUR DEPOSITION THAT THE

15   REASON YOU DIDN'T DIAGNOSE THAT IS BECAUSE YOU THINK THAT

16   DEALS WITH CHILDREN?

17   A    THEN I MISSPOKE.  THAT IS NOT CORRECT.

18   Q    JUST SO WE ARE CLEAR, YOU MISSPOKE WHEN YOU SAID

19   PARAPHILIA NOT OTHERWISE SPECIFIED BEGINS TO TALK ABOUT

20   PEDOPHILIC TYPE ACTIVITIES.  IT TALKS ABOUT AGES AND

21   DIFFERENCE IN AGES, AND I DIDN'T HAVE THE DATA THAT WOULD

22   GIVE THAT.  IS THAT YOUR TESTIMONY; YOU MISSPOKE?

23   A    IT IS.  CAN I PUT AN ADDENDUM TO THAT?

24            THE COURT:  YOU MAY, SIR.

25            THE WITNESS:  IN -- SOMETIMES -- AND YOU HEARD

1    THE LAST TWO DAYS, THERE IS DISCREPANCY WITH AGE.  THAT

2    CAN COVER PART OF PEDOPHILIA IF IT'S NOT A CONSTANT

3    REOCCURRING PATTERN OR JUST PARTS OF IT AND THERE ARE

4    OTHER PARTS OF A PARAPHILIA THAT HE QUALIFIES FOR.  IT'S

5    A NICE CATCH ALL.

6              MR. ROYSTER:

7    Q    THE PARAPHILIA NOT OTHERWISE SPECIFIED, NONCONSENT,

8    IS A NICE CATCH ALL?

9    A    IT'S A NICE CATCH ALL, YES.

10   Q    DO YOU BELIEVE THAT PARAPHILIA NOT OTHERWISE

11   SPECIFIED, NONCENSENT, IS A VALID DIAGNOSIS?

12   A    I DON'T USE THAT, NO.  I DON'T USE THAT.

13   Q    BUT IS IT A VALID DIAGNOSIS?

14   A    IT'S IN THE DSM.  IT'S ALLOWED TO BE USED.  THE

15   NONCONSENT IS NOT IN THE DSM.

16   Q    I AM ASKING YOU THOUGH IF YOU BELIEVE THAT PARAPHILIA

17   NOT OTHERWISE SPECIFIED, NONCONSENT, IS A VALID

18   DIAGNOSIS?

19   A    NOT THE WAY YOU ARE STATING IT NO, I DO NOT BELIEVE

20   THAT IS A VALID DIAGNOSIS.

21   Q    I TAKE IT THERE ARE PEOPLE IN KANSAS THAT ARE CIVILLY

22   COMMITTED THAT ARE DIAGNOSED WITH PARAPHILIA NOT

23   OTHERWISE SPECIFIED, NONCONSENT?  THAT IS TRUE, ISN'T IT?

24   A    I DON'T KNOW OF THAT, NO, SIR.  I DON'T.  I KNOW

25   PARAPHILIA NOS, BUT I AM NOT AWARE OF THE NONCONSENT.

1   Q   SO THERE ARE PEOPLE IN KANSAS THAT ARE DIAGNOSED WITH

2   PARAPHILIA NOT OTHERWISE SPECIFIED THAT ARE CIVILLY

3   COMMITTED AT THE HOSPITAL WHERE YOU WORK?

4   A   YES.

5   Q   YOU JUST DON'T KNOW IF THEY HAVE THE QUALIFIER OF

6   NONCONSENT?

7   A   I DON'T KNOW THAT -- I DON'T KNOW OF ANYONE THAT DOES

8   HAVE THAT.

9   Q   AT YOUR FACILITY?

10  A   AT THE FACILITY THAT I WORK AT, YES.

11  Q   NOW, THE BORDERLINE PERSONALITY DISORDER, YOU BELIEVE

12  THIS IS A SERIOUS MENTAL DISORDER, ILLNESS OR

13  ABNORMALITY; RIGHT?

14  A   I DO.  IT'S A PERSONALITY DISORDER, YES.

15  Q   BUT IT TOO, LIKE FROTTEURISM, IS A SERIOUS MENTAL

16  ILLNESS, ABNORMALITY OR DISORDER?

17  A   IT IS.

18  Q   AND A PERSON WITH BORDERLINE PERSONALITY DISORDER HAS

19  MARKED IMPULSIVITY.  YOU WILL AGREE WITH THAT, WON'T YOU?

20  A   YES.

21          THE COURT:  MR. ROYSTER, LET ME INQUIRE.  HOW

22  MUCH MORE DO YOU BELIEVE YOU HAVE?  I KNOW IT WOULD JUST

23  BE AN ESTIMATE.  I INQUIRE BECAUSE IT'S 5:00 O'CLOCK.

24          MR. ROYSTER:  JUDGE, I WILL BE HONEST, I HAVE

25  A FAIR AMOUNT BECAUSE I AM GOING TO GET INTO THE MNSOST-R

1    AND THAT MIGHT TAKE A LITTLE WHILE.

2              THE COURT:  AND I AM SURE THE RESPONDENT IS

3    GOING TO WANT TO HAVE AN OPPORTUNITY AS WELL.

4              MR. ROYSTER:  MAYBE 30 MINUTES.

5              THE COURT:  WELL, I DON'T SEE US BEING ABLE TO

