UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:07-HC-02042-FL

UNITED STATES OF AMERICA,          )
        Petitioner,     )     PETITIONER'S SUPPLEMENTAL
                    )     PROPOSED FINDINGS OF
     v.                     )     FACT AND CONCLUSIONS OF LAW
                    )
BYRON NEIL ANTONE,                 )
        Respondent.     )

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby supplements it proposed findings of fact and conclusions of law, [DE-90], as follows:

**A.  Testimony of Byron Antone**

1.  Antone has not had any sex offender treatment while in prison, [Part One, p. 39,][1] and he acknowledged that sex offender treatment would probably do him some good, [Part One, p. 40].

2.  Antone admitted that when he was drinking, he lost control of himself, [Part One, p. 33].  He also admitted his alcohol and drug abuse led him to sexually offend, [Part One, p. 40].  He testified that there is always a chance he might drink if he is around a place that serves alcohol, [Part One, p. 68].

_____

1    The citations are to the transcript of the three-day bench trial held on October 20, 21, and 24, 2011.  Day One and Part One are referred to as "Part One," and Day Three is referred to as "Part Two."

1

3.     Antone testified that he attends AA meetings, and he has completed a forty hour drug treatment program while in federal custody, [Part One, p. 32].     However, he has not had any other treatment to address his significant drug and substance abuse problems, [Part One, pp. 32, 33], and believes he probably needs alcohol and drug treatment, [Part One, p. 40].

4.     Antone testified that he could not remember attempting to rape "Cheryl," [Part One p. 23].     However, he pleaded guilty in federal court to Aggravated Sexual Abuse, which involved his attempted rape of "Cheryl."[2] He also testified that he did not remember attempting to apologize to Cheryl, [Part One, p. 23] or that he had previously admitted to having sexual thoughts about Cheryl before he raped her, and that he intended to do something sexual to her, [Part One, p. 24].[3]

5.     Antone denied that he had previously informed psychologists that he had forced his ex-girlfriend, Tanya McCloud, to have sex with him, [Part One, 35].     However, he acknowledged that it is possible he raped Tanya, and just he didn't remember, [id.].

6.     Antone denied raping "Valita," or "VR1" in 1990, even

2     Cheryl is "CR" in the Pre-Sentence Investigative Report that sets forth the offense conduct related to his federal conviction for Aggravated Sexual Abuse.  See Government Ex. 8, ¶ 5-6.

3     His admissions to these items, however, are reported in Government Ex. 10, p. 5.

though he pleaded guilty to raping her, [Government Ex. 20, Bates Stamp 2050-52], and admitted as part of his plea agreement with the United States that he raped her, [Government Ex. 12, p. 8].

7.    Antone lied to Dr. Phenix when he told her that his mother died of a heart attack, [Part One, p. 92].

8.    Antone testified he had a relapse prevention plan, [Part One, p. 46], and that he was going to live his sister and son in Tucson, Arizona, if released, [Part One, p. 48].

**B.    Testimony of Dr. Amy Phenix**

1.    Dr. Phenix testified that of the 350 individuals she had evaluated for sexual dangerousness, she had determined that over half did not meet the criteria for commitment, and she had testified approximately twenty times in favor of respondents at civil commitment hearings, [Part One, p. 114].

2.    Dr. Phenix testified that Antone suffers from (1) paraphilia not otherwise specified, non-consent females, (2) alcohol dependence in a controlled environment, (3) depressive disorder not otherwise specified, and (4) anti-social personality disorder, [Part One, p. 119]. According to Dr. Phenix, all but his depressive disorder not otherwise specified affected his sexual dangerousness, [id.]

