IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:07-HC-2042-FL

UNITED STATES OF AMERICA,                )
                                         )
            Petitioner,                  )
                                         )
      v.                                 )        **ORDER and**
                                         )        **MEMORANDUM AND**
BYRON NEIL ANTONE,                       )        **RECOMMENDATION**
                                         )
            Respondent.                  )


# Table of Contents

I.    ADAM WALSH CHILD PROTECTION AND SAFETY ACT OF 2006 ............................ 3

II.   PROCEDURAL HISTORY ................................................................................................. 4

III.  PENDING EVIDENTIARY RULINGS ........................................................................... 7

  A. Qualification of Dr. Daum as an Expert in Forensic Psychology ......................................... 7

  B. Affidavit of Tanya McCloud ................................................................................................ 10

  C. Testimony of Anne Schauder .............................................................................................. 12

IV.   FINDINGS OF FACT .................................................................................................... 13

  A. Personal History .................................................................................................................. 13

  B. Medical and Psychiatric History ......................................................................................... 15

  C. Substance Abuse History ..................................................................................................... 18

  D. Overview of Respondent's Sexual Offense History .............................................................. 19

  E. Sexual Offenses ................................................................................................................... 21

    1.  1989—Sexual Touching of T.F. ..................................................................................... 21

    2.  20 and 25 September 1990—Intercourse with and Rape of V.R. #1 ......................... 21

    3.  Summer of 1992 or 1993—Rape of V.R. #2 ................................................................. 23

    4.  Several Occasions between 1992 and 10 February 1998—Forcible Intercourse with
        Tanya McCloud ............................................................................................................. 24

    5.  Summer of 1996—Touching of R.A. ............................................................................ 24

    6.  17 February 1997—Touching of T.F. ........................................................................... 25

    7.  June or July 1997—Sexual Assault against C.R. ........................................................... 25

      8.       8 November 1997—Rape of R.J. .................................................................... 27

  F.  Other Criminal History ...................................................................................... 29

      1.       July 1990—Unlawful Possession of Liquor by Consumption, Criminal Damage to Private Property, Drunken Driving, Reckless Driving ................................ 29

      2.       1994—Unlawful Possession of Liquor .................................................... 29

  G.  Incarceration History and Prison Disciplinary and Work Record ..................... 29

V.   LAY WITNESS TESTIMONY ................................................................................ 30

  A.  Respondent ........................................................................................................ 30

  B.  Clement Gallop .................................................................................................. 31

  C.  Andre Taylor ...................................................................................................... 31

  D.  Allan Duprey ...................................................................................................... 32

  E.  Anne Schauder .................................................................................................. 33

VI.   EXPERT REPORTS AND TESTIMONY ............................................................... 34

  A.  Dr. Phenix ......................................................................................................... 34

  B.  Dr. Gutierrez ...................................................................................................... 43

  C.  Dr. Daum ........................................................................................................... 47

VII.   CONCLUSIONS OF LAW .................................................................................... 51

  A.  Elements for Civil Commitment ........................................................................ 51

      1.       Prior Sexually Violent Conduct or Child Molestation ............................ 52

      2.       Current Serious Mental Illness, Abnormality, or Disorder ...................... 52

      3.       Serious Difficulty Refraining .................................................................. 53

      4.       Burden of Proof, and Clear and Convincing Standard ............................ 54

  B.  First Element:  Prior Sexually Violent Conduct or Child Molestation .............. 55

  C.  Second Element:  Current Serious Mental Illness, Abnormality, or Disorder .... 56

  D.  Third Element:  Serious Difficulty Refraining ................................................... 68

VIII.   CONCLUSION .................................................................................................... 73

     This case comes before the court for determination whether respondent Byron Neil Antone ("respondent") is a sexually dangerous person and thereby subject to commitment under 18 U.S.C. § 4248 ("4248").  The case was referred to the undersigned for an evidentiary hearing and memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (*See* Minute

Entry after D.E. 80; 1 Sept. 2011 Order (D.E. 81)). For the reasons stated below, it will be recommended that respondent be found not to be a sexually dangerous person and that this case be dismissed with prejudice. Specifically, the court finds that although the government has shown by clear and convincing evidence that respondent has previously engaged in sexually violent conduct and child molestation and that he currently suffers from a serious mental illness, abnormality, or disorder, namely, polysubstance dependence, it has not shown by clear and convincing evidence that as a result of such serious mental illness, abnormality, or disorder he would have serious difficulty refraining from sexually violent conduct or child molestation if released.

## I.     ADAM WALSH CHILD PROTECTION AND SAFETY ACT OF 2006

The Adam Walsh Child Protection and Safety Act of 2006 ("the Act"), Pub. L. No. 109-248, § 302, 120 Stat. 587, 619-22 (codified in 18 U.S.C. §§ 4241, 4247, and 4248), established a program for the civil commitment of individuals in the custody of the Federal Bureau of Prisons ("BOP"), and others, who are determined to be "sexually dangerous person[s]." 18 U.S.C. § 4248(d). The commitment process is initiated when either the Attorney General, the Director of BOP, or their designee files a certification that an individual is sexually dangerous pursuant to the Act. *Id.* (a); *United States v. Timms*, 664 F.3d 436, 439 (4th Cir. 2012). Following such certification, the district court must conduct a hearing to determine if the person is sexually dangerous. 18 U.S.C. § 4248(d). "If, after the hearing, the court finds by clear and convincing evidence that the person is a sexually dangerous person, the court shall commit the person to the custody of the Attorney General." *Id.*

A "sexually dangerous person" is defined by statute as one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually

dangerous to others." 18 U.S.C. § 4247(a)(5). The phrase "sexually dangerous to others" means that "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Thus, to satisfy the criteria for civil commitment under § 4248, the government must show by clear and convincing evidence that an individual: (1) has previously "engaged or attempted to engage in sexually violent conduct or child molestation"; (2) currently "suffers from a serious mental illness, abnormality, or disorder"; and (3) "as a result of" such condition, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. §§ 4247(a)(5), (6); *see United States v. Comstock*, __ U.S. __, 130 S. Ct. 1949, 1954 (2010).

## II.   PROCEDURAL HISTORY

The government commenced this proceeding on 23 February 2007 by filing a certification of respondent as a sexually dangerous person, pursuant to § 4248(a) (D.E. 1, 1-2). At the time, respondent was in the custody of BOP pursuant to a criminal judgment entered on 30 November 1999 by the United States District Court for the District of Arizona (Gov't Ex. 7). *See United States v. Byron Antone*, No. 4:99-CR-906-JMR (D. Ariz.). In its judgment, the court found respondent guilty of an aggravated sexual offense under 18 U.S.C. §§ 1153 and 2241(a), pursuant to his plea of guilty, and sentenced him to 114 months of imprisonment and 60 months of supervised release. (Gov't Ex. 7 at 4[1]). The certification was filed four days before respondent's expected release date of 27 February 2007. (Cert. (D.E. 1-2) ¶ 2).

Proceedings in the case were subsequently stayed pending an appeal relating to the constitutionality of § 4248 in *United States v. Comstock*, 507 F. Supp. 2d 522 (E.D.N.C. 2007)

---

[1] Page number references in citations to the hearing exhibits are to the Bates number when available or, if not available, to the page number assigned by the CM/ECF system.

(holding § 4248 unconstitutional as beyond Congress's authority and violative of the due process clause), *aff'd*, 551 F.3d 274 (4th Cir. 2009) (addressing only the issue of Congress's authority), *rev'd and remanded,* 130 S. Ct. 1949 (2010) (same; remanding for consideration of due process issue), *rev'd on remand*, 627 F.3d 513 (4th Cir. 2010) (upholding § 4248 under due process clause), *cert. denied*, 131 S. Ct. 3026 (2011). (*See* 25 Sept. 2007 Order (D.E. 12); 8 July 2008 Order (D.E. 18)). On 11 June 2008 (*see* D.E. 22), the stay was lifted.

Discovery in this case began on 4 August 2010 upon the court's entry of a standing order, Standing Order 10-SO-01, governing the administration and management of § 4248 cases. (*See* Standing Order 10-SO-01 ¶¶ 1, 4(a); Sched. Order (D.E. 46) ¶ 3). Discovery closed on 6 May 2011. (*See, e.g.*, Recording of 27 May 2011 status conf. 1:48:46 to 1:49:55). The parties filed jointly a proposed final prehearing order (D.E 68) on 27 June 2011.

On 1 September 2011, the court set this case for hearing on 20 October 2011 before the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* Minute Entry after D.E. 80; 1 Sept. 2011 Order (D.E. 81)). The parties filed a revised proposed final prehearing order (D.E. 86) on 22 September 2011 and proposed findings of fact and conclusions of law on 7 October 2011 (D.E. 89 (resp.), 90 (gov't)).

Also on 7 October 2011, the court granted a motion by respondent to exclude from the commitment hearing those opinions and related facts set out in the tardily submitted supplemental report (Gov't Ex. 3; D.E. 84-1) of one of the government's designated expert witnesses, Amy Phenix, Ph.D. ("Dr. Phenix"), that had not otherwise been disclosed in her original report (Gov't Ex. 2; D.E. 37) or deposition. (*See* 7 Oct. 2011 Order (D.E. 91); Transcript of Hearing ("Tr."), Vol. I ("Tr. I") (D.E. 107) 7:7-11; 101:14-24 (explaining that the

order subsumed the facts underlying excluded opinions)).[2]  On 18 October 2011, the court entered the revised proposed final prehearing order with modifications (D.E. 97).

The commitment hearing was conducted over three days:  20, 21, and 24 October 2011. (*See* Minute Entries at D.E. 100, 101, 102, respectively; Tr. I (covering 20 Oct. 2011); Tr. Vol. II ("Tr. II") (D.E. 108) (covering 21 Oct. 2011)[3]; Vol. III ("Tr. III") (D.E. 106) (covering 22 Oct. 2011)).  The government presented the testimony of respondent and two expert witnesses, Dr. Phenix and Manuel E. Gutierrez, Psy.D. ("Dr. Gutierrez"), both licensed psychologists. Respondent presented the testimony of:  Clement Gallop ("Gallop"), a treatment specialist in the commitment and treatment program at the Federal Correctional Institution in Butner, North Carolina ("FCI-Butner"); Andre Taylor ("Taylor"), a counselor at FCI-Butner; Allan W. Duprey ("Duprey"), respondent's former criminal attorney; Anne Schauder ("Schauder"), a United States Probation Officer from Arizona; and an expert witness, licensed psychologist Roy G. Daum, Psy.D. ("Dr. Daum").  In addition to the testimonial evidence, the court admitted into evidence various documentary exhibits introduced by both parties, including the forensic evaluation reports of the parties' experts, medical records, court records, police reports, art work created by respondent, and BOP records.[4]

At the conclusion of the hearing, respondent requested the opportunity to submit supplemental proposed findings and conclusions.  (Tr. III 89:22 to 90:6).  The court extended

---

[2] In accordance with a directive in the revised final prehearing order (D.E. 97 at 10), each party submitted designations of the portions of Dr. Phenix's supplemental report containing information the party proposed be excluded pursuant to the 7 October 2011 Order (D.E. 99 (resp.), 113 (gov't)).  Nevertheless, at the hearing, the court advised respondent that he was responsible for objecting to questions seeking information he deemed excludable. (Tr. I 7:2 to 8:1).  The court hereby adopts respondent's designations subject to the following exceptions because the information covered by these designations was elicited in testimony at the hearing without objection by respondent: no. 2 (*see id.* at 27:7 to 28:22); no. 4 (*see id.* at 218:25 to 219:5); no. 5 (*see id. at* 26:5 to 27:20); no. 7 (*see id.* at 128:4-18; 133:4-23).

[3] Tr. I and Tr. II are numbered consecutively.  Tr. I runs from pages 1 to 248, and Tr. II from 249 to 510.

[4] The parties stipulated to the authenticity of all copies of official documents, documents kept in the ordinary course of business, and all production exchanged during discovery.  (*See* Rev. Final Prehear. Order (D.E. 97) 1 ¶ 7).

that opportunity to both sides and, with counsel's consent, set the deadline for filing as two weeks after the filing of the hearing transcripts. (*Id.* at 90:7 to 91:7). The government and respondent filed their supplemental proposed findings of fact and conclusions of law timely on 23 December 2011 (D.E. 109) and 27 December 2011 (D.E. 110), respectively.

## III. PENDING EVIDENTIARY RULINGS

The court reserved ruling on three evidentiary matters at the hearing: the qualification of Dr. Daum as an expert in forensic psychology; the admissibility of an affidavit by Tanya McCloud ("McCloud"), a former girlfriend of respondent; and the admissibility of Schauder's testimony. Each of these matters is addressed in turn below.

### A. Qualification of Dr. Daum as an Expert in Forensic Psychology

At the hearing, the government objected to Dr. Daum's testifying as an expert in forensic psychology with respect to sexual dangerousness. (Tr. II 418:16-19; 426:11). The principal grounds for the objection were that Dr. Daum does not perform forensic evaluations with respect to determining sexual dangerousness and lacks training in that area. (*Id.* at 418:23 to 419:18; 426:11 to 427:5). While expressing skepticism regarding the government's objection, the court reserved ruling and permitted Dr. Daum to testify to preserve the record. (*Id.* at 427:20 to 428:17).

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). A district court is granted broad latitude in making its determination on the admissibility of proposed expert testimony. *United States v. Gastiaburo*, 16 F.3d 582, 589 (4th Cir. 1994).

Rule 702 provides that expert testimony is appropriate when it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Rule 702 further provides that a witness qualified as an expert may be permitted to testify where "(1) the testimony is based upon sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." *Id.* (b), (c), and (d). Courts have distilled Rule 702's requirements into two crucial inquiries: whether the proposed expert's testimony is relevant and whether it is reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *United States v. Forrest*, 429 F.3d 73, 80 (4th Cir. 2005). The trial court must carry out the special gate-keeping obligation of ensuring that expert testimony meets both requirements. *Kumho Tire*, 526 U.S. at 147.

One factor pertinent to reliability of an expert's opinion is the proposed expert's qualifications. *See Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1266 (D. Kan. 2003). A witness may qualify to render expert opinions in any one of the five ways listed in Rule 702: knowledge, skill, experience, training, or education. *Kumho Tire*, 526 U.S. at 147. The Fourth Circuit has ruled that, when an expert's qualifications are challenged, "'the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.'" *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989)); *accord The Harvester, Inc. v. Rule Joy Trammell & Rubio, LLC*, No. 3:09cv358, 2010 WL 2653373, at *1 (E.D. Va. 2 July 2010) (citing *Kopf*).

Applying these standards, the court finds that Dr. Daum is qualified to testify as an expert in forensic psychology with respect to sexual dangerousness. He holds a master's degree in

psychology and counseling, and a doctorate in clinical psychology (along with a doctorate in educational leadership). (Resp. Ex. 2 at 13 (Daum curriculum vitae ("C.V."))). He is licensed as a psychologist in Kansas; as a counselor in New Mexico and Texas; and as a sex offender treatment provider in Texas. (*Id.*; *see also* Tr. II 413:1-5; Tr. III 59:3-11). He has attended multiple workshops focused on forensic psychology. (Resp. Ex. 2 at 15-16). He has training and experience in the use of actuarials (which are discussed herein in detail in a later section). (Tr. II 424:21 to 425:6).

As part of a yearlong doctoral-level internship at Larned State Hospital ("LSH") in Kansas, he assisted in the preparation of annual reports mandated by state law on the sexual dangerousness of about 60 patients. (*Id.* at 411:6-12; 421:14-23; 422:7 to 423:15). His current duties as a psychologist at LSH include evaluation of the dangerousness of each person admitted to the unit where he works, including their sexual dangerousness if they have sex offenses. (*Id.* at 424:10-20). There are about six to eight such admissions per week and up to four are sexual predators. (*Id.* at 424:13-17). The fact that these evaluations are not made for purposes of commitment does not deprive them of significance to Dr. Daum's qualification to testify as a forensic psychologist. (*See id.* at 426:8-10). Dr. Daum also presently attends a weekly meeting with his eight other colleagues in this unit to discuss forensic evaluations. (*Id.* at 423:19 to 424:8). Every other week, the group discusses sexual predator evaluations. (*Id.* at 424:1-3).

Lastly, Dr. Daum has testified twice in New Mexico state court on whether persons were sexual predators. (*Id.* at 414:10-13). The fact that New Mexico did not then have a program for civil commitment of sexual predators, but instead referred them for treatment, does not negate the relevance of this experience. (*See id.* at 416:10-24).

The court concludes that Dr. Daum is qualified as an expert in the field of forensic psychology. Accordingly, the government's objection is OVERRULED, and the court recognizes Dr. Daum as an expert in forensic psychology with respect to sexual dangerousness.