6    FINISH THIS WITNESS GIVEN THE TIME CONSTRAINTS THAT THE

7    COURT HAS AND THE COURT STAFF TODAY.  I SAY THAT WITH

8    REGRET.  WE ALL WISH WE COULD FINISH TODAY.

9              IN LIGHT OF THAT, I DON'T FRANKLY SEE MUCH

10   POINT IN GOING FURTHER TODAY.  WE DO HAVE THE COURTROOM

11   FOR 9:00 O'CLOCK FOR MONDAY, STARTING AT 9:00 O'CLOCK.

12             BEFORE WE BREAK UP, I THINK WHAT -- WE'LL

13   CEASE WITH THE WITNESS FOR TODAY.  MY IMPRESSION IS THAT

14   THIS NOTEBOOK AT THE WITNESS STAND DOES NOT -- MY

15   IMPRESSION IS DOESN'T CONTAIN RESPONDENT'S EXHIBITS, OR

16   AT LEAST NOT ALL OF THEM.  I AM DIRECTING RESPONDENT'S

17   COUNSEL TO MAKE A DETERMINATION IF THAT IS TRUE, AND IF

18   THAT IS TRUE, TO GET THOSE EXHIBITS IN THERE.

19             MS. ALLEN:  YES, YOUR HONOR, WE'LL DO THAT.

20             THE COURT:  SO THEY WILL BE READY ON MONDAY

21   MORNING.  I WOULD ALSO ASK RESPONDENT'S COUNSEL TO MAKE

22   SURE THEY HAVE A SET OF EXHIBITS THAT COINCIDES WITH THE

23   COURT'S EXHIBITS SO WE CAN GET AWAY FROM THIS BY

24   REFERRING BY DEPOSITION EXHIBITS THAT ARE, IN FACT, IN

25   THE EXHIBITS THAT HAVE BEEN PASSED UP THAT HAVE A

 1    DIFFERENT IDENTIFICATION.

 2                MS. ALLEN:  WE'LL DO THAT, YOUR HONOR.

 3                THE COURT:  ARE THERE ANY OTHER HOUSEKEEPING

 4    MATTERS BEFORE WE BREAK FOR THE WEEKEND?

 5                MR. ROYSTER?

 6                MR. ROYSTER:  THE ONLY CONCERN I HAVE, JUDGE,

 7    JUST TO MAKE THE COURT AWARE OF IT, IS DR. PHENIX'S LACK

 8    OF ABILITY ON MONDAY AND WHETHER I WOULD WANT TO CALL HER

 9    AS A REBUTTAL WITNESS, BUT I WILL THINK ABOUT THAT OVER

10    THE WEEKEND.

11                THE COURT:  I DON'T KNOW HER SCHEDULE,

12    OBVIOUSLY, BUT ONE OPTION THAT CAN BE AVAILABLE IN CASES

13    LIKE THIS IS TELECONFERENCES.  I DON'T KNOW IF WE HAVE

14    THAT CAPABILITY IN THIS COURTROOM.  WE ACTUALLY MAY, BUT

15    I BELIEVE WE DO.  AND I DON'T KNOW HER -- I DON'T KNOW

16    HER SCHEDULE, BUT THAT IS SOMETHING TO CONSIDER, MR.

17    ROYSTER.

18                MR. ROYSTER:  THE OTHER CONCERN IS THAT, YOU

19    KNOW, FINISHING HIS TESTIMONY, THERE MAY BE SOMETHING IN

20    EITHER CROSS OR REDIRECT OR FROM THE COURT THAT I MAY

21    WANT TO PUT HER ON AS A REBUTTAL WITNESS, SO I WILL THINK

22    ABOUT HOW TO DEAL WITH THAT OVER THE WEEKEND.  THANK YOU.

23    NOTHING ELSE.

24                THE COURT:  OKAY.  VERY GOOD, SIR.  MR. ROSS,

25    MS. ALLEN, ANYTHING?  MR. WATERS?

1              MR. ROSS:  NO, WE DON'T HAVE ANYTHING AT THIS

2      POINT.

3              THE COURT:  VERY GOOD.  WE'LL BE IN RECESS

4      UNTIL 9:00 AM MONDAY MORNING.

5              (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED.)

6

7

8

9

10                          CERTIFICATE

11

12          THIS IS TO CERTIFY THAT THE FOREGOING

13     TRANSCRIPT OF PROCEEDINGS TAKEN IN THE UNITED STATES

14     DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF

15     THE SHORTHAND NOTES OF THE PROCEEDINGS TAKEN BY ME IN

16     MACHINE SHORTHAND AND TRANSCRIBED BY COMPUTER UNDER MY

17     SUPERVISION.

18              DATED THIS 10TH DAY OF DECEMBER, 2011.

19

20

21                               /S/ SHARON K. KROEGER
                                 COURT REPORTER
22

23

24

25