3.    Dr. Phenix testified that "non-consent" is a descriptor for the diagnosis of paraphilia not otherwise specified, [Part

3

One, p. 124].  Paraphilia not otherwise specified is used as a
diagnosis to identify a sexual abnormality that is not
specifically or individually defined by the DSM, but is known to
exist, [Part One, p. 123].  Dr. Phenix testified that it is a
valid diagnosis, and has been used for years to describe
paraphilias involving non-consent persons, [Part One, p. 124].
She also testified that the large majority of the mental health
community believe that paraphilia not otherwise specified is a
valid diagnosis, [Part One, p. 240].  She also noted that the DSM
Case Book, which teaches how to provide diagnoses, uses a
descriptor of this disorder, and one of the most well known
researchers in the field, Dr. Fred Berlin, advises this diagnosis
should be used to identify a paraphilia that shows arousal to
coercion during sexual activity, [Part One, p. 125].

    4.  In forming her opinion, Dr. Phenix considered the
pattern and duration of Antone's offenses, and noted that over
approximately eight years, he had committed multiple acts
involving non-consenting persons, [Part One, pp. 127-28].  She
also noted that he has deviant arousal to both children and
adults, [Part One, p. 133].  Additionally, she testified it is
unusual for men to show sexual arousal in non-consenting
situations, but Antone was able to maintain erections when he
committed his sexual assaults against non-consenting victims,

[Part One, p. 137].

5.   Dr. Phenix opined that Antone's offenses evolved into planned events that he designed so that he could engage in non-consent sex with his victims, [Part One, p. 130]. For example, subsequent to his rape of "VR1," Antone urged "VR2" to walk with him under the ruse that they were going to another cousin's house that VR2 wanted see, [Part One, p. 130-31]. Once he got her outside, isolated from everyone else, he raped her, [Part One, p. 131].

6.   She distinguished Antone from a "mean, nasty person that likes to rape women" in two ways. First, by the pattern and duration of his offending, [Part One, p. 244], and second, by his admissions, [Part One, pp. 244-45]. She also noted the polygraph result that revealed Antone was deceptive when he denied ever masturbating to a rape fantasy, [Part One, p. 245].

7.   Dr. Phenix opined that Antone would meet the criteria even without the diagnosis of paraphilia not otherwise specified, [Part One, p. 246].

8.   With respect to her diagnosis of alcohol dependence in a controlled environment, Dr. Phenix testified that alcohol and other substances contributed to his sex offending, and it doesn't allow him to think through the consequences of his behavior, [Part One, p. 144]. She also testified that for someone who does

5

harbor sexual deviance as a paraphilia disorder (like Antone) it is more likely that the person will act out on that sexual deviance when they are using substances, [Part One, p. 144].

9.    Dr. Phenix opined that Antone has not sufficiently addressed his alcohol dependence, [Part One, p. 145].  She also noted that Antone only attended about half of the AA sessions available to him between October 2000 and May 2002, and did not attend any others sessions until about 2010, [id.].  She testified that if he were serious about his substance abuse problem, he would be consistently attending those meetings throughout his incarceration, [id.].

10.    With respect to his institutional adjustment, Dr. Phenix noted that Antone had responded very well to the structure, rules, and support that he had gotten institutionally, [Part One, p. 159].  However, she testified that it is very common to see someone, if they haven't had enough strong intervention for their problem areas (like Antone), to continue to struggle with those same problem areas once they get out and they are responsible for their own behavior, [id.].  Dr. Phenix opined that Antone has not had strong interventions for his most serious problem areas, [id.].

6

11.   With respect to his testimony, Dr. Phenix observed that Antone is remembering things he most wants to remember about his life and is saying he has no memory of a lengthy history of sexual deviant behavior.  She believed it would be very unusual to have no memory of all but one sexually deviant act from 1989 to 1997, [Part One, p. 193].

12.   Dr. Phenix testified that Antone's lack of sex offender treatment increases his risk to reoffend, [Part One, p. 193]. Additionally, she does not believe he has the skills, abilities, and techniques that he would learn in treatment in order to prevent himself from reoffending, [Part One, p. 195].  She opined that the dynamics behind his diagnosis are far more complicated in what contributes to his offending than his belief that his alcohol and drugs caused him to offend, and intensive intervention was required so that upon release he could be successful in not acting on his deviant sexual arousal, [Part One, p. 195].