Having found Dr. Daum qualified to testify as an expert, the court has considered his testimony, to the extent otherwise ruled to be admissible, in determining whether respondent is a sexually dangerous person under § 4248. The court has, of course, considered the points raised by the government regarding Dr. Daum's qualifications in evaluating the weight to be accorded his testimony. *See, e.g.*, *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.") (citing *Martin v. Fleissner GMBH*, 741 F.2d 61, 64 (4th Cir. 1984) ("[L]ack of direct experience is not a sufficient basis to reject [a proposed expert's] testimony, but may affect the weight that testimony is given, a decision properly made by the jury.")).

**B. Affidavit of Tanya McCloud**

McCloud is a former live-in girlfriend of respondent and the mother of his only child, a son. (*E.g.*, Gov't Ex. 27 at 8, int. ans. no. 10; Resp. Ex. 1 at 2). In a clinical interview in 1999, respondent reported that "[o]n several occasions he forcibly had intercourse with her." (Gov't Ex. 10 at 1848. *But see* Tr. I 92:7-9 (denying forced sex with McCloud)). In an affidavit by McCloud obtained by respondent, McCloud states, in relevant part, that "I cannot imagine that he would ever be sexually aggressive toward women" and that "I was never a victim of sexual abuse" by him. (Resp. Ex. 16 ¶ 6).

The court allowed respondent to use the affidavit to elicit opinions from Drs. Phenix and Gutierrez, pursuant to Fed. R. Evid. 703.[5]  (Tr. I 219:13 to 220:25) (Dr. Phenix); Tr. II 330:16-19 (Dr. Gutierrez)).  However, at the close of his case, respondent offered McCloud's affidavit as substantive evidence and the government objected on the grounds of hearsay.  (Tr. III 60:22 to 64:5).  The court expressed its doubt that the affidavit could be admitted under any theory as substantive evidence, but reserved its ruling.  (*Id.* at 63:20 to 64:5).

While respondent acknowledges that McCloud's affidavit is hearsay (*Id.* at 62:3-8), he appears to argue that it is admissible, in part, because the experts used it as a basis for opinions.  (*Id.* at 62:11 to 63:13).  Such use does not, of course, itself justify admission of the affidavit as substantive evidence.  *See* Fed. R. Evid. 703.  Indeed, in jury cases, the presumption under Rule 703 is that inadmissible facts, like those at issue, relied upon by experts should not be disclosed to the jury.  *See id.*

Respondent also contends that admission is warranted because "that affidavit goes to the heart of the matter, that she was never forced to have sex with [respondent]."  (Tr. III 63:11-13).  But the mere fact that the affidavit is relevant to a material fact in dispute does not bring it within an exception to the hearsay rule.  *See* Fed. R. Evid. 803, 804, 807.  Notwithstanding respondent's contentions regarding the significance of the statements in McCloud's affidavit, he offered no evidence that he made any effort to procure her attendance at the commitment hearing.

The court concludes that McCloud's affidavit is inadmissible as substantive evidence.  Accordingly, the government's objection is SUSTAINED, and its admission as such is therefore

---

[5] It is apparent from the other types of evidence relied upon by Drs. Phenix and Gutierrez that McCloud's statements are the type of facts reasonably relied upon by experts in their field.  *See* Fed. R. Evid. 703 (allowing otherwise inadmissible facts to be the basis for an expert's opinion "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject").

DENIED. The court has not considered the McCloud affidavit as evidence of the truth of the matters asserted therein in determining this case.

### C. Testimony of Anne Schauder

As indicated, Schauder is a United States Probation Officer in the District of Arizona, where respondent would serve his five-year term of supervised release, assuming, as appears likely, that he returns to his home state. (Tr. II 405:2-7). She testified on behalf of respondent regarding how sex offenders are supervised in her district, including sex offenders living on an Indian reservation, as respondent, a Native American, did. (*Id.* at 394:18 to 405:9). The government objected to her testimony on the grounds of relevance, arguing that a prescribed regimen of treatment or care upon release is not relevant to a determination of whether a respondent is sexually dangerous under § 4248. (*Id.* at 393:4-16; 409:3-5). Respondent counters that the conditions of supervised released to which he would be subjected, including the types of treatment and level of structure in respondent's potential release environment, are directly relevant to the ultimate question of whether he would be sexually dangerous if released. (*Id.* at 393:18 to 394:9).

Rule 401 states that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (pre-1 Dec. 2011 rev.).[6] A court has broad discretion under Rule 401 in assessing the relevance of evidence presented for admission at trial. *See, e.g., United States v. Abel*, 469 U.S. 45, 54 (1984); *United States v. Vogt*, 910 F.2d 1184, 1192 (4th Cir. 1990).

---

[6] The revisions that went into effect on 1 December 2011 were stylistic and not intended to change the meaning of Rule 401. Fed. R. Evid. 401 advisory comm. notes, 2011 amends.

The circumstances of respondent's supervision if he were to be released are relevant to the determination whether he will have serious difficulty in refraining from sexually violent conduct. *See United States v. Neuhauser*, No. 5:07-HC-2101-BO, 2012 WL 174363, at *3 (E.D.N.C. 20 Jan. 2012) (addressing both the length and specific conditions of respondent's supervised release in concluding that the government had failed to demonstrate that respondent was sexually dangerous); *see also United States v. Turner*, No. 5:07-HC-2167-D, 2012 WL 965985, at *2 (E.D.N.C. 21 Mar. 2012) (acknowledging that the court had "certainly considered the term of supervised release to be a protective factor" in making its determination that respondent was not sexually dangerous). In fact, the conditions to which respondent would be subject upon release were considered by the government's experts in reaching their opinions on sexual dangerousness. (*See, e.g.,* Tr. I 184:20 to 185:25 (Dr. Phenix); 194:4-14 (same); Tr. II 340:10 to 341:24 (Dr. Gutierrez)). The government cannot credibly object to the relevance of evidence upon which it itself relies.

The court concludes that the testimony of Schauder is relevant. Accordingly, the government's objection is OVERRULED, and the testimony is ADMITTED.

## IV. FINDINGS OF FACT

### A. Personal History

Respondent was born on 26 May 1972 on the Tohono O'odham Indian Reservation, which is located in south central Arizona. (Gov't Ex. 8 ¶ 42; Tr. I 201:7-9). He was raised by his mother, relatives, and friends, and when not with one of them, at a boarding school, but had no contact with his father, whom he did not meet until he was 15 or 16 years old. (Gov't Ex. 8 ¶ 42; Gov't Ex. 10 at 1849; Resp. Ex. 1 at 2; Tr. I 52:17 to 53:1). He has one sister, whose

paternity is not clear, and one half-brother, Eric Juan. (Gov't Ex. 10 at 1851; Gov't Ex. 5 at 450; Tr. I 52:7-13; 53:2-3).

Respondent's mother was a heavy drinker and she often neglected, and verbally and physically abused him. (Gov't Ex. 8 ¶ 42). According to respondent, "'Everybody was a drunk at my house. My mom, my grandma . . . everybody was a drunk.'" (Resp. Ex. 1 at 2; *see also* Tr. I 53:13 to 54:3). He was a loner and frequently picked on. (Gov't Ex. 8 ¶ 44). His mother would attend parties and leave him with people he did not know. (*Id.*). At age nine or ten, he moved in with his grandmother, but she could not control his unruly behavior and after a short time he moved back into his mother's home. (*Id.*). He began running away from home at age 11. (*Id.*).

At that age, he was abandoned by his mother and moved to Phoenix, Arizona to live with his godmother. (*Id.*). He was expelled from school for assaulting another student, and his godmother called his mother and insisted she pick him up. (*Id.*). After respondent spent three days in juvenile hall, his mother came for him and transported him to his grandmother's house, where he lived most of his teen years. (*Id.*).

When he was seven years old, he was subjected to sexual abuse, including intercourse, on several occasions by his aunt, who was 17 or 18 years old. (Gov't Ex. 10 at 1849). He also engaged in sexual intercourse at age 12 with his sister's cousin, who was 26 years old. (*Id.*). In addition, he had sex at age 14 or 15 when drinking at his cousin's house with a 17 or 18 year old woman. (*Id.*).

Respondent has never been married, but has been involved in two intimate relationships. (Gov't Ex. 8 ¶ 46). The first was with a woman named Shawna, which began when he was 18 years old. (*Id.*; Gov't Ex. 10 at 1849). The relationship lasted one year and ended after both

were arrested for domestic violence. (Gov't Ex. 8 ¶ 46; Gov't Ex. 10 at 1849). Respondent admits that he beat Shawna when he was drunk. (Gov't Ex. 8 ¶ 46). The second relationship was with McCloud and lasted for about six years. (*Id.*; Gov't Ex. 10 at 1849). They have one son together. (Gov't Ex. 8 ¶ 46). As discussed, respondent admitted in 1999 that there were occasions on which he became intoxicated and had forced intercourse with Tanya when she refused. (Gov't Ex. 10 at 1848). At the hearing, he denied having forced sex with her, but the court does not find that testimony credible. (Tr. I 92:7-9).

Respondent left school in the ninth grade. (Gov't Ex. 5 at 450; Gov't Ex. 8 ¶ 57; Resp. Ex. 1 at 3). Prior to his most recent incarceration, which began in February 1998, respondent was employed seasonally by the United States Forestry Service as a firefighter. (Gov't Ex. 8 ¶ 59; Gov't Ex. 10 at 1852; Tr. I 93:12-18). He attended specialized training classes in firefighting and was in the process of being promoted prior to being arrested. (Gov't Ex. 8 ¶ 59).

While incarcerated, respondent received a High School Equivalency Diploma. (Tr. I 60:6-22; Resp. Ex. 12). He has also completed classes or otherwise developed skills in guitar playing and teaching, beading, Reiki (a form of mediation and natural healing), drawing and painting, car maintenance, computers, and money management and finance. (Tr. I 73:3 to 79:21; 83:19 to 87:3; Tr. II 371:21 to 373:19; Resp. Ex. 8, 13, 17-20).

### B. Medical and Psychiatric History

Respondent does not have a significant medical history. He was injured at the age of 8 or 9 when a firecracker blew up in his mouth and at age 18 in an alcohol-related car accident. (Gov't Ex. 8 ¶ 47). In prison, he had a fall that rendered him unconscious and caused neck pain. (Gov't Ex. 2 at 2030). He has not otherwise had serious medical problems. (*See id.* at 2029-30; Gov't Ex. 8 ¶ 47).

Respondent has a history of depression with at least three suicide attempts: at age 16, he attempted to overdose and was hospitalized at Tucson Psychiatric Institute for 3 weeks; at age 18, he attempted to hang himself and was hospitalized at Kino Psychiatric Hospital; and at age 20, he stabbed himself in the chest with a knife. (Gov't Ex. 8 ¶ 48). He also has self-inflicted wounds on his wrists. (*Id.*). Respondent reports that these attempts were caused by abuse of alcohol and by feeling down on himself. (Resp. Ex. 1 at 3). During a previous incarceration on the reservation, respondent attended weekly therapy sessions, and his therapist reported that he made progress. (Gov't Ex. 8 ¶ 49).

In June 1999, the federal district court in Arizona ordered a psychological assessment of respondent for purposes of sentencing on his sole federal conviction. (*See* Gov't Ex. 9). The resulting psychophysiological evaluation and treatment plan, dated 30 August 1999, was prepared by Steven R. Gray, Ed.D. and Stephen Sadler, M.A./M.C. (Gov't Ex. 10) ("Gray and Sadler report"). Without making a formal diagnosis, they reached the conclusion, among others, that "[i]t is possible that [respondent's] sexually aggressive and sexually deviant behavior patterns are the result of emotional and psychological disturbance, rather than persistent deviant sexual arousal or attraction," although they clearly did not rule out deviant arousal. (*Id.* at 1865). They further concluded that while "[o]verall, he appears to be a good candidate for treatment based upon his willingness to acknowledge a problematic history . . . his apparent multiple emotional/psychological problems may present as an issue in an outpatient treatment setting." (*Id.*). Respondent stated that he would like treatment for his substance abuse and sexual misconduct. (*Id.* at 1852, 1853, 1865). Gray and Sadler also found that respondent might be a suicide risk and should be referred for a psychiatric evaluation to address possible treatment for depression. (*Id.* at 1865). They made a range of recommendations regarding community

supervision and clinical management of respondent, including sex offender treatment and release conditions limiting the opportunity for reoffense.  (*Id.* at 1867-69).

During his BOP incarceration, respondent has participated in periodic counseling sessions and attended appointments to monitor psychiatric treatment.  (Gov't Ex. 5 at 454; Tr. I 96:1 to 100:5).   While he had been treated with antidepressants, he has not taken these medications for more than ten years.  (Gov't Ex. 5 at 454).

Respondent has not received sex offender treatment during his BOP incarceration or at any other time.  (*E.g.*, Tr. I 39:18-20).  Although in his federal plea agreement he agreed to sex offender treatment while incarcerated and the sentencing judge recommended it, he apparently did not qualify for it at the time he began his sentence because his release date was so far in the future.  (Gov't Ex. 7 at 6; Gov't Ex. 12 ¶¶ 5, 12.c; Tr. II 380:3 to 381:3).  As discussed further below, Duprey, the lawyer representing respondent in the federal case, testified that he worked with the United States Attorney in Tuscon to have respondent charged in federal court because of the treatment available to him in the federal system, which was not available in the tribal jail. (Tr. II 378:5 to 379: 24; *see* Resp. Ex. 6).

In September 2008, following his § 4248 certification and transfer to FCI-Butner, respondent declined to participate in sex offender treatment.  (Gov't Ex. 3 at 2311).  He testified at the hearing that while he wanted to have treatment available to him upon his release, he knew that anything he said during treatment while he is in prison could be used against him in this proceeding.  (Tr. I 46:22 to 47:8; 80:14 to 81:17).  In fact, respondent declined, on the advice of his lawyer, to be interviewed by Dr. Gutierrez for a 2009 forensic evaluation and in 2010 for an updated forensic evaluation.  (Gov't Ex. 5 at 448-49; Gov't Ex. 6 at 1917).  Respondent testified

at the hearing that he believes he would benefit from sex offender treatment after his release and that it would help prevent him from reoffending. (Tr. I 40:4-6; 47:20-22).

### C. Substance Abuse History

Respondent has a history of substance abuse. (*See, e.g.*, Tr. I 29:9 to 34:22; Gov't Ex. 8 ¶¶ 55, 56; Gov't Ex. 10 at 1850, 1852, 1854-55, 1862; Resp. Ex. 1 at 2-3). He first consumed alcohol at age 9 and began drinking heavily at age 12, consuming 2 to 3 quarts of beer every other day. (Tr. I 29:9-23; Gov't Ex. 8 ¶ 55). When arrested in February 1998, he was drinking on average 3 to 5 quarts a day and up to 11 quarts on some days. (Gov't Ex. 8 ¶ 55).

He first had blackouts from drinking about age 13 to 14. (Tr. I 30:6-10). By the time he was 17, he was drinking to the point of blacking out as often as every other day. (*Id.* at 30:22 to 31:5; *see also* Gov't Ex. 8 ¶ 55). He admitted at the hearing that he was and always will be an alcoholic. (Tr. I 79:22-25).

Respondent first used marijuana at age 13, and, if available, used it on a daily basis. (Tr. I 33:20-25; Gov't Ex. 8 ¶ 56; Gov't Ex. 10 at 1850). He started using cocaine at age 16, and would use it on a daily basis if he could afford it, but usually once a month. (Tr. I 34:10-13; Gov't Ex. 8 ¶ 56; Gov't Ex. 10 at 1850). Marijuana and cocaine, along with alcohol, were the principal substances respondent used. (Tr. I 34:19-22).

Nevertheless, respondent also used other substances. (*See, e.g.*, Resp. Ex. 1 at 3). For example, at age 16, he huffed gas on about 4 separate occasions, but quit after having a bad experience, but also huffed paint cans. (Gov't Ex. 8 ¶ 56; Tr. I 56:8-13). He began using LSD at age 17 and, at the time of his arrest in 1998, he was using it approximately 3 times per month. (*Id.*). He has used the following additional drugs around the ages indicated: "speed" (*i.e.*, amphetamine) at age 17; phencyclidine ("PCP") at age 17; "rush" (*i.e.*, alkyl nitrites) at age 17;

"premo" (*i.e.*, marijuana cigarettes laced with cocaine) at age 18; and crack cocaine at age 23. (*Id.*).

Respondent attended Alcoholics Anonymous/Narcotics Anonymous ("Alcoholics Anonymous") when he first went to prison and has been attending it at FCI-Butner for about a year. (Tr. I 31:18 to 32:10). He has also completed a 40-hour[7] drug treatment program in prison. (*See id.* at 32:14 to 33:8; Resp. Exs. 10, 13 at 376). Although alcohol and drugs are available in prison (Tr. I 62:21 to 63:3; 69:2-16; Tr. II 202:15-20; 281:18-22), respondent reports that he has not used substances during his incarceration, and there are no disciplinary or other records showing that he did (Tr. I 34:4-7, 14-16; 62:4 to 63:24; Respon. Ex. 5 at 3). As discussed below, Taylor, a counselor at FCI-Butner, confirms that he has no knowledge of respondent using alcohol there. (Tr. I 370:13-15; 374:1-3).