13.  Dr. Phenix also testified that there is no research that suggests that recreational activities (i.e. playing the guitar and flute, or beading) decreases a person's risk to reoffend sexually, [Part One, p. 237].

**C.  Testimony of Dr. Manuel Gutierrez**

1.  Dr. Gutierrez testified that of the 47 Adam Walsh evaluations he had conducted, only 23 met the criteria for civil commitment, [Part One, p. 256].

2.  Dr. Gutierrez testified that Antone suffers from (1) paraphilia not otherwise specified, non-consent and hebephilia; (2) alcohol dependence in a controlled environment, and (3) anti-social personality disorder, [Part One, p. 268].  He believed these conditions had a cumulative or synergistic effect on Antone, [Part One, p. 284].

3.  Dr. Gutierrez testified that the diagnosis of paraphilia not otherwise specified was essentially a "catch-all" diagnosis to identify a diagnosis that is not specifically identified and defined by the DSM, of which there are dozens, [Part One, p. 268].

4.  He testified that the specifier of non-consent was appropriate because of the pattern of Antone's offending, which included multiple rapes, the polygraph finding that he was deceptive when he denied masturbating to a rape fantasy, and the objective testing conducted by Gray and Sadler, [Part One, pp. 269-70].  He also noted that there were factors present here that

8

differentiated Antone from an individual "that just commits rapes," such as having an available consenting partner, and maintaining an erection when the victim was resisting or fighting back, [Part One, p. 347].

5.    Dr. Gutierrez testified that paraphilia not otherwise specified was a valid diagnosis, and is generally accepted in the field, [Part One, p. 273]. He acknowledged there is debate about the validity of the diagnosis with respect to non-consent, but noted that of the twenty states that have civil commitment laws for sexually dangerous predators or persons, all have civilly committed individuals diagnosed with paraphilia not otherwise specified, non-consent, [Part One, p. 273-74].

6.    Dr. Gutierrez also testified that the specifier of hebephilia was appropriate because of the instances of sexual misconduct that involved pubescent children, [Part One, p. 274]. He identified the sexual misconduct involving "TF," "VR#2," and "R.A." to support this conclusion, [Part One, p. 276]. Additionally, the results of the Abel Assessment conducted by Gray and Sadler showed that Antone's preferential age group was pubescent females between the ages of 14 and 17, [Part One, p. 278].

9

7. Dr. Gutierrez testified that the diagnosis of paraphilia not otherwise specified with the specifier of hebephilia was generally accepted in the field, and many psychologists use this diagnosis in the evaluation and treatment of sex offenders, [Part One, p. 280]. He also noted that the First Circuit ruled that paraphilia not otherwise specified with the specifier of hebephilia qualified as a serious mental illness, abnormality, or disorder, [Part One, p. 280].[4]

8. Dr. Gutierrez testified that Antone would remain sexually dangerous even with just the antisocial personality diagnosis, [Part One, pp. 284, 350].

9. Dr. Gutierrez testified that frotteurism involves an individual rubbing his genitalia against a non-consenting person or fondling the person, [Part One, p. 288]. He noted that it is typically done in a public place and crowded area such as a bus or subway or at a concert or shopping area, and done anonymously and very quickly, [Part One, p. 288]. He described it as almost a "hit and run" type of offense, [id.]. In this respect, he did not believe that frotteurism, as diagnosed by Respondent's selected examiner, Dr. Roy Daum, captured the extent of Antone's

---

4 See United States v. Carta, 592 F.3d 34 (1st Cir. 2010)

sexual deviance and offense behavior, and did not even scratch the surface, [Part One, p. 289]. According to Dr. Gutierrez, it missed the big picture, [id.].