### D. Overview of Respondent's Sexual Offense History

Respondent's history of sexual misconduct spans at least nine years—1989 to 1997. There are seven known victims of his misconduct: T.F., V.R. #1, V.R. #2, McCloud, R.A., C.R., and R.J.

Respondent has had four criminal judgments entered against him for sexual offenses. Three were entered by the tribal court, the Judicial Court of the Tohono O'odham Nation.[8] The charging document with respect to each of the judgments is a criminal complaint, and there is a written plea agreement with respect to two of them. The remaining judgment is by the United

---

[7] Although this program is referred to frequently in the record as a 40-hour program (*see, e.g.*, Tr. I 32:14-15; 72:11-12 (respondent); 145:5-9 (Dr. Phenix); Tr. II 495:10-15 (Dr. Daum)), the record of respondent's completion lists the total hours as 32.5 (Resp. Ex. 10).

[8] The court is terming tribal judgments the tribal court filings entitled "Tribal Record Entry." The court deems the date of execution of tribal judgments to be their date of entry.

States District Court for the District of Arizona. The charging documents in that case are a criminal complaint and criminal information, and there is also a written plea agreement.

The first tribal judgment was entered on 10 April 1991 and relates to incidents in September 1990 between respondent and V.R. #1. (Gov't Ex. 20 at 2046; *see also id.* at 2047 (crim. compl.)). The second tribal judgment was entered on 18 May 1998 and concerns sexual misconduct by respondent against T.F. on 17 February 1997. (*Id.* at 2062; *see also id.* at 2054 (crim. compl.), 2063-64 (plea agree.)). The third, consolidated tribal judgment was entered on 16 March 1999. (*Id.* at 2048-49). It relates to sexual misconduct by respondent against four victims: (1) V.R. #2 in the summer of 1992 or 1993[9] (*see id.* at 2060 (crim. compl.)); (2) R.A. in the summer of 1996 (*see id.* at 2071 (crim. compl.)); (3) C.R. in June or July 1997 (*see id.* at 2078 (crim. compl.)); and (4) R.J. on 8 November 1997 (*see id.* at 2053 (crim. compl.)). The charges addressed in the 16 Mach 1999 tribal judgment were the subject of a consolidated plea agreement. (*Id.* at 2050-52).

The federal judgment was entered on 10 December 1999, respondent having been sentenced on 30 November 1999. (Gov't Ex. 7 at 4, 7). The conviction was for respondent's sexual assault against C.R. in June or July 1997 (*see* Gov't Ex. 12 at 1215 (crim. info.)), although in the plea agreement underlying the judgment respondent admits his sexual misconduct as to all the victims involved in the tribal court convictions (*see* Gov't Ex. 12 at 1223-24). Information regarding the misconduct as to each of the victims was also included in

---

[9] As to the offense date, see footnote 13 below.

the original charging document, the criminal complaint (Gov't Ex. 13 at 1820),[10] as well as the presentence report (Gov't Ex. 8 at ¶¶ 5-16, 33, 34, 36).

### E. Sexual Offenses

#### 1. 1989—Sexual Touching of T.F.

In 1989, when respondent's cousin T.F. was a 13-year-old in eighth grade, respondent, then 16 or 17, came over to visit. (Gov't Ex. 17 at 1660). Respondent came up behind her and grabbed her breast and crotch over her clothing. (*Id.*). He also reached inside her shirt and touched her breast. (*Id.*). Respondent admitted to this conduct in the federal plea agreement (Gov't Ex. 12 at 1224), although he was never charged for it. According to T.F., respondent engaged in similar conduct on numerous other occasions. (Gov't Ex. 17 at 1660).

#### 2. 20 and 25 September 1990—Intercourse with and Rape of V.R. #1

On 20 September 1990, respondent, then 18, had sexual intercourse with his cousin V.R. #1, a minor at age 16. (Gov't Ex. 17 at 1686; Gov't Ex. 19 at 1720, 1722). Respondent was V.R. #1's boyfriend, and the intercourse was consensual. (*Id.* at 1722).

Five days later, on 25 September 1990, respondent went to V.R. #1's house at approximately 2:30 a.m. and knocked on her window. (*Id.* at 1721, 1725; *see generally* Gov't Ex. 18 at 1102). They talked for a while. (Gov't Ex. 19 at 1725). V.R. #1 could tell respondent had been drinking from the odor on his breath. (*Id*. at 1721, 1725). Respondent asked her to go to his house and, when she refused, he threatened to smash her window and yell if she did not come out. (*Id.* at 1721, 1725). She believed respondent was talking about killing himself. (*Id.* at 1725). She came out through a window and went to respondent's house. (*Id.* at 1721, 1725).

---

[10] The federal criminal complaint and other filings in the federal case at times identify respondent's victims by number, as follows: C.R. as victim one; V.R. #1 as victim two; V.R. #2 as victim three; T.F. as victim four; R.A as victim five; and R.J. as victim six. (Gov't Ex. 13 at 1819-20).

They went to his bedroom and talked for a while. (*Id.* at 1721, 1725). Then, respondent got on top of her and would not get off. (*Id.* at 1721, 1725). He pulled her shorts down past her knees, took out his penis, stuck it in the left side of her underwear, and raped her for approximately a half hour. (*Id.*). V.R. #1 stated she tried to move respondent off her, but could not. (*Id.*). She did not know if he ejaculated, but stated it felt very slippery. (*Id.* at 1725). A later medical report found no sperm. (Gov't Ex. 18 at 1102). He gave her a ride on his back to her house. (*Id.*). She said that respondent did not threaten her and told her he was sorry and that it would not happen again. (Gov't Ex. 19 at 1722, 1725). Respondent admitted to the rape in his federal plea agreement. (Gov't Ex. 12 at 1223).

On 11 October 1990, respondent was charged by tribal authorities in a criminal complaint with sexual misconduct with a minor (statutory rape) for the 20 September 1990 incident, sexual abuse for the 25 September 1990 incident, and contributing to the delinquency of a minor for both incidents. (Gov't Ex. 20 at 2047). Respondent pled guilty to the sexual abuse charge. (*Id.* at 2046).[11] In a tribal court judgment entered 10 April 1991, he was found guilty on that charge and sentenced to 360 days in jail, with 270 days suspended; 360 days of supervised probation; and a fine of $250. (*Id.*). The remaining charges were dismissed. (*Id.*). It appears that respondent served about six months in jail in connection with this offense, presumably including pretrial incarceration. (Gov't Ex. 8 ¶ 7).

---

[11] The 1999 presentence report indicates that an additional charge for disorderly conduct on 25 September 1990 was dismissed on 10 April 1991 (Gov't Ex. 8 ¶ 36), but that charge is not reflected in the tribal court documents of record.

### 3. Summer of 1992 or 1993—Rape of V.R. #2

In or around the summer of 1992 or 1993, respondent, then 21 or 22, approached his cousin V.R. #2,[12] who was 14 or 15 years old, and told her that her cousins wanted her to visit them at her aunt's house. (Gov't Ex. 17 at 1686; *see generally* Gov't Ex. 8 at 95). He offered to walk with her to the aunt's home. (Gov't Ex. 17 at 1686). It was dark outside, and as they walked toward the aunt's house, respondent walked to another house. (*Id.*). He returned with two quarts of beer and offered her some, but she declined. (*Id.*; Gov't Ex. 8 at 95). Respondent drank the beer himself in about 20 minutes. (Gov't Ex. 8 at 95). V.R. #2 then began walking back to her house, and respondent jumped on top of her. (Gov't Ex. 17 at 1686). She started fighting with him, but he was too strong for her. (*Id.*). V.R. #2 was crying and told respondent to get off of her as she hit him. (*Id.*). Respondent held her arms tight and raped her. (*Id.*). After the assault ended, respondent apologized and asked her if she was okay. (Gov't Ex. 8 at 95). Respondent admitted to this offense in his federal plea agreement. (Gov't Ex. 12 at 1223).

On 10 March 1998, respondent was charged by tribal authorities in a criminal complaint with threatening through forcible rape, disorderly conduct, and child molestation. (Gov't Ex. 20 at 2060).[13] Respondent pled guilty to threatening and, in lieu of child molestation, sexual assault. (*Id.* at 2050). In its consolidated judgment entered 16 March 1999, the tribal court found respondent guilty of threatening and sexual assault, dismissed the disorderly conduct charge, and sentenced him to 3,600 days in the tribal jail, with credit for time served. (*Id.* at 2048, 2049).

---

[12] V.R. #2 is the sister of V.R. #1. (Gov't Ex. 17 at 1686).

[13] The criminal complaint alleges an offense date of May 1990, consistent with a portion of a supplemental statement given by V.R. #2. (*See* Gov't Ex. 20 at 2060; Gov't Ex. 15 at 1687). The court, however, relies on the offense date of the summer of 1992 or 1993 provided in the earlier, principal statement by V.R. #2 (Gov't Ex. 17 at 1686) and the federal court documents (*e.g.*, Gov't Ex. 12 at 1223 (plea agree.)).

### 4. Several Occasions between 1992 and 10 February 1998—Forcible Intercourse with Tanya McCloud

Respondent, 19 or 20, began dating McCloud, 18, around 1992 and they moved in together about 6 months later. (Gov't Ex. 10 at 1849[14]; Gov't Ex. 27 at 8, int. ans. 10). McCloud had a 3-month-old daughter. (Gov't Ex. 10 at 1849). Their relationship lasted until respondent was arrested on 10 February 1998 on the multiple charges leading to the 16 March 1999 consolidated tribal judgment against him. (*Id.* at 1849).

In an interview on 22 July 1999 for the Gray and Sadler report, respondent reported that "[o]n several occasions he forcibly had intercourse with [McCloud]." (*Id.* at 1848). He said it occurred in situations in which he became intoxicated and she refused his sexual advances. (*Id.*). Respondent was not charged in connection with any forced sex with McCloud.

### 5. Summer of 1996—Touching of R.A.

In the summer of 1996, respondent, 24, touched the crotch area of his cousin R.A., 11, over her clothing. (Gov't Ex. 17 at 1661; *see also* Gov't Ex. 15 at 1663-64). Respondent admitted to this incident in the federal plea agreement.[15] (Gov't Ex. 12 at 1224). R.A. said that respondent had touched her crotch area on many other occasions, sometimes under her clothes. (Gov't Ex. 17 at 1661; Gov't Ex. 15 at 1663-64).

Based on the incident, tribal authorities charged respondent in a criminal complaint dated 30 December 1998 with child molesting, sexual abuse, and threatening. (Gov't Ex. 20 at 2071). These charges were dismissed by the tribal court in its 16 March 1999 consolidated judgment (*id.* at 2048), pursuant to the consolidated plea agreement (*id.* at 2048, 2050-51).

---

[14] According to this report, respondent stated his age as 23 when he met McCloud. (Gov't Ex. 10 at 1849). That age appears incorrect because it would correspond to the year 1994 or 1995, which is later than when he stated in his interrogatory answers his relationship with McCloud began (Gov't Ex. 27 at 8, int. ans. 10) and incompatible with the finding in the presentence report that he had been involved with McCloud for about 6 years. (Gov't Ex. 8 ¶ 46).

[15] The federal plea agreement (Gov't Ex. 12 at 1224) and tribal police report (Gov't Ex. 15 at 1663) state R.A.'s age at the time of the incident as 12, but her date of birth, as listed in the relevant FBI report, would have made her 11 years old (*see* Gov't Ex. 17 at 1661).

### 6.     17 February 1997—Touching of T.F.

On 17 February 1997, respondent, 24, rubbed the buttocks of his cousin, T.F., age 21, the same victim involved in the 1989 incident above, over a blanket while she was sleeping on a couch at respondent's home.  (Gov't Ex. 17 at 1660).  Respondent was drunk at the time and eventually passed out.  (*Id.*).

In a criminal complaint dated 10 March 1998, tribal authorities charged respondent with threatening and disorderly conduct based on this incident.  (Gov't Ex. 20 at 2054).  Respondent pled guilty to, thereby admitting, the disorderly conduct charge in a written plea agreement.  (*Id.* at 2063).  Pursuant to that agreement, the tribal court entered a judgment on 18 May 1998 holding respondent guilty on the disorderly conduct charge, sentencing him to 60 days in the tribal jail, and dismissing the threatening charge.  (*Id.* at 2062).

### 7.     June or July 1997—Sexual Assault against C.R.

In or about June or July 1997, respondent went to the house of C.R., a cousin of his, and asked her to hang out with him.  (Gov't Ex. 15 at 1658).  She agreed and they went to his house, where he tried to get her drunk and take drugs.  (*Id.*).  Respondent's mother was in the living room with them.  (*Id.*).  At respondent's suggestion, they went into his room to watch a movie.  (*Id.*).  Respondent tried to force C.R. to have sex with him.  (*Id.*).  When she refused, respondent threw her on the bed, held her hands down, touched her breasts skin to skin, and touched her genitalia through her clothing.  (*Id.*).  He unbuttoned her pants as they struggled.  (*Id.*).  She was able to kick respondent off her and reach the door, but she fell and respondent put his hand over her mouth, squeezing her cheeks hard and telling her to shut up.  (*Id.*).

Respondent told her that she should let him do it and that she would like it.  (*Id.*).  C.R. kept telling him to leave her alone and let her go home.  (*Id.*).  When respondent's mother called

him, C.R. was able to escape by jumping out the bedroom window. (*Id.*). Respondent was drunk and had been using cocaine. (*Id.*).

In a criminal complaint dated 29 April 1998, tribal authorities charged respondent with one count of kidnapping and two counts of disorderly conduct based on his conduct against C.R. (Gov't Ex. 20 at 2078). He pled guilty to the kidnapping charge in the consolidated plea agreement. (*Id.* at 2050). In its 16 March 1999 consolidated judgment, the tribal court found respondent guilty on this charge, dismissed the other two charges, and sentenced him to 3,600 days in the tribal jail. (*Id.* at 2048, 2049).

On 14 April 1999, respondent was charged by criminal complaint in the District of Arizona with aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a)(1), in that "he did knowingly cause another person to engage in a sexual act by using force against that other person, to wit, directly touching the victim[']s breasts and touching her genitalia through the clothing." (Gov't Ex. 13 at 1819). The criminal complaint alleged jurisdiction under 18 U.S.C. § 1153(a), which subjects a Native American committing a felony under chapter 109A, such as a violation of 18 U.S.C. § 2241, to the same law as others committing such a felony. (*Id.*). Respondent was subsequently charged with the same offense by criminal information, dated 2 June 1999. (Gov't Ex. 12 at 1215). Respondent agreed to plead guilty to the criminal information pursuant to a plea agreement (*id.* at 1216-25), filed 28 June 1999, in which he admitted to the facts underlying the crime (*id.* at 1223); on the same date, a magistrate judge recommended that the court accept respondent's guilty plea in findings and a recommendation (*id.* at 1836-37) and ordered a presentence psychological evaluation of respondent (Gov't Ex. 9); and the following day, 29 June 1999, the district judge accepted the plea (*id.* at 1837). Following completion of the evaluation of respondent (Gov't Ex. 10) and the presentence report (Gov't Ex.

8), the court sentenced respondent on 30 November 1999 and entered its judgment on 8 December 1999 (Gov't Ex. 7).

The court sentenced respondent to 114 months of incarceration with credit for time served and 60 months of supervised release. (*See* Gov't Ex. 7 at 4). On 16 February 2000, the court ordered that the federal sentence run concurrently with the sentence imposed in the 16 March 1999 tribal consolidated judgment. (*See* Gov't Ex. 11).

### 8.    8 November 1997—Rape of R.J.

On 8 November 1997, respondent, age 25, raped R.J., 20. (Gov't Ex. 15 At 1695). R.J. is the sister of respondent's half-brother, Eric Juan. (Gov't Ex. 10 at 1848).

The rape occurred in the early morning hours that day. (Gov't Ex. 15 at 1695). R.J. had gone to respondent's house the preceding evening with her son to watch movies and visit Eric. (*Id.*). Respondent was there, having just returned from fighting a fire, along with others. (*Id.*). Later, around 10:00 p.m., Eric and two others arrived. (*Id.*).

Everyone started drinking, including respondent and R.J. (*Id.* at 1695-96). According to respondent, he himself drank a 12-pack of 12-ounce beers and 3 40-ounce bottles of liquor. (*Id.* at 1697). Respondent was also snorting cocaine and took a black pill he had previously offered Eric. (*Id.* at 1696).

Sometime after 4:00 a.m., R.J. laid down in respondent's mother's bed and went to sleep. (*Id.* at 1695). She awoke to find respondent laying on top of her. (*Id.*). She told him to get off of her, but he hit her on the top of her head—neither this nor a subsequent strike were painful to R.J.—and told her to shut up. (*Id.* at 1695, 1696). She kept telling him to get off of her, but he kept hitting her and telling her to shut up. (*Id.* at 1695). Respondent put one hand over her mouth and used his other hand to hold her hands down. (*Id.*). R.J. stated that respondent forced

his erect penis into her, and attacked her for 5 to 15 minutes. (*Id.*). She attempted to kick him off of her to no avail. (*Id.*).