10. Like Dr. Phenix, [Part One, p. 190], Dr. Gutierrez testified that the best predictor of future behavior is past behavior, [Part One, p. 296]. Moreover, because of the absence of any treatment or intervention to address the areas of sexual deviance, Dr. Gutierrez believed it was highly likely Antone would engage in similar acts if released to the community, [id.]. He also did not believe that Antone's substance abuse had been sufficiently addressed, which was another area of concern, [Part One, p. 297].

**D.    Testimony of Clement Gallop**

1. Respondent called Clement Gallop as a witness. Mr. Gallop is a treatment specialist in the Commitment and Treatment Program at FCI Butner. Mr. Gallop provided testimony about the advice he gave Antone regarding Antone's son, and anger management, [Part One, p. 97-98].

**E.    Testimony of Allan Duprey**

1. Respondent called Allan Duprey as a witness. Mr. Duprey was Antone's criminal defense attorney in the federal

11

criminal prosecution of his assault on CR.  Mr. Duprey testified about his efforts to get Antone sex offender treatment in the federal Bureau of Prisons, specifically at Butner.

**F.   Testimony of Andre Taylor**

1.    Respondent called Andre Taylor as a witness.  Mr. Taylor is a Correction Counselor at FCI Butner, and is currently assigned to the Maryland Unit, where Antone is detained.  Mr. Taylor testified about the physical arrangements where Antone and the other Adam Walsh detainees are detained, and the rules that the detainees must follow.  He testified that he has observed Antone with a guitar trying to teach others to play, [Part One, pp. 371-72], observed Antone's art, [Part One, p. 372], and observed Antone's work, [Part One, pp. 373].  He testified that Antone has a positive rapport with the inmates in the unit, [Part One, p. 374].

**G.   Testimony of Anne Schauder**

1.    Respondent called Anne Schauder as a witness.  Ms. Schauder is a Probation Officer with U.S. Probation in Flagstaff, Arizona.  She testified about some of the supervised release conditions available for sex offenders on supervised release.  She understood that Antone agreed to modify his supervised

release conditions to enter a halfway house or residential reentry center for up to 365 days, unless released earlier by the probation officer, [Part One, p. 403].5

2. Ms. Schauder, however, does not supervise the area where Antone would be released and would be subject to supervised release conditions, [Part One, p. 405]. She did not know whether other sex offenders she had supervised had committed a new sex offense while on supervised release, [Part One, p. 406]. She testified that she is only aware "to [a] degree" of the services that are available to the area where Antone would be released, [Part One, p. 407].

**H. Testimony of Dr. Roy Daum[6]**

1. Dr. Daum has never testified in state or federal court in any civil commitment case relating to sex offenders, [Part One, p. 417]. Prior to Antone, he had never prepared a report of

---

5 Antone did not mention this arrangement when asked on direct examination about his plans upon release.

6 Dr. Daum's testimony occurred on two separate days. His direct examination and part of his cross examination occurred on the first day. The continuation of his cross examination occurred on the second day, along with his redirect. Dr. Daum admitted that he spent approximately three hours over the weekend talking with Respondent's counsel or their paralegals, after his direct examination and partial cross examination, but before he completed his testimony on the third day of the trial, [Part Two, p. 3].

a forensic evaluation for the civil commitment of a sexually dangerous person, [Part One, p. 479]. Since Antone, he has evaluated five other Adam Walsh detainees and he opines that none of them meet the criteria for commitment, [Part Two, p. 5].

2. Dr. Daum admitted that when asked at his deposition how much of his practice involves evaluations of sex offenders, he answered, "I don't do that. There are others assigned to that," [Part One, p. 426].

3. Dr. Daum does not appear to have understood what he was asked to do in this case. He testified that the question he believed he was asked in this case, and that he answered for the court, was whether Antone "has a mental disorder that will make it such that he cannot go out into the community," [Part One, p. 476]. The question at issue here, however, is whether Antone is "sexually dangerous to others," which means a person "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation of released. See 18 U.S.C. § 4247(a)(6).