McCloud knocked on the door, respondent moved off of R.J., put R.J.'s pants on her, told her not to say anything about what had happened, and hit her on the head again. (*Id.*). When respondent returned to the bed, he attempted to push her on her back twice more. (*Id.*). Respondent asked her, "'Don't you want me?'" and "'You can give it to Eric and you can't give it to me.'" (*Id.*). This latter statement tends to confirm respondent's claim in 1999 that immediately prior to entering the bedroom he had seen R.J. having sex with Eric. (Gov't Ex. 10 at 1848). The last thing respondent said to her was she was "good." (Gov't Ex. 15 at 1695).

McCloud was about eight months pregnant at the time. (*Id.* at 1697-98). According to respondent, he had last had sex six months before the incident with R.J. (*Id.* at 1698). R.J. has reported that the rape has had a devastating impact on her life. (Gov't Ex. 8 ¶¶ 14-16).

Respondent admitted to the rape of R.J. in the federal plea agreement. He stated, "I penetrated her vulva with my penis as she struggled with me. I told her to shut up as I hit her." (Gov't Ex. 12 at 1224).

On 2 December 1997, tribal authorities charged respondent by criminal complaint with two counts of sexual assault and one count of kidnapping based on the incident with R.J. (Gov't Ex. 20 at 2053). He was arrested on these charges on 10 February 1998 and, although the record is not entirely clear, the court assumes that he has remained in custody since that date. (Gov't Ex. 8 ¶ 33; Gov't Ex. 20 at 2049 (consolidated judgment giving credit for 281 days served plus other time)). Respondent pled guilty to all counts in the 16 March 1999 consolidated plea agreement. (Gov't Ex. 20 at 2050). In its consolidated 16 March 1999 judgment, the tribal court

found respondent guilty on all counts and sentenced him to 3,600 days in the tribal jail. (*Id.* at 2048, 2049).

### F. Other Criminal History

#### 1. July 1990—Unlawful Possession of Liquor by Consumption, Criminal Damage to Private Property, Drunken Driving, Reckless Driving

In early July 1990, respondent, age 18, committed the tribal offenses of unlawful possession of liquor by consumption, criminal damage to private property, drunken driving, and reckless driving. (Gov't Ex. 8 ¶¶ 37, 38). In November 1990, the tribal court sentenced him to a term of imprisonment, which it suspended; supervised probation of at least 180 days; and fines. (*Id.* ¶¶ 37, 38).

#### 2. 1994—Unlawful Possession of Liquor

On 12 February 1994, tribal authorities arrested respondent, age 21, for unlawful possession of liquor by consumption. (*Id.* ¶ 35). He was convicted on the charges and found in contempt for failure to appear for plea agreement. (*Id.*). The tribal court sentenced him to 30 days imprisonment. (*Id.*).

### G. Incarceration History and Prison Disciplinary and Work Record

While in BOP custody, respondent has been sanctioned for the following four violations:

1. 25 January 2000. Fighting with Another Person. (Resp. Ex. 5; Gov't Ex. 25 at 1581-83). The inmate whom respondent fought did not suffer serious injuries. (Gov't Ex. 25 at 1594).

2. 5 March 2000. Using Phone or Mail without Authorization. (Resp. Ex. 5).

3. 14 January 2001. Failing to Stand Count. (Resp. Ex. 5).

4. 22 October 2004. Assault without Serious Injury. (Resp. Ex. 5; Gov't Ex. 26 at 1475-77).

There are three other events reflected in the BOP records that did not result in any sanction:

1.      11 August 2006.   Rejection of the magazine *Maxim*, which respondent had ordered.  (Gov't Ex. 21).

2.      4 October 2006.  Rejection, again, of *Maxim*.  (Gov't Ex. 22).

3.      12 September 2008.  Recovery from respondent's cell of pictures from magazines of adult women in swimsuits and underwear, and seminude adult women, and a novel with descriptions of adults engaging in sexual activity.  (Gov't Ex. 23).

Respondent's prison record shows no sanctions or nonsanctioned incidents relating to alcohol or drugs.  His work in federal prison includes service at a superior level as an orderly in the unit where he is presently housed at FCI-Butner.  (Gov't Ex. 3 at 2307; Resp. Ex. 7).

## V.      LAY WITNESS TESTIMONY

### A.  Respondent

Respondent, who was called by the government, testified that because of his substance abuse he did not recall his assaults on V.R. #2, R.A., T.F., C.R., and R.A.  (Tr. I 22:8 to 26:4; 28:23 to 29:8; 36:1 to 37:4; 38:19 to 39:7).  He denied raping V.R. #1, claiming that her parents, who opposed his dating her, pressed the allegations of rape.  (*Id.* at 27:21 to 28:22; 37:5 to 38:18).  He also denied forced sex with McCloud.  (*Id.* at 35:7-25; 91:15-18).

The court does not find respondent's denials credible because, among other reasons, he admitted to the offense against V.R. #1 in the federal plea agreement (Gov't Ex. 12 at 1223) and, as indicated, he admitted to forced sex with McCloud in the 1999 Gray and Sadler report (Gov't Ex. 10 at 1848).

The principal other topics about which respondent testified were his upbringing, substance abuse, and activities in prison. (Tr. I, *e.g.*, 29:9 to 34:22; 52:7 to 54:18; 60:6-22; 64:21 to 65:9; 73:3 to 79:25; 83:19 to 87:3). Respondent's testimony in these areas is addressed as part of the general discussion of these topics elsewhere herein. The court finds his testimony in these other areas generally to be credible.

### B. Clement Gallop

Gallop, who was called by respondent, is a treatment specialist in the commitment and treatment program at FCI-Butner. (Tr. I 96:2-7). He has known respondent for approximately four years. (*Id.* at 96:17-18). Gallop testified that he speaks with respondent about two to three times per week and that respondent usually initiates the interactions. (*Id.* at 97:11-20). Gallop stated that the frequency with which respondent seeks out his assistance is more than average for an inmate. (*Id.* at 99:24 to 100:1). The advice that respondent usually seeks relates to issues with his son, such as his son's schooling and disciplinary matters. (*Id.* at 98:20-22). On occasion, respondent seeks advice from Gallop regarding anger management. (*Id.* at 98:23 to 99:6). Gallop testified that his follow-up conversations with respondent on such issues were generally positive and that respondent always thanked him for his assistance. (*Id.* at 99:10-20). The court finds Gallop's testimony credible.

### C. Andre Taylor

Taylor, who was also called by respondent, is a counselor at FCI-Butner whose duties include counseling inmates on job skills and planning for release. (Tr. II 364:25 to 365:7). Taylor testified that although use of alcohol and controlled substances and engaging in sex and fighting is prohibited, these activities still occur in the prison setting. (*Id.* at 368:8 to 369:5). Inmates violating the rules prohibiting these activities are sanctioned by the disciplinary hearing

officer.  (*Id.* at 371:1-10).  In the last three years, Taylor has observed at least five inmates disciplined for alcohol use in the unit where respondent is housed with approximately 70 to 80 other inmates.  (*Id.* at 367:25 to 368:7; 369:6-13; 370:2-7).  He testified that inmates are subjected to breathalyzer tests, sometimes at random, to detect the use of alcohol, and that the results of these tests are recorded in a log.  (*Id.* at 369:14 to 370:1).  He further testified that he has observed intoxicated inmates and has detected inmates with the distinctive odor of the alcohol that is made by prison inmates.  (*Id.* at 369:14-19; 370:8-12).  However, he stated that he has no knowledge of respondent ever having been documented as having a positive breathalyzer test, nor has he ever observed respondent to possess alcohol or to have an odor of alcohol about him.  (*Id.* at 370:13-15; 374:1-3).  Taylor also testified that respondent serves as a unit orderly, plays and teaches guitar, and creates art and beaded jewelry.  (*Id.* at 371:21 to 373:19).  The court finds Taylor's testimony to be credible.

### D.  Allan Duprey

Duprey, respondent's attorney on the federal criminal charges (*see, e.g.*, Gov't Ex. 7 at 4), testified that he attempted, successfully, to have the United States Attorney's Office in the District of Arizona charge respondent with a federal felony, based on his tribal offense conduct. (Tr. II 378:5 to 379:24).  The reason was to enable respondent to be transferred to federal custody and thereby have access to sex offense treatment at FCI-Butner, which Duprey believed, would be designed specifically for Native Americans.  (*Id.* at 378:5 to 379:24; 381:4-13; 388:25 to 390:6).  Reflective of Duprey's efforts, the federal plea agreement requests that respondent receive sex offender treatment at FCI-Butner.  (*Id.* at 380:16 to 381:3; Gov't Ex. 12 at 1217 ¶ 5). The court, in turn, included a recommendation in the judgment that respondent participate in the

BOP residential drug abuse treatment program and sexual offender treatment program. (Tr. II 385:3-25; Gov't Ex. 7 at 6).

Duprey testified that respondent has never received sex offender treatment while serving his criminal sentence. (Tr. II 385:21 to 386:3). He stated that when he inquired after first learning that treatment was not being provided, he was told that respondent would not receive treatment until the last five years of his ten-year sentence. (*Id.* at 386:1-23; 387:4-13; Resp. Ex. 6). Duprey further testified that he believed that there was an agreement in place to provide respondent treatment and that had he known that respondent would not receive treatment, he would not have agreed to the transfer from the tribal jail to federal custody. (Tr. II 387:14 to 388:6). The court found Duprey's testimony to be credible.

### E. Anne Schauder

As discussed, Schauder, another witness for respondent, is a United States Probation Officer from the District of Arizona who supervises defendants in northern Arizona. (Tr. II 394:20-24; 405:18). She testified that the majority of defendants whom she supervises are Native Americans and that some of them are sex offenders living on a reservation. (*Id.* at 395:20 to 396:12). She also stated that supervised sex offenders in the District of Arizona may be subject to some of the following conditions: sex offender and mental health treatment, registration with the state as well as the tribe, no contact with minors or victims, warrantless searches, and electronic monitoring. (*Id.* at 396:13 to 397:5). She further testified that halfway house programs are also utilized. (*Id.* at 397:20 to 398:12). She stated that supervised

defendants are subjected to polygraph tests at least every six months and that penile plethysmograph[16] testing is used in some cases. (*Id.* at 400:8 to 401:1).

Schauder testified that respondent has voluntarily signed a waiver agreeing to reside in a halfway house for up to 365 days after release from custody. (*Id.* at 403:3 to 404:4; *see* Waiver & Order (D.E. 24), *United States v. Byron Antone*, No. 4:99-CR-906-JMR (D. Ariz.)). She testified that she would not be his supervising officer if he lives in Tuscon, which is in southern Arizona. (Tr. II 405:14-25). However, she testified that she does know the officer who would supervise respondent and that the officer is a senior officer who specializes in sex offenders and has fewer people to supervise than a more junior officer. (*Id.* at 407:5-20; 408:16-18). She also testified that there are more services through the Probation Office and more employment opportunities in Tucson than in the area that she supervises. (*Id.* at 408:3-19). As with the other lay witnesses, the court found Schauder's testimony to be credible.

## VI.    EXPERT REPORTS AND TESTIMONY

### A.  Dr. Phenix

Dr. Phenix, a witness called by the government, is a clinical psychologist in private practice who specializes in assessment of sex offenders. (Tr. I 102:10-21; *see also* Gov't Ex. 1 at 1 (Phenix C.V.)). With no objection from respondent, the court recognized Dr. Phenix as an expert in the field of forensic psychology specializing in the evaluation, diagnosis, and treatment of sex offenders.[17] (Tr. I 115:4-11).

---

[16] A penile plethysmograph is a device that is connected to the offender's penis and measures whether the offender becomes physiologically aroused when shown certain photographs. (Tr. II 400:17-23).

[17] The court entered an order (D.E. 6) on 24 March 2007 allowing a motion by the government for a psychological examination of respondent (D.E. 5), pursuant to 18 U.S.C. §§ 4247(b) and 4248(b), and subsequent orders (D.E. 9, 46 ¶ 3) extending the time for completion of the evaluation. The evaluations by Dr. Phenix were arguably conducted pursuant to the court's directive for a psychological evaluation.

Dr. Phenix issued an initial report on 3 October 2010 (Gov't Ex. 2) and a supplemental report on 8 September 2011 (Gov't Ex. 3). The supplemental report was essentially a copy of the initial report with additional information added reflecting primarily Dr. Phenix's interview of respondent on 12 April 2011. (*See id.* at 1). The reports are otherwise based on Dr. Phenix's review of numerous records relating to respondent, including court documents, mental health records, and prison records. (*See* Gov't Ex. 2 at 2000-02; Gov't Ex. 3 at 2280-82). As discussed previously, the court excluded portions of the supplemental report due to tardiness.[18] (See footnote 2 above). In both reports, Dr. Phenix made the same diagnoses and reached the same conclusion that respondent meets the requirements for commitment under § 4248. (*See* Gov't Ex. 2 at 2030, 2045; Gov't Ex. 3 at 2312, 2330). The court cites herein to the supplemental report, as the more recent report, unless the context requires otherwise.

Dr. Phenix diagnosed respondent with the following mental disorders: (1) paraphilia not otherwise specified ("NOS"), nonconsenting females ("paraphilia NOS, nonconsent"); (2) alcohol dependence, in a controlled environment; (3) antisocial personality disorder; and (4) depressive disorder, NOS. (Gov't Ex. 3 at 2312; Tr. I 118:18 to 119:3). With a notable exception discussed below, Dr. Phenix made these diagnoses using the criteria set forth in the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM"), the current version of which is the Fourth Edition, Text Revision (2000) ("DSM-IV-TR"). The DSM is a catalog of mental disorders published by the American Psychiatric Association and used by mental health professionals to diagnose mental illness. (Tr. II 266:24 to 267:8; 455:25 to 456:1).

Turning to the first diagnosis, paraphilia NOS, nonconsent, the DSM-IV-TR defines paraphilia as "recurrent, intense sexually arousing fantasies, urges or behaviors generally

---

[18] Although Dr. Phenix interviewed respondent, the exclusion of portions of her supplemental report precludes the court from knowing fully the findings and conclusions she made based on it and thereby from ascribing enhanced weight to her opinions generally based on the interview.

involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons that occur over a period of at least 6 months."  DSM-IV-TR 566 (cited in Gov't Ex. 3 at 2313); (Tr. I 120:3-12).  "NOS" is a catch-all category used in the DSM-IV-TR for disorders that meet the general guidelines for a mental disorder but do not meet the criteria for any of the specific disorders listed.  DSM-IV-TR 4; (Tr. I 123:12 to 124:4).  The specifier "nonconsent" indicates that the person is sexually aroused by the nonconsenting aspect of nonconsensual sexual encounters.  (Tr. I 124:18-24; *see also, e.g., id.* 132:20 to 133:1; 136:20 to 137:8).  Paraphilia NOS, nonconsent has never been listed in the DSM, and there is an ongoing controversy over whether it is a valid diagnosis.  (*E.g.*, *id.* at 124:7 to 126:19 (Dr. Phenix); 239:9 to 240:7 (same); Tr. II 273:14 to 274:4 (Dr. Gutierrez); 506:10 to 507:10 (Dr. Daum)).

In her supplemental report, Dr. Phenix based her diagnosis of paraphilia NOS, nonconsent principally on the following factors:  the number and pattern over an extended period of respondent's sexual offenses; his offending when he had consenting sexual partners available to him; and the finding in the 1999 Gray and Sadler report that he was deceptive on a polygraph in denying having ever masturbated to a rape fantasy.  (Gov't Ex. 3 at 2313).  In her testimony regarding paraphilia NOS, nonconsent (Tr. I, *e.g.*, 127:10 to 139:8), she pointed to these factors and several additional factors, including respondent's purported ability to maintain erections when he committed the assaults (*id.* at 137:5-8) and his purported admission to having deviant sexual fantasies (*id.* at 138:24 to 139:4).

As to the second diagnosis, alcohol dependence, in a controlled environment, the DSM-IV-TR defines substance dependence as a "maladaptive pattern of substance use, leading to clinically significant impairment or distress, as manifested by three (or more) of . . . [seven

Case 5:07-hc-02042-FL   Document 114   Filed 04/30/12   Page 36 of 74

specified factors] occurring at any time in the same 12-month period." DSM-IV-TR 197[19]; (*see also* Gov't Ex. 3 at 2313 (quoting in part and paraphrasing in part the criteria in the DSM-IV-TR)). The seven factors include tolerance of the substance, withdrawal from the substance, and consumption of increasing amounts of the substance. DSM-IV-TR 197; (*see also* Gov't Ex. 3 at 2313). The "in a controlled environment" specifier indicates that while respondent is presently abstaining from alcohol consumption, his abstinence is attributable to the controlled environment of the prison, where there is less access to alcohol and immediate sanctions for its use. (Tr. I 143:13 to 144:6).