4. Dr. Daum diagnosed Antone with (1) frotteurism, (2) polysubstance dependence, and (3) borderline personality disorder

14

with antisocial traits, [Part One, pp. 449-52].

5. On cross examination, Dr. Daum acknowledged that frotteurism is a sexual disorder that is a serious mental illness, abnormality, or disorder under the Adam Walsh Act, [Part One, p. 497]. He also admitted that borderline personality disorder is a serious mental illness, abnormality, or disorder, [Part One, p. 507]. On the second day of his testimony, however, he changed his opinion and stated that Antone did not have a serious mental illness, abnormality, or disorder, [Part Two, p. 42]. He then admitted this was different from his testimony at deposition, [Part Two, pp. 42-3].

6. Initially, Dr. Daum, on cross-examination, testified that frotteurism is a mood disorder or an emotional mood dysfunction, and that it was like depression or mental retardation, [Part One, p. 499]. On the second day of his testimony, however, he changed his testimony and testified frotteurism actually was not a mood disorder, [Part Two, pp. 3-4].

7. Dr. Daum testified that frotteurism normally happens in a public place and is unwanted touching of one individual by another, [Part One, p. 450]. He also testified it "really means

it's an unwanted touching or rubbing of any part of an individual that doesn't want to be touched or rubbed," [id.]. He acknowledged that Antone touched and rubbed, but at the same time, he raped, [Part One, p. 450]. Dr. Daum testified though that rape is not part of a diagnosis of frotteurism, [Part One, pp. 450-51, 500].

8. Dr. Daum testified that Dr. Gutierriez gave a good explanation of frotteurism, [Part One, p. 498]. However, Dr. Daum believed that an act of frotteurism could last up to thirty minutes or "as long as you want it to go," [Part One p. 498].

9. Dr. Daum admitted that paraphilic disorders tend to be chronic and lifelong, [Part One, pp. 499-500]. However, Dr. Daum acknowledged that he had previously testified at his deposition that frotteurism can actually "come and go," [Part One, p. 500].

10. On cross-examination, Dr. Daum testified he misspoke when he testified at his deposition that the reason he did not diagnose paraphilia not otherwise specified is because it deals with children, [Part One, p. 505]. However, he agreed that paraphilia not otherwise specified, non-consent is a nice catchall, [Part One, p. 506]. On re-direct though (after speaking with Respondent's counsel for three hours) Dr. Daum

changed his testimony and stated that non-consent does not exist, [Part Two, p. 47].

11.  Dr. Daum did not include it in his report, but on cross examination, Dr. Daum acknowledged that Antone met the criteria for polysubstance dependence, **in a controlled environment**, which is the most severe that a person can be with respect to dependence, [Part One, p. 492].  According to Dr. Daum, this means Antone "craves alcohol," [id.].  Dr. Daum believes this is true even though Antone told him he did not crave alcohol, [Part One, pp. 492-93].

12.  Regarding his diagnosis of borderline personality disorder with antisocial traits, Dr. Daum testified that part of the reason he gave this diagnosis was because Antone had a reason for doing the things he did, [Part Two, p. 5].  However, Dr. Daum could not identify the reason and testified he was not sure he knew the reason, [id.].

13.  Dr. Daum acknowledged on cross-examination that he failed to identify all of Antone's criminal convictions in his report, [Part Two, p. 14].  Specifically, he failed to report two of Antone's convictions for sexual assault, [Part Two, p. 15], two convictions for kidnapping, [id.], two convictions for

17

threatening, [Part Two, p. 15], and two convictions for sexual abuse, [Part Two, p. 15-16]. He also did not indicate in his report the number of victims associated with Antone's sex offenses, [Part Two, p. 17]. Importantly, Dr. Daum testified that he did not include Antone's child molests in his report because he did not see where Antone molested any children, [Part Two, p. 18]. Subsequently, he acknowledged his report was inaccurate in reporting that the age of the victims of Antone's offenses ranged from 15 to mid-20's and should have stated there were younger victims, [Part Two, p. 21].