Dr. Phenix's diagnosis of alcohol dependence, in a controlled environment was based primarily on the following: respondent's admission to heavy drinking, which began at age 12;

---

[19] The criteria for substance dependence as set out in the DSM-IV-TR read:

> A maladaptive pattern of substance use, leading to clinically significant impairment or distress, as manifested by three (or more) of the following, occurring at any time in the same 12-month period:

> (1)        tolerance, as defined by either of the following:

>        (a)        a need for markedly increased amounts of the substance to achieve intoxication or desired effect
>        (b)        markedly diminished effect with continued use of the same amount of the substance

> (2)        withdrawal, as manifested by either of the following:

>        (a)        the characteristic withdrawal syndrome for the substance . . .
>        (b)        the same (or a closely related) substance is taken to relieve or avoid withdrawal symptoms

> (3)        the substance is often taken in larger amounts or over a longer period than was intended
> (4)        there is a persistent desire or unsuccessful efforts to cut down or control substance use
> (5)        a great deal of time is spent in activities necessary to obtain the substance (e.g., visiting multiple doctors or driving long distances), use the substance (e.g., chain-smoking), or recover from its effects
> (6)        important social, occupational, or recreational activities are given up or reduced because of substance use
> (7)        the substance use is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the substance (e.g., current cocaine use despite recognition of cocaine-induced depression, or continued drinking despite recognition that an ulcer was made worse by alcohol consumption)

DSM-IV-TR 197.

his admitted symptoms of blackouts and increased tolerance to alcohol; his admission that he is an alcoholic; his unsuccessful attempts to stop using alcohol; the commission of sexual offenses while intoxicated; having a car accident while drinking; and the effect of drinking on his performance in school. (Gov't Ex. 3 at 2314; Tr. I 140:6-17; 141:20 to 142:13). Dr. Phenix did not diagnose respondent with drug abuse or dependence because she found insufficient evidence for such a diagnosis. (Gov't Ex. 3 at 2314).

With respect to the third diagnosis, antisocial personality disorder, Dr. Phenix in her supplemental report first defined a personality disorder generally, paraphrasing the definition in the DSM-IV-TR, as "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment." (*Id.* at 2314 (paraphrasing DSM-IV-TR 686)). The specific diagnosis of antisocial personality disorder requires, in relevant part, that: (1) the individual "show a pervasive pattern of disregard for and violation of the rights of others since the age of 15," as indicated by at least three of seven indicators, including criminal law violations, deceitfulness, impulsivity, and lack of remorse; (2) the individual be at least 18 years old; and (3) there be evidence that before age 15 the individual exhibited a repetitive and persistent pattern of behavior in which the basic rights of others or major age appropriate norms or rules were violated.[20] (*id.* at 2315 (paraphrasing DSM-IV-TR 706)).

---

[20] The DSM-IV-TR diagnostic criteria for antisocial personality disorder are as follows:

    A.    There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three (or more) of the following:

        (1)    failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest

Dr. Phenix made the antisocial personality disorder diagnosis based on: respondent's childhood misbehavior (*e.g.*, assault of a classmate, trespassing charge, running away from home, frequent truancy, and bullying); the onset of drinking at age 12; multiple arrests for alcohol-related offenses, property offenses, nonsexually violent and sexually violent offenses; aggressive behavior; behavioral impulsivity and angry outbursts as reported in the 1999 Gray and Sadler report; sporadic employment; and apparent lack of remorse for his sexual offense due to repeat offending. (*Id.* at 2315; Tr. I 149:6 to 151:10).

As to the diagnosis of depressive disorder, NOS, the supplemental report indicates that it is a disorder respondent currently has. (Gov't Ex. 3 at 2312 ("Mr. Antone *has* the following diagnosed mental disorders . . . Depressive Disorder, NOS . . . ." (emphasis added); 2314 ("He

---

| | (2) | deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure |
| | (3) | impulsivity or failure to plan ahead |
| | (4) | irritability and aggressiveness, as indicated by repeated physical fights or assaults |
| | (5) | reckless disregard for safety of self or others |
| | (6) | consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations |
| | (7) | lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another |
| B. | | The individual is at least age 18 years. |
| C. | | There is evidence of Conduct Disorder (see p. 98) with onset before age 15 years. |
| D. | | The occurrence of antisocial behavior is not exclusively during the course of Schizophrenia or a Manic Episode. |

DSM-IV-TR 706.

continues to receive an antidepressant medication in the BOP . . . ."). However, in her testimony, she stated that he is not suffering from it at this time and is in remission.[21] (Tr. I 230:20-23).

In any event, as Dr. Phenix set out in her supplemental report, depressive disorder, NOS is a disorder with depressive features (*e.g.*, depressed mood, loss of interest or pleasure) that does not meet the criteria for certain other depressive disorder diagnoses, such as major depressive disorder.[22] (Gov't Ex. 3 at 2314; DS-IV-TR 381). In support of this conclusion, she cites to the following: 3 hospitalizations for suicide attempts beginning at age 16; past use of antidepressant medication; evidence of symptoms of depression such as self-isolation, sad mood, excess sleep, and suicidal ideation. (Gov't Ex. 3 at 2314; Tr. I 146:19 to 147:12).

As to the requirements for civil commitment, Dr. Phenix opined that, in satisfaction of the first element, respondent had engaged in sexually dangerous conduct or child molestation based on his offense history. (Gov't Ex. 3 at 2283-93; Tr. I 117:12 to 118:15). On the second element, Dr. Phenix stated in her supplemental report that each of the four diagnoses was a serious mental illness, abnormality, or disorder from which respondent currently suffers. (Gov't

---

[21] Dr. Phenix testified that it was because respondent does not currently have depressive disorder, NOS that "I gave this diagnosis by history," that is, using a history specifier. (Tr. I 230:22-23). In fact, though, she did not include any such specifier. (*See* Gov't Ex. 3 at 2315).

[22] In the supplemental report, Dr. Phenix paraphrased the DSM-IV-TR diagnostic criteria for major depressive disorder, apparently for a single episode, as follows:

> A) Five (or more) of the following symptoms have been presented during the same two week period and represent a change from previous functioning, and at least one of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure; B) The symptoms do not meet criteria for Mixed Episode; C) The symptoms cause clinically significant distress or impairment, social, occupational or other important areas of functioning; D) The symptoms are not due to the direct physiological effects of a substance (*e.g.*, drug of abuse, a medication) or a general medical condition (*e.g.*, hypothyroidism); E) The symptoms are not better accounted for by Bereavement, i.e., after loss of a loved one, the symptoms persist for longer than two months or are characterized by marked functional impairment, morbid preoccupation with worthlessness, suicidal ideation, psychotic symptoms, or psycho-motor retardation.

(Gov't Ex. 3 at 2314; *see* DSM-IV-TR 375 (listing presence of a single major depressive episode as a basis for major depressive disorder, single episode), 356 (criteria for major depressive episode, which are paraphrased in Dr. Phenix's supplemental report as set out above).

Ex. 3 at 2316). However, in her testimony, she stated that depressive disorder, NOS is not a serious mental illness, abnormality, or disorder. (Tr. I 119:6-17). She, of course, also testified that respondent did not currently suffer from it, as discussed.

In satisfaction of the third element, Dr. Phenix concluded that respondent would have serious difficulty refraining from sexually violent conduct or child molestation as a result of his serious mental illnesses, abnormalities, or disorders if he were released. (Gov't Ex. 3 at 2329; Tr. I 117:17-21). She opined that respondent's paraphilia would be the primary cause of such difficulty, while his alcohol dependence would serve as a disinhibitor of his paraphilic impulse and his antisocial personality disorder would serve as a permission giver, blinding him to the harm he was causing his victims. (*See* Tr. I 144:7-23; 151:11-23; *cf. id.* 119:4-13). Nevertheless, she testified, he would have serious difficulty refraining even without the paraphilia NOS, nonconsent diagnosis. (*Id.* at 246:8-25). She based her conclusion that respondent would have serious difficulty principally on: the pattern and duration of his offending; his commission of additional offenses after his conviction in 1991 for the rape of V.R. #1; his purportedly high risk of reoffense based on static actuarial instruments; and the presence of dynamic risk factors and the absence of protective factors. (Gov't Ex. 3 at 2316-30; Tr. I. 157:14 to 191:18).

Actuarial risk assessments are tools that are used to calculate a statistical risk that someone will be convicted for a new sexual offense within a specified time frame based on the scores that an individual obtains on certain static measures. (*See* Tr. I 160:5-8; 162:21 to 163:10; Gov't Ex. 3 at 2316). The measures are static in that they are based on historical facts and are therefore invariable, except for age, and, depending on the specific tool used, include such factors as the number of prior sex offenses, whether any victims were related to the offender, and

whether the offender was single or had cohabited for less than two years. (*See* Tr. I 177:7-11; Gov't Ex. 3 at 2317). The risk of reoffense is determined by comparing the individual to a sample group of sex offenders with similar scores for which the reoffense rate has been determined. (*See* Tr. I 162:21 to 163:10).

Dr. Phenix used three static actuarial risk assessment tools, the Static-99R, the Static-2002R, and the Minnesota Sexual Offender Screening Tool-Revised ("MnSOST-R"). (Gov't Ex. 3 at 2316-22; Tr. I 162:1-4). Dr. Phenix concluded that respondent fell in the moderate-high category for reoffense on the Static-99R, in the moderate risk category on the Static-2002R, and in the high risk category on the MnSOST-R. (Gov't Ex. 3 at 2322; Tr. I 181:18-25).

In contrast to the static risk factors, the dynamic factors are those that have the capacity to change over time, for example, with treatment. (*See* Tr. I 177:7-11; Gov't Ex. 3 at 2323). The presence of dynamic risk factors increases an offender's risk of reoffense. (Gov't Ex. 3 at 2323). Dynamic risk factors include significant negative social influences, intimacy deficits, deficient sexual self-regulation, lack of cooperation with supervision, and deficient general self-regulation. (*See id.* at 2323). Dr. Phenix identified 3 protective factors that reduce the risk of sexual reoffense: presence in the community for 10 years without sexually reoffending; having less than 15 years left in the offender's time at risk due to illness or physical conditions that significantly decrease the motivation and/or ability to sexually reoffend; and very advanced age. (*Id.* at 2329).

Dr. Phenix reviewed relevant dynamic risk factors for respondent using the Stable-2007 dynamic risk assessment instrument. (*Id.* at 2323-25; Tr. I. 183:3 to 191:4). She also considered the presence of the protective factors. (Gov't Ex. 3 at 2329; Tr. I 191:5-18). Based on this assessment, she concluded that risk factors are strongly present, including absence of positive social influences in the community, lack of existing intimate relationship, some hostility toward

women, and likely inability to regulate his conduct outside the structure of prison. (Gov't Ex. 3 at 2323-25; Tr. I 190:23 to 191:4). She also concluded that no protective factors are present. (Gov't Ex. 3 at 2329; Tr. I 191:17-18).

**B. Dr. Gutierrez**

Dr. Gutierrez, also called by the government, is a clinical psychologist currently employed as a forensic psychologist with FCI–Butner. (Tr. II 252:2-4; *see also* Gov't Ex. 4 at 1 (Gutierrez C.V.)). With no objection from respondent, the court recognized Dr. Gutierrez as an expert in the field of forensic psychology.[23] (Tr. II 256:25 to 257:6).

On 21 February 2007, Dr. Gutierrez issued a precertification evaluation of respondent. (Resp. Ex. 4). Following respondent's certification under § 4248 (on 23 February 2007), Dr. Guitierrez conducted a forensic evaluation of respondent and issued a report of his findings on 29 May 2007. (Gov't Ex. 5). This evaluation was based solely on a review of criminal, mental health, prison, and other records relating to respondent because respondent declined to participate in the evaluation on the advice of his counsel. (*Id*. at 448-49). In this report, Dr. Gutierrez diagnosed respondent with the following mental disorders: (1) paraphilia NOS, nonconsent[24]; (2) paraphilia NOS, hebephilia[25]; (3) polysubstance dependence, in a controlled environment; and (4) antisocial personality disorder. (Gov't Ex. 5 at 457; Tr. II 266:15-23). Except as noted, Dr. Gutierrez relied on the diagnostic criteria in the DSM-IV-TR for diagnosing respondent. (Gov't Ex. 5 at 457). Dr. Gutierrez also concluded that respondent met the criteria for commitment under § 4248. (Gov't Ex. 5 at 460).

---

[23] Dr. Gutierrez was not a court-appointed examiner.

[24] Although Dr. Gutierrez used the specifier "nonconsent," rather than "nonconsenting females," as did Dr. Phenix, it is clear from the record that the terms have the same meaning in the context of this case.

[25] Although Dr. Gutierrez at one point characterizes paraphilia NOS, nonconsent and paraphilia NOS, hebephilia as a single diagnosis (*see* Tr. II 283:10-17), the court addresses paraphilia NOS, hebephilia separately because certain unique criteria apply to it.

On 13 September 2010, Dr. Guitierrez issued an updated forensic evaluation (Gov't Ex. 6), also completed without participation by respondent. It addressed respondent's history since the initial report and recalculated respondent's Static-99 risk score using the revised version, the Static-99R (*id.* at 1917; *see also* Tr. II 262:23 to 263:9). In the updated report, Dr. Gutierrez reached the same conclusions as in the initial report regarding respondent's diagnoses and respondent's qualification as a sexually dangerous person under § 4248. (Gov't Ex. 6 at 1918, 1919).

Turning to the first diagnosis, paraphilia NOS, nonconsent, Dr. Gutierrez based it principally on: respondent's pattern of sexual offending; the finding in the 1999 Gray and Sadler report that he was deceptive on a polygraph in denying having ever masturbated to a rape fantasy; the fact that his response style on the Multiphasic Sex Inventory,[26] also administered for the 1999 Gray and Sadler report, was consistent with rapists; and the fact that he engaged in nonconsensual intercourse when he had an available consensual partner. (Gov't Ex. 5 at 458; Tr. II 269:3 to 273:11).

Dr. Gutierrez's second diagnosis, paraphilia NOS, hebephilia, is not listed in the DSM, just as paraphilia NOS, nonconsent is not. (Tr. II 326:11-13). Dr. Gutierrez defined paraphilia NOS, hebephilia as "sexual attraction to adolescents, or minors that are pubescent/postpubescent but not of consenting age." (Gov't Ex. 5 at 458; *see also* Tr. II 274:21 to 275:8). He based this diagnosis primarily on 3 of respondent's victims being in the pubescent age category (specifically, T.F., V.R. # 2, and R.A.); the fact that his response style on the  Multiphasic Sex Inventory from 1999 was consistent with child molesters; and respondent's responses on the

---

[26] The Multiphasic Sex Inventory is a lengthy questionnaire in which an individual provides responses, true or false, to certain statements. (Tr. II 270:15-19). The individual's responses are compared to those of a normative group, in this particular instance, rapists. (*See id.* at 270:22 to 271:2).

Case 5:07-hc-02042-FL   Document 114   Filed 04/30/12   Page 44 of 74

Abel Assessment for Sexual Interest,[27] also administered in 1999 for the Gray and Sadler report, indicating that he had sexual attraction to minors in the pubescent age group, females between ages 14 and 17, more so than adult females.  (Gov't Ex. 5 at 452-53, 458; Tr. II 275:9 to 278:15).

The next diagnosis, polysubstance dependence, in a controlled environment, is comparable to Dr. Phenix's diagnosis of alcohol dependence, in a controlled environment, but involves not only alcohol, but also marijuana, cocaine, and other substances.  (Gov't Ex. 5 at 458; Tr. II 280:15 to 281:22).  Dr. Gutierrez based this diagnosis on respondent's lengthy history of abuse of alcohol and other substances, including his history of daily use of substances.  (Gov't Ex. 5 at 458; Tr. II 280:15 to 281:9).

Dr. Gutierrez diagnosed respondent with antisocial personality disorder based principally on:  evidence of conduct disorder prior to the age of 15, including respondent's interactions with the juvenile justice system, suspension or expulsion from school, and fighting and bullying; numerous arrests over time for a variety of offenses; evidence of impulsivity with respect to offenses; evidence of irritability and aggressiveness (*i.e.*, fighting or physical altercations); and failure to maintain consistent employment and provide for himself.  (Gov't Ex. 5 at 458; Tr. II 282:10 to 283:5).

As to the requirements for commitment, Dr. Gutierrez found that respondent satisfied the first element by engaging in sexually violent conduct and child molestation.  (Tr. II 265:3-266:10).  He also found respondent satisfied the second element.  Specifically, he determined that the diagnoses of paraphilia NOS, nonconsent and hebephilia, and antisocial personality disorder, but not the polysubstance dependence, in a controlled environment, are serious mental

---

[27] In the Abel Assessment for Sexual Interest, an individual is presented with some visual stimuli and based on the amount of time the individual looks at the pictures, the evaluator can make a determination whether or not the individual is sexually aroused.  (Tr. II 357:23 to 358:3).

illnesses respondent currently has.  (Gov't Ex. 5 at 460; Gov't Ex. 6 at 1917, 1918; Tr. II 279:14-16; 283:6-9).