14. Dr. Daum testified that he used the MnSOST-R, an actuarial tool, as part of his evaluation. He testified that he did so because, at the time he used it, it had validity, reliability, and it was commonly used, [Part Two, p. 23]. He initially reported Antone's score on the MnSOST-R was a 4.

15. During his direct examination, Dr. Daum testified that the "4" was a "typo," [Part One, p. 436]. He ultimately acknowledged it was not a typo, but that he had changed Antone's score to 11, as a result of the testimony he heard during the evidentiary hearing, [Part One, p. 441]. He testified that his report with respect to the MnSOST-R scoring was not valid now

18

because of the "new" information disclosed in court during the evidentiary hearing, [Part One, pp. 441, 443].

16.    Despite his testimony to the contrary, the information Dr. Daum described as "new" that changed Antone's score on the MnSOST-R appears to have been available to him in order to score the MnSOST-R correctly well before the evidentiary hearing of this matter.[7]  Dr. Daum's failure to review the record carefully enough in order to complete an actuarial he used to evaluate Antone and then submit to the Court as part of the basis of his opinion significantly diminishes the credibility of his testimony.

17.    Dr. Daum testified that even though he used the MnSOST-R in conducting his evaluation of Antone, and Antone's score on the MnSOST-R was now "11," he no longer used the MnSOST as of three to four weeks prior to the evidentiary hearing as a result of a training he attended, [Part One, p. 442].    Dr. Daum

_____

7    For example, Dr. Daum acknowledged that the records, which Dr. Daum claims to have reviewed, clearly indicated that one of the victims was 14 or 15 years old at the time of the offense, [Part Two, p. 33].  He acknowledged this information was available to him at the time he initially scored the MnSOST-R, [id.].  Additionally, when Dr. Daum initially scored the MnSOST-R, he indicated there was no indication of adolescent antisocial behavior, [Part Two, p. 33].  However, the record is riddled with evidence of adolescent antisocial behavior.

initially testified that he no longer used the MnSOST-R because, even though he believes it has high reliability and is probably one of the best instruments in the field, [Part Two, pp. 24-25], it also has a proclivity to give a high rate of false positives, [id.].[8]  Dr. Daum's change of opinion regarding the usefulness of the MnSOST-R (subsequent to his deposition testimony), and in light of the significant increase in Antone's score from "4" to "11" at trial, is suspect at best.

18.  On the first day of his testimony, Dr. Daum testified that Antone's score on the STATIC-99R was a "4," [Part One, pp. 445, 447].  He testified though that he agreed with the scoring of Dr. Phenix and Dr. Gutierrez, who scored Antone as a 5 and 6, respectively.  On cross examination, after being shown from the records available at the time he completed his report that there were more sentencing dates for Antone than he had considered, Dr. Daum acknowledged he had not scored the STATIC-99R correctly, and he should have scored Antone as a "5," [Part Two, p. 11].

19.  In determining the percentages of sexual recidivism

---

[8]    On the second day of his testimony, when asked on cross examination why he no longer used the MnSOST-R, he gave several additional reasons, which he acknowledged were from notes he put together over the weekend (i.e. after his direct examination testimony and part of his cross-examination), [Part Two, p. 24].

associated with Antone's score on the STATIC-99R, Dr. Daum testified on direct examination that he compared Antone to the "High Risk/High Needs" group, [Part One, p. 448]. However, on cross examination, he acknowledged that this was wrong and he actually had compared Antone to the "Preselected for Treatment" norm group, [Part Two, p. 13].

20. While Antone's score on the STATIC-99R, or the MnSOST-R, is not conclusive with respect to whether Antone is sexually dangerous, these are actuarial instruments that are commonly used in assessing a sex offender's risk of sexual recidivism. Dr. Daum's apparent lack of familiarity with these instruments, ability to score them correctly, and appreciate the difference between the scoring significantly diminishes the credibility of his testimony.