In satisfaction of the third element, Dr. Gutierrez concluded that respondent would have serious difficulty refraining from sexually violent conduct and child molestation as a result of his serious mental illnesses if released.  (Gov't Ex. 5 at 460; Gov't Ex. 6 at 1919; Tr. II 284:17-19; 299:13-19).  He opined that respondent's paraphilia NOS, nonconsent and hebephilia, and his antisocial personality disorder would in combination cause such difficulty, but that the antisocial personality disorder alone would also.[28]  (Tr. II 283:14 to 284:1; 284:5-19; 351:2-18).  He based his conclusion that respondent would have serious difficulty refraining primarily on:  his commission of sexual assaults after his conviction in 1991; the eventual increase in the frequency of his offending; his score on the Static-99R indicating that he was at high risk of reoffending[29]; his not having received any sex offender treatment; his not having received substance abuse treatment sufficient to address his polysubstance dependence; and the absence of positive social influences in his life.  (Gov't Ex. 5 at 459-60; Gov't Ex. 6 at 1918-19; Tr. II 289:22 to 299:3).

---

[28] In cross-examining Dr. Gutierrez, respondent quoted an article in the *Journal of the American Academy of Psychiatry and the Law* co-authored by Dr. Phenix stating that "'in our opinion, an antisocial personality disorder diagnosis alone is not a sufficient diagnostic condition for a[] . . . [sexually violent predator/sexually dangerous predator] civil commitment without an intended diagnosis of paraphilia that indicates an established deviant sexual preference.'"  (Tr. II 359:19 to 361:20; 362:10-20); *see* Fed. R. Evid. 803(18).  Given the court's determination that it has not been shown by clear and convincing evidence that respondent currently suffers from antisocial personality disorder, it need not determine whether antisocial personality alone could cause respondent to have serious difficulty refraining.  In her testimony, Dr. Phenix did not address whether antisocial personality disorder alone could cause respondent to have serious difficulty refraining.

[29] Dr. Gutierrez also used the Rapid Risk Assessment for Sex Offender Recidivism ("RRASOR") actuarial instrument and determined respondent's score to be four out of a possible six, with a six being at the high end of risk.  (Gov't Ex. 5 at 459).  While Dr. Gutierrez did not offer an opinion as to the level of risk indicated by a score of four on the RRASOR, he did state that the score is "associated statistically with about a 33% likelihood for being re-convicted for a new sexual offense within five years post-incarceration, and about a 49% likelihood for being re-convicted of a new sexual offense within 10 years post-release from incarceration."  (*Id.*).

## C. Dr. Daum

As previously discussed, Dr. Daum, who was called by respondent, is employed as a forensic psychologist at LHS. (Tr. II 410:22 to 411:4; *see also* Resp. Ex. 2 at 13 (Daum C.V.)). The court recognized him, over the government's objection, as an expert in the field of forensic psychology with respect to sexual dangerousness.[30]

On 19 February 2011, Dr. Daum conducted a forensic evaluation of respondent, which included the review of criminal, mental health, and prison records relating to respondent, as well as a clinical interview and testing of respondent, which lasted approximately five hours. (Resp. Ex. 1 at 2; Tr. II 430:25 to 436:1). On 1 March 2011, Dr. Daum issued a report of his findings. (Resp. Ex. 1). Using the diagnostic criteria in the DSM-IV-TR, he diagnosed respondent with: (1) polysubstance dependence (alcohol, cannabis, cocaine, hallucinogens); (2) frotteurism; and (3) borderline personality disorder with antisocial features (principal). (Resp. Ex. 1 at 10 (using diagnostic codes in DSM-IV-TR at pp. 293, 570, 710); Tr. II 449:19 to 450:1; 451:5-6; 452:10-12)). He also concluded that respondent did not meet the criteria for commitment under § 4248. (Resp. Ex. 1 at 11; Tr. II 449:13-18).

On 5 July 2011, Dr. Daum issued an addendum to his report describing certain additional records that he reviewed. (Gov't Ex. 3). Dr. Daum states in the addendum that these additional records did not change the diagnoses and opinions expressed in his original report. (*Id.* at 17, 19).

Dr. Daum's diagnosis of polysubstance dependence was based primarily on: respondent's lengthy history of substance abuse starting at an early age; the significant impact his continual use of substances has had on his social, occupational, and recreational activities;

---

[30] The court entered an order (D.E. 64) appointing Dr. Daum *nunc pro tunc* as an additional, respondent-selected examiner, pursuant to 18 U.S.C. §§ 4247(b) and 4248(b), on 3 June 2011.

and his development of a need for an increased amount of substances to achieve intoxication. (Resp. Ex. 1 at 9-10; Tr. II 450:2-10).

As to the second diagnosis, frotteurism, it is the unwanted touching or rubbing of another person, such as fondling the person or rubbing one's genitals up against the person, usually quickly and in a crowded public place, such as a shopping center, to facilitate escape. (*See* Tr. II 450:15-21; *see also id.* at 288:12 to 289:2; DSM-IV-TR 570). Dr. Daum based his diagnosis of frotteurism principally on respondent's offense conduct of rubbing his victims where they did not want to be rubbed and, at the same time in certain instances, engaging in the distinct conduct of rape. (Tr. II 450:22 to 451:2). He distinguished respondent's conduct from pedophilia, which focuses on sexual activity with prepubescent children (*see* DSM-IV-TR 571-72), on the basis of his sexual offense history involving young women ranging in age from 15 to the mid-20's; his denial of fantasies involving children or young teens; and the lack of records to support a history of sexual acts with prepubescent girls. (Resp. Ex. 1 at 9; Tr. II 45:7-14).

Turning to the diagnosis of borderline personality disorder with antisocial personality features (principal), borderline personality disorder is defined as "[a] pervasive pattern of instability of interpersonal relationships, self-image, and affects, marked impulsivity beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of" nine specified factors. DSM-IV-TR 710. Dr. Daum found that respondent exhibited five of these factors: a pattern of unstable and intense interpersonal relationships; impulsivity in the areas of sex and substance abuse; recurrent suicidal behavior and gestures; affective instability of mood due to marked reactivity of mood; and chronic feelings of emptiness. (Tr. II 452:10 to 453:1 (referring to DSM-IV-TR 710, criteria (2), (4)-(7)); Resp. Ex. 1 at 10 (referring to DSM-IV-TR 710, criteria (2), (4), (7))). The antisocial features he found respondent to have are: failure to

conform to social norms with respect to lawful behaviors; impulsivity or failure to plan ahead; irritability and aggressiveness as indicated by repeated physical fights and assaults; and reckless disregard of himself and others. (Tr. II 453:2-7 (referring to DSM-IV-TR 706, criteria A(1), (3), (5)); Resp. Ex. 1 at 10 (referring to DSM-IV-TR 706, criteria A(1), (3), (4), (5))).

Dr. Daum explained that in borderline personality disorder with antisocial personality features the person is seeking something, such as a sense of belonging, while in antisocial personality disorder the person is not and, instead, does not care what others think of him. (Tr. II 453:7 to 454:18). As he stated, a person with borderline personality disorder "does antisocial personality things . . . because he needs to . . . [whereas] [a]n antisocial does the same things . . . because he can." (*Id.* at 451:23 to 452:3; *see also* Tr. III 5:17 to 6:4). Dr. Daum could not definitively determine what it is respondent is seeking. (Tr. III 5:11- to 6:4). The specifier "principal" apparently signifies that Dr. Daum views the borderline personality disorder as the condition chiefly responsible for respondent's present incarceration. *See* DSM-IV-TR 3 (explaining use of "principal" specifier); (*see also, e.g.,* Tr. II 477:1-3; III 47:24 to 48:1).

As to the requirements for commitment, Dr. Daum found that respondent has engaged in sexually violent conduct in satisfaction of the first element. (Resp. Ex. 1 at 10). With respect to the second element—whether respondent has a serious mental illness, abnormality, or disorder— Dr. Daum testified that clinically respondent's frotteurism and borderline personality disorder with antisocial features are serious mental illnesses, abnormalities, or disorders. (*Id.* at 10; Tr. II 476:3 to 477:11; 497:15-22; 507:11-17; Tr. III 42:12-15; 43:3-4; 43:16-22). Given the significance of respondent's polysubstance dependence to his evaluation of respondent, it is

likely that Dr. Daum also considered it a serious mental illness, abnormality, or disorder from a

clinical standpoint, although the record does not appear to contain that express finding.[31]

On the third element, Dr. Daum found that respondent would not have serious difficulty

refraining from sexually violent conduct or child molestation as a result of a serious mental

illness, abnormality, or defect if released. (*See* Resp. Ex. 1 at 11; Tr. II 476:3 to 477:11). He

reasoned that respondent's offense conduct results from his borderline personality disorder,

including his minimal social and interpersonal skills, as exacerbated by his substance abuse, and

is not rooted in sexual deviance. (*See* Resp. Ex. 1 at 10-11; Tr. III 38:3 to 41:3). In this sense,

he views respondent as having attributes of a typical rapist, rather than a paraphilic one. (Tr. III

38:20-24; *see also id.* at 54:7-11, 15-19). Further, Dr. Daum opined that outpatient treatment of

respondent while he resides in a halfway house could adequately address his sexual offense and

substance abuse problems, including substance abuse treatment and dialectical behavior therapy

("DBT").[32] (Resp. Ex. 1 at 10-11; Tr. II 458:25 to 460:5; 460:22-25; Tr. III 55:14 to 56:18).

In reaching these conclusions, Dr. Daum considered the results for respondent on the

Static-99R.[33] In his report, Dr. Daum reported a score of four for respondent (Resp. Ex. 1 at 10;

---

[31] Dr. Daum also testified that "legally speaking, according to the Adam Walsh Act . . . [respondent] does not" have a serious mental illness, abnormality, or disorder. (Tr. III 43:22-23; *see also id.* at 4:7-15; 42:12-16; 43:4-7). Dr. Daum understands the legal meaning of "serious" to signify that the mental illness, abnormality, or disorder is "going to impede" respondent. (*Id.* at 43:3-7; *see also id.* at 4:10-12; 42:15-16). Thus, Dr. Daum appears to read into the term "serious" the concept reflected in the third element for civil commitment that the mental illness, abnormality, or disorder result in the person's having difficulty in refraining from sexually violent conduct or child molestation. In any event, it is Dr. Daum's clinical opinions, not his legal opinions, that are relevant.

[32] DBT is a treatment program used to treat borderline personality disorder and is employed in sex offender treatment programs. (Tr. III 56:2-7). The treatment encourages an individual to come to his own realization about his problems rather than simply being told about them. (*Id.* at 56:6-11).

[33] Dr. Daum also used the MnSOST-R actuarial risk assessment tool. (Resp. Ex. 1 at 7; Tr. II 436:2-6). In his report, Dr. Daum concluded that respondent's score on the MnSOST-R was 4, which placed him in the moderate risk category. (Resp. Ex. 1 at 7; Tr. II 448:3-4). However, at the hearing, Dr. Daum testified that the testimony he heard prior to giving his own testimony caused him to adjust respondent's score on the MnSOST-R to 11, putting respondent in a higher risk category. (Tr. II 436:7-16; 440:9 to 441:23). Nevertheless, Dr. Daum testified that he no longer uses the MnSOST-R because, among other reasons, it has a low sample rate, it has a high false positive rate, the data on which it is based has not been updated, and the underlying sample contains very few Native Americans.

*see also* Tr. II 447:23 to 448:4), but stated at the hearing on cross-examination that it should have been a five (Tr. III 10:25 to 11:3). Either score places respondent in the moderate to high risk category. (*See* Gov't Ex. 6 at 2170 (scale for Static-99R); Tr. II 448:1-4). Dr. Daum also considered dynamic factors, which he characterized as a central part of his analysis because they reflect changes in a person over time as opposed to the unchanging, static factors. (Tr. II 468:14-24; Tr. III 44:19 to 46:14; 53:7-17). The dynamic factors he cited include: the absence of documentation indicating that, while incarcerated, respondent used recreational drugs, engaged in antisocial activities, or presented management issues; the absence of records showing that respondent had a preoccupation with children or a general sexual preoccupation; and respondent's completion of several self-help programs, learning of vocational skills, and seeking counseling while incarcerated. (Resp. Ex. 3 at 18-19; Tr. III 29:22 to 30:3; 49:19 to 50:3).

## VII. CONCLUSIONS OF LAW

### A. Elements for Civil Commitment

As indicated, there are three essential elements the government must establish by clear and convincing evidence to obtain an individual's civil commitment under § 4248. They are that the person: (1) has previously "engaged or attempted to engage in sexually violent conduct or child molestation"; (2) currently "suffers from a serious mental illness, abnormality, or disorder"; and (3) "as a result of" such condition, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(5), (6). Each of these elements will be reviewed in further detail below.

---

(*Id.* at 437:10-20; Tr. III 23:9 to 24:1; 24:21 to 27:9; 45:22 to 46:4). Dr. Daum accordingly urged the court to use caution in relying on the MnSOST-R results for respondent in its analysis. (Tr. III 59:18 to 60:8).

## 1.    Prior Sexually Violent Conduct or Child Molestation

Although the statute does not specifically define "sexually violent conduct," BOP regulations that set forth the standards for certification of persons to federal district courts as sexually dangerous persons define "sexually violent conduct" to include:

> [A]ny unlawful conduct of a sexual nature with another person ("the victim") that involves:
>
> (a)    The use or threatened use of force against the victim;
>
> (b)    Threatening or placing the victim in fear that the victim, or any other person, will be harmed;
>
> (c)    Rendering the victim unconscious and thereby engaging in conduct of a sexual nature with the victim;
>
> (d)    Administering to the victim, by force or threat of force, or without the knowledge or permission of the victim, a drug, intoxicant, or other similar substance, and thereby substantially impairing the ability of the victim to appraise or control conduct; or
>
> (e)    Engaging in such conduct with a victim who is incapable of appraising the nature of the conduct, or physically or mentally incapable of declining participation in, or communicating unwillingness to engage in, that conduct.

28 C.F.R. § 549.92.  Sexually violent conduct under § 4248 need not be criminal behavior. *United States v. Comstock*, 627 F.3d 513, 520 (4th Cir. 2010).

"Child molestation" is also not defined by statute.  However, BOP regulations define it as "any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years."  28 C.F.R. § 549.93.

## 2.    Current Serious Mental Illness, Abnormality, or Disorder

The Act requires explicitly that the mental illness, abnormality, or disorder of the person sought to be committed be "serious."  18 U.S.C. § 4247(a)(6).  Although neither the statute nor the corresponding regulations provide a definition for "serious," the record establishes that in the

field of forensic psychology it signifies that the person's mental illness, abnormality, or disorder causes a marked impairment in the person's day-to-day life and, secondarily, has a significant negative effect on the person's victims.  (Tr. II 351:19 to 353:4).

In addition, the Act does not require that to come within its scope a mental illness, abnormality, or disorder be included in the DSM.  As the First Circuit has held, the serious mental illness requirement in the Act is not "delimited by the consensus of the medical community" and "a mental disorder or defect need not necessarily be one so identified in the DSM in order to meet the statutory requirement."  *United States v. Carta*, 592 F.3d 34, 39-40 (1st Cir. 2010).  The *Carta* court cited the United States Supreme Court holding in *Kansas v. Crane*, 534 U.S. 407, 413 (2002) that "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law."  *Carta*, 592 F.3d at 40 n.2.

### 3.    Serious Difficulty Refraining

The "serious difficulty" element "refers to the degree of the person's 'volitional impairment,' which impacts the person's ability to refrain from acting upon his deviant sexual interests."  *United States v. Hall*, 664 F.3d 456, 463 (4th Cir. 2012) (citing *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)).  "[T]he 'serious difficulty' language does not require total or complete lack of control, but does require that it must be difficult, if not impossible, for the person to control his dangerous behavior."  *United States v. Abregana*, 574 F. Supp. 2d 1145, 1159 (D. Haw. 2008).  As the Supreme Court has put it, to meet substantive due process requirements, "this [difficulty], when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder

Case 5:07-hc-02042-FL   Document 114   Filed 04/30/12   Page 53 of 74

subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Crane*, 534 U.S. at 413 (internal citations omitted). Proof of statistical probability of reoffense is not required. *United States v. Hunt*, 643 F. Supp. 2d 161, 180 (D. Mass. 2009) ("[T]his court does not construe the 'serious difficulty' criterion for commitment to require proof of any statistical probability of reoffense."); *see also Crane*, 534 U.S. at 413 (recognizing that inability to control behavior will not be demonstrable "with mathematical precision").

Under BOP regulations, the "serious difficulty refraining" element may include consideration of evidence:

(a)     Of the person's repeated contact, or attempted contact, with one or more victims of sexually violent conduct or child molestation;

(b)     Of the person's denial of or inability to appreciate the wrongfulness, harmfulness, or likely consequences of engaging or attempting to engage in sexually violent conduct or child molestation;

(c)     Established through interviewing and testing of the person or through other risk assessment tools that are relied upon by mental health professionals;

(d)     Established by forensic indicators of inability to control conduct, such as:

(1)     Offending while under supervision;
(2)     Engaging in offense(s) when likely to get caught;
(3)     Statement(s) of intent to re-offend; or
(4)     Admission of inability to control behavior; or

(e)     Indicating successful completion of, or failure to successfully complete, a sex offender treatment program.

28 C.F.R. § 549.95.

### 4.     Burden of Proof, and Clear and Convincing Standard

As indicated, the burden lies with the government to prove each of the elements for civil commitment. *See Comstock*, 130 S. Ct. at 1954; *Hall*, 664 F.3d at 461. It must do so by clear

and convincing evidence. 18 U.S.C. § 4248(d); *Comstock*, 130 S. Ct. at 1954; *Hall*, 664 F.3d at 461. "'[C]lear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable.'" *Hall*, 664 F.3d at 461 (quoting *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir.2001). This standard of proof is an intermediate standard that falls between the "mere preponderance of the evidence" and "beyond a reasonable doubt" standards. *Addington v. Texas*, 441 U.S. 418, 423–24 (1979) (cited in *Hall*, 664 F.3d at 463).

## B. First Element: Prior Sexually Violent Conduct or Child Molestation

The court finds by clear and convincing evidence that respondent has previously engaged in sexually violent conduct and child molestation within the meaning of 18 U.S.C. § 4247(a)(5). The sexually violent conduct consists of both the 1997 touching of T.F.; the rapes of V.R. #1, V.R. #2, McCloud (*i.e.*, respondent's forcible intercourse with her on several occasions while they were living together), and R.J.; and the attempted rape of C.R. The touching of T.F. qualifies as sexually violent conduct because respondent engaged in it without T.F.'s consent, when she was sleeping. The rapes and attempted rape obviously involved the use of force. Respondent concedes that he engaged in sexually violent conduct. (*See* Resp. Proposed Find. & Conc. (D.E. 89) ¶ 123).

The child molestation includes the 1989 touching of T.F. and the 1996 touching of R.A. These acts involve "unlawful conduct of a sexual nature with . . . a person under the age of 18 years." 28 C.F.R. § 549.93. The rapes of V.R. #1 and V.R. #2 involved victims under 18 and therefore constitute child molestation as well as sexually violent conduct within the meaning of

18 U.S.C. § 4247(a)(5). The court concludes that the first element for civil commitment under § 4248 is satisfied.

### C. Second Element:  Current Serious Mental Illness, Abnormality, or Disorder

The court finds by clear and convincing evidence that respondent currently suffers from a serious mental illness, abnormality, or disorder within the meaning of 18 U.S.C. § 4247(a)(5). That mental illness, abnormality, or disorder is polysubstance dependence.  The substances on which respondent has a dependence are alcohol, marijuana, and cocaine.

The evidence supporting this finding includes, in part, respondent's past self-reports of his abuse of these substances.  He has reported, credibly, that this substance abuse began in his preteen years and continued through his arrest in February 1998.  (*See, e.g.*, Gov't Ex. 10 at 1852).

Further, the victims of most of his sexual offenses—V.R. #1, T.F. with respect to the 1997 touching, C.R., and R.J.—reported that he was drunk and, in certain cases, also under the influence of drugs, at the time of the offenses against them.  V.R. #2 reported that respondent consumed 2 quarts of beer in about 20 minutes before raping her, and he therefore can be assumed to have been impaired.  Respondent himself admits to intoxication when engaging in forcible intercourse with McCloud, and he generally confirms intoxication with the other victims referenced.

In his hearing testimony, respondent corroborated his history of substance abuse.  (Tr. I 29:9 to 31:17; 33:20 to 34:22).  He acknowledged that he was and always will be an alcoholic and has to work on his substance abuse problem.  (*Id.* at 40:8-9; 46:22 to 47:8; 68:22 to 69:1; 79:22 to 80:6).  He has been attending Alcoholics Anonymous and previously completed a drug treatment program in prison.  (*See id.* at 31:20 to 32:10).  This current evidence of ongoing

substance dependence—in combination with the unambiguous nature of the evidence of dependence in the past—tends to negate any inference from his abstinence in prison that he no longer has the problem.

In addition, all three testifying psychologists agreed that respondent suffers from substance dependence. (Gov't Ex. 3 at 2313-14 (Dr. Phenix); Gov't Ex. 4 at 62314 (Dr. Phenix); Gov't Ex. 5 at 458 (Dr. Gutierrez); Resp. Ex. 1 at 9-10 (Dr. Daum); Resp. Ex. 3 at 2, 3) (Dr. Daum)). They all cited to respondent's hearing testimony regarding his current view toward his use of substances as supporting their conclusion that respondent has substance dependence. (Tr. I 140:4-8 (Dr. Phenix); Tr. II 298:17 to 299:3 (Dr. Gutierrez); 493:1-3 (Dr. Daum)). While Dr. Phenix limited her diagnosis of substance dependence to alcohol, the significant evidence of respondent's use of marijuana and cocaine substantiates that he suffers from polysubstance dependence.

The court finds that the government has not established by clear and convincing evidence that respondent presently suffers from any other serious mental illness, abnormalities, or disorders. For instance, it has not been shown by clear and convincing evidence that respondent presently suffers from antisocial personality disorder.

The diagnosis of antisocial personality disorder rests heavily on respondent's misconduct prior to his incarceration in February 1998, including both his sexual and nonsexual misconduct. (*See, e.g.,* Gov't Ex. 3 at 2315-16 (Dr. Phenix); Tr. I 150:5-9 (Dr. Phenix); Tr. II 282:20 to 283:1) (Dr. Gutierrez)). But this misconduct occurred over 13 years ago. This period represents for respondent, who was born in 1972, the majority of his adult life. The record does not convincingly establish that this conduct remains a valid indicator of respondent's current mental health.

That is particularly the case because there have been precious few manifestations of antisocial personality disorder by respondent during the intervening 13 years. Although Dr. Phenix points to two fights respondent has had in prison (*see* Gov't Ex. 3 at 2315), the court does not find that number of fights, without any resulting serious injuries, over more than a decade of incarceration to be convincing evidence of ongoing affliction with antisocial personality disorder. As Dr. Gutierrez himself states in his updated forensic evaluation (dated 13 September 2010), "It should be noted that Mr. Antone has not demonstrated *any* difficulties with anger or hostility since he was certified more than three years ago." (Gov't Ex. 6 at 1919 (emphasis added)).[34] Dr. Gutierrez also notes that respondent has "engaged in positive coping strategies such as meditation, exercising, drawing, country music, and playing the guitar." (*Id.* at 1918).

Both Drs. Phenix and Gutierrez cited respondent's checkered employment history, consisting of only seasonal work, as a basis for their diagnosis of antisocial personality disorder. (Gov't Ex. 3 at 2315 (Dr. Phenix); Tr. I 150:16-20 (same); Gov't Ex. 5 at 458 (Dr. Gutierrez); Tr. II 283:2-5 (same)). But as Dr. Daum points out, employment opportunities on the reservation where respondent lived are limited to such work. (Tr. II 470:22 to 471:15; *see also* Tr. II 397:25 to 398:2 (Schauder)).

Dr. Phenix also supports her diagnosis of antisocial personality disorder with testing results reported in the 1999 Gray and Sadler report showing that respondent had periods of behavioral impulsivity and angry outbursts. (Gov't Ex. 3 at 2315; Tr. I 150:21 to 151:1). Dr. Gutierrez references these results in his initial forensic evaluation (of 29 May 2007), but the degree to which he relied on them in making his antisocial personality disorder diagnosis is not clear, especially in light of his observation that respondent has not manifested any difficulties

---

[34] Notably, the principal basis upon which Dr. Gutierrez found respondent does not have borderline personality disorder is the absence of the behaviors associated with it over the extended period that he has been incarcerated. (Tr. II 286:21 to 288:6).

with anger or hostility since his certification in 2007. (Gov't Ex. 5 at 453). Again, though, these test results are over a decade old. There has been no convincing evidence showing why they should be deemed a valid indicator of respondent's current condition.

Dr. Gutierrez did not, of course, conduct an interview of respondent, which presumably would have provided him updated information on respondent's condition. While respondent declined to be interviewed by Dr. Gutierrez, the government did not seek an order compelling an interview by him.

The court also believes there has been no convincing showing that the offense conduct in which respondent engaged while under the influence of one or more substances—encompassing all his rapes and the overall majority of his sexual offenses—was not the product of his substance abuse, including the associated loss of inhibitions and degradation of judgment, rather than antisocial personality disorder. If such offenses are not attributed to antisocial personality disorder, a finding under the clear and convincing standard that respondent has that disorder would be precluded on that basis alone.

Dr. Daum, of course, did not find respondent to have antisocial personality disorder. (Tr. II 453:17 to 454:10). This fact also supports the court's determination that the government has not shown by clear and convincing evidence that respondent has this disorder.

While not finding respondent to have antisocial personality disorder, Dr. Daum did find him to have borderline personality disorder. The court finds that the record does not establish by clear and convincing evidence that respondent has this disorder either. Both the other testifying psychologists rejected the diagnosis of borderline personality disorder. (Tr. I 156:6 to 157:9 (Dr. Phenix); Tr. II 286:21 to 288:6 (Dr. Gutierrez)). The court finds persuasive the principal basis upon which Dr. Gutierrez rejected this diagnosis—namely, that respondent has not manifested

the behaviors associated with this disorder during the over decade-long period of his incarceration. (Tr. II 287:1 to 288:6).

In both her reports, Dr. Phenix diagnosed respondent with a depressive disorder. (Gov't Ex. 2 at 2030, 2031-32; Gov't Ex. 3 at 2312, 2314). However, at the hearing, she testified that "I don't think he is suffering from it at this time. I would say it is in remission." (Tr. I 230:15-23). Dr. Gutierrez agreed that while respondent had manifested symptoms of depression in the past, he was not doing so at the time of his latest report and could not then be deemed to have depression. (Tr. II 285:24 to 286:19). Dr. Daum also did not diagnose respondent with a depressive disorder. (*See* Resp. Ex. 11 at 9-10). The court concludes that it has not been shown by clear and convincing evidence that respondent has a depressive disorder.

Dr. Daum diagnosed respondent with frotteurism. (Resp. Ex. 1 at 9-10). The court finds that the record does not establish by clear and convincing evidence that respondent has this disorder. Frotteurism is, as discussed, the unwanted touching or rubbing of another person, such as fondling the person's private areas or rubbing one's genitals up against the person, usually quickly and in a crowded public place, such as a shopping center, to facilitate escape. (*See* Tr. II 450:15-21 (Dr. Daum); *see also id.* at 288:12 to 289:2 (Dr. Gutierrez); DSM-IV-TR 570). Respondent's sexual offenses were not committed in public places, and they otherwise did not conform closely with this definition. Furthermore, neither Dr. Gutierrez nor Dr. Phenix diagnosed respondent with frotteurism. (*See* Gov't Ex. 3 at 2312-16 (Dr. Phenix); Tr. II 289:3-10 (Dr. Gutierrez)).

The court also finds that it has not been established by clear and convincing evidence that respondent has paraphilia NOS, nonconsent, a diagnosis both Drs. Phenix and Gutierrez gave him. Among other reasons, the record does not establish convincingly that paraphilia NOS,

nonconsent is a disorder that exists among the population generally. No empirical evidence to that effect was presented. Dr. Phenix testified that there is a good deal of research showing physiological measures among individuals with this diagnosis that she finds very convincing, but she did not substantiate that testimony with more detailed information about the research. (Tr. I 125:7-16). She also testified that a case book for the DSM contains a "descriptor" of paraphilia NOS, nonconsent and how to diagnose it. (*Id.* at 125:16-24). Neither this nor any other portion of this case book was presented at the hearing. Nor was the standing of this separate case book in relation to the DSM explained.

While Dr. Gutierrez testified that there are some studies differentiating between persons with paraphilia NOS and those with antisocial personality disorder and sexual sadism, he did not identify any studies specifically validating the factors he testified were in general use to diagnose paraphilia NOS, nonconsent, such as availability of a consenting partner when offending, admissions or polygraphs showing arousal to nonconsent, and maintenance of an erection during nonconsensual encounters. (Tr. II 345:23 to 346:6; 346:15 to 348:15). He was also unable to identify any empirical studies differentiating rapists with paraphilia NOS, nonconsent from nonparaphilic rapists—a distinction very much at issue in this case. (*Id.* at 348:16-22). Further, Dr. Daum testified that parahilia NOS, nonconsent is not a valid diagnosis. (*Id.* at 506:16-20).

Although there was evidence that it is a broadly accepted diagnosis within the psychological community (*id.* at 347:24 to 348:4), it is undisputed that it has not been adopted for inclusion in the DSM, a definitive compilation of psychiatric and psychological diagnoses. Nor have the diagnostic factors Dr. Gutierrez identified been formally adopted by any professional body. (*Id.* at 347:25 to 348:1). In any event, general acceptance does not, in itself,

necessarily show a diagnosis to be a valid one.  *See Kumho Tire,* 526 U.S. at 149-50; *Daubert,* 509 U.S. at 588-94.

It is not essential, of course, that any disorder respondent has be one shared by others. But the lack of adequate proof that paraphilia NOS, nonconsent is a disorder among the general population tends, all other things being equal, to reduce the possibility that respondent suffers from it.

The essence of paraphilia NOS, nonconsent, of course, is that the person is aroused by the nonconsensual aspect of nonconsensual sexual encounters.  (*E.g.,* Tr. I 124:18-24).  But here, the record shows, as indicated, that respondent was impaired by alcohol, drugs, or both when he committed most of his sexual offenses, including all his rapes.  The record does not clearly rule out the possibility that the effects of any substances respondent consumed, such as loss of inhibition and impairment of cognition and judgment, account for his substance-related offense conduct, rather than arousal to the nonconsent of his victims.[35]  Even Drs. Phenix and Gutierrez acknowledge that the substance abuse played a significant role.  (*Id.* at 142:9-13 (Dr. Phenix); 144:7-23 (same); Tr. II 284:22 to 285:6 (Dr. Gutierrez)).  If the substance abuse-related offense conduct is deemed not to be the result of arousal to nonconsent, the other offense conduct is manifestly inadequate to establish a pattern sufficient to support a finding of paraphilia NOS, nonconsent.

Dr. Phenix testified that "there was clear sexual arousal . . . because he was able to maintain erections when he committed these clearly nonconsensual sexual assaults."  (Tr. I

---

[35] With respect to the diagnosis of paraphilias, the DSM specifically instructs that when diagnosing individuals who exhibit unusual sexual behaviors in conjunction with other conditions, such as substance intoxication, such unusual sexual behaviors "can be distinguished from a Paraphilia by the fact the that the unusual sexual behavior is not the individual's preferred or obligatory pattern, the sexual symptoms occur exclusively during the course of the mental disorders, and the unusual sex acts tend to be isolated rather than recurrent and usually have a later age at onset." DSM-IV-TR 568.

137:5-8).  In fact, though, there is scant evidence indicating whether or not respondent did maintain erections during the various assaults.  For example, V.R. #1 did not know whether respondent had ejaculated and a medical examination after the rape revealed no sperm.  (Gov't Ex. 18 at 1148, 1102).  Obviously, absence of ejaculation would be consistent with absence of maintenance of an erection and arousal generally.  R.J. was also unsure whether respondent ejaculated—he said he did not—although she said he was erect at the start of the rape.  (Gov't Ex. 15 at 1695, 1698).

Dr. Phenix cites respondent's reoffense after imposition of a sanction—the conviction in April 1991 for the rape of V.R. #1—as an indication of paraphilia NOS, nonconsent.  But here, the sanction was a relatively light penalty for the misconduct involved:  respondent was sentenced to 90 days active time and apparently served a period of about the same length in pretrial trial custody, for a total of only about 6 months of incarceration.  Moreover, this is the only penal sanction respondent received for sexual misconduct prior to the date his most recent incarceration began.  Thus, he committed all his other sex offenses without any sanction until his arrest in February 1998.  The continuation of respondent's offense conduct after his sentencing in 1991 is therefore not compelling evidence that respondent suffered from an intense, irresistible impulse to engage in nonconsensual encounters.

There is also an element of opportunism in respondent's offense conduct in that his victims were all either members of his family or girlfriends of his, or both.  Specifically, T.F., V.R. #1, V.R. #2, R.A., and C.R. are respondent's cousins and R.J. is the sister of his half-brother.  McCloud was a girlfriend, as was V.R. #1.  To be sure, with respect to several of his victims, including V.R. #1 and V.R. #2, respondent apparently manipulated the circumstances to create the opportunity for the offense conduct.  Nevertheless, the record does not fully explain

why, if respondent had an intense impulse to engage in nonconsensual sexual encounters his victim pool was as limited as it was. Dr. Daum agreed that there was an opportunistic aspect to respondent's offense conduct. (Tr. II 465:5 to 466:12).

Both Drs. Phenix and Gutierrez rely on the purported availability of McCloud to respondent as a willing sexual partner to support their diagnosis of paraphilia NOS, nonconsent. Their rationale is that since he had an outlet for consensual sexual relations when he was with McCloud, his offense conduct during that period must have been driven by an impulse for nonconsensual encounters. While this inference appears to be a logical one, no empirical evidence supporting it—or, as discussed, the other factors purportedly indicating paraphilia NOS, nonconsent—was presented. Moreover, it is not clear that McCloud was consistently a willing partner. There is, of course, respondent's admission in the 1999 Gray and Sadler report that she refused to have sex on several occasions and he forced himself on her anyway. Further, in questioning about the rape of R.J. on 13 November 1997, five days after it occurred, respondent stated that McCloud was due to give birth to their child in a month and that he last had sex, impliedly with her, six months earlier. (Gov't Ex. 15 at 1698). The six-month period would encompass not only the rape of R.J., but also the attempted rape of C.R.

Drs. Phenix and Gutierrez also rely on the results of the polygraph administered as part of the evaluation for the 1999 Gray and Sadler report. Of the four questions discussed in the report, the question at issue was: "Have you ever masturbated to a rape type fantasy?" (Gov't Ex. 10 at 1851). Respondent's response was "No." (*Id.*). The report stated that "[a] careful numerical evaluation of Mr. Antone's polygraph charts produced scores indicative to deceptive answers to

each of the relevant questions asked." (*Id.*). The inference Drs. Phenix and Gutierrez draw is

that respondent, whom they deem to have lied,[36] is aroused by nonconsensual sexual encounters.

The court finds this analysis unconvincing. The polygraph was taken over 12 years ago.

The record does not establish that its results, however interpreted, remain a valid indicator of

whether respondent currently suffers from a mental illness, abnormality, or disorder. Indeed, Dr.

Phenix concedes that she does not know whether respondent currently has rape fantasies. (Tr. I

225:17-22). As she testified, "I am not privy to what he fantasizes about . . . . I know absolutely

nothing about that . . . ." (*Id.* at 188:20-22).

There has also been no demonstration that polygraphs are a reliable means of determining

credibility for purposes of diagnosing mental illness, particularly in the context of civil

commitment. Such a demonstration is especially important given the hostility of the Fourth

Circuit toward polygraph results. While not addressing them in the context of civil commitment,

it has adopted a per se prohibition against their admission in criminal cases to support or impeach

credibility. *See, e.g.*, *U.S. v. Prince-Oyibo*, 320 F.3d 494, 497, 501 (4th Cir. 2003); *United States*

*v. Sanchez*, 118 F.3d 192, 197 (4th Cir. 1997).

Drs. Phenix and Gutierrez interpret respondent's purportedly deceptive answer as

signifying that respondent has had recurrent rape fantasies. (*See* Tr. I 136:20 to 137:4 (Dr.

Phenix); Tr. II 269:17-22 (Dr. Gutierrez); 273:7-8 (same)). But that is not what the question in

issue asked. Rather, it inquired, "Have you *ever* masturbated to *a* rape type fantasy?" (Gov't

Ex. 10 at 1851) (emphasis added). Thus, this question asked simply whether respondent had

masturbated to a rape type fantasy at least once. It does not otherwise specify the number of

---

[36] There is no express explanation in the record of the phrase "indicative to deceptive." Although the nonidiomatic wording suggests that it may have some technical meaning beyond respondent's simply not being truthful, all the testifying psychologists interpreted the phrase to mean simply that. The court therefore assumes the phrase signifies just that respondent was not truthful in his response.

such occurrences. Drs. Phenix and Gutierrez did not justify the expansive reading they gave to respondent's answer to the polygraph question.[37]

Dr. Phenix also testified that she relied on respondent's purported *admission* to having rape fantasies as a basis for her diagnosis of paraphilia NOS, nonconsent. (*See* Tr. I 138:24 to 139:4; 243:20-25; 244:1, 19-25). There is no evidence of any such admission. (*See, e.g.*, Tr. II 361:21 to 362:1). Dr. Phenix's error tends to further undercut the credibility of her opinion on paraphilia NOS, nonconsent.

Dr. Gutierrez also relied on another test performed as part of the evaluation for the 1999 Gray and Sadler report, the Multiphasic Sexual Inventory, that purportedly showed respondent's thought patterns were similar to those of rapists. As with the polygraph, the record does not establish the current validity of these results from over ten years ago. The record also does not clearly explain the significance of the results or demonstrate their reliability.

Moreover, while the Gray and Sadler report did not purport to diagnose respondent, it did state that "[i]t is possible that [respondent's] sexually aggressive and sexually deviant behavior patterns are the result of emotional and psychological disturbance, rather than persistent deviant sexual arousal or attraction." (Gov't Ex. 10 at 1865). Gray and Sadler made this observation with the benefit of an interview of respondent, which, as noted, Dr. Gutierrez did not have.

A final and central reason why the record fails to establish by clear and convincing evidence that respondent has paraphilia NOS, nonconsent is the absence of any manifestation by respondent of the paraphilia NOS, nonconsent since his incarceration began in February 1998, over 13 years ago. As Dr. Phenix put it, "I haven't seen any signs institutionally of sexual preoccupation." (Tr. I 188:18-19). This period of incarceration, as indicated, represents the

---

[37] Dr. Phenix erroneously testified that respondent was found deceptive solely with respect to the rape fantasy question. (Tr. II 245:2-7). In fact, he was found "indicative to deceptive" with respect to all four questions asked. (Gov't Ex. 10 at 1851). The error does not appear to be a material one.

majority of respondent's adult life. Drs. Phenix and Gutierrez hypothesize that without the constraints imposed by incarceration respondent would manifest his paraphilia NOS, nonconsent. (*See* Tr. I 158:12 to 159:18 (Dr. Phenix); Tr. II 353:18 to 356:4 (Dr. Gutierrez)). But that hypothesis is no substitute for actual manifestations of the disorder.

Dr. Daum agrees that there would have been manifestations if respondent had the impulse the diagnosis of paraphilia NOS, nonconsent posits. (*Id.* at 462:25 to 464:13). He contrasted the absence of impulsive conduct by respondent with, among others, a pedophile at LSH who would obtain an erection and lick and kiss the television screen when children's programs come on. (*Id.* at 463:14-15; 464:4-13).

The court also finds that the record does not establish by clear and convincing evidence that respondent has paraphilia NOS, hebephilia, a diagnosis only Dr. Gutierrez gave respondent. As with paraphilia NOS, nonconsent, paraphilia NOS, hebephilia is not included in the DSM, and the record does not establish that it is a disorder present in the human population generally. Dr. Daum does not appear to believe that it is a valid diagnosis. (*Id.* at 455:15 to 456:2; Tr. III 47:6-11).

Further, Dr. Gutierrez testified that a diagnosis of paraphilia NOS, hebephilia typically requires a five-year difference in age between the pubescent victim and the perpetrator. (*See, e.g.*, Tr. II 275: 22-24; 319:20 to 320:1). Here, there are only two incidents that meet this criterion—the 1992 or 1993 rape of V.R. #2 and the 1996 touching of R.A. While acknowledging that normal adult males can have a sexual attraction to pubescent females, Dr. Gutierrez cites, as indicated, to respondent's performance on the Multiphasic Sex Inventory and the Abel Assessment for Sexual Interest as helping to establish that respondent's arousal to this group is abnormally strong. (Tr. II 277:17 to 279:13). But both these tests were administered for

the 1999 Gray and Sadler report and their validity as an indicator of respondent's current condition has not been established. Nor has the reliability of either test. And, as with paraphilia NOS, nonconsent, there have been no manifestations of paraphilia NOS, hebephilia over the course of respondent's extended incarceration.

The court has considered whether the record shows by clear and convincing evidence that respondent suffers from any serious mental illness, abnormality, or disorder, other than polysubstance dependence, that was not diagnosed by the testifying psychologists, including any such condition not listed in the DSM. *See Carta*, 592 F.3d at 39-40. It has determined that the record does not.

### D. Third Element: Serious Difficulty Refraining

Because the court has found that respondent has the serious mental illness, abnormality, or disorder of polysubstance dependence, the issue presented with respect to the third element for commitment is whether as a result of the polysubstance dependence respondent would have serious difficulty refraining from sexually violent conduct or child molestation. The court finds that the government has failed to show by clear and convincing evidence that respondent would.

Among other reasons, the expert evidence shows that polysubstance dependence alone cannot generally account for the type of sexual offense conduct by respondent. Dr. Phenix testified, "in the field, we do not believe that substances are fully responsible, generally, for this type of sex offending history." (Tr. I 144:13-16). In a similar vein, Dr. Gutierrez testified to his "understanding that just a substance diagnosis alone could not essentially stand by itself for civil commitment." (Tr. II 351:11-13; Gov't Ex. 5 at 460 (excluding substance dependence as a serious mental illness, abnormality, or disorder that would cause respondent serious difficulty refraining)).

Case 5:07-hc-02042-FL   Document 114   Filed 04/30/12   Page 68 of 74

Further, respondent has not been shown to have consumed alcohol or drugs during the entire period of his incarceration over the last 13 or so years—again, representing the majority of his adult life. The court recognizes that during his incarceration respondent has been in a controlled environment where, among other constraints, access to alcohol and drugs is limited. Nevertheless, the absence of evidence of any use of alcohol or drugs over such an extended period substantiates that respondent has achieved a measure of self-control in this area and tends to undercut the notion that he would have serious difficulty refraining from polysubstance dependence if released and, to the extent that respondent's polysubstance dependence is a root cause of his offense conduct, serious difficulty refraining from sexually violent conduct and child molestation.

Respondent has also not engaged in sexual misconduct during his extended incarceration. This fact substantiates that he has achieved a level of sexual self-regulation and, again, tends to undercut the notion that he would have serious difficulty refraining from sexually violent conduct and child molestation if released. Similarly, the paucity of other behavioral problems with respondent during his incarceration evinces a degree of general self-regulation tending to undermine the notion that he would have serious difficulty refraining from sexually violent conduct and child molestation if released.

Respondent has been attending Alcoholics Anonymous on his own initiative for an extended time. Such attendance not only indicates his desire to control his polysubstance dependence problem, but also substantiates that he is enhancing his ability to do so. He has also completed a drug treatment program. While respondent has not attended sex offender treatment at FCI-Butner, he suggested at the hearing that he did not do so because he believed statements he made during treatment could be used against him in the commitment proceeding. (Tr. I 80:14

to 81:17).  Further, he acknowledged at the hearing that such treatment would probably help him and that he wanted it.  (*Id.* at 40:4-9; 81:22-25).  He had, of course, sought such treatment upon entering the federal prison system—indeed, access to treatment was the reason for his seeking entry into the federal system—but it was not then available to him.  All the testifying psychologists affirmed that sex offender treatment can be effective.  (Tr. I 193:22 to 194:3 (Dr. Phoenix); Tr. II 356:5-12 (Dr. Gutierrez); 458:25 to 459:25; 478:3-24).

As discussed, respondent has sought out counseling at FCI-Butner on a regular basis from Gallop, usually about his son but sometimes about anger management.  Dr. Daum considers respondent's doing so a very significant indicator that respondent recognizes that he has problems, takes responsibility for them, and seeks help for them.  (Tr. III 49:21 to 50:3).  Respondent's desire to improve himself is also evinced by his completion of numerous classes and acquisition of various skills while incarcerated.

Significantly, respondent is subject to an extended term of supervised release—five years.[38]  With respondent's consent, the district court in Arizona on 3 November 2011 added the condition that respondent "reside and participate in a residential re-entry center for 365 days, unless discharged earlier by the probation officer."  (Waiver & Order (D.E. 24), *United States v. Byron Antone*, No. 4:99-CR-906-JMR (D. Ariz.)).  Thus, during his first year of release, respondent will be in a halfway house.

In addition, the terms of supervised release include many measures addressed to substance dependence as well as to sexual conduct directly.  As to substance dependence, respondent must participate as instructed by the probation officer in a substance abuse treatment program, which may include substance abuse testing; otherwise submit to such periodic drug

---

[38] At the hearing, Dr. Phenix was under the misunderstanding that the period of supervised release was four years. (Tr. I 194:4-6).

tests as directed from time to time by the probation officer; and abstain from the use of alcoholic beverages and other intoxicants during and after the course of substance abuse treatment. (Gov't Ex. 7 at 5, 1st ¶ (unnumbered) & ¶¶ 8, 9, 16; 6 ¶ 1). The conditions relating directly to sexual conduct include: participation in sex offender treatment as directed by the probation officer, including submission to risk assessment and related testing; mental health treatment as directed by the probation officer; and prohibitions against contact with children, engagement in work providing access to children, and possession of a computer with online computer services absent prior written approval by the probation officer. (*Id.* at 6 ¶¶ 3, 5-11. 13-15). These conditions, as well as the others (Gov't Ex. 7 at, *e.g.*, 5 ¶ 1-7, 10-15; 6 ¶¶ 2, 4, 12), while not as restrictive as incarceration, should tend to lessen any difficulty respondent would otherwise have refraining from sexually violent conduct and child molestation, both directly and indirectly, to the extent that his sexual offense conduct is rooted in his polysubstance dependence. *See Turner*, 2012 WL 965985, at *2; *Neuhauser*, 2012 WL 174363, at *3.

That conclusion finds strong support in Dr. Daum's opinions. As noted, he believes that placement in a halfway house together with intensive outpatient treatment should be sufficient to prevent reoffense by respondent without need for commitment. (Tr. II 458:25 to 459:25). These resources would appear to be available to respondent back in the area of Arizona where he was living. (*See* Tr. I 396:13 to 408:19).

The foregoing considerations address many of the factors cited by Drs. Phenix and Gutierrez as showing that respondent would have serious difficulty refraining from sexually violent conduct and child molestation, recognizing, of course, that their analyses were based on multiple diagnoses the court has rejected under the clear and convincing standard. For example, the nature, pattern, and duration of respondent's offense conduct is not as reliable an indicator of

his behavior if released as they posit because of, among other reasons, the extended intervening period in which there was no manifestation of such conduct. Similarly, his lack of sex offender treatment and need for more substance abuse treatment can be addressed on an outpatient basis as part of his five-year supervised release, including his placement in a halfway house during the first year. While respondent does not have positive social influences among his family and friends, he will have such influences during his supervised release, which will provide him the opportunity to develop such influences on a more permanent basis. The fact that respondent reoffended after his 1991 conviction is not convincing evidence that he would have serious difficultly refraining from sexually violent conduct and child molestation for the same reasons that it does not substantiate that he has paraphilia NOS, nonconsent, as previously discussed.

Finally, with respect to the actuarial risk assessments performed by Drs. Phenix and Gutierrez, as well as Dr. Daum, the court has given them little weight. While the court concludes that these tools may be useful in identifying, from a large population, individuals who may warrant further, more detailed evaluations, it does not find them to be helpful in determining whether any one individual with a unique history and set of characteristics may be likely to reoffend. As one court has stated, while the recidivism rates generated by these risk assessments "are circumstantially relevant to the serious difficulty inquiry because offenders who continually expose themselves to punishment may be presumed to have the most difficulty refraining from sexual reoffending, . . . the ultimate question called for by [§ 4248] concerns the self-control of an individual, not the statistical rearrest patterns of a given population." *United States v. Hunt*, 643 F. Supp. 2d 161, 180 (D. Mass. 2009). The *Hunt* court further stated that while it had considered the respondent's actuarial scores, it had "afford[ed] them less weight than Respondent's past conduct, the severity of his pedophilia, and the testimony of the experts." *Id*.

More recently, this court rejected the use of actuarial instruments to assess serious difficulty in refraining, noting an expert's opinion that "due to their low predictive value such instruments should not be used in an effort to predict the dangerousness in an individual case." *United States v. Revland*, 5:06-HC-2212, 2011 WL 6749814, at *6 (E.D.N.C. 23 Dec. 2011); *see also* Order (D.E. 110)*, United States v. Red Star*, No. 5:06-HC-2222-BR, 6-7 (E.D.N.C. 3 Jan. 2012) (noting that court considered respondent's actuarial scores, but "afford[ed] them less weight than [respondent's] past and current conduct, and the testimony of the experts as a whole"). The court's approach in this case is comparable.[39]   Given the paucity of the other evidence showing that respondent would have difficulty refraining from sexually violent conduct and child molestation, the court's attribution of little weight to the actuarial assessments is not a critical part of its determination of that issue.

## VIII.   CONCLUSION

For the foregoing reasons, it is RECOMMENDED that that respondent be found not to be a sexually dangerous person within the meaning of the Adam Walsh Child Protection and Safety Act of 2006, 18 U.S.C. § 4247(a)(5), and that he be released forthwith.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in which to file written objections.   Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

---

[39] With respect to the MnSOST-R, the court finds persuasive the criticisms relating specifically to it voiced by Dr. Daum, as set forth in footnote 33 above.

SO ORDERED, this the 30th day of April 2012.

James E. Gates
United States Magistrate Judge