21. Dr. Daum agreed that Antone needs sex offender treatment, [Part One, pp. 458-59]. He agreed Antone needed a structured environment in which Antone has counseling and therapy available in order to assist him in formulating a recidivism plan, [Part One, p. 459].

22. Dr. Daum acknowledged that the Gray and Sadler Report, [Government Ex. 10], was relevant to his evaluation of Antone and

dealt in large part with Antone's sexual deviancy, [Part One, p. 483]. However, he admitted he made no mention of it in his report, [Part One, p. 483], and it appears he did not consider the information included in it.

23. On cross-examination, Dr. Daum acknowledged that he testified at his deposition that past behavior is a good predictor of future behavior, [Part One, p. 478]. However, he testified at trial that he did not believe that, [Part One, pp. 477-72].

24. Dr. Daum used the "MMSE" to evaluate Antone, but he was unable to identify a single study that shows the "MMSE" is associated with sexual recidivism, [Part One, p. 486].

25. Dr. Daum agreed that he had to rely on the answers provided by Antone in scoring the Navaco Anger Scale, but agreed that there was evidence that Antone had lied in the past, [Part One, 488]. Dr. Daum could not identify a single study that showed the Navaco Anger Scale was associated in any way with sexual recidivism, [Part One, p. 488].

26. Dr. Daum acknowledged that Antone does not have a relapse prevention plan, [Part One, p. 496].

27. Dr. Daum agreed that if Antone starts drinking again,

his risk to commit another sex offense is going to increase, [Part One, p. 497].

28. Dr. Daum agreed that the actuarials he used may underestimate the risk of recidivism, and that there is a possibility of that in this case, [Part Two, p. 13].

29. Dr. Daum agreed that Antone's memory was better when Dr. Daum interviewed him than when Antone testified at trial, [Part One, p. 502]. For example, Dr. Daum testified that Antone admitted to all of the charges during his clinical interview, and described all of the events, [Part One, p. 502-03].

30. Dr. Daum admitted that at his deposition he testified that there is no reason to believe Antone will engage in repeated acts of sexual violence, [Part Two, p. 40]. When asked to admit this was his testimony at his deposition, he denied it, [id.]. When confronted with his deposition testimony, he attempted to change it, [id.].

## CONCLUSIONS OF LAW

1. Clement Gallop's testimony was not relevant to this proceeding and the Court affords no weight to his testimony.

2. Allan Duprey's testimony was not relevant to this proceeding and the Court affords no weight to his testimony.

3.    Andre Taylor's testimony was not relevant to this proceeding and the Court affords no weight to his testimony.

4.    Anne Schauder's testimony is not relevant to this proceeding and the Court affords no weight to his testimony.    To the extent her testimony has any relevance, it does not undermine the testimony and opinions of Drs. Phenix and Gutierrez, or this Court's determination, that Antone is sexually dangerous.

5.    Dr. Daum is not qualified to opine on whether a person is sexually dangerous under the Adam Walsh Act.

6.    Dr. Daum is not credible and his opinion is given no weight.

Respectfully submitted, this 23rd day of December, 2011.

THOMAS G. WALKER
United States Attorney

BY: /s/ Joshua B. Royster
JOSHUA B. ROYSTER
Attorney for Petitioner
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC  27601-1461
Telephone: (919) 856-4530
Facsimile: (919)856-4821
Email: joshua.royster@usdoj.gov
N. C. Bar# 28785

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing has been served upon the Office of the Federal Public Defender, counsel for Respondent, by electronically filing the foregoing with the Clerk of Court this date, December 23, 2011, using the CM/ECF system which will send notification of such filing to the above.

BY: /s/ Joshua B. Royster
JOSHUA B. ROYSTER
Attorney for Petitioner
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 27601-1461
Telephone: (919) 856-4530
Facsimile: (919)856-4821
Email: joshua.royster@usdoj.gov
N. C. Bar# 